**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION | * <br> <br> * <br> <br> * |
| | MDL No.: 19-md-2879 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | * <br> *     JUDGE GRIMM <br> * |

\*   \*   \*   \*   \*   \*   \*   \*          \*   \*   \*   \*   \*   \*   \*   \*


**PLAINTIFFS' INTERIM COORDINATING COUNSEL'S**
**LEADERSHIP APPLICATION FOR THE CONSUMER TRACK**

Andrew N. Friedman
D. Md. Bar No. 14421
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, D.C.  20005
Tel. 202-408-4600
afriedman@cohenmilstein.com

James J. Pizzirusso
D. Md. Bar No. 20817
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C.  20006
Tel. 202-540-7200
jpizzirusso@hausfeld.com

Amy E. Keller
D. Md. Bar No. 20816
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Tel. 312-214-7900
akeller@dlcfirm.com

*Proposed Co-Lead Counsel*

**Dated:**  April 19, 2019

## TABLE OF CONTENTS

1.  **Proposed Leadership Structure of the Slate** ................................................... 2

2.  **The Slate's MDL and Class Action Experience** ............................................ 3

    Andrew N. Friedman .............................................................................................. 4

    Amy E. Keller ........................................................................................................ 7

    James J. Pizzirusso ............................................................................................... 10

    David M. Berger ................................................................................................... 13

    Megan Jones .......................................................................................................... 14

    James Ulwick ........................................................................................................ 16

    Lesley Weaver ....................................................................................................... 17

    Hassan Zavareei .................................................................................................... 19

3.  **Funding of the Litigation** .................................................................................. 22

4.  **Any Agreements with Other Counsel in the Case** ......................................... 22

5.  **Monitoring Billing, Controlling Costs, and Avoiding
    Duplication of Effort** ......................................................................................... 23

6.  **Additional 23(g) Factors** ................................................................................... 23

    **CONCLUSION** ................................................................................................... 26

In Case Management Order No. 1, the Court appointed Andrew N. Friedman from Cohen Milstein Sellers & Toll PLLC, as well as Megan Jones and James Pizzirusso from Hausfeld LLP, to "coordinate with all counsel with respect to the effective preparation for and conduct of the Case Management Conference." CMO 1, ECF No. 23 at 2. Consistent with the Court's early guidance, these attorneys demonstrated that they can work effectively and collaboratively not only with defense counsel, but with plaintiffs' counsel from the dozens of other cases comprising this MDL. Now, these same attorneys respectfully seek interim appointment of themselves and a right-sized, diverse slate of experienced, talented, and independent lawyers to lead the action (the "Interim Coordinating Counsel Slate" or "ICC Slate"). The Court should appoint the ICC Slate because, among other reasons, it: (a) includes attorneys or leadership from nearly every major data breach case litigated to date, including *Equifax*, *Home Depot*, *Anthem*, *Facebook, Target, Wendy's, Arby's, Premera*, and *Hutton*; (b) is led by lawyers who coordinated this case since the outset from moving and arguing before the JPML for transfer of the pending cases to this Court to handling the Court's pre-conference submissions; (c) includes the team that filed the first—and *only*—complaint in this MDL containing plaintiffs from all fifty states,[1] which will allow the case to proceed expeditiously; and (d) is composed of a carefully-selected team which will bring complementary skills to bear in this case, including recognized thought leaders in the bar on e-discovery (through the Sedona Conference and elsewhere), seasoned trial lawyers familiar with this Court, and tried and true experts in the field of data breach litigation.

---

[1] *Vetter, et al. v. Marriott International, Inc.*, No. 19-cv-00094 (D. Md.), ECF No. 1.

### 1.      Proposed Leadership Structure of the Slate

Our proposed leadership slate is comprised of the following individuals:

*Co-Lead Counsel*: (1) **Andrew N. Friedman**, Cohen Milstein Sellers & Toll PLLC; (2) **Amy E. Keller**, DiCello Levitt Gutzler LLC; and (3) **James J. Pizzirusso**, Hausfeld LLP.

*Plaintiffs' Steering Committee*: (1) **David Berger**, Gibbs Law Group LLP; (2) **Megan Jones**, Hausfeld LLP; (3) **James Ulwick**, Kramon & Graham, P.A.[2]; (4) **Lesley E. Weaver**, Bleichmar Fonti & Auld LLP; and (5) **Hassan Zavareei**, Tycko & Zavareei LLP.[3]

This representative slate, selected from the pool of cases pending in this MDL, is a product of a "private ordering" process, where individuals came together because of their desire to assemble the team "best suited" to represent the class, while ensuring the case is zealously, cooperatively, efficiently, and successfully litigated. *See* Rule 23(g)(A) and *Manual for Complex Litigation* (4th) ("*Manual*") § 14.211. The ICC Slate also reflects the diversity of the bar and the plaintiff class—from the standpoint of age, race, gender, sexual orientation, experience, and geographical location—following guidance from the Duke Law Bolch Judicial Institute's *Standards and Best Practices for Large and Mass-Tort MDLs* ("*Duke Standards*"), which

---

[2] Mr. Ulwick's office is located in Baltimore, Maryland. For efficiency, we propose that he may also perform the duties of liaison counsel; however, should the Court wish to appoint other individuals in Greenbelt, Maryland, our slate would be happy to work with any attorney the Court wishes to appoint in that role.

[3] All three of the proposed Co-Lead Counsel, as well as Megan Jones, James Ulwick, and Hassan Zavareei, are fully admitted to practice in this Court. Accordingly, they are familiar with the Court's Local Rules and procedures. Our team has proposed a slate with five PSC members; however, should the Court feel the need to add additional counsel, we welcome the opportunity to work with many of the other qualified applicants as we have worked with nearly all of them in other matters. While Ms. Jones was appointed as one of the Interim Coordinating Counsel, to avoid having two attorneys from the same firm as Co-Leads in this matter, she is willing to serve on the PSC or in another role, at the Court's discretion.

encourage "appointment of an experienced slate of attorneys" who will "fairly represent all plaintiffs, keeping in mind the benefits of diversity of experience, skills, and backgrounds."[4]

This Slate was not formed by reaching agreements with other counsel to drum up support for the Slate.  Instead, it came together considering the needs of the case, not because of deals contingent on promises of future work in other cases.[5]  The Slate was crafted for the purpose of assembling the right combination of talent, personalities, and data breach experience to best and most efficiently prosecute *this* case, in *this* Court, against *these* Defendants.[6]  A chart of the slate's proposed structure is attached hereto as Exhibit B.

