### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 19-md-2879 |
| | This Document Relates to Case No. 8:18-cv-03833-PJM |
| This Document Relates to: | Honorable Paul W. Grimm |
| BANK OF LOUISIANA, individually and on behalf of all others similarly situated, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | |
| MARRIOTT INTERNATIONAL, INC., | |
| Defendant. | |

Plaintiff Bank of Louisiana ("Plaintiff"), by its undersigned counsel, files this First Amended Class Action Complaint on behalf of itself and a class of all similarly situated financial institutions and other entities against Defendant Marriott International, Inc. ("Defendant" or "Marriott"). Plaintiff bases the following allegations upon personal information and belief, the investigation of counsel, and states the following:

### INTRODUCTION

1.      Marriott is the world's largest hotel chain, comprising 30 brands, nearly 7,000 properties and over 1.3 million hotel rooms worldwide. To become the largest hotel chain, Marriott purchased another hotel giant, Starwood Hotels and Resorts Worldwide, LLC ("Starwood"), in September 2016. The Starwood brand includes almost a dozen well-known and international brands, including Westin, Sheraton, St. Regis, W Hotels, and others. Since Marriott's

acquisition of Starwood, Marriott has continued to rapidly expand both its properties and its profits. In 2018 alone, Marriott's net income neared $2 billion.

2.      Due to its massive worldwide reach, Marriott gathers sensitive and valuable information on the hundreds of millions of guests who stay at Marriott hotels. Marriott stores information in its databases such as guest names, addresses, phone numbers, passport numbers, reservation dates, email addresses, date of birth, gender, arrival and departure details, payment card numbers and payment card expiration dates. Upon its acquisition of Starwood, Marriott also gained control over Starwood's massive reservation database ("Starwood Database"), which contained similar information on hundreds of millions of guests dating back to as early ██████

3.      Marriott knew fully of the sensitive nature of its guests' data stored on its databases and the Starwood Database. Marriott also understood it would be a preferred target of hackers because it operated a huge repository of sensitive data from its hundreds of millions of guests. Indeed, numerous hotel chains have suffered massive data breaches in recent years, including Hilton Hotels, Hyatt Hotels, InterContinental Hotels Group, Wyndham Worldwide, Radisson Hotel Group, HEI Hotels & Resorts, and prior to the Marriott acquisition, Starwood Hotel Group. In fact, the hotel data breach beginning in March 2015 at HEI Hotels & Resorts – a company that owns and operates various hotel properties – affected several Marriott hotels that HEI operated, and exposed customer payment card data, leaving Marriott with undeniable knowledge that the safety and security of its customer data was at risk and that appropriate security measures to protect that data were paramount.

4.      In addition to hotel data breaches, the media has reported on massive data breaches involving other large repositories of consumer data maintained by companies such as Equifax and Experian. Equifax suffered one of the most massive data breaches of all time in 2017, just one

year after Experian suffered a data breach that exposed significant amounts of sensitive consumer information. Marriott, like Equifax and Experian, collected and stored large amounts of sensitive customer and payment card data, making it a likely target for hackers.

5.      Additionally, Marriott knew fully that the Starwood Database and environment, including Starwood's networks, systems, and processes, were insecure and vulnerable to a data breach. From 2014 to 2015, prior to Marriott's acquisition of Starwood, hackers compromised Starwood's cardholder data environment and placed malware designed to steal payment card data on approximately 100 hotels within the Starwood brand. Starwood's data security tools and personnel entirely failed to identify the breach, and it only learned that hackers were in its systems after financial institutions identified Starwood hotels as a common point of purchase for payment cards being used for fraudulent transactions.

Furthermore, after acquiring Starwood,



7.    Nevertheless, by 2018, Marriott had not resolved ███████████████████████████ ██████████████████ n the Starwood Database and environment. ██████████████████████████

███████████████████████████████████████████

██████████████████ Penetration testing is a security practice in which "good guy" hackers are hired to

see if they can penetrate a system to expose vulnerabilities. ██████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████ Marriott, therefore, received clear notice of specific deficiencies that made the

Starwood environment vulnerable to exploitation by unauthorized parties and the Starwood

Database vulnerable to unauthorized access to its massive repository of customer data.

8.    Marriott knew of data security measures capable of preventing or limiting the scope

of a data breach.  For example, Marriott was obligated to adhere to certain data security

requirements set forth in the Payment Card Industry Data Security Standards ("PCI DSS").  PCI

DSS was created by the Payment Card Industry, including Visa, MasterCard, American Express,

Discover and JCB International, to provide "technical and operational requirements . . . to protect

card holder data" that applied to "all merchants organizations that store, process or transmit

[payment card] data . . . ."[2]  The Payment Card Industry Security Standards Council ("PCI Council") set the PCI DSS requirements and allowed certain entities, called "Participating Organizations", to review and comment on its requirements.[3]  The "Participating Organizations" included a variety of businesses such as merchants, banks, processors, hardware and software developers, and point-of-sale vendors.  At all relevant times, Marriott was one of these Participating Organizations, meaning it was fully aware of the PCI DSS requirements because it had an opportunity to review them and provide feedback.[4]  Additionally, because Marriott stored and processed payment card data, Marriott was obligated to comply with PCI DSS.

9.    In addition to PCI DSS compliance, the Federal Trade Commission ("FTC"), state governments, and data security organizations created industry standards and made recommendations designed to prevent and limit the scope of a data breach.  Generally, these measures were more rigorous than the PCI DSS.  One such standard, for example, was the ISO/IEC 27000 information security management system standards published by the Internal Organization for Standardization and the International Electrotechnical Commission.  ISO/IEC 27000 was designed to provide standard best practices for implementing a comprehensive data security program, including implementing adequate security tools, security personnel, and security departments and creating a sufficient data security response program.

---

[2] *Payment Card Industry Security Standards*, PCI SECURITY STANDARDS COUNCIL (Oct. 2010), https://www.pcisecuritystandards.org/documents/PCI_SSC_Overview.pdf?agreement=true&time=1560370308360.

[3] *See Participating Organizations*, PCISecurityStandards.org (last visited Jun. 17, 2019), https://www.pcisecuritystandards.org/get_involved/participating_organizations?category=&region=&alphaFilter=m#filterForm.

[4] *See id.*

10.    Indeed, the FTC has also made it abundantly clear to companies that store customer data that the failure to take reasonable security measures to protect the security and confidentiality of such data constitutes a violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. §45, and will be fined accordingly. *See, e.g., F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 613 (D.N.J. 2014), *aff'd*, 799 F.3d 236 (3d Cir. 2015); *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act); *In re BJ's Wholesale Club, Inc.*, FTC Docket No. C-4148, FTC File No. 042-3160 (Sept. 20, 2005) (same); *In re CardSystems Solutions, Inc.*, FTC Docket No. C-4168, FTC File No. 052-3148 (Sept. 5, 2006) (same); *see also United States v. ChoicePoint, Inc.*, Civil Action No. 1:06-cv-0198-JTC (N.D. Ga. Oct. 14, 2009) ("failure to establish and implement, and thereafter maintain, a comprehensive information security program that is reasonably designed to protect the security. confidentiality, and integrity of personal information collected from or about consumers" violates § 5(a) of FTC Act); 15 U.S.C. §45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.").

