**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 19-md-2879<br><br>This Document Relates to Case No. 8:18-cv-03833-PJM |
| This Document Relates to:<br><br>BANK OF LOUISIANA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC.,<br><br>Defendant. | Honorable Paul W. Grimm |

**PLAINTIFF BANK OF LOUISIANA'S OPPOSITION TO DEFENDANT MARRIOTT**
**INTERNATIONAL, INC.'S MOTION TO DISMISS**

**TABLE OF CONTENTS**                                                                    **PAGE**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL ALLEGATIONS ............................................................................... 4

III.  ARGUMENT ....................................................................................................... 7

    I.    PLAINTIFF'S HAS STANDING TO BRING ITS CLAIMS. ........................... 7

        A.    Plaintiff's Fraud Reimbursement Damages Confer Standing. ..................... 7

        B.    Plaintiff's Other Injuries are Sufficient For Article III Standing. . ........................... 10

    II.   PLAINTIFF'S INDIVIDUAL CLAIMS SURVIVE. .................................... 12

        A.    Maryland's Economic Loss Rule Does Not Bar Plaintiff's Claim............................ 13

        B.    Marriott Owed Financial Institutions a Duty Under Maryland's
            "Intimate Nexus" Test. ........................................................................ 17

        C.    Section 5 of the FTC Act Provides an Independent Source of
            Marriott's Duty to Maintain Reasonable Data Security Measures........................... 21

        D.    Plaintiff's Claims for Injunctive and Declaratory Relief Survive. ........................... 23

CONCLUSION...................................................................................................... 23

CERTIFICATE OF SERVICE...................................................................................26

## TABLE OF AUTHORITIES

PAGE

**Cases**

*100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1 (Md. 2013) ...................... 14, 18

*Absolon v. Dollahite*, 831 A.2d 6, 11 (Md. 2003) ................................................. 3, 21

*Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184
 (Mo. App. 2010) ................................................................................ 16

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*,
 155 A.3d 445 (Md. 2017) ................................................................ 18-20

*Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017) ............................................ 9, 11

*Bellsouth Telecommunications, Inc. v. Eustis Engineering Co., Inc.*,
 974 So. 2d 729 (La. App. 2007) ........................................................... 13

*Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616 (Md. 2003) .................................... 21

*Cash & Carry America, Inc. v. Roof Solutions, Inc.,* 223 Md. App. 451 (2015) ......... 17

*Cedarholley Inv., LLC v. Pitre*, 209 So. 3d 850 (La. App. 2016) ............................... 13

*Chicago Title Ins. Co. v. Allfirst Bank*, 905 A.3d 366 (Md. 2005) .......................... 19

*Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803 (7th Cir. 2018) ............ 14

*Cooper v Berkshire Life Ins. Co.,* 810 A.2d 1045 (Md. App. 2001) .............. 13, 14, 15

*Cornelio v. Covenant Transp., Inc.*, No. CIV.A 3-02-CV-2279, 2006 WL 236856
 (D. Conn. Jan. 31, 2006) ..................................................................... 3

*Cremi v. Brown*, 955 F. Supp 499 (D. Md. 1997) ................................................ 3

*Doe v. Alisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015) ................................... 4

*Ducote v. Boleware*, 216 So. 3d 934 (La. App. 2016),
 *writ denied* 191 So. 3d 1071 (La. 2016) ............................................... 13

*F.T.C. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) ........................ 22

*F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ........................... 22

*F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602 (D.N.J. 2014),
 *aff'd*, 799 F.3d 236 (3d Cir. 2015) ................................................... 21, 22

*Fidelity & Guaranty Life Ins. Co. v. United Advisory Grp., Inc.*, No. 13-cv-0040,
    2014 WL 346630 (D. Md. Jan. 29, 2014) .................................................................. 13

*First Choice Fed. Credit Union v. Wendy's Co.*, No. 16-cv-0506, 2017 WL 9487086
    (W.D. Penn. Feb. 13, 2017) ........................................................................... 16, 23

*Hutton v. Nat'l Bd. of Examiner in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018) ........ 2, 8, 10-11

*In re Arby's Restaurant Grp. Inc. Litig.*, No. 17-mi-55555, 2018 WL 2128441
    (N.D. Ga. Mar. 5, 2018) ........................................................................... 13, 16, 22

*In re BJ's Wholesale Club, Inc.*, FTC Docket No. C-4148,
    FTC File No. 042-3160 (Sept. 20, 2005) ................................................................... 22

*In re CardSystems Solutions, Inc.*, FTC Docket No. C-4168,
    FTC File No. 052-3148 (Sept. 5, 2006) ..................................................................... 22

*In re Equifax*, 2019 WL 949366, at *11 .......................................................................... 16

*In re Equifax*, 371 F. Supp. 3d at 1165 (N.D.Ga. 2019) ................................................. 8, 10, 22

*In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154 (D. Minn. 2014) ..................... 16

*In re The Home Depot Inc. Customer Data Sec. Breach Litig.*, No. 14-md-2583, 2016 WL
    2897520 (N.D. Ga. May 17, 2016) ................................................... 2, 8, 10, 13, 16, 22-23

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018) .... 17

*In the Matter of LabMD, Inc.*, No. 9357, 2016 WL 4128215 (F.T.C. July 28, 2016) ........... 21, 22

*Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756 (Md. 1986) .......................... 3, 14, 17, 18

*Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524 (D. Md. 2016) ................................. 8

*Kiriakos v. Phillips*, 139 A.3d 1006 (Md. 2016) .......................................................................... 21

*Lone Star Nat'l Bank, N.A. v. Heartland Payment Sys.*, 729 F.3d 421 (3d Cir. 2013) ................ 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 7

*Malinowski v. Lichter Group, LLC*, No. 14-cv-0917, 2015 WL 1129522
    (D. Md., Mar. 11, 2015) ............................................................................................ 2, 13

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) .......................................................... 23

*Moore v. Myers*, 868 A.2d 954 (Md. 2005) .................................................................................. 17

*Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982) ............................................. 16

*Paul v. Blackburn Ltd. P'ship*, 63 A.3d 11074 (Md. App. 2013),
  *aff'd*, 90 A.3d 464 (Md. 2014) ..................................................................................... 21

*Powell v. McCormack*, 395 U.S. 486 (1969) ............................................................................. 23

*Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 668 (7th Cir. 2015) ........................................ 12

*Shukis v. Bd. of Educ. of Reg'l Dist. No. 17*, 122 Conn. App. 555 1 A.3d 137 (2010) ................ 21

*Slacum v. Trust Co.*, 163 A. 119 (Md. 1932) .............................................................................. 14

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 395 F. Supp. 2d 183 (M.D. Penn. 2005) ............. 17

*Steven B. Snyder, M.D., P.A. v. Cynosure, Inc.*, No. 18-cv-2049,
  2019 WL 1386727, at 4 (D. Md. Mar. 27, 2019) ........................................................... 14

*United States v. ChoicePoint, Inc.*, Civil Action No. 1:06-cv-0198-JTC
  (N.D. Ga. Oct. 14, 2009) ............................................................................................... 23

*U.S. Ass'n of Credit Bureaus v. F.T.C.*, 299 F.2d 220 (7th Cir. 1962) ........................................ 22

*U.S. Retail Credit Ass'n. Inc. v. F.T.C.*, 300 F.2d 212 (4th Cir. 1962) ........................................ 22

*Valentine v. On Target, Inc.*, 727 A.2d 947 (Md. 1999) ............................................................. 17

*Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582 (Md. 2000) ................................. 18

*Williams v. Ketler Mgmt. Inc.*, No. 12-cv-1226, 2013 WL 398741 (D. Md. Jan. 31, 2013) ........ 10

**Statutes**

15 U.S.C. § 45(a)(1) .................................................................................................................... 22

**Regulations**

29 Fed. Rg. 8324 (July 2, 1964) .................................................................................................. 22

**Other**

Fed. Trade. Comm'n, Statement of the Fed. Trade Comm'n
  on *F.T.C. v. Lifelock* (Dec. 17, 2015) .......................................................................... 15

Plaintiff Bank of Louisiana ("Plaintiff"), individually and on behalf of the class of financial institutions, submits this memorandum of law in opposition to Defendant Marriott International, Inc.'s ("Marriott") Motion to Dismiss (ECF No. 358) Plaintiff's First Amended Consolidated Class Action Complaint ("Complaint") (ECF No. 328).

## INTRODUCTION

Plaintiff brings claims against Marriott for injuries incurred responding to one of the largest data breaches in history. As alleged, Marriott knew for years that the data environment it inherited from Starwood Hotels & Resorts, LLC ("Starwood") lacked adequate data security protections and was susceptible to a data breach. Within that unprotected environment, Starwood, and subsequently Marriott, operated a reservation database ("Starwood Database") that contained personal and payment card information for millions of guests. Rather than resolve the data security deficiencies in the Starwood environment, Marriott continued to voluntarily accept Plaintiff's and other financial institutions' payment card data and store that data, unsecured, in the Starwood Database. As such, Marriott knowingly put Plaintiff and other financial institutions at risk of harm because it understood that financial institutions would bear the lion's share of the burden of addressing and reimbursing fraud if there was a breach.

As a result of Marriott's security failures, the Starwood Database was breached and hackers copied and stole the information within it ("Data Breach"). The hackers stole hundreds of millions of former guests' personal information, including data on nearly ten million payment cards. On December 6, 2018, Visa notified Plaintiff that some of its payment cards had been exposed in the Data Breach and were at risk of fraud. Subsequently, Plaintiff determined that some of the very cards exposed in the Data Breach had incurred fraud. Plaintiff reimbursed the fraudulent charges to its customer accounts and took additional measures to prevent further fraud, including

increasing fraud monitoring efforts.  None of these costly measures would have been necessary absent the Data Breach caused by Marriott's security failings.

Marriott now seeks to dismiss the Complaint, arguing Plaintiff lacks standing because it did not suffer an Article III injury, that Plaintiff may only assert contractual, rather than tort, remedies, and that Plaintiff's negligence *per se* and injunctive relief claims cannot stand on their own.  Marriott's arguments are unpersuasive.

*First*, Plaintiff has standing because it is well recognized in this Circuit that measures taken in response to a data breach where fraud or identity theft actually occurred are Article III Injuries. *Hutton v. Nat'l Bd. of Examiner in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018); *see also In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1165 (N.D. Ga. 2019); *In re The Home Depot Inc. Customer Data Sec. Breach Litig.*, No. 14-md-2583, 2016 WL 2897520, at *3 (N.D. Ga. May 17, 2016).  As pled, Plaintiff issued payment cards that were in fact compromised in the Data Breach, and Plaintiff subsequently had to reimburse fraud on some of those very cards.  Plaintiff also incurred losses reissuing some of its compromised cards to prevent further fraud and monitoring for other fraud losses.  Plaintiff's damages are not some hypothetical future injury, but represent injuries Plaintiff has *already* suffered, providing it standing to bring its claims.

*Second*, Maryland's economic loss doctrine does not bar Plaintiff's tort claims.  The Court should examine Plaintiff's claims under Maryland law, as required at this stage when choice-of-law is not easily determinable.  *See Malinowski v. Lichter Group, LLC*, No. 14-cv-0917, 2015 WL 1129522, at *4 (D. Md., Mar. 11, 2015).  Under Maryland's "independent duty" exception to the economic loss doctrine, where the duty at issue exists independently from contractual duties, the economic loss doctrine does not apply, and a plaintiff may recover in tort.  *See Jacques v. First*

*Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986) ("Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such a duty is a tort and the injured party may have his remedy by an action on the case . . . .").

Here, Plaintiff has pled two independent bases for Marriott's duty to use reasonable care: (1) Marriott has an "intimate nexus" with Plaintiff because Marriott used and stored Plaintiff's payment card data in an unsecured database, creating a foreseeable risk of harm to Plaintiff; and, (2) Marriott's data security measures violated Section 5 of the Federal Trade Commission Act ("FTC Act") which is *prima facie* evidence of negligence.  Under both theories, Marriott had a duty to maintain reasonable data security measures that existed independently from its contractual duties to the card brands.  Therefore, the economic loss doctrine does not bar Plaintiff's tort claims.

