**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CONSUMER ACTIONS** | MDL No. 19-md-2879<br><br>Judge Paul W. Grimm |

---

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE BELLWETHER PLAINTIFFS' SECOND AMENDED CONSOLIDATED
CONSUMER CLASS ACTION COMPLAINT**

---

Daniel R.Warren
Lisa M. Ghannoum
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
Tel: (216) 621-0200
Email: dwarren@bakerlaw.com
Email: lghannoum@bakerlaw.com

Gilbert S. Keteltas
Baker & Hostetler LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1530
Email: gketeltas@bakerlaw.com

*Attorneys for defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................iii

INTRODUCTION .......................................................................................................1

ALLEGED FACTS ......................................................................................................2

LEGAL STANDARD....................................................................................................3

LAW AND DISCUSSION..............................................................................................3

    I.      Most of the Bellwether Plaintiffs Lack Standing ...................................3

          A.      The Non-Misuse Plaintiffs Have Not Alleged an Injury-in-Fact ...............4

                1.      The Constitutional Bar for Standing Based on Risk of Future
Harm Is a Demanding One ............................................................4

                2.      *Beck* Applied This Demanding Standard to Data Breach Cases .....5

                3.      *Beck*'s Reasoning Applies Here .........................................................6

                      a.  Plaintiffs do not individually identify the information they
provided defendants ...............................................................6

                      b.  Paintiffs who allegedly provided payment-card information
do not face certainly impending future harm ..........................7

                      c.  Plaintiffs who allegedly provided passport numbers also
do not face certainly impending future harm ..........................10

                4.      The time, money, and effort the non-misuse plaintiffs
allegedly spent to mitigate an uncertain risk of future harm
are not injuries-in-fact .................................................................14

                5.      Plaintiffs' Other Generic Allegations Do Not Show an
Injury-in-Fact..............................................................................15

          B.      Some of the Bellwether Plaintiffs Who Do Allege Misuse Have
Not Alleged Facts Showing It Is Fairly Traceable to the Starwood
Cyberattack...............................................................................................17

    II.      The Bellwether Plaintiffs Do Not State a Claim for Relief...................18

          A.      The Illinois Negligence Claim (Count 1) Is Barred by the Economic
Loss Rule...................................................................................................18

B.      The Georgia Negligence Per Se Claim (Count 2) Fails for Lack of an Ascertainable Standard of Conduct Regarding Data Protection .......... 19

C.      The New York and Maryland Express Contract Claims (Count 3) Also Fail ................................................................................................ 22

D.      The Oregon Breach of Implied Contract Claim (Count 4) Fails for Lack of Mutual Assent .............................................................................. 25

E.      The Court Should Dismiss the Bellwether Plaintiffs' Statutory Claims ... 26

      1.      Plaintiffs' Maryland Statutory Claims (Counts 7 & 8) Fail ......... 26

      2.      The Michigan Identity Theft Protection Act Claim (Count 46) Fails ........................................................................................... 28

      3.      Plaintiffs' New York General Business Law Claim (Count 62) Fails ........................................................................................... 28

      4.      The California UCL Claim (Count 15) Fails Too. ........................ 30

F.      The Bellwether Plaintiffs' Claims Also Fail Because They Have Not Adequately Alleged Damages ........................................................... 30

CONCLUSION ...................................................................................................... 35

TABLE OF AUTHORITIES

**Cases**

*Abdale v. North Shore-Long Island Jewish Health Systems, Inc.*,
49 Misc. 3d 1027 (N.Y. Sup. Ct. 2015)..................................................................25

*Adams v. Bain*,
697 F.2d 1213 (4th Cir. 1982).............................................................................12

*In re Adobe Systems, Inc. Privacy Litigation*,
66 F. Supp. 3d 1197 (N.D. Cal. 2014)....................................................................7

*Agomuoh v. PNC Financial Services Group*,
2017 WL 657428 (D. Md. Feb. 16, 2017)................................................................27

*Alston v. Astrue*,
2012 WL 665982 (D. Md. Feb. 28, 2012).................................................................3

*Alston v. Freedom Plus/Cross River*,
2018 WL 770384 (D. Md. Feb. 7, 2018).................................................................34

*Amenu-El v. Select Portfolio Services*,
2017 WL 4404428 (D. Md. Oct. 4, 2017)................................................................27

*Antman v. Uber Technologies, Inc.*,
2015 WL 6123054 (N.D. Cal. Oct. 19, 2015)............................................................6

*Antman v. Uber Technologies, Inc.*,
2018 WL 2151231 (N.D. Cal. May 10, 2018).........................................................17

*In re Arby's Restaurant Group Inc. Litigation*,
2018 WL 2128441 (N.D. Ga. Mar. 5, 2018)............................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................3

*Attias v. CareFirst, Inc.*,
365 F. Supp. 3d 1 (D.D.C. 2019)........................................................31, 32, 34, 35

*Azeltine v. Bank of America*,
2010 WL 6511710 (D. Ariz. Dec. 14, 2010)............................................................22

*Bans Pasta, LLC v. Mirko Franchise, LLC*,
2014 WL 637762 (W.D. Va. Feb. 12, 2014)............................................................21

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017)........................................................................*passim*

*Brault v. Trans Union, LLC*,
    2019 WL 2162284 (D. Md. May 17, 2019) ...................................................... 27

*Chambliss v. Carefirst, Inc.*,
    189 F. Supp. 3d 564 (D. Md. 2016) ............................................. 5, 15, 16, 32

*Cherny v. Emigrant Bank*,
    604 F. Supp. 2d 605 (S.D.N.Y. 2009) ..................................................... 31

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ................................................................... 3, 4, 5, 14

*Community Bank of Trenton v. Schnuck Markets, Inc.*,
    887 F.3d 803 (7th Cir. 2018) ............................................................. 19, 21

*In re Community Health System, Inc.*,
    2016 WL 4732630 (N.D. Ala. Sept. 12, 2016) .................................... 8, 18

*Coast to Coast Energy, Inc. v. Gasarch*,
    126 A.D.3d 621 (N.Y. App. Div. 2015) .............................................. 24

*Collins v. Athens Orthopedic Clinic*,
    815 S.E.2d 639 (Ga. Ct. App. 2018) ...................................................... 31

*Comparion Medical Analytics, Inc. v. Prime Healthcare Services, Inc.*,
    2014 WL 12589670 (C.D. Cal. Oct. 22, 2014) .................................. 24

*Cooney v. Chicago Public Schools*,
    407 Ill. App. 3d 358 (2010) ............................................................... 19

*Cozzarelli v. Inspire Pharmaceutical Inc.*,
    549 F.3d 618 (4th Cir. 2008) ........................................................... 29

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ............................................................................. 4

*Department of Labor v. McConnell*,
    828 S.E.2d 352 (Ga. 2019) ........................................................... 20, 22

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*,
    2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) .................................. 17, 30, 32

*Dyer v. Northwest Airlines Corps.*,
    334 F. Supp. 2d 1196 (D.N.D. 2004) ............................................... 22

*In re Equifax, Inc., Customer Data Security Breach Litigation*,
    362 F. Supp. 3d 1295 (N.D. Ga. 2019) ......................................... 21, 22

*Federal Trade Commission v. Indiana Federation of Dentists*,
   476 U.S. 447 (1986) ........................................................................................................ 20

*Federal Trade Commission v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ........................................................................................... 21

*First Choice Federal Credit Union v. Wendy's Co.*,
   2017 WL 9487086 (W.D. Pa. Feb. 13, 2017) ............................................................... 21

*Fox v. Iowa Health System*,
   2019 WL 3349988 (W.D. Wis. July 25, 2019) ........................................................ 18, 19

*In re Fyre Festival Litigation*,
   2019 WL 3006629 (S.D.N.Y. July 10, 2019) ................................................................ 29

*Gardner v. Health Net, Inc.*,
   2010 WL 11597979 (C.D. Cal. Aug. 12, 2010) ................................................. 22, 26, 30

*Genesco, Inc. v. Visa U.S.A., Inc.*,
   302 F.R.D. 168 (M.D. Tenn. 2014) .................................................................................. 8

*Glenn v. Wells Fargo Bank, N.A.*,
   2016 WL 3570274 (D. Md. July 1, 2016) ...................................................................... 27

*Goshen v. Mutual Life Insurance Co. of New York*,
   774 N.E.2d 1190 (N.Y. 2002) ........................................................................................ 28

*Goss v. Bank of Am., N.A.*,
   917 F. Supp. 2d 445 (D. Md. 2013) .......................................................................... 27, 31

*Hammond v. The Bank of New York Mellon Corp.*,
   2010 WL 2643307 (S.D.N.Y. June 25, 2010) ................................................................ 34

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016) ..................................................................................... 15, 33

*Hutton v. National Bd. of Examiners in Optometry, Inc.*,
   892 F.3d 613 (4th Cir. 2018) ......................................................................................... 17

*In re Illinois Bell Switching Station Litigation*,
   641 N.E. 2d 440 (Ill. 1994) ............................................................................................ 18

*Irwin v. Jimmy John's Franchise, LLC*,
   175 F. Supp. 3d 1064 (C.D. Ill. 2016) .......................................................................... 16

*Johnson v. Dore*,
   2013 WL 5335626 (D. Md. Sept. 20, 2013) .................................................................. 24

*Jones v. Sears Roebuck & Co.*,
  301 F. App'x 276 (4th Cir. 2008) .......................................................................... 29

*Joseph Martin, Jr., Delicatessen v. Schumacher*,
  52 N.Y.2d 105 (1981) ............................................................................................ 25

*Kamal v. J. Crew Group, Inc.*,
  918 F.3d 102 (3d Cir. 2019) .................................................................................. 12

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................................................... 30

*Kerns v. U.S.*,
  585 F.3d 187 (4th Cir. 2009) ................................................................................. 12

*Khan v. Children's National Health System*,
  188 F. Supp. 3d 524 (D. Md. 2016) ...................................................................... 14

*Krottner v. Starbucks Corp.*,
  2009 WL 7382290 (W.D. Wash. Aug. 14, 2009) .................................................. 34

*Krottner v. Starbucks Corp.*,
  406 F. App'x 129 (9th Cir. 2010) ..................................................................... 26, 31

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) ....................................................................................... 30

*Legacy Academy, Inc. v. Mamilove, LLC*,
  761 S.E.2d 880 (Ga. Ct. App. 2014) ...................................................................... 21

