**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL INC., CUSTOMER DATA SECURITY BREACH LITIGATION** | MDL No. 19-md-2879 |
| | Judge Paul W. Grimm |
| **THIS DOCUMENT RELATES TO THE CONSUMER ACTIONS** | **JURY TRIAL DEMANDED** |

**CONSUMER PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS MARRIOTT INTERNATIONAL, INC. AND**
**STARWOOD HOTELS & RESORTS WORLDWIDE, LLC'S**
**MOTION TO DISMISS THE BELLWETHER PLAINTIFFS'**
**SECOND AMENDED CONSOLIDATED**
**CONSUMER CLASS ACTION COMPLAINT**

"The Marriott Group, which includes Marriott International, Inc., Starwood
Hotels & Resorts Worldwide, LLC… and their affiliates, values you as our guest
and recognizes that privacy is important to you."

Marriott Global Privacy Statement, May 18, 2018.

"A company does not act equitably when it publishes a privacy policy to attract
customers who are concerned about data privacy, fails to make good on that
promise by investing inadequate resources in cybersecurity, exposes its
unsuspecting customers to substantial financial injury, and retains
the profits of their business."

*F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245 (3d Cir. 2015).

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ i

I.      Introduction. .......................................................................................................... 1

II.     As Marriott largely concedes, Plaintiffs have standing for their claims. ........................ 2

        A.      Plaintiffs have suffered an injury in fact. ................................................... 3

                1.      Hackers intentionally targeted the Personal Information
                        compromised in the breach. ............................................ 6

                2.      Plaintiffs allege misuse of their information. ............................... 8

                3.      The information exposed in the breach can be—and has been—
                        used to commit fraud. ................................................... 9

                4.      Plaintiffs did not receive the benefit of their bargain. ............... 133

                5.      Plaintiffs' personal data has lost value. ................................. 14

        B.      Plaintiffs' injuries are fairly traceable to Marriott's conduct. ...................... 15

III.    The Bellwether Plaintiffs have stated a claim as to their particular states. ..................... 16

        A.      Standard on motion under Rule 12(b)(6). ................................................ 16

        B.      The facts of this particular case render the economic loss rule inapplicable. ........ 17

        C.      The Court should decline Marriott's invitation to speculate on what
                Georgia state courts may do in the future as to Plaintiffs' negligence per se
                claim. .................................................................................................. 19

        D.      Plaintiffs state a claim for breach of express contract under both New
                York and Maryland law. ..................................................................... 21

        E.      Plaintiffs state a claim for implied contract under Oregon law. ....................... 25

        F.      Plaintiffs state a claim for violation of Maryland's consumer protection
                and data breach statutes. ................................................................... 26

        G.      Plaintiffs state a claim for violation of the Michigan Identity Theft
                Protection Act. .................................................................................. 30

        H.      Plaintiffs state a claim for violation of the New York General Business
                Law. .................................................................................................. 30

        I.      Plaintiffs have shown statutory standing under the California UCL. ................. 32

        J.      Plaintiffs have suffered cognizable damages. ............................................ 33

IV.     Conclusion. .......................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Adcock v. Freightliner LLC,*
  550 F.3d 369 (4th Cir. 2008) ........................................................................................ 6

*Address v. Millstone,*
  208 Md. App. 62, 56 A.3d 323 (2012) ....................................................................... 22

*Amos v. City of Butler,*
  529 S.E.2d 420 (Ga. App. 2000) ................................................................................ 21

*Anderson v. Hannaford Bros. Co.,*
  659 F.3d (1st Cir. 2011) .............................................................................................. 35

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................... 16

*Azeltine v. Bank of Am.,*
  No. CV 10-218-TUC-RCC, 2010 WL 6511710 (D. Ariz. Dec. 14, 2010) ................ 24

*Bank of Am., N.A. v. Jill P. Mitchell Living Tr.,*
  822 F. Supp. 2d 505 (D. Md. 2011) ............................................................................ 27

*Bass v. Facebook, Inc.,*
  394 F. Supp. 3d 1024 (N.D. Cal. 2019) .......................................................... 14, 15, 18

*Beck v. McDonald,*
  848 F.3d 262 (4th Cir. 2017) ............................................................................... passim

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................... 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..................................................................................................... 15

*Bostic v. Schaefer,*
  760 F.3d 352 (4th Cir. 2014) ........................................................................................ 4

*Bradley Ctr., Inc. v. Wessner,*
  296 S.E.2d 693 (Ga. 1982) .......................................................................................... 20

*Bruns v. City of Centralia,*
  21 N.E.3d 684 (Ill. 2014) ............................................................................................ 18

*Brush v. Miami Beach Healthcare Grp. Ltd.,*
  238 F. Supp. 3d 1359 (S.D. Fla. 2017) ....................................................................... 18

*Carlsen v. GameStop, Inc.*,
   833 F.3d 903 (8th Cir. 2016) ................................................................. 13

*Castillo v. Seagate Tech., LLC*,
   Case No. 16-cv-01958-RS, 2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ............................ 25

*Catalano v. BMW of N. Am., LLC*,
   167 F. Supp. 3d 540 (S.D.N.Y. 2016) ....................................................... 31

*Chambliss v. Carefirst, Inc*,
   189 F. Supp. 3d 564 (D. Md. 2016) ......................................................... 14

*Cities4Life, Inc. v. City of Charlotte*,
   341 F. Supp. 3d 621 (W.D.N.C. 2018) ...................................................... 10

*Coca-Cola Refreshments, USA, Inc. v. Binghamton Giant Markets, Inc.*,
   127 A.D.3d 1319 (N.Y. App. Div. 2015) .................................................... 23

*Cmty. Bank of Trenton v. Schnuck Markets, Inc.*,
   887 F.3d 803 (7th Cir. 2018) .............................................................. 20

*Cooney v. Chicago Public Schools*,
   943 N.E.2d 23 (Ill. App. 2010) ........................................................... 18

*Dept. of Labor v. McConnell*,
   828 S.E.2d 352 (Ga. 2019) ............................................................. 20, 21

*Dieffenbach v. Barnes & Noble, Inc.*,
   887 F.3d 826 (7th Cir. 2018) .............................................................. 35

*Dyer v. Nw. Airlines Corps.*,
   334 F. Supp. 2d 1196 (D.N.D. 2004) ....................................................... 24

*F.T.C. v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ........................................................... 19, 21

*Fero v. Excellus Health Plan, Inc.*,
   236 F. Supp. 3d 735 (W.D.N.Y. 2017) ............................................... 25, 30, 32

*First Choice Fed. Credit Union v. Wendy's Co.*,
   No. 16-506, 2017 WL 9487086 (W.D. Pa. Feb. 13, 2017) ................................ 19, 21

*Flemington Nat. Bank & Tr. Co. v. Domler Leasing Corp.*,
   65 A.D.2d 29 (N.Y. App. Div. 1978) ...................................................... 24

*Gardner v. Health Net, Inc.*,
   No. CV 10-2140 PA (CWX), 2010 WL 11597979 (C.D. Cal. Aug. 12, 2010) .................. 24

ii

*Gordon v. Chipotle Mexican Grill*, Inc.,
    344 F. Supp. 3d 1231 (D. Colo. 2018) ................................................................ 26

*Greene v. Gerber Prod. Co.*,
    262 F. Supp. 3d 38 (E.D.N.Y. 2017) ................................................................... 31

*Hameed-Bolden v. Forever 21 Retail, Inc.*,
    No. CV1803019SJOJPRX, 2018 WL 6802818 (C.D. Cal. Oct. 1, 2018) ......................... 14, 17

*Houck v. Substitute Tr. Servs., Inc.*,
    791 F.3d 473 (4th Cir. 2015) ............................................................................ 16

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
    892 F.3d 613 (4th Cir. 2018) ....................................................................... passim

*In re 21st Century Oncology Customer Data Sec. Breach Litig.*,
    380 F. Supp. 3d 1243 (M.D. Fla. 2019) ............................................................. 7, 11

*In re Adobe Sys., Inc. Privacy Litig.*,
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) .............................................................. 33, 34

*In re Anthem, Inc. Data Breach Litig.*,
    162 F. Supp. 3d 953 (N.D. Cal. 2016) .................................................... 13, 31, 32, 33

*In re Anthem Inc. Data Breach Litig.*,
    No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016) ............................... 14

*In re Arby's Rest. Grp. Inc. Litig.*,
    No. 1:17-CV-0514-AT, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) .............................. 19, 21

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
    362 F. Supp. 3d 1295 (N.D. Ga. 2019) ...........................................................19, 21, 30e

*In re Experian Data Breach Litig.*,
    No. SACV 15-1592 AG (DFMx), 2016 WL 7973595 (C.D. Cal. Dec. 29, 2016) ....... 14, 32, 34

*In re Facebook Privacy Litig.*,
    572 F. App'x 494 (9th Cir. 2014) ....................................................................... 14

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
    613 F. Supp. 2d 108 (D. Me. 2009) ...................................................................... 26

*In re LinkedIn User Privacy Litig.*,
    No. 12-cv-3088-EJD, 2014 WL 1323713 (N.D. Cal. Mar. 28, 2014) ...................................... 33

*In re Michaels Stores Pin Pad Litig.*,
    830 F. Supp. 2d 518 (N.D. Ill. 2011) ................................................................... 18

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
    45 F. Supp. 3d 14 (D.D.C. 2014) .................................................................................. 8

*In re SuperValu, Inc.*, *Customer Data Sec. Breach Litig.*,
    870 F.3d 763 (8th Cir. 2017) ............................................................................... 8, 15

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ........................................................................... passim

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    313 F. Supp. 3d 1113 (N.D. Cal. 2018) ......................................................... 13, 34

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
    No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ............................... 14

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ........................................................................ passim

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*,
    No. 3:12-cv-00325-RCJ-VPC, 2013 WL 4830497 (D. Nev. Sept. 19, 2013) ..................... 32

*In re: Cmty. Health Sys., Inc.*,
    No. 15-cv-222, 2016 WL 4732630 (N.D. Ala. Sept. 12, 2016) ................................. 8

*In re: Home Depot, Inc., Customer Data Sec. Breach Litig.*,
    No. 25831:14-md-2583-TWT, 2016 WL 2897520 (N.D. Ga. May 18, 2016) ............. 18, 19, 21

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ........................................................................... 12

