# BakerHostetler

Baker & Hostetler LLP

Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214

T 216.621.0200
F 216.696.0740
www.bakerlaw.com

Daniel R. Warren
direct dial: 216.861.7145
DWarren@bakerlaw.com

September 1, 2020

**VIA E-MAIL**

Hon. John M. Facciola
facciolj@georgetown.edu

Re:   *In re Marriott Int'l., Inc. Customer Data Sec. Breach Litig.*, MDL No. 19-md-2879, Government Track

Dear Judge Facciola:

Defendants Marriott International, Inc. and Starwood Hotels & Resorts Worldwide, LLC (collectively, Marriott) submit this letter pursuant to the May 22, 2020 Stipulated Order regarding Discovery-Dispute Protocol (MDL ECF No. 580).

**Background**

This letter concerns the Government Track, which consists of a single case brought by the City of Chicago under a Chicago ordinance, MCC § 2-25-090, that prohibits conduct that violates Illinois's consumer fraud statute within city limits. The ordinance provides that the city may bring suit "[i]f, after completing an investigation," the city's Commissioner of Business Affairs and Consumer Protection "determines that a person has engaged in, is engaging in, or is about to engage in a practice prohibited by [the ordinance]." MCC § 2-25-090(f). The city alleges Marriott violated the ordinance by failing to protect residents' data, misrepresenting its data security practices, and failing to timely notify residents of the attack on Marriott. (Am. Compl. ¶¶ 80-108, ECF No. 27.) The city seeks to impose a fine of up "$10,000 per violation per day," an injunction requiring Marriott to alter its data security practices, and an order requiring Marriott to fund a city-run fraud-monitoring program on behalf of Chicago residents. (*Id.* at 28.)

Marriott served its first set of document requests and interrogatories in January 2020, and a second set of interrogatories in May. These requests seek discovery on several relevant topics, including the city's purported basis for its assertion of home-rule authority to enforce its ordinance against Marriott, the statements the city alleges were deceptive, and whether the city employs the same data security practices it claims are deficient in this case. After several meet-and-confer efforts, the parties have been unable to come to a resolution on these requests.

**The city's investigation into the Marriott cyberattack**

Request No. 1 seeks documents related to the Marriott cyberattack and Request No. 2 focuses on the city's investigation file for this matter.[1] Although the city objected to these requests as overly broad, unduly burdensome, and disproportionate, it agreed to produce responsive documents. (Pl. Resp. to RFPs 1 and 2.) But the city's production—just 149 documents in all—contains very few references to the Marriott cyberattack and only one document concerning the investigation. The few documents the city produced consist mostly of documents created by other parties, such as news articles about the cyberattack and periodic security briefings from the Department of Homeland Security. The only document relating to a supposed investigation is a one-paragraph memorandum dated June 13, 2019—well *after* the city filed suit—stating that the commissioner's investigation into the incident is complete and that the law department is authorized (after the fact) to file suit against Marriott. Notably, the city has not produced a single internal email regarding the Marriott cyberattack from the time it was announced in November 2018 until the city filed suit in February 2019.

Marriott for months has sought to confirm whether the city has completed its production for these two basic requests. It still does not have a clear answer. The city recently stated that, "with the exception of a limited number of privileged and otherwise protected documents" for which it will provide a log, it "is not withholding any documents or communications with the Department of Business Affairs and Consumer Protection regarding the Marriott data security incident." (Pl. Letter 1, Aug. 27, 2020.) But Marriott's requests extend to *all* documents about the incident and the city's investigation—not just those housed within one department. The city cannot simply recast Marriott's requests in a way that serves its own purposes. Moreover, to the extent the city maintains any other objections to these requests—even though the city has not stated whether it is withholding any documents on the basis of those objections as required per Rule 34(b)(2)(C)—its meager production totaling 149 documents belies any claim of overbreadth or undue burden.

**The city's decision to sue Marriott**

Request No. 3 seeks documents relating to the commissioner's decision to authorize litigation under the ordinance against Marriott. Requests No. 7 and 8 seek documents pertaining to the city's decision to apply its ordinance to data breaches generally and whether that decision was motivated by a desire to generate revenue. The city objected to these requests based on relevance, undue burden, and proportionality, and agreed only to produce documents that, in the city's estimation, "would allow Marriott to assess . . . its decision to invoke the Ordinance in this matter." (Pl. Letter 2, May 8, 2020; *see also* Pl. Resp. to RFPs 3, 7, and 8.)

This attempt to avoid producing all responsive documents, and instead to make a selective production of documents of its own choosing, is highly improper. Marriott is entitled to full discovery on the commissioner's decision-making and motivations for three reasons.

First, in response to Marriott's motion to dismiss, which focuses on the city's home-rule authority under the Illinois constitution (Def. Br. in Supp. of Mot. to Dismiss 4-8, ECF No. 33), the city argued it has a "local" interest in "protecting City residents' personal information." (Pl. Opp'n to

---

[1] The city's responses to the relevant discovery requests are attached to this letter.

Mot. to Dismiss 13-14, ECF No. 40.) The Court accepted the city's characterization of its purported local interest at the pleading stage, but made clear it would revisit the issue once discovery was completed and the facts were in. (Mem. Op. & Order 2, 12-13, ECF No. 46) (holding ordinance addressed local problem of protecting residents' personal data "under the facts pleaded in the FAC"; there were "insufficient facts" at pleading stage "to determine whether the extent of the problem was statewide or national").)

Marriott now must be permitted to test whether the city genuinely brought this suit to protect its residents' personal information—as it argued in order to survive Marriott's motion to dismiss—or whether it did so for some ulterior reason such as to exploit an opportunity to raise funds to close the city's well-publicized revenue gap. *See Peace v. Premier Primary Care Physicians S.C.*, 2014 WL 1018191, at *2 (N.D. Ill. Mar. 17, 2014) ("As grounds for plaintiffs' termination, defendants cited a 'pattern of disruption of the work place and unprofessional behavior' . . . . Plaintiffs are entitled to discovery that could lead to evidence that would rebut these proffered reasons; patients' testimony could be relevant to whether these reasons were pretextual."). (*See also* Karen Pierog, *Chicago eyes shrinking budget gap for fiscal 2019*, Reuters, July 21, 2018, https://www.reuters.com/article/us-chicago-budget/chicago-eyes-shrinking-budget-gap-for-fiscal-2019-idUSKBN1KL33I.) The city also undoubtedly will offer at trial its purported reasons for bringing this case—and Marriott must be allowed to probe the authenticity of those reasons now. *See DeLeon-Reyes v. Guevara*, 2020 WL 1429521, at *6 (N.D. Ill. Mar. 18, 2020) ("[P]arties are entitled to explore and uncover information that may be introduced at trial during the discovery phase of litigation, so long as their approach is within the bounds of law.").

Second, the city is seeking drastic and wide-ranging equitable relief, including an injunction exerting control over Marriott's operations and the creation of a "monitoring fund." In matters of equity, "the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F. Supp. 2d 1043, 1049 (N.D. Ill. 1998), *aff'd*, 191 F.3d 813 (7th Cir. 1999); *see also I/P Engine, Inc. v. AOL Inc.*, 915 F. Supp. 2d 736, 743 (E.D. Va. 2012) (court's equitable authority "lies within [its] sound discretion," and in assessing "an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties"); *Coach, Inc. v. Surf Beachwear, Inc.*, 2013 WL 8366901, at *1 (D. Md. Mar. 28, 2013) (courts exercise equitable powers "based upon a wide range of considerations"); *Lewsader v. Wal-Mart Stores, Inc.*, 694 N.E.2d 191, 195 (Ill. App. Ct. 1998) ("The exercise of these equitable powers is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case.") (internal quotation marks omitted).

Whether the city's asserted motive is pretextual is certainly a fact to be considered in deciding whether to grant equitable relief. *See Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 416 (M.D.N.C. 1992) ("The relief that the plaintiff seeks in equity is as much a part of the case as is the issue of liability. . . . Where, as here, the plaintiff seeks an equitable remedy that puts control of the defendant corporation substantially in play, the plaintiff's motive in doing so certainly is a 'circumstance' that a court of equity may consider in its discretion.").

There is good reason to question the city's motive for bringing this case here. The provision under which the city is suing requires the commissioner to investigate and authorize litigation *before* the city files suit. MCC § 2-25-090(f). Yet, the commissioner did not authorize the city's law

3

department to bring this action until June 13, 2019—four months after it filed suit. (Pl. Resp. to Interrog. No. 3; Compl., ECF No. 1, Feb. 14, 2019.) And the city retained a private law firm on a purely contingent-fee basis, thus incentivizing it to simply recover the largest fine possible.

Third, the city's financial interest in seeking a large fine is relevant to bias. In cases where it was a defendant, the city has argued (successfully) that it should be permitted introduce evidence of the plaintiff's motive for filing suit. *See Scott v. City of Chicago*, 724 F. Supp. 2d 917, 929 (N.D. Ill. 2010) ("[City's] counsel contend correctly that they should be permitted to argue that Scott's motive for suing was to obtain money"); *Lugo-Villalobos v. City of Chicago*, No. 13-cv-5716, ECF No. 61 (N.D. Ill. Jan. 30, 2015) (holding city "may argue that financial gain is a possible motivation for [the plaintiff's] suit"). Having argued as a defendant that financial motivations for bringing a suit are relevant, the city cannot now be heard to argue the opposite when it is the plaintiff.

**The city's other data security cases**

Request No. 3 also seeks documents relating to the commissioner's decision to authorize litigation under the ordinance in connection with other data breaches. Interrogatory No. 4 asks the city to identify other data security investigations the commissioner has pursued under the ordinance. The city has refused to produce this information on the ground that "discovery regarding other litigation or investigations is inapposite and entirely irrelevant." (Pl. Letter 2, May 8, 2020; *see also* Pl. Resp. to RFP No. 3; Pl. Resp. to Interrog. No. 4.) But this discovery is relevant and proportional.

This is the third data breach case the city has brought under its ordinance against large companies. The city sued Equifax following its 2017 announcement of an incident affecting 147 million people across the country. That suit reportedly settled for $1.5 million. (Kathy Fiewegar, *City of Chicago Reaches Settlement with Equifax*, City of Chicago, Apr. 7, 2020, www.chicago.gov/city/en/depts/dol/provdrs/lit/news/2020/april/settlement-with-equifax.html.) The city subsequently sued Uber in connection with a 2016 incident that involved 57 million users and drivers across the country. That suit is ongoing, although Uber reportedly settled with the State of Illinois. (*See* Jonathan Bilyk, *Uber: City's attempt to 'resuscitate' data breach lawsuit 'naked gamesmanship' to maintain play for Uber's money*, Cook County Record, Sept. 5, 2019, https://cookcountyrecord.com/stories/5134 76427-uber-city-s-attempt-to-resuscitate-data-breach-lawsuit-naked-gamesmanship-to-maintain-play-for-uber-s-money.)

The city cited the Equifax and Uber incidents in its complaint in this case. (Am. Compl. ¶ 25, ECF No. 30.) And in opposing Marriott's motion to dismiss, to bolster its assertion that it has a vital interest in regulating the Marriott cyberattack on behalf of residents—which is a factor in the home-rule analysis—the city relied on the fact that it had brought similar suits against Equifax and Uber. (Pl. Opp'n to Mot. to Dismiss 14, ECF No. 40.) Having relied on these cases to avoid dismissal, the city may not avoid discovery into the reasons it brought those cases now.

Moreover, the city's motives for asserting its ordinance against other major companies like Equifax and Uber in the context of national (and international) data breaches also bears on whether its professed interest in this case is in fact pretextual. Indeed, Uber has argued that the city's case against it is simply a "ploy" to "extract more money from Uber." (Br. in Supp. of Def. Mot. to Dismiss 1-2, *City of Chicago v. Uber Techs, Inc.*, No. 2017-CH-15594 (Ill. Cir. Ct. July 31, 2019).

Finally, given the broad equitable relief the city seeks and the fact that it has failed to explain how Marriott's requests impose an undue burden on the city, these requests are proportionate.

**Alleged deceptive statements**

Interrogatories Nos. 9 and 10 ask the city to identify the statements and communications that form the basis of its allegations that Marriott deceived residents with misrepresentations about data security. (*See* Am. Compl. ¶¶ 100-01.) These are not contention interrogatories, as the city claims. (Pl. Resp. to Interrog. Nos. 9 and 10.) If the city was not prepared to identify the alleged deceptive statements that form the basis of its claim, then it had no business filing the claim to begin with.

This information is obviously necessary to enable Marriott to defend itself against the city's deceptive practices claim. *See Schaefer v. Family Med. Ctrs. of S.C., LLC*, 2019 WL 5893632, at *11 (D.S.C. Aug. 5, 2019) (compelling answers over objection that requests were premature contention interrogatories; "the discovery requests at issue primarily [sought] information concerning the underlying facts of the alleged conspiracy"); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 59 F.R.D. 500, 502-03 (N.D. Ill. 1973) ("It is clear that the defendants are entitled to know the facts upon which plaintiff's claim is founded. Mutual knowledge of the relevant facts is essential to proper litigation. Either party may compel the other to disclose what relevant facts he has in his possession."); *see also Bost v. Wexford Health Sources, Inc.*, 2017 WL 11453961, at *2 (D. Md. Sept. 25, 2017) ("The defendant is entitled to know the factual basis of plaintiff's allegations and the documents which the plaintiff intends to use to support those allegations.").

**The city's comparative data security practices**

Interrogatory No. 11 seeks information about the city's practices for protecting the personal data of the same Chicago residents it alleges were harmed by Marriott's practices. The city objects to this request based on relevance, burden, and proportionality. (Pl. Resp. to Interrog. No. 11.) But none of these objections has merit.

Marriott's request is narrowly tailored to the practices the city has put at issue and is proportional to the broad equitable relief the city seeks. Moreover, the city's failure to practice what it preaches would be entirely relevant. *See E.E.O.C. v. Freeman*, 2012 WL 3536752, at *2 (D. Md. Aug. 14, 2012) ("[I]f Plaintiff uses hiring practices similar to those used by Defendant, this fact may show the appropriateness of those practices, particularly because Plaintiff is the agency fighting unfair hiring practices."). The city has an Information Security Office headed by a Chief Information Officer. (City of Chicago, Dep't of Innov. & Tech., *Policy Responsibility & Oversight* 1, Jan. 1, 2014, https://www.chicago.gov/content/dam/city/depts/dgs/InformationTechnology/CoC_IT_IS_Policy_Set_ver_RC_05.pdf.) The city also collects payment card data and is subject to the same PCI standards it invokes in its complaint. (*Compare id.* ("The purpose of this Information Security Policy is to . . . comply with applicable external controls and regulations including . . . the Payment Card Industry's Data Security Standards (PCI-DSS).") *with* Am. Comp. ¶¶ 50-51.) Evidence of the city's practices also may bear on its claim for equitable relief, for the reasons discussed above.

Sincerely,

*/s/ Daniel R. Warren*
*Government Track Defendants' Co-Lead Counsel*