March 2, 2021

The Honorable John M. Facciola (Ret.), facciola@georgetown.edu

Re: *In re Marriott*, MDL No. 2879 (D. Md.), Inspection of Consumer Plaintiffs' Devices

Plaintiffs move for a protective order prohibiting Marriott's from obtaining a highly-invasive forensic analysis of nearly every file on—and the entire history of—Plaintiffs' personal cell phone and computer use. Marriott's unprecedented and brazen discovery request seeks information that is not relevant to the case. Plaintiffs are not aware of any other court in a data breach case allowing the types of overly broad and unfettered personal device searches as Marriott is proposing here. Indeed, in the one case from which Marriott apparently patterned its discovery request, that court *rejected* Marriott's approach, allowed only limited discovery, and later expressed regret over the decision. Plaintiffs ask Your Honor to follow the weight of authority and reject Marriott's intrusive, unnecessary, and wholly disproportionate request.

**A.      Discovery Sought and Relevant History**.

On September 20, 2020, Marriott requested:

> The results of a forensic examination of the Plaintiff's devices that connect to the internet and contain electronically stored information, including a list of the indicators of compromise, to include ***malicious files, historical evidence of malicious files, and events logs of any anti-virus software that may have removed the malware prior to examination***, as identified via a forensic examination conducted in accordance with industry standard best practices by an expert selected by Plaintiff, and ***using a methodology and program to be agreed upon by Plaintiff*** and Marriott. (Ex. A, emphases added)

Plaintiffs objected to this request on numerous grounds. (Ex. B) The parties conferred and, while Plaintiffs maintained their objections to any discovery at all, to avoid burdening the Court with additional discovery disputes, Plaintiffs negotiated a compromise whereby an expert would perform a forensic examination of a random sample of Plaintiffs' devices to search for evidence of any attack and, if no such evidence was found, the parties would move on.

After the parties selected the custodians and prepared a list of eligible devices for selection, Plaintiffs provided a proposed Remote Collection and Examination Protocol ("Protocol"). (Ex. C) The Protocol was consistent with industry-standard collection methods, consistent with the scope of Marriott's request, and similar to protocols adopted in the small number of other cases which allowed such device inspection. Specifically, the Protocol provided that the vendor would create a forensic image of the selected devices and run automated scans looking for evidence of malware and viruses that could result in data exfiltration (as Marriott's request specifically delineated). If such malware was present, a "root cause" analysis would then be performed to determine when and how the malware was installed and whether it could have resulted in the exfiltration of sensitive information. Following the inspection, the vendor would produce a report for each plaintiff's devices which would detail the examination findings. The Protocol provided that the vendor would not view any additional files or data copied from the device unless it was necessary to perform a root cause analysis and only after obtaining permission.

On February 16, 2021, Marriott sent nearly 10 pages of proposed "revisions" to the Protocol, drastically broadening the scope of the proposed examination. (Ex. D) Marriott's revisions *far exceeded the scope of its own request*, which was limited to things like evidence of malware. Marriott now seeks, in part, examination and reports pertaining to *all* of the following: Web Browsing History and Bookmarked Pages; Installed Programs/Applications; Notes/Documents/ Text Files; Photos/Digital Images of Personal Information or Passwords; Cloud Storage Accounts (Google Drive, OneDrive, DropBox, etc.); Apple/Google/Microsoft Account IDs; Chats & Message; Email; Wireless Device Connectivity; Bluetooth Data Transfer; and Passwords—in other words, *every* sensitive file that could ever exist on one's computer or cellular phone (including personal pictures, emails, passwords, and internet history).

Marriott's initial discovery request, already overbroad and objectionable, has now morphed into an unprecedented dive into Plaintiffs' personal data. Not only does this proposed discovery have no relevance to the parties' claims and defenses, but granting this discovery may result in several of the plaintiffs dropping out of the litigation entirely, as they would be a subject to a forensic search that is more intrusive and violative than the actual data breach at issue. This is not reasonable discovery; it is retaliation.

### B.   Legal Standard.

Rule 26(c) governs protective orders. Under that rule, the Court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . forbidding the disclosure or discovery" of certain items or "prescribing a discovery method other than the one selected by the party seeking discovery." Fed. R. Civ. P. 26(c)(1)(A), (C). Additionally, Federal Rule of Civil Procedure 26(b)(1) limits discovery to matters that are (1) "relevant to any party's claim or defense" and (2) "proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

### C.   Argument.

There is more than good cause to issue a protective order in this case. The sweeping forensic search Marriott seeks is untethered to the issues in the case, is much broader than Marriott's actual discovery request as written (which *required* Plaintiffs' agreement), and implicates significant privacy concerns that are disproportional to the needs of this case. While a few courts have allowed very limited and targeted searches of some devices when tied to the case at issue, no prior data breach case has *ever* allowed the type of oppressive discovery Marriott seeks here.

#### 1.   Marriott's Proposed Discovery is Irrelevant.

Marriott has proffered two reasons for needing this discovery: 1) to show that other events may have triggered the loss of Plaintiffs' information; and 2) to contest the inherent value Plaintiffs place on their data. Neither argument can justify the discovery Marriott seeks.

For Marriott's proposed discovery to have any possible relevance to causation, a series of remote and highly-speculative steps would have had to occur: a plaintiff would have had to experience a fraud event allegedly tied to the Marriott breach; then used a specific device at the time the fraud event took place; and then a forensic inspection would have had to reveal unauthorized access to the device and the same data at issue. But that could only provide a

potential alternative basis for the fraud if Marriott limited the scope of its request to devices in use at the time of the fraud event (it did not) or there was a whole separate round of third-party discovery into that other breach. With discovery ending, these highly theoretical and unlikely occurrences cannot justify the intrusive nature of the Marriott's request.

Marriott's second justification fares no better. Marriott's suggestion that this discovery may reveal that Plaintiffs were careless with their personal information somehow demonstrating that they do not value privacy is fatally flawed because it has nothing to do with the claims or defenses in this case. One of Plaintiffs' damages measures relates to the *objective* value of their personal information. Importantly, this has no bearing on any individual plaintiffs' *subjective* feelings about their information. This is as if Marriott had wrongfully let a thief steal a car from each of the plaintiffs and plaintiffs claimed the "value" of the stolen cars. The relevant question is not how much each plaintiff loved her car, but how much the car is worth in the market. The same holds true here: as Your Honor already ruled, Plaintiffs will submit expert testimony establishing the *objective* market value of their data on an aggregate, classwide basis. Plaintiffs will *not* base damages claims on their *subjective* feelings about their personal information.

### 2. Marriott's proposed discovery is unlikely to shed light on a Plaintiff's subjective privacy valuation even if it were relevant.

Even if every sensitive file on a Plaintiffs' computer was somehow relevant to the damages analysis, Marriott cannot explain how the information it seeks would actually shed light on that topic. As noted above, Marriott's proposed search protocol includes recent internet search history, personal images, photographs, and documents, personal emails and chat messages, login IDs and passwords, and even files stored on cloud storage accounts that are not physically present on the device. Marriott offers no substance behind what this information could reasonably be expected to show. For example, Marriott contends that a plaintiff's recent internet search history could show that he or she visited a "vulnerable" website. But how does Marriott show whether a website is "vulnerable"? And how does that devalue their data?

The additional information Marriott seeks is even more untethered to this case. Why would a Plaintiff's private internet search history from last week have any bearing on a breach that occurred seven years ago? What relevance do personal photographs or a Google search history on a plaintiff's computer have to their data security practices or value of their data? Why would a plaintiff's most personal text messages or emails have any bearing on the issues raised in this case? Stripped of the dubious pretense that this information could show plaintiffs did not value their data, it appears that the purpose of this discovery is to harass, embarrass, and call into question the plaintiffs' character by digging through their most sensitive information.

### 3. The proposed discovery would be wildly disproportionate to the needs of the case, even if some of the information sought were somehow relevant.

Plaintiffs are aware of no precedent allowing this type of inspection of plaintiffs' personal cell phone and computer devices simply because they were victims of a data breach. Two previous cases are particularly relevant: *In re Anthem* and *Henson v. Turn*.

In *Anthem*, the defendants initially sought the same type of discovery as Marriott requests here (essentially full forensic images of devices). The magistrate judge *rejected* that request, holding:

> The Court finds that the burden of providing access to each plaintiff's computer system greatly outweighs its likely benefit. There is an Orwellian irony to the proposition that in order to get relief for a theft of one's personal information, a person has to disclose even more personal information, including an inspection of all his or her devices that connect to the internet. If the Court were to grant Anthem's request, it would further invade plaintiffs' privacy interests and deter current and future data theft victims from pursuing relief.

*In re Anthem, Inc. Data Breach Litig.*, 2016 WL 11505231, at *1 (N.D. Cal. Apr. 8, 2016) (Ex. E) (holding that the device discovery sought was "unreasonably intrusive and disproportional to the present needs of the case").

The magistrate judge in that case later allowed a much narrower forensic examination of certain plaintiffs' devices. It *excluded* handheld devices such as cell phones, and it was limited to the *exact* scope as the one Plaintiffs suggested here in an effort to compromise with Marriott. (Ex. F) Judge Lucy H. Koh, who presided over the litigation, said that even the more limited search—which had caused a plaintiff to drop out of the litigation—was not warranted. Judge Koh stated, "I would just say that—had this issue come to me as a first instance, I probably would not have compelled the discovery." *In re Anthem, Inc. Data Breach Litig*., Dkt. No. 700, 6:3-13 (N.D. Cal. 2016) (Ex. G) This was so, she explained, because "the discovery is burdensome" and it is "pretty invasive." *Id*.[1]

Perhaps the most detailed analysis on the question of whether to permit forensic analysis in a data privacy case is contained in *Henson v. Turn, Inc*., 2018 WL 5281629 (N.D. Cal. Oct. 22, 2018). (Ex. H) In that case, a class of subscribers to cellular and data services filed a data-privacy class action against the defendant for surreptitiously tracking their web history. *Id*., at *1. Like Marriott, the defendant submitted a request that plaintiffs produce: (1) their mobile devices for inspection or complete forensic images of their devices; (2) their full web browsing history from their devices; and (3) all cookies (lines of software code that monitor and gather information about users' browsing and app use) stored on or deleted from their devices. *See id*.

Magistrate Judge Laurel Beeler rejected the "request to inspect the plaintiffs' mobile devices or for complete forensic images" as it "call[s] for information that is not relevant and is disproportional to the needs of the case." *Id*. at *5. She explained:

- The breadth of the search "threatens to sweep in documents and information that are not relevant to the issues in this case, such as the plaintiffs' private text messages, emails, contact lists, and photographs." *Id*. (collecting cases rejecting broad discovery of irrelevant documents).

---

[1] Even the Supreme Court has recognized that the "storage capacity of cell phones has several interrelated consequences for privacy" and that "[a]n Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns[.]" *Riley v. California*, 573 U.S. 373, 394–95 (2014).

- The question of discovery proportionality "is not limited to . . . financial considerations. Courts and commentators have recognized that privacy interests can be a consideration in evaluating proportionality, *particularly in the context of a request to inspect personal electronic devices*." *Id*. (collecting cases, emphasis added).[2]

- "[I]n light of the fact that the plaintiffs' devices likely contain information not relevant to this case, may contain privileged information, and implicate significant privacy concerns, [defendant's] request for the plaintiffs to allow it to directly inspect their devices (or produce complete forensic images of their devices) is not relevant or proportional to the needs of this case." *Id*. at *7.

- "[R]equiring the plaintiffs to produce their full browsing history presents significant privacy concerns" and that the defendant "has not shown that its request for the plaintiffs' full browsing history and cookies … is relevant or proportional to the needs of this case." *Id*. at *8.

There is even less of a need for discovery in this case than in *Henson*, which was actually about a defendant who tracked Plaintiffs' browsing history.

### D.    Conclusion

There is good cause to issue a protective order. Marriott seeks discovery no court in a similar matter has *ever* ordered (although other defendants have tried) —not to prosecute claims or support its defenses, but to "punish" and harass individuals for daring to sue it. Marriott has no proper basis—much less a proportionate one—for seeking Plaintiffs' web browsing habits, personal photographs, emails and text messages, or passwords. And as Your Honor has already recognized, Plaintiffs' damages claim that Marriott owes them the "value" of their personal information does not turn on any individual plaintiff's *subjective* feelings about his or her data. Plaintiffs respectfully request that Your Honor prohibit this irrelevant, overly broad, intrusive, and disproportionate discovery.

---

[2] *See, e.g.*, *Tingle v. Hebert*, 2018 WL 1726667, at *7–8 (M.D. La. Apr. 10, 2018) (finding that "Defendants have also made no showing that the requested forensic examination of Plaintiff's personal cell phone and personal email accounts are proportional to the needs of this case" and holding that " '[t]he utility of permitting a forensic examination of personal cell phones must be weighed against inherent privacy concerns'"); *Crabtree v. Angie's List, Inc*., 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017) (denying request to forensically examine plaintiff's personal cell phones and holding that the forensic examination "is not proportional to the needs of the case because any benefit the data might provide is outweighed by Plaintiffs' significant privacy and confidentiality interests"); *Hespe v. City of Chicago*, No. 13 C 7998, 2016 WL 7240754, at *3 (N.D. Ill. Dec. 15, 2016) (affirming order denying request to inspect plaintiff's personal computer and cell phone because, among other things, inspection "is not 'proportional to the needs of this case' because any benefit the inspection might provide is 'outweighed by plaintiff's privacy and confidentiality interests'"); *Areizaga v. ADW Corp*., 2016 WL 9526396, at *3 (N.D. Tex. Aug. 1, 2016) (denying request to inspect plaintiff's personal computer, smart phone, and other electronic devices because the request "is not proportional to the needs of the case at this time, when weighing [defendant]'s explanation and showing as to the information that it believes might be obtainable and might be relevant against the significant privacy and confidentiality concerns implicated by [defendant]'s request").

Respectfully,

*/s/ Amy E. Keller*          */s/ Andrew N. Friedman*          */s/ James J. Pizzirusso*

*Co-Lead Counsel, Consumer Track*

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | * | |
| | * | |
| | * | **MDL No.: 19-md-2879** |
| THIS DOCUMENT RELATES TO THE CONSUMER TRACK | * | JUDGE GRIMM |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*         \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANT MARRIOTT'S SECOND SET OF REQUESTS FOR PRODUCTION TO BELLWETHER PLAINTIFF ROGER CULLEN**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendants Marriott International, Inc. and Starwood Hotels and Resorts Worldwide, LLC (collectively, "Marriott") hereby serve the following request for the production of documents.

**INSTRUCTIONS**

1.      If, in responding to this request, the meaning of the request is not clear on its face, or you encounter any ambiguity in construing the request or instructions, you shall make your best effort to interpret the request within the context of this litigation and shall explain in your response the matter deemed ambiguous and the construction or interpretation chosen or used in responding to the request.

2.      For the purposes of this discovery request, the singular includes the plural, and vice versa; the conjunctive shall also be construed in the disjunctive, and vice versa; and the past tense includes the present tense where the clear meaning is not distorted by change of tense.

3.      This request for production is continuing in nature and, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, you are under a duty to seasonably supplement your response.

4.      If you refuse to respond to this request for production, in whole or in part, state clearly the basis for such refusal.  If a privilege is claimed, identify the information for which the privilege is claimed and set forth the nature of the privilege asserted.

## REQUEST FOR PRODUCTION

3.      The results of a forensic examination of the Plaintiff's devices that connect to the internet and contain electronically stored information, including a list of the indicators of compromise, to include malicious files, historical evidence of malicious files, and events logs of any anti-virus software that may have removed the malware prior to examination, as identified via a forensic examination conducted in accordance with industry standard best practices by an expert selected by Plaintiff, and using a methodology and program to be agreed upon by Plaintiff and Marriott.

Date: September 29, 2020

*/s/ Lisa M. Ghannoum*

Daniel R. Warren (*pro hac vice*)
Lisa M. Ghannoum (*pro hac vice*)
Baker & Hostetler LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114
Tel: 216.621.0200
Fax: 216.696.0740
Email: dwarren@bakerlaw.com
Email: lghannoum@bakerlaw.com

Gilbert S. Keteltas (Bar No. 12679)
Baker & Hostetler LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, D.C. 20036
Tel: 202.861.1530
Fax: 202.861.1783
Email: gketeltas@bakerlaw.com

*Consumer Defendant's Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th of September, 2020, I served the foregoing document on

the Consumer Plaintiffs' Co-Lead Counsel—James Pizzirusso (jpizzirusso@hausfeld.com),

Andrew Friedman (afriedman@cohenmilstein.com), and Amy Keller

(akeller@dicellolevitt.com)—and Ariana Tadler (atadler@tadlerlaw.com) via electronic mail.


/s/ Lisa M. Ghannoum
*One of the Consumer Defendant's Co-Lead Counsel*

Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*SOUTHERN DIVISION***

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL<br><br>INC., CUSTOMER DATA SECURITY<br><br>BREACH LITIGATION | **MDL No. 19-md-2879**<br><br>**Hon. Paul W. Grimm** |

**CONSUMER PLAINTIFF ROGER CULLEN'S OBJECTIONS TO DEFENDANT**

**MARRIOTT'S SECOND SET OF REQUESTS FOR PRODUCTION TO**

**CONSUMER PLAINTIFF ROGER CULLEN**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Roger Cullen ("Plaintiff") sets forth herein answers and objections (collectively, "Responses") to Marriott Defendant's ("Marriott" or "Defendants") Second Set of Requests for Production ("RFPs") to Plaintiffs, dated September 29, 2020.

No incidental or implied admissions are intended in these Responses. Plaintiff's Response to all or any part of the RFPs should not be taken as an admission that (1) Plaintiff accepts or admits the existence of any fact(s) set forth or assumed by the RFPs; (2) Plaintiff has possession, custody or control of information responsive to that RFP; or (3) documents exist that are responsive to the RFPs.

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO

## MARRIOTT'S SECOND SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION:**

The results of a forensic examination of the Plaintiff's devices that connect to the internet and contain electronically stored information, including a list of the indicators of compromise, to include malicious files, historical evidence of malicious files, and events logs of any anti-virus software that may have removed the malware prior to examination, as identified via a forensic examination conducted in accordance with industry standard best practices by an expert selected by Plaintiff, and using a methodology and program to be agreed upon by Plaintiff and Marriott.

**RESPONSE TO REQUEST FOR PRODUCTION:**

Plaintiff objects to this Request because it is vague and ambiguous, highly invasive, harassing and intrusive, overbroad, overly burdensome, seeks entirely irrelevant information, and there are substantially less burdensome and less intrusive means of obtaining the information Marriott seeks.   Plaintiff further objects because the discovery sought in this Request is

2

disproportional to the needs of this case as Plaintiff's privacy interests in the information contained on his/her devices and the burden and expense of complying with this Request far outweigh any likely benefit.

This Request is vague and ambiguous because Marriott fails to explain which of Plaintiff's devices it seeks to have forensically examined, and fails to explain or provide definitions for any of the technical terms it uses in its Request, leaving Plaintiff to guess at the precise scope of Marriott's Request.

This Request is highly invasive, harassing, and intrusive because it would require Plaintiff to submit his/her most personal devices such as cell phones, iPads, laptop and desktop computers to be forensically examined, which might contain sensitive personal and financial information including, but not limited to, private photos of and communications with non-parties to this litigation.   These devices may also contain personal browsing history, protected health information, attorney-client communications, and other personal and financial information that serves no purpose in this case.

This Request is overbroad because it provides no limitation on the scope of devices potentially subject to forensic examination, meaning Plaintiff may be subject to providing personal devices that were used prior to or subsequent to the events giving rise to this litigation.  This Request is further overbroad because it does not limit the request to Plaintiff's personal devices, thus any devices used for employment or other purposes would be included, which could implicate the privacy rights of non-parties to this litigation.  Any personal or employment devices that are forensically examined may further have confidential and proprietary information which would require the consent of these third parties.

This Request is overly burdensome because requiring Plaintiff to locate and produce

his/her Personal devices without limitation would require Plaintiff to spend significant time searching for all such devices, even in cases where they may not be easily accessible. For instance, it is common for Plaintiff, like all consumers, to periodically replace his/her devices, often times requiring him/her to trade in or donate the device to a third party. Plaintiff may not even own the device, requiring Plaintiff to locate and review the terms of the contract with the provider of the device, further subjecting Plaintiff to significant time and effort, which is simply disproportionate with any likely benefit to be obtained from this discovery. To the extent a device is no longer in the possession of Plaintiff, then Plaintiff further objects that this discovery is improper and not directed toward the proper party. In addition and given the COVID-19 pandemic, Plaintiff objects to the extent this discovery would require Plaintiff to either provide the personal devices to third parties to conduct the forensic examination or require third parties to meet with Plaintiff in person, potentially increasing the risk of transmission and/or subjecting Plaintiff to COVID-19, especially for discovery that would bear little to no relevance on this case. Plaintiff also objects to the extent that conducting a forensic examination of Plaintiff's devices would interfere with Plaintiff's daily use of those devices for an undisclosed amount of time and would unduly interrupt Plaintiff's personal and/or work life in a manner that is disproportional to the needs of the case. This Request seeks information that is entirely irrelevant because it requires the forensic examination of all Plaintiff's devices without limitation, even where there is no indication that such devices maintain any of the Personal Information provided to Starwood or Marriott and even where such devices may have been obtained prior to or well after the Data Breach and misuse occurred, bearing no relevance on Plaintiff's claims or Marriott's defenses. Moreover, many of Plaintiff's alleged injuries, such as "loss of the benefit of the bargain," are not premised upon the theory that Plaintiff's PII (which was accessed in the Data Breach) has already been used for illicit gain. For

such categories of harm, evidence that Plaintiff's PII might possibly have also been stolen from his/her own computer systems is completely irrelevant.  Further, the discovery sought in this Request is not proportional to the needs of this case because any benefit the inspection might provide is far outweighed by Plaintiff's privacy and confidentiality interests in the information contained on his/her devices. Finally, this Request is objectionable because there are significantly less burdensome and intrusive means to obtain the information Marriott seeks.  For instance, Marriott can propound interrogatories or requests for admission upon Plaintiff, or question Plaintiff at his/her deposition, requiring Plaintiff to response under penalty of perjury whether Plaintiff is aware of any malware or other malicious files on Plaintiff's personal devices.

Given that this Request is vague and ambiguous, highly invasive, harassing, and intrusive, overbroad, overly burdensome, seeks entirely irrelevant information and information that is disproportional to the needs of this case, and given that there are substantially less burdensome and intrusive means of obtaining the information Marriott seeks, Plaintiff will not produce any documents or devices in response to this request.

Dated: October 29, 2020

*/s/ Amy E. Keller*
Amy E. Keller (D. Md. Bar No. 20816)
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel. 312-214-7900
akeller@dicellolevitt.com

*/s/ James J. Pizzirusso*
James J. Pizzirusso (D. Md. Bar No. 20817)
**HAUSFELD LLP**
1700 K Street NW Suite 650
Washington, D.C. 20006
Tel. 202-540-7200
jpizzirusso@hausfeld.com

*/s/ Andrew N. Friedman*
Andrew N. Friedman (D. Md. Bar No. 14421)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, D.C. 20005
Tel. 202-408-4600
afriedman@cohenmilstein.com

*Consumer Plaintiffs' Co-lead Counsel*

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100
siegel@stuevesiegel.com

Daniel Robinson
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: 949-720-1288
drobinson@robinsonfirm.com

MaryBeth V. Gibson
**THE FINLEY FIRM, P.C.**
3535 Piedmont Road, Bldg. 14, Suite 230
Atlanta, GA 30305
Tel: 404-320-9979
mgibson@thefinleyfirm.com

Megan Jones
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: 415-633-1908
mjones@hausfeld.com

Ariana J. Tadler
**TADLER LAW LLP**
One Penn Plaza, 36th Floor
New York, NY 10119
Tel: 212-946-9300
atadler@tadlerlaw.com

Timothy Maloney
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel: 301-220-2200
tmaloney@jgllaw.com

Jason Lichtman
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 212-355-9500
jlichtman@lchb.com

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412-322-9243
glynch@carlsonlynch.com

*Consumer Plaintiffs' Steering Committee*

Veronica Nannis
**JOSEPH GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel: 301-220-2200
vnannis@jgllaw.com

James Ulwick
**KRAMON & GRAHAM PA**
1 South Street, Suite 2600
Baltimore, MD 21202
Tel: 410-347-7426
julwick@kg-law.com

*Consumer Plaintiffs' Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel S. Robinson, hereby certify that on October 29, 2020, I served the above and foregoing responses by causing true and accurate copies of such document to be transmitted via electronic mail to counsel of record as follows:

***Counsel for Defendants:***

Daniel R. Warren
Lisa M. Ghannoum
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
Tel.: 216.621.0200
dwarren@bakerlaw.com
lghannoum@bakerlaw.com

Gilbert S. Keteltas
Carey Busen
Baker & Hostetler LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, D.C. 20036
Tel.: 202.861.1530
gketeltas@bakerlaw.com
cbusen@bakerlaw.com

Dated: October 29, 2020

*/s/ Daniel S. Robinson*
Daniel S. Robinson

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CONSUMER ACTIONS** | MDL No. 19-md-2879<br><br>Judge Paul W. Grimm |

**REMOTE COLLECTION AND EXAMINATION PROTOCOL**

Consumer Plaintiffs and Defendants (collectively, the "Parties") in the above-captioned matter stipulate and agree to the following protocol for the collection, examination, and production of data concerning Marriott's Request for Results of Examination of Plaintiffs' Devices, as the parties agreed to on or around January 6, 2021.

**I.     Device Identification**

1.      Prior to scheduling any remote collections or preservations, each Custodian shall provide a detailed schedule of electronic devices to be forensically imaged and a secure address to send a remote collection kit containing the necessary hardware. This schedule will, at a minimum, include the following information:

     a.   Custodian Name

     b.   Device Description

     c.   Make/Model/Serial #

     d.   Estimated total storage capacity (used and available for use)

**II.    Collection and Imaging**

2.      Respective to each Custodian, upon receiving the schedule of devices 4Discovery shall propose dates and times for a remote collection kit to arrive at each Custodian's provided address. A signature will be required at the time of delivery. Within 2 days of delivery, each Custodian will participate in a virtual meeting with a 4Discovery collection specialist at an agreed upon time to facilitate collection and preservation of the specified devices. Collections will be performed using industry standard tools and methodology. This methodology will vary per device. If any encryption or passcodes are being used to protect the device(s), these codes will be provided by the Custodian to 4Discovery at the time of imaging.

3.      4Discovery shall create a full and complete forensic image of each device prior to starting any analysis. These forensic images will be shipped to the 4Discovery lab and shall reside solely in 4Discovery's custody for the length of the matter. The original device(s) will remain in the control of each Custodian. 4Discovery will ensure that the devices are not altered or harmed in any way.

4.      While data responsive to the analysis steps described below will be sent to Counsel for review, copies of original data and forensic images collected shall not be released to counsel or experts for the parties and shall not be released from 4Discovery's custody for any reason absent written permission from the Custodian.

III.    **Analysis and Production**

5.      4Discovery will perform automated scans on the forensic image to look for evidence of malware and review the log files of any antivirus or antivirus programs that have been installed on the Custodian's device. This review will be performed using various anti-virus scans, a review of file lists for suspicious files, analysis of any previously executed command line strings, and a

review of system registry hives and event logs. 4Discovery will not view any additional files or data copied from the device unless necessary to perform a root cause analysis.

6.     If there is evidence of malware on a device, 4Discovery will determine whether the malware is of the type that could result in the exfiltration of sensitive user data stored on the device. If it is, 4Discovery will perform a root cause analysis to determine when and how the malware was installed and whether it resulted in the exfiltration of sensitive information. For purposes of performing the root cause analysis, 4Discovery will not view any pictures or other files on the device until after it has discussed the nature of the analysis with counsel for the parties and obtained permission from the Custodian to do so.

7.     4Discovery shall then produce a forensic examination report for each Custodian's devices which details the examination findings.

## IV.    Data Disposition

8.     Upon receiving written authorization provided by Counsel, 4Discovery will securely delete all collected data.

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CONSUMER ACTIONS** | MDL No. 19-md-2879<br><br>JUDGE PAUL W. GRIMM |

**REMOTE COLLECTION AND EXAMINATION PROTOCOL**

Consumer Plaintiffs and Defendants (collectively, the "Parties") in the above-captioned matter stipulate and agree to the following protocol for the collection, examination, and production of data concerning Marriott's Request for Results of Examination of Plaintiffs' Devices, as the parties agreed to on or around January 6, 2021.

**I.    Device Identification**

1.       Prior to scheduling any remote collections or preservations, each Custodian (as agreed to by the Parties) shall provide 4Discovery a detailed schedule of electronic devices to be forensically imaged and a secure address to send a remote collection kit containing the necessary hardware. This schedule will, at a minimum, include the following information:

   a.   Custodian Name

   b.   Device Description

   c.   Make/Model/Serial #

   d.   Estimated total storage capacity (used and available for use)

## II.     Collection and Imaging

2.      Respective to each Custodian, upon receiving the schedule of devices 4Discovery shall propose dates and times for a remote collection kit to arrive at each Custodian's provided address. A signature will be required at the time of delivery. Within 2 days of delivery, each Custodian will participate in a virtual meeting with a 4Discovery collection specialist at an agreed upon time to facilitate collection and preservation of the specified devices. Collections will be performed using industry standard tools and methodology. This methodology will vary per device. If any encryption or passcodes are being used to protect the device(s), these codes will be provided by the Custodian to 4Discovery at the time of imaging. To the extent any of the devices store information in a cloud-based storage location, the cloud storage will be included in the data being collected by 4Discovery.

3.      4Discovery shall create a full and complete forensic image of each device prior to starting any analysis. These forensic images will be shipped to the 4Discovery lab and shall reside solely in 4Discovery's custody for the length of the matter. The original device(s) will remain in the control of each Custodian and will be preserved consistent with the plaintiffs' obligations to preserve evidence. 4Discovery will ensure that the devices are not altered or harmed in any way during the imaging process.

4.      While responsive data will be sent to counsel for the Parties for review, copies of original data and forensic images collected shall not be released to counsel or experts for the Parties and shall not be released from 4Discovery's custody for any reason absent written permission from the Custodian or Court order.

2

### III.    Analysis and Production

5.    4Discovery will conduct a forensic examination of the agreed upon devices and produce a report containing the following items:

    **a.  <u>Malware Scans</u>**

        i.  4Discovery will perform automated scans on the forensic images to look for evidence of viruses or malware and identify and review the log files of any antivirus or anti-malware programs that have been installed on the devices. This review will be performed using various antivirus scans, a review of file lists for suspicious files, analysis of any previously executed command line strings, and a review of system registry hives and event logs.

        ii.  4Discovery will produce a report identifying any evidence any viruses and/or malware found on each device, including both the current antivirus and malware findings, as well as any historical information. The report will also identify the methodology or methodologies used to scan the forensic images.

    **b.  <u>Web Browsing History and Bookmarked Pages</u>**

        i.  4Discovery will examine the active web history information for any internet browsers found on the devices and carve or search for any deleted internet history as well. In addition, any bookmarked or otherwise saved websites in any browser or format will be examined.

        ii.  The report will include any analytics available on internet history and bookmarked/saved websites, such as frequency of visit, first and most

4827-5816-1116.1

recent visit, etc. The report will also include the full parsed internet history (both active and deleted-recovered) showing the full list of all available entries and all parsed metadata in an industry standard format. Additionally, the report will include all information about any bookmarked or saved websites including the location where it was found, website it points to and/or was from, and any associated dates.

c. **Installed Programs/Applications**

    i. This examination will include the identification of all installed programs or applications, and any artifacts indicative of programs or applications that were previously installed or used that are no longer installed.

    ii. The report will include a list of all installed programs and applications with the context of when and where they were installed and any relevant configuration options. Any artifacts related to previously installed programs and applications should include the location the artifact was found, any contextual details, and the program or application to which the artifact relates.

d. **Notes/Documents/Text Files**

    i. 4Discovery will examine and/or search all notes, documents, and text files on the devices and identify any on the devices or a synchronized cloud-based account, that contain personal information or usernames, passwords, passcodes, pins, passphrases, and/or other types of security keys (e.g., answers to security questions) that the Custodian used to secure personal information or access any website, program,

application, or account (as used in this protocol "passwords"). As used in this protocol, the term "personal information" is information concerning a single person, including but not limited to a person's name, gender, address, electronic mail address, telephone number, social security number, driver's license information, state identification information, passport information, telephone number, financial information, information about a person's banking or other type of account, payment card information, date of birth, place of birth, nationality, employer information, membership or loyalty program information, geolocation information, mother's maiden name, and social media account ID or profile information (including username and photo or other data from social media accounts).

ii. The report will identify all documents found that contained any personal information or passwords, including the location, dates, and metadata from the documents. Any documents found in an application, platform, cloud-based storage, or email system should include the context of where the item was found and any transfer or send/receive artifacts about the item. The report will also include a copy of any notes, documents, or text files found to contain personal information or passwords.

e.  **Photos/Digital Images of Personal Information or Passwords**

i. 4Discovery will conduct a search for all images of items revealing personal information or passwords. While 4Discovery may start by

4827-5816-1116.1

asking the Custodians if they have any such images, this examination will also include a search and review designed to identify such images on the devices or any related online accounts. The type of images to be reported upon include photographs, screen shots, or any images of passports, drivers' licenses, social security cards, birth certificates, credit cards, or a screenshot, image or photograph of any application, website, document, or anything else that shows personal information or passwords of the Custodian.

ii. 4Discovery will include in their report information about all images of personal information or passwords, including the details and context of how/where they were found, where they were transferred or sent to/from, and include copies of the images.

f. **Cloud Storage Accounts (Google Drive, OneDrive, DropBox, etc.)**

i. This examination will include identifying any and all cloud storage or file transfer platforms that were connected to the devices, synced with the devices, or that the devices accessed and with which the devices may have transferred data. Each of the cloud storage platforms identified should be collected and their data included in this overall examination. The data stored in any cloud storage platforms should be examined to determine if any of the data contains personal information or passwords.

ii. The report will include a list of all cloud storage accounts identified in the examination with contextual information and metadata, as well as a

6

copy of any files found on cloud storage platforms found to contain personal information or passwords.

g. **Apple/Google/Microsoft Account IDs**

    i. On each device, 4Discovery will examine any login information or accounts that are connected to the device and provide a list of any identified accounts. This shall include accounts such as Microsoft accounts being used to login to Windows computers, Apple accounts (iCloud or other) being used with any iPhones, iPads, or Mac computers, and any Google accounts being used on Android based phones, Google Chromebooks, or Windows computers.

    ii. 4Discovery will include in their report a list of any accounts found to be in use as well as any accounts that may have been used historically based on any artifacts or findings on the devices examined, including the context of where and how each was found.

h. **Chats & Messages**

    i. 4Discovery will examine all chat and messaging applications on the Custodians devices to identify any persistent or ephemeral messaging applications. For any applications identified, all extant messages will be parsed into readable form and searched for any personal information or passwords in the message content or as included as attachments.

    ii. The reporting on this area will include a list of all chat and messaging applications found, details around where the applications reside as well as their account information and configuration. Any messages that

7

include personal information or passwords in the message or an attachment should be included in the report as well.

**i.   Email**

    i.   This examination will include identifying any email continent, both messages and attachments, that may contain or refer to any personal information or passwords. This should include both email data stored on the devices and email in any online email accounts that are connected to any of the devices.

    ii.   This report will include any and all available metadata as well as a copy of the email messages and/or any attachments where the message or any attachment contains personal information or passwords.

**j.   Wireless Device Connectivity**

    i.   4Discovery will examine any artifacts relating to Wi-Fi network connections to determine what wireless networks were connected to, when, and using what type of security.

    ii.   The report will include a list of all artifacts related to connecting to wireless networks including all available metadata.

**k.   Bluetooth Data Transfer**

    i.   4Discovery will examine any artifacts related to Bluetooth connections that could facilitate data transfer, including Apple AirDrop and Android Nearby Share, or any other Bluetooth transfer applications or technologies.

8

ii. The report will include a list of all artifacts related to connecting to and/or transferring data with Bluetooth devices capable of data transfer, including all available metadata.

**l.   Passwords**

i. On each device, 4Discovery will search for and identify any information they can determine may be passwords or other account credentials stored on the devices, or in any cloud storage or email platform connected to or used by the Plaintiffs on the devices. This analysis should also capture any context to the passwords/credentials such as any notes around them or site, service, or username noted with them.

ii. 4Discovery will include in their report a list of any identified passwords, account information, or other credentials as well as the context of how and where each was found. The report should be encrypted, and password protected to secure and protect this password related information as well as other sensitive information being reported upon.

**m.   General Search**

i. In addition to the specific analysis included in the examination to attempt to locate personal information or passwords, a general non-targeted search will be run to identify personal information or passwords stored anywhere else on the devices. This search will leverage tools designed to identify personal information or passwords or search patterns designed to identify personal information or passwords.

  ii. The report will include a list of all files, artifacts, or fragments containing potential personal information or passwords that were identified through this process. Any items already identified in any other analysis focus areas in this protocol may be withheld from reporting in this focus area as long as all the same information is being reported. The report should include all metadata and contextual information about what was found, where, bearing what dates, and any other metadata or information about each item. The identified items themselves should also be included in the report. The report will also identify the methodology or methodologies used to conduct this search.

 **n. Other Analysis**

  i. Any other analysis, evaluation, or steps 4Discovery deems appropriate to serve the purpose of this examination should also be performed.

  ii. Forensic investigators performing an examination commonly identify other items of interest while carrying out a predetermined protocol even if not explicitly written into the protocol. If this occurs, or if 4Discovery has other ideas it believes should be included, these tasks or items will be added as additional analysis focus areas.

  iii. Any additional work being performed will be included in the report describing the work and any findings or observations.

6. 4Discovery shall produce a forensic examination report for all analysis focus areas listed above including all Custodians' devices and accounts. To the extent the information described above to be included in the report can fit and makes sense to include inline in the report,

4827-5816-1116.1

it may be included inline. But for larger sets of data that would not fit well inline, those information sets should be included as attachments to the report and/or can be produced in native form.

7.       4Discovery shall provide its report to counsel for Plaintiffs and Defendants simultaneously and as soon as possible but in no event more than 14 days following the date of this agreement.

8.       4Discovery's report shall be provided to counsel for Plaintiffs and Defendants without any screening review by Plaintiffs' counsel.

9.       If requested by either Plaintiffs' counsel or Defendants' counsel, 4Discovery shall make itself available to discuss its report and the methodologies used to complete it with counsel or any expert for Plaintiffs or Defendants following 4Discovery's production of the report.

## IV.   Data Disposition

10.       Upon receiving written authorization provided by counsel for Plaintiffs and Defendants, 4Discovery will securely delete all collected data in its possession.

4827-5816-1116.1

Exhibit E

In re Anthem, Inc. Data Breach Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 11505231

Case 8:19-md-02879-PWG   Document 752-1   Filed 03/15/21   Page 38 of 61

2016 WL 11505231
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE ANTHEM, INC. DATA
BREACH LITIGATION

Case No. 15-md-02617 LHK (NC)
|
Signed 04/08/2016

**ORDER DENYING ANTHEM'S
REQUEST TO COMPEL DISCOVERY
OF PLAINTIFFS' COMPUTER SYSTEMS**

Re: Dkt. No. 479

NATHANAEL M. COUSINS, United States Magistrate
Judge

**\*1** The Anthem Defendants seek a discovery order
compelling each of the named plaintiffs either to provide
access to, or produce forensically sound images of,
their "computer systems that connect to the internet."
According to Anthem, the information it seeks is relevant
to causation. By exploring plaintiffs' computers, tablets, and
smartphones, Anthem asserts that it may determine whether
the plaintiffs' computer systems contain malware, viruses, or
other electronic indicators suggesting that their personally
identifiable information or personal health information was
compromised before the cyberattack on Anthem. Plaintiffs,
on the other hand, object to the discovery as highly invasive,
intrusive, and burdensome.

The Court, on referral from District Court Judge Lucy H.
Koh, heard the motion on April 6, 2016. At the beginning
of the hearing, and again near the end, the Court encouraged
the parties to confer and cooperate in an effort to resolve the
dispute. The parties conferred but were unable to agree. After
considering all the arguments presented, the Court DENIES
the requested discovery, finding that it is unreasonably
intrusive and disproportional to the present needs of the case.

Under recently revised Federal Rule of Civil Procedure 26,
parties may obtain discovery regarding any nonprivileged
matter that is "relevant to any party's claim or defense and
proportional to the needs of the case ..."

Here, Anthem asserts that inspection of plaintiffs' computer
systems is relevant to causation. The Court agrees with
Anthem that if there was information that plaintiffs'
personally identifiable information and personal health
information was compromised before the Anthem attack, that
information might be probative of causation.

But under the revised discovery rules, not all relevant
information must be discovered. The Court also considers
whether the discovery is "proportional to the needs of the
case." Fed. R. Civ. P. 26(b)(1). This means the Court must
consider "the importance of the issues at stake in the action,
the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of
the discovery in resolving the issues, and whether the burden
or expense of the proposed discovery outweighs its likely
benefit." *Id.*

The Court finds that the burden of providing access to
each plaintiff's computer system greatly outweighs its likely
benefit. There is an Orwellian irony to the proposition that in
order to get relief for a theft of one's personal information,
a person has to disclose even more personal information,
including an inspection of all his or her devices that connect
to the internet. If the Court were to grant Anthem's request,
it would further invade plaintiffs' privacy interests and deter
current and future data theft victims from pursuing relief.

On the other hand, Anthem might seek other, less intrusive
and more targeted means, to explore whether the cyberattack
on Anthem caused plaintiffs' harm. For example, if Anthem
has evidence of a specific data compromise by a specific
plaintiff, then it might focus its discovery on that intrusion,
rather than a blanket request for all plaintiffs' computer
systems.

**\*2** At the hearing, Anthem's counsel analogized to cases in
which a plaintiff seeks damages for injuries and the Court
compels a medical examination, which certainly is invasive
and personally burdensome discovery. But in a case with a
plaintiff with a broken finger, the Court would be unlikely to
compel inspection of every body system. Here, as there, the
discovery must be targeted and proportional to the needs of
the case.

Because Anthem's requested discovery is disproportional to
the needs of the case, the Court DENIES the motion.

In re Anthem, Inc. Data Breach Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 11505231
Case 8:19-md-02879-PWG   Document 752-1   Filed 03/15/21   Page 39 of 61

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11505231

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE ANTHEM, INC.**<br>**DATA BREACH LITIGATION** | Case No. 15-md-02617 LHK (NC)<br><br>**ORDER GRANTING ANTHEM'S**<br>**REQUEST TO COMPEL**<br>**DISCOVERY OF PLAINTIFFS'**<br>**COMPUTER SYSTEMS, SUBJECT**<br>**TO PROTOCOL**<br><br>Re: Dkt. No. 549 |

The Anthem Defendants seek a discovery order compelling each of the named

plaintiffs to provide the results of a forensic analysis of certain of their devices that

connect to the internet (desktop computers, laptop computers, and tablets, but not mobile

phones such as iPhones). The forensic analysis by a third party examiner is proposed to

identify malicious files, historical evidence of malicious files, and event logs of anti-virus

software that may have removed the malware prior to examination.

According to Anthem, the information it seeks is relevant to causation. By

exploring plaintiffs' devices, Anthem asserts that it may determine whether the plaintiffs'

computer systems contain malware, viruses, or other electronic indicators suggesting that

their personally identifiable information or personal health information was compromised

before the cyberattack on Anthem. Plaintiffs, on the other hand, object to the discovery as

highly invasive, intrusive, and burdensome.

The Court, on referral from District Court Judge Lucy H. Koh, heard the motion on

October 26, 2016. The Court at a previous hearing determined that Anthem's request for

plaintiffs to produce their devices to Anthem directly was not proportional to the needs of

Case No. 15-md-02617 LHK (NC)

*United States District Court*
*Northern District of California*

1    the case.  Dkt. No.  502.  In that order, the Court suggested that Anthem needed a more

2    targeted approach, and rejected Anthem's request as overly intrusive of plaintiffs' privacy.

3          The Court finds that Anthem's narrowed proposal seeks relevant information and is

4    proportional to the needs of the case.  The protocol described in this order is less intrusive

5    than Anthem's first proposal for three reasons: (1) the devices will be provided to a third

6    party examiner, not Anthem; (2) handheld devices are excluded; and (3) the Court will

7    limit the production to the devices of 30 plaintiffs, to be selected by Anthem.

8          The protocol follows.  The costs of the Independent Forensic Examiner will be paid

9    by defendants.

10   I.    SELECTIONS OF PLAINTIFFS AND INDEPENDENT FORENSIC EXAMINER

11         By November 4, Anthem must identify the 30 plaintiffs who will be subject to the

12   forensic examination.  By that same date, plaintiffs must select an expert Independent

13   Forensic Examiner ("the Independent Forensic Examiner") from among those proposed by

14   Anthem, that has the capacity to conduct the entire data acquisition, data preservation, and

15   forensic review in accordance with industry standards as described in resources such as the

16   National Institute of Standards and Technology (NIST) draft Scale-Invariant Feature

17   Transform protocols and procedures.

18         This analysis will include a forensic scan of device data for the limited purpose of

19   identifying malware or malicious files, undertaking root cause analysis of select malware

20   when identified, and the generation of a summary report for the Defendants and their

21   experts, as described below.  At no time will Defendants or their experts be provided a

22   copy of any forensic image collected from the Plaintiffs.

23   II.   FORENSIC IMAGING

24         First, the Independent Forensic Examiner will access the selected Plaintiffs' devices

25   to acquire and preserve its data by creating a forensic image. The Court recommends that

26   this data acquisition be conducted by the Independent Forensic Examiner at a location and

27   a convenient time selected by each Plaintiff.  The Independent Forensic Examiner will

28   acquire a forensic image of each of the Plaintiffs' devices. A forensic image is a bit by bit

United States District Court
Northern District of California

duplicate of the physical sectors of a device's storage media. The Independent Forensic Examiner will perform the imaging process by using industry-standard tools—AccessData FTK Imager Lite for Windows computers and Paladin 7 Boot CD/USB for Apple computers—that have been tested and validated for use in forensic examinations. The images will be captured and stored by the Independent Forensic Examiner using industry-standard methods to preserve evidentiary chain of custody and verify the forensic copy's authenticity against the original device. These methods also ensure that Plaintiffs' devices and operating systems will not be altered or harmed. After acquiring the forensic images, the Independent Forensic Examiner will not require any further access to Plaintiffs' devices.

III.     FORENSIC REVIEW AND SCAN

After acquisition, the Independent Forensic Examiner will undertake the following steps to determine if indicators of compromise are on Plaintiffs' devices that connect to the internet and contain electronically stored information relating to any Plaintiff.

The Independent Forensic Examiner will first conduct a scan for indicators of compromise, to include malicious files, historical evidence of malicious files, and event logs of any anti-virus software that may have removed the malware prior to examination, using select tools that are tailored to the operating systems installed on the hard disks of the devices. Those tools will include commercial, off-the-shelf software, such as Malwarebytes for Windows and Windows Defender for Windows-based operating systems and Malwarebytes for Mac and Clam A/V for Apple-based operating systems.

If malware or malicious files are discovered during the initial scan of a device, the Independent Forensic Examiner will confer with Defendants' experts regarding the findings to determine whether an additional root cause analysis is necessary. A root cause analysis determines the type of malware that was installed on the device, the date it was first installed, the method by which it was installed, and the malware's mode of operation to include whether data or credentials were stolen from the device. The Independent Forensic Examiner will conduct this root cause analysis on the same device images which

Case No. 15-md-02617 LHK (NC)                3

were collected from Plaintiffs and subjected to the initial scan.

IV.     GENERATION OF SUMMARY REPORT

At the conclusion of the analysis, the Independent Forensic Examiner will generate a report for the Parties that will contain a summary of the scans conducted on Plaintiffs' devices, the results of those scans to include any malware or malicious files that were identified, and the results of any root cause analyses conducted on that malware or malicious files.  The Independent Forensic Examiner will provide this report in an industry-standard encrypted format, with the decryption key provided through separate means.  The Parties and their experts will destroy the report at the conclusion of the litigation.

V.      DESTRUCTION OF FORENSIC IMAGES

The forensic images of Plaintiffs' devices will never be supplied to the Defendants or their experts.   These forensic images will be destroyed in accordance with forensic industry standards after the conclusion of the Independent Forensic Examiner's analysis.

VI.     MEET AND CONFER REQUIRED

If the parties have any disputes about this Protocol, they must promptly meet and confer in an effort to resolve the dispute.

**IT IS SO ORDERED.**


Dated:  October 31, 2016                    _____

NATHANAEL M. COUSINS
United States Magistrate Judge

Exhibit G

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4


5

        IN RE ANTHEM, INC. DATA BREACH    )   15-MD-02617-LHK
6       LITIGATION                        )
                                          )   SAN JOSE, CALIFORNIA
7                                         )
                                          )   JANUARY 25, 2017
8                                         )
                                          )   PAGES 1-50
9                                         )
                                          )
10                                        )
                                          )
11      _____  )

12                TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
13             UNITED STATES DISTRICT JUDGE

14      A P P E A R A N C E S:

15        FOR THE PLAINTIFFS:     BY:  EVE HEDY CERVANTEZ
                                       MEREDITH ANNE JOHNSON
16                                ALTSHULER BERZON LLP
                                  177 POST STREET, SUITE 300
17                                SAN FRANCISCO, CA 94108

18        FOR THE PLAINTIFFS:     BY:  ANDREW S. FRIEDMAN
                                  COHEN MILSTEIN SELLERS & TOLL,
19                                PLLC
                                  1100 NEW YORK AVENUE, N.W.,
20                                STE 500
                                  WASHINGTON, DC 20005

21

22            APPEARANCES CONTINUED ON THE NEXT PAGE

23      OFFICIAL COURT REPORTER:  SUMMER FISHER, CSR, CRR
                                  CERTIFICATE NUMBER 13185

24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        APPEARANCES(CONTINUED)

 2        FOR THE DEFENDANTS:        BY:  CRAIG ALAN HOOVER
                                          E. DESMOND HOGAN
 3                                        PETER BISIO
                                          ALLISON HOLT
 4                                   HOGAN LOVELLS US LLP
                                     555 13TH STREET NW
 5                                   WASHINGTON, DC 20004

 6        FOR THE DEFENDANTS:        BY:  BRIAN KAVANAUGH
                                     KIRKLAND AND ELLIS LLP
 7                                   300 N. LASALLE
                                     CHICAGO, IL 60654
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

04:04:21   1      LIKE WE WILL WITH REGARD TO PLAINTIFF ZAND, WE WOULD BE USING

04:04:24   2      THAT WITH REGARD TO PLAINTIFF CERRO ON CLASS CERTIFICATION.

04:04:29   3              THE COURT:  WELL, YOU KNOW, I WOULD JUST SAY THAT --

04:04:31   4      HAD THIS ISSUE COME TO ME AS A FIRST INSTANCE, I PROBABLY WOULD

04:04:35   5      NOT HAVE COMPELLED THE DISCOVERY.  BUT BECAUSE IT CAME TO ME AS

04:04:38   6      AN OBJECTION TO A DISCOVERY MAGISTRATE JUDGE'S RULING, THE

04:04:43   7      STANDARD IS DIFFERENT.

04:04:47   8              I ACTUALLY DO THINK THE DISCOVERY IS BURDENSOME, AND I

04:04:50   9      THINK IT'S APPROPRIATE FOR SOMEONE TO SAY, YOU KNOW, LOOK AT

04:04:54   10     WHAT ANTHEM HAS DONE WITH HOW WELL THEY PROTECTED THESE

04:04:57   11     PEOPLE'S MEDICAL INFORMATION AND PERSONALLY IDENTIFYING

04:05:01   12     INFORMATION.  I THINK IT'S PRETTY INVASIVE TO MAKE THEM TURN

04:05:04   13     OVER ALL THEIR DEVICES.  I WOULD ALLOW THEM TO GET OUT.

04:05:08   14     NOW WHETHER THAT SHOULD BE A DISMISSAL WITH PREJUDICE, I

04:05:10   15     THINK THAT'S FAIR.  BUT WHETHER THAT WOULD THEN CREATE SOME

04:05:13   16     ADVERSE INFERENCE THAT THERE ACTUALLY IS DISCOVERY TO THE

04:05:17   17     CONTRARY ON THESE DEVICES, I THINK THAT'S REALLY A STRETCH.

04:05:27   18             SO, YOU KNOW, THERE ARE A LOT OF DISCOVERY THINGS WHERE, AT

04:05:30   19     THE FIRST INSTANCE, I MIGHT COME UP DIFFERENTLY THAN

04:05:32   20     JUDGE COUSINS.

04:05:34   21             FOR EXAMPLE, I'M MORE OPEN TO HAVING CEO'S BE DEPOSED.  I

04:05:38   22     DON'T UNDERSTAND, THESE PLAINTIFFS HAVE TO GET ALL OF THEIR

04:05:41   23     DEVICES REVIEWED AND THEN THE CEO IS IN CHARGE OF 80 MILLION

04:05:45   24     USERS' DATA BEING BREACHED, DOESN'T GET DEPOSED?

04:05:47   25             I MEAN, IN THE FIRST INSTANCE, AND I PROBABLY WOULD HAVE

# Exhibit H

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 50 of 61

KeyCite Yellow Flag - Negative Treatment
Distinguished by    In re Apple Inc. Device Performance Litigation,
N.D.Cal.,  August 22, 2019

2018 WL 5281629
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Francisco Division.

Anthony HENSON, et al., Plaintiffs,

v.

TURN, INC., Defendant.

Case No. 15-cv-01497-JSW (LB)
|
Signed 10/22/2018

**Attorneys and Law Firms**

Michael W. Sobol, Nimish Ramesh Desai, Lieff Cabraser
Heimann & Bernstein, LLP, San Francisco, CA, Bradley
Scott Clanton, Clanton Legal Group, PLLC, Jackson, MS,
Joseph Henry Bates, III, Carney Bates & Pulliam, PLLC,
Little Rock, AR, Nicholas Diamand, Lieff Cabraser Heimann
and Bernstein LLP, New York, NY, for Plaintiffs.

Michael H. Rubin, Melanie Marilyn Blunschi, Latham &
Watkins LLP, San Francisco, CA, Serrin A. Turner, Latham
& Watkins LLP, New York, NY, for Defendant.

**ORDER ADJUDICATING DISCOVERY DISPUTE
REGARDING REQUESTS FOR (1) INSPECTION
OR FORENSIC IMAGES OF MOBILE DEVICES,
(2) WEB BROWSING HISTORY, AND (3) COOKIES**

Re: ECF No. 87, 90

LAUREL BEELER, United States Magistrate Judge

**INTRODUCTION**

**\*1** Plaintiffs Anthony Henson and William Cintron,
subscribers to Verizon's cellular and data services, bring
this data-privacy class action against defendant Turn, Inc.
The plaintiffs' allegations center around "cookies": lines of
software code that monitor and gather information about
users' browsing and app use. Web browsers, computers, and

mobile devices have settings that allow users to block or
delete cookies from their devices. The plaintiffs allege Turn
engaged in a practice of placing so-called "zombie cookies"
on users' devices: cookies that users either cannot delete or
block or that, when users try to delete them, "respawn" to
continue tracking users across the web. The plaintiffs, both
New York residents, bring claims for (1) violations of New
York General Business Law § 349, which makes unlawful
"[d]eceptive acts or practices in the conduct of any business,
trade or commerce or in the furnishing of any service in [New
York]," and (2) trespass to chattels.

Turn issued a number of discovery requests for production
("RFPs") to the plaintiffs. Among other things, Turn
requested that the plaintiffs (1) produce their mobile devices
for inspection or produce complete forensic images of their
devices (RFP 1), (2) produce their full web browsing history
from their devices (RFP 32), and (3) produce all cookies
stored on or deleted from their devices (RFP 33).[1] The
plaintiffs argue that Turn's requests are overbroad and invade
their privacy rights. The plaintiffs propose instead that
they produce (1) their web browsing history and cookies
associated with Turn partner websites (contingent on Turn's
identifying such sites) and (2) the date fields (but not the
content) of all other cookies on their mobile devices.[2] The
plaintiffs oppose allowing Turn to inspect their devices or
producing complete forensic images of their devices.[3]

Judge White referred all discovery matters to the
undersigned.[4] The undersigned can decide the parties'
dispute without a hearing. N.D. Cal. Civ. L.R. 7-1(b). For
the following reasons, the undersigned adopts the plaintiffs'
proposals, as slightly modified below.

**STATEMENT**

**1. The Plaintiffs' Allegations**
Users increasingly use a single mobile device — a
smartphone or a tablet — for their online activities, including
web browsing, reading the news, listening to radio content,
accessing their banking information and managing their
finances, shopping online, using GPS for directions and traffic
updates, communicating over email and social networks,
and reading sites like WebMD to assess their medical
condition.[5] Marketing companies like Turn have developed
ways to place "tracking beacons" on these devices —

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG   Document 752-1   Filed 03/15/21   Page 51 of 61

lines of code called "cookies" — through web browsers or other smartphone apps. [6] Cookies monitor and gather information about a user's website browsing and app use, which includes personal information regarding the user's daily routines. [7] The resulting data is analyzed and used to target advertisements that match the user's profile. [8]

**\*2** Consumers have expressed discomfort at the idea of an unknown third party surreptitiously monitoring their online activity for commercial purposes. [9] As one academic study reported:

> Web browsing history is inextricably linked to personal information. The pages a user visits can reveal her location, interests, purchases, employment status, sexual orientation, financial challenges, medical conditions, and more. Examining individual page loads is often adequate to draw many conclusions about a user; analyzing patterns of activity allows yet more inferences.... In mid-2011, we discovered that an advertising network, Epic Marketplace, had publicly exposed its interest segment data, offering a rare glimpse of what third-party trackers seek to learn about users. User segments included menopause, getting pregnant, repairing bad credit, and debt relief. Several months later we found that the free online dating website OkCupid was sending to the data provider Lotame how often a user drinks, smokes, and does drugs. When Krishnamurthy et al. tested search queries on ten popular health websites, they found a third party learned of the user's query on nine of them. [10]

In a 2013 white paper issued in conjunction with Forbes, Turn surveyed Americans' attitudes about online tracking, marketing, and privacy. [11] The survey found that, among other things, 69% of participants deleted cookies in order to "shield their online privacy," 56% of participants "are generally uncomfortable with the amount of information companies know about them or could learn about them through their activities," and 54% of participants felt that "their privacy concerns outweigh[ed] any benefits derived from sharing information with businesses." [12] In light of privacy concerns, manufacturers and software companies developed functions for clearing and blocking cookies, which have long been standard features on all smartphones, tablets, computers, and web browsers. [13]

Turn developed a method that allegedly made an "end-run" around users' cookie-blocking-and-deleting technologies. [14] Turn allegedly did so through a Verizon function that created a persistent, unique identifier header ("UIDH" or "X-UIDH") for Verizon subscribers. [15] Each Verizon customer had a unique X-UIDH value. [16] Verizon embedded that unique X-UIDH value into the header of every HTTP request that its customers made from their mobile devices. [17] Turn monitored the web traffic of its partner websites, searching for HTTP requests from Verizon customers (and the attendant X-UIDH values embedded in the requests). [18] Upon receiving an HTTP request, Turn would check the X-UIDH value in the request against a database of values that it had stored from previous cookies. [19] If there was a match, Turn would place a new cookie on the user's device that contained all of the values from the old cookies in its database that were associated with the same X-UIDH — even if the user had previously deleted cookies from her device in an effort to not be tracked. [20] Turn refers to this as "respawning," which led security experts to refer to these cookies as "zombie cookies" because they have the ability to regenerate and continue to track users despite users' attempts to not be tracked. [21]

**\*3** The plaintiffs alleged the following example of this process at work, citing in part an analysis conducted by Stanford professor Jeremy Mayer. [22] Without a Verizon X-UIDH, when a user visits a Turn partner website, the website might place a cookie in her browser with a certain ID number (the example ID number used in the complaint of the cookie placed in the user's browser was 2415230717135370700). [23]

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG   Document 752-1   Filed 03/15/21   Page 52 of 61



As long as the cookie remains in the browser, it allegedly transmits the user's browsing history back to the third party that first generated the cookie. [24]



If the user then deletes her cookies:



and then visits another Turn partner website, the website would place a new cookie in her browser with a new ID number (the new example ID number used in the complaint was 4425321986559530189). [25]



With a Verizon X-UIDH, however, when a user visits a Turn partner website, the website might place a cookie in her browser with a certain ID number (the example X-UIDH used in the complaint was "OTgxNT ...," and the example ID number of the cookie placed in the user's browser was 4012847891611109688). [26]



If the user then deletes her cookies:



and visits another Turn partner website, the website recognizes the Verizon X-UIDH and places a cookie in her browser with the same ID as before and all of the values from the user's old cookie that Turn stored within its database. [27]



## 2. The Parties' Discovery Dispute

The parties raise disputes with respect to three of Turn's requests for production: RFP 1, RFP 32, and RFP 33. [28] RFP 1 is a request for the plaintiffs to produce "[a]ll mobile devices with which You accessed the internet via the Verizon network during the alleged Class Period" (or complete forensic images of the devices). [29] RFP 32 is a request for the plaintiffs to produce "[a]ll data from each Mobile Device reflecting or regarding the user's web browsing history, including web pages viewed either through a dedicated browser application or an 'in-app' browser embedded in another type of application." [30] RFP 33 is a request for the plaintiffs to produce "[a]ll data from each Mobile Device reflecting or regarding any cookies stored on and/or deleted from the device, including the filenames, contents, and creation/modification/deletion dates of each cookie." [31]

### 2.1 RFP 1: Inspection or Complete Forensic Images of the Plaintiffs' Mobile Devices

**\*4**  Turn argues that the plaintiffs' mobile devices "are at the very heart of this case." [32]  Specifically, with respect to the plaintiffs' New York unfair-business-practices claim, Turn argues that the claim "is wholly dependent on allegations about the content of Plaintiffs' phones, including whether Turn placed (and replaced) cookies on the phones, what kind of cookies Turn placed on the phones (if any) and when, whether Plaintiffs regularly deleted cookies and

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 53 of 61
2018 WL 5281629

their browsing history from their phones, whether Turn 'circumvented device settings' on the phones, and what information (if any) was gathered from the phones." [33] With respect to the plaintiffs' trespass-to-chattels claim, Turn argues that "the phones are the very 'chattels' that Plaintiffs allege Turn 'trespassed[.]' " [34] Turn argues that "[i]t's hard to imagine a closer connection between plaintiffs' claims and their phones to justify allowing Turn's digital forensics experts to analyze them directly." [35]

The plaintiffs respond that allowing Turn to inspect their devices or producing a complete forensic image would allow Turn to "access to Plaintiffs' entire phones and thus access to their private text messages, emails, contact lists, photographs and web browsing histories unrelated to Turn." [36] The plaintiffs represent that they objected to RFP 1 and invited Turn to make requests for specific information, which prompted Turn to issue a second, more specific set of requests — RFPs 27–35 — for which (aside from RFPs 32 and 33) the plaintiffs have produced responsive information. [37] The plaintiffs argue that Turn's request for the full contents of their devices "flies in the face of Rule 26(b)'s relevancy and proportionality requirements." [38]

### 2.2 RFP 32: Production of the Web Browsing History on the Plaintiffs' Devices

Turn argues that it is entitled to review the plaintiffs' complete browsing history "[ (1) ] to investigate whether and to what extent Plaintiffs even visited websites that worked with Turn cookies; [ (2) ] to test Plaintiffs' claim that they regularly deleted their browsing history in order to protect their privacy; and [ (3) ] to show that it does not constitute personally identifiable information implicating a protected privacy interest in any event." [39] Turn also argues that the plaintiffs alleged that its cookies "transmit[ ] a user's web-browsing history back to the third party that generated the cookie, thus allowing the third party to glean valuable information about the user and her (presumed) interests" and that it "is entitled to discovery into all evidence that would provide those allegations untrue." [40]

The plaintiffs respond that producing their full web browser history is overbroad, irrelevant, and invasive of their privacy interests. [41] They argue that "people often browse the Internet for private reasons, such as health, dating, finances, and personal interests." [42] In response to Turn's first argument,

the plaintiffs state that they are willing to produce all browsing history associated with Turn partner websites, contingent on Turn's identifying its partner websites. [43] In response to Turn's second argument, the plaintiffs state that (1) their web browsing history does not speak to the zombie-cookie scheme they allege, and that (2) in any event, Turn can discover whether the plaintiffs regularly deleted their browsing history by asking for the date ranges of the history on their devices, without the contents of the history. [44] In response to Turn's third point, the plaintiffs argue that they "need not disclose the contents of every website ever visited in order to allege that Turn's surreptitious tracking of their web browsing violates Plaintiffs' privacy" and that "whether the information Turn catalogued implicates PII [personally identifiable information] is best determined by evaluating the information Turn has or had in its possession." [45] The plaintiffs also argue that "Turn ignores that it obtains web browsing information by establishing relationships with Turn *partner websites*, and using cookies to track users as they visit those websites over time. And yet Turn's request is not limited to browsing history related to Turn's partner websites — it seeks everything." [46]

### 2.3 RFP 33: Production of Cookies on the Plaintiffs' Devices

**\*5** Turn argues that it is entitled to review all cookies stored on the plaintiffs' mobile devices "to technically examine what Turn cookies (if any) are on Plaintiffs' devices and compare them to standard browser cookies — including other non-Turn cookies that Plaintiffs permitted on their devices." [47] Turn argues that "if Plaintiffs have numerous cookies on their devices over a wide range of installation dates, that information would prove their claim [that they regularly deleted cookies] to be false." [48] Turn also argues that "if the devices have cookies dated *after* the complaint, it suggests a failure to preserve key evidence in its original condition." [49]

The plaintiffs respond that their cookies implicate the same privacy interests as their web browsing history. [50] The plaintiffs state that they are willing to produce cookie data related to any Turn partner website, to identify the date fields (but not the contents) of all other cookies, and to meet and confer to consider requests for specific cookies. [51]

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)

Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 54 of 61

2018 WL 5281629

## ANALYSIS

### 1. Inspection or Complete Forensic Images of the Plaintiffs' Mobile Devices

The undersigned denies Turn's request to require the plaintiffs to produce their mobile devices for Turn's inspection or, in the alternative, to produce complete forensic images of their mobile devices. Federal Rule of Civil Procedure 26(b)(1) limits discovery to matters that are (1) "relevant to any party's claim or defense" and (2) "proportional to the needs of the case[.]" Turn's request to inspect the plaintiffs' mobile devices or for complete forensic images call for information that is not relevant and is disproportional to the needs of the case.

With respect to relevance, as the plaintiffs correctly point out (and as Turn does not address), Turn's request to directly inspect the plaintiffs' mobile devices or for complete forensic images of the devices threatens to sweep in documents and information that are not relevant to the issues in this case, such as the plaintiffs' private text messages, emails, contact lists, and photographs. Just as a hypothetical request from the plaintiffs for Turn to allow them to directly inspect its emails servers (or produce complete forensic image of its servers) would likely sweep in numerous emails that are not relevant to this action, Turn's request for the plaintiffs to allow it to directly inspect their mobile devices (or produce complete forensic images of their devices) would likely sweep in numerous irrelevant documents as well. *See* John B. v. Goetz, 531 F.3d 448, 457–58 (6th Cir. 2008) (noting that "imaging of these computers and devices will result in the duplication of confidential and private information unrelated to the [ ] litigation"); *Salazar v. Bocanegra*, No. 12cv0053 MV/LAM, 2012 WL 12893938, at *2 (D.N.M. July 27, 2012) (noting that forensic images, due to their broad nature, may include information irrelevant to the parties' claims or defenses); *Sony BMG Music Entm't v. Arellanes*, No. 4:05-CV-328, 2006 WL 8201075, at *1 (E.D. Tex. Oct. 27, 2006) (finding meritorious responding party's argument that a full forensic image of her computer hard drive would sweep in irrelevant documents).[52]

With respect to proportionality, Turn's request for the plaintiffs to allow it to inspect their mobile devices (or produce complete forensic images of their devices) is disproportional to the needs of the case. While questions of proportionality often arise in the context of disputes about the expense of discovery,[53] proportionality is not limited to such financial considerations. Courts and commentators have recognized that privacy interests can be a consideration in evaluating proportionality, particularly in the context of a request to inspect personal electronic devices. *Tingle v. Hebert*, No. 15-626-JWD-EWD, 2018 WL 1726667, at *7–8 (M.D. La. Apr. 10, 2018) (finding that "Defendants have also made no showing that the requested forensic examination of Plaintiff's personal cell phone and personal email accounts are proportional to the needs of this case" and holding that " '[t]he utility of permitting a forensic examination of personal cell phones must be weighed against inherent privacy concerns' ") (quoting *John Crane Grp. Corp. v. Energy Devices of Tex., Inc.*, No. 6:14-CV-178, 2015 WL 11112540, at *2 (E.D. Tex. Oct. 30, 2015) ); *Crabtree v. Angie's List, Inc.*, No. 1:16-cv-00877-SEB-MJD, 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017) (denying request to forensically examine plaintiff's personal cell phones and holding that the forensic examination "is not proportional to the needs of the case because any benefit the data might provide is outweighed by Plaintiffs' significant privacy and confidentiality interests"); *Hespe v. City of Chicago*, No. 13 C 7998, 2016 WL 7240754, at *3 (N.D. Ill. Dec. 15, 2016) (affirming order denying request to inspect plaintiff's personal computer and cell phone because, among other things, inspection "is not 'proportional to the needs of this case' because any benefit the inspection might provide is 'outweighed by plaintiff's privacy and confidentiality interests' "); *Areizaga v. ADW Corp.*, No. 3:14-cv-2899-B, 2016 WL 9526396, at *3 (N.D. Tex. Aug. 1, 2016) (denying request to inspect plaintiff's personal computer, smart phone, and other electronic devices because the request "is not proportional to the needs of the case at this time, when weighing [defendant]'s explanation and showing as to the information that it believes might be obtainable and might be relevant against the significant privacy and confidentiality concerns implicated by [defendant]'s request"); *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 LHK (NC), 2016 WL 11505231, at *1–2 (N.D. Cal. Apr. 8, 2016) (denying request to inspect or forensically image plaintiffs' computers, tablets, and smartphones as "invad[ing] plaintiffs' privacy interests" and "disproportional to the needs of the case"); Agnieszka A. McPeak, *Social Media, Smartphones, and Proportional Privacy in Civil Discovery*, 64 U. Kan. L. Rev. 235, 288–91 (2015) (arguing that courts should consider privacy burdens in evaluating proportionality under Rule 26(b)(1) ); *see* John B., 531 F.3d at 460 (issuing writ of mandamus to set aside orders for forensic imaging of state-owned and privately-owned employee computers because,

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 55 of 61

among other things, "[t]he district court's compelled forensic
imaging orders here fail to account properly for the significant
privacy and confidentiality concerns present in this case");

*see also* ⬛ *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562
(S.D.N.Y. 1996) (holding that Rule 26 allows courts to
limit discovery on account of burden, including "where the
burden is not measured in the time or expense required
to respond to requested discovery, but lies instead in the
adverse consequences of the disclosure of sensitive, albeit
unprivileged, material," and that courts should consider "the
burdens imposed on the [responding parties]' privacy and
other interests").

**\*6** As the Supreme Court has recognized, "[m]odern cell
phones are not just another technological convenience. With
all they contain and all they may reveal, they hold for many
Americans 'the privacies of life.' " ⬛ *Riley v. California*, 134
S. Ct. 2473, 2494–95 (2014) (citation omitted). As the Court
observed:

> Even the most basic phones that sell for less than $20
> might hold photographs, picture messages, text messages,
> Internet browsing history, a calendar, a thousand-entry
> phone book, and so on. ...
>
> ....
>
> .... [I]t is no exaggeration to say that many of the more than
> 90% of American adults who own a cell phone keep on
> their person a digital record of nearly every aspect of their
> lives — from the mundane to the intimate. ...
>
> .... An Internet search and browsing history, for example,
> can be found on an Internet-enabled phone and could reveal
> an individual's private interests or concerns — perhaps
> a search for certain symptoms of disease, coupled with
> frequent visits to WebMD. Data on a cell phone can
> also reveal where a person has been. Historic location
> information is a standard feature on many smart phones and
> can reconstruct someone's specific movements down to the
> minute, not only around town but also within a particular
> building. ...
>
> Mobile application software on a cell phone, or "apps,"
> offer a range of tools for managing detailed information
> about all aspects of a person's life. There are apps
> for Democratic Party news and Republican Party news;
> apps for alcohol, drug, and gambling addictions; apps
> for sharing prayer requests; apps for tracking pregnancy
> symptoms; apps for planning your budget; apps for every

> conceivable hobby or pastime; apps for improving your
> romantic life. There are popular apps for buying or selling
> just about anything, and the records of such transactions
> may be accessible on the phone indefinitely. There are over
> a million apps available in each of the two major app stores;
> the phrase "there's an app for that" is now part of the
> popular lexicon. The average smart phone user has installed
> 33 apps, which together can form a revealing montage of
> the user's life.

*Id.* at 2489–90 (citations omitted); *accord* McPeak, 64 U.
Kan. L. Rev. at 244–45 (discussing how a smartphone can
contain information about its owner and her emails, text
messages, phone calls, calendars, social-media accounts,
photographs, videos, what books she reads, what music she
listens to, where she goes, when she sleeps, what she buys,
and whom she dates — "[q]uite simply, her [smartp]hone
is a portal to a complete, intimate portrait of her entire
life"). While *Riley* was a criminal case, courts have applied
its observations about the privacy concerns implicated by
modern cell phones in the context of civil discovery as well.
*See Bakhit v. Safety Mktg., Inc.*, No. 3:13CV1049 (JCH), 2014
WL 2916490, at \*3 (D. Conn. June 26, 2014) (citing *Riley*
in denying civil-discovery request to inspect personal cell
phones).

Turn cites no authorities to support its request that the
plaintiffs allow it to directly inspect their mobile devices (or
produce complete forensic images of their devices). Turn cites
to several cases where courts have ordered a party responding
to a discovery request to forensically image its devices — in
situations where there was a "sufficient nexus" between the
party's devices and the claims or defenses at issue.[54] But
forensic imaging itself is not the issue here. The plaintiffs
represent that they have already forensically imaged their
devices and are producing information from those images.[55]
What Turn raises is the separate issue of its being allowed
to directly *access* its opponents' devices or forensic images.
None of the cases it cites supports that proposition.

**\*7** Turn's first case, ⬛ *Calyon v. Mizuho Securities USA,
Inc.*, No. 07CIV02241RODF, 2007 WL 1468889 (S.D.N.Y.
May 18, 2007), undercuts its request for direct access to the
plaintiffs' devices or forensic images. That case, like this one,
involved a discovery request for the responding parties (there,
the defendants) to produce forensic images of their personal
devices. *Id.* at \*1. There, as here, the responding parties
created forensic images of their devices and offered to search
the images (or to have a neutral third-party expert search the

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 56 of 61

images) and produce responsive information. *Id.* at *2. There, as here, the requesting party demanded that it be allowed to directly inspect the entirety of the responding parties' forensic images. *Id.* at *1 ("At bottom, [the requesting party] maintains that only *its* expert — as opposed to the [responding parties]' expert or an independent third-party expert — would possess the requisite incentive to search exhaustively for evidence, and that only [its] expert would be able to confer with [its] counsel on an on-going basis to refine search methods.") (emphasis in original). The Court denied the requesting party's request, finding that the requesting party had not made a showing as to why it would be entitled to such "extraordinary" access. *Id.* at *5. Turn's other cases likewise do not support its position. In each of them, the responding party or a neutral third-party expert accessed and produced information from the responding party's forensic images. In none of them did the requesting party directly access its opponent's devices or forensic images. *Cf.* *Lifetouch Nat'l Sch. Studios, Inc. v. Moss-Williams*, No. C10-05297 RMW (HRL), 2013 WL 11235928, at *2 (N.D. Cal. Oct. 15, 2013) (adopting parties' stipulated protocol that a neutral third-party forensic expert would image computers and produce responsive information therefrom to the parties and that "[n]either [the requesting party]'s personnel nor counsel will ever inspect or otherwise handle [the responding party]'s computers") (citing Stipulated Protective Protocol for Inspection of the Computers, *Lifetouch Nat'l Sch. Studios Inc. v. Moss-Williams*, No. C10-05297 RMW (HRL) (N.D. Cal. filed July 9, 2012), ECF No. 78 at 4–6); *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443, 449 (D. Conn. 2010) (ordering a third-party forensic expert to image the responding party's devices and provide recovered data to the responding party, which would review data for responsiveness and privilege before producing data to requesting party); *see also* *Sony BMG*, 2006 WL 8201075, at *1 (denying a party's request to directly inspect the forensic image of its opponent's hard drive in lieu of a neutral third-party expert's doing so). [56]

The parties appear to have in place a protocol for producing information from the plaintiffs' devices or forensic images. Turn has issued nine RFPs (RFPs 27–35) for specific information from the plaintiffs' devices. [57] The plaintiffs represent (and Turn does not deny) that they have produced information from their devices responsive to all of these requests (other than with respect to RFPs 32 and 33 regarding the browsing-history and cookie disputes the parties raise

in their joint letter brief, which the undersigned addresses below). [58] Given this, and in light of the fact that the plaintiffs' devices likely contain information not relevant to this case, may contain privileged information, and implicate significant privacy concerns, Turn's request for the plaintiffs to allow it to directly inspect their devices (or produce complete forensic images of their devices) is not relevant or proportional to the needs of this case.

**2. Full Web Browsing History and Cookies**

The plaintiffs have produced or have offered to produce (1) their web browsing history and cookies associated with Turn partner websites (contingent on Turn's identifying such sites) and (2) the date fields (but not the content) of all other cookies on their mobile devices. [59] The plaintiffs also represent that they offered to meet and confer with Turn to consider requests for specific cookies. [60] The undersigned finds the plaintiffs' position and proposals to be reasonable and proportional, with a slight modification — the plaintiffs should produce the dates (but not the content) of the entries in their browsing history (as they are doing for their cookies).

**\*8** The undersigned denies Turn's request to require the plaintiffs to produce their full web browsing history and cookie data. As discussed above, requiring the plaintiffs to produce their full browsing history presents significant privacy concerns. *See* *Riley*, 134 S. Ct. at 2490 ("An Internet search and browsing history, for example, could be found on an Internet-enabled phone and could reveal an individual's private interests or concerns — perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD."). Cookies, which the plaintiffs assert (and Turn does not deny) are closely associated with websites, [61] raise similar privacy concerns. Turn has not shown that its request for the plaintiffs' full browsing history and cookies as they relate to websites other than Turn partner websites is relevant or proportional to the needs of this case.

Turn claims that it needs to examine what Turn cookies are on the plaintiffs' devices, [62] but the plaintiffs have agreed to produce those cookies, so there is no dispute there. Turn claims it needs web browsing history to determine whether the plaintiffs visited websites that worked with Turn cookies in the first place, [63] but the plaintiffs have agreed to produce their browsing history and cookies for those sites, so again there is no dispute there. Turn claims it needs to compare

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG   Document 752-1   Filed 03/15/21   Page 57 of 61

its cookies to standard browser cookies, [64] but it does not need all of the cookies on the plaintiffs' devices to run that comparison. Turn claims that it needs to determine whether the plaintiffs regularly deleted their cookies or browsing histories as they allege, [65] but it can do so through the date fields of the plaintiffs' cookies and browsing histories and does not need the full content of the cookies and histories to do so. Turn claims that the plaintiffs argued that Turn's cookies transmit a user's web-browsing history back to Turn, [66] but Turn has not shown why it needs the plaintiffs' full browsing history to determine what information was or was not transmitted back to Turn (information that is presumably within Turn's possession, custody, or control). Given all this, and in light of the significant privacy concerns present here, Turn has not shown that its request for plaintiffs' full browsing history or cookies is relevant or proportional to the needs of this case.

* * *

As another court in this district noted in the context of a data-breach case, "[t]here is an Orwellian irony to the proposition that in order to get relief for a theft of one's personal information, a person has to disclose even more personal information, including an inspection of all his or her devices that connect to the internet. If the Court were to grant [that] request, it would further invade plaintiffs' privacy interests and deter current and future data theft victims from pursuing relief." *In re Anthem Data Breach*, 2016 WL 11505231, at *1. The same holds true here. There is an Orwellian irony to the proposition that in order to get relief for a company's alleged surreptitious monitoring of users' mobile device and web activity, a person has to allow the company unfettered access to inspect his mobile device or his web browsing history. Allowing this discovery would further invade the plaintiffs' privacy interests and may deter current and future plaintiffs from pursuing similar relief. *Cf. Rivera v. NIBCO, Inc.,* 364 F.3d 1057, 1065 (9th Cir. 2004) (affirming district court's refusal to allow discovery into certain private information of plaintiffs in a Title VII employment case because, among other things, "[t]he chilling effect such discovery could have on the bringing of civil rights actions unacceptably burdens the public interest").

The undersigned does not mean to imply that there could never be an instance where a request to directly inspect a litigant's electronic devices or forensic images, or a request that a litigant produce his complete web browsing history

or cookies, would be relevant and proportional. There may be situations where such a request would be proper, and this order is without prejudice to Turn's renewing its request should such a situation arise. But that situation has not presented itself here. Turn's request for the plaintiffs to allow it to directly inspect their mobile devices (or produce complete forensic images of their devices) and for the plaintiffs to produce their complete browsing history and cookies, is denied.

**CONCLUSION**

**\*9** The court adopts the plaintiffs' proposals, with the slight modification that the plaintiffs should also produce the dates of the entries in their browsing history.

Going forward, if any other discovery disputes arise, the parties must comply with the dispute procedures in the undersigned's standing order (attached). The procedures in it require, among other things, that if a meet and confer by other means does not resolve the parties' dispute, lead counsel for the parties must meet and confer in person (if counsel are local) and then submit a joint letter brief with information about any unresolved disputes. The letter brief must be filed under the Civil Events category of "Motions and Related Filings > Motions – General > Discovery Letter Brief." After reviewing the joint letter brief, the court will evaluate whether further proceedings are necessary, including any further briefing or argument.

**IT IS SO ORDERED.**

Attachment

**STANDING ORDER FOR UNITED STATES MAGISTRATE JUDGE LAUREL BEELER**

*(Effective October 17, 2018)*

Parties must comply with the procedures in the Federal Rules of Civil and Criminal Procedure, the local rules, the general orders, this standing order, and the Northern District's standing order for civil cases titled "Contents of Joint Case Management Statement." These rules and a summary of electronic-filing requirements (including the procedures for emailing proposed orders to chambers) are available at http://www.cand.uscourts.gov (click "Rules" or "ECF-PACER"). A

failure to comply with any of the rules may be a ground for monetary sanctions, dismissal, entry of judgment, or other appropriate sanctions.

## I. CALENDAR DATES AND SCHEDULING

Motions are heard each Thursday: civil motions at 9:30 a.m. and criminal motions at 10:30 a.m. Case-management conferences are every Thursday: criminal cases at 10:30 a.m. and civil cases at 11:00 a.m. Parties must notice motions under the local rules and need not reserve a hearing date in advance if the date is available on the court's calendar (click "Calendars" at http://www.cand.uscourts.gov). Depending on its schedule, the court may reset or vacate hearings. Please call courtroom deputy Elaine Kabiling at (415) 522-3140 with scheduling questions.

## II. CHAMBERS COPIES

Under Civil Local Rule 5-1(b), parties must lodge a paper "Chambers" copy of any filing unless another format makes more sense (such as for spreadsheets, pictures, or exhibits that are better lodged electronically). Paper copies must be printed on both sides and three-hole punched, and they must be the electronically filed copies with the PACER/ECF-generated header (with the case number, docket number, date, and ECF page number). Exhibits must be tabbed. Parties do not need to submit copies of certificates of service, certificates of interested entities or persons, consents or declinations to the court's jurisdiction, stipulations that do not require a court order (*see* Civil Local Rule 6-1), or notices of appearance or substitution of counsel. Please read Civil Local Rule 79-5 regarding the requirements for filing documents under seal and providing copies. STANDING ORDER

## III. CIVIL DISCOVERY

**\*10  1. Evidence Preservation**. After a party has notice of this order, it must take the steps needed to preserve information relevant to the issues in this action, including suspending any document-destruction programs (including destruction programs for electronically maintained material).

**2. Production of Documents In Original Form**. When searching for material under Federal Rule of Civil Procedure 26(a)(1) or after a Federal Rule of Civil Procedure 34(a) request, parties (a) must search all locations — electronic and otherwise — where responsive materials might plausibly exist, and (b) to the extent feasible, produce or make available for copying and/or inspection the materials in their original form, sequence, and organization (including, for example, file folders).

**3. Privilege Logs.** If a party withholds material as privileged, *see* Fed. R. Civ. P. 26(b)(5) and 45(d)(2)(A), it must produce a privilege log that is sufficiently detailed for the opposing party to assess whether the assertion of privilege is justified. The log must be produced as quickly as possible but no later than fourteen days after the party's disclosures or discovery responses are due unless the parties stipulate to, or the court sets, another date. Unless the parties agree to a different logging method, privilege logs must contain the following: (a) the title and description of the document, the number of pages, and the Bates-number range; (b) the subject matter or general nature of the document (without disclosing its contents); (c) the identity and position of its author; (d) the date it was communicated (or prepared, if that is the more relevant date); (e) the identity and position of all addressees and recipients of the communication; (f) the document's present location; (g) the specific basis for the assertion that the document is privileged or protected (including a brief summary of any supporting facts); and (h) the steps taken to ensure the confidentiality of the communication, including an affirmation that no unauthorized persons received the communication.

**\*11  4. Expedited Procedures for Discovery Disputes**. The parties may not file formal discovery motions. Instead, and as required by the federal rules and local rules, the parties must meet and confer to try to resolve their disagreements. *See* Fed. R. Civ. P. 37(a)(1); Civil L. R. 37-1. Counsel may confer initially by email, letter, or telephone to try to narrow their disputes. After trying those means, lead trial counsel then must meet and confer **in person** to try to resolve the dispute. (If counsel are located outside of the Bay Area and cannot confer in person, lead counsel may meet and confer by telephone.) Either party may demand such a meeting with ten days' notice. If the parties cannot agree on the location, the location for meetings will alternate. The plaintiff's counsel will select the first location, defense counsel will select the second location, and so forth. If the parties do not resolve their disagreements through this procedure, lead counsel must file a joint letter brief no later than five days after lead counsels' in-person meet-and-confer. The letter brief must be filed under the Civil Events category of "Motions and Related Filings > Motions — General > Discovery Letter Brief." It may be **no more than five pages** (12-point font or greater, margins of no less than one inch) without leave of the court. Lead counsel for both parties must sign the letter and attest that

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-mc-02879-TWC Document 752-1 Filed 03/15/21 Page 59 of 61

they met and conferred in person. Each issue must be set forth in a separate section that includes (1) a statement of the unresolved issue, (2) a summary of each parties' position (with citations to supporting facts and legal authority), and (3) each party's final proposed compromise. (This process allows a side-by-side, stand-alone analysis of each disputed issue.) If the disagreement concerns specific discovery that a party has propounded, such as interrogatories, requests for production of documents, or answers or objections to such discovery, the parties must reproduce the question/request and the response in full either in the letter or, if the page limits in the letter are not sufficient, in a single joint exhibit. The court then will review the letter brief and determine whether formal briefing or future proceedings are necessary. In emergencies during discovery events such as depositions, the parties may contact the court through the court's courtroom deputy pursuant to Civil Local Rule 37-1(b) but first must send a short joint email describing the nature of the dispute to lbpo@cand.uscourts.gov.

### IV. CONSENT CASES

1. In cases that are assigned to Judge Beeler for all purposes, the parties must file their written consent or declination of consent to the assignment of a United States Magistrate Judge for all purposes as soon as possible. If a party files a dispositive motion (such as a motion to dismiss or a motion for remand), the moving party must file the consent or declination simultaneously with the motion, and the party opposing the motion must file the consent or declination simultaneously with the opposition.

2. The first joint case-management conference statement in a case must contain all of the information in the Northern District's standing order titled "Contents of Joint Case Management Statement." Subsequent statements for further case-management conferences must not repeat information contained in an earlier statement and instead must report only progress or changes since the last case-management conference and any new recommendations for case management.

### V. SUMMARY-JUDGMENT MOTIONS

The parties may not file separate statements of undisputed facts. *See* Civil L. R. 56-2. Joint statements of undisputed facts are not required but are helpful. Any joint statement must include — for each undisputed fact — citations to admissible evidence. A joint statement generally must be filed with the opening brief, and the briefs should cite to that statement. A reasonable process for drafting a joint statement is as follows: (1) two weeks before the filing date, the moving party proposes its undisputed facts, and (2) one week later, the responding party replies and the parties meet and confer about any disagreements. For oppositions, a responding party may propose additional undisputed facts to the moving party within seven days after the motion is filed and ask for a response within two business days.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 5281629

### Footnotes

| | |
|---|---|
| 1 | Joint Letter Br. – ECF No. 90 at 2–5; Joint Letter Br. Ex. 1 – ECF No. 90-1. (The parties filed two copies of the letter brief, one at ECF No. 87 without an exhibit, and one at ECF No. 90 with an exhibit containing RFPs 1, 32, and 33, and the plaintiffs' responses thereto. Other than the exhibit, the letters are identical.) Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. |
| 2 | Joint Letter Br. – ECF No. 90 at 8–9. |
| 3 | *Id.* at 7. |
| 4 | Referral Order – ECF No. 88. |
| 5 | Compl. – ECF No. 1 at 3 (¶¶ 2–3). |
| 6 | *Id.* at 3 (¶ 3), 9 (¶ 27). |
| 7 | *Id.* at 3 (¶ 3). |
| 8 | *Id.* at 3 (¶ 3), 9 (¶¶ 25–27). |

Henson v. Turn, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5281629

Case 8:19-md-02879-PWG Document 752-1 Filed 03/15/21 Page 60 of 61

9   *Id.* at 3–4 (¶ 4), 9 (¶ 28).

10  *Id.* at 9–10 (¶ 29) (citing Jonathan R. Mayer & John C. Mitchell, *Third-Party Web Tracking: Policy and Technology*, 2012 IEEE Symposium on Security & Privacy 413, 415 (2012) ).

11  *Id.* at 11 (¶ 33) (citing Forbes, *The Promise of Privacy: Respecting Consumers' Limits While Realizing the Marketing Benefits of Big Data* (2013) (*The Promise of Privacy* ), *available at* http://images.forbes.com/forbesinsights/StudyPDFs/turn_promise_of_privacy_report.pdf (last visited Oct. 22, 2018) ).

12  *Id.* (citing *The Promise of Privacy* at 15).

13  *Id.* at 4 (¶ 5), 10 (¶¶ 30–31).

14  *Id.* at 11 (¶ 35).

15  *Id.* at 4 (¶¶ 7–8), 13 (¶ 43).

16  *Id.* at 12 (¶ 40).

17  *Id.* An "HTTP request" is a request from a device to a web server for the website that a user is trying to view. *Id.* (¶ 38). For example, if a user wants to view the New York Times's website and types www.nytimes.com into her phone's web browser, the web browser sends an HTTP request to the Times's web server at http://www.nytimes.com. *Id.* The server then sends data back to the user's web browser, which enables the user to view the Times's website. *Id.*

18  *Id.* at 13 (¶ 43).

19  *Id.*

20  *Id.* at 13–14 (¶ 43).

21  *Id.* at 5 (¶ 9), 11–12 (¶ 35).

22  *Id.* at 13–15 (¶¶ 42–47) (citing Jonathan Mayer, *The Turn-Verizon Zombie Cookie*, Web Policy (Jan. 14, 2015), http://webpolicy.org/2015/01/14/turn-verizon-zombie-cookie (last visited Oct. 22, 2018) ).

23  *Id.* at 14 (¶ 45). The ID numbers used here are the ones used in Professor Mayer's analysis and cited in the plaintiffs' complaint.

24  *Id.* at 9 (¶ 27).

25  *Id.* at 14 (¶ 45).

26  *Id.* The complaint characterizes 4012847891611109688 as the Verizon X-UIDH in Professor Mayer's example, *id.* (¶ 46), but Professor Mayer's article shows that the Verizon X-UIDH in his example is actually OTgxNT ..., and 4012847891611109688 is an ID number that is set in the cookie placed in the user's browser.

27  *Id.* (¶¶ 43–45).

28  Joint Letter Br. – ECF No. 90.

29  Joint Letter Br. Ex. 1 – ECF No. 90-1 at 1; Joint Letter Br. – ECF No. 90 at 2 (proposing forensic images as an alternative to production of the devices).

30  Joint Letter Br. Ex 1 – ECF No. 90-1 at 2.

31  *Id.*

32  Joint Letter Br. – ECF No. 90 at 2.

33  *Id.* at 3 (citing Compl. – ECF No. 1 at 22 (¶ 81) ).

34  *Id.*

35  *Id.*

36  *Id.* at 8.

37  *Id.* at 6. The top of page 6 identifies the two requests to which the plaintiffs objected as RFP 31 (web browsing history) and RFP 32 (cookies), but the rest of the joint letter brief and the exhibit identifies these as RFPs 32 and 33, respectively.

38  *Id.* at 7.

39  *Id.* at 5.

40  *Id.* at 4–5.

41  *Id.* at 8–9.

42  *Id.* at 8 (citing Compl. – ECF No. 8–10 (¶¶ 24–29), 15–16 (¶¶ 50–52) ).

43  *Id.*

44   *Id.* at 9.

45   *Id.*

46   *Id.* (emphasis in original).

47   *Id.* at 4.

48   *Id.* at 5.

49   *Id.*

50   *Id.* at 9.

51   *Id.*

52   Turn's request might sweep in privileged documents as well, such as emails the plaintiffs might have sent their attorneys that may be stored in email applications on their mobile devices. *Cf.* Sony BMG, 2006 WL 8201075, at *1.

53   Rule 26(b)(1) expressly provides that "whether the burden or expense of the proposed discovery outweighs its likely benefit" is a consideration in evaluating proportionality.

54   Joint Letter Br. – ECF No. 90 at 3 (citing cases).

55   *Id.* at 7 ("Most importantly, Plaintiffs have already forensically imaged the devices and are producing the categories of information requested, subject to the remaining dispute over web browsing history and cookies, outlined below.").

56   Turn also cites Austin v. Foodliner, Inc., No. 16-cv-07185-HSG (DMR), 2018 WL 1168694 (N.D. Cal. Mar. 6, 2018), to argue that the protective order in this case "is more than sufficient to protect Plaintiffs' privacy concerns." Joint Letter Br. – ECF No. 90 at 5. But the information at issue in *Austin* was just phone-number contact information, and the court there specifically distinguished such contact information from "the disclosure of medical or financial information" or information that "implicates special privacy concerns or threatens 'undue intrusion into one's personal life.' " Austin, 2018 WL 1168694, at *2 (citation omitted).

57   Joint Letter Br. – ECF No. 90 at 6.

58   *Id.*

59   *Id.* at 8–9 ("Plaintiffs are amenable — just as they were with regard to cookies — to produce all browsing history associated with Turn partner websites, contingent on Turn's identifying its partner websites.... Plaintiffs produced cookie data associated with the turn.com domain, and offered to produce cookie data related to any Turn partner websites. Additionally, Plaintiffs identified the date fields (but not their content) for all other cookies on Plaintiffs' devices (regardless of their association with Turn) .... Plaintiffs offered in meet and confer to consider requests for specific cookies[.]").

60   *Id.* at 9.

61   *Id.* at 9.

62   *Id.* at 4.

63   *Id.* at 5.

64   *Id.* at 4.

65   *Id.* at 4–5.

66   *Id.* at 4.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.