### 2.     The Slate's MDL and Class Action Experience

Each of the attorneys listed below has significant and varied skills directly applicable to the current litigation.  The Slate was designed to ensure that the class is well-represented by an experienced, skilled, and diverse group of people who will commit their time, resources, and unique talents to this litigation.  Further, and important to any case affecting a significant percentage of the U.S. population, the Slate shores up the credibility of the justice system by appointing truly representative counsel:  attorneys from both Coasts and the Midwest (including

---

[4] David Rock and Heidi Grant, *Why Diverse Teams Are Smarter*, Harv. Bus. Rev. (Nov. 4, 2016), https://hbr.org/2016/11/why-diverse-teams-are-smarter.  Lesley Weaver, one of the proposed PSC members, is a team leader drafting Standards and Best Practices for Increasing Diversity in Mass Tort and Class Action Leadership for the Duke Law Bolch Judicial Institute, and has served as a panelist at related conferences. *See Panel 1: Data on and Barriers for Women and Diverse Lawyers Attaining Leadership Positions*, Duke Law Bolch Jud. Inst., https://judicialstudies.duke.edu/conferences/diversify-leadership-positions/panelists.

[5] Indeed, while various attorneys who have filed cases in this MDL have inquired about assisting the Slate, no Slate members have sought any support in connection with this application.

[6] Accordingly, movants respectfully suggest that the Court appoint the Slate as a whole, even if others are added.  *See generally Duke Standards*, Best Practice 4C(ii) ("The transferee judge should be mindful of the importance of harmony among the leadership team, and between the leadership team and both the court and opposing counsel.").

several from D.C. and Baltimore, who are close to and admitted in this Court); younger attorneys and more seasoned attorneys with substantial trial experience; attorneys who have represented both defendants and plaintiffs; and attorneys who are on the cutting edge of the cybersecurity field. They are all significantly qualified and complement each other's skill sets and talents.  A summary of the attorneys' former and current class action and MDL leadership appointments can be found at Exhibit A.

### Proposed Co-Lead Counsel

__*Andrew N. Friedman*__ is a Partner at Cohen Milstein, a firm recognized as "the most effective law firm in the U.S. for lawsuits with a strong social and political component," and one of "America's 25 Most Influential Law Firms."[7]  Practicing in the class action field since 1985, Mr. Friedman co-chairs the firm's Consumer Protection practice group and specializes in litigating complex, multi-state class action lawsuits against manufacturers and consumer service providers such as banks, insurers, credit card companies, and other entities using or storing consumer information.  He has been lead or co-lead counsel in numerous important cases, bringing relief to millions of consumers and recovering hundreds of millions of dollars in class actions.  He is widely recognized as a leader in enforcing consumer rights and known as a "hands-on" lawyer who has crafted creative relief when money alone is insufficient.

Mr. Friedman was named a *Law 360* Cybersecurity and Privacy MVP in 2018, and that same publication named his Consumer practice group as Practice Group of the Year in Privacy in 2017, and one of the Consumer Protection Groups of the Year in 2019.  He has been named a Washington, D.C. *SuperLawyer* in 2010, and from 2013 through 2018.  In 2011, *Lawdragon*

---

[7] *InsideCounsel Magazine*; The National Trial Lawyers, America's 25 Most Influential Law Firms (2018), https://www.thetriallawyermagazine.com/wp-content/uploads/2019/01/2018-the-forum.pdf.

named him one of the Leading Plaintiffs' Lawyers.  His work has been cited in the media and his litigation talents were profiled in the April 14, 2000 *Washington Business Journal*.  Mr. Friedman is a noted speaker who has appeared on numerous panels for legal education seminars and institutional investor conferences on the issues of consumer and securities class actions.

In 2015, Mr. Friedman was appointed by the Honorable Lucy Koh as one of two Co-Lead (among hundreds of applicants) in the watershed data breach case against Anthem Inc. for the exfiltration of 78.8 million customers' personal information, including social security numbers. Under Mr. Friedman's leadership, a team of attorneys aggressively pursued compensation from Anthem, its affiliates, numerous Blue Cross Blue Shield entities, and the Blue Cross Blue Shield Association.  Through arguments made in several rounds of motions to dismiss, plaintiffs successfully sustained claims and damage theories that are on the cutting edge of privacy and data breach jurisprudence, including the ability to pursue: a) "benefit of the bargain" damages for the difference between data security received and security promised; (b) contract and consumer protection act claims damages; and (c) damages for loss of value of Personally Identifiable Information.

In *Anthem*, Mr. Friedman's team took or defended more than 200 depositions and reviewed 3.8 million pages of defendants' documents.  Ultimately, Mr. Friedman and his co-counsel mediated an historic $115 million settlement, then the largest court-approved settlement ever in a consumer data breach litigation.  This record-breaking settlement, which became the model for future data breach settlements, provides: multiple years of first-rate credit monitoring or alternative cash compensation; payment of out-of-pocket losses related to the breach; fraud resolution services (even if the class member does not submit a claim form); and significant data security practice changes and commitments by Anthem for three years.  In finally approving the settlement in

August 2018, Judge Koh called the deal "exceptional" and noted that the settlement was "carefully calibrated to provide substantial benefits to all of the settlement class members."

As the attached Exhibit A[8] shows, Mr. Friedman has been intimately involved in a number of other privacy and data breach matters including *Schmidt v. Facebook, Inc.* (Co-Lead Counsel in nationwide class action against Facebook for breach of personal data of approximately 29 million people); *Equifax* (PSC and Co-Chair of the Expert Committee on consumer side of litigation concerning the 2017 breach); *Home Depot* (PSC member on financial institution side of data and privacy case, member of several subcommittees, and head of the Expert Committee; Settlement of $25 million approved); and *In Re: Vizio, Inc., Consumer Privacy Litig.* (PSC in data and privacy case relating to Vizio Smart TVs' default feature that tracks what viewers watch; resulted in settlement (preliminarily approved) of $17 million).

Mr. Friedman's consumer protection practice extends beyond data breach and privacy cases, leading numerous significant class actions. In *Snyder v. Nationwide Mut. Ins., Co.*, Mr. Friedman represented consumers for marketing abuses related to the sale of so-called "vanishing premium policies," when such policies were based upon unrealistic interest rate projections, which never resulted in premiums "vanishing." Mr. Friedman negotiated a class-wide settlement valued at between $85 and $103 million—one of several vanishing premium cases he has handled. Mr. Friedman also represented a nationwide class of consumers against Symantec related to the marketing of a re-download service in conjunction with the sale of Norton software, resulting in a $60 million all-cash settlement after the class was certified and one month before the case was set

---

[8] The cases cited in Exhibit A do not include the approximately 35-plus additional class actions in which Mr. Friedman functioned as lead or principal counsel, but for which no formal designation was made of him by the Court as "lead" (*e.g.*, cases where his firm and not an individual was selected as "lead counsel").

for trial. His technical expertise in litigation also extends to a $100 million settlement he negotiated against Thompson Consumer Electronics for unreimbursed repairs to defective televisions, and combined settlements resulting in $15.5 million related to negative options programs and improper post-transaction marketing against Intelius, Inc.

Prior to his current role as Co-Chair and member of the Consumer Protection group, Mr. Friedman was a member of the Securities Litigation & Investor Protection practice, litigating numerous securities class actions, including *Globalstar Securities Litigation* (S.D.N.Y.), in which he served as one of the lead trial counsel. The case settled in 2005 for $20 million during the second week of the trial.

As the above and attached Exhibit A demonstrate, Mr. Friedman is presently litigating several class actions in leadership positions; however, he is not involved in any other pending MDLs and the existing cases would not interfere with his ability to commit the significant resources of time and effort this case requires. The resume for Mr. Friedman and his firm is attached as Exhibit D.

**_Amy E. Keller_** is a partner of the law firm DiCello Levitt Gutzler LLC,[9] where she chairs the firm's technology litigation practice, primarily focusing on issues of privacy and consumer protection. Recognized as a "rising superstar" by her colleagues in the bar, with a "deep and thoughtful understanding of the most difficult issues in consumer class actions,"[10] Ms. Keller has a significant amount of experience leading consumer and technology cases.

---

[9] Formerly known as DiCello Levitt & Casey LLC.

[10] Chris Bruce, *Rising Class-Action 'Superstar' Keller Takes Lead in Equifax Case*, Bloomberg BNA (Feb. 26, 2018), *available at* https://www.bna.com/rising-classaction-superstar-n57982089249.

Perhaps most significantly, for purposes of this litigation, Ms. Keller was appointed by Chief Judge Thomas Thrash in the United States District Court for the Northern District of Georgia to serve as Co-Lead Counsel in the pending *Equifax* MDL, where she represents a putative class of nearly 150 million people in connection with Equifax's massive 2017 data breach—*the youngest woman ever appointed to such a position*. That case, which has significant similarities to this case, resulted in the compromise of credit card numbers, Social Security numbers, drivers' license numbers, and other personal information of nearly half of the United States' population. With her fellow Co-Lead Counsel, Ms. Keller actively oversees a PSC of seven, along with two Co-Liaison Counsel, and a State Court Coordinating Counsel. She argued a significant portion of the motion to dismiss, which resulted in an 80-page opinion sustaining the most important, and wide-reaching of the consumer plaintiffs' claims.[11]

Ms. Keller has substantial, additional experience in litigating consumer protection, privacy, and technology cases, including her appointment to the Executive Committee and Co-Chair of Law and Briefing in *In re: Apple Inc. Device Performance Litig.*, a pending international class action against Apple Inc. related to device performance and throttling. She has also held leadership roles in actions requiring significant work in the calculation of class-wide damages and the development of models to explain class member injury—issues directly applicable to this case, as the Defendants have already indicated that they will be challenging class member standing. *See, e.g., Catalano v. BMW of N. Am., LLC, et al.* (interim settlement counsel for nationwide settlement providing repair and replacement of certain electrical parts in automobiles); *Roberts, et al. v.*

---

[11] To the extent the Court wishes to learn more about Ms. Keller's work as Co-Lead Counsel in the *Equifax* litigation, we respectfully suggest that the Court contact David Balser, of King & Spalding LLP, Equifax's lead counsel in that litigation (tel. 404-572-2782), who has agreed to serve as a reference for Ms. Keller with respect to her leadership application here.

*Electrolux Home Prods., Inc.* (Co-Lead in nationwide settlement benefitting owners of certain, allegedly defective, clothes dryers).  Ms. Keller was also recently appointed Co-Lead Counsel in *T.S. Kao, Inc., et al. v. North American Bancard, LLC*, a nationwide class action against a credit card processor for overcharging merchants in violation of its agreements, requiring a significant amount of work with experts to develop a damages methodology and proposed apportionment of a proposed $15 million settlement fund.

Ms. Keller's partners at DiCello Levitt have been widely regarded as attorneys at the forefront of privacy and data breach litigation—beginning with Adam Levitt, who was recognized as a "pioneer" in the field by Judge James Ware, former Chief Judge of the United States District Court for the Northern District of California.[12]  Ms. Keller's work continues to advance the practice, focusing on forward-looking theories of liability and novel damages modeling, resulting in her having been named a *National Law Journal* Plaintiff Trailblazer for her work on privacy, data breach, and technology litigation.  Ms. Keller's leadership on consumer protection extends beyond her case load.  Significantly, she serves on the Sedona Conference's Working Group 11 on Data Security and Privacy Liability ("WG11"), where she is also a member of the Model Data Breach Notification Principles drafting team, charged with preparing commentary, principles, and best practices to guide the development of data breach notification laws.  She also serves on *Law360*'s Editorial Advisory Board on Cybersecurity & Privacy, providing the plaintiffs' perspective on the importance of maintaining robust cybersecurity hygiene and the types of damages that consumers often sustain in the event of data breaches.

---

[12] Mr. Levitt is also an Advisory Council Member of the Duke Law Bolch Judicial Institute, the entity responsible for the above-referenced *Duke Standards*.

Ms. Keller and her firm, which has offices in Chicago, Cleveland, New York, and St. Louis, have recovered billions of dollars for their clients, and are well-resourced and able to handle this litigation.  Of particular note, DiCello Levitt is the only plaintiff-side law firm with an in-house focus group and mock jury practice, which allows the firm to narrow the issues which will be important to the judge and jury before discovery even commences.  Ms. Keller's partners are also acknowledged as *SuperLawyers*, Leading Lawyers by *Lawdragon*, AV-Rated by Martindale-Hubbell, included in the *Law Bulletin*'s and *National Trial Lawyers'* 40 Under 40 lists, and included in the *Best Lawyers in America* publication.  Beyond recognition from legal publications, the firm's attorneys have contributed to the legal community through scholarship and speaking engagements, testifying before the Illinois Supreme Court Rules Committee on class action practice, and chairing an annual class action litigation conference in Chicago.  If appointed as Co-Lead Counsel, Ms. Keller—with the full personnel and financial support of her firm—is ready, willing, and able to commit the necessary resources to leading this litigation to a successful conclusion.  The resume for Ms. Keller and her firm is attached hereto as Exhibit E.

**_James J. Pizzirusso_** is a partner at the law firm of Hausfeld LLP, which is widely-acknowledged as one of the nation's preeminent and most successful class action law firms with over 120 lawyers in eleven offices (including six in Europe).  According to the *Global Competition Review*, Hausfeld "is clearly recognized as one of the best plaintiffs' firms in the country." Hausfeld has recovered billions of dollars for its clients and courts have appointed the firm's attorneys to leadership positions in hundreds of cutting-edge cases.  In this case in particular, Hausfeld's attorneys are particularly well-suited to lead this litigation given the firm's extensive resources and experience in cybersecurity matters; its nationally-recognized skills in electronic discovery; and its offices in Washington, D.C. (near this Court and Marriott's headquarters), New

York, New York (near Starwood's headquarters), and numerous European offices, to the extent discovery regarding foreign passport holders is necessary.

James Pizzirusso is a founding partner of Hausfeld, head of its Cybersecurity/Privacy and Consumer practice groups, and a nationally recognized data breach lawyer. In 2017, the *National Law Journal* recognized Mr. Pizzirusso as a Cybersecurity Trailblazer, one of only two plaintiffs' lawyers in the country to achieve that distinction. In 2012, he was also named one of four Rising Stars under 40 by *Law360* in Consumer Protection and Privacy law. He is also an active member of WG11, serving as a dialogue leader at the last two of WG11's annual meetings. He is currently the sole plaintiffs' bar member helping to draft WG11's "Reasonable Security Test" commentary and serves on its Membership Committee, as well. *SuperLawyers* has recognized Mr. Pizzirusso as a "Top Rated Class Action & Mass Torts Attorney" in Washington, D.C.

Courts have appointed Mr. Pizzirusso to leadership positions in numerous data breach and consumer cases and he has overseen hundreds of lawyers working under him. He is currently appointed in three active data breach matters. In *Arby's*, he serves as Co-Lead Counsel, where he is managing defensive discovery and leading the class certification briefing team. He argued the propriety of pre-trial class communications before Judge Amy Totenberg (the case has recently been transferred to the newly-appointed Judge Billy Ray). In the *Equifax* MDL, he serves as a PSC member, and has personally overseen the vetting and review of hundreds of individual plaintiffs from the dozens of coordinated cases to determine who would be suitable to serve as class representatives in the consolidated complaint, as well as managing all plaintiff-related discovery. He also briefed the standing-related issues in connection with Equifax's motion to dismiss and serves on the Settlement Committee. In the *Premera* MDL, he serves on the Executive Committee, where he has overseen exfiltration-related discovery and taken multiple depositions.

He also handled all *Daubert*-related briefing and argument related to seeking to exclude defendant's experts at class certification before Judge Michael Simon (motions pending).

Mr. Pizzirusso's recently-resolved data breach and privacy matters include *Wendy's* (PSC Member; $50 million settlement pending); *Kmart Corp.* (Co-Lead; $18.5 million settlement, handled approval arguments before Judge John Lee); *Home Depot* (PSC Chair; $40 million settlement, attorneys' fees on appeal); and *Target* (Financial Institution Executive Committee; $60 million settlement, handled privilege motions before then Magistrate Judge Arthur Boylan (ret.)). Other active consumer cases include *Bhatia v. 3M Company* (PEC Chair, $30 million settlement pending); and *Morris v. Bank of America* (leadership appointment pending). While Mr. Pizzirusso maintains an active case load, many of his current cases are in the process of resolving and none of his matters would interfere with his ability to devote substantial time as Co-Lead Counsel in this matter. Given his Washington, D.C. location, he is fully committed to appearing in person at Court hearings without travel expense to the Class and, if appointed, will not delegate his leadership functions.

Beyond cybersecurity and consumer rights, Mr. Pizzirusso has maintained an active class action practice in other areas, including antitrust, environmental, and sports and entertainment law. In the antitrust field, he prevailed on motion to dismiss arguments in the *Potatoes* price fixing case before Judge Lynn Winmill, creating new law on the Capper Volstead Act. In the *Eggs* price fixing matter, he succeeded in knocking out Defendants' Capper Volstead defense on summary judgement before Judge Gene Pratter and assisted on the recent trial of that matter. He has also served as an adjunct and visiting professor at George Washington University School of Law. Mr. Pizzirusso has been asked to speak on numerous ethics issues facing practitioners including "An Ethical Journey Through E-Discovery" at the ABA's Spring Antitrust Meeting (he also serves as

Co-Chair of the ABA Antitrust Section's Food and Agriculture Committee) and "Ethics and Pitfalls to Avoid in Class Action Litigation," at the Class Action Roundtable. Numerous organizations, including *The International Who's Who of Competition Lawyers & Economists*, *The Benchmark Plaintiff Guide to America's Leading Plaintiff's Firms and Attorneys*, and *Who's Who Legal: Competition* have named him as one of the country's leading antitrust practitioners, as well. The resume for Mr. Pizzirusso and his firm is attached hereto as Exhibit F.

### Proposed Plaintiffs' Steering Committee Members

**_David Berger_** has obtained substantial benefits for consumers injured in some of the largest and most sophisticated data breach and privacy class actions and MDLs.  Mr. Berger has expert knowledge of the legal claims, theories, and strategies involved in data breach cases.  As a core member of the team litigating the *Anthem* data breach MDL, Mr. Berger helped achieve the largest consumer settlement yet approved in a data breach class action, in hotly-contested litigation on an extremely compressed schedule.  He has also served a core member of litigating teams in *Equifax*, *Adobe*, *Banner Health*, and *Excellus BlueCross BlueShield* given his expertise in cybersecurity.

Mr. Berger augments his litigation experience with a deep, technical understanding of cybersecurity—from hacking techniques and cybersecurity controls, to industry standard IT practices, information security frameworks, and auditing processes.  He has taken technical depositions of the Chief Information Security Officers and information security professionals at Fortune 500 corporations, worked with expert witnesses on cutting-edge cybersecurity and damages theories, and reviewed hundreds of thousands of technical documents.  Mr. Berger's understanding of cybersecurity and privacy is unparalleled in the plaintiffs' bar, and he has become the "go to" attorney to negotiate business practice changes in data breach settlements, often directly with the defendants' IT executives.

13

Mr. Berger holds the Certified Internet Privacy Technologist (CIPT) certification through the International Association of Privacy Professionals, a program primarily designed for career IT professionals, allowing him to effectively communicate directly with company witnesses, without the need for expert translation.  In addition, Mr. Berger regularly speaks at conferences and seminars on data breach and privacy litigation.

Although Mr. Berger has not previously applied for a leadership position in a class action, he has an excellent reputation among the plaintiffs' data breach and privacy bar and has worked alongside many of the attorneys applying for leadership positions in this litigation.  Mr. Berger's partner, Eric Gibbs, has been appointed to leadership in numerous data breach cases, and Mr. Berger assumed substantial responsibility for leading those cases.  While he would be an important part of our slate, it is beyond question that he would be an irreplaceable part of any leadership team chosen by the Court.

Mr. Berger has substantial time to devote toward this MDL, and, if appointed to the PSC, would work closely with Plaintiffs' technical and liability experts to understand the mechanism for the breach, and remedial measures that should be taken to improve Marriott's cybersecurity. The resume for Mr. Berger and his firm is attached hereto as Exhibit G.

**_Megan Jones_** is known as a "trailblazer" who is "highly respected from all contingents"[13]—and, indeed, was recently praised by a member of the JPML as one of "the nation's best lawyers in an MDL" and heralded as a "professional problem solver."[14]

With 19 years' experience, Ms. Jones is a recognized e-discovery expert who has presented at the ABA's _National Institute of Electronic Discovery_ multiple times, and knows how to reduce

---

[13] _Competition 2018: Plaintiff Lawyers_, Who's Who Legal (May 2018), http://bit.ly/2qVlEJB.

[14]  Transcript of August 30, 2018 Hearing at 23, _In re Blue Cross Blue Shield Antitrust Litig_., No. 2:13-cv-20000 (N.D. Ala.).

the burdens of such discovery on the parties and the Court.  For example, in *In re Blue Cross Antitrust Litig.*, Ms. Jones proposed, and the Court adopted, a novel approach to privilege review when defendants together had over 700,000 privilege log entries: a sampling process by which a Special Master could rule in a manner that could apply to de-designate similar documents on the logs. Through this process, nearly half of the privilege log entries have been de-designated (including by defendants' agreement), without burdening the court with repetitive and lengthy motions to compel.  In addition to other conferences, Ms. Jones spent two days as faculty, training plaintiffs and defense lawyers how to conduct ESI negotiations using cooperation at the Sedona Conference's 2017 *eDiscovery Negotiation Training: Practical Cooperative Strategies*. Similar sensibilities will be applied here if she is part of the Plaintiffs' Steering Committee.

Megan's approach to discovery is both reasonable and relentless.  She carefully chooses her legal battles, avoids a boilerplate approach, and eschews gamesmanship for the sake of gamesmanship.  Mindful of scarce judicial resources in complex litigation that can last years, she develops a discovery strategy at the outset about what particular legal issues need judicial attention and clears the board of the rest.

In addition to the foregoing, Ms. Jones has two decades of settlement negotiation experience in complex litigation.  Known for her ability to craft creative solutions to thorny subjects, she is adept at bridging the divide among even the most disparate parties.  She has worked with renowned mediators as well as led independent negotiation teams to obtain hundreds of millions of dollars for classes in her career.  Serving in leadership positions in only three cases, she is able to devote a substantial amount of her time toward this litigation and, if appointed to the PSC, would use her expertise in discovery to negotiate appropriate protocols and oversee offensive discovery.  The resume for Ms. Jones and her firm is attached hereto as Exhibit F.

**_James Ulwick_** is a principal at Kramon & Graham, PA, with more than 30 years' experience in class actions and multi-district litigations, most of which have been managed in this District.  Mr. Ulwick has served as court-appointed plaintiffs' Lead Class Counsel in *In re American Honda Dealers Litigation*, a case in this District, and has served as the lead defense trial counsel in a class action in *In re Titanium Dioxide Antitrust Litigation*, also in this District.  He has also been appointed by the Montgomery County Circuit Court (Rubin, J.) to represent one of the few defendant classes ever certified in the State of Maryland in *Yang v. G & C Towing, Inc*.

Mr. Ulwick currently serves as putative class counsel in two class actions pending in this District: *Jackson v. Viking Group, Inc*. and *Scalsky, et al. v. American Honda Motor Co., Inc., et al*.  Neither case is expected to require a substantial investment of Mr. Ulwick's time, for reasons which can be explained *ex parte*, if necessary.

If appointed, Mr. Ulwick will assist with trial preparation and serve on the trial team.  He is widely-recognized as one of Maryland's finest trial lawyers.  He has tried dozens of cases in this Court, as well as in the state courts of Maryland.  Those cases include a broad array of claims, and include representation of both plaintiffs and defendants.  For example, his most recent cases include: *Engility, Inc. v. Nell, et. al.* (represented six defendants in unfair competition jury trial brought by defense contractor; non-suited by Plaintiff after four days of trial); *Cherry v. Mayor and City of Baltimore* (represented defendant in $1 billion-plus class action bench trial brought by police and fire unions against City of Baltimore, decision pending); *United States v. Byrd* (represented defendant in racketeering jury trial brought against correctional officer, defendant acquitted of all counts); *Paice LLC v. Hyundai Motors* (Co-Lead for plaintiffs in patent infringement jury trial, $27 million verdict for plaintiffs).

Mr. Ulwick has been a fellow of the American College of Trial Lawyers since 1997.  He is a Permanent Member of the Judicial Conference for the United States Court of Appeals for the Fourth Circuit.  He has been consistently rated one of Maryland's best litigators by every rating service for more than 25 years, including *Chambers USA*, *Best Lawyers in America*, *Benchmark*, and *SuperLawyers*.  His law firm is perennially ranked as one of Maryland's best litigation firms.  He is able to dedicate whatever time is necessary to prosecute this litigation.  The resume for Mr. Ulwick and his firm is attached hereto as Exhibit H.

**_Lesley Weaver_** is the Partner-In-Charge of the Oakland, California, office of Bleichmar Fonti & Auld ("BFA"), a firm that has recovered more than $19 billion for its clients since its founding in 2014.  She founded and chairs the firm's consumer practice group after years of litigating at some of the country's finest class action law firms.  Ms. Weaver was honored as California Lawyer of the Year in 2018 by the *Daily Journal*; has been recognized as a *SuperLawyer* beginning in 2017; and was selected as one of just 24 Plaintiffs' Trailblazers by the *National Law Journal*.  Ms. Weaver recently spoke by invitation regarding data privacy and the effect of the newly enacted California Consumer Privacy Act at the Northern District Judicial Conference and is an author on similar topics.[15]

In 2018 Ms. Weaver was appointed Co-Lead Counsel by the Honorable Vincent Chhabria in the Northern District of California in *In re Facebook Consumer Privacy User Profile Litigation*, the privacy matter arising out of the Cambridge Analytica scandal affecting billions of users.  Ms. Weaver and her co-counsel have tightly organized that highly complex MDL, researching, analyzing, and simplifying federal and 50-state claims asserted by hundreds of lawyers around the

---

[15]  Northern District of California 2019 District Conference Agenda, https://2019ndca.com/home/agenda (last accessed Apr. 17, 2019).

country to address an ever-emerging set of disclosures affecting hundreds of millions of users worldwide. Significantly, this work requires skills that address concerns raised by this Court: identifying and prioritizing complex privacy claims and rigorously analyzing questions of standing, consent, and other significant issues to craft targeted, prioritized claims for the Court to consider first. As will be true here, the *Facebook* matter requires counsel to be diligent, thorough, creative, and selective.

In addition to this and other significant MDL experience, in 2014, Ms. Weaver successfully prosecuted one of the few internet privacy class actions tried in the country, delivering the opening and closing statements. Her clients won 100% of economic damages and $15 million in punitives.[16]

Ms. Weaver also brings an additional skill set the Court may find useful here. As privacy regimes emerge around the U.S. and the world, the judiciary, regulators, and private counsel must engage in the delicate task of balancing consumer protection with the interests of businesses important to the new world economy. These privacy regimes include not only the California Consumer Privacy Act, set to take effect on January 1, 2020, but also legislation intended to address, specifically, harms inflicted by *this* breach. For example, California has proposed amendments to existing data breach legislation to include passport numbers as protected information.[17] In addition, pressing security issues arising from the theft of passport numbers, and the global impact of such a breach, demand diplomacy and collaboration. Leadership in this action

---

[16] *Doe v. Successful Match.com*, No. 11-cv-21120 (Cal. Superior Court, Santa Clara Cty.).

[17] Press Release: Attorney General Becerra and Assemblymember Levine Unveil Legislation to Strengthen Data Breach Notification Law (Feb. 21, 2019), https://oag.ca.gov/news/press-releases/attorney-general-becerra-and-assemblymember-levine-unveil-legislation-strengthen.

will need the experience and relationships to engage meaningfully on these issues with various regulatory and governmental agencies.

These skills are among Ms. Weaver's core competencies. In 2016, Judge Breyer appointed her to the PSC in *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods. Liability Litig.* One of Ms. Weaver's roles was to facilitate a close working relationship between her co-counsel and certain state Attorneys General and regulatory agencies. In addition, she actively participated in settlement discussions involving these groups, the Department of Justice, the Federal Trade Commission, and interfaced directly with certain foreign regulators. The remarkable outcome in the case can be attributed in part to firm judicial leadership, a high-functioning and well-staffed PSC, and the extraordinary collaboration between the government and private counsel. Collaboration and collegiality are core values for Ms. Weaver, and are critical components of successfully leading a complex action like this one.

Ms. Weaver has litigated complex class cases from their inception through trial and/or settlement for twenty years. She has managed and organized teams of attorneys from multiple firms; deposed CEOs, CFOs and COOs of Fortune 500 companies; worked closely with renowned experts; and negotiated complex settlements. Ms. Weaver does not overcommit because personal involvement and attention to detail are hallmarks of her work. She is a hands-on litigator who digs into the facts, writes her briefs, and reads the cases. Ms. Weaver serves in leadership positions in two cases at present, both of which are well-past the intensive preliminary pleading stage. If appointed to the PSC, both Ms. Weaver and BFA will wholly commit their resources to the class. The resume for Ms. Weaver and her firm is attached hereto as Exhibit I.

**_Hassan A. Zavareei_** cut his teeth for seven years as a litigator at the defense firm of Gibson, Dunn & Crutcher LLP. Then, in 2002, he and his partner left Gibson, Dunn to form a private

public interest litigation law firm.  That firm, Tycko & Zavareei LLP, quickly became a leading plaintiffs' law firm, recognized for its high-profile work returning hundreds of millions of dollars to consumers and other victims of wrongdoing.  Tycko & Zavareei was recognized by the *National Law Journal*'s Elite Trial Lawyers report as one of the 50 Leading Plaintiffs Firms in America in 2014, and again in 2016 as a finalist in the Class Action category.  Mr. Zavareei was named to *Lawdragon*'s 500 Leading Lawyers in America in 2017 and 2018, and has been named as a *SuperLawyer* every year from 2012 to 2019.

Mr. Zavareei has tried numerous complex cases to verdict in state and federal courts across the nation (including as co-lead counsel in jury trials in the D.C. Superior Court and District Court) and has argued appeals before the United States Courts of Appeals for the D.C. Circuit, Fourth Circuit, and Fifth Circuit.  He has been appointed to leadership positions in class cases on several occasions, including as Lead Counsel in an MDL against a financial services company that provided debit cards to college students.  That case resulted in a recovery of over fifteen million dollars for class members.  He is currently serving as Co-Lead in consolidated proceedings against Fifth Third Bank and on the Plaintiff's Executive Committee in MDL litigation against TD Bank.  As Co-Lead in *Farrell v. Bank of America*, a case challenging Bank of America's punitive overdraft fees, Mr. Zavareei secured a class settlement valued at $66.6 million in cash and debt relief, together with injunctive relief forcing the bank to change a practice that will save millions of low-income consumers approximately $1.2 billion in overdraft fees.  In his Order granting final approval, Judge Lorenz described this outcome as a "remarkable" accomplishment, and recognized that Mr. Zavareei's team achieved such a result "through tenacity and great skill."  A collaborative leader with a track record of working with diverse groups of attorneys to obtain outstanding results

for his clients, Mr. Zavareei has served as lead counsel or co-lead counsel in over two dozen class action cases.

Mr. Zavareei is also a leader in Tycko & Zavareei's emerging privacy practice, serving as local counsel in *Hutton v. National Board of Examiners in Optometry, Inc.*, a case of significant importance here given the Circuit's decision that the plaintiffs in that case possessed Article III standing to sue. That privacy practice also includes important work under the Telephone Consumer Protection Act, where Mr. Zavareei served as Co-Lead in *Vargara v. Uber Technologies, Inc.*, which recently settled for $20 million. Mr. Zavareei has testified before Congress regarding privacy protections afforded by statutory regimes, and presented at numerous continuing legal education events on such issues. Mr. Zavareei's other current cases reflect his dedication to protecting the public and consumer privacy, and include a putative class action against Facebook related to its location tracking services, leading a deceptive business practices case against Apple Inc., representing the Environmental Defense Fund in a Freedom of Information Act litigation against the Environmental Protection Agency and Scott Pruitt, among others cases challenging governmental and corporate misconduct and abuses of power.

Apart from his litigation experience, Mr. Zavareei is also active in the public interest legal community. He serves on the Executive Committee of the Public Justice Foundation Board of Directors. He has testified before the Judicial Committee of the U.S. House of Representatives and the Civil Rules Advisory Committee and served as an editor of the Duke Law Review's Guidance on New Rule 23 Class Action Settlement Provisions.

Tycko & Zavareei's diversity makes it a leader among its peers: of the firm's thirteen attorneys, nine are women (including five partners), and three are people of color. To support its mission of litigating in the public interest, Tycko & Zavareei offers a unique public interest

fellowship program for recent law graduates, where fellows join the firm for two years, and participate in a three-month rotation at a local nonprofit.

While Tycko & Zavareei practices nationwide, as shown in Exhibit A, the firm and Mr. Zavareei regularly practice before the U.S. District Court for the District of Maryland, where it is now litigating three class cases.  If selected for the PSC, Mr. Zavareei would be able to devote substantial time to the litigation.  The resume for Mr. Zavareei and his firm is attached hereto as Exhibit J.

### 3.    Funding of the Litigation.

Our proposed Slate is comprised of well-financed and successful law firms.  We will not be using third-party litigation finance to fund the litigation, and the proposed slate is capable of financing the litigation without outside assistance.  While are are fully prepared to fund this litigation on our own, we may seek contributions from those counsel not appointed to the leadership to the extent that they are actively involved in the case and wish to remain involved.

### 4.    Any Agreements with Other Counsel in the Case.

Members of our Slate have no agreements, implicit or explicit, with any other counsel in the case.  While numerous individuals and slates have reached out to us, we have not solicited support from any applicants beyond those proposed herein to avoid commitments at the outset of the litigation not driven by the case's needs.   We recognize the pool of talent of other lawyers seeking roles in this case, and we welcome the opportunity to incorporate input from non-appointed counsel as we have done from the outset.  We also intend to put forward the strongest putative class representatives possible to successfully litigate the case.  Because we are the only group that has already filed a complaint with class representatives from each impacted state and territory, however, it will likely be unnecessary to spend significant time vetting thousands of

potential class representatives.  Thus, the ICC Slate is uniquely situated to move this case forward expeditiously.

### 5.   Monitoring Billing, Controlling Costs, and Avoiding Duplication of Effort.

The ICC Slate has significant experience monitoring billing, controlling costs, and avoiding duplication of effort in assigning and undertaking case-related work.  Attached as Exhibit C is a proposed Time Management and Billing Protocol.  Mindful of best practices in MDLs like this one, we understand the importance of efficient, effective litigation and of keeping the Court informed in the manner best suited to this Court's needs.

### 6.   Additional 23(g) Factors.

Although the foregoing narrative demonstrates that the proposed Slate has the requisite experience to handle class actions and the types of claims asserted in this action, our knowledge of the applicable law, and the resources that we will commit to representing the putative Class members, considering the work that Slate members have already done to advance this litigation also weighs heavily in favor of the Slate's appointment here.  *See* Rule 23(g)(1)(A)(i).[18]

From the outset of this litigation, members of this proposed Slate have led the efforts to ensure that this case was well-organized and litigated efficiently and without disputes.  We filed one of the first cases in Maryland, *Tapling, et al. v. Marriott International Inc.*, No. 18-cv-03703

---

[18] Pursuant to Rule 23(g)(1)(A), the Court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class," and may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  The Court may also "make further orders in connection with the appointment," such as "provisions about the award of attorney's fees or nontaxable costs."  Rule 23(g)(1)(C)-(E).  We have not included any promises in our application regarding attorneys' fees, as we intend to follow applicable precedent in this Court and the Fourth Circuit if and when the time comes to apply for our fees.

(D. Md.), and James Pizzirusso quickly filed a motion to centralize the proceedings in this District with the JPML given Marriott's nearby headquarters and the experienced bench in this Court. Once Marriott hired BakerHostetler as its counsel, *Tapling* counsel contacted them given our prior, positive working relationships with several of Marriott's counsel. At Marriott's counsel's request, Andrew Friedman took the lead in reaching out to other Plaintiffs' Counsel to coordinate stays in the Maryland cases pending the JPML decision. In the meantime, *Tapling* Counsel continued to be inundated with calls from concerned consumers and later, with the addition of Mr. Ulwick and others, filed the first (and only) class action centralized in this MDL containing class representatives from all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands, with 276 named class representatives. Our comprehensive, 50-state Complaint, for which Amy Keller led the team's efforts, contained many additional details from an extensive investigation that included discussions with confidential witnesses and numerous experts in the field that we have already retained. These experts include a leading cybersecurity researcher at the University of Maryland, as well as economists and other data breach experts.

Ms. Keller and one other counsel handled the argument for centralization in Maryland[19] at the JPML hearing in January. Once the cases were centralized here and the Court appointed Interim Coordinating Counsel, Andrew Friedman, Megan Jones, and James Pizzirusso quickly divided tasks and reached out again to Marriott's Counsel. Mr. Pizzirusso took the lead on assembling and tracking the numerous cases and counsel and putting together the Status of Cases and Plaintiffs' Counsel chart for the Court. This included coordinating and communicating with counsel for the City of Chicago, as well as the securities and derivatives actions. Members of the

---

[19] Several other counsel in the litigation had moved to centralize the actions in California, Connecticut, Florida, or New York.

slate also reached out to the Court to clarify questions raised by CMO 1 and the leadership application process and handled numerous questions and inquiries from other plaintiffs' counsel. Interim Coordinating Counsel created a draft Proposed CMO 2, while Ms. Jones, Mr. Pizzirusso, and Mr. Friedman met and conferred with Marriott's counsel in an effort to see if they could present an agreed CMO to the Court—which they did, after much negotiations and discussion through developing a sound rapport and working relationship.  Mr. Friedman handled discussions particularly related to bellwether trials, given his prior experiences in other MDLs.  Ms. Jones took the lead on developing and implementing a survey of Plaintiffs' counsel to present the Court with detailed information about the expected size and type of leadership applications and in order to ensure a smooth application process.  After the initial status conference, Mr. Friedman and other team members quickly began work on drafting and filing a proposed model leadership application, turning it around in three business days, which the Court largely adopted.

Respectfully, we believe that our team has already demonstrated its ability to: (1) lead this case efficiently and without duplication of effort; (2) manage a large group of disparate counsel and cases with differing opinions (soliciting and incorporating input where appropriate); and (3) and coordinate in a cooperative manner with defense counsel.  If the past is any indicator, we anticipate few, if any, disputes before this Court.  We hope to follow through with these efforts throughout the case and continue the work that we began at the outset to this litigation's ultimate resolutions—via trial or otherwise.

## CONCLUSION

The Interim Coordinating Counsel Slate has collectively substantial experience litigating cybersecurity and consumer protection cases.  If appointed, the work done by members of our slate will allow the case to move forward efficiently and without any delay.

Dated: April 19, 2019                              Respectfully submitted by:

_/s/ Andrew N. Friedman (w/ permission)_          _/s/ James J. Pizzirusso (w/ permission)_
Andrew N. Friedman                                James J. Pizzirusso
D. Md. Bar No. 14421                              D. Md. Bar No. 20817
**COHEN MILSTEIN SELLERS & TOLL PLLC**            **HAUSFELD LLP**
1100 New York Avenue, NW, Suite 500               1700 K Street NW Suite 650
Washington, D.C.  20005                           Washington, D.C. 20006
Tel. 202-408-4600                                 Tel. 202-540-7200
afriedman@cohenmilstein.com                       jpizzirusso@hausfeld.com

_/s/ Amy E. Keller_
Amy E. Keller
D. Md. Bar No. 20816
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Tel. 312-214-7900
akeller@dlcfirm.com

***Proposed Co-Lead Counsel***

David Berger                                      Megan Jones
*Pro Hac Vice*                                    D. Md. Bar No. 15671
**GIBBS LAW GROUP LLP**                           **HAUSFELD LLP**
505 14th Street, Suite 1110                       600 Montgomery Street, Suite 3200
Oakland, California  94612                        San Francisco, California  94111
Tel. 510-350-9700                                 Tel. 415-633-1908
dmb@classlawgroup.com                             mjones@hausfeld.com

Lesley Weaver                                     James Ulwick
*Pro Hac Vice*                                    D. Md. Bar No. 00536
**BLEICHMAR FONTI & AULD LLP**                    **KRAMON & GRAHAM PA**
555 12th Street, Suite 1600                       One South Street, Suite 2600
Oakland, California  94607                        Baltimore, Maryland  21202
Tel. 415-445-4004                                 Tel. 410-347-7426
lweaver@bfalaw.com                                julwick@kg-law.com

Hassan Zavareei
D. Md. Bar No. 18489
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Tel. 202-973-0900
hzavareei@tzlegal.com

***Proposed Plaintiffs' Steering Committee***

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. Civ. P. 5(a), and L.R. 102(1)(c), that the foregoing document was filed using this Court's CM/ECF service, which will send notice of such filing to all counsel of record this 19th day of April 2019.

*/s/ Amy E. Keller*
Amy E. Keller