11.    Marriott had access to industry best practices in data security and recommended data security measures because it co-founded the Hospitality Chief Information Security Officer Forum, later renamed to the Travel Information Sharing and Analysis Center, which was focused on promoting cyber threat information sharing and collaboration in the hospitality and travel industries.

12.    Despite the confidential nature of the customer and payment card data Marriott collected and stored, its understanding that nefarious actors would likely target such data, and its knowledge of appropriate and reasonable data security measures capable of preventing or limiting a data breach, Marriott neglected to implement even the minimum data security measures necessary to protect personal and payment card data. After obtaining control over the Starwood Database, Marriott chose not to address known and identified security vulnerabilities in Starwood's environment despite concerns from several data security assessors. Had Marriott reviewed Starwood's data security posture, it would have discovered numerous and significant deficiencies that left the personal and payment information of hundreds of millions of consumers vulnerable to theft.

13.    Due to Marriott's inadequate data security measures, intruders entered into the Starwood Database and environment, roamed freely throughout Starwood's systems and networks, compromised hundreds of host and user accounts, and ultimately stole sensitive information on hundreds of millions of customers ("Marriott Data Breach" or "Data Breach").

14.    Despite the hackers' prolific activity, Marriott's data security measures, like Starwood's in its earlier breach, completely failed to detect the intrusion for nearly two years. Marriott was first alerted to potentially suspicious activity within its Starwood Database on September 7, 2018, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ Rather than take immediate and urgent action, Marriott's incident response program implemented a delayed and inadequate response that failed to fully contain the Data Breach until ████████████████ and did not remove the vulnerabilities that caused it until

█████████████████████████

15.    Marriott's slow response proved to be consequential. On ███████████████████████████████████████████████████████████████████████ The information included nearly 10 million encrypted payment card numbers.

16.    Although Marriott discovered it had been breached in September 2018, it waited until November 30, 2018 to announce it.  Marriott admitted that, from at least July 28, 2014 to September 10, 2018, customer data on Marriott's Starwood Hotel brand's guest reservation database was exposed by and available to hackers, resulting in one of the longest-running and largest data breaches in history.  Despite the hackers' prolific activity in Marriott's systems and the massive amount of data they accessed, consolidated, and exfiltrated, Marriott's security measures and personnel were unaware of the breach for nearly two years.  Combined, Starwood and Marriott failed to identify that hackers resided in their system for over four years.

17.    The Marriott Data Breach was the inevitable result of Marriott's inadequate data security protections.  Despite being a Participating Organization in creating and having an obligation to follow PCI DSS, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



18.    Many of these security deficiencies were the same ones identified by previous security assessments of Starwood's systems and databases. ███████████████ ████████████████████████████████████████████████████ Had Marriott implemented reasonable data security measures and complied with PCI DSS and Section 5(a) of the FTC Act, Marriott could have reasonably prevented the breach of its systems or minimized its scope and impact.

19.    As a result of the Marriott Data Breach, payment card data was exposed to nefarious parties who were capable of and in some instances actually committed fraud.  The hackers copied and stole ██████ unique encrypted payment card numbers from the Starwood Database. Additionally, over the course of their four-year intrusion into the Starwood environment, the hackers had access to at least ██████████ payment card numbers stored both on the Starwood Database and within the Starwood environment.  While Marriott and the PFI investigator have stated that there is no evidence that the encryption key for the purportedly encrypted ██████████ cards was obtained by the hackers, neither has ruled out the possibility.[5]  In other words, the integrity of the data contained on each of those cards cannot be confirmed.

---

[5] *Examining Private Sector Data Breaches:  Hearing before the U.S. Senate Committee on Homeland Security & Governmental Affairs* (Mar. 7, 2019) (Prepared Testimony of Arne Sorenson, President and Chief Executive Officer of Marriott Int'l, Inc.), https://www.hsgac.senate.gov/imo/media/doc/Soresnson%20Testimony.pdf.

20.     On or about December 6, 2018, Visa issued a Compromised Account Management System (CAMS) alert to certain financial institutions warning those institutions that payment card data on certain of their issued credit and debit cards may have been compromised during the Marriott Data Breach.  The Visa CAMS alert notified those financial institutions, including Plaintiff, that they had accounts potentially compromised due to the Marriott Data Breach.

21.     Upon receipt of an alert of a potentially compromised account, financial institutions, including Plaintiff, carried a legal and business obligation to immediately respond. As a result of the Marriott Data Breach, Plaintiff and other financial institutions incurred significant costs and injuries associated with responding to the alerts, including, but not limited to, costs to:

     a.   cancel or reissue credit and debit cards;

     b.   refund or credit any cardholder to cover the cost of any unauthorized transaction relating to the Marriott Data Breach; and

     c.   increase fraud monitoring efforts.

22.     The injuries to Plaintiff and the Class were directly and proximately caused by Marriott's failure to implement and maintain adequate data security measures to protect the massive amount of information stored within the Starwood Database, including both personally identifying information and payment card data.

23.     Plaintiff brings this class action on behalf of itself and financial institutions throughout the United States to recover the costs that they have been forced to bear as a direct result of the Marriott Data Breach and to obtain equitable relief.  Plaintiff asserts claims for negligence, negligence per se, and for declaratory and injunctive relief.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, Marriott is a citizen of a State different from that of at least one Class member, and there are more than 100 putative class members. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25.     This Court has personal jurisdiction over Marriott, because the company maintains its principal place of business in Maryland, regularly conducts business in Maryland and has sufficient minimum contacts in Maryland. Marriott intentionally avails itself of this jurisdiction by marketing and selling services and managing companywide affairs in Maryland.

26.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) through (d) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

27.     Plaintiff Bank of Louisiana is an FDIC-insured bank. Its principal place of business is located at 300 St. Charles Avenue, New Orleans, Louisiana 70130. Plaintiff has five branches located in Orleans Parish, Jefferson Parish, and St. Tammany Parish. Plaintiff issued Visa payment cards and received a CAMS alert that some of the cards it issued were compromised in the Marriott Data Breach. Due to Marriott's failure to adequately protect its data systems, Plaintiff has suffered, and continues to suffer, injury, including, but not limited to costs for cancelling and reissuing compromised payment cards; reimbursing cardholders for fraudulent transactions; and other administrative and operational costs in responding to the Marriott Data Breach.

28.    Defendant Marriott is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Bethesda, Maryland 20817. Marriott owned and operated the Starwood Database upon completion of its merger with Starwood Hotels & Resorts Worldwide, LLC on September 23, 2016, and was responsible for maintaining adequate data security measures over information stored on the Starwood Database, including payment card information.

## FACTUAL BACKGROUND

29.    Marriott, a giant in the hospitality industry, operates hotels worldwide from its headquarters in Bethesda, Maryland. On September 23, 2016, Marriott completed the acquisition of Starwood Hotels & Resorts Worldwide, LLC to become the world's largest hotel chain. To date, Marriott owns and operates 30 hotel brands, nearly 7,000 properties, and over 1.3 million hotel rooms worldwide.

30.    As part of its acquisition of Starwood, Marriott gained control over the Starwood Database, a database Starwood used to collect and store information related to guest hotel reservations. The Starwood Database is a repository of personal and payment information on hundreds of millions of Starwood's customers and contains data that traces back to at least ████ possibly earlier.

████████████ tarwood, and subsequently, Marriott, used the Starwood Database to record hotel reservations made by guests online, over the phone, and through third-party aggregators such as Expedia or Travelocity. To make reservations, certain guest information was required, including names, addresses, phone numbers, payment card numbers, and payment card expiration dates. Other information was additionally recorded, including passport numbers, email addresses, dates of births, gender, travel information, reservation start and end dates, and Starwood Preferred Guest ("SPG") account numbers. Once provided, the guest information was sent to Starwood, which

stored it in an  (*i.e.*, the Starwood Database).

32.     After acquiring Starwood, Marriott continued to use the Starwood Database to track and collect guest information, including payment card data. Marriott intended to consolidate the Starwood Database and its systems and processes with Marriott's to create a single reservation database and environment. However, Marriott faced difficulties merging the two different databases, systems and processes. In 2017, for example, Marriott admitted that integrating the Starwood Database "could also take longer than we anticipated and involve unexpected costs" due to "[d]isruptions of each legacy company's ongoing business, process, and systems . . . [Marriott] also may still encounter difficulties harmonizing [the] different reservations and other systems and business practices as the integration process continues."[6] In 2018, Marriott further noted that "[a]s one of the largest transactions ever in the hospitality industry, integration into one unified company has been an understandably complex process. While Marriott and Starwood were both hospitality companies, the back-end systems that supported our businesses . . . were way different."[7] In the same report, Marriott again noted "[i]ntegration could also involve unexpected costs" and that it could not "assure [anyone] when or that [Marriott] will be able to fully realize additional benefits

---

[6] *2017 Annual Report*, MARRIOTT INT'L, INC. (2017), https://marriott.gcs-web.com/static-files/057a8e1a-a5c5-4c20-a51c-0b20bf8a0bc1.

[7] *2018 Annual Report*, MARRIOTT INT'L, INC. (2018), https://marriott.gcs-web.com/static-files/8799734e-b9e0-4e53-b194-7bd24a381118.

from the Starwood Combination . . . or that challenges encountered with [the] harmonization efforts will not have adverse effects on our business or reputation."[8]

33.    Due to the difficulties, Marriott had not merged the two reservation systems by the end of 2018.  As such, Marriott continued to rely on the Starwood Database to retrieve and store certain guest information, including payment card details, and continued to utilize the Starwood environment, including its systems, processes, and applications ███████████████████████

███████████ While attempting to consolidate the "way different" Marriott and Starwood databases, systems, and processes, Marriott completely neglected to resolve known and identified data security issues in the Starwood Database.  Marriott knew, for example, that hackers had breached Starwood systems from 2014 to 2015 and compromised Starwood's cardholder data environment.  Moreover, Marriott knew or should have known that the Starwood Database was a clear target for hackers considering that both Marriott and Starwood were involved in the HEI data breach that was announced in August 2016.  The hackers placed malware designed to steal payment card data on approximately 100 hotels within the Starwood brand.  An investigation of the Data Breach found ████████████████████████████████

███████████████████████████████████████████

---

[8] *Id.*



35.    In addition, after acquiring Starwood, Marriott performed assessments that identified significant security issues in the Starwood Database.

36.    Marriott, therefore, knew of the significant security issues in the Starwood environment. However, it failed to take adequate measures to respond and address those known deficiencies and failed to protect the massive repository of guest information stored in the Starwood Database. For nearly two years, Marriott left in place outdated and insufficient measures incapable of adequately protecting the Starwood Database.

37.    As a result of Marriott's decision to deprioritize data security in the Starwood Database and environment, unauthorized intruders entered into and resided in Marriott's Starwood Database for years, exploring and compromising numerous systems and databases.  In late 2018, completely undetected by Marriott's cybersecurity tools and personnel, the intruders aggregated and exfiltrated hundreds of millions of guests' personal information and nearly ten million payment card numbers and expiration dates from the Starwood Database, resulting in one of the most massive data breaches of all time.

**Marriott's Deficient Data Security Measures Permitted Hackers**
**To Infiltrate the Starwood Database Undetected for Years**

38.    Marriott claims to have first learned of its Data Breach on September 7, 2018, when Marriott's ███████████████████████████████████ within the Starwood Database. ████████████████████

39.    Although the alert should have been of significant concern to Marriott, it failed to respond with the urgency required. ████████████████████



41.

42.

Again, Marriott has not ruled out the possibility that the encryption key was obtained by the hackers, a fact that puts the integrity of those cards in question.

44.      The Marriott Data Breach is a remarkable failure of Marriott's data security tools and personnel.  After the Data Breach, Marriott hired ███████ to perform a mandatory "PCI Forensic Investigation" into the Data Breach on behalf of the Card Brands, including an assessment of Marriott's compliance with PCI DSS. ████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

45.      By comparison, the average data breach lasts just 266 days before companies identify and contain a breach.[9]  Marriott acquired the Starwood Database on September 23, 2016, meaning it failed to detect the Data Breach for 715 days, until September 7, 2018, and did not resolve the Data Breach for 733 days, until September 26, 2018, which is nearly three times the average length.  Overall, however, both Marriott and Starwood failed to resolve the Data Breach for an unprecedented 1,522 days, almost six times the average length of a data breach.  Worse, ████████████████████████████████ that the breach may have begun even earlier.

46. ████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

██████████████████████████████ compromise Starwood user accounts, including accounts with administrative privileges that provide the authority to make changes to the Starwood environment.  The hackers used numerous types of malware to compromise and take advantage of the Starwood environment, including using:

---

[9] Rob Sobers, *Data Breach Response Times: Tips and Trends*, VARONIS (Mar. 13, 2019), https://www.varonis.com/blog/data-breach-response-times/



48.     The hackers operated for years in the Starwood Database without any detection by Marriott or Starwood, and compromised numerous systems, accounts, and processes by placing various malware on hundreds of hosts.  Indeed, although Marriott's security tools identified the suspicious queries of the Starwood Database on September 7, 2018,

███████████████████████████████████████████ Marriott subsequently admitted it did not know why its security measures did not identify these queries. Marriott also failed to detect that the hackers had aggregated information on hundreds of millions of guests, archived the data, prepared it to be sent, connected to outside malicious IP addresses, and exported the files. Had Marriott had a reasonable data security program, as required by PCI DSS requirements and Section 5(a) of the FTC Act, it could have detected the numerous activities of the hackers. And, had Marriott had a reasonable incident response program, Marriott could have stopped the breach before hundreds of millions of guests' information was stolen.

49.    Unsurprisingly,



Multi-factor authentication is a fundamental security measure that data security experts and the PCI DSS have recommended for years.

50. ████████████████████████████████████████

████████████████████████████████████ Aggregating and monitoring system logs – usually with the help of an Intrusion Detection System – is a basic data security technique used to identify suspicious behavior occurring within an organization's computers, systems, or networks. Typically, businesses rely on a Security Information and Event Monitoring ("SIEM") tool to

collect system logs and monitor logs for patterns of unexpected or unauthorized activity. SIEM

tools allow businesses to identify an intrusion quickly before sensitive data is exposed or stolen.



52.



Because the stored payment card data was unencrypted, it could be

sold "as is" to fraudsters to make unauthorized transactions.

53.    In all, the Marriott Data Breach led to the theft of nearly 10 million encrypted

payment cards and exposed at least ████████unencrypted payment cards. Again, Marriott has not

been able to rule out the possibility that the encryption key was obtained by the hackers.

54.     As part of its investigation of the Marriott Data Breach, ███████ analyzed whether Marriott complied with PCI DSS, the bare minimum mandatory data security measures with which Marriott was required to comply.



59.    Marriott's numerous violations of the PCI DSS requirements demonstrate its failure to comply with even the minimum data security measures necessary to secure cardholder data. As a "Participating Organization" in the PCI Council that creates the PCI DSS requirements, Marriott fully knew of the need to and importance of complying and exceeding PCI DSS.

Moreover, having owned and operated the Starwood Database starting in September 2016, Marriott has no excuse for failing to investigate the state of Starwood's data security measures and to resolve any identified vulnerabilities or non-compliance with PCI DSS. Indeed, PCI DSS certification is required at least annually, and as such, Marriott should have been fully aware of the deficiencies in the Starwood Database's security measures.



60.

Marriott did not resolve those issues and they ultimately caused or contributed to the Marriott Data Breach.

61.     Had Marriott remedied the deficiencies in the Starwood Database, followed PCI DSS requirements, and adopted basic, reasonable security measures recommended by experts in the field, Marriott could have prevented the Data Breach and, ultimately, the theft of millions of customers' purchasing information.

### Marriott Knew the Risks of Its Inadequate Data Security

62.     Prior to the Data Breach, Marriott knew of the necessity of implementing reasonable data security measures and of the significant repercussions of a security breach due to the massive amount of sensitive data it stored.

24

63.    Marriott's "Global Privacy Statement" asserted Marriott prioritized securing its guests' data: "We use reasonable physical, electronic, and administrative safeguards to protect your Personal Data from loss, misuse and unauthorized access, disclosure, alteration and destruction, taking into account the nature of the Personal Data and the risks involved in processing that information."[10]

64.    Marriott's Privacy Policy also stated that Marriott "limit[ed] the collection and use of Personal Data to the information that is relevant for the purposes of processing and will not process Personal Data in a way that is incompatible with the purposes for which the information has been collected or subsequently authorized by you."[11] Marriott promised that it took "reasonable steps to ensure the Personal Data is reliable for its intended use, accurate, complete, and current to the extent necessary for the purposes for which we use the Personal Data."[12]

65.    Additionally, Marriott co-founded the Hospitality Chief Information Security Officer forum, later renamed to the Travel Information Sharing and Analysis Center, which was focused on promoting cyber threat information sharing and collaboration in the hospitality and travel industries. As such, Marriott fully knew the importance of data security.

66.    Marriott was also fully aware of the detrimental consequences of a data breach, both on consumers and financial institutions. Massive data breaches have occurred at institutions throughout the United States every year since 2013, putting Marriott on notice both that it may be

---

[10] *See* Global Privacy, Marriott.com (last visited Nov. 30, 2018), https://www.marriott.com/about/global-privacy.mi.

[11] *Id.*

[12] *Id.*

a target of an attack and that hackers might seek to obtain customers' personally identifying information and payment card data.

67.     For example, in 2013 and 2014, hackers breached Target and Home Depot's point-of-sale terminals and stole both personal customer information and payment card data.  In the Target data breach, hackers collected 40 million payment card credentials and 70 million customer records in a matter of weeks.   In the Home Depot data breach, hackers stole 56 million payment cards over several months.  Both breaches were preventable.[13]

68.     Marriott knew, or should have known, that hackers were targeting companies with massive repositories of confidential customer data.  In 2014, hackers compromised JP Morgan Chase, which manages billions of dollars' worth of assets for millions of individuals and business. The hackers stole customer names, addresses, phone numbers and email addresses of 76 million Americans and additional information on 7 million small businesses.  In 2015, Anthem, the second-largest health insurer in the United States, suffered a data breach that exposed the names, addresses, Social Security numbers, dates of birth, and employment histories of nearly 80 million current and former plan members.  In September 2015, credit reporting agency Experian, one of the three largest financial data aggregators in the United States, acknowledged that an unauthorized party accessed one of its servers containing the names, addresses, Social Security numbers, dates of births, driver's license, military ID, and/or passport numbers, and additional information of more than 15 million consumers over a period of two years.  In 2017, Equifax announced one of the most massive breaches of all-time – now easily surpassed by the Marriott Data Breach –

---

[13] *See, e.g.*, Brett Hawkins, *Case Study: The Home Depot Data Breach*, SANS Institute (Jan. 2015); Teri Radichel, *Case Study: Critical Controls that Could Have Prevented Target Breach*, SANS Institute (Aug. 5, 2014).

acknowledging that hackers had stolen personal and financial information of nearly 150 million Americans over a two-and-a-half-month period.

69.    Marriott also should have known hackers had focused their attacks on the hotel industry. From March 18, 2017 to July 2, 2017, Hyatt Hotels Corp. suffered a data breach leading to the exposure of payment card data. Previously, in late 2015, Hyatt suffered a separate data breach affecting certain payment processing system where hackers installed card-stealing malware. Overall, the two breaches affected hundreds of Hyatt hotels and compromised a significant amount of confidential personal and payment card data.

70.    In April 2017, InterContinental Hotel Group discovered unauthorized intruders had installed malware at 1,200 of its hotels. The malware was specifically designed to steal payment card data. The breach purportedly lasted from September 29, 2016 to December 29, 2016.

71.    From March 2015 to June 2016, Marriott, Starwood, Hyatt and InterContinental brand hotels were affected by a data breach at HEI Hotel & Resorts ("HEI"), a company that owns and operates various hotel properties.[14] In August 2016, HEI announced that it suffered a data breach at 20 of its hotel properties, including 6 Marriott properties, 12 Starwood properties, 1 Hyatt property, and 1 InterContinental Hotels Group property.[15] The HEI breach exposed information obtained in tens of thousands of transactions, including customer names, payment card account numbers, expiration dates, and verification codes.[16] HEI acknowledged that "the malware [on its

---

[14] *Notice of Data Breach (8/12/2016)*, HEI HOTELS & RESORTS (Aug. 12, 2016), https://oag.ca.gov/system/files/Sample%20Notice_7.pdf.

[15] *Id.*

[16] *Starwood, Marriott and Hyatt Breached (Again)*, PYMNTS.COM (Aug. 15, 2016), https://www.pymnts.com/news/security-and-risk/2016/hei-data-breach-starwood-marriott-hyatt/.

point-of-sale systems] may have accessed payment card information in real-time as it was being inputted into our systems."[17]  Marriott, therefore, had first-hand knowledge by at least August 2016 that hackers were targeting hotels to steal payment card data.

72.    Marriott also knew that Starwood had experienced a previous breach just prior to its acquisition of Starwood.  In November 2015, Starwood Hotels identified a credit card data breach that impacted Sheraton and Westin hotels primarily located in the United States and Canada.[18]  Starwood confirmed that it had been breached for at least one full year before discovering the intrusion. ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

73.    Marriott was on full notice that Starwood had implemented deficient security measures and was vulnerable to a cyberattack and that hackers would target Marriott due to its significant repository of customer and payment card data.  In fact, Marriott knew the hospitality industry had seen an uptick in large data breaches seeking to obtain payment card data and guests' personal information.  As such, Marriott should have prioritized securing its databases, including the Starwood Database, which contained confidential personal and payment card data on hundreds of millions of guests.  Marriott, however, did not prioritize securing the large swath of sensitive

---

[17] John Ribeiro, *HEI Hotels Reports Point-of-Sale Terminals Breach*, CSO (Aug. 15, 2016, 3:00 AM),       https://www.csoonline.com/article/3107286/hei-hotels-reports-point-of-sale-terminals-breach.html.

[18] *See Starwood Hotels Warns of Credit Card Breach*, KREBSONSECURITY (Nov. 15, 2015), https://krebsonsecurity.com/2015/11/starwood-hotels-warns-of-credit-card-breach/ (last accessed Nov. 30, 2018).

data it stored in the Starwood Database, laying the groundwork for one of the most massive data breaches ever.

### Reasonable Security Measures Could Have Prevented or Limited the Scope of the Marriott Data Breach

74.     Despite their prevalence, a data breach is not the inevitable result of doing business. The Online Trust Alliance has consistently found more than 90% of data breaches were preventable, including finding an estimated 93% of data breaches that occurred in 2017 were preventable. The Trust warned that "there is no excuse not to implement fundamental security best practices" which are, in part, necessary to prevent or limit the scope of a data breach.

75.     Numerous data security companies and standards exist to inform businesses of the measures necessary to prevent or limit the scope of a data breach. For example, one of the most widely known set of security standards, the PCI DSS, was created by the payment card industry to "encourage and enhance cardholder data security and facilitate the broad adoption of consistent data security measures."[19] PCI DSS provides "fundamental" security measures and sets mandatory data security requirements for "all entities that store, process, or transmit cardholder data and/or sensitive authentication data."[20]

76.     Both PCI DSS 3.1 and PCI DSS 3.2, the PCI DSS versions in effect during Marriott's ownership of the Starwood Database, set forth comprehensive and detailed requirements to achieve twelve "high-level" security objectives:

---

[19] *Requirements and Security Assessment Procedures*, PCI Security Standards Council at 5 (last visited Jun. 17, 2019), https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2-1.pdf?agreement=true&time=1560805191237.

[20] *Id.*

## The PCI Data Security Standard

PCI DSS is the global data security standard adopted by the payment card brands for all entities that process, store or transmit cardholder data and/or sensitive authentication data. It consists of steps that mirror security best practices.

| Goals | PCI DSS Requirements |
|---|---|
| Build and Maintain a Secure Network and Systems | 1. Install and maintain a firewall configuration to protect cardholder data<br>2. Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. Protect stored cardholder data<br>4. Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. Protect all systems against malware and regularly update anti-virus software or programs<br>6. Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. Restrict access to cardholder data by business need to know<br>8. Identify and authenticate access to system components<br>9. Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. Track and monitor all access to network resources and cardholder data<br>11. Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. Maintain a policy that addresses information security for all personnel |

77.     PCI DSS v. 3.1 and 3.2 created specific requirements for the types of software and security tools businesses have to use, including antivirus and antimalware software, security tools that track and monitor access to network resources and cardholder data, and methods of encrypting stored or transmitted cardholder data. Additionally, PCI DSS requires certain system configurations to be in place to limit the ability of unauthorized intruders to move across networks and firewalls and to prevent intruders from compromising administrative accounts by obtaining user names and passwords. The PCI DSS also established rules specifically designed to protect stored cardholder data. The payment card industry requires businesses to regularly analyze and test their data security measures to ensure they function properly and to identify security vulnerabilities.

78.    Meeting the mandatory PCI DSS requirements is an important first step to a reasonable cybersecurity posture. However, PCI DSS comprises only a portion of the protective measures a business must take. As the PCI Council, of which Marriott is a member, acknowledges, PCI DSS represents the "minimum set of requirements for protecting account data" and it is widely recognized that PCI compliance alone is insufficient to prevent a data breach.[21] The FTC, for example, warns that "PCI DSS certification is insufficient in and of itself to establish the existence of reasonable security protections. The [FTC's] *Wyndham* order calls for a number of additional signification protections . . . In short, the existence of PCI DSS certification is an important consideration in, but by no means the end of, our analysis of reasonable security."[22] In fact, "every company that has been spectacularly hacked in the last three years has been PCI compliant."[23] Target, Home Depot, Neiman Marcus, Wendy's, Arby's, Michael's, Sally Beauty Holdings, Inc., Supervalu, Albertson's and many other businesses subjected to data breaches were recognized as PCI DSS compliant at the time of the compromise.[24]

---

[21] *See supra* note 19, at 5 (noting PCI DSS "may be enhanced by additional controls and practices to further mitigate risks . . . .").

[22] *See* Statement of the Federal Trade Commission (FTC) v. Lifelock, FED. TRADE COMM'N (Dec. 17, 2015), https://www.ftc.gov/system/files/documents/public_statements/896143/151217lifelo ckcommstmt.pdf.

[23] Sean M. Kerner, *Eddie Bauer Reveals It Was the Victim of a POS Breach*, EWEEK (Aug. 19, 2016), http://www.eweek.com/security/eddie-bauer-reveals-it-was-the-victim-of-a-pos-breach.html.

[24] *See, e.g.*, Radichel, *supra* note 13, at 5 ("Target passed PCI compliance audits prior to this breach . . . . We can learn from the Target breach that compliance with baseline standards isn't enough.").

79.    To supplement PCI DSS and enhance businesses' data security measures, Federal and State governments have introduced security standards and recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices.[25]    The FTC recommends that data security factor into all business decision-making, and that businesses, at a minimum, take measures to encrypt information stored on computer networks; keep sensitive information only as long as necessary; properly dispose of personal information that is no longer needed; limit administrative access to business systems; use industry-tested and accepted security methods; monitor activity on your network to uncover unapproved activity; verify that privacy and security features work; test for common vulnerabilities; and update and patch third-party software.[26]

80.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

81.    As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data.[27] *See In the matter of Lookout*

---

[25] *See* Federal Trade Comm'n, Start With Security A Guide For Business, Lessons Learned from FTC Cases (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[26] *Id*; *see also* Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personal-information.pdf.

[27] *See, e.g., FTC v. Wyndham Worldwide Corp.,* No. 13:-CV-01887-ES-JAD (D.N.J. Dec. 11, 2015); *In the Matter of LabMD, Inc.,* 2016-2 Trade Cas. (CCH) ¶ 79708 (MSNET July 28, 2016); *In the Matter of Gmr Transcription Servs., Inc.,* 2015-1 Trade Cas. (CCH) ¶ 17070 (MSNET Aug. 14, 2014); *In the Matter of Genelink, Inc.,* 2015-1 Trade Cas. (CCH) ¶ 17034 (MSNET Jan. 7, 2014).

*Services, Inc.*, No. C-4326, □ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, □ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between in-store networks . . .").

82.    States have also adopted unfair and deceptive trade practices acts that prohibit unfair trade practices, including the failure to employ reasonable security processes to protect payment card data.  Most states have also enacted statutes requiring merchants to provide notice to consumers of security systems breaches.  These statutes, explicitly or implicitly, mandate the use of reasonable data security practices and reflect the public policy of protecting sensitive customer data.

83.    As an industry leader and member of the PCI Council, Marriott was aware of data security measures that were capable of preventing or limiting the scope of its Data Breach. Marriott, however, inexplicably failed to comply with four of the twelve PCI DSS requirements –

33

the minimum data security standards Marriott was obligated to meet. Had Marriott implemented reasonable data security measures like those outlined by data security experts and the FTC, it could have prevented the Marriott Data Breach, identified it sooner, or prevented the exfiltration of sensitive customer data.

### The Marriott Data Breach Harmed Financial Institutions

84.    Marriott is, and at all relevant times was, aware that the payment card data it receives via credit and debit card transactions is highly sensitive, is highly sought after by hackers, and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases. Marriott knew of the necessity of safeguarding payment card data and of the foreseeable consequences that would occur if its data security systems were breached, including the significant costs that would be imposed on payment card issuers, such as the Plaintiff and members of the Class. Numerous widely reported data breaches put Marriott on notice that it may be targeted by a data breach seeking to obtain confidential customer and payment card data.

85.    Marriott is, and at all relevant times was, fully aware of the significant volume of payment card data stored in the Starwood Database, amounting to information for nearly ten million payment cards. Marriott similarly knew of the massive amount of personally identifying information on the Starwood Database, storing the names, addresses, and phone numbers of hundreds of millions of guests.

86.    Marriott is, and at all relevant times was, aware of its obligations to protect personal and payment card data and of the need to secure its databases containing sensitive information. As a "Participating Organization" in the PCI Data Security Council, Marriott had both the access to and knowledge of the security measures necessary to adequately protect payment

card data.[28]    Marriott knew that because it used and stored payment card data, financial institutions, including Plaintiff and the Class, were entitled to and, in fact, relied upon Marriott to keep sensitive financial information secure from hackers.  However, Marriott woefully failed to protect sensitive customer information, including payment card data.

87.    Despite understanding the consequences of a data breach and the measures it could have taken to avoid or limit the scope of a data breach, Marriott chose not to invest in the data security measures necessary to reasonably secure its systems, let alone meet PCI DSS requirements.  Marriott failed to resolve known data security deficiencies in the Starwood environment and the Starwood Database despite the massive amount of personal and payment card data stored there.

88.    Financial Institutions, like Plaintiff and the Class, have a legal and business obligation to respond quickly to any notice of a payment card potentially compromised in a data breach.  Upon learning of a breach that likely impacted its customers and/or receiving notice of a potentially compromised account – usually from the card brands like Visa, Mastercard, Amex, and Discover – financial institutions have a range of viable and reasonable responses.  In most cases, card-issuing financial institutions are legally required to reimburse their customers for any fraudulent charges made with any payment card they issued.  To limit the amount of fraud on a potentially compromised account, financial institutions take reasonable measures like cancelling and reissuing the payment card, and increasing their monitoring for potentially fraudulent charges.  Additionally, financial institutions often take strident efforts to keep their customers informed about the potential effects of a data breach and field inquiries from concerned customers seeking information about their personal and financial information.

---

[28] *See supra* note 3.

89.    When personal information and payment card data is stolen, as in the Marriott Data Breach, hackers can make wide use of that data for fraudulent purposes.  For example, hackers sell payment card data on the dark web to fraudsters who may either duplicate the card to be swiped at in-store locations for fraudulent purposes or may commit card-not-present fraud, where payment card information is used to make online purposes without the need for a physical card.  In data breaches like Marriott's, card-not-present fraud is particularly problematic because the hackers obtained guests' personally identifying information and payment card data making card-not-present fraud more successful.

90.    Given the massive fraud that may occur in the wake of a data breach, financial institutions must act swiftly to protect their reputation with their customers and their bottom line. Financial institutions have a strong incentive to keep the payment cards they issue at the "top of the wallet," meaning customers have the confidence and ability to use their payment cards frequently.  Due to no fault of the financial institutions, however, customers of financial institutions potentially affected by a data breach are less likely to use that financial institutions' payment cards in the future.[29]  Decreased payment card use decreases the financial institutions' revenue and, moreover, may lead to a decrease in the financial institution's reputation.

91.    As such, in the wake of a data breach, financial institutions assess the most appropriate responsive action to both prevent fraudulent transactions and to ensure customers have their payment cards available for use.  In many instances, financial institutions must communicate with their members who are potentially affected by a data breach and field communications from

---

[29] *More Consumers Say They'll Bail After Breach*, ICBA.org (Nov. 5, 2018), https://www.icba.org/advocacy/industry-issues/data-breach/2018/11/05/more-consumers-say-they-ll-bail-after-breach.

members with questions about the breach. In many instances, financial institutions determine that the most effective response to a data breach is to reissue some or all of their alerted-on cards.

92.    Once a financial institution becomes aware that it has potentially compromised payment cards, it faces a long-term risk of harm. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[30]

93.    Marriott had every opportunity to take preventive measures to avoid a data breach. First, Marriott was on notice that hackers were targeting large repositories of personal and payment card information, including attacks on the hospitality industry and other hotel and restaurant brands. Second, Marriott appreciated the consequences of such a breach, having witnessed other major hotel chain competitors – including Starwood, who it ultimately acquired – experience data breaches and other large breaches at Target, Home-Depot, Anthem and Equifax. Third, Marriott had access to information from data security experts, the FTC, and the payment card industry identifying steps necessary to protect payment card data. Fourth, Marriott had available established guidelines from PCI DSS that offered at least minimal levels of protection against a data breach. Fifth, Marriott, as the world's largest hotel chain, had ample resources to identify and address vulnerabilities in its data security and implement reasonable measures to protect its guests' personal and payment card data.

---

[30] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

94.     Despite its resources, Marriott chose not to take reasonable and sufficient action to avoid a breach of its systems, including failing several of the PCI DSS's minimal data security requirements.    While Marriott saved money by truncating its data security investments, it knowingly put itself at risk of a breach and Plaintiff and the Class at risk of incurring expenses necessary to address and limit the damages caused by a breach.

95.     As a direct and proximate result of Marriott's Data Breach, Plaintiff and the Class have suffered damages and injuries, including expenses related to the following: (a) cancelling or reissuing credit and debit cards affected by the Marriott Data Breach; (b) refunding or crediting cardholders to cover the cost of any unauthorized transactions relating to Marriott's data breach; (c) responding to a higher volume of cardholder complaints, confusion, and concern; (d) increasing fraud monitoring efforts; and (e) investigating the impact of the breach on the financial institution and its members.

96.     Plaintiff here has likewise suffered damages due to Marriott's Data Breach.    On December 6, 2018, Plaintiff received a CAMS alert from Visa informing it that cards it issued may have been compromised in the Marriott Data Breach.    In response to the alert, Plaintiff incurred costs to cancel and reissue compromised payment cards; and reimburse cardholders for fraudulent transactions.    In addition, Plaintiff expended other administrative and operational costs in responding to the Marriott Data Breach.

97.     Due to Marriott's Data Breach, Plaintiff and the Class have suffered and will continue to suffer damages, including among other things:

> a.  bearing the costs of canceling or reissuing any credit and debit cards affected by the Marriott Data Breach;

38

    b.  refunding or crediting cardholders to cover the cost of any unauthorized

transaction relating to the Marriott Data Breach;

    c.  responding to cardholder complaints, confusion, and concern; and

    d.  increasing fraud monitoring efforts.

## CLASS ACTION ALLEGATIONS

98.    Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and, as applicable, (c)(4), Plaintiff

seeks certification of the following Nationwide Class (the "Nationwide Class" or the "Class"):

> All banks, credit unions, financial institutions, and other entities in the United States
> (including its Territories and the District of Columbia) that issued payment cards
> (including debit or credit cards) that were compromised in the Marriott Data
> Breach.

99.    Excluded from the Class is Defendant and its subsidiaries and affiliates, all

employees of Defendant, any entity in which Defendant has a controlling interest, and Defendant's

officers, directors, legal representative, successors, subsidiaries, and assigns. Also excluded from

the Class are any judicial officers presiding over this matter, members of their immediate family,

and members of their judicial staff.

100.    Plaintiff reserves the right to modify, expand or amend the above class definition

or to seek certification of a class or subclass defined differently than above before any court

determines whether certification is appropriate following discovery.

101.    **Numerosity:** The members of the Class are so numerous and geographically

dispersed that individual joinder of all Class members is impracticable. Plaintiff believes,

confirmed by documents produced by Marriott in discovery, that there are thousands of members

of the Class. Class members may be identified through objective means. Class members may be

notified of the pendency of this action by recognized, Court-approved notice dissemination

methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

102.    **Commonality and Predominance:** Consistent with Fed. R. Civ. P. 23(a)(2) and (b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting only individual Class members, including, but not limited to:

a.    Whether Marriott had a duty to financial institutions to implement reasonable data security measures because of the foreseeable harm a data breach causes financial institutions;

b.    Whether Marriott knew or should have known its inadequate data security measures left its Starwood Database vulnerable to a data breach;

c.    Whether Marriott's non-compliance with PCI DSS constituted a breach of its duty to implement reasonable data security;

d.    Whether Marriott's failure to implement reasonable data security violated Section 5(a) of the FTC Act;

e.    Whether Marriott's other data security deficiencies and failure to resolve other vulnerabilities constituted a breach of its duty to implement reasonable data security;

f.    Whether Marriott's failure to implement reasonable data security measures allowed the breach of the Starwood Database to continue and allowed hackers to exfiltrate significant amounts of sensitive data;

g.    Whether reasonable data security measures could have reasonably prevented the Marriott Data Breach; and

h.    Whether Plaintiffs and the Class were injured and suffered damages or other losses as a result of Marriott's unreasonable actions or inaction.

103.    **Typicality**: Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff is a bank which issued payment cards compromised by the infiltration and theft of card payment information from the Starwood Database. Plaintiff's claims are typical of other Class members' claims because the Plaintiff and Class members were subjected to the same allegedly unlawful conduct and injured in the same way.

104.    **Adequacy of representation**: Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate class representative because its interests do not conflict with the interests of Class members who it seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation and data breach litigation, and Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

105.    **Superiority:** Consistent with Fed. R. Civ. P 23(b)(3), a class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the Class members. Plaintiff and the Class members have been harmed by Defendant's wrongful actions and inaction. Litigating this case as a class action will reduce the possibility of repetitious litigation relating to Defendant's wrongful actions and inaction.

106.    A class action is an appropriate method for the fair and efficient adjudication of this controversy. There is no special interest in the members of the Class individually controlling the prosecution of separate actions. The loss of money and other harm sustained by many individual Class members will not be large enough to justify individual actions, especially in proportion to the significant costs and expenses necessary to prosecute this action. Class treatment will permit a large number of similarly situated institutions to prosecute their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual

actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. Furthermore, Defendant transacts substantial business in and perpetuated its unlawful conduct from Maryland. Defendant will not be prejudiced or inconvenienced by the maintenance of this class action in this forum.

107. **Declaratory and Injunctive Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

## CLAIMS FOR RELIEF

## COUNT 1

### Negligence

108. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

109. Marriott owed an independent duty to Plaintiff and the Class to take reasonable care in managing and protecting the payment card information that Marriott voluntarily accepted for payment and voluntarily stored on its databases. Marriott's duty arises from multiple sources.

110. At common law, Marriott owed a duty to Plaintiff and the Class to implement reasonable data security measures because it knew financial institutions inherently rely on merchants who accept payment cards to secure that payment card data. It was foreseeable that Marriott's databases, as a significant repository of customers' personal and payment information, would be targeted by hackers seeking to steal that information; and, the foreseeable consequence of such a data breach would be harm to Plaintiff and the Class who are legally obligated to respond to notice of an account that is potentially compromised in a data breach.

111.    At common law, Marriott owed an independent duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that Marriott's databases, as a repository of a significant amount of customer personal and payment data, would be targeted by hackers and that, should a breach occur, Plaintiff and the Class would be harmed. Marriott knew or should have known that if hackers breached its databases, they would extract payment card data and inflict injury upon Plaintiff and the Class. Marriott knew or should have known that if hackers accessed payment card data, Plaintiff and the Class would be responsible for remediating and mitigating the consequences of a breach by cancelling and reissuing payment cards to their members, reimbursing their members for fraud losses, and taking other responsive action, thereby incurring costs and damages as a direct result of Marriott's breach. Therefore, the foreseeable consequence of Marriott's unsecured, unreasonable data security measures was a data breach that harmed Plaintiff and the Class.

112.    Additionally, Marriott voluntarily assumed a duty to Plaintiff and the Class to reasonably secure payment card data because Marriott voluntarily accepted payment cards as a method of payment at its hotels and voluntarily chose to store payment card data in its databases, including in the Starwood Database. The foreseeable consequence of Marriott's failure to adequately protect the payment card data it voluntarily stored was harm to the Plaintiff and the Class, who are legally and otherwise obligated to respond to a notice of a data breach.

113.    Marriott's duty to Plaintiff and the Class also arose under Section 5(a) of the FTC Act, 15 U.S.C. §45, which required Marriott to take reasonable measures to protect cardholder data. Section 5 prohibits unfair practices in or affecting commerce and, under the FTC's interpretation, Section 5(a) required Marriott to implement reasonable data security measures to protect payment card data it processed or stored. FTC publications and data security breach orders

further form the basis of Marriott's duty to adequately protect sensitive card payment information. By implementing unreasonable data security measures, Marriott violated Section 5(a) of the FTC Act. Moreover, state consumer protection statutes and deceptive and unfair trade practices statutes incorporate and prohibit the unfair conduct prohibited under Section 5(a) of the FTC Act.

114.    Industry standards and best practices provide another source of Marriott's duty and obligation to exercise reasonable care with respect to Plaintiff and the Class by requiring implementation of data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class. Marriott was obligated to comply with one such industry standard, PCI DSS, detailing certain baseline data security measures because Marriott stored, processed, or otherwise used customer payment card data as part of its business.

115.    Marriott had an intimate nexus akin to contractual privity with Plaintiff and the Class because Marriott accepts and stores Plaintiff and the Class's payment card data, understands that Plaintiff and the Class rely on it to keep the payment card data it stores secure from unauthorized access or exposure, and knows that should unauthorized parties gain access to the payment card data, Plaintiff and the Class would incur significant costs.

116.    Marriott breached its duty to Plaintiff and the Class. Marriott admitted that it had a responsibility to protect consumer data, that it is entrusted with this data, and that it did not live up to its responsibility to protect the personal information and payment card data it received.[31]

117.    Marriott exacerbated Plaintiff's and the Class' injuries by waiting until November 30, 2018 to provide notice of the Data Breach, almost three months after Marriott first became

_____

[31] *Examining Private Sector Data Breaches:  Hearing before the U.S. Senate Committee on Homeland Security & Governmental Affairs* (Mar. 7, 2019) (Prepared Testimony of Arne Sorenson, President and Chief Executive Officer of Marriott Int'l, Inc.), https://www.hsgac.senate.gov/imo/media/doc/Soresnson%20Testimony.pdf.

aware of it.   Timely notification was required, appropriate and necessary to allow, among other things, Plaintiff and the Class members to take immediate and appropriate actions to protect their members and their business interests from unnecessary damages.

118.    Marriott had the opportunity and resources to detect and prevent the Marriott Data Breach by implementing reasonable and known data security measures capable of preventing or limiting the scope of a data breach.  Marriott knew upon its acquisition of Starwood that Starwood had recently suffered a massive data breach due to significant data security deficiencies.  Marriott, therefore, was on notice that the systems, networks, and processes it inherited from Starwood may not be capable of protecting the large repository of guest data stored in the Starwood Database. Marriott was also a Participating Organization in PCI DSS, meaning it knew of and had the opportunity to review and comment on the data security measures PCI DSS required.  As a Participating Organization, Marriott also received access to resources to help ensure PCI DSS compliance and a strong overall data security posture.  Marriott also knew, or should have known, of other data security measures beyond PCI DSS compliance that would have prevented or limited the scope of its Data Breach.  Marriott, however, failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

119.    As a direct and proximate result of Marriott's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including, but not limited to cancelling and reissuing payment cards, notifying customers, investigating claims of fraudulent activity, refunding fraudulent charges, increasing fraud monitoring, and taking other steps to protect themselves and their members.  Plaintiff and the Class suffered further injury because they lost interest and transaction fees due to reduced card usage resulting from the breach, and the cards they issued (and the corresponding account numbers) were rendered worthless.

## COUNT 2

### Negligence Per Se

120.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

121.    Marriott's unreasonable data security measures violated Section 5(a) of the FTC Act. Although the FTC Act does not create a private right of action, it requires businesses to institute reasonable data security measures, which Marriott failed to do.

122.    Section 5(s) of the FTC Act, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by retailers, restaurants and other businesses like Marriott of failing to use reasonable measures to protect cardholder data. The FTC publications and orders described above also form the basis of Marriott's duty.[32]

123.    Marriott violated Section 5(a) of the FTC Act by failing to use reasonable measures to protect cardholder data and by not complying with applicable industry standards, including PCI DSS. Marriott's conduct was particularly unreasonable given the nature and amount of payment card data it obtained and the foreseeable consequences of a data breach.

124.    Marriott's violation of Section 5(s) of the FTC Act constitutes negligence per se.

125.    Plaintiff and the Class are within the class of persons Section 5(a) of the FTC Act (and similar state statutes) was intended to protect because they are engaged in trade and commerce and bear primary responsibility for reimbursing consumers for fraud losses.

126.    Additionally, the harm that has occurred is the type of harm the FTCA (and similar state statutes) was intended to guard against. The FTC has pursued over 50 enforcement actions

---

[32] *See supra*, note 27 (listing orders).

against businesses that caused the same type of injuries suffered here by Plaintiff and the Class due to the breached merchants' respective failures to employ reasonable data security measures.

127. As a direct and proximate result of Marriott's negligence per se, Plaintiff and the Class have suffered and continue to suffer injury, including but not limited to costs to cancel and reissue payment cards, refund fraudulent charges, increase fraud monitoring, and other steps to protect themselves and their members.

## COUNT 3

### Declaratory and Injunctive Relief

128. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

129. Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. This Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal and state statutes described herein.

130. An actual controversy has arisen in the wake of the Marriott Data Breach regarding Defendant's common law and other duties to implement measures to reasonably safeguard the cardholder data issued by Plaintiff and the Class. Plaintiff alleges Marriott's actions (and inaction) in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff continues to suffer injury as additional fraud and other illegal charges are made upon payments cards Plaintiff and the Class members have issued.

131. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.  Marriott owes a legal duty to secure the personal and financial information with which it is entrusted – specifically including information pertaining to credit and debit cards entrusted to its protection– and to immediately notify financial institutions of a data breach under the common law, Section 5 of the FTC Act, Card Operating Regulations, PCI DSS standards, and various state statutes of the precise scope of payment cards at risk and the reasons therefor;

    b.  Marriott breached and continues to breach these legal duties by failing to employ reasonable measures to secure its customers' personal and financial information; and

    c.  Marriott's ongoing breaches of its legal duty caused and to continue to cause Plaintiff and the Class harm.

132.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate data security protocols consistent with law and industry standards.

133.    If an injunction is not issued, Plaintiff will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. If another breach of Marriott's Starwood or other databases occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and it will be forced to bring multiple lawsuits to rectify the same conduct. The Starwood environment has suffered at least two separate data breaches since 2015, demonstrating that Starwood and Marriott have continuously failed to implement the data security measures necessary to protect the large repositories of consumer and payment card data Marriott stores and is responsible for.

134.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.  Among other things, if another massive data breach occurs at Marriott, Plaintiff and the thousands of putative Class members will likely be subjected to substantial financial damage.  On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

135.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Marriott, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose confidential information would be further compromised.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the Class, respectfully requests that:

136.    The Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; appoint Plaintiff as class representative; and appoint Plaintiff's counsel as Class Counsel;

137.    The Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

138.    The Court award Plaintiff and the Class members damages in an amount to be determined at trial;

139.    Plaintiff be granted the declaratory relief sought herein;

140.    The Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses to the extent allowed by law;

141.    The Court award pre- and post-judgment interest at the maximum legal rate; and

142.    The Court grants all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

June 28, 2019                                        Respectfully submitted,

                                                    SILVERMAN THOMPSON SLUTKIN &
                                                    WHITE LLC

                                                    */s/ William N. Sinclair*
                                                    Steven D. Silverman (Bar No. 22887)
                                                    ssilverman@mdattorney.com
                                                    Joseph F. Murphy, Jr. (Bar No. 00659)
                                                    jmurphy@mdattorney.com
                                                    Andrew C. White (Bar No. 08821)
                                                    awhite@mdattorney.com
                                                    William N. Sinclair (Bar No. 28833)
                                                    bsinclair@mdattorney.com
                                                    201 N. Charles Street, 26th Floor
                                                    Baltimore, MD  21201
                                                    Telephone: (410) 385-2225
                                                    Facsimile: (410) 547-2432

                                                    Arthur Murray
                                                    amurray@murray-lawfirm.com
                                                    Caroline T. White
                                                    cthomas@murray-lawfirm.com
                                                    MURRAY LAW FIRM
                                                    650 Poydras Street, Suite 2150
                                                    New Orleans, LA 70130
                                                    Telephone: (504) 525-8100
                                                    Facsimile: (504) 584-5249

                                                    *Co-Lead Counsel for Plaintiff and the*
                                                    *Financial Institution Class*

Brian C. Gudmundson
brian.gudmundson@zimmreed.com
Bryce D. Riddle
bryce.riddle@zimmreed.com
Michael Laird
Michael.Laird@zimmreed.com
ZIMMERMAN REED LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

Stuart A. Davidson
sdavidson@rgrdlaw.com
Christopher C. Gold
cgold@rgrdlaw.com
Bradley Beall
bbeall@rgrdlaw.com
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

Charles H. Van Horn
cvanhorn@bfvlaw.com
Katherine M. Silverman
ksilverman@bfvlaw.com
BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, NE Suite 1100
Atlanta, GA 30305
Telephone: (404) 261-7711

*Counsel for Plaintiff and Members of the
Financial Institution Plaintiff's Steering
Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ William N. Sinclair*
William N. Sinclair