*Third*, Marriott is correct that Maryland and Louisiana do not have standalone negligence *per se* claims, but rather, treat a violation of a statutory duty as *prima facie* evidence of negligence. *Absolon v. Dollahite*, 831 A.2d 6, 11 (Md. 2003).  Marriott's violation of Section 5 of the FTC Act therefore provides further support of Plaintiff's negligence claim.  However, Plaintiff's negligence *per se* claim should not be dismissed until choice-of-law issues have been determined because Connecticut law may still apply and under Connecticut law, Plaintiff could bring a standalone negligence *per se* claim. *See Cremi v. Brown*, 955 F. Supp 499, 522 (D. Md. 1997) (applying law of the state where the misrepresentations were made, not where the financial injury occurred); *Cornelio v. Covenant Transp., Inc.*, No. CIV.A 3-02-CV-2279, 2006 WL 236856 at *3 (D. Conn. Jan. 31, 2006) (recognizing Connecticut allows a standalone negligence *per se* claim).  Should Maryland or Louisiana law apply, Plaintiff's negligence *per se* claim would be subsumed within its negligence claim.

*Finally*, in the Fourth Circuit, injunctive and declaratory relief are treated as remedies to a plaintiff's substantive claims. *See, e.g.*, *Doe v. Alisbury Univ.*, 123 F. Supp. 3d 748, 770 (D. Md. 2015). Because Plaintiff's negligence claim survives, so too should these claims.

## FACTUAL ALLEGATIONS

On November 30, 2018, Marriott announced it had suffered one of the largest data breaches in history, in which hackers obtained the sensitive personal information of hundreds of millions Marriott's customers, as well as payment card data for nearly 10 million unique payment cards. ¶¶ 16, 19.[1]  Investigations of the Data Breach revealed ██████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ¶¶ 30, 40, 44.

Despite the public's shock, Marriott had long known the Starwood Database was at risk of a breach. ¶¶ 34-35. Marriott purchased Starwood in 2016, and thereby, gained control of the Starwood Database. ¶¶ 29-30. Upon acquiring the Starwood Database, Marriott hired ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ Despite being fully aware of the risk posed by Starwood's data security

---

[1] Citations to "¶ _" refer to Plaintiff's Complaint (ECF No. 306).

deficiencies, Marriott continued to use and rely on the Starwood Database in its substantially flawed condition.  ¶¶ 31-33, 36.

While Marriott saved money by avoiding security related expenditures necessary to protect its systems, its use of the unsecured Starwood Database knowingly put financial institutions like Plaintiff and the proposed class at risk of harm.  Marriott knew the Starwood Database contained a massive amount of payment card data.  Marriott also knew hackers had previously targeted hotel chains and data repositories to steal payment card data.  ¶ 32.  In 2015, for example, Starwood suffered a payment card data breach which ███████████████████████████████ ██████████████████████████████████████████████  ¶ 34.  That same year, a data breach at HEI Hotel & Resorts affected both Marriott and Starwood-branded hotels.  ¶¶ 71-72. Marriott understood a breach of payment card data would ultimately harm financial institutions, that were legally obligated to reimburse consumers for fraudulent transactions.  ¶ 88.  Despite its knowledge of the possibility and consequences of a data breach, Marriott failed to secure its systems, resulting in the theft of 10 million unique encrypted payment card numbers – the integrity of those cards cannot be confirmed – and the exposure of ████████████████████████████ ████████████████████████████████████████████████████████████  ¶¶ 19, 40-42, 53.

When a data breach involves the theft of payment card data, the payment card industry requires the merchant to hire an independent investigator to perform a Payment Card Industry Forensic Investigation ("PFI") which assesses the cause and extent of the breach.  After the Data Breach, Marriott hired Verizon to perform the PFI.  Verizon ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████  ¶¶ 44, 45, 48-60.  ██████████████████████ ██████████████████████████████████████████████████████████

¶¶ 39, 46-47.

¶¶ 44, 45, 48-60.  Marriott's data security measures did not comply with the Payment Card Industry Data Security Standards ("PCI DSS"), the minimum data security measures the card brands require to accept credit and debit cards for payment.  ¶¶ 54-59.  Marriott also failed to meet numerous data security best practices and industry standards.  ¶¶ 11-12, 44-45, 48-60

Marriott's Data Breach directly harmed Plaintiff and other financial institutions.  ¶¶ 20-22, 95-97.  After a data breach, financial institutions carry a substantial burden to mitigate the consequences of a data breach and are required to incur expense and injury by responding to the card brand's notice that cards have been breached. ¶¶ 88, 89, 91, 95-97.  To prevent further harm, financial institutions must determine how to respond once notified of a breach, which often includes canceling and reissuing payment cards, monitoring for fraudulent charges, notifying consumers, and investigating the impact of the data breach on customers and the institution.  ¶¶ 95, 97.

On December 6, 2018, shortly after Marriott announced the Data Breach, Visa issued a Compromised Account Management System ("CAMS") alert to Plaintiff and other financial institutions warning that their payment card data may have been captured by hackers in the  Data

Breach and was at risk of being used for fraud.  ¶ 96.  Some of Plaintiff's alerted cards were, in fact, used to make fraudulent transactions, which Plaintiff was required to reimburse.  ¶¶ 21, 96-97.  Additionally, Plaintiff cancelled and reissued some of its compromised cards on the CAMS alert and increased its fraud monitoring efforts.  ¶¶ 21-22, 96-97.

## ARGUMENT

### I.   PLAINTIFF HAS STANDING TO BRING ITS CLAIMS.

Article III standing requires Plaintiff to plead (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Marriott asserts Plaintiff did not plead an Article III injury because it supposedly did not adequately allege its fraud reimbursement costs were related to the Data Breach and because its other responsive actions were purportedly not in response to a "certainly impending" harm.  Marriott's arguments fail.  Marriott's Data Breach exposed Plaintiff's payment card data to hackers who used that very data to commit fraud that Plaintiff had to reimburse.  While the foregoing alone is sufficient to establish standing, Plaintiff's other actions in response to the CAMS alert also constitute Article III injuries.

### A.  Plaintiff's Fraud Reimbursement Damages Confer Standing.

For standing, a plaintiff must allege an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (citations removed).  Here, Plaintiff alleges, among other things, that it had to reimburse fraud on payment card accounts compromised in the Data Breach.  ¶¶ 21, 88, 95-97.  Whether Plaintiff's damages are "certainly impending," as Marriott argues, is therefore irrelevant because Plaintiff has *already* incurred injury reimbursing fraud related to the Data Breach.

7

Financial institutions' fraud reimbursement damages are well-established Article III injuries. *See, e.g.*, *In re Equifax*, 371 F. Supp. 3d at 1165 ("[T]he Court concludes that the Financial Institution Card Issuers have adequately alleged an injury resulting from compromised payment card data. In the Complaint, the Financial Institution Card Issuers alleged that payment cards that they issued were compromised in the Data Breach, and that they received fraud alerts relating to these compromised cards."); *In re Home Depot*, 2016 WL 2897520, at *3 ("Here, the financial institution plaintiffs have adequately pleaded standing. Specifically, the banks have pleaded actual injury in the form of costs to cancel and reissue cards compromised in the data breach, costs to refund fraudulent charges, costs to investigate fraudulent charges, costs for customer fraud monitoring, and costs due to lost interest and transaction fees to reduced card usage. These injuries are not speculative and not threatened future injuries, but are actual, current, monetary damages.").

Just last year, the Fourth Circuit held that fraud damages confer standing in a data breach case:

> The Plaintiffs in these cases, on the other hand, allege that they have already suffered actual harm in the form of identity theft and credit card fraud. The Plaintiffs have been concretely injured by the data breach because the fraudsters used – and attempted to use – the Plaintiffs' personal information to open Chase Amazon Visa credit card accounts without their knowledge or approval. Accordingly, there is no need to speculate on whether substantial harm will befall the Plaintiffs.

*Hutton*, 892 F.3d at 622.

Marriott's principal cases are not to the contrary and *agree* that standing exists when the stolen data is used to commit fraud or identity theft. *See Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 531 (D. Md. 2016) ("Although these courts reached conflicting results [concerning standing], the difference appears to arise . . . from crucial distinctions in the underlying

facts.  In [cases where plaintiffs had standing], the allegations included either actual examples of the use of the fruits of the data breach for identity theft, even if involving victims other than the named plaintiffs, or a clear indication that the data breach was for the purpose of using the plaintiffs' personal data to engage in identity fraud. . . .");  *Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017) (agreeing that standing exists where "the data thief intentionally targeted the personal information compromised in the data breaches" or "at least one named plaintiff alleged misuse or access of that personal information by the thief").

Marriott seemingly concedes that fraudulent transactions are sufficient to generate standing.  *See* Def. Mem. Supp. Mot. Dismiss ("Br.") at 8 (ECF 359).  However, Marriott tries to get around this basic rule by claiming first that Plaintiff has not alleged the fraud was caused by the Data Breach, and second that Plaintiff's damages might be caused by the Equifax data breach.  *Id.* at 10.  Both suggestions should be rejected.

First, any plain reading of the Complaint shows that, as Plaintiff alleged, the fraud occurred on some of Plaintiff's payment cards exposed during the Data Breach.  Specifically, Plaintiff alleged that it received a CAMS alert from Visa on December 6, 2018 notifying it that the Data Breach exposed its customers' payment cards.   ¶ 20.  Plaintiff alleged that "[a]s a direct and proximate result of Marriott's Data Breach, Plaintiff…suffered damages and injuries related to… refunding or crediting cardholders to cover the costs of any unauthorized transactions relating to Marriott's data breach." ¶¶ 21, 95.  In its Class Allegations, Plaintiff alleged it is a "typical member of the Class" because it "was subjected to the same unlawful conduct and injured in the same way," and repeatedly states that fraud reimbursement linked to the Data Breach is one such shared injury. ¶¶ 103, 95-96, 111, 118.  In short, the Complaint leaves no question that Plaintiff reimbursed its

customers for fraud on payment card accounts identified as potentially compromised because of Marriott's Data Breach.

Second, at the pleading stage, Plaintiff is only obligated to plausibly allege causation, not to definitively prove it. *See Hutton*, 892 F.3d at 623 ("Put simply, the complaints contained sufficient allegations that the [database] was a plausible source of Plaintiff's personal information."); *see also Williams v. Ketler Mgmt. Inc.*, No. 12-cv-1226, 2013 WL 398741, at *3 (D. Md. Jan. 31, 2013) ("Constructing all factual inferences in favor of Plaintiff, it is plausible to infer causation from" the allegations). Marriott claims *Hutton* requires the breached database to be the "only common source" of the data later used for fraud and claims Plaintiff's participation in the Equifax Data Breach shows Plaintiff's fraudulent charges might have been a result of that data breach. That claim is meritless and the need to definitively prove causation at the motion to dismiss stage is rebuked by *Hutton* itself. *See Hutton*, 892 F.3d at 623 (requiring only "sufficient factual mater to render the Plaintiffs' allegations plausible on their face with respect to traceability."). Here, Visa alerted Plaintiff of cards compromised in Marriott's Data Breach and some of those very cards were used to commit fraud. The Data Breach is therefore a plausible cause of the fraud. *In re Home Depot Inc.,* 2016 WL 2897520, at *3; *In re Equifax, Inc.*, 371 F. Supp. 3d at 1165. Plaintiff has standing, and Marriott's arguments fail.

**B. Plaintiff's Other Injuries are Sufficient For Article III Standing.**

Plaintiff incurred additional alleged injuries, such as card reissuance costs, in direct response to the CAMS alert, which also confer Article III standing. Marriott claims that Plaintiff does not know whether or not fraud will occur on any of its cards stolen in the Data Breach and, therefore, any action it took to prevent fraud was in response to an unknown future threat. Courts have rejected this defense. *See, e.g.*, *In re Equifax*, 371 F. Supp. 3d at 1165 ("Even if some of the

Financial Institution Card Issuers did not allege that any of these compromised cards had already experienced unauthorized charges as a result of the Data Breach, they have still alleged that they incurred costs of reissuing these cards to customers.  These costs associated with replacing their payment cards constitute sufficient injury to confer standing."); *see also Hutton*, 892 F.3d at 622 (holding that "time lost in seeking to respond to fallout from the [defendant's] data breach" would establish an Article III injury).

*Beck*, Marriott's principle case, is not to the contrary.  In *Beck*, plaintiffs brought claims concerning a laptop stolen from a Veteran Affairs Medical Center that contained patients' names, birth dates, physical descriptors, and the last four digits of social security numbers.  *Beck*, 848 F.3d at 267.  The plaintiffs asserted they had standing based on increased risk of future identity theft. Yet, "*after extensive discovery*, the *Beck* plaintiffs ha[d] uncovered no evidence that the information contained on the stolen laptop ha[d] been accessed or misused or that they ha[d] suffered identity theft, [or], for that matter, that the thief stole the laptop with the intent to steal their private information."[2]  *Id.* at 274 (emphasis added).  The *Beck* court, however, noted the result might be different had the "data thief intentionally targeted the personal information compromised in the data breach" or if "at least one named plaintiff alleged misuse or access of that personal data."  *See id.*

Here, putting aside that discovery has just commenced, Plaintiff plausibly alleged the hackers intended to steal and use payment card data stored in Marriott's servers for fraud, and that Plaintiff in fact incurred fraud on some of its issued cards. ████████████████

---

[2] *Beck* is inapplicable here because it involved a motion for summary judgment and class certification filed after "extensive discovery," which still failed to show the risk of identity theft was "certainly impending."  *Id.* at 267.  As described further below, Plaintiff only needs to plausibly allege a "certainly impending" risk of harm and has done so in its Amended Complaint.

11

[REDACTED] The hackers then stole over ten million encrypted payment cards, [REDACTED] The plausible purpose of the hacker's inquiry into and subsequent theft of payment card data was fraud. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 668, 694 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information."). Plaintiff followed industry guidelines and appropriate business practices in responding to the Marriot Data Breach by reissuing some of its alerted cards, among other efforts. These costly efforts were in response to a "certainly impending" injury and are more than sufficiently confer standing.

## II.   PLAINTIFF'S INDIVIDUAL CLAIMS SURVIVE.

In assessing several of Plaintiff's claims, Marriott invokes choice of law principles, seeking those laws that it apparently believes favor its chances of dismissal. For choice-of-law purposes, "Maryland courts have not yet specifically spoken as to the issue of where the 'wrong' occurs in cases of pecuniary injury resulting from fraud, negligent misrepresentation or commercial negligence, when the alleged wrongful act or omission occurred in one jurisdiction and the 'loss' by plaintiff in another jurisdiction." *Cremi*, 955 F. Supp at 522. While Marriott asserts Louisiana law is likely to apply, Marriott's negligent acts were committed in Maryland (where Marriott is located) or, arguably, in Connecticut (where Starwood is located), and, consequently, one of those states' laws seem more likely to apply to these claims. *See, e.g.*, *id.* at 524. Where choice-of-law questions are complex and fact specific, courts typically apply Maryland law at the motion to dismiss stage and reserve making a final determination on choice of law until later. *Malinowski*,

2015 WL 1129522, at *4 ("Given the fact-intensive, context specific . . . [and] complexity of the choice of law analysis . . . [t]he Court will apply Maryland law to resolve the pending motion and defer final determination of the choice-of-law issues."); *see also See Fidelity & Guaranty Life Ins. Co. v. United Advisory Grp., Inc.*, No. 13-cv-0040, 2014 WL 346630, at *4 (D. Md. Jan. 29, 2014). Under Maryland law, Plaintiff's claims survive.[3]

### A. Maryland's Economic Loss Rule Does Not Bar Plaintiff's Claim

The purpose of the economic loss doctrine is to prevent "a plaintiff from recovering tort damages for what in fact is a breach of contract." *Cash & Carry Am., Inc. v. Roof Solutions, Inc.*, 117 A.3d 52, 60 (Md. App. 2012); *see also Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1068 (Md. App. 2001) ("[T]he economic loss doctrine . . . [is] a rule of law restricting tort theories of recovery in situations involving economic loss when there exists no independent duty."). Primarily

---

[3] Although Maryland law applies at this stage, Plaintiff's negligence claim would also survive under Louisiana law. Louisiana has abolished the economic loss rule and instead uses a risk-duty analysis. *See, e.g.*, *Cedarholley Inv., LLC v. Pitre*, 209 So. 3d 850, 852-53 (La. App. 2016) ("[T]he prohibitory economic-loss rule advanced by the defendants is not the law of this state."). The risk-duty analysis "melds policy and foreseeability into one inquiry[,]" asking "[i]s the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?" *Bellsouth Telecommunications, Inc. v. Eustis Engineering Co., Inc.*, 974 So. 2d 729, 751 (La. App. 2007). Here, the type of conduct engaged in by Marriott is known to put financial institutions like Plaintiff at risk of harm. Marriott voluntarily used and stored payment card data despite ██████████████████████████████ Marriott put financial institutions in harm's way by continuing to use the unsecured Starwood Database. Its conduct is "easily associated" with and well-known to cause the type of harm that Plaintiff ultimately sustained as a result of the Data Breach. *See, e.g.*, *In re Arby's Restaurant Grp. Inc. Litig.*, No. 17-mi-55555, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) ("[A]llegations that a company knew of a foreseeable risk to its data security systems are sufficient to establish the existence of a plausible legal duty and survive a motion to dismiss."); *Home Depot*, 2016 WL 2897520, at *4 (holding Home Depot had a duty to use reasonable data security measures because otherwise retailers "would use outdated security measures and turn a blind eye to the ever-increasing risk of cyber attacks . . . even though the retailer was in a superior position to safeguard the public form such a risk."). Plaintiff's negligence claim would also survive under Louisiana for the same reason it survives in Maryland because both states hold that a statutory violation is *prima facie* evidence of negligence. *See Ducote v. Boleware*, 216 So. 3d 934, 945 (La. App. 2016), *writ denied* 191 So. 3d 1071 (La. 2016).

relying on *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803 (7th Cir. 2018), Marriott claims Maryland's economic loss doctrine prevents Plaintiff from recovering in tort because its remedies are limited to the "web of contracts" between Plaintiff, the card brands, and Marriott. Br. at 13. However, in Maryland, a plaintiff is not limited to contractual remedies simply because the duty at issue also exists in contract. *See, e.g.*, *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 10 (Md. 2013) (noting that although "not every duty assumed by contract will sustain an action sounding in tort[,]" Maryland recognizes situations "when responsibilities imposed by a contractual relationship are supplemented with tort duties.").

Rather, where the duty at issue exists independently from the contractual duties, the economic loss doctrine does not apply. *See Steven B. Snyder, M.D., P.A. v. Cynosure, Inc.*, No. 18-cv-2049, 2019 WL 1386727, at *4 (D. Md. Mar. 27, 2019) ("Where the alleged tortfeasor is under a duty of care independent of any contractual obligations, the economic loss rule does not bar recovery" in tort); *Cooper*, 810 A.2d at 1069–70 (allowing "tort claims for purely economic losses" where "the tort concerns a duty or obligation imposed by law independent of that arising out of the contract itself."). In other words, when a defendant breaches *both* a contractual duty and an independent duty in tort, Maryland allows the plaintiff to pursue its claim in either tort or contract. *Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 759 (Md. 1986) ("Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such a duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract." (Citing *Slacum v. Trust Co.*, 163 A. 119 (Md. 1932));

*Cooper*, 810 A.2d at 1069 ("The existence of this independent duty means that [the defendants] fall within" one of the "categor[ies] . . . constituting an exception to the economic loss rule.").[4]

Here, Marriott owed Plaintiff a duty to maintain reasonable data security independent of any contract Marriott had with the card brands.  Indeed, Plaintiff alleges Marriott acted negligently *even if* it complied with the card brands' minimum contractual security standards (which it did not) because a merchant does not act reasonably merely by satisfying those PCI DSS standards. ¶ 78 ("In short, the existence of PCI DSS certification is an important consideration in, but by no means the end of, our analysis of reasonable security." (quoting Fed. Trade. Comm'n, Statement of the Fed. Trade Comm'n on *F.T.C. v. Lifelock* (Dec. 17, 2015)).[5]

Plaintiff properly alleges two independent bases for Marriott's duty to use reasonable care under Maryland law: (1) Marriott has an "intimate nexus" with Plaintiff because Marriott used and stored Plaintiff's payment card data and created a foreseeable risk of harm by using unreasonable data security measures; and (2) Marriott's data security measures violated § 5 of the FTC Act which is *prima facie* evidence of negligence.  ¶¶ 108-127.  Under both theories, Marriott had a duty to use reasonable data security measures and that duty existed independently from its contractual duties to the card brands. Marriott's violation of those independent duties affords Plaintiff a basis to sue in tort. *Jacques*, 515 A.2d at 759.

Marriott does not address the "independent duty" rule in Maryland, but rather relies on *Schnuck's*, in which the Seventh Circuit held Missouri's and Illinois's economic loss doctrines limit financial institutions to contractual remedies in a merchant data breach case. *See* 887 F.3d at

---

[4] Although Plaintiff may choose its remedy in tort or contract, Plaintiff does not assert it may recover full damages in both and has not sought to obtain damages pursuant to a contract.

[5] Available at https://www.ftc.gov/system/files/documents/public_statements/896143/151217 lifelockcommsmt.pdf.

816. *Schnuck*'s is inapposite here because unlike Maryland, neither Illinois nor Missouri have an "independent duty" exception. *See id.* at 813; *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450-52 (Ill. 1982) (recognizing Illinois's economic loss doctrine barred torts for purely economic losses absent a sudden or dangerous occurrence, fraud, or negligence misrepresentations by professional business advisors); *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. App. 2010) (recognizing Missouri's economic loss doctrine barred tort claims for purely economic losses absent personal injury, property damage, or a special relationship triggering a fiduciary duty).

Indeed, in other states with an independent duty exception to the economic loss doctrine, courts consistently allow financial institutions to proceed with tort claims against merchants responsible for a data breach. *See In re Arby's.*, 2018 WL 2128441, at *12-13 (holding Georgia's independent duty exception to its economic loss rule allowed financial institutions to bring tort claims against Arby's for data breach); *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1171-76 (D. Minn. 2014) (allowing state claims to proceed where the "independent duty" exception existed and dismissing state claims where the state "do[es] not recognize the independent duty exception" or where the exception to the economic loss doctrines "is narrowly drawn[.]"); *see also Home Depot*, 2016 WL 2897520, at *4; *In re Equifax*, 2019 WL 949366, at *11.

Other states, even without the independent duty exception, have also found their states' economic loss doctrine does not apply to claims against a retailer for damages caused by a data breach. *See First Choice Fed. Credit Union v. Wendy's Co.*,  No. 16-cv-0506, 2017 WL 9487086, at *2 (W.D. Penn. Feb. 13, 2017) (Report and Recommendation declining to apply Ohio's economic loss doctrine); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d

1113, 1131 (N.D. Cal. 2018) (declining to apply California's economic loss doctrine); *Lone Star Nat'l Bank, N.A. v. Heartland Payment Sys.*, 729 F.3d 421, 426 (3d Cir. 2013) (declining to apply New Jersey's economic loss doctrine); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 395 F. Supp. 2d 183, 203-06 (M.D. Penn. 2005) (declining to apply Pennsylvania's economic loss doctrine).[6]

To the extent *Schnuck's* barred any claims, it did so because of the laws in Illinois and Missouri, not because the economic loss doctrine would universally bar Plaintiff's claims.   As discussed below, the Complaint plausibly alleges that Marriott violated an "independent duty" to Plaintiff and Plaintiff may bring its claims in tort.   *Jacques*, 515 A.2d at 759; *Cooper*, 810 A.2d at 1069-70.

## B. Marriott Owed Financial Institutions a Duty Under Maryland's "Intimate Nexus" Test.

A "duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Valentine v. On Target, Inc.*, 727 A.2d 947, 950 (Md. 1999) (quoting W. Page, Keaton, Prosser & Keaton On Torts, § 53, at 356 (5th ed. 1984)).   "[W]hether a duty is owed to a particular plaintiff turns on the essential question [of] whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Cash & Carry*, 117 A.3d at 58 (internal quotations removed).   "When a reasonable person knows or should have known that certain types of conduct constitute an unreasonable risk of harm to another, he or she has the duty to refrain from that conduct." *Moore v. Myers*, 868 A.2d 954, 969 (Md. 2005) (quoting *B.N. v. K.K.*, 538 A.2d 1175, 1178 (Md. 1988)).

---

[6] *See also* David W. Opderbeck, *Cybersecurity, Data Breaches, and the Economic Loss Doctrine in the Payment Card Industry*, 75 Md. L. Rev. 935, 980 (2016) (suggesting that the "economic loss doctrine should not bar tort claims in data breaches involving the consumer credit card system" because of the negative externalities associated with data breaches and the lack of contractual remedies associated with the breach (emphasis removed)).

17

In Maryland, a defendant owes a duty to prevent the economic losses of another with whom it shares an "intimate nexus." *Jacques*, 515 A.2d at 759. The "intimate nexus" test "looks for linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 457 (Md. 2017). The plaintiff must seek "redress not as a mere member of the public, but as one of a settled and particularized class" affected by the defendant's conduct. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 606 (Md. 2000) (intimate nexus exists where the defendant knew of "the plaintiffs' identity, or at least the class in which they belonged, and that they were going to use, and therefore rely on the information [provided by the defendant] . . . ."); *see also 100 Investment*, 60 A.3d at 13 (same). A defendant need not know of the plaintiff specifically, but rather, must be capable of identifying the plaintiff as part of a class affected by the defendant's actions. *See, e.g.*, *Cash & Carry*, 117 A.3d 52 at 59.

Here, Plaintiff is part of a "particularized class" of financial institutions and shares an "intimate nexus" with merchants like Marriott. Marriott voluntarily accepted Plaintiff's payment card data to facilitate transactions and stored that data in its Starwood Database. Marriott knew, through payment industry requirements and from other highly publicized data breaches, that a payment card data breach would cause substantial harm to Plaintiff and other financial institutions. ¶¶ 66-73. In fact, breaches involving Marriott hotels and a prior data breach at Starwood put it on notice that hackers were targeting payment card data at its hotel chains. ¶¶ 71-72.

As the only entity capable of preventing the Data Breach, Marriott knew financial institutions relied on it to protect the payment card data it voluntarily accepted and stored. While Marriott presented itself as a steward of data security to the public, ¶¶ 63-65, it ignored its█

██████████████████ Marriott continued to use the unsecure Starwood Database, knowingly putting financial institutions in harm's way.  ¶¶ 32-33.  As the court in *Home Depot* explained:

> The Court declines the Defendant's invitation to hold that it had no legal duty to safeguard data even though it had warnings that its data security was inadequate and failed to heed them.  To hold that no such duty existed would allow retailers to use outdated security measures and turn a blind eye to the ever-increasing risk of cyber attacks, leaving customers with no resource to recover damages even though the retailer was in a superior position to safeguard the public form such a risk.

2016 WL 2897520, at *4.   The fact that Plaintiff would be harmed and the type of harm Plaintiff actually experienced were both foreseeable consequences of Marriott's use of knowingly deficient data security practices.

As such, finding an "intimate nexus here" would not result in liability for "in an indeterminate amount for an indeterminate time to an indeterminate class."  *Chicago Title Ins. Co. v. Allfirst Bank*, 905 A.3d 366, 380 (Md. 2005).  Rather, liability is constrained to the identifiable and narrow class of financial institutions that issued the finite set of payment cards compromised in the Data Breach and to the amount of calculable losses financial institutions incurred as a result of the Data Breach.

Relying on *Balfour*, Marriott claims Plaintiff cannot recover in tort because of the "web of contracts" between it, Plaintiff, and the card brands.  Br. at 16.  *Balfour*, which examined the "intimate nexus" and the economic loss doctrine, held that the "intimate nexus test does not apply to large-scale government construction projects . . . because the complex web of contractual arrangements predominates and injecting a tort duty is not in the public interest." 155 A.3d at 462. The *Balfour* court made clear, however, that while it declined to extend liability "to design professionals on government construction projects," it did "not hold that [the test] cannot apply to design professionals in other contexts."  *Id.* at 461, n.17.

19

The *Balfour* court reasoned that the "intimate nexus" generally should not apply in government construction cases because "government contracts have a special consideration—the public purse" and to "[i]mpose a tort duty on design professionals [would] likely correlate with an increase in project costs and with a corresponding rise in price for government entities." *Id.* at 461. Additionally, the court noted the "complex web of contracts" in that case provided all of the parties with "sufficient opportunity to protect themselves" during contract negotiations. *Id.* at 460 (noting contractors may "protect themselves" and "anticipate their liability" when negotiating contracts).

Neither of those circumstances exist here, and therefore, *Balfour* is inapplicable. Marriott is not a governmental entity and the imposition of a tort duty would not tax the public purse. *Balfour* specifically declined to extend its holding beyond the public construction context and into circumstances like those here. *Id.* at 461. Also, unlike the construction contractors in *Balfour*, financial institutions cannot assess the data security measures used by specific retailers nor can they limit where their customers choose to use their payment cards. While government contractors may evaluate a project, offer a specific bid, and negotiate a contract, Plaintiff could not anticipate and safeguard against its liability because they have no means to identify Marriott's security deficiencies or the massive amount of data those deficiencies put at risk of compromise. This case, therefore, lacks the basic facts deemed dispositive in *Balfour*. Marriott, therefore, provides no basis for extinguishing Plaintiff's claims.

**C. Section 5 of the FTC Act Provides an Independent Source of Marriott's Duty to Maintain Reasonable Data Security Measures.**

Marriott also owed an independent duty to use reasonable data security measures under Section 5 of the FTC Act.[7]   Section 5 prohibits "unfair or deceptive acts or practices in or affecting commerce."   15 U.S.C. § 45.   The FTC consistently interprets § 5 as requiring businesses to implement reasonable data security measures.   *See F.T.C. v. Wyndham Worldwide Corp*, 799 F.3d 236 (3d Cir. 2015); *In the Matter of LabMD, Inc.*, No. 9357, 2016 WL 4128215, at *10-13, 23 (F.T.C. July 28, 2016), *reversed on other grounds sub nom LabMD, Inc. v. F.T.C.*, 894 F.3d 1221 (11th Cir. 2018).

In Maryland, violating a statute is *prima facie* evidence of negligence.   *See Absolon v. Dollahite*, 831 A.2d 6, 11 (Md. 2003) ("[T]he settled rule in Maryland is that a statutory violation is evidence of negligence"); *Paul v. Blackburn Ltd. P'ship*, 63 A.3d 1107, 1134 (Md. App. 2013), *aff'd*, 90 A.3d 464 (Md. 2014).   To satisfy this rule, a plaintiff must show: (1) a violation of a statute or ordinance designed to protect a class of persons to which Plaintiff belongs, and (2) the violation proximately caused the injury complained of.   *Kiriakos*, 139 A.3d at 1016); *see also Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616, 621 (Md. 2003).   Plaintiff's allegations meet both requirements here.

---

[7] Marriott is correct that neither Maryland nor Louisiana have standalone negligence *per se* claims, but rather, allow a statutory violation to act as *prima facie* evidence of negligence.   However, Plaintiff's negligence *per se* claim should not be dismissed because Connecticut law may apply, and Connecticut allows such a claim.   *See Cornelio*, 2006 WL 236856 at *3.   The elements of Connecticut's negligence *per se* claim are identical to Maryland's rules for using a statutory violation to establish negligence.   *See Shukis v. Bd. of Educ. of Reg'l Dist. No. 17*, 122 Conn. App. 555, 580, 1 A.3d 137, 152 (2010) ("[T]he two-pronged test applied to establish negligence *per se* is: (1) that the plaintiff was within the class of persons protected by the statute; and (2) that the injury suffered is of the type that the statute was intended to prevent."); *Kiriakos v. Phillips*, 139 A.3d 1006, 1016 (Md. 2016).

First, financial institutions are among the class of persons Section 5 is intended to protect. Contrary to Marriott's position, Section 5 broadly applies to all "[u]nfair or deceptive acts in or affecting commerce[,]" not just those impacting consumers or competitors. 15 U.S.C. § 45(a)(1). The FTC has recognized that Section 5 applies to "unfair" or "deceptive" acts that "cause[] substantial injury to consumers (or competitors or *other businessmen*."). 29 Fed. Rg. 8324, 8355 (July 2, 1964) (discussing unfair or deceptive cigarette advertisings) (emphasis added). Courts have also long applied Section 5 to practices victimizing businesses. *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 346-47 (9th Cir. 1989); *U.S. Retail Credit Ass'n. Inc. v. F.T.C.*, 300 F.2d 212 (4th Cir. 1962); *U.S. Ass'n of Credit Bureaus v. F.T.C.*, 299 F.2d 220 (7th Cir. 1962); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1296-97 (D. Minn. 1985). Numerous courts have found Section 5's requirements to employ reasonable data security apply in the data security context to protect financial institutions whose data is at risk. *See, e.g., In re Arby's*, 2018 WL 2128441, at *8; *Home Depot*, 2016 WL 2897520, at *4; *In re Equifax,* 371 F. Supp. 3d at 1175. Indeed, in the wake of a data breach, financial institutions are required to reimburse consumers for fraudulent charges and bear the brunt of the financial impact of mitigating the breach's damages. ¶¶ 88, 125.

Second, the harm here is the type Section 5 was intended to prevent. The FTC has pursued over 50 enforcement actions against businesses whose unreasonable data security resulted in compromised data and subsequent fraud. *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 613 (D.N.J. 2014), *aff'd*, 799 F.3d 236 (3d Cir. 2015); *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016); *In re BJ's Wholesale Club, Inc.*, FTC Docket No. C-4148, FTC File No. 042-3160 (Sept. 20, 2005); *In re CardSystems Solutions, Inc.*, FTC Docket No. C-4168, FTC File No. 052-3148 (Sept. 5, 2006); *see also United States v.*

*ChoicePoint, Inc.*, Civil Action No. 1:06-cv-0198-JTC (N.D. Ga. Oct. 14, 2009).  In *Wyndham*, for example, the FTC alleged the defendant's unreasonable data security measures violated Section 5 and resulted in "*financial injury* through unreimbursed fraudulent charges, increased costs . . . [and] expended time and money resolving fraudulent charges and mitigating subsequent harm." 799 F.3d at 242 (emphasis added) (internal quotations removed).  That is exactly the type of harm Plaintiff alleges it suffered here.

### D.  Plaintiff's Claims for Injunctive and Declaratory Relief Survive.

Plaintiff has adequately pleaded its request for injunctive and declaratory relief under 28 U.S.C. §2201.  Plaintiff satisfies § 2201's "substantial controversy" requirement because it alleged Marriott continues to knowingly use unreasonable data security measures to protect its sensitive systems.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *see also Powell v. McCormack*, 395 U.S. 486, 499 (1969).  Indeed, Marriott has expressed ongoing difficulty merging its data environment with Starwood's, an issue which contributed to Marriott's Data Breach. ¶¶ 32-33.  Because Plaintiff has stated a negligence claim, its request for declaratory and injunctive relief should also survive.  *See Home Depot*, 2016 WL 2897520, at *4; *First Choice Fed. Credit Union v. Wendy's Co.*, No. 16-506, 2017 WL 9487086, at *4-5 (W.D. Pa. Feb. 13, 2017).

### CONCLUSION

For the reasons stated herein, the Court should deny Marriott's motion to dismiss in its entirety.

23

August 30, 2019

Respectfully submitted,

SILVERMAN THOMPSON SLUTKIN &
WHITE LLC

*/s/ William N. Sinclair*
Steven D. Silverman (Bar No. 22887)
ssilverman@mdattorney.com
Joseph F. Murphy, Jr. (Bar No. 00659)
jmurphy@mdattorney.com
Andrew C. White (Bar No. 08821)
awhite@mdattorney.com
William N. Sinclair (Bar No. 28833)
bsinclair@mdattorney.com
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

Arthur Murray
amurray@murray-lawfirm.com
Caroline T. White
cthomas@murray-lawfirm.com
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249

*Co-Lead Counsel for Plaintiff and the*
*Financial Institution Class*

Brian C. Gudmundson
brian.gudmundson@zimmreed.com
Bryce D. Riddle
bryce.riddle@zimmreed.com
Michael Laird
Michael.Laird@zimmreed.com

24

ZIMMERMAN REED LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

Stuart A. Davidson
sdavidson@rgrdlaw.com
Christopher C. Gold
cgold@rgrdlaw.com
Bradley Beall
bbeall@rgrdlaw.com
ROBBINS GELLER RUDMAN
& DOWD LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

Charles H. Van Horn
cvanhorn@bfvlaw.com
Katherine M. Silverman
ksilverman@bfvlaw.com
BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, NE Suite 1100
Atlanta, GA 30305
Telephone: (404) 261-7711

*Counsel for Plaintiff and Members of the
Financial Institution Plaintiff's Steering
Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ William N. Sinclair*