*Lewert v. P.F. Chang's China Bistro, Inc.*,
  819 F.3d 963 (7th Cir. 2016) ................................................................................. 16

*Lexington 360 Associates v. First Union National Bank of North Carolina*,
  234 A.D.2d 187 (N.Y. App. Ct. 1996) ................................................................... 30

*Lombel v. Flagstar Bank F.S.B.*,
  2013 WL 5604543 (D. Md. Oct. 11, 2013) ...................................................... 27, 29

*Longenecker-Wells v. Benecard Services Inc*,
  658 F. App'x 659 (3d Cir. 2016) ............................................................................ 26

*Lovell v. P.F. Chang's China Bistro, Inc.*,
  2015 WL 4940371 (W.D. Wash. Mar. 27, 2015) .................................................. 26

*Lucarelli Pizza & Deli v. Posen Construction, Inc.*,
  173 So. 3d 1092 (Fla. Dist. Ct. App. 2015) ........................................................... 31

*Manchester v. Sivantos GmbH,*
2019 WL 3734307 (C.D. Cal. Aug. 7, 2019) ....................................................... 31

*McIntosh v. Royal Caribbean Cruises Ltd.,*
2018 WL 791342 (S.D. Fla. Feb. 7, 2018) .......................................................... 33

*In re Michaels Stores Pin Pad Litigation,*
830 F. Supp. 2d 518 (N.D. Ill. 2011) .......................................................... 18, 32

*In re Microsoft Corp. Antitrust Litigation,*
127 F. Supp. 2d 702 (D. Md. 2001) ................................................................. 29

*Murphy v. Capella Education Co.,*
589 F. App'x 646 (4th Cir. 2014) ................................................................... 29

*Oden v. Boston Scientific Corp.,*
330 F.Supp.3d 877 (E.D.N.Y. 2018) ............................................................... 29

*Ogola v. Chevron Corp.,*
2014 WL 4145408 (N.D. Cal. Aug. 21, 2014) ................................................ 15

*Orkin Exterminating Co., Inc. v. Federal Trade Commission,*
849 F.2d 1354 (11th Cir. 1988) ...................................................................... 20

*Otterness v. City of Waldport,*
883 P.2d 228 (Or. Ct. App. 1994) ................................................................... 26

*Polek v. J.P. Morgan Chase Bank, N.A.,*
36 A.3d 399 (Md. App. Ct. 2012) ................................................................... 25

*Posner v. Minnesota Mining & Manufacturing Co.,*
713 F. Supp. 562 (E.D.N.Y. 1989) .................................................................. 24

*Primoff v. Warfield,*
495 F. App'x 293 (4th Cir. 2012) ................................................................... 30

*Remijas v. Neiman Marcus Group, LLC,*
794 F.3d 688 (7th Cir. 2015) ............................................................................ 8

*Ruiz v. Gap, Inc.,*
2009 WL 250481 (N.D. Cal. Feb. 3, 2009) .................................................... 30

*In re Science Applications International Corp. (SAIC) Backup Tape Data Theft*
*Litig.*, 45 F. Supp. 3d 14 (D.D.C. 2014) ............................................... 8, 9, 16, 32

*Shafran v. Harley-Davidson, Inc.,*
2008 WL 763177 (S.D.N.Y. Mar. 20, 2008) .................................................. 34

*Sharma v. Providence Health & Services-Oregon*,
  412 P.3d 202 (Or. App. Ct. 2018) ........................................................................ 31

*Spokeo v. Robins*,
  136 S. Ct. 1540 (2016) ........................................................................................... 1

*State v. Heisser*,
  249 P.3d 113 (Or. 2011) ....................................................................................... 26

*Storm v. Paytime, Inc.*,
  90 F. Supp. 3d 359 (M.D. Pa. 2015) ..................................................................... 5

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ............................................................................................... 5

*In re SuperValu, Inc.*,
  2018 WL 1189327 (D. Minn. Mar. 7, 2018) ....................................................... 31

*In re SuperValu, Inc.*,
  870 F.3d 763 (8th Cir. 2017) ................................................................................. 9

*In re SuperValu, Inc.*,
  925 F.3d 955 (8th Cir. 2019) ......................................................................*passim*

*In re Target Corp.*,
  66 F. Supp. 3d 1154 (D. Minn. 2014) .................................................................. 18

*In re The Home Depot, Inc., Customer Data Security Breach Litigation*,
  2016 WL 2897520 (N.D. Ga. May 17, 2016) ................................................. 21, 22

*In re TJX Cos. Retail Security Breach Litigation*,
  564 F.3d 489 (1st Cir. 2009) ............................................................................... 21

*Wag More Dogs, Ltd. Liability Corp. v. Cozart*,
  680 F.3d 359 (4th Cir. 2012) ................................................................................. 3

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................. 15

*Wells Fargo Bank, N.A. v. Jenkins*,
  744 S.E.2d 686 (Ga. 2013) ............................................................................. 20, 22

*Williams v. Facebook, Inc.*,
  384 F. Supp. 3d 1043 (N.D. Cal. 2018) ............................................................... 11

*Wolverine Construction, Inc. v. Argonaut Insurance Co.*,
  2013 WL 5727018 (D. Md. Oct. 18, 2013) .......................................................... 24

*In re Yahoo! Inc. Customer Data Security Breach Litigation*,
2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) .........................................................................7

**Constitutional Provisions**

United States Constitution, Article III............................................................. 1, 3, 4, 16, 30, 31, 34

**Statutes**

California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ........................... 30

Federal Trade Commission Act (Section 5), 15 U.S.C. § 45(a)(1) .................................... 12, 20, 21

Gramm-Leach-Bliley Act, 15 U.S.C. § 6801(a) ............................................................................ 20

Maryland Personal Information Protection Act, Md. Code, Com. Law §§ 14-3501,
*et seq.* ...................................................................................................................................... 26, 28

Maryland's Consumer Protection Act, Md. Code, Com. Law §§ 13-301, *et seq.* .................. 26, 29

Michigan Identity Theft Protection Act, Mich. Comp. Laws §§ 445.61, *et seq.* .......................... 28

New York's General Business Law, N.Y. Gen. Bus. Law §§ 349, *et seq.* .............................. 28, 29

**Regulations**

16 C.F.R. § 436.5(s) ...................................................................................................................... 21

**Rules**

Rule 8 ............................................................................................................................................ 29

Rule 9(b) ............................................................................................................................ 27, 29, 30

Rule 12(b)(1) ............................................................................................................................. 3, 12

Rule 12(b)(6) ................................................................................................................................... 3

**INTRODUCTION**

The bellwether process has resulted in the parties selecting ten claims brought by 20 named plaintiffs. These bellwether plaintiffs now bear the burden to "clearly allege facts demonstrating" standing at the pleading stage. *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotation and alteration omitted).

They have had every opportunity to do so. From the multitude of class actions initially brought by more than 630 named plaintiffs, they prepared a consolidated amended complaint, curating the claims of 76 hand-picked plaintiffs. And then, after reviewing defendants' arguments laid out in a pre-motion letter, they were given the chance to amend their pleading again. Yet they have done virtually nothing to address the shortcomings raised in that pre-motion letter.

To evaluate whether a data breach has caused harm, one first must know what type of personal information was compromised. But plaintiffs continue to cloud the issue by alleging—collectively—that they provided "all or any part or combination of" myriad types of information that might have been affected in the cyberattack. Generalized allegations like these are improper. And while certain plaintiffs allege they provided a payment card or passport number, none of them state when they did so or whether the card or passport is still valid.

Perhaps more important, the majority of bellwether plaintiffs do not claim the cyberattack has resulted in any actual misuse of their information. These "non-misuse" plaintiffs pin their standing instead on an alleged fear that they might be harmed in the future. But they do not allege facts showing that any harm is certain (or even likely) to occur, as the Supreme Court and Fourth Circuit require. Under Article III, the federal courthouse doors are generally open only to plaintiffs who allege an actual injury. If plaintiffs' mere conjecture of future harm were enough, a fundamental constitutional limitation on judicial-branch authority would be erased.

Even some of the few bellwether plaintiffs who do claim misuse of their information have

failed to allege facts connecting that misuse to the Starwood cyberattack. Indeed, the harms these few plaintiffs allege, such as having an account opened in their name, a bank account accessed, or a tax refund collected without their authorization, cannot be accomplished without a social security number or bank-account information, which *no* plaintiff alleges are at issue here.

The Court should also dismiss each of the bellwether claims on the merits.[1]

**ALLEGED FACTS**

On September 23, 2016, Marriott acquired Starwood. (2d. Consol. Compl., ECF No. 413, ¶ 98.) In late 2018, Marriott announced a data security incident involving unauthorized access to Starwood's guest reservation database. (*Id.* ¶ 1.) The data stored there contained reservation-related information for Starwood customers dating back to 2002. (*Id.* ¶ 191.) This included things such as names, addresses, email addresses, gender, arrival and departure dates, reservation dates, and communication preferences. (*Id.* ¶ 196.) In certain instances, the database also contained passport numbers, payment-card numbers, and payment-card expiration dates. (*Id.* ¶ 2.)

Marriott hired Verizon to perform a forensic investigation into the cyberattack. (*Id.* ¶ 225.) ████████████████████████████████████████████ ████ (PFI Report at 5-6, ECF No. 331-2.) And plaintiffs allege that hackers may have exfiltrated approximately 383 million guest records, including information related to about nine million payment cards. (2d Consol. Compl. ¶ 3.)

████████████████████████████████████████ (PFI Report at 6.) ████████ ████████████████████████████████████████████████████████

---

[1] As the Court is aware, the parties "agreed that a 'claim' for bellwether purposes should consist of a cause of action and a jurisdiction from the operative complaint and that the bellwether plaintiffs for each claim would be the named plaintiffs from the selected jurisdiction." (ECF No. 368 at 1.) And "the parties further agreed that neither party was waiving any arguments it may have regarding choice of law and that each party is reserving its rights as to the same." (*Id.*)

2

███████████████████████████████████████████ (*Id.*)

In addition, the database contained approximately 23.75 million passport numbers, the majority of which were also encrypted. (2d Consol. Compl. ¶ 208.)

## LEGAL STANDARD

In assessing a Rule 12(b)(1) facial challenge to standing, courts accept factual allegations as true but "do not [ ] apply the same presumption of truth to 'conclusory statements' and 'legal conclusions' contained in [the] complaint." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). On a factual challenge to standing, "a court need not assume that all facts alleged in the complaint are true" and "may consider matters outside the pleadings in deciding whether it has jurisdiction." *Alston v. Astrue*, 2012 WL 665982, at *3 (D. Md. Feb. 28, 2012). And under Rule 12(b)(6), plaintiffs "must establish facial plausibility by pleading factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quotation omitted).[2]

## LAW AND DISCUSSION

### I.   MOST OF THE BELLWETHER PLAINTIFFS LACK STANDING.

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quotation omitted). "The three irreducible minimum requirements of Article III standing"—which "a plaintiff bears the burden of establishing"—are (1) an injury-in-fact, (2) that is fairly traceable to the challenged

---

[2] For ease of reference, defendants attach as Exhibit 1 a one-page chart detailing defendants' position as to each bellwether plaintiff's standing and failure to state a claim.

conduct, and (3) that can be redressed through the court's ruling. *Beck*, 848 F.3d at 269 (quotation omitted). Together these constitutional requirements serve as a bulwark "to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.

Indeed, courts would be in danger of crossing the line from adjudicating to legislating if they were to get in the business of resolving issues raised by parties who have not been injured by the conduct they challenge. The danger is particularly acute here, where plaintiffs purport to represent many millions of people without regard to whether they claim any real injury or not. *See id.* ("Article III standing . . . is built on separation-of-powers principles"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.").

### A.     The Non-Misuse Plaintiffs Have Not Alleged an Injury-in-Fact.

####     1.     The Constitutional Bar for Standing Based on Risk of Future Harm Is a Demanding One.

Fifteen bellwether plaintiffs do not allege their information has been misused as a result of the Starwood cyberattack. Instead, they claim to be injured because they allegedly are (a) "at a substantial and imminent risk of future harm," and (b) spent time, effort, and money to mitigate that purported risk.[3]

This species of fear-of-future-harm standing is reserved for rare and extraordinary circumstances. The Supreme Court and Fourth Circuit have held it is not enough that the future injury *might* come to pass, or even that it is reasonably likely to happen—instead, the "threatened injury must be *certainly impending* to constitute an injury in fact[.]" *Clapper*, 568 U.S. at 409

---

[3] The non-misuse plaintiffs are Guzikowski, Marks, Sempre, Maisto, Lawrence, Bittner, Long, Viggiano, Miller, Raab, Maldini, Ryans, Wallace, Gononian, and Fishon. (*See* 2d Consol. Compl. ¶¶ 25-28, 34-35, 37-39, 43, 52-53, 55-56, 71.)

(quotation omitted) (emphasis in original); *accord Beck*, 848 F.3d at 272.

Needless to say, "[t]his standard establishes a high bar for plaintiffs seeking to recover for injuries which have not in fact occurred, even if they appear likely or probable." *Storm v. Paytime, Inc.*, 90 F. Supp. 3d 359, 365 (M.D. Pa. 2015); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499-500 (2009) (declining to "replace the requirement of imminent harm . . . with the requirement of a *realistic* threat that reoccurrence of the challenged activity would cause the plaintiff harm in the reasonably near future") (quotations and alterations omitted). Thus, a theory of standing that "relies on a highly attenuated chain of possibilities[] does not satisfy the requirement[.]" *Clapper*, 568 U.S. at 410.

### 2.    *Beck* Applied This Demanding Standard to Data Breach Cases.

In *Beck*, the Fourth Circuit applied *Clapper*'s stringent limits on adjudicating claims of future harm to two data breaches at a medical center. One involved a stolen "laptop contain[ing] unencrypted personal information of approximately 7,400 patients, including names, birth dates, the last four digits of social security numbers, and physical descriptors (age, race, gender, height, and weight)." *Beck*, 848 F.3d at 267. The other involved stolen "reports contain[ing] identifying information of over 2,000 patients, including names, social security numbers, and medical diagnoses." *Id.* at 268.

The Fourth Circuit held the increased risk of future harm from these breaches did not meet *Clapper*'s "certainly impending" standard, and thus did not amount to an injury-in-fact. *Id.* at 273-76. The plaintiffs' theory of standing required one to "assume that the thief target[] the stolen items for the personal information they contained," then "select, from thousands of others, the personal information of the named plaintiffs," and then "attempt successfully to use that information to steal their identities." *Id.* at 275. The *Beck* court refused to engage in such an "'attenuated chain of possibilities.'" *Id.* (quoting *Clapper*, 568 U.S. at 410); *see also Chambliss v.*

*Carefirst, Inc.*, 189 F. Supp. 3d 564, 570 (D. Md. 2016) (no standing in data breach case that "depend[s] on a chain of assumptions that must occur before the harm materializes").

### 3.   *Beck*'s Reasoning Applies Here.

#### a.   Plaintiffs do not individually identify the information they provided defendants.

To begin with, plaintiffs' pleading tactics obscure the specific information they claim to have provided to defendants. All plaintiffs in the case collectively allege they gave defendants "Personal Information." (2d Consol. Compl. ¶ 19.) But they define "Personal Information" to "include[] *all or any part or combination of* name, mailing address, phone number, email address, passport number, Starwood Preferred Guest account information, date of birth, gender, arrival and departure information, reservation date, communication preferences, payment card numbers, and payment card expiration dates." (*Id.* ¶ 17 (emphasis added).)

Plaintiffs failed to revise this murky allegation even after defendants raised the problem in their pre-motion letter. Of course, most of the "Personal Information" listed by plaintiffs could not present a risk of certainly impending future harm in any event. But even if that were not the case, plaintiffs' generalized allegation that they provided "any combination" of this information makes it impossible to determine which types of information each of them provided.

Five of the non-misuse plaintiffs say nothing more than this about the data they gave defendants, and they fail to meet their burden of showing certainly impending future harm for that reason alone. *See Antman v. Uber Techs., Inc.*, 2015 WL 6123054, *11 (N.D. Cal. Oct. 19, 2015) ("Mr. Antman alludes to the disclosure of unspecified 'other personal information;' this is insufficient, and Mr. Antman has the burden of establishing the court's jurisdiction.").[4]

---

[4] These five include plaintiffs Marks, Sempre, Ryans, Wallace, and Fishon. (2d Consol. Compl. ¶¶ 26-27, 53, 55, 71.)

> **b.**   **Plaintiffs who allegedly provided payment-card information do not face certainly impending future harm.**

In addition to that generalized allegation, four non-misuse plaintiffs also allege they provided defendants with payment-card information.[5] But none of them allege the payment card they provided is still valid—which is questionable given their allegation that the customer information at issue "dat[es] all the way back to 2002." (*See* 2d Consol. Compl. ¶¶ 28, 35, 39, 52, 191.) Of course, nothing can be purchased with an expired or canceled payment card, and these plaintiffs have not shown they are at *any* risk of suffering future fraud for this reason alone.

But even assuming a plaintiff did provide an unexpired payment card to Starwood, each of the following things would still have to happen before that plaintiff suffers hypothetical harm:

- The hacker intends to use payment-card information to make unauthorized charges;

- The hacker selects the individual plaintiff's payment-card information for use;

- Either the plaintiff's payment-card information is unencrypted or the hacker successfully decrypts it; and

- The hacker is able to use a payment card without the card's security code (which plaintiffs do not allege was part of the breach).

Each of these assumptions requires much speculation. First, plaintiffs do not allege that the hackers intended to commit payment-card fraud; nor do they allege facts suggesting that was the case. For example, plaintiffs do not allege their payment-card information is for sale on the dark web. *Compare In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *13 (N.D. Cal. Aug. 30, 2017) (finding standing where, "like the plaintiffs in *Adobe,* Plaintiffs here allege that the stolen data has appeared on the dark web") (citing *In re Adobe Systems, Inc.*

---

[5] They are plaintiffs Maisto, Bittner, Miller, and Maldini. (2d Consol. Compl. ¶¶ 28, 35, 39, 52.)

*Privacy Litig.*, 66 F. Supp. 3d 1197 (N.D. Cal. 2014)). If plaintiffs could have alleged their information was available on the dark web, they would have—indeed, they refer to the dark web in the context of other data breaches in their complaint. (*See* 2d Consol. Compl. ¶¶ 155, 264-65.)

Similarly, plaintiffs do not allege a pattern of fraud associated with the cyberattack, such as allegations that payment-card companies have identified a significant uptick in unauthorized charges with Starwood as the common point of purchase. *See Genesco, Inc. v. Visa U.S.A., Inc.*, 302 F.R.D. 168, 171 (M.D. Tenn. 2014) (following data breach, Visa prepared common-point-of-purchase report that "revealed . . . multiple accounts subjected to fraudulent activity, with Genesco as the common point of purchase"). Such an allegation was vital in *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 690 (7th Cir. 2015), where 9,200 "cards were known to have been used fraudulently." In fact, Neiman Marcus's chief information officer acknowledged in Congressional testimony that the company received common-point-of-purchase reports from Visa and MasterCard identifying thousands of fraudulent charges on cards used at its stores.[6]

Without allegations of information being posted on the dark web or that there was a common point of purchase, any suggestion that Starwood's guest reservation database was attacked for the purpose of obtaining payment-card numbers is speculative at best. And the mere fact that some plaintiffs have alleged unauthorized charges does not mean other plaintiffs will suffer the same harm, especially when the number of plaintiffs claiming such charges is so small. *See In re Cmty. Health Sys., Inc.*, 2016 WL 4732630, at *11 (N.D. Ala. Sept. 12, 2016) (26 non-misuse plaintiffs lacked standing even though 14 other plaintiffs alleged misuse of their information); *In re Science Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F.

---

[6] *See* Written Testimony of Michael R. Kingston, https://www.judiciary.senate.gov/imo/media/doc/02-04-14KingstonTestimony.pdf (last accessed Sept. 20, 2019).

Supp. 3d 14, 24-29 (D.D.C. 2014) (24 non-misuse plaintiffs lacked standing even though nine

plaintiffs alleged misuse); *In re SuperValu, Inc.*, 870 F.3d 763, 768-72 (8th Cir. 2017) (15 non-

misuse plaintiffs did not have standing, but sole plaintiff alleging misuse did).[7]

It is also highly unlikely that the hacker will select any given plaintiff's payment card for

misuse, especially given plaintiffs' allegation that the cyberattack involved "at least 383 million

guest records" and "more than 9 million credit and debit cards." (2d Consol. Compl. ¶ 3.) *See*

*Beck*, 848 F.3d at 275 (finding it speculative that "thieves [would] then select, from thousands of

others"—not millions as is the case here—"the personal information of the named plaintiffs").



(PFI Report at 6.) Thus, it is all but certain that a would-be identity thief would have to

decrypt any given plaintiff's payment card to use it. ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ (*Id.* at 6, 61.) *See SAIC*, 45 F. Supp. 3d at 25

(fact that "portions of the data that are encrypted would have to be deciphered" is another link in

"speculative . . . chain of events"). ████████████████████████████

██████████████████████████████████████████ (PFI Report at

73.) ████████████████████████████████████████████

██████████████████████████████████████████████

The remote chances of any future fraud here drop further yet given plaintiffs' allegation

that the hackers were in Starwood's network from 2014-18. (2d Consol. Compl. ¶ 2.) As the

---

[7] Here only three bellwether plaintiffs allege unauthorized charges on their payment cards. In
fact, by defendants' count, fewer than ten of the 630-plus original named plaintiffs made such
allegations. These sparse numbers hardly compel a conclusion that these alleged charges can be
traced to the Starwood cyberattack.

Fourth Circuit explained in *Beck*, "as the breaches fade further into the past, the Plaintiffs' threatened injuries become more and more speculative." 848 F.3d at 275 (quotation omitted). And to the extent plaintiffs' allegation of when this cyberattack began is correct, their feared injuries have not yet materialized here despite the passage of up to five years.

███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ (PFI Report at 30.)

When all these variables are considered together, it is clear that the non-misuse plaintiffs' fear of future harm is based on nothing more than pure conjecture. Indeed, it is highly unlikely that any sophisticated hacker would have targeted the Starwood guest reservation database for the purpose of obtaining payment-card information to begin with given the small number of payment cards relative to the number of guest records involved in the cyberattack, the tiny fraction of those payment cards that were unencrypted, the absence of security codes, and the sheer likelihood that many of the cards have expired. On top of all that, the lack of allegations regarding the dark web and common point of purchase strongly corroborates that the Starwood cyberattack was not carried out for the purpose of committing payment-card fraud.

It is important to keep in mind that the question here is not whether there is some theoretical possibility that payment-card fraud could occur in the future. Nor is it whether such harm is likely to occur. Instead, standing based on the risk of future harm exists only in the exceptional circumstance where it is certainly impending. The non-misuse plaintiffs have not come close to meeting that standard.

> c. **Plaintiffs who allegedly provided passport numbers also do not face certainly impending future harm.**

Seven non-misuse plaintiffs allege they provided a passport number and claim they "are at

an even greater risk of harm." (2d Consol. Compl. ¶ 266.)[8] They say "[h]ackers can combine exposed passport numbers with other personal information to create false identities or fraudulent passports" and to engage in "illegal immigration, contraband smuggling, economic crimes, international terrorism . . . drug trafficking, organized crime, alien smuggling, money laundering, pedophilia, and murder." (*Id.* (quotation omitted).)

Plaintiffs' sole support for claiming that a passport *number* (as opposed to a physical passport) can be used in this way is an Internet article stating "criminals can use your passport number, along with your name and several other points of data that were in Marriott's database for customers of its Starwood division, to impersonate you online. They could also use the number to create a more authentic forgery, something that could be worth thousands of dollars on the black market." (*Id.* ¶ 267 (quotation, citation, and alterations omitted).)[9]

This is not a well-pleaded allegation of fact. Instead it is in effect a "retweet" of unverified musings by a person whose qualifications or expertise are not even described by plaintiffs. *See Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1053 (N.D. Cal. 2018) (rejecting allegations "based on selective information from [an Internet] article"; "More needs to be averred to satisfy the applicable rules of pleading."). To make matters worse, although plaintiffs purport to quote "Brian Stack, vice president of dark web intelligence at Experian" (2d Consol. Compl. ¶ 267),

---

[8] They are plaintiffs Guzikowski, Maisto, Lawrence, Long, Viggiano, Raab, and Gononian. (2d Consol. Compl. ¶¶ 25, 28, 34, 37-38, 43, 56.)

[9] Though plaintiffs do not mention it, the article also acknowledges: "On the plus side, US citizens concerned about their passport number being used for malicious activity need not worry. A passport number can't be used to access State Department records or obtain a citizen's government records, according to a State Department spokeswoman. Also, international travel is impossible on only the passport number; travelers must present an official, physical passport book or card when entering the US from a foreign country." L. Hautala, *Marriott Breach: What to do when hackers steal your passport number*, CNET (Dec. 3, 2018), https://www.cnet.com/news/marriott-breach-what-to-do-when-hackers-steal-your-passport-number/ (last accessed September 15, 2019).

they actually are quoting an article by a person named Laura Hautala who purports to quote Mr. Stack—which makes plaintiffs' unverified allegation double hearsay and thus even less plausible.

Notably, neither plaintiffs nor the article they cite offer any explanation of *how* an identity thief could use a stolen passport number to impersonate someone or create a forged passport. Conclusory allegations supported by nothing but unauthenticated quotations from an Internet article are not enough to establish a certainly impending risk of future harm. *See Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 116 (3d Cir. 2019) ("conclusory allegations of risk are insufficient" to confer standing).

Moreover, as it turns out, plaintiff's allegations about passport numbers are flatly wrong. On this discrete point, defendants also bring a factual challenge under Rule 12(b)(1). In support, defendants submit the attached declaration of Brenda Sprague, who served as "the immediate past Deputy Assistant Secretary of State for Passport Services in the U.S. Department of State Bureau of Consular Affairs"—"the highest-ranking position in the U.S. government with responsibility for passports." (Sprague Decl., attached as Ex. 2, ¶ 1.)[10]

As Sprague explains, "[a] U.S. passport is virtually impossible to forge successfully." (*Id.* ¶ 10.) This is because "[t]he current security features of" a U.S. passport include an "embedded, coded chip." (*See id.*) Thus, "[e]ven if all of the information on a forged 'data page' (*i.e.*, the visible portion of the passport) corresponds to a real passport, the passport book would

---

[10] The factual question here—whether a passport number can be used to commit identity fraud—goes solely to the existence of certainly impending future harm. This is uniquely a standing issue under *Beck*. It is irrelevant to—and not "inextricably intertwined" with—the merits because no bellwether plaintiff alleges passport fraud. *Compare Kerns v. U.S.*, 585 F.3d 187, 195 (4th Cir. 2009) (factual challenge "inextricably intertwined" where "scope-of-employment issue is determinative of both jurisdiction and the underlying merits of an FTCA claim"). In these circumstances, "[a] trial court may consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

not pass as valid—and indeed, could not even be read at the border—without the authentic coded

chip, among other covert security features." (*Id.* ¶ 11.)

In addition, "the passport number on the data page cannot be used by anyone to access

additional sensitive personal data outside of authorized users at the Department of State and

Department of Homeland Security." (*Id.* ¶ 12.) In fact, Sprague is "unaware of any instance in

which a person could commit identity theft simply by providing another's passport number

without also being required to present the physical passport." (*Id.* ¶ 17.) And "during [her] time in

the Department of State, [she] never learned of an instance where wrongdoers were using valid

passport numbers to impersonate passport holder's identities online." (*Id.*)

Moreover—and even apart from the inadequacy of plaintiffs' allegations regarding the

uses of stolen passport numbers—plaintiffs' allegations of future harm are once again dependent

on a chain of speculative links. Here again, plaintiffs fail to specify whether the passport numbers

they provided to defendants are still valid and unexpired. Even if they had alleged that basic

fact—and even if it were possible to commit identity fraud with a passport number—the

following additional things would still have to happen before plaintiffs would suffer any harm:

- The hacker intends to commit passport fraud;

- The hacker selects the plaintiff's passport number;

- Either the plaintiff's passport number is unencrypted or the hacker successfully
  decrypts it; and

- The hacker successfully counterfeits a passport using the plaintiff's passport
  number or otherwise uses the passport number to harm the plaintiff.

Each of these steps is speculative at best. The bellwether plaintiffs have not alleged they

have suffered any form of passport fraud—nor have they alleged their passport numbers are

available on the dark web. It is highly improbable that the hacker will select any individual

plaintiff's passport number from the nearly 24 million passport numbers allegedly at issue. (*See*

2d Consol. Compl. ¶ 208.) And if the hacker did happen to alight on one of these seven plaintiffs'

passport numbers, there is a strong probability that the number would be encrypted. (*See id.*)

In short—both facially *and* factually—the seven non-misuse plaintiffs who allegedly

provided their passport numbers to defendants have failed to establish that they face a certainly

impending future harm.

### 4. The time, money, and effort the non-misuse plaintiffs allegedly spent to mitigate an uncertain risk of future harm are not injuries-in-fact.

The non-misuse plaintiffs also allege they spent time, money, and effort to mitigate the

risk of future harm from the cyberattack. (*See, e.g.*, 2d Consol. Compl. ¶ 25.) But a party "cannot

manufacture standing by choosing to make expenditures based on hypothetical future harm that is

not certainly impending." *Clapper*, 568 U.S. at 402.

In *Beck*, the Fourth Circuit considered whether plaintiffs faced "a 'substantial risk' that

the harm will occur, which in turn may prompt a party to reasonably incur costs to mitigate or

avoid that harm." 848 F.3d at 275 (citing *Clapper*, 568 U.S. at 414 n.5). The plaintiffs there

"alleg[ed] that 33% of those affected by [the] data breaches will become victims of identity

theft." *Id.* at 276. But even accepting that statistic to be true, the Fourth Circuit held it did not

"establish[] a 'substantial risk' of harm" because "it follows that over 66% of veterans affected

will suffer no harm." *Id.*; *see also Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 533

(D. Md. 2016) (allegation "that data breach victims are 9.5 times more likely to suffer identity

theft and that 19 percent of data breach victims become victims of identity theft" insufficient to

establish substantial risk that the harm will occur). *Beck* thus rejected plaintiffs' argument

regarding mitigation expenses as "merely a repackaged version of [p]laintiffs' first failed theory

of standing." 848 F.3d at 276 (quotations and alterations omitted).

The analysis in *Beck* erects an insurmountable barrier to plaintiffs' mitigation theory of standing here. Because plaintiffs cannot "first show that the harm is 'certainly impending'"—or that they face a "substantial risk" of future harm—their alleged mitigation expenses and efforts likewise do not constitute an injury-in-fact. *Chambliss*, 189 F. Supp. 3d at 571-72.

### 5.    Plaintiffs' Other Generic Allegations Do Not Show an Injury-in-Fact.

The complaint also includes an everything-but-the-kitchen-sink, 12-subparagraph list of every type of harm that could conceivably arise from a data breach. (2d Consol. Compl. ¶ 270.) Plaintiffs claim, implausibly, that "[they] and class members have and will continue to suffer" each and every one of those harms. (*Id.*) Yet few items from this parade of injuries appear in any of the bellwether plaintiffs' individual allegations.

Plaintiffs' one-size-fits-all pleading style is entitled to zero weight on a motion to dismiss. Courts have held that similarly "scattered descriptions of generalized harms" and "[a] list of horribles" do not make out injuries-in-fact. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 732-33 (1st Cir. 2016); *see also Ogola v. Chevron Corp.*, 2014 WL 4145408, at *5 (N.D. Cal. Aug. 21, 2014) (no standing where complaint failed to "describe a specific injury to each of the named plaintiffs"). And named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Further, it is not plausible that *all* plaintiffs (much less millions of putative class members) suffered *all* the injuries listed in paragraph 270. For example, read literally, plaintiffs allege that they and many millions of others suffered "lowered credit scores resulting from credit inquiries following fraudulent activities" (2d Consol. Compl. ¶ 270(j))—yet, no one alleges social security numbers were in the data and only five bellwether plaintiffs allege their information was

misused at all. And plaintiffs claim everyone incurred "costs associated with replacing passports or addressing passport-related fraud" (*id.* ¶ 270(g)), even though only seven of the non-misuse bellwether plaintiffs claim they even provided a passport number to the defendants (*id.* ¶¶ 25, 28, 34, 37-38, 43, 56), and no bellwether plaintiff alleges any "passport-related fraud."

What is more, some of the alleged harms—like overpayment and lost value of information—are not cognizable injuries under Article III as a matter of law. *See Chambliss*, 189 F. Supp. 3d at 572 (rejecting loss-of-value theory because "[p]laintiffs have not alleged that they have attempted to sell their personal information or that, if they have, the data breach forced them to accept a decreased price for that information"); *id.* (rejecting overpayment theory where "[p]laintiffs make no allegations that the data breach diminished the value of the health insurance they purchased," "offer no factual allegations indicating that the prices they paid for health insurance included a sum to be used for data security, and that both parties understood that the sum would be used for that purpose," and "could not even quantify this alleged loss").[11]

---

[11] Indeed, plaintiffs reveal why courts have so often rejected the overpayment theory when they argue that data security, "like soaps and shampoos," is just one of many "tangible and intangible components" of "[t]he cost of purchasing a hotel room." (*See* 2d Consol. Compl. ¶ 274.) Plaintiffs believe they are entitled to claim as an injury-in-fact that they separately overpaid for data security (or presumably any other "component" of their purchase price). But as the court explained in rejecting a similar effort to chop up a contract in *Irwin v. Jimmy John's Franchise, LLC*: "[Plaintiff] did not pay for a side order of data security and protection; it was merely incident to her food purchase, as is the ability to sit at a table to eat her food, or to use Jimmy John's restroom." 175 F. Supp. 3d 1064, 1072 (C.D. Ill. 2016); *see also SAIC*, 45 F. Supp. 3d at 30 ("To the extent that [p]laintiffs claim that some indeterminate part of their premiums went toward paying for security measures, such a claim is too flimsy to support standing."); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) ("such arguments have been adopted by courts only where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect").

## B. Some of the Bellwether Plaintiffs Who Do Allege Misuse Have Not Alleged Facts Showing It Is Fairly Traceable to the Starwood Cyberattack.

Two plaintiffs, Hevener and Ropp, claim unauthorized credit cards or other accounts were applied for or opened in their names. (2d Consol. Compl. ¶¶ 36, 77.) Ropp also claims a tax refund was "collected by an unauthorized individual." (*Id.* ¶ 77.) Another plaintiff, Cullen, says he suffered "unauthorized purchases made from his personal checking account." (*Id.* ¶ 70.) None of these alleged injuries can be traced to the cyberattack based on the face of the complaint.[12]

Neither Hevener nor Ropp (nor any other plaintiff) claims to have provided a social security number to defendants. Without one, a wrongdoer cannot apply for or open financial accounts or collect a tax refund. *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018) ("social security numbers [ ] were required to open a credit card account"); *In re SuperValu, Inc.*, 925 F.3d 955, 960 (8th Cir. 2019) ("stolen card information is distinct from the type of personally identifying information generally necessary to open a new fraudulent account, such as social security numbers, birth dates, or driver's license numbers") (quotation omitted); *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 2016 WL 6523428, at *5 (S.D. Cal. Nov. 3, 2016) (noting that social security number is "needed to open" new account in plaintiff's name); *Antman v. Uber Techs., Inc.*, 2018 WL 2151231, at *6, 10-11 (N.D. Cal. May 10, 2018) (social security numbers required to apply for credit cards or collect tax refunds).

Likewise, no plaintiff claims to have provided banking information to defendants, which would be necessary to make the unauthorized checking-account transactions alleged by Cullen.

---

[12] Cullen, along with plaintiffs Golin and O'Brien, also alleges his payment card was used without his authorization. (*See* 2d Consol. Compl. ¶¶ 42, 70, 72.) Defendants are not challenging these allegations of payment-card misuse on standing grounds in this motion. However, it is highly unlikely that these allegations will withstand scrutiny when defendants have an opportunity to put a factual record before the Court. And these plaintiffs have failed to state a claim in any event, as shown below.

Without such an allegation, the Starwood cyberattack cannot be the source of the alleged

unauthorized checking-account transactions. *Cmty. Health Sys.*, 2016 WL 4732630, at *12

(unauthorized access to bank account not traceable to data breach that "did not include financial

information such as bank account numbers").

## II. THE BELLWETHER PLAINTIFFS DO NOT STATE A CLAIM FOR RELIEF.

### A. The Illinois Negligence Claim (Count 1) Is Barred by the Economic Loss Rule.

The Illinois plaintiffs, Golin and Raab, allege only economic losses, including "paying

more for good[s] and services than they otherwise would have paid, . . . losing the inherent value

of their Personal Information[,] . . . identity theft and fraud[,] . . . [and] costs associated with the

detection and prevention of identity theft and unauthorized use of their financial accounts." (2d

Consol. Compl. ¶ 270.) *See Fox v. Iowa Health Sys.*, 2019 WL 3349988, at *8 (W.D. Wis. July

25, 2019) (applying Illinois law; such injuries are "economic damages because they reflect a

pecuniary loss rather than a personal injury or damage to property").

Illinois's "economic loss rule bars a plaintiff from recovering for purely economic losses

under a theory of negligence." *See In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 528

(N.D. Ill. 2011). This is because "tort law affords a remedy for losses occasioned by personal

injuries or damage to one's property, but contract law and the Uniform Commercial Code offer

the appropriate remedy for economic losses occasioned by diminished commercial expectations

not coupled with injury to person or property." *In re Illinois Bell Switching Station Litig.*, 641

N.E. 2d 440, 444 (Ill. 1994).

Courts have often applied Illinois's economic loss rule to negligence claims arising out of

data breaches. *See Michaels Stores*, 830 F. Supp. 2d at 530-31 (dismissing claim arising from

data breach of retail merchant); *In re Target Corp.*, 66 F. Supp. 3d 1154, 1174 (D. Minn. 2014)

(same); *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 817 (7th Cir. 2018) (affirming same); *see also Fox*, 2019 WL 3349988, at *8 (applying rule where "plaintiffs had a contract with [defendant] for health services, and the parties had an opportunity to include a remedy for data breaches as part of their contract but chose not to").

This is particularly true for a cyberattack involving payment-card information where "[a]ll parties involved in the complicated network of contracts that establish the card payment system have voluntarily decided to participate and to accept responsibility for the risks inherent in their participation." *Cmty. Bank of Trenton*, 887 F.3d at 815. Indeed, the banks that issued the payment cards are required by contract and federal law to indemnify plaintiffs for fraudulent activity resulting from a data breach. *Id.* at 807-09. Thus, plaintiffs have already agreed to a remedy for losses resulting from a data breach. Plaintiffs' attempt to augment that remedy by resorting to tort law is exactly what the economic loss rule is designed to prevent. *See id.* at 811-12.

Moreover, Illinois common law does not impose a duty on retailers to safeguard credit-card information from cyberattacks. *SuperValu*, 925 F.3d at 963 (finding no duty to protect personal information and dismissing negligence claim against merchant); *Cmty. Bank of Trenton*, 887 F.3d at 816 (same); *see also Cooney v. Chicago Public Schools*, 407 Ill. App. 3d 358, 363 (2010) (Illinois does not recognize a duty in tort to safeguard sensitive personal information).

### B. The Georgia Negligence Per Se Claim (Count 2) Fails for Lack of an Ascertainable Standard of Conduct Regarding Data Protection.

Plaintiffs Long, Viggiano, and Miller allege "Marriott violated Section 5 of the [Federal Trade Commission] Act (and similar state statutes)," which they claim "constitutes negligence *per se*." (2d Consol. Compl. ¶¶ 307-08.) No appellate decision in Georgia has specifically addressed the question of whether Section 5 can support a negligence-per-se claim. But two decisions from the Georgia Supreme Court provide strong evidence that the answer is no.

In *Wells Fargo Bank, N.A. v. Jenkins,* 744 S.E.2d 686 (Ga. 2013), the plaintiff brought tort claims based on the Gramm-Leach-Bliley Act (GLBA), which requires financial institutions "'to protect the security and confidentiality of [ ] customers' nonpublic personal information.'" *Id.* at 687 (quoting 15 U.S.C. § 6801(a)). The Georgia Supreme Court held this statute could not support a tort duty to protect customers' information because "[i]t does not provide for certain duties or the performance of or refraining from any specific acts on the part of financial institutions, nor does it articulate a standard of conduct or care, ordinary or otherwise." *Id.* at 688.

Thus, under *Wells Fargo*, without an "ascertainable standard of conduct," even a statute relating directly to information security cannot support a negligence per se claim. *Id.* And just a few months ago, the court again declined to impose a tort duty to safeguard personal information, this time under a state statute that "d[id] not explicitly establish any duty, nor . . . prohibit or require any conduct at all." *Dept. of Labor v. McConnell*, 828 S.E.2d 352, 358 (Ga. 2019).

These rulings leave little doubt as to how the Georgia Supreme Court would resolve plaintiffs' attempt to derive a common law duty to protect information from Section 5 of the FTCA. Section 5 broadly provides that "unfair or deceptive acts or practices in or affecting commerce[] are hereby declared unlawful." 15 U.S.C. § 45(a)(1). The Eleventh Circuit has noted that "the standard of unfairness is 'by necessity, an elusive one[.]'" *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1367 (11th Cir. 1988) (quoting *F.T.C. v. Indiana Fedn. of Dentists*, 476 U.S. 447, 454 (1986)). And Section 5 does not set forth an "ascertainable standard of conduct," or any standard at all, regarding information security. Thus, plaintiffs' negligence-per-se theory does not even rise to the level that the Georgia Supreme Court found insufficient in *Wells Fargo*.

Moreover, through the FTCA, "Congress empowered the Commission—and the Commission alone—to enforce the FTCA." *SuperValu*, 925 F.3d at 963-64. There is "nothing

20

suggesting that the Commission's enforcement efforts have been inadequate to redress violations of the statute" with respect to cyberattacks or data breaches; thus, "[i]mplying a cause of action would be inconsistent with Congress's anticipated enforcement scheme." *Id.* at 964. For this reason, the Eighth Circuit recently "conclude[d] that Illinois is unlikely to recognize a legal duty enforceable through a negligence action arising from the FTCA." *Id.*

Defendants recognize that two judges from the Northern District of Georgia have made *Erie* guesses that Georgia would allow negligence-per-se claims for data breaches under Section 5. *See In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 2897520, at *4 (N.D. Ga. May 17, 2016); *In re Equifax, Inc., Customer Data Security Breach Litig.*, 362 F. Supp. 3d 1295, 1327 (N.D. Ga. 2019). But that conclusion has been criticized as "a prediction of Georgia law that seems to have been incorrect." *Cmty. Bank of Trenton*, 887 F.3d at 819.

An analysis of the Northern District cases bears this out. In *Home Depot*, Judge Thrash relied on two non-Georgia Supreme Court cases that held the FTCA's franchise regulations— which, unlike Section 5's unfairness provision, provide for specific types of disclosures, *see* 16 C.F.R. § 436.5(s)—were sufficiently ascertainable to give rise to a negligence-per-se claim. *See* 2016 WL 2897520, at *4 (citing *Bans Pasta, LLC v. Mirko Franch., LLC¸* 2014 WL 637762, at *13-14 (W.D. Va. Feb. 12, 2014); *Legacy Acad., Inc. v. Mamilove, LLC*, 761 S.E.2d 880, 891 (Ga. Ct. App. 2014)). Then, in *In re Arby's Restaurant Group Inc. Litig.*, 2018 WL 2128441, at *8 (N.D. Ga. Mar. 5, 2018), Judge Totenberg followed *Home Depot* in a brief analysis in which she cited no other cases involving Georgia law.[13] Finally, in *Equifax*, Judge Thrash repeated his

---

[13] Judge Totenberg cited *First Choice Federal Credit Union v. Wendy's Co.*, 2017 WL 9487086, at *4 (W.D. Pa. Feb. 13, 2017) (decided under Ohio law); *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498 (1st Cir. 2009) (decided under Massachusetts law); and *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236, 247 (3d Cir. 2015) (FTC enforcement action not decided under any state law).

prediction of Georgia law, relying on his reasoning in *Home Depot*. 362 F. Supp. 3d at 1327.

There is no reason to believe these cases are accurate predictions of what the Georgia Supreme Court would do. To the contrary, *Wells Fargo* and *McConnell* strongly indicate that the Georgia Supreme Court would find Section 5's broad invocation of "unfairness" to be insufficient to support plaintiffs' negligence-per-se claim.

### C.     The New York and Maryland Express Contract Claims (Count 3) Also Fail.

New York plaintiffs Cullen, Fishon, and O'Brien, and Maryland plaintiffs Maldini and Ryans, allege that two online privacy statements formed express contracts for data security—Starwood's October 14, 2014 "online Privacy Statement" and "Marriott's Privacy Statement." (2d Consol. Compl. ¶¶ 313-14, 318-21.) These claims fail for several reasons.

*First,* plaintiffs fail to allege they ever accessed, saw, read, or considered these privacy statements. And even though defendants raised this issue in their pre-motion letter, plaintiffs still do not allege they even visited the Starwood or Marriott websites, which are the only places that the privacy statements existed.

Courts faced with similarly lacking contract allegations in privacy cases have not hesitated to dismiss. *See Dyer v. Nw. Airlines Corps.*, 334 F. Supp. 2d 1196, 1199-1200 (D.N.D. 2004) (rejecting contract claim where plaintiffs failed to allege they "ever logged onto Northwest Airlines' website and accessed, read, understood, actually relied upon, or otherwise considered Northwest Airlines' privacy policy"); *Azeltine v. Bank of Am.*, 2010 WL 6511710, at *10 (D. Ariz. Dec. 14, 2010) (dismissing complaint that "contain[ed] no allegations that [p]laintiff relied upon [d]efendant's privacy policy in conducting business with [d]efendant"); *Gardner v. Health Net, Inc.*, 2010 WL 11597979, at *6 (C.D. Cal. Aug. 12, 2010) ("Plaintiffs have failed to allege that they ever submitted any information over [d]efendant's website, accessed or read the Privacy Policy, or relied on the Privacy Policy[.]").

22

In their newest complaint, plaintiffs added allegations that they "manifested their . . . intention to assent to the terms of the Privacy Statement by providing their Personal Information to [defendants]." (2d Consol. Compl. ¶¶ 316, 323.) But plaintiffs cannot plausibly claim they assented to the terms of a contract they never saw, read, considered, or even knew existed.

Plaintiffs have also added an allegation referring to the terms and conditions of the Starwood Preferred Guest Program and Marriott Rewards Program. (*Id.* ¶¶ 315, 322.) But as with the privacy statements, no plaintiff alleges that he or she saw, read, or relied on these terms and conditions. In fact, other than Cullen, none of the express-contract plaintiffs individually allege they were enrolled in either rewards program. (*See id.* ¶ 70.)

*Second*, the express-contract plaintiffs do not state when or with whom (Starwood or Marriott) they allegedly contracted. Instead, plaintiffs collectively allege they "provid[ed] [their] Personal Information to Marriott in order to stay at a Marriott Property prior to the Data Breach" and, in some cases, "used [a] credit card to purchase goods or services at a Marriott Property." (*E.g.*, *id.* ¶¶ 52-53, 70-72.)[14] "Marriott," however, "is defined to include" not only "Marriott International, Inc.," but also "Starwood Hotels & Resorts Worldwide, LLC, Starwood Hotels & Resorts Worldwide, Inc., and any other wholly-owned subsidiaries of Marriott International, Inc." (*Id.* ¶ 16). These allegations make it impossible to determine whether any given plaintiff is claiming to have contracted with Starwood or Marriott (or both).

And because none of the plaintiffs allege whether they provided their information before or after September 23, 2016—the date Marriott acquired Starwood (*id.* ¶ 98)—there is no way to determine whether any of them agreed to the Marriott Privacy Statement at all. Indeed, assuming

---

[14] A "Marriott Property," in turn, is defined to be a "Marriott property collecting guest information that was compromised in the data breach[.]" (2d Consol. Compl. ¶ 18.)

that the "Marriott Privacy Statement" is "Marriott's Global Privacy Statement dated May 18, 2018" referenced elsewhere in the complaint (*id.* ¶¶ 100-03), it would only apply to individuals providing their information during the narrow window between May 18, 2018, and the announcement of the cyberattack on November 30, 2018 (*id.* ¶ 15).

Courts in Maryland, New York, and elsewhere have rejected contract claims based on sloppy pleading such as this. *See Johnson v. Dore*, 2013 WL 5335626, at *3 (D. Md. Sept. 20, 2013) (dismissing complaint where "[plaintiff] fails to identify the contract breached, or the [d]efendant who breached it"); *Posner v. Minn. Min. & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989) ("Although the existence of a contract is alleged, plaintiffs fail to set forth any specific information as to when the agreement was made, the terms of the agreement upon which liability is predicated, or any other evidence supporting the formation of an agreement."); *Coast to Coast Energy, Inc. v. Gasarch*, 126 A.D.3d 621, 622 (N.Y. App. Div. 2015) (upholding dismissal "since plaintiffs failed to allege that [defendants] were parties to the contracts at issue"); *Wolverine Const., Inc. v. Argonaut Ins. Co.*, 2013 WL 5727018, at *3 (D. Md. Oct. 18, 2013) (dismissing complaint that alleged contract existed but "offers no further details about the nature, terms, or timing of that contract"); *Comparion Med. Analytics, Inc. v. Prime Healthcare Servs., Inc.*, 2014 WL 12589670, at *3 (C.D. Cal. Oct. 22, 2014) ("Comparion does not allege who agreed to its T&Cs . . . , when Prime agreed to its T&Cs, where Prime agreed to its T&Cs, or even that Prime agreed to its T&Cs. Comparion does not even allege that Prime visited its website, where the T&Cs appear. Thus, even charitably construed, Comparion's complaint alleges no facts showing Comparion's and Prime's mutual assent to a contract.").[15]

---

[15] Plaintiffs' generic pleading style makes it difficult to sort out what terms and conditions apply to their dealings with Starwood or Marriott, which could include arbitration provisions, class-action waivers, choice of law provisions, and limitations on liability.

24

*Third*, plaintiffs' vague allegations and generalized pleading style fail to make out a sufficiently definite contract for data security. *See Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. App. Ct. 2012) ("Maryland law requires that a plaintiff alleging a breach of contract must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." (quotation omitted) (emphasis in original); *Joseph Martin, Jr., Delicatessen v. Schumacher*, 52 N.Y.2d 105, 109 (1981) ("[D]efiniteness as to material matters is of the very essence in contract law"; "before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."); *Abdale v. N. Shore-Long Island Jewish Health Sys., Inc.*, 49 Misc. 3d 1027, 1040 (N.Y. Sup. Ct. 2015) ("To the extent that plaintiffs are relying on a privacy statement, either provided to them or at the time they received medical services or posted on a website, plaintiffs do not allege that said privacy statement contained any obligation or promise regarding the theft of personal information by third parties."). Plaintiffs have not met these standards here.

### D.    The Oregon Breach of Implied Contract Claim (Count 4) Fails for Lack of Mutual Assent.

Plaintiff Ropp alleges he entered into an implied contract with defendants for data security because "[he] obtained services from Marriott, or otherwise provided Personal Information to Marriott." (2d Consol. Compl. ¶ 330.) Ropp claims this implied contract flowed from the "reasonable expectation" held by all plaintiffs that defendants would provide reasonable data security. (*Id.* ¶ 332.) Defendants breached this implied contract, plaintiffs allege, when they failed to provide the expected data security or adequate notice of the cyberattack. (*Id.* ¶ 335.)

These allegations fall short of what is required to state an implied-contract claim. The elements of implied and expressed contract are the same: "there must be an offer; there must be

an acceptance; the acceptance must be in the terms of the offer; it must be communicated to the offeror; there must be a mutual intention to contract; and there must be a meeting of the minds." *See Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th Cir. 2010) (quotation and alteration omitted); *State v. Heisser*, 249 P.3d 113, 120 (Or. 2011) ("there [must] be mutual assent to the terms of the agreement"). Yet Ropp fails to allege even basic facts such as when he supposedly entered into an implied contract and with which entity. *See Otterness v. City of Waldport*, 883 P.2d 228, 232 (Or. Ct. App. 1994) (affirming dismissal of implied-contract claim because "there remains a complete absence of allegations describing the acts of the parties that warrant the conclusion that a contract was intended") (quotation omitted). Nor does he allege he was aware of any representation by Starwood or Marriott about data security. *See Krottner*, 406 F. App'x at 131 (rejecting implied-contract claim where "[plaintiffs] d[o] not allege that they read or even saw the documents" relied on in their complaint); *Gardner*, 2010 WL 11597979, at *6.

Contrary to plaintiffs' view, the fact that Ropp allegedly provided information when booking a hotel room does not by itself "create a contractual promise to safeguard that information, especially from third party hackers." *See Longenecker-Wells v. Benecard Servs. Inc*, 658 F. App'x 659, 662 (3d Cir. 2016) ("Merely claiming that an implied contract arose from the course of conduct between [p]laintiffs and [defendant] is insufficient to defeat a motion to dismiss.") (quotation and citation omitted); *see also Lovell v. P.F. Chang's China Bistro, Inc*., 2015 WL 4940371, at *3 (W.D. Wash. Mar. 27, 2015) ("unilateral and subjective expectations" of data privacy "do not give rise to enforceable contracts").

**E.      The Court Should Dismiss the Bellwether Plaintiffs' Statutory Claims.**

**1.      Plaintiffs' Maryland Statutory Claims (Counts 7 & 8) Fail.**

Plaintiffs allege that defendants violated Maryland's Consumer Protection Act (CPA) and Personal Information Privacy Act (PIPA). (2d Consol. Compl. ¶¶ 355-82.) Both claims fail.

In support of their CPA claim, plaintiffs claim they "acted reasonably in relying on Marriott's misrepresentations and omissions[.]" (*Id.* ¶ 379.) But this conclusory statement is unsupported by any allegation that plaintiffs were even aware of any representation from Marriott or Starwood about data security. Numerous courts have dismissed Maryland CPA claims for similarly inadequate pleadings. *See Amenu-El v. Select Portfolio Servs.*, 2017 WL 4404428, at *3 (D. Md. Oct. 4, 2017) (conclusory allegations of reliance without factual support are insufficient); *Agomuoh v. PNC Fin. Servs. Grp.*, 2017 WL 657428, at *12 (D. Md. Feb. 16, 2017) (dismissing CPA claim where plaintiffs did not allege facts showing "how they relied to their detriment upon" the alleged misrepresentation); *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 450 (D. Md. 2013), *aff'd*, 546 F. App'x 165 (4th Cir. 2013) (dismissing for lack of reliance where statement "did not induce the [plaintiffs] to take any action in reliance on that statement").

In addition, because plaintiffs' CPA claims mainly involve allegedly false, misleading, or deceptive statements or omissions (*see* 2d Consol. Compl. ¶ 375(c)-(f), (h); *id.* ¶ 376(d)-(g)), they are subject to the heightened pleading requirements of Rule 9(b). *See Lombel v. Flagstar Bank F.S.B.*, 2013 WL 5604543, at *6 (D. Md. Oct. 11, 2013). Thus, plaintiffs must specify "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quotation omitted). Plaintiffs do not establish any of these elements. *See Brault v. Trans Union, LLC*, 2019 WL 2162284, at *4 (D. Md. May 17, 2019) (dismissing under Rule 9(b) where "[plaintiff] has not alleged that either of the [d]efendants knew the statement was false or acted with reckless disregard for the truth, nor has she alleged that either of the [d]efendants made the statement for the purpose of defrauding her"); *Glenn v. Wells Fargo Bank, N.A.*, 2016 WL 3570274, at *8 (D. Md. July 1, 2016) (dismissing where "complaint does not allege unfair and deceptive practices with particularity").

27

Plaintiffs' attempt to invoke Maryland's PIPA is also misplaced. That statute's definition of "personal information" covers only unencrypted payment-card numbers, and only when they are accompanied by access or security codes or passwords. *See* Md. Code, Com. Law § 14-3501(e)(1)(i)(3). Plaintiffs do not allege such codes or passwords were implicated in the Starwood cyberattack. And while unencrypted passport numbers are covered, *see id.* § 14-3501(e)(1)(i)(1), neither Maryland plaintiff claims to have provided passport information to defendants. (*See* 2d Consol. Compl. ¶¶ 52-53.)

### 2.    The Michigan Identity Theft Protection Act Claim (Count 46) Fails.

Plaintiffs Gononian and Wallace allege defendants violated Michigan's Identity Theft Protection Act by failing to disclose the cyberattack in a timely and accurate fashion. (2d Consol. Compl. ¶¶ 778-85.) But that statute's notice provision is triggered only by the loss of unencrypted and unredacted "personal information"—which does not include passport numbers or payment-card numbers unaccompanied by "any required security code, access code, or password that would permit access to . . . financial accounts." Mich. Comp. Laws §§ 445.63(r), 445.72(1). Plaintiffs do not allege any such information was taken in the cyberattack.

### 3.    Plaintiffs' New York General Business Law Claim (Count 62) Fails.

Plaintiffs Cullen, Fishon, and O'Brien claim a violation of New York's General Business Law, § 349. (2d Consol. Compl. ¶¶ 934-42.) But "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002). Even after an opportunity to cure this pleading deficiency, plaintiffs can only muster a conclusory, one-size-fits-all allegation that they all "were deceived in New York" and they "transacted with Marriott in New York by making hotel reservations from New York and/or staying in Marriott properties based in New York." (2d Consol. Compl. ¶ 936.)

This is not enough. This allegation—including its invocation of the non-committal

"and/or"—masks which if any plaintiffs accessed, saw, read, or considered an allegedly deceptive statement while making a reservation in New York or checking into a hotel in New York. *See In re Fyre Festival Litig.*, 2019 WL 3006629, at *14 (S.D.N.Y. July 10, 2019) (dismissing Section 349 claim where "[complaint] does not sufficiently allege ties to New York"); *Oden v. Boston Scientific Corp.*, 330 F.Supp.3d 877, 902 (E.D.N.Y. 2018) ("[t]o properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased") (quotation omitted).

Indeed, plaintiffs' allegations fail to satisfy Rule 8, much less Rule 9(b), which under Fourth Circuit law should apply to plaintiffs' Section 349 claims involving misrepresentations that sound in fraud. *See Murphy v. Capella Educ. Co.*, 589 F. App'x 646, 658 (4th Cir. 2014) (Virginia Consumer Protection Act claims alleging misrepresentations subject to Rule 9(b) because they sounded in fraud); *Jones v. Sears Roebuck & Co.*, 301 F. App'x 276, 287 (4th Cir. 2008) (applying 9(b) to West Virginia's Consumer Credit and Protection Act claims); *Lombel*, 2013 WL 5604543, at *6 (applying 9(b) to Maryland Consumer Protection Act claims).[16]

Finally, plaintiffs' Section 349 claims that rely on an alleged duty arising from Section 5 of the FTCA fail for the reasons explained above—namely, that Section 5 does not provide an "ascertainable standard of conduct," or any standard at all, regarding data security.

---

[16] Although Second Circuit cases have held that Section 349 claims are not subject to Rule 9(b), Fourth Circuit case law controls in this MDL proceeding. *See In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 718 n.15 (D. Md. 2001) ("I must apply Fourth Circuit law as the transferee court in an MDL proceeding."). And the Fourth Circuit case law cited above, while focusing on different state statutes, suggests a broader principle—that Rule 9(b) applies to state consumer deception claims sounding in fraud. *See also Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("When a plaintiff makes an allegation that has the substance of fraud, . . . he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability. Allowing a plaintiff to do so would undermine one of the primary purposes of Rule 9(b)[.]").

### 4.    The California UCL Claim (Count 15) Fails Too.

Plaintiffs Guzikowski, Maisto, Marks, and Sempre assert claims under California's UCL. (2d Consol. Compl. ¶¶ 450-59.) But not only do they lack standing under Article III for the reasons discussed above, they also lack statutory standing under the UCL, which requires loss of money or property. *See Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885-86 (Cal. 2011).

These plaintiffs do not allege actual misuse as a result of the data breach. At most, Guzikowski and Sempre claim they spent money purchasing credit-monitoring and identity-theft services. (2d Consol. Compl. ¶¶ 25, 27.) Although courts applying California law have reached inconsistent conclusions, the better-reasoned cases hold such expenditures do not amount to lost "money or property" for UCL standing purposes. *See Ruiz v. Gap, Inc.*, 2009 WL 250481, at *4 (N.D. Cal. Feb. 3, 2009), *aff'd*, 380 F. App'x 689 (9th Cir. 2010) ("[I]t is far from clear that the time and expenditure associated with monitoring one's credit is the kind of loss of money or property necessary for standing to assert a claim under section 17200."); *Dugas*, 2016 WL 6523428, at *11 (damages to monitor identity theft and time addressing unauthorized charges do not satisfy UCL's standing requirement); *Gardner*, 2010 WL 11597979, at *12 (same).

To the extent their UCL claim sounds in fraud (2d Consol. Compl. ¶¶ 455(d)-(g), 457), plaintiffs fail to satisfy Rule 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (affirming dismissal of UCL claim on Rule 9(b) grounds for failure to allege particular facts regarding misrepresentations). (*See also* § II.E.3 & n.16 above.)

### F.    The Bellwether Plaintiffs' Claims Also Fail Because They Have Not Adequately Alleged Damages.

Damages are an essential element of each of plaintiffs' common law claims. In New York, Maryland, and Oregon, actual loss is required for breach of contract. *Primoff v. Warfield*, 495 F. App'x 293, 298 (4th Cir. 2012); *Lexington 360 Assocs. v. First Union Nat'l Bank of N.

30

*Carolina*, 234 A.D.2d 187, 189-90 (N.Y. App. Ct. 1996); *Sharma v. Providence Health & Servs.-Oregon*, 412 P.3d 202, 211 (Or. App. Ct. 2018). The same is true for negligence in Illinois, Florida, and Georgia. *Collins v. Athens Orthopedic Clinic*, 815 S.E.2d 639, 643-45 (Ga. Ct. App. 2018); *In re SuperValu Inc.*, 2018 WL 1189327, at *11-13 (D. Minn. Mar. 7, 2018), *aff'd*, 925 F.3d 955 (8th Cir. 2019) (Illinois law); *Lucarelli Pizza & Deli v. Posen Const., Inc.*, 173 So. 3d 1092, 1094 (Fla. Dist. Ct. App. 2015). And actual injury is required under the statutory claims too. *Goss*, 917 F. Supp. 2d at 450; *Manchester v. Sivantos GmbH*, 2019 WL 3734307, at *3 (C.D. Cal. Aug. 7, 2019); *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 608-09 (S.D.N.Y. 2009).

"[T]he standard for alleging actual damages is generally higher than that for plausibly alleging injury in fact." *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 13 (D.D.C. 2019); *see also Krottner*, 406 F. App'x at 131 ("[O]ur holding that [p]laintiffs–[a]ppellants pled an injury-in-fact for purposes of Article III standing does not establish that they adequately pled damages for purposes of their state-law claims.").

Plaintiffs' damages allegations fall short. In paragraph 270, they purport to list "loss[es] and other actual harm[s] for which they are entitled to damages" that "[they] and class members have and will continue to suffer[.]" (2d Consol. Compl. ¶ 270.) This list does not withstand scrutiny. It is implausible that all plaintiffs and class members suffered these injuries, especially considering the nature of the information allegedly involved in the cyberattack and the paucity of identity fraud alleged by the named plaintiffs. Indeed, plaintiffs' individual allegations in many cases only serve to contradict the sweeping, general claims of paragraph 270.

*"Value" allegations.* Paragraphs 270(a) and (c) allege that plaintiffs and class members overpaid for goods and services and lost the value of the alleged promise for data security. But no plaintiff attempts to place an actual value on this purported overpayment. Nor do plaintiffs,

31

individually or collectively, offer no "factual allegations indicating that the prices they paid . . . included a sum to be used for data security, and that both parties understood that the sum would be used for that purpose." *See Chambliss*, 189 F. Supp. 3d at 572; *see also Attias*, 365 F. Supp. 3d at 12 (rejecting overpayment damages where plaintiffs "broadly allege that some indeterminate amount of their health insurance premiums went towards providing data security" and "allege only in conclusory fashion that the services they received 'were of a diminished value'").

The same is true for the loss of "inherent value of their Personal Information[.]" (2d Consol. Compl. ¶ 270(b).) That speculative loss is insufficient to confer standing, let alone constitute recoverable damages, particularly where, as here, plaintiffs "do not contend that *they* intended to sell this information on the cyber black market in the first place." *SAIC*, 45 F. Supp. 3d at 30; *Chambliss*, 189 F. Supp. 3d at 572 (same).

*"Misuse" allegations*. Paragraphs 270(d) alleges that plaintiffs suffered "identity theft and fraud," while Paragraph 270(i) alleges damages in the form of "unauthorized charges and loss of use of and access to their financial account funds," among other harms. But these allegations are belied by the fact that only five of the bellwether plaintiffs individually allege that they experienced any actual identity theft, fraud, or unauthorized charges.

Moreover, only three of those five (Cullen, Golin, and O'Brien) allege they incurred unauthorized charges on their payment cards. And none of those three allege they were not reimbursed. *See SuperValu*, 925 F.3d at 964 (no damages where "[plaintiff] does not directly allege that the fraudulent charge to his credit card resulted in any pecuniary loss"); *Dugas*, 2016 WL 6523428, at *4, 11 (no damages where "[p]laintiff does not assert that he suffered any unreimbursed losses from the unauthorized use of his credit card or that he was unable to use credit thereafter"); *Michaels Stores*, 830 F. Supp. 2d at 527 ("[p]laintiffs were reimbursed for all

unauthorized withdrawals and bank fees and, thus, suffered no out-of-pocket losses").

Of course, each individual plaintiff in this case "is in the best position to know whether he [or she] was ever obligated to pay [an alleged] unauthorized charge." *See SuperValu*, 925 F.3d at 965. Because "federal law and card-issuer contracts ordinarily absolve the consumer from any obligation to pay the fraudulent charge," any assumption that an unauthorized charge was not reimbursed would "run[] counter to established law and common experience." *Id.*

The notion that all plaintiffs incurred costs replacing passports or addressing passport-related fraud (2d Consol. Compl. ¶ 270(g)) is also patently incorrect since no bellwether plaintiff individually alleges any passport fraud, and only one, Viggiano, alleges he replaced a passport. (*Id.* ¶ 38.) As discussed below, those alleged costs are not recoverable as damages anyway. Similarly, none of the bellwether plaintiffs individually claim to have incurred the "loss of value of reward points" that plaintiffs refer to in paragraph 270(h). And no plaintiff individually claims to have incurred a "lowered credit score[]" either. (*Id.* ¶ 270(j).) *See Hochendoner*, 823 F.3d at 732 (rejecting "scattered descriptions of generalized harm" in place of actual alleged injury to named plaintiffs); *McIntosh v. Royal Caribbean Cruises Ltd.*, 2018 WL 791342, at \*2 (S.D. Fla. Feb. 7, 2018) (reciting "laundry list of harms allegedly suffered by the class [the plaintiff] hopes to represent" does not amount to plausible allegations of harm to named plaintiff).

*"Mitigation" allegations*. The remaining injuries can be classified as alleged efforts to mitigate future harm, which include "costs associated with detection and prevention of identity theft" (2d Consol. Compl. ¶ 270(e)), costs for credit-monitoring services (*id.* ¶ 270(f)), an amorphous claim of lost productivity and "enjoyment of one's life" (*id.* ¶ 270(k), and "imminent and certainly impending" future injury (*id.* ¶ 270(l)).

But most of the bellwether plaintiffs do not allege *any* costs associated with mitigation

regardless of whether they allege misuse; instead, they allege "time and effort" spent preventing against an alleged increased risk of misuse. (*See, e.g.*, *id.* ¶ 28 (plaintiff alleges she "spent time and effort monitoring her financial accounts and credit card statements to detect fraudulent activity and uses a credit monitoring service in order to mitigate against potential harm").)

Many courts have held that an increased risk of identity theft, and time and effort spent addressing that risk, are not recoverable damages. *Alston v. Freedom Plus/Cross River*, 2018 WL 770384, at *6 (D. Md. Feb. 7, 2018) ("The Fourth Circuit has squarely rejected the general increased risk of identity theft as a basis for Article III standing, and its analysis applies with equal force to preclude a showing of actual damages here.") (citing *Beck*, 848 F.3d at 273-76); *Attias*, 365 F. Supp. 3d at 14-15 (mitigation costs for "those whose information has been exposed but not misused . . . are not actual damages in their own right and cannot be recovered as consequential damages because there is not an actual injury, only an anticipated one"); *Hammond v. The Bank of New York Mellon Corp.*, 2010 WL 2643307, at *13 (S.D.N.Y. June 25, 2010) ("[I]t is not surprising that the United States District Courts in New York, California, Illinois and Michigan (applying state law) have each found that the increased risk of identity theft (in the future) is not a cognizable claim."); *Shafran v. Harley-Davidson, Inc.*, 2008 WL 763177, at *3 (S.D.N.Y. Mar. 20, 2008) ("Courts have uniformly ruled that the time and expense of credit monitoring to combat an increased risk of future identity theft is not, in itself, an injury that the law is prepared to remedy"); *Krottner v. Starbucks Corp.*, 2009 WL 7382290, at *7 (W.D. Wash. Aug. 14, 2009), *aff'd in part*, 406 F. App'x 129 (9th Cir. 2010) ("Courts applying the law of at least nine states have rejected the claims of plaintiffs similarly situated to [the named plaintiffs]. Most courts . . . dispose of such claims as a matter of law, concluding that state law does not recognize either an increased risk of identity theft or monitoring costs as a compensable injury.").

In fact, the "vast majority of courts" have allowed recovery of mitigation costs as damages only when they are incurred in response to *actual* misuse, not to protect against potential misuse. *See Attias*, 365 F. Supp. 3d at 16 ("Consistent with the weight of authority on this issue, the remaining plaintiffs who have not alleged actual misuse of their exposed personal information may not plead actual damages under a mitigation-cost theory.") (collecting cases).

Thus, plaintiffs like Viggiano, who voluntarily replaced his passport "to mitigate against potential harm"—not in response to any alleged misuse—have not alleged recoverable damages. (2d Consol. Compl. ¶ 38.) Indeed, of the five bellwether plaintiffs who allege misuse, only Ropp alleges he expended any money in response. (*Id.* ¶ 77.) And, as explained above, the misuse Ropp alleges cannot be connected to the Starwood cyberattack.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint.


Dated: September 23, 2019                    */s/ Daniel R. Warren*
                                             Daniel R. Warren
                                             Lisa M. Ghannoum
                                             Baker & Hostetler LLP
                                             127 Public Square, Suite 2000
                                             Cleveland, OH 44114
                                             Tel: (216) 621-0200
                                             Email: dwarren@bakerlaw.com
                                             Email: lghannoum@bakerlaw.com

                                             Gilbert S. Keteltas
                                             Baker & Hostetler LLP
                                             1050 Connecticut Ave. NW, Suite 1100
                                             Washington, D.C. 20036
                                             Tel: (202) 861-1530
                                             Email: gketeltas@bakerlaw.com

                                             *Attorneys for defendants*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2019, the foregoing, with exhibits thereto, was filed with the Clerk of Court using CM/ECF, which will send notification to the registered attorneys of record that the document has been filed and is available for viewing and downloading.

*/s/ Daniel R. Warren*
*Attorney for defendants*