*Khan v. Children's Nat'l Health Sys.*,
    188 F. Supp. 3d 524 (D. Md. 2016) ............................................................... 8, 14

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) ......................................................................... 8

*Larisa's Home Care, LLC v. Nichols-Shields*,
    404 P.3d 912 (Or. 2017) ................................................................................. 25

*Lewert v. P.F. Chang's China Bistro, Inc.*,
    819 F.3d 963 (7th Cir. 2016) ........................................................................... 9

*Longenecker-Wells v. Benecard Servs. Inc*,
    658 F. App'x 659 (3d Cir. 2016) ................................................................... 26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................... 3

*Morris v. Harvey Cycle & Camper, Inc.*,
  911 N.E.2d 1049 (Ill. App. 2009) ........................................................................ 17

*Mountz v. Glob. Vision Prod., Inc.*,
  770 N.Y.S.2d 603 (Sup. Ct. 2003) ....................................................................... 31

*Goshen v. Mut. Life Ins. Co. of New York*,
  774 N.E.2d 1190 (N.Y. 2002) .............................................................................. 31

*New York v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) .................................................................. 32

*Owen v. Bradley*,
  371 P.2d 966 (Or. 1962) ....................................................................................... 25

*Paolillo v. Murphy*,
  No. WMN-99-2508, 2000 WL 34441151 (D. Md. Aug. 11, 2000) ......................... 34

*Pelman ex rel. Pelman v. McDonald's Corp*,
  396 F.3d 508 (2d Cir. 2005) ................................................................................. 31

*Ray v. William G. Eurice & Bros.*,
  201 Md. 115, 93 A.2d 272 (1952) ......................................................................... 24

*Remijas v. Neiman Marcus Grp., LLC*,
  794 F.3d 688 (7th Cir. 2015) ........................................................................... 7, 8, 9

*Resnick v. AvMed, Inc.*,
  693 F.3d 1317 (11th Cir. 2012) ............................................................................ 13

*Rudolph v. Hudson's Bay Co.*,
  No. 18-CV-8472 (PKC), 2019 WL 2023713 (S.D.N.Y. May 7, 2019) .................... 26

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ................................................................................................. 4

*Shaw v. Brown & Williamson Tobacco Corp.*,
  973 F. Supp. 539 (D. Md. 1997) ........................................................................... 27

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................ 3

*Stutman v. Chem. Bank*,
  731 N.E.2d 608 (N.Y. 2000) ................................................................................. 30

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .............................................................................................. 15

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) ................................................................. 27

*Target Corp. Data Sec. Breach Litig.*,
   66 F. Supp. 3d 1154 (D. Minn. 2014) .......................................................... 30

*Teague v. Keith*,
   108 S.E.2d 489 (Ga. 1959)............................................................................ 21

*Tera Grp., Inc. v. Citigroup, Inc.*,
   No. 17-cv-4302, 2019 WL 3457242 (S.D.N.Y. July 30, 2019)...................... 6

*Toll Bros. v. Dryvit Sys., Inc.*,
   432 F.3d 564 (4th Cir. 2005) ........................................................................ 35

*Walters v. Kimpton Hotel & Rest. Grp., LLC*,
   No. 16-CV-05387-VC, 2017 WL 1398660 (N.D. Cal. Apr. 13, 2017) ........... 26

*Wells Fargo Bank*, *N.A. v. Jenkins*,
   744 S.E.2d 686 (Ga. 2013)............................................................................ 20

*Willis v. Bank of Am. Corp.*,
   No. CIV.A. ELH-13-02615, 2014 WL 3829520 (D. Md. Aug. 1, 2014) ......... 27

## **Statutes**

15 U.S.C. § 45 ...................................................................................................... 19

15 U.S.C. § 1681 .................................................................................................... 9

15 U.S.C. § 6801 .................................................................................................... 20

Md. Code Ann., Com. Law § 14-3501 ................................................................. 28, 29

Md. Code Ann., Com. Law § 13-301 .................................................................... 26

N.Y. Gen. Bus. § 349 ............................................................................................ 30, 32

## **Other Authorities**

1 Williston on Contracts § 3:5 (4th ed.)............................................................... 24

*Newberg on Class Actions* § 2:8 (5th ed. 2019) .................................................. 3

Restatement (Second) of Contracts...................................................................... 22, 25

I.    **Introduction.**

Marriott[1] is the world's largest hotel chain. Customers and hotel guests provide Marriott with their money and personal information in exchange for rooms and services, with the explicit agreement that Marriott will keep that information secure. Marriott's collection of personal data was pervasive and well beyond that which was necessary for individuals to book a hotel room (such as names, addresses, and payment card information)—it also collected its guests' nationalities, dates of birth, passport numbers, employer details, anniversaries, geolocation information, amenity requests, and even biometric data in certain circumstances. Second Amended Consolidated Consumer Class Action Complaint ("Compl."), ¶ 101. Marriott's reasons for collecting this information are obvious: data equals dollars. In fact, Marriott even employs a customer analytics company to identify, attract, and retain the most profitable customers and to predict future behaviors based upon the data it retains. *See id*. ¶ 104.

But while Marriott prioritized collecting the most sensitive of personal customer data to increase its profits, it failed to invest in corresponding data security measures necessary to keep that data secure. Even after Marriott acquired Starwood—and its vaunted Starwood Preferred Guest ("SPG") loyalty program—it failed to conduct basic cybersecurity due diligence to ensure the databases housing Starwood's guest information were secure. The result was predictable. On November 30, 2018, Marriott announced that it had been subject to one of the *largest* data breaches in history. Investigations revealed that for *four years*, hackers exploited glaring vulnerabilities in the Starwood network to install malicious software, harvest user credentials, and then roam freely across the Starwood networks to steal valuable consumer data, including names, mailing addresses,

---

[1]    As used in this opposition, "Marriott" and "Defendants" are defined to include Marriott International, Inc., Starwood Hotels & Resorts Worldwide, LLC, Starwood Hotels & Resorts Worldwide, Inc., and any other wholly-owned subsidiaries of Marriott International, Inc. At times, Plaintiffs refer to Marriott and Starwood separately for purposes of clarity.

phone numbers, email addresses, passport numbers, SPG account information, dates of birth, gender, arrival and departure information, reservation dates, communication preferences, payment card numbers and expiration dates, and tools needed to decrypt cardholder data ("Personal Information"). *Id.* ¶¶ 2, 17. The data breach occurred in spite of Marriott's repeated promises that it would maintain and protect its customers' data—via both a robust privacy policy and explicit and implied agreements with hotel guests—which customers objectively assented to by providing their Personal Information to Marriott when booking rooms.

Marriott knew of the substantial shortcomings of Starwood's IT systems long before the data breach was discovered, but did nothing to correct those deficiencies for over two years, all the while providing customers with a false sense of security. While Marriott has now admitted that the breach impacted at least 383 million guest records, it is still unable to definitively determine how much data was stolen beyond the limited data it has been able to identify, including whether the hackers were able to decrypt and steal massive amounts of credit card numbers, since several files that the hackers appear to have exfiltrated are now deleted. This of course has resulted in catastrophic outcomes for Marriott's customers, who did not receive the benefit of their bargains with Marriott and have already been exposed to or are at an alarmingly significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. Marriott's attempts to dismiss this action and fault Plaintiffs for failing to identify every piece of data that was stolen are unavailing; the pervasive and unmatched level of unfettered access the hackers had here, leading to extensive knowledge gaps about the hackers' activities, are *all* the fault of Marriott.

## II.    As Marriott largely concedes, Plaintiffs have standing for their claims.

When a company entrusted with consumers' sensitive personal information fails to provide even basic security of that data from malicious hackers, consumers pay a steep price. Nevertheless, Marriott asserts that the Article III standing doctrine shields it from responsibility for its role in

exposing its customers' sensitive data. But Marriott's attempts to downplay the damage wrought by its acknowledged security failures cannot overcome Plaintiffs'[2] well-pleaded factual allegations of injuries in fact that are fairly traceable to Marriott's conduct and redressable by this Court. The Plaintiffs have suffered—or are in immediate jeopardy of suffering—serious fraud given the highly sensitive financial and personal information now in the hands of data thieves. Because of Marriott's failure to secure Plaintiffs' Personal Information, Plaintiffs did not receive the benefit of the bargain they struck with Marriott. Plaintiffs have Article III standing to hold Marriott accountable for the price they and millions of other consumers around the country have already paid for Marriott's carelessness.

### A.    Plaintiffs have suffered an injury in fact.

Marriott concedes that Plaintiffs Barry Golin, Roger Cullen, and Paula O'Brien (the "Uncontested Plaintiffs") have Article III standing. Brief in Support ("Br.") at 17 n.12. These Uncontested Plaintiffs allege that they suffered actual fraud in the form of unauthorized charges on credit cards they provided to Marriott and, like all Plaintiffs, they allege that Marriott failed to protect their Personal Information from criminal hackers. Compl. ¶¶ 2, 19, 42, 70, 72. Thus, there is no question that at least these Plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).[3]

---

[2]    Unless otherwise indicated, "Plaintiffs" as used in this opposition refers to the Bellwether Plaintiffs selected by the parties.

[3]    Marriott does not contest that all of the Plaintiffs satisfy the redressability prong of Article III standing.  Because the Uncontested Plaintiffs' allegations cover all of the Nationwide Claims as well as Count 62 under the New York GBL, Plaintiffs have standing to move forward with at least these claims on behalf of the class even if the remaining Plaintiffs are found to lack standing. *See Newberg on Class Actions* § 2:8 (5th ed. 2019) ("A class action can be maintained by one class representative with proper standing."). Both the Fourth Circuit and "the Supreme Court ha[ve]

Because the Fourth Circuit has concluded that all victims of a data breach face substantial risk of imminent injury where at least one named plaintiff has alleged misuse, Marriott's concession as to the Uncontested Plaintiffs is fatal to its argument that the other Plaintiffs lack standing. Every Plaintiff alleges that they "provided their Personal Information to Marriott, including payment card information." Compl. ¶ 19.[4] Plaintiffs further allege facts showing the hackers intentionally targeted their Personal Information, *see e.g., id.* ¶ 2. Either actual misuse by some plaintiffs or the intentional targeting of personal information is sufficient to establish all Plaintiffs' standing under Fourth Circuit precedent. *See Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018).

In *Hutton*, three optometrists alleged that personal data provided to the defendant *decades earlier* had been compromised in a breach that the defendant *denied even occurred*. 892 F.3d at 617-19. Though the plaintiffs in *Hutton* had a far more tenuous factual footing for their claims than the Plaintiffs here, the Fourth Circuit concluded they had Article III standing. The court held that where Plaintiffs "allege that their data has been stolen, accessed, and used in a fraudulent manner," they "sufficiently allege[] an imminent threat of injury to satisfy Article III standing." *Hutton*, 892 F.3d at 622.

Marriott essentially ignores *Hutton*, relying instead on *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017)—a highly distinguishable case predating *Hutton* that ultimately fails to support

---

made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement'" for all claims asserted by that Plaintiff. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

[4]      While not every Plaintiff's individual paragraph specifically alleges he or she provided payment card information to Marriott, Compl. ¶¶ 20-95. Plaintiffs' allegation at Paragraph 19 does, and is specifically intended to aver that each Plaintiff provided their payment card information to Marriott.

Marriott's argument. In *Beck*, the plaintiffs alleged that "a laptop connected to a pulmonary function testing device" and "four boxes of pathology reports headed for long-term storage had been misplaced or stolen." *Id.* at 267-68. But "even after extensive discovery," the plaintiffs "uncovered no evidence that the information contained on the stolen laptop has been accessed or misused or that they ha[d] suffered identity theft, nor, for that matter, that the thief stole the laptop with the intent to steal their private information." *Id.* at 274-75. In other words, it was a common theft and the thief did not appear to be targeting personal data or even know personal data was on the computer. Thus, on a *summary judgment* record—and only after the conclusion of discovery— the court found that the plaintiffs there lacked standing. *Id.* at 267; *compare Hutton*, 892 F.3d at 622 (stating allegations of actual identity theft and credit card fraud following data breach "stand in stark contrast to *Beck*"); *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig. ("OPM")*, 928 F.3d 42, 58-59 (D.C. Cir. 2019) (distinguishing *Beck* as a case involving no actual fraud and no indication the laptop thief had any intent to steal private information).

Even in *Beck*, however, the court concluded that allegations like those Plaintiffs make here would "suffice[] to push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent." 848 F.3d at 274. In particular, the Fourth Circuit concluded that a threat of future injury is sufficiently imminent for Article III standing purposes if either (1) the "data thief intentionally targeted the personal information compromised in the data breach[]" or (2) "at least one named plaintiff alleged misuse or access of that personal information by the thief." *Id.* Because the *Beck* plaintiffs made neither claim, the risk of future harm was too speculative to confer standing there. *Id.* In contrast, both allegations are made here, and thus *Beck* provides no support for Marriott's argument.

As in *Hutton*, Plaintiffs here allege that hackers intentionally targeted their Personal

Information on Starwood's network. Compl. ¶ 2. Confirming both the motives of the hackers and their successful exfiltration of the Plaintiffs' sensitive data, several Plaintiffs allege they have already experienced fraud resulting from the breach, including unauthorized charges on payment cards provided to Marriott. *Id.* ¶¶ 42, 70, 72. And, given that Plaintiffs have sufficiently alleged they face a substantial risk of injury from the data breach, "any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact." *OPM*, 928 F.3d at 59. *See also Hutton*, 892 F.3d at 622 ("[T]he Court has recognized standing to sue on the basis of costs incurred to mitigate or avoid harm when a substantial risk of harm actually exists.").

### 1. Hackers intentionally targeted the Personal Information compromised in the breach.

Marriott argues that "it is highly unlikely that any sophisticated hacker would have targeted the Starwood guest reservation database for the purpose of obtaining payment-card information." Br. at 10. But Marriott's bare speculation cannot stand up to Plaintiffs' well-pleaded factual allegations, particularly when these allegations are construed on a motion to dismiss "in the light most favorable to plaintiff." *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008).[5] This is especially true where, as here, Plaintiffs allege that hotels have been frequent targets of payment card breaches in recent years, including Starwood's own properties. *See* Compl. ¶¶ 140-146, 154-163. In fact, Plaintiffs allege that in 2017 Verizon named the accommodation industry as "the

---

[5]     Marriott also contends that "the lack of allegations regarding the dark web and common point of purchase strongly corroborates that the Starwood cyberattack was not carried out for the purpose of committing payment-card fraud." Br. at 10. These "contentions about the absence of certain facts . . . may be appropriate for summary judgment" but cannot "support a facial challenge to standing at the motion to dismiss stage." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1022 (9th Cir. 2018) ("*Zappos*"); *see also Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302, 2019 WL 3457242, at *18 (S.D.N.Y. July 30, 2019) ("The Court . . . declines Defendants' invitation to 'draw a negative inference from the absence' of certain allegations in the Complaint . . . , since doing so would contravene the Court's duty to draw all factual inferences in favor of [the plaintiff] at the motion-to-dismiss stage.").

hardest hit" industry for point-of-sale intrusions accessing payment card data, *id.* ¶ 153, and that hotels such as Marriott "are an attractive target for hackers because they hold a lot of sensitive information, including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking." *Id.* ¶¶ 139, 152. Importantly, these allegations (unlike Marriott's arguments) are not mere speculation. Based on the PFI Report, Plaintiffs allege exactly when and how hackers "███████████████████████████████ ████████████████████" (*id.* ¶ 176), "███████████████████████████████ █████████████████████████████████" (*id.* ¶ 177), and "████████████ ████████████████████████████████████████████" (*id.* ¶ 179). If there were any doubt that the hackers were after sensitive and potentially encrypted payment-card and passport information in that guest-reservation database, Plaintiffs allege that "██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████." *Id.* ¶ 180. ██████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████." *Id.* ¶ 239. Based on Marriott's *own* investigation report, it appears highly likely that the hackers specifically targeted payment card information to misuse or sell.

These allegations "suffice[s] to push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent." *Beck*, 848 F.3d at 274 ("Why else would hackers break into a . . . database and steal consumers' private information?") (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694 (7th Cir. 2015)). *See also In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1251-52 (M.D. Fla. 2019); *Zappos*, 888 F.3d at 1028 n.9. Arguments regarding the lack of targeting of sensitive data here are specious.

### 2.    Plaintiffs allege misuse of their information.

Marriott does not challenge the Uncontested Plaintiffs' allegations that they have standing based on the unauthorized charges they have incurred on payment cards they provided to Marriott. Br. at 17 n.12.[6] These uncontested allegations of fraud demonstrate that data from the breach is in the hands of identity thieves intent on using it to commit fraud, and that therefore *all Plaintiffs* face an imminent threat of harm from the data breach.

Courts have consistently held that a threat of future injury is sufficiently imminent for Article III standing purposes where "at least one named plaintiff alleged misuse or access of that personal information by the thief." *Beck*, 848 F.3d at 274 (citing *Remijas*, 794 F.3d at 690) (at least some exposed credit cards "were known to have been used fraudulently"); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010) (one named plaintiff alleged identity theft)). Marriott attempts to carve the Plaintiffs into "Non-Misuse" and "Misuse" categories, but courts have rejected this approach, finding instead that allegations of misuse of stolen information by some plaintiffs are sufficient to establish that other plaintiffs face an imminent risk of harm.[7] *See Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 532 (D. Md. 2016) ("The Court therefore concludes that in the data breach context, plaintiffs have properly alleged an injury in fact arising from increased risk of identity theft if they put forth facts that provide . . . actual examples of the

---

[6]    Bellwether Plaintiffs Hevener, Ropp, and Cullen allege other forms of misuse as well, including identity theft and bank fraud. Compl. ¶¶ 36, 77, 70.

[7]    The cases cited by Marriott for the contrary proposition are inapposite. Br. at 8-9. Several plaintiffs in *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 31 (D.D.C. 2014) alleged that they had suffered fraudulent charges, but the compromised data did not include "any financial data." In *In re SuperValu, Inc., Customer Data Security Breach Litigation*, 870 F.3d 763 (8th Cir. 2017), "no other PII, such as addresses, telephone numbers, or passwords, was stolen" and the court averred "that standing questions in data breach cases 'ultimately turn[ ] on the substance of the allegations before each court'—particularly, the types of data allegedly stolen." *Zappos*, 888 F.3d at 1026 n.6 (quoting *SuperValu*, 870 F.3d at 770). *In re: Cmty. Health Sys., Inc.*, No. 15-cv-222, 2016 WL 4732630 (N.D. Ala. Sept. 12, 2016) is an unpublished, out-of-circuit outlier.

use of the fruits of the data breach for identity theft, even if involving other victims."). Simply put, "the fact that several named . . . Plaintiffs have already experienced some form of identity theft since the breach[]" makes it "at least plausible" that *other* Plaintiffs whose information was compromised in the breach "run a substantial risk of falling victim to other such incidents in the future." *OPM*, 928 F.3d at 59.

### 3. The information exposed in the breach can be—and has been—used to commit fraud.

Plaintiffs allege that they gave Marriott their Personal Information, which for each of them included payment card information. Compl. ¶¶ 17, 19, 25, 28, 34-35 37-39, 42-43, 52, 56, 70, 72.[8] As courts have noted, "Congress has treated credit card numbers as sufficiently sensitive to warrant legislation prohibiting merchants from printing such numbers on receipts—specifically to reduce the risk of identity theft." *Zappos*, 888 F.3d at 1027 (citing 15 U.S.C. § 1681c(g) (2012)). And "[a]lthough there is no allegation in this case that the stolen information included social security numbers, . . . the information taken in the data breach still gave hackers the means to commit fraud or identity theft." *Id*. (breach exposed "names, account numbers, passwords, email addresses, billing and shipping addresses, telephone numbers, and credit and debit card information"); *Remijas*, 794 F.3d at 693 (criminal payment card data breach exposed plaintiffs to substantial risk of card fraud). And even without making fraudulent transactions, the "information stolen from payment cards can be used to open new cards in the consumer's name," facilitating identity theft. *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016).

---

[8]     Marriott claims that Plaintiffs' allegations of the specific information that was compromised in the data breach are too "generalized." Br. at 6. But "Marriott is still unable to provide consumers with a complete understanding or confirmation of the type of information stolen in the Data Breach." Compl. ¶ 190. Thus, any lack of specifics results from the incomplete nature of Marriott's *own* data based on the fact that the hackers had such extensive and lengthy access to the innerworkings of Marriott's systems and were able erase their steps.

Marriott mounts a litany of veiled (and disputed) factual challenges to Plaintiffs' allegations that the disclosure of this Personal Information will expose Plaintiffs to fraud (*see* Br. at 7-10), but "it does so by relying on facts outside the Complaint[] (or contentions about the absence of certain facts), which makes its argument one that may be appropriate for summary judgment but not one that may support a facial challenge to standing at the motion to dismiss stage." *Zappos*, 888 F.3d at 1028. In a facial challenge to standing, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Cities4Life, Inc. v. City of Charlotte*, 341 F. Supp. 3d 621, 627 (W.D.N.C. 2018). Marriott's speculations and disputed factual challenges cannot overcome the Plaintiffs' well-pleaded factual allegations.

*First*, Marriott contends that many of the payment cards exposed in the breach may be expired. At the motion to dismiss stage, however, the Court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Beck*, 848 F.3d at 270. Thus, Marriott's bald speculation that some of the cards may be expired cannot overcome Plaintiffs' allegations that their payment cards were compromised in the breach and are still subject to fraud. Compl. ¶¶ 19, 28, 35, 39, 42, 52, 70, 72. Moreover, whether or not some cards have now expired, Plaintiffs were justified in spending money, time, and effort to mitigate possible future harm where they were at substantial risk of fraud at the time of the expenditures, and independently have standing to seek redress for those harms. *See, e.g., Hutton*, 892 F.3d at 622. And a hacker may commit fraud on an expired card simply by adding three or four years to the date because card numbers rarely change.

*Second*, Marriott claims that the massive scope of the breach including "at least 383 million guest records" means it is "highly unlikely" that a hacker will select any Plaintiff's payment card

10

for misuse. Br. at 9. In other words, Marriott suggests that as long as a breach is big enough, a plaintiff will never have standing because the risk of harm to any given plaintiff is too remote. This perverse argument necessarily relies on unsupported inferences and is undermined by the fact that the Uncontested Plaintiffs plausibly allege they have already suffered fraud. *See* Compl. ¶¶ 42, 70, 72. The allegations that some Plaintiffs have already suffered fraud establishes that others are at an imminent risk as well. *See OPM*, 928 F.3d at 59.

*Third*, Marriott asserts that nearly all of the payment-card data exposed in the breach was encrypted and that there is no evidence the encryption keys were compromised in the breach. Br. at 9. But this is explicitly contradicted by Plaintiffs' detailed allegations showing that the hackers likely made off with the encryption keys. Compl. ¶¶ 180, 197, 234. Plaintiffs' well-pleaded allegations that hackers accessed and likely utilized the tools necessary to decrypt the payment card data defeat Marriott's *speculative* claim that the data was not decrypted. Ultimately, this is a question of fact for the jury.

*Fourth*, Marriott claims that Plaintiffs' "feared injuries have not yet materialized here despite the passage of up to five years" since the breach began. Br. at 9-10. This is untrue; Plaintiffs allege, and Marriott does not contest, that these injuries *have* materialized at least for the Uncontested Plaintiffs. Compl. ¶¶ 42, 70, 72. And courts have been "unpersuaded" by this argument in other data breach cases. *OPM*, 928 F.3d at 59. *See also 21st Century*, 380 F. Supp. 3d at 1256.

*Fifth*, Marriott asserts that any unauthorized purchases would have to be accomplished without "payment-card security features—like a CVV number." Br. at 10. But, as discussed further herein, payment card numbers with expiration dates standing alone are enough to commit fraud with many merchants. Further, Plaintiffs specifically allege that other data that may serve to

11

authenticate credit card transactions (including mailing addresses and payment card expiration dates) were also exposed in the breach. *Id.* ¶¶ 196–97. As other courts have held, "even if the breaches in question did not expose all information necessary to make fraudulent charges on victims' existing financial accounts, the personal data the hackers did manage to obtain is enough, by itself, to enable several forms of identity theft." *OPM*, 928 F.3d at 60-61.

*Finally*, Marriott mounts an explicit factual challenge to standing under Rule 12(b)(1) on one "discrete point": "whether a passport number can be used to commit identity fraud." Br. at 12 n.10. But whether the passport numbers compromised in the data breach can be utilized for fraud goes not only to standing, but to what damages the Plaintiffs may be entitled. Moreover, the usefulness of passport information for fraud may also affect the standard of care applicable to safeguarding such information. Thus, the factual issue raised by Marriott is "inextricably intertwined" with the merits of Plaintiffs' claims. As the Fourth Circuit has held, when "the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). As such, Marriott's purported expert should be ignored.[9]

Even if considered now, Plaintiffs dispute Marriott's factual challenge, as the attached record evidence shows that passport numbers can in fact be utilized to commit many forms of fraud. *See* Declaration of Nicolas Christin; Declaration of Mary Frantz (attached hereto as Exhibits A and B, respectively).

---

[9] In any event, where all Plaintiffs allege they provided their payment cards to Marriott, and Marriott does not dispute that the Uncontested Plaintiffs have sufficiently alleged injury from fraud on those cards, whether compromised passport numbers also result in a risk of fraud need not be determined to reject Marriott's standing challenge.

4.      **Plaintiffs did not receive the benefit of their bargain.**

In addition to the points raised above, every Plaintiff independently has standing based on allegations that they were financially harmed in other ways by the breach. For example, each Plaintiff alleges that they overpaid for Marriott's services and did not receive the benefit of their bargain with Marriott. Plaintiffs allege that they place significant value in data security (Compl. ¶ 273); that one component of the cost of a hotel room is the explicit and implicit promises Marriott made to protect their customers' Personal Information (*id.* ¶ 274); and that had Plaintiffs known the truth about Marriott's inadequate data security practices, they would not have stayed at a Marriott property, purchased products or services there, or would have paid less (*id.* ¶ 275).

Many courts have concluded that similar allegations state Article III injuries. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016) (devaluation of service "in an amount equal to the difference between the value of the [service] that [plaintiff] paid for and the value of the subscription that [plaintiff] received. . ." was "an 'actual' injury" for purposes of standing); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012) (plaintiff had financial injury from paying higher premiums in light of defendant's failure to implement security policies); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1130 (N.D. Cal. 2018) (plaintiff's "allegations are sufficient to allege that he suffered benefit-of-the-bargain losses" because he "pleads that he has paid $19.95 each year since December 2007 for Yahoo's premium email service," which was supposed to be "secure," and would not have signed up "had he known that Yahoo's email service was not as secure as [Yahoo] represented"); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 992, 995 (N.D. Cal. 2016) (recognizing "loss of benefit of the bargain" theory of "actual harm" for plaintiffs who alleged they had contracted for "reasonable and adequate security measures" that Anthem failed to deliver, causing plaintiffs to overpay for

13

health insurance).[10] The same is true in this case.

### 5. Plaintiffs' personal data has lost value.

Plaintiffs also allege that because their Personal Information is now in the hands of criminals, it is less valuable. Several courts recognize this loss in value as a cognizable injury. *See In re Experian Data Breach Litig.*, No. SACV 15-1592 AG (DFMx), 2016 WL 7973595, at *5 (C.D. Cal. Dec. 29, 2016) ("[A] growing number of federal courts have now recognized Loss of Value of PII as a viable damages theory.") (quoting *In re Anthem*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *43 (N.D. Cal. May 27, 2016)); *In re Facebook Privacy Litig.*, 572 F. App'x 494 (9th Cir. 2014); *In re Yahoo!*, No. 16-MD-02752-LHK2017 WL 3727318, at *13 (N.D. Cal. Aug. 30, 2017) ("[T]he Ninth Circuit and a number of district courts have approved allegations of damages arising from the loss of value of PII.") (internal quotations omitted). While the courts in *Chambliss* and *Khan* rejected as cognizable injury the decrease in value of the plaintiffs' personal information resulting from the data breach in those cases, *Chambliss*, 189 F. Supp. 3d at 572; *Khan*, 188 F. Supp. 3d at 532, the Fourth Circuit has not weighed in on the issue of whether the diminished value of one's Personal Information when it is compromised in a data breach is a form of injury—either in the form of property loss[11] or monetary damages. However, such allegations

---

[10]     The court in *Chambliss v. Carefirst, Inc*, 189 F. Supp. 3d 564, 572 (D. Md. 2016) rejected the plaintiffs' "benefit of the bargain" or "overpayment" theory of injury, but in that case the plaintiffs "ma[de] no allegations that the data breach diminished the value of the health insurance they purchased from CareFirst," "offer[ed] no factual allegations indicating that the prices they paid for health insurance included a sum to be used for data security, and that both parties understood that the sum would be used for that purpose," and "could not even quantify this alleged loss." Plaintiffs allege the facts that were missing in *Chambliss* and intend to quantify the loss at the appropriate stage of the proceedings.

[11]     *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) ("plaintiff alleged his loss of time as a harm and so does not allege pure economic loss. The economic loss rule therefore does not apply."); *Hameed-Bolden v. Forever 21 Retail, Inc.*, No. CV1803019SJOJPRX, 2018 WL 6802818, at *5 (C.D. Cal. Oct. 1, 2018) (recognizing that loss of value of personal information may represent a form of property damages, not merely economic losses).

do set data breach victims apart from others in society, and therefore "ensure that the plaintiff has a personal stake in the outcome of the litigation" for purposes of standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).[12]

**B.      Plaintiffs' injuries are fairly traceable to Marriott's conduct.**

Marriott contests traceability only as to Plaintiffs Hevener, Ropp, and Cullen, who allege that they suffered identity theft or fraud beyond just unauthorized payment card charges (Compl. ¶¶ 36, 77, 70).[13] Marriott argues that it is impossible that the identity theft alleged by these Plaintiffs was caused by the breach because they do not allege that they provided their social security numbers or banking information to Marriott. Br. at 17-18. Stolen consumer data can be pieced together to access more data and commit different types of fraud, however. For example, a fraudster with access to a consumer's name, email address, phone number, and payment card information could use that information to "verify" the consumer's identity and open a fraudulent account or send a "phishing" email intended to gain access to additional sensitive information. *See* Compl. ¶ 65 (New Hampshire plaintiff alleging she was the victim of a mobile phishing scam caused by the data breach that resulted in unauthorized and unreimbursed purchases); *see also id.* ¶¶ 202, 264, 266. Courts have recognized this increased risk. In *Bass v. Facebook, Inc.*, for example, Facebook contended that there was no risk of harm where a Facebook user's "publicly available" information was accessed by an unauthorized party in a breach that did not involve

---

[12]     Because the other forms of injury Plaintiffs have alleged are sufficient to confer standing, this Court need not decide whether the loss in value of Plaintiffs' Personal Information is an independent injury.

[13]     Marriott does not contest that all other Plaintiffs' alleged injuries are traceable to the data breach. Plaintiffs have met their "relatively modest" burden of alleging traceability by alleging Marriott and Starwood failed to secure, among other things, Plaintiffs' payment card information, their networks were subsequently hacked, customer payment card information was stolen by the hackers, and some Plaintiffs experienced subsequent payment card fraud on the same cards, Compl. ¶¶ 2-5. *See In re SuperValu*, 870 F.3d at 772 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)); *see also OPM*, 928 F.3d at 60-61.

financial information or social security numbers. 394 F. Supp. 3d. at 1034. The court rejected Facebook's argument, noting that "[t]he information taken … need not be sensitive to weaponize hackers in their quest to commit further fraud or identity theft." *Id*. The court recognized that pieces of "immutable" information such as someone's date of birth or hometown "can now forever be wielded to identify [the plaintiff] and target him in fraudulent schemes and identity theft attacks"— while this data coupled with theoretically "alterable" information such as names, email addresses, and telephone numbers "in the hands of nefarious actors, will provide further ammo [to commit fraud or identity theft]." *Id*. Other courts have reached a similar conclusion. *See, supra* II.A.3.

## III.   The Bellwether Plaintiffs have stated a claim as to their particular states.[14]

### A.   Standard on motion under Rule 12(b)(6).

"[A] motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint," and "the legal sufficiency is determined by assessing whether the complaint contains sufficient facts, when accepted as true, to 'state a claim to relief that is plausible on its face.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This plausibility standard requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "If [the plaintiff's] explanation is plausible, [the] complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a

---

[14]     Pursuant to the bellwether process agreed to by the parties and approved by the Court, Plaintiffs' opposition analyzes the bellwether claims on the premise that the respective state laws at issue apply. By doing so, Plaintiffs do not waive their contention that one state's law will govern their common law claims. *See* Compl. ¶¶ 294, 286-95; ECF No. 368 at 1.

more plausible alternative explanation." *Id*.

**B.    The facts of this particular case render the economic loss rule inapplicable.**

Marriott contends that Illinois's economic loss doctrine bars the Illinois Plaintiffs' negligence claim. Although Plaintiffs recognize that Illinois's economic loss doctrine has been cited by a number of courts as a basis to dismiss certain negligence claims under Illinois law in other data breach cases, the Court should decline any invitation to expand it here given the scope of Marriott's data collection and the unprecedented extent and length of the breach. Plaintiffs here did not merely suffer the loss of certain information that Marriott collected ancillary to their stay; rather, Marriott collected a treasure trove of information about its guests to identify, attract, and retain the most profitable of customers and predict behaviors through predictive analytics. Compl. ¶¶ 100-104.

In addition, Plaintiffs' losses go well beyond typical "economic losses" like fraudulent charges on their credit cards. Rather, given the extent of the information collected, and what that information is used for, Plaintiffs have lost the value of their Personal Information, which is a distinct *property* right, separate and apart from a pure economic loss. *See Id.* ¶¶ 304.b (alleging loss of the inherent value of their Personal Information); *see also* II.A.5, *supra*. *See Hameed-Bolden*, 2018 WL 6802818, at *5 (recognizing that loss of value of personal information may represent a form of property damages, not merely economic losses). Further, Plaintiffs assert that, not only have they spent a significant amount of time poring over statements to identify potential fraud (and, in Plaintiff Golin's case, working with the police and FBI to have unauthorized charges reversed), but they also have the added aggravation of a substantial and imminent risk of future harm. Compl. ¶¶ 42, 43. These are not economic damages that are subject to the limitations of Illinois' economic loss rule. *See Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049, 1053 (Ill. App. 2009) (finding that claims for aggravation and inconvenience are not economic

damages); *see also Bass*, 394 F. Supp. 3d at 1039 ("plaintiff alleged his loss of time as a harm and so does not allege pure economic loss. The economic loss rule therefore does not apply."); Compl. ¶ 304 (alleging additional, noneconomic damages such as identity fraud and theft and lowered credit scores); *cf. In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 530-31 (N.D. Ill. 2011) (following other data breach cases in the application of the economic loss rule where there was no allegation of *damage to property*).

Marriott also argues that Illinois common law does not recognize a duty to safeguard credit card information from cyberattacks. Br. at 19. But Plaintiffs allege more than credit card information was compromised in the breach. In addition, while *Cooney v. Chicago Public Schools*, refused to recognize a "'new common law duty' to safeguard information," 943 N.E.2d 23, 28 (Ill. App. 2010), Plaintiffs here do not seek the creation of a "new duty," but rather argue that a duty exists under the traditional duty analysis applied by Illinois courts. *See Bruns v. City of Centralia*, 21 N.E.3d 684, 689 (Ill. 2014) ("In resolving whether a duty exists, we ask whether defendant and plaintiff stood in such a relationship to one another that the law imposed upon defendant an obligation of reasonable conduct for the benefit of plaintiff, considering: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant.") (internal quotations and citations omitted). Numerous courts have found a duty exists to protect consumers' personal information under this general duty analysis. *See, e.g., In re: Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 25831:14-md-2583-TWT, 2016 WL 2897520, at *3 (N.D. Ga. May 18, 2016) ("A retailer's actions and inactions, such as disabling security features and ignoring warning signs of a data breach, are sufficient to show that the retailer caused foreseeable harm to a plaintiff and therefore owed a duty in tort."); *Brush v. Miami Beach*

*Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017) ("It is well-established that entities that collect sensitive, private data from consumers and store that data on their networks have a duty to protect that information."). Thus, Plaintiffs' negligence claim should not be dismissed under Illinois law.

### C.     The Court should decline Marriott's invitation to speculate on what Georgia state courts may do in the future as to Plaintiffs' negligence per se claim.

Marriot argues that under Georgia law a negligence per se claim cannot be premised on Section 5 of the FTC Act, 15 U.S.C. § 45, contending the statute does not provide an ascertainable standard of conduct. That is incorrect. Section 5 prohibits unfair or deceptive trade practices.[15] The failure to maintain reasonable data security measures to safeguard confidential consumer information is an unfair practice prohibited by the Act. *See, e.g., F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015).[16]

Plaintiffs here allege that Marriott violated Section 5—and similar state statutes—by not having reasonable data security. Compl. ¶¶ 306-310. Such allegations properly state a claim for negligence per se under Section 5, as at least four courts have so held in other data breach cases. *See, e.g., In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1327-28 (N.D. Ga. 2019); *Arby's*, 2018 WL 2128441, at *8-9; *Home Depot*, 2016 WL 2897520, at *4; *First Choice Fed. Credit Union v. Wendy's Co.*, No. 16-506, 2017 WL 9487086, at *4 (W.D. Pa. Feb.

---

[15]     Plaintiffs also state negligence per se claims predicated on various state statutes modeled after Section 5, such as the Georgia Uniform Deceptive Trade Practices Act. *See* Compl. ¶¶ 555-565. The same rationale that supports Plaintiffs' claim under Section 5 supports the additional state statutory claims. *Id.* ¶¶ 308, 1350-1356.

[16]     The FTC frequently takes enforcement actions against companies following data breaches, charging them with violating Section 5 of the FTC Act. *See* Compl. ¶¶ 256-59. Consequently, courts routinely conclude that Section 5 of the FTC Act sets forth a duty on the part of companies to provide adequate data security to protect their customers' personal information. *See In re Arby's Rest. Grp. Inc. Litig.*, No. 1:17-CV-0514-AT, 2018 WL 2128441, at *8 (N.D. Ga. Mar. 5, 2018) (collecting cases).

13, 2017), *report and recommendation adopted*, 2017 WL 1190500 (W.D. Pa. Mar. 31, 2017).[17] Marriott ignores these cases, which involve cybersecurity incidents similar to this case, and instead argues that this Court should take the extraordinary position of speculating that the Supreme Court of Georgia might arrive at a different result.

Marriott misreads the two cases on which it principally relies.  Marriott suggests that *Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686 (Ga. 2013) holds that statutes relating to information security cannot support a negligence per se claim. Br. at 20. But *Jenkins* dealt with an entirely distinguishable issue and held only that duties imposed by the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801(a), do not give rise to a cause of action for negligence under O.C.G.A. § 51-1-6. *Id.* at 165 n.4. Marriott also relies on *Dept. of Labor v. McConnell*, 828 S.E.2d 352 (Ga. 2019), which held that there was no "general legal duty 'to all the world not to subject [others] to an unreasonable risk of harm.'" *Id.* at 358 (citing and disapproving of *Bradley Ctr., Inc. v. Wessner*, 296 S.E.2d 693 (Ga. 1982)). Plaintiffs' negligence per se claim is not premised on this general duty; they rely instead solely upon duties specifically created by *statute*—an issue not present in *McConnell* as the court did not address a negligence per se claim. The duty to adopt reasonable security safeguards is specific enough to be enforceable, and Plaintiffs have discussed in detail the unreasonable aspects of Marriott's security.

Marriott argues that Section 5 does not provide an "ascertainable standard of conduct" sufficient to create a duty to maintain a reasonable standard of cybersecurity. Br. at 29. But Marriott failed to adopt reasonable security measures *in the face of* a *known* and *anticipated*

---

[17] Marriott cites to a Seventh Circuit case from 2018 for the proposition that *Home Depot* was decided incorrectly. But *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018) specifically examined the common law of Illinois and Missouri, and was decided before *Equifax*.

security risk: cyberattacks. Criminal hacking is a foreseeable result of inadequate data security which necessarily subjects victims to substantial harms. Neither *Jenkins* nor *McConnell* involved criminal hacking. *See Arby's*, 2018 WL 2128441, at *4 ("[T]here are no Georgia appellate cases that have considered negligence claims in a large data breach involving a third-party criminal hacker."). The foreseeability and extent of potential harm, in many ways, is the precondition of the duty analysis. *See, e.g., Amos v. City of Butler*, 529 S.E.2d 420, 422 (Ga. App. 2000) ("[T]he legal duty to exercise ordinary care arises from the foreseeable unreasonable risk of harm from such conduct."). And whether a duty exists can turn on obligations imposed by federal law. *Wyndham Worldwide*, 799 F.3d at 240.

Marriott's argument that Section 5 is "not specific enough" to create a statutory duty conflicts with Georgia precedent, and was summarily rejected in *Arby's*, *Home Depot*, *Wendy's*, and *Equifax*. *See Equifax*, 362 F. Supp. 3d at 1327-28 ("The failure to maintain reasonable and appropriate data security for consumers' sensitive personal information can constitute an unfair method of competition in commerce in violation of the Federal Trade Commission Act"); *Arby's*, 2018 WL 2128441, at *8. Nothing in the *McConnell* holding changes this result and therefore Marriott's Motion as to the Georgia Plaintiffs' negligence per se claim should be denied.[18]

D.     **Plaintiffs state a claim for breach of express contract under both New York and Maryland law.**

Plaintiffs allege that Marriott and Starwood are liable for breach of promises expressly made in Marriott's and Starwood's respective Privacy Statements. In particular, Marriott's Global

---

[18]     As the Georgia Supreme Court has held, "[w]here a statute provides a general rule of conduct, although only amounting to a requirement to exercise ordinary care, the violation thereof is negligence as a matter of law, or negligence per se." *Teague v. Keith*, 108 S.E.2d 489, 491-92 (Ga. 1959) (noting for example that a negligence per se claim can be based on statutes prohibiting a driver from driving at a "speed *greater than is reasonable*"). To find otherwise would be ruling against established precedent based entirely upon Marriott's speculation that a different case involving different facts might someday be decided differently.

Privacy Statement dated May 18, 2018, which was in effect at the time of the breach and after Marriott acquired Starwood,[19] promised that Marriott would use "reasonable organizational, technical and administrative measures to protect [its customers'] Personal Data." Compl. ¶ 317. Likewise, Starwood's Privacy Statement dated October 14, 2014, which was also in effect while the breach was ongoing, promised that Starwood would maintain reasonable data security measures to protect customers' Personal Information (*id.* ¶ 320), including use of appropriate password controls, firewalls, and encryption technology (*id.* ¶ 321). Starwood's Privacy Statement also identified the specific groups with which it would share customers' Personal Information and under what circumstances. *Id.*; *see also id.* ¶ 113.

Plaintiffs allege in detail Defendants' various security failings that were the cause of the breach. *See id.* ¶¶ 119-193. Marriott does not challenge Plaintiffs' allegations that Defendants failed to maintain reasonable data security to protect its customers' Personal Information. Instead, Marriott contends that Defendants are not bound by the promises they it made in their own Privacy Statements because Plaintiffs do not allege that they each accessed, saw, read, or considered these Privacy Statements. Br. at 22. This position is specious, however, because Plaintiffs' *subjective* intent to contract is not required for a contract to be formed. Rather, "objective assent is all that is required" to bind Defendants to their promises to provide reasonable and appropriate data security. *See Address v. Millstone*, 208 Md. App. 62, 82, 56 A.3d 323, 334–35 (2012) ("Maryland . . . applies the objective standard as to the formation of contracts.") (ellipsis in original) (citing Restatement (Second) of Contracts § 2 cmt. b (1981) (observing that "'manifestation of intention' adopts an external or objective standard for interpreting conduct" and that a "promisor manifests

---

[19]     The data breach was ongoing from July 2014 until October 2018. Compl. ¶¶ 172-184. Marriott closed its acquisition of Starwood on September 23, 2016. *Id.* ¶ 98.

an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct")); *Coca-Cola Refreshments, USA, Inc. v. Binghamton Giant Markets, Inc.*, 127 A.D.3d 1319, 1323 (N.Y. App. Div. 2015) ("[W]hether a contract has been formed does not depend on either party's subjective intent; instead, the determination must be based on the objective manifestations of the intent of the parties as gathered by their expressed words and deeds") (internal quotations omitted).

Here, Plaintiffs objectively manifested their assent to accept Marriott's and Starwood's express promises of reasonable data security by providing their Personal Information in order to transact business with them. Compl. ¶ 316. Plaintiffs' delivery of their Personal Information to Marriott and Starwood objectively conveyed that Plaintiffs had accepted Defendants' offers of reasonable data security because their Privacy Statements expressly stated that they applied to customers who used their services in any manner. *Id.* ¶¶ 314-16, 319, 322-23.

Marriott's contention that their customers must individually review the Privacy Statements in order to be bound by *its own* drafted promises would have untenable consequences. First, it would render meaningless Marriott's and Starwood's express statements that their Privacy Statements come into force upon customers' use of their services (even through offline channels), without regard to whether the customer affirmatively expresses their consent to the Privacy Statements. *See* Compl. ¶¶ 314-15, 319, 322. Second, adopting Marriott's argument would lead to the absurd outcome that Defendants' promises to keep information secure are enforceable as to some of their customers, but not others, depending on who read or accessed the terms. That cannot be the case, especially where Marriott and Starwood did not request any other form of assent to their Privacy Statements. Thus, under an *objective* standard, Plaintiffs' act of providing their Personal Information to Marriott and Starwood is sufficient to make enforceable Defendants'

23

promises of reasonable data security. *See* 1 Williston on Contracts § 3:5 (4th ed.) ("The courts'

inquiry [is] . . . whether the parties' outward expression of assent is sufficient to show an apparent

intention to enter into a contract."); *Ray v. William G. Eurice & Bros.*, 201 Md. 115, 127, 93 A.2d

272, 278 (1952) ("The only intent of the parties to a contract which is essential, is an intent to say

the words and do the acts which constitute their manifestation of assent."); *Flemington Nat. Bank*

*& Tr. Co. v. Domler Leasing Corp.*, 65 A.D.2d 29, 37 (N.Y. App. Div. 1978) (where a promise is

made in exchange for an act, "the promise is the offer and the act . . . is the acceptance. As soon

as the act . . . takes place, the offer is accepted, and the contract is made, leaving only the promise

outstanding") (ellipses in original).[20]

Marriott next contends that Plaintiffs' claim fails because each Plaintiff must allege

whether he or she contracted with Starwood, Marriott, or both. Br. at 23. But such allegations are

not necessary to plausibly state a claim. Marriott and Starwood both made promises that they

would maintain reasonable security measures to protect customers' Personal Information, and both

formed contracts with Plaintiffs when Plaintiffs provided their Personal Information to them.

Compl. ¶¶ 316-17, 323-24. Moreover, Marriott has now acquired Starwood. Thus, if a Plaintiff

provided their Personal Information to Starwood before or after the acquisition, Marriott is liable,

just as Marriott is liable if a Plaintiff provided their Personal Information to Marriott after the

acquisition. In either scenario, Plaintiffs have sufficiently alleged a breach of contract.

---

[20]     The cases Marriott cites for the proposition that a plaintiff must affirmatively allege he or she read and relied on a company's privacy statement to enforce security promises made by the company, Br. at 22, fail to apply basic contract law in their cursory analyses, not even referencing the objective assent component of contract formation, and instead apply a subjective intent requirement that is not in accordance with the law. *See Dyer v. Nw. Airlines Corps.*, 334 F. Supp. 2d 1196, 1200 (D.N.D. 2004); *Azeltine v. Bank of Am.*, No. CV 10-218-TUC-RCC, 2010 WL 6511710, at *10 (D. Ariz. Dec. 14, 2010); *Gardner v. Health Net, Inc.*, No. CV 10-2140 PA (CWX), 2010 WL 11597979, at *6 (C.D. Cal. Aug. 12, 2010). These cases should not be followed here.

Finally, Marriott contends Plaintiffs' allegations "fail to make out a sufficiently definite contract for data security." Br. at 25. That is incorrect. Both Privacy Statements contain specific promises to provide reasonable security measures to protect customers' Personal Information. Marriott and Starwood's actual security measures fell so far below reasonable data security that there can be no dispute that Plaintiffs have alleged they did not perform as promised. *See, e.g., Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 760-61 (W.D.N.Y. 2017) ("[T]he statements from the privacy policies identified by Plaintiffs plausibly could be read to reflect a definite promise by Excellus to maintain the security of the personal information that it collected and stored on its networks."). Marriott's motion to dismiss Plaintiffs' breach of contract claim should be denied.

### E.      Plaintiffs state a claim for implied contract under Oregon law.

Plaintiffs have also alleged, in the alternative to the extent necessary, that they entered into implied contracts with Defendants whereby Defendants agreed to safeguard and protect Plaintiffs' Personal Information and provide timely and accurate notification if their Personal Information was breached or compromised. Compl. ¶¶ 329-336.  "In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct." *Larisa's Home Care, LLC v. Nichols-Shields*, 404 P.3d 912, 919 n.5 (Or. 2017) (citing Restatement (Second) of Contracts § 4 comment a (1979)). "[A] contract implied in fact can arise 'where the natural and just interpretation of the acts of the parties warrants such conclusion.'" *Id.* (quoting *Owen v. Bradley*, 371 P.2d 966, 970 (Or. 1962)). The "natural and just interpretation" of Plaintiffs providing consideration in the form of their Personal Information to Defendants in exchange for the purchase of good or services is that Defendants would take reasonable measures to protect that information. *See, e.g., Castillo v. Seagate Tech., LLC*, Case No. 16-cv-01958-RS, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016) ("[I]t is difficult to imagine how, in our day and age of data and identity theft, the mandatory

25

receipt of . . . sensitive personal information would not imply the recipient's assent to protect the information sufficiently."). Numerous courts have sustained breach of implied contract claims in this context.[21] For the same reasons here, Marriott's motion to dismiss Plaintiffs' claim for breach of implied contract should be denied.

### F. Plaintiffs state a claim for violation of Maryland's consumer protection and data breach statutes.

Marriott argues Plaintiffs' claim for violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-301, *et seq.* (MCPA) should be dismissed, contending Plaintiffs have not sufficiently alleged they relied on Marriott's deceptive conduct, and have not satisfied Rule 9(b)'s particularity requirement. Br. at 27. These arguments fail for multiple reasons. First, Plaintiffs have sufficiently stated that they relied to their detriment on Marriott's omissions regarding its security failures by alleging that they would not have provided their Personal Information to Marriott, transacted with Marriott, or would have paid Marriott less had they known

---

[21]    *See, e.g., Gordon v. Chipotle Mexican Grill*, Inc., 344 F. Supp. 3d 1231, 1247-48 (D. Colo. 2018); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 613 F. Supp. 2d 108, 119 (D. Me. 2009), *aff'd in relevant part, Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 159 (1st Cir. 2011); *Rudolph v. Hudson's Bay Co.*, No. 18-CV-8472 (PKC), 2019 WL 2023713, at *11 (S.D.N.Y. May 7, 2019) (citing cases).  Marriott relies on *Longenecker-Wells v. Benecard Servs. Inc*, 658 F. App'x 659, 662 (3d Cir. 2016) for its argument that an implied contract is not alleged by "merely claiming that an implied contract arose from the course of conduct" between the parties. Br. at 26. In *Longenecker-Wells*, the court recognized that the parties' intent to form an implied contract "is inferred from acts in the light of the surrounding circumstances." 658 F. App'x at 662. Despite this recognition, the court said the plaintiff could not state a claim for implied contract without pleading "company-specific documents or policies from which one could infer an implied contractual duty to protect Plaintiffs' information." *Id.* While this rationale seems to conflate an implied contract with an express contract, here Plaintiffs have pled Defendants made promises in their Privacy Statements to provide reasonable data security. Thus, to the extent this Court concludes those promises do not create an express contract, the reasoning in *Longenecker-Wells* at a minimum supports finding an implied contract to provide reasonable data security. *Cf. Walters v. Kimpton Hotel & Rest. Grp., LLC*, No. 16-CV-05387-VC, 2017 WL 1398660, at *2 (N.D. Cal. Apr. 13, 2017) (finding plaintiffs had stated a claim for breach of implied contract arising from defendant's privacy policy which stated that the company was "'committed' to safeguarding customer privacy and personal information").

the truth about its inadequate data security. Compl. ¶¶ 304, 333, 341, 381. Because "the MPCA imposes an objective test whereby a plaintiff's reliance on a defendant's omission can be presumed by the materiality of the omitted fact," Plaintiffs' claim survives. *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 484 (C.D. Cal. 2012) (collecting cases); *see also Willis v. Bank of Am. Corp.*, No. CIV.A. ELH-13-02615, 2014 WL 3829520, at *22 (D. Md. Aug. 1, 2014) ("[A] consumer relies on a material omission under the MCPA where it is substantially likely that the consumer would not have made the choice in question had the commercial entity disclosed the omitted information.") (internal quotations omitted); *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 535 (D. Md. 2011) (material omission claim established where defendant's omission was "substantial inducement" in consumer's decision; recognizing this is lower standard than "but for causation").

Second, it is well-established that "Rule 9(b) is 'less strictly applied with respect to claims of fraud by concealment' or omission of material facts, as opposed to affirmative misrepresentations, because 'an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Willis*, 2014 WL 3829520, at *8 (quoting *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997)). Thus, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Plaintiffs' Complaint fully apprises Marriott of the basis for Plaintiffs' claims and is replete with facts showing Marriott knew or should have known about its inadequate data security and risk of data breach such that its failure to disclose this information to Plaintiffs was a material omission. *E.g.,* Compl. ¶¶ 128, 139, 256-260.

Therefore, Plaintiffs have sufficiently alleged that they relied on Marriott's deceptive omissions, and their MCPA claim should not be dismissed.

In addition, Plaintiffs allege that Marriott's violation of Maryland's Personal Information Privacy Act, Md. Comm. Code §§ 14-3501, *et seq.* (PIPA), is itself a violation of the MCPA. *See* § 14-3508(1). Although a violation of PIPA does not depend on an underlying misrepresentation or omission, Marriott contends that PIPA only applies to Plaintiffs who had passport numbers stolen,[22] or credit or debit card information stolen in conjunction with security or access codes, and the Maryland Plaintiffs do not allege this information was stolen. Br. at 28.

Marriott's arguments should be rejected. First, Marriott misstates PIPA's requirements. The statute defines Personal Information to include "[a]n account number, a credit card number, or a debit card number, in combination with *any required* security code, access code, or password, that permits access to an individual's financial account." Md. Code Ann., Com. Law § 14-3501(e)(1)(i)(3) (emphasis added). Thus, under the plain language of the statute, a security code, access code, or password is only necessary in conjunction with the card number if such information is "required . . . [to] access . . . an individual's financial account." But Marriott does not argue that any such code is required to access an individual's payment card account. In fact, Marriott concedes that at least the Uncontested Plaintiffs have sufficiently alleged that they incurred fraudulent charges on the payment cards they provided to Marriott. Br. at 17 n.12. And Plaintiffs allege that full payment card numbers and expiration dates were stolen in the breach. Compl. ¶¶ 2, 19, 197. Because it is plausible that access to payment card accounts can be achieved with the full

---

[22]    That the PIPA consider passport numbers sensitive personal information further diminishes Marriott's factual challenge to standing on the premise that a stolen passport number poses no risk to the passport holder.

card number and expiration date alone, PIPA applies here.[23]

Second, even if the theft of security or access codes were required to bring a claim under PIPA, it is plausible from the allegations that such information was compromised. While Marriott did not *publicly disclose* that security or access codes were compromised in the breach, Plaintiffs allege that because of the extended period of time the hackers had access to Starwood's systems, Marriott cannot say precisely which information was exfiltrated and that it is highly likely that additional Personal Information was stolen beyond what Marriott has already confirmed, including "full payment card information with encryption keys." Compl. ¶ 208; *see also id.* ¶¶ 2, 146, 187-92, 196-97, 213, 226, 234, 239.[24] It is beyond plausible at this stage that security codes were accessed in conjunction with the additional payment card information.

Finally, even if the Court concludes PIPA's payment card provision does not apply here, Plaintiffs independently have a claim because class members had passport information stolen, which PIPA includes. *See* § 14-3501(e)(1)(i)(1). While the Maryland Plaintiffs do not allege they provided their passport numbers to Defendants, they can still represent Maryland class members who did. In *Target* and *Equifax*, for example, the courts declined to dismiss certain state-law claims even where there were *no plaintiffs* from those states named in the complaints, finding that "[a]t this stage of the litigation, it is sufficient to allege that individuals nationwide … suffered injury from the Data Breach" given that "it is very likely, that there are consumers in [the states where

---

[23]     For example, some merchants require full payment card numbers, expirations dates, and Card Verification Values (CVV) to make a purchase, but others do not, meaning CVV numbers would not necessarily be required "to access an individual's financial account." At the very least this is a factual question that is not entitled to resolution at this stage.

[24]     Indeed, in its announcement of a contemporaneous payment card breach, Starwood announced to customers that the "malware discovered on its systems was designed to collect cardholder name, payment card number, *security code*, and expiration date." *Id.* ¶ 146 (emphasis added).

plaintiffs were not named] whose personal information was compromised[.]" *Equifax*, 362 F. Supp. 3d at 1344; *id* ("'To force Plaintiffs' attorneys to search out those individuals at this stage serves no useful purpose.'") (quoting *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014)).

**G.      Plaintiffs state a claim for violation of the Michigan Identity Theft Protection Act.**

Marriott contends that Plaintiffs cannot state a claim under the Michigan Identity Theft Protection Act because it only applies if credit or debit card numbers are exposed in combination with the cards' security or access codes. For the same reasons Plaintiffs' Maryland PIPA claim should not be dismissed, above, this claim should likewise be allowed to proceed.

**H.      Plaintiffs state a claim for violation of the New York General Business Law.**

New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. § 349(a). To state a claim, plaintiff must allege (1) that defendant's "act or practice was consumer-oriented," (2) that the act or practice "was misleading in a material way,"[25] and (3) that plaintiff "suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Marriott first challenges Plaintiffs' claim for violation of the GBL by contending Plaintiffs have not alleged a New York tie to the claim. Br. at 28-29. While Marriott acknowledges that Plaintiffs allege they "were deceived in New York" because they "transacted with Marriott in New York by making hotel reservations from New York and/or staying in Marriott properties based in New York" (Compl. ¶ 936), it contends that using "and/or" somehow obfuscates whether the deception has "ties to New York." But this makes little sense. By alleging they were deceived

---

[25]      Whether a particular act or practice is deceptive is usually a factual question that cannot be resolved on a motion to dismiss. *Fero*, 236 F. Supp. 3d at 775-76.

in New York because they made reservations from New York or stayed in New York hotels, Plaintiffs have sufficiently alleged Plaintiffs were deceived by Marriott's omissions during New York-based transactions. *See Mountz v. Glob. Vision Prod., Inc.*, 770 N.Y.S.2d 603, 608 (Sup. Ct. 2003) (stating to assert a claim for violation the GBL, "some part of the underlying transaction must occur in New York State," and concluding the New York plaintiff "who allegedly was 'deceived in New York' state[d] a cognizable cause of action") (quoting *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002)).

Marriott next argues that Plaintiffs have not sufficiently stated their misrepresentation claim. This argument should be rejected for the same reasons the Court should reject those arguments as to Plaintiffs' Maryland CPA claim, *see* III.F., *supra*. In particular, Plaintiffs allege they would not have provided their Personal Information to Marriott, transacted with Marriott, or would have paid Marriott less had they known the truth about its inadequate data security. Compl. ¶¶ 304, 333, 341, 381. Therefore, Plaintiffs have sufficiently alleged they were harmed by Marriott's omissions regarding its security failures, regardless of whether Rule 8 or 9(b) applies.[26] *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 562 (S.D.N.Y. 2016) (rejecting argument that GBL claim should be dismissed because the plaintiff had not provided detail on what marketing or advertising materials the plaintiff had viewed where the plaintiff sufficiently alleged the defendant knew about the defect complained of and primarily asserted an omission-based theory of deception) (citing cases).

Numerous courts have found a GBL claim properly stated for misrepresentations or

---

[26]    Plaintiffs dispute Marriott's contention that Rule 9(b) applies to claims for violation of the GBL. Federal courts applying the GBL hold Rule 9(b) does not apply to such claims. *See, e.g., Pelman ex rel. Pelman v. McDonald's Corp*, 396 F.3d 508, 511 (2d Cir. 2005); *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 67 (E.D.N.Y. 2017) (citing cases); *Anthem*, 162 F. Supp. 3d at 996-97.

omissions regarding data security in the data breach context. *See, e.g., Fero*, 236 F. Supp. 3d at 776 ("Defendants' failure to disclose the purportedly inadequate security measures would mislead a reasonable consumer. At least at the pleading stage, these allegations are sufficient."); *Experian*, 2016 WL 7973595, at *4-5; *Zappos*, No. 3:12-cv-00325-RCJ-VPC, 2013 WL 4830497, at *6  (D. Nev. Sept. 19, 2013); *Anthem*, 162 F. Supp. 3d at 991-97. The same reasoning holds true here.

Finally, as Marriott argued as to Plaintiffs' negligence per se cause of action, it asserts that Plaintiffs' GBL claim cannot rely on a duty arising from Section 5 of the FTC Act because Section 5 does not provide an "ascertainable standard of conduct." Br. at 29. But New York courts explicitly interpret § 349 "by looking to the definition of deceptive acts and practices under [S]ection 5 of the Federal Trade Commission Act." *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002). For the same reason this argument has been rejected by numerous courts in the context of negligence per se claims, Marriott's argument fails here, as well.

## I.    Plaintiffs have shown statutory standing under the California UCL.

Plaintiffs have demonstrated standing for purposes of Article III, *see* Section II, *supra*, and have satisfied their statutory standing obligations under the California UCL. Marriott argues that Plaintiffs' allegations that they spent money *as a direct result of* Marriott's data breach in order to mitigate any further losses is somehow not enough. Instead, Marriott reasons, the Plaintiffs should have avoided mitigation altogether, and elected to sit and wait to become victims of identity theft. Br. at 30.

But in making this argument Marriott ignores that the California Plaintiffs have alleged other damages, as well as Judge Koh's extensive analysis in *Anthem* on this issue.[27] First, as Judge Koh explained, "benefit of the bargain damages represent economic injury for purposes of the

---

[27]    Surprisingly, Marriott does not cite to *Anthem*—at all—in its brief.

UCL." *Anthem*, 162 F. Supp. 3d at 985. *See also In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014) (finding standing under the UCL because "[f]our of the six [p]laintiffs allege they personally spent more on Adobe products than they would had they known Adobe was not providing the reasonable security Adobe represented it was providing."); *In re LinkedIn User Privacy Litig.*, No. 12-cv-3088-EJD, 2014 WL 1323713, *4 (N.D. Cal. Mar. 28, 2014) (finding that benefit of the bargain losses are "sufficient to confer...statutory standing under the UCL"). Plaintiffs have alleged damages in the form of the loss of the benefit of their bargain. Compl. ¶¶ 275, 457. Additionally, Plaintiffs may seek restitution for the profits unfairly obtained by Marriott as a result of Plaintiffs' overpayment for hotel rooms, *id.* ¶ 459. *Anthem*, 162 F. Supp. 3d at 986 ("In other words, Defendants profited from their lax security measures. Because Plaintiffs seek to recover profits unfairly obtained, Plaintiffs have sufficiently established that they may seek restitution in the instant action.") (internal quotation marks and citation omitted).[28] The California Plaintiffs have more than met the applicable statutory standard.

### J.    Plaintiffs have suffered cognizable damages.

Parroting its unfounded standing arguments, Marriott argues that the Plaintiffs have not suffered any damages from Marriott's failure to protect their sensitive data from malicious hackers. Br. at 30-35. This argument likewise "rel[ies] on facts outside the Complaint[] (or contentions about the absence of certain facts)" and cannot overcome the Plaintiffs' well-pleaded factual allegations of damages. *Zappos*, 888 F.3d at 1028. Plaintiffs have alleged actual loss to state a

---

[28]     Judge Koh also determined in *Anthem* that "because Plaintiffs have established economic injury and restitution under the UCL by pleading benefit of the bargain losses, the Court need not address whether 'Out of Pocket Costs' and 'Imminent Risk of Further Costs' constitute economic injury under the UCL. The Court recognize[d], however, that the case law on these questions is still developing." 162 F. Supp. 3d at 986. The California Plaintiffs intend to seek all damages to which they are entitled and will demonstrate this in latter stages of the litigation. But the Court need not address this issue yet, as Plaintiffs have demonstrated enough to advance their UCL claim.

claim under every theory pleaded.

*First*, Plaintiffs have plausibly alleged that they have suffered damages from their overpayment for Marriott's hotel services, Compl. ¶¶ 270, 273-75, and the diminished value of their Personal Information following the breach, *id.* ¶¶ 270, 340-42. Marriott argues that these claims should be dismissed because "no plaintiff attempts to place an actual value on this purported overpayment" or loss of value. Br. at 31-32. But a "request for damages need not, at the pleading stage, put forth the damages amount with the specificity that Defendant recommends." *Paolillo v. Murphy*, No. WMN-99-2508, 2000 WL 34441151, at *5 (D. Md. Aug. 11, 2000). Plaintiffs' allegation that the "cost of purchasing a hotel room includes tangible and intangible components, including . . . the explicit and implicit promises Marriott made to protect its customers' Personal Information," Compl. ¶ 274, cannot be overcome by Marriott's bare factual assertion that data security was not a component of the parties' bargain. *See, e.g*., *Yahoo!*, 313 F. Supp. 3d at 1130 (holding that benefit-of-the-bargain losses are sufficient to allege damages); *Adobe*, 66 F. Supp. 3d at 1224 (same). The same goes for Plaintiffs' allegations that their Personal Information is now less valuable because it is in the hands of criminals. *See, e.g., Experian*, 2016 WL 7973595, at *5 ("A growing number of federal courts have now recognized Loss of Value of PII as a viable damages theory.").

*Second*, Marriott admits that three Plaintiffs have suffered unauthorized charges on payment cards they provided to Marriott and three Plaintiffs have suffered other types of identity theft and fraud as well. Br. at 32.[29] Notably, Marriott does not contest that the three Plaintiffs that experienced identity theft and non-payment-card fraud have suffered cognizable damages. *See id*.

---

[29] Plaintiff Cullen suffered unauthorized charges on both his credit card and his checking account. Compl. ¶ 70.

34

Instead, Marriott urges the Court to indulge the inference that the three Plaintiffs that suffered unauthorized charges were *probably* reimbursed and thus suffered no damages. *Id.* at 32-33. Even if Marriott's proposed inference were appropriate at this stage, it is wrong on the merits. *See Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018) ("[U]nauthorized withdrawals from [a plaintiff's] accounts cause a loss (the time value of money) even when banks later restore the principal, and because the value of one's own time needed to set things straight is a loss from an opportunity-cost perspective. These injuries can justify money damages, just as they support standing.").

 *Finally*, Plaintiffs have spent time and money taking reasonable steps to protect themselves from the foreseeable risks created by Marriott's failure to secure their sensitive data. It is hornbook law that "a plaintiff may recover from a tort-feasor the expense of a reasonable attempt to avoid being injured by the tort." *Toll Bros. v. Dryvit Sys., Inc.*, 432 F.3d 564, 570 (4th Cir. 2005). If the law were otherwise, individuals whose data was compromised in a data breach would face "'a Hobson's choice' between allowing further damage to occur or mitigating the damage at their own expense." *Anderson*, 659 F.3d at 163 (1st Cir. 2011) (quoting *Toll Bros.*, 432 F.3d at 570). But the Plaintiffs here faced no such choice. The Fourth Circuit has held that where there is a "substantial risk that [a] harm will occur," a party may "reasonably incur costs to mitigate or avoid that harm." *Beck*, 848 F.3d at 275; *see also Hutton*, 892 F.3d at 622. That is precisely what the Plaintiffs did here.

## IV. Conclusion.

 For the foregoing reasons, Marriott's motion should be denied.

Dated: October 21, 2019                              Respectfully submitted,


/s/ Amy E. Keller                                    /s/ James J. Pizzirusso
Amy E. Keller (D. Md. Bar No. 20816)                 James J. Pizzirusso (D. Md. Bar No. 20817)
**DiCELLO LEVITT GUTZLER LLC**                       **HAUSFELD LLP**
Ten North Dearborn Street, Eleventh Floor            1700 K Street NW Suite 650
Chicago, Illinois 60602                              Washington, D.C. 20006
Tel. 312-214-7900                                    Tel. 202-540-7200
akeller@dlcfirm.com                                  jpizzirusso@hausfeld.com


/s/ Andrew N. Friedman
Andrew N. Friedman (D. Md. Bar No. 14421)
**COHEN MILSTEIN SELLERS & TOLL
PLLC**
1100 New York Avenue, NW, Suite 500
Washington, D.C. 20005
Tel. 202-408-4600
afriedman@cohenmilstein.com


*Consumer Plaintiffs' Co-lead Counsel*


Norman E. Siegel                                     MaryBeth V. Gibson
**STUEVE SIEGEL HANSON LLP**                         **THE FINLEY FIRM, P.C.**
460 Nichols Road, Suite 200                          3535 Piedmont Road, Bldg. 14, Suite 230
Kansas City, Missouri 64112                          Atlanta, GA 30305
Tel: 816-714-7100                                    Tel: 404-320-9979
siegel@stuevesiegel.com                              mgibson@thefinleyfirm.com


Ariana J. Tadler                                     Jason Lichtman
**TADLER LAW LLP**                                   **LIEFF CABRASER HEIMANN &
                                                     BERNSTEIN, LLP**
One Penn Plaza, 36th Floor                           250 Hudson Street, 8th Floor
New York, NY 10119                                   New York, NY 10013
Tel: 212-946-9300                                    Tel: 212-355-9500
atadler@tadlerlaw.com                                jlichtman@lchb.com


36

Daniel Robinson
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: 949-720-1288
drobinson@robinsonfirm.com

Megan Jones
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: 415-633-1908
mjones@hausfeld.com

Timothy Maloney
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel: 301-220-2200
tmaloney@jgllaw.com

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412-322-9243
glynch@carlsonlynch.com

*Consumer Plaintiffs' Steering Committee*

Veronica Nannis
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel: 301-220-2200
vnannis@jgllaw.com

James Ulwick
**KRAMON & GRAHAM PA**
1 South Street, Suite 2600
Baltimore, MD 21202
Tel: 410-347-7426
julwick@kg-law.com

*Consumer Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I, Veronica Nannis, Co-Liaison Counsel for the Consumer Plaintiffs, hereby certify that on October 21, 2019, I served the above and foregoing Consumer Plaintiffs' Response in Opposition to Defendants Marriott International, Inc. and Starwood Hotels & Resorts Worldwide, LLC's Motion to Dismiss the Bellwether Plaintiffs' Second Amended Consolidated Consumer Class Action Complaint on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

/s/ *Veronica Nannis*