Baker&Hostetler LLP

# BakerHostetler

Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214

T  216.621.0200
F  216.696.0740
www.bakerlaw.com

March 8, 2021

The Honorable John M. Facciola (Ret.) via email to facciola@georgetown.edu

Re:     *In re: Marriott International, Inc. Customer Data Security Breach Litigation*, 8:19-md-02879;
        Marriott's Response in Opposition to the Consumer Plaintiffs' Motion for Protective Order

Dear Special Master Facciola:

Stripped of histrionics and adjectives, Plaintiffs' motion makes three claims: (1) Marriott seeks full images of Plaintiffs' phones and computers, (2) those devices have no relevant information, and (3) Marriott's true goal is to harass or retaliate against Plaintiffs. Each claim is incorrect.

First, Marriott's proposed protocol does not seek full images. It asks a third-party expert—whom Plaintiffs already selected—to identify relevant forensic information on their phones and computers, and then to produce only that relevant information. Second, Plaintiffs filed this case—a nationwide class action seeking hundreds of millions of dollars in damages—alleging that Marriott harmed personal information they consider "highly-sensitive" and that they "place significant value in data security." (ECF No. 537 ¶¶ 20-95, 273.) All of their damage theories are rooted in these basic allegations—and Marriott is entitled under Rule 26 to test those allegations during discovery.

Plaintiffs' last argument is belied by the falsity of the first two. This is not retaliation. It is discovery. Indeed, the Court has already rejected Plaintiffs' blanket attempt to shield personal information because "[t]he entire premise of the Consumer Plaintiffs' claims is that their PII was compromised by the Marriott data security breach, and this resulted in substantial damages." (ECF No. 726 at 4.)

Plaintiffs' motion to prevent discovery they essentially agreed to provide months ago is a continuation of their campaign to obstruct and delay Marriott's discovery of information necessary to its defense. Marriott asks the Court to reject Plaintiffs' tactic.

### Marriott is not seeking full images of Plaintiffs' devices.

Plaintiffs suggest repeatedly that Marriott is seeking to review "nearly every file on—and the entire history of—Plaintiffs' personal phone and computer use." (Pls' Ltr. 1; *see also id.* at 4-5.) Not so. Rather, just like Plaintiffs' proposal, Marriott's protocol asks an expert of Plaintiffs choosing to forensically search for specific information on their devices, and then to only produce that specific information. (*Compare* Pl. Ltr., Ex. C (Plaintiffs' proposal), *with* Pl. Ltr., Ex. D (Marriott's resp.).)

Plaintiffs' motion also ignores that Marriott revised its protocol in response to Plaintiffs' concerns. In fact, Marriott further narrowed its proposed protocol in its email to you on February 25, deleting the request for a forensic review of photographs that Plaintiffs claimed was too intrusive. Marriott attaches the protocol that is actually at issue—including redlines to reflect the additional offered compromise noted below—to this letter as Exhibit A.

**Marriott's proposal protects against the production of irrelevant information.**

Marriott's proposal asks that a third-party expert look for five categories of information:

1. Evidence of malware and other viruses. (Ex. A § III.5.a.)
2. Web browsing history and bookmarked pages. (*Id.* § III.5.b.)
3. Installed programs and applications. (*Id.* § III.5.c.)
4. Identification of the location of personal information on the devices, *e.g.*, in emails, text messages, or text files. (*Id.* §§ III.5.d-h & l.)
5. Evidence of Plaintiffs' information security habits, such as wireless and Bluetooth connectivity and security. (*Id.* §§ III.5.i-k.)

The search for and production of categories 1, 4, and 5 will not result in the production of extraneous information. Importantly, and contrary to Plaintiffs' suggestion (*see* Pl. Ltr. 3), Marriott would not receive all of Plaintiffs' text messages and emails—only those that reflect storing or sharing of personal information. And while categories 2 and 3 could in theory result in the production of extraneous information, the protective order prevents any such information from being used for the nefarious purposes Plaintiffs claim to fear. (*See* ECF No. 726 at 6 ("[U]nder the SPO discovery information can only be used to prosecute, defend, or settle the case, and the SPO contains additional protection for Highly Confidential Information and Confidential Information (including PII) by limiting who can access the information.").) But to further assuage Plaintiffs' concerns, Marriott has revised the protocol further (Exhibit A) to provide for its expert to inspect the data responsive to categories 2 and 3, identifying for production only relevant information.

**The information Marriott seeks is relevant.**

The information Marriott seeks is focused on identifying evidence of: (1) the risk of or actual theft of Plaintiffs' personal information unrelated to the Starwood cyberattack, (2) instances where Plaintiffs freely provided to others the personal information they claim in this case to carefully protect, and (3) Plaintiffs' security habits on devices containing their personal information. Marriott's expert, Kevin Poindexter of Crypsis, explains in the attached declaration how each category of forensic information identified above will reflect this type of evidence. (*See* Poindexter Dec., Ex. B.)

Plaintiffs concede the first category of information could cause data to be lost. (Pl. Ltr. 2.) But that is only the tip of the iceberg. For example, websites that people visit can result in the theft of personal information with or without malware being installed on the device. (Poindexter Dec. ¶ 6(a)(i).) Similarly, websites often allow or require people to share their personal information voluntarily. (*Id.*) The same is true of applications on computers and phones. (*Id.* ¶ 6(b)(i).) How Plaintiffs connect to wireless Internet or Bluetooth applications, and the related security settings they use, will evidence their security practices for devices that contain personal information. (*Id.* ¶ 6(h)-(i).)

Under Rule 26, relevance is "broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *O'Malley v. Trader Joe's E., Inc.*, 2020 WL 6118841, at *3 (D. Md. Oct. 15, 2020) (quotation omitted). The information Marriott seeks— that is, the risk of Plaintiffs' information being stolen, Plaintiffs' freely giving their information to other persons or entities, and Plaintiffs' own security practices—meets this standard.

First, the evidence is relevant to plaintiffs' misuse theory of damages and their request for injunctive relief. Plaintiffs concede that if their information was stolen from their own devices prior to fraud for which they blame Marriott, that is relevant to causation of that fraud. (Pl. Ltr. 2-3.) Plaintiffs argue that this means the search should be limited to devices in "use at the time of the fraud event." (*Id.* at 3.) Marriott agrees that all of Plaintiffs' devices in operation prior to any alleged fraud are relevant and should be searched for evidence of alternative sources of that fraud.

But each plaintiff also alleges that he or she "remains at a substantial and imminent risk of future harm" and that they "continue to suffer injury as a result of the compromise of their Personal Information." (ECF No. 537 ¶¶ 20-95, 273.) Having put the future at issue, Plaintiffs cannot cut Marriott's discovery off at the date of any particular fraud. Moreover, the less securely and sensitively Plaintiffs treat their personal information—*e.g.*, by not securing it on their electronic devices and by providing to other third parties—the less likely a juror is to believe Plaintiffs claim that Marriott caused fraud or the risk of fraud. Plaintiffs also seek injunctive relief, arguing that an injunction is necessary to prevent them from injury due to further cyber-attacks. (*See, e.g., id.* ¶ 352.) Whether the Court issues an injunction should turn, in part, on the degree to which Plaintiffs protect their own information. If, for example, Plaintiffs do not protect their information, then an injunction would do nothing to prevent the harm they argue an injunction would protect against.

Second, the evidence Marriott seeks is relevant to Plaintiffs' loss-of-value damages theory. Plaintiffs argue that, "as Your Honor already ruled, Plaintiffs will submit expert testimony establishing the *objective* value of their data on an aggregate, classwide basis." (Pl. Ltr. 3 (emphasis in original).) They similarly attribute a ruling to you that "Plaintiffs' damages claim that Marriott owes them the 'value' of their personal information does not turn on any individual plaintiff's *subjective* feelings about his or her data." (*Id.* at 5 (emphasis in original).) Plaintiffs cite no order from you or Judge Grimm on either alleged point, and Marriott is aware of none. How and if Plaintiffs prove their alleged "lost value" theory is still in dispute, and the time has not yet come for those determinations.

In any event, Plaintiffs claim that "because their Personal Information is now in the hands of criminals, it is less valuable." (ECF No. 473 at 14.) How Plaintiffs used or disclosed—and continue to use or disclose—their personal information, both before and after the Starwood incident, is thus relevant to whether Marriott caused their information to lose value, as well as the value of the information itself. In any market for information, information that had never been disclosed and has since never been disclosed would be more valuable than information that has been disclosed 50 times. In short, the issue is not whether a Plaintiff "loved her car"; it is whether the stolen car was missing a bumper and had 150,000 or 15 miles on it. (*Compare* Pl. Ltr. 3.)

Alternatively, the Court ruled that Plaintiffs could attempt to prove they were damaged based on "the economic benefit the consumer derives from being able to purchase goods and services remotely and without the need to pay in cash or a check," specifically noting that "[c]onsumers choose whether to exchange their personal information for these goods and services every day." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020). The evidence Marriott seeks will inform whether Plaintiffs have suffered any inability to exchange their information. And, under the Court's order, this evidence is also relevant to determine how each of the Plaintiffs chooses to exchange his or her information for goods and services.

Third, the evidence is designed to test specific allegations that Plaintiffs make in the complaint. Each Plaintiff alleges his or her personal information is "highly sensitive." (ECF No. 537 ¶¶ 20-95.) Each

also claims to "place significant value in data security," and "would not have stayed at a Marriott Property, purchased products or services at a Marriott Property, and/or would have paid less" if they knew what Plaintiffs allege is "the truth" about Marriott's data security. (*Id.* ¶¶ 273, 275.)

Marriott does not have to take Plaintiffs' word for it. If a Plaintiff, for example, provided personal information to dozens of merchants to receive free shipping or other online discounts, that fact contradicts the allegation that Plaintiffs place significant value in data security. Plaintiffs' browsing history and applications (*e.g.*, applications related to specific merchants that store personal information) may contain this evidence. The evidence Marriott seeks may also show that a Plaintiff frequented a website or has an application or program known to gather or steal personal information.[1] In general, the more third parties to whom a Plaintiff provides personal information, the less likely a juror is to believe their claim that they consider this information highly sensitive or that they desire to protect the purported value of that information. And if Plaintiffs do nothing to secure the devices that contain their personal information, a reasonable juror could conclude that they do not, in fact, protect or value that information.

### The discovery Marriott requests is proportional.

Proportionality is based on "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *O'Malley*, 2020 WL 6118841, at *3. Plaintiffs largely ignore these factors and focus on the so called "unprecedented" nature of Marriott's request, and rely on *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 11505231 (N.D. Cal. Apr. 8, 2016), and *Henson v. Turn, Inc.*, 2018 WL 5281629 (N.D. Cal. Oct. 22, 2018).

These cases support the Court compelling discovery consistent with Marriott's protocol. Both orders deny discovery requests related to turning over *full* images to the defendant. *See Anthem*, 2016 WL 11505231, at *1 ("Defendants seek a discovery order compelling each of the named plaintiffs either to provide access to, or produce forensically sound images of, their computer systems that connect to the internet."); *Henson*, 2018 WL 5281629, at *1 (request was "to directly access its opponents' devices or forensic images"). And neither court stated that a full forensic image was never appropriate. The *Henson* court stated it did "not mean to imply that there could never be an instance where a request to directly inspect a litigant's electronic devices or forensic images, or a request that a litigant produce his complete web browsing history or cookies, would be relevant and proportional." 2018 WL 5281629, at *8.

More to the point, Marriott's protocol does not require that a full image—or anything close to a full image—be disclosed. It targets limited areas of the devices likely to contain relevant information, as described in detail above. Thus, *Anthem* and *Henson* support Marriott: in neither case was the defendant denied *all* forensic information, as Plaintiffs request here.

In *Anthem*, the Court ordered a search for malware, as Plaintiffs admit. (Pl. Ltr. 4.) Anthem argued malware was relevant, so the court's order does not imply that the only possible relevant information

---

[1] Plaintiffs quip that "how does Marriott show whether a website is 'vulnerable?'" Expert testimony is one answer, and Plaintiffs know this. What's more, it is well known and documented that some types of websites are riskier than others. *See* https://usa.kaspersky.com/blog/risky-websites-42/15946/; https://www.sagacent.com/dangerous-websites-on-internet/.

on electronic devices is malware. *See Anthem*, 2016 WL 11505231, at *1 ("Anthem asserts that it may determine whether the plaintiffs' computer systems contain malware, viruses, or other electronic indicators suggesting that their personally identifiable information or personal health information was compromised").

As explained above and in Mr. Poindexter's declaration, relevant information beyond malware exists on Plaintiffs' devices. Citing Judge Koh's comments in an unrelated hearing, Plaintiffs suggest the *Anthem* Court "regretted" the decision. In fact, Judge Koh rejected the challenge to the Magistrate Judge's order compelling a forensic inspection for malware. (*See* Ex. C.)

The *Henson* defendants also received significant information from the plaintiffs' electronic systems. There, plaintiffs "already forensically imaged their devices and [were] producing information from those images" and agreed to produce any browsing history that was possibly relevant to the case. *Henson*, 2018 WL 5281629, at *7-8. This is what Marriott is requesting through its proposed protocol (Exhibit A). Indeed, it may be that Plaintiffs are fighting so hard here because they did not take steps to prevent the loss of relevant information from their devices.

**Marriott is not harassing Plaintiffs; Plaintiffs are stonewalling Marriott.**

Marriott's request is not unprecedented. "Forensic imaging is not uncommon in the course of civil discovery." *List Indus., Inc. v. Umina*, 2019 WL 1933970, at *4 (S.D. Ohio May 1, 2019) (quotation omitted)). And forensic information was searched and produced in both *Anthem* and *Henson*. *See also In re Apple Inc. Device Performance Litig.*, 2019 WL 3973752, at *2 (N.D. Cal. Aug. 22, 2019) (ordering forensic review of plaintiffs' cell phones).

As noted in *Apple*, "[p]laintiffs are not passive third parties or defendants sued by the party seeking the invasion." *Id.* Plaintiffs chose to sue Marriott, to allege value in and the unique loss of their personal information, and to claim Marriott devalued that information and caused fraud and the risk of future fraud. And, on top of their choices, they were selected as bellwether plaintiffs in this MDL—a select group whose claims should be fully tested.  "It is well-established that a plaintiff cannot bring suit and then limit the defendant's discovery that is targeted at the subject matter of the plaintiff's claims." *Id.*; *see also Barfell v. Brucker*, 2018 WL 4568861, at *1 (E.D. Wisc. Sept. 24, 2018) ("Plaintiff's claims of deliberate indifference to his serious medical needs place his medical health at issue, which entitles Defendants to conduct discovery related to his medical health and to obtain his medical records.").

But that is what Plaintiffs have done throughout this litigation. They have produced few documents (all but a handful have produced fewer than 100 pages), evasively answered interrogatories, redacted personal information they put at issue, and continued to stymie Marriott's attempts to discover relevant information from third parties.

Sincerely,

/s/ Daniel R. Warren                    /s/ Gilbert S. Keteltas                    /s/ Lisa M. Ghannoum

Co-Lead Counsel for Marriott

# EXHIBIT A TO LETTER

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CONSUMER ACTIONS** | MDL No. 19-md-2879<br><br>Judge Paul W. Grimm |

### REMOTE COLLECTION AND EXAMINATION PROTOCOL

Consumer Plaintiffs shall submit their devices that connect to the Internet to the following protocol for the collection, examination, and production of data concerning Marriott's Request for Results of Examination of Plaintiffs' Devices.

### I.   Device Identification

1.   Prior to scheduling any remote collections or preservations, each Consumer Plaintiff (referred to as "Custodians") shall provide 4Discovery a detailed schedule of electronic devices they own that connect to the Internet and a secure address to send a remote collection kit containing the necessary hardware. This schedule will, at a minimum, include the following information:

    a.   Custodian Name

    b.   Device Description

    c.   Make/Model/Serial #

    d.   Estimated total storage capacity (used and available for use)

## II.     Collection and Imaging

2.       Respective to each Custodian, upon receiving the schedule of devices 4Discovery shall propose dates and times for a remote collection kit to arrive at each Custodian's provided address. A signature will be required at the time of delivery. Within 2 days of delivery, each Custodian will participate in a virtual meeting with a 4Discovery collection specialist at an agreed upon time to facilitate collection and preservation of the specified devices. Collections will be performed using industry standard tools and methodology. This methodology will vary per device. If any encryption or passcodes are being used to protect the device(s), these codes will be provided by the Custodian to 4Discovery at the time of imaging. To the extent any of the devices store information in a cloud-based storage location, the cloud storage will be included in the data being collected by 4Discovery.

3.       4Discovery shall create a full and complete forensic image of each device prior to starting any analysis. These forensic images will be shipped to the 4Discovery lab and shall reside solely in 4Discovery's custody for the length of the matter. The original device(s) will remain in the control of each Custodian and will be preserved consistent with the plaintiffs' obligations to preserve evidence. 4Discovery will ensure that the devices are not altered or harmed in any way during the imaging process.

4.       While responsive data will be sent to counsel for the Parties for review, copies of original data and forensic images collected shall not be released to counsel or experts for the Parties and shall not be released from 4Discovery's custody for any reason absent written permission from the Custodian or Court order.

### III.    Analysis and Production

5.    4Discovery will conduct a forensic examination of the agreed upon devices and produce a report containing the following items:

    a.  **Malware Scans**

        i.  4Discovery will perform automated scans on the forensic images to look for evidence of viruses or malware and identify and review the log files of any antivirus or anti-malware programs that have been installed on the devices. This review will be performed using various antivirus scans, a review of file lists for suspicious files, analysis of any previously executed command line strings, and a review of system registry hives and event logs.

        ii.  4Discovery will produce a report identifying any evidence any viruses and/or malware found on each device, including both the current antivirus and malware findings, as well as any historical information. The report will also identify the methodology or methodologies used to scan the forensic images.

    b.  **Web Browsing History and Bookmarked Pages**

        i.  4Discovery will examine the active web history information for any internet browsers found on the devices and carve or search for any deleted internet history as well. In addition, any bookmarked or otherwise saved websites in any browser or format will be examined.

        ii.  The report will include any relevant analytics available on internet history and bookmarked/saved websites, such as frequency of visit, first

and most recent visit, etc. The report will also include ~~the full parsed~~relevant internet history (both active and deleted-recovered) showing the full list of all available entries and all parsed metadata in an industry standard format. Additionally, the report will include all relevant information about any bookmarked or saved websites including the location where it was found, website it points to and/or was from, and any associated dates.

~~ii.~~iii.   Relevant information to be included in the report pursuant to Part 5.III.b will be identified through a remote-inspection during which 4Discovery hosts a remotely accessible platform for Marriott's expert to remotely access and analyze all forensically identified web history without the ability to save or download any information. Any information sought for production will be marked during this analysis and reviewed by Plaintiffs' counsel for privilege or other applicable protections prior to production.

c.  **Installed Programs/Applications**

i. This examination will include the identification of all installed programs or applications, and any artifacts indicative of programs or applications that were previously installed or used that are no longer installed.

ii.  The report will include a list of all relevant installed programs and applications with the context of when and where they were installed and any relevant configuration options. Any artifacts related to previously installed programs and applications should include the location the

4

artifact was found, any contextual details, and the program or application to which the artifact relates.

    ii.iii.   Relevant information to be included in the report pursuant to Part 5.III.c will be identified through the process described in Part 5.III.b.iii.

**d.**  **Notes/Documents/Text Files**

    i.  4Discovery will examine and/or search all notes, documents, and text files on the devices and identify any on the devices or a synchronized cloud-based account, that contain personal information or usernames, passwords, passcodes, pins, passphrases, and/or other types of security keys (e.g., answers to security questions) that the Custodian used to secure personal information or access any website, program, application, or account (as used in this protocol "passwords"). As used in this protocol, the term "personal information" is information concerning a single person, including but not limited to a person's name, gender, address, electronic mail address, telephone number, social security number, driver's license information, state identification information, passport information, telephone number, financial information, information about a person's banking or other type of account, payment card information, date of birth, place of birth, nationality, employer information, membership or loyalty program information, geolocation information, mother's maiden name, and social media account ID or profile information (including username and photo or other data from social media accounts).

    ii.  The report will identify all documents found that contained any personal information or passwords, including the location, dates, and metadata from the documents. Any documents found in an application, platform, cloud-based storage, or email system should include the context of where the item was found and any transfer or send/receive artifacts about the item. The report will also include a copy of any notes, documents, or text files found to contain personal information or passwords.

    e.  **Cloud Storage Accounts (Google Drive, OneDrive, DropBox, etc.)**

        i.  This examination will include identifying any and all cloud storage or file transfer platforms that were connected to the devices, synced with the devices, or that the devices accessed and with which the devices may have transferred data. Each of the cloud storage platforms identified should be collected and their data included in this overall examination. The data stored in any cloud storage platforms should be examined to determine if any of the data contains personal information or passwords.

     ii.  The report will include a list of all cloud storage accounts identified in the examination with contextual information and metadata, as well as a copy of any files found on cloud storage platforms found to contain personal information or passwords.

    f.  **Apple/Google/Microsoft Account IDs**

        i.  On each device, 4Discovery will examine any login information or accounts that are connected to the device and provide a list of any

6

identified accounts. This shall include accounts such as Microsoft accounts being used to login to Windows computers, Apple accounts (iCloud or other) being used with any iPhones, iPads, or Mac computers, and any Google accounts being used on Android based phones, Google Chromebooks, or Windows computers.

ii. 4Discovery will include in their report a list of any accounts found to be in use as well as any accounts that may have been used historically based on any artifacts or findings on the devices examined, including the context of where and how each was found.

g. **Chats & Messages**

i. 4Discovery will examine all chat and messaging applications on the Custodians devices to identify any persistent or ephemeral messaging applications. For any applications identified, all extant messages will be parsed into readable form and searched for any personal information or passwords in the message content or as included as attachments.

ii. The reporting on this area will include a list of all chat and messaging applications found, details around where the applications reside as well as their account information and configuration. Any messages that include personal information or passwords in the message or an attachment should be included in the report as well.

h. **Email**

i. This examination will include identifying any email continent, both messages and attachments, that may contain or refer to any personal

7

information or passwords. This should include both email data stored on the devices and email in any online email accounts that are connected to any of the devices.

ii. This report will include any and all available metadata as well as a copy of the email messages and/or any attachments where the message or any attachment contains personal information or passwords.

i. **Wireless Device Connectivity**

i. 4Discovery will examine any artifacts relating to Wi-Fi network connections to determine what wireless networks were connected to, when, and using what type of security.

ii. The report will include a list of all artifacts related to connecting to wireless networks including all available metadata.

j. **Bluetooth Data Transfer**

i. 4Discovery will examine any artifacts related to Bluetooth connections that could facilitate data transfer, including Apple AirDrop and Android Nearby Share, or any other Bluetooth transfer applications or technologies.

ii. The report will include a list of all artifacts related to connecting to and/or transferring data with Bluetooth devices capable of data transfer, including all available metadata.

k. **Passwords**

i. On each device, 4Discovery will search for and identify any information they can determine may be passwords or other account credentials

stored on the devices, or in any cloud storage or email platform connected to or used by the Plaintiffs on the devices. This analysis should also capture any context to the passwords/credentials such as any notes around them or site, service, or username noted with them.

ii. 4Discovery will include in their report a list of any identified passwords, account information, or other credentials as well as the context of how and where each was found. The report should be encrypted, and password protected to secure and protect this password related information as well as other sensitive information being reported upon.

l.   **General Search**

i. In addition to the specific analysis included in the examination to attempt to locate personal information or passwords, a general non-targeted search will be run to identify personal information or passwords stored anywhere else on the devices. This search will leverage tools designed to identify personal information or passwords or search patterns designed to identify personal information or passwords.

ii. The report will include a list of all files, artifacts, or fragments containing potential personal information or passwords that were identified through this process. Any items already identified in any other analysis focus areas in this protocol may be withheld from reporting in this focus area as long as all the same information is being reported. The report should include all metadata and contextual information about what was found, where, bearing what dates, and any other metadata or

9

information about each item. The identified items themselves should also be included in the report. The report will also identify the methodology or methodologies used to conduct this search.

**m.  ~~Other Analysis~~**

> i.    ~~Any other analysis, evaluation, or steps 4Discovery deems appropriate to serve the purpose of this examination should also be performed.~~

> ii.   ~~Forensic investigators performing an examination commonly identify other items of interest while carrying out a predetermined protocol even if not explicitly written into the protocol. If this occurs, or if 4Discovery has other ideas it believes should be included, these tasks or items will be added as additional analysis focus areas.~~

> iii.  ~~Any additional work being performed will be included in the report describing the work and any findings or observations.~~

6.    4Discovery shall produce a forensic examination report for all analysis focus areas listed above including all Custodians' devices and accounts. To the extent the information described above to be included in the report can fit and makes sense to include inline in the report, it may be included inline. But for larger sets of data that would not fit well inline, those information sets should be included as attachments to the report and/or can be produced in native form.

7.    4Discovery shall provide its report to counsel for Plaintiffs and Defendants simultaneously and as soon as possible but in no event more than ~~14~~ 21 days following the date ~~of this agreement~~Plaintiffs are ordered to conduct the forensic examination described in this protocol.

10

8.        Except for the review process identified in Parts III.5.b & c, 4Discovery's report shall be provided to counsel for Plaintiffs and Defendants without any screening review by Plaintiffs' counsel.

9.        If requested by either Plaintiffs' counsel or Defendants' counsel, 4Discovery shall make itself available to discuss its report and the methodologies used to complete it with counsel or any expert for Plaintiffs or Defendants following 4Discovery's production of the report.

## IV.   Data Disposition

10.        Upon receiving written authorization provided by counsel for Plaintiffs and Defendants, 4Discovery will securely delete all collected data in its possession.

**EXHIBIT B TO LETTER**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL CONSUMER ACTIONS | MDL No. 19-md-2879<br><br>JUDGE PAUL W. GRIMM |

### DECLARATION OF KEVIN T. POINDEXTER

I, Kevin T. Poindexter, declare as follows:

1.      I am a Senior Consultant at Crypsis, a Palo Alto Networks Company ("Crypsis"), a cybersecurity consulting firm specializing in digital forensic investigations, data breach and computer crime response, and cyber risk management services. I have personal knowledge of the following facts, and if called to testify, I could and would competently testify thereto. Crypsis was retained by Baker & Hostetler LLP ("Counsel"), on behalf of its client Marriott, to provide digital forensic consulting services in this matter.

2.      Prior to my employment at Crypsis, I served as a sworn law enforcement officer with over 20 years of service. I have more than 10 years of training and experience in digital and mobile forensics, including conducting and overseeing forensic acquisitions and analyses of laptops, desktops, servers, and mobile devices in criminal investigations, civil litigation, and internal investigations. I have extensive training and experience in using computer and mobile forensic tools and techniques, including tools such as Blacklight, Cellebrite, Forensic Toolkit, Magnet AXIOM and X Ways Forensic. I also have received training in the investigation and analysis of networked and stand-alone computer systems and mobile devices, including Microsoft Windows, Mac, and Linux operating systems and Android and Apple-branded mobile

devices. I have forensically acquired and analyzed hundreds of digital media items, including desktops, laptops, mobile devices, and server computers. I have performed forensic analysis on a wide range of digital forensic matters, including metadata analysis, file transfer, deletion activity, and electronic document movement chronology among different storage media. I hold active certifications as a Commonwealth of Virginia Certified Law Enforcement Officer, National White-Collar Crime Center Certified Cyber Crime Examiner (3CE), Cellebrite Certified Physical Analyst (CCPA), and Certified Blacklight Examiner (CBE). Attached as Exhibit A is a copy of my curriculum vitae, which details additional aspects of my qualifications, experience, and background.

3.       I understand that Plaintiffs have alleged certain incidents of identity theft occurred in this matter. A critical component of understanding how identity theft could have occurred, or whether it can be attributed to a particular source, is determining how Plaintiffs stored, used, and shared their personal information. Insecure storage or sharing of personal information could lead to identity theft separate and apart from any security incident that may have occurred at Starwood. Additionally, the secure sharing or storing of personal information to an online platform that then experienced a security incident could also have resulted in the release of sensitive personal information, separate and apart from any security incident that may have occurred at Starwood. Understanding how Plaintiffs stored their personal information, how they shared that information, and with whom the information was shared prior to any alleged incidents of identity theft is critical in identifying how those alleged to have committed these fraudulent acts may have come into possession of Plaintiffs' personal information. This identification process would best be performed on the device Plaintiffs' used prior to the time of any claim of identity theft. To the extent the devices in use prior to the claims of identity theft no

longer exist, examining Plaintiff's current devices can provide information about how they use, store, and share personal information.

4.      I also understand that there are claims of ongoing risk related to Plaintiffs' personal information in this matter. To the extent ongoing risk is a factor, the alleged risk continues to the present day and beyond. As such, any storage, use, or sharing of personal information to present day is relevant to determine how the information is stored and shared, and what risks may exist related to the personal information separate and apart from any security incident that may have occurred at Starwood, either before or after the time of the alleged security incident with Starwood.

5.      Personal information can be freely offered into a variety of applications and web sites. It can also be stolen by programs or websites designed to capture and transmit personal information. An analysis of what applications were installed and what websites were visited will help demonstrate how personal information may have been shared/stolen. Analysis of what cloud platforms or what online email, chat, or other systems were in use will also help determine what other systems may have been involved in any potential theft of personal information through other online resources. Analysis of wireless and Bluetooth connection will help identify whether or not each examined Plaintiff connected to insecure wireless connections which may have stolen, or contributed to the theft of personal information. Analysis of notes, documents, and general searches for personal information will help identify if and where personal information was stored on Plaintiffs' devices. Any identified information would then be evaluated for how it may have been stored, used, or shared, contributing to the potential for identity theft or ongoing risk. Malware or viruses on the Plaintiffs' computers will be identified both for current infections as well as log files showing historical infections which could potentially steal personal

information. Finally, any passwords or other credentials stored on Plaintiffs' computers will be evaluated to determine whether or not Plaintiffs' engaged in sub-optimal security practices such as using the same passwords for multiple services. If so, any system that experienced a security incident but did not include any personal information could be relevant if the same password or credential was also used for some other service that did store personal information.

6.      The following analysis areas are typically found on the devices selected for examination and are a sampling of the data that could be analyzed in order to provide conclusions of how each plaintiff stored, used, shared, and secured their personal information on their devices as well as identify potential areas where this data may have been publicly exposed or used for identity theft or fraud. This analysis could be performed leveraging the collection process proposed by Plaintiffs utilizing their own expert for the collection, analysis process, and production of data described in this protocol.

   a) Web Browsing History and Bookmarked Pages

        i.    Websites can be a platform where personal information is stored or shared. Some
              websites can also be sources of potential compromise for a device as some
              websites can steal personal information with or without leaving malware on a
              device, allow an attacker to gain access to a device, passwords, or credentials, or
              to plant viruses or malware onto a device for later exploitative use. As such,
              websites visited on the devices could have allowed personal information to be
              either publicly exposed or used for identity theft or fraud. I understand Plaintiffs
              object to providing their entire web history. As such, I would recommend a
              remote-inspection approach where Plaintiffs' experts or other consultants would
              host a remotely accessible platform where I could remotely access and analyze

web browsing activity on Plaintiffs' devices without the ability to save or
download any information. Any data sought for production from Plaintiffs to
Defendant would be marked in the course of this analysis and reviewed by
Plaintiffs' counsel for privilege prior to production.

b) <u>Installed Programs/Applications</u>

    i. Programs and applications can store, process, or transmit personal information
and may have allowed personal information to be either publicly exposed, or used
for identity theft or fraud if those areas of the devices or the applications
themselves were compromised. I understand Plaintiffs also object to providing a
full listing of applications and programs installed on their devices. As such, I
would recommend a similar remote-inspection approach.

c) <u>Notes/Documents/Text Files</u>

    i. Documents in many different formats can contain personal information. If the
location in which these documents were stored, or any other platform, system, or
application that stored or transferred the documents was compromised, that could
have allowed personal information to be either publicly exposed or used for
identity theft or fraud.

d) <u>Cloud Storage Accounts (Google Drive, OneDrive, DropBox, etc.)</u>

    i. Personal information stored in cloud storage platforms, if compromised, could
have allowed personal information to be either publicly exposed, or used for
identity theft or fraud, even without any compromise occurring on the devices
themselves.

e) Apple/Google/Microsoft Account IDs

    i. Plaintiffs' accounts used to login or sync any devices may have been compromised, which may have allowed personal information to be either publicly exposed or used for identity theft or fraud.

f) Chats & Messages

    i. Individuals often share personal information through chat and messaging platforms on their devices and may have allowed this sensitive information to be inadvertently publicly exposed if those areas of the devices or the messaging platforms themselves were compromised.

g) Email

    i. Personal information in email accounts can be sent to other people; email accounts can be compromised, or locally stored email data can be stolen if a device storing the data is compromised. As such, any personal information stored in email on the devices or in accounts associated with the devices could have allowed personal information to be either publicly exposed or used for identity theft or fraud.

h) Wireless Device Connectivity

    i. Wireless devices used while traveling can be subject to interception or access by third parties when connecting to insecure or unofficial wireless networks. Connection to insecure or otherwise questionable wireless networks may have allowed personal information to be either publicly exposed or used for identity theft or fraud.

i) <u>Bluetooth Data Transfer</u>

    i. Sharing or transferring information via Bluetooth can result in inadvertent disclosure of information to unknown third parties if the security of Bluetooth connections are not carefully verified before sending data. Even accidental sharing of information with an unknown third party can cause personal information to be either publicly exposed or used for identity theft or fraud.

j) <u>Passwords</u>

    i. Any stored passwords may have been accessed by an attacker if the device or account holding the stored password information was compromised. Also, it is common for some users to use the same password for multiple accounts and a compromise of one system or platform that does not contain any personal information could lead to an attacker accessing other platforms that do contain personal information leveraging the same password.

k) <u>Malware Scans</u>

    i. Computer viruses and malware can be used by attackers to steal personal information, to gain remote access to a device, or for a variety of other purposes. If an attacker did compromise any of the devices, the associated accounts, or any of the platforms or information protecting personal information, then the compromise could have allowed personal information to be either publicly exposed or used for identity theft or fraud.

l) <u>General Search</u>

    i. Temporary files, uncommon file types, or other unexpected storage locations may contain copies of personal information that a Custodian does not even know exist

but could nonetheless be accessed by an attacker if the device was compromised. If an attacker were able to gain access to any of these files, the compromise could have allowed personal information to be either publicly exposed or used for identity theft or fraud.

7.      Because we need to understand how Plaintiffs' stored, used, and shared personal information in order to evaluate the risks posed for potential identity theft, other types of potential fraud, and ongoing risk, the types of analysis described above are necessary, narrowly tailored to identify relevant information, and involve limited burden on Plaintiffs.

8.      I declare under the penalty of perjury that the foregoing is true and correct.


Executed on March 8, 2021 at Lynchburg, Virginia.                    _____ _____ _____

                                                                    Kevin T. Poindexter



# Kevin Poindexter

**CRYPSIS, A PALO ALTO NETWORKS COMPANY**
**Senior Consultant**, March 2019 to Present
McLean, VA

Maintain an active case load of digital forensic engagements in internal investigations, civil matters, and cybercrime engagements. Perform digital forensic acquisitions and examinations on laptop and desktop computers, e-mail and file servers, handheld/mobile devices, and network logs. Types of analysis include (but not limited to) document authentication, the theft or misappropriation of intellectual property or other data, computer hardware forensics and data recovery, and investigations into computer/network intrusions or hacking.

**LYNCHBURG SHERIFF'S OFFICE**
**Sworn Auxiliary Deputy Sheriff**, March 2019 to Present
Lynchburg, VA

Sworn to maintain full Certified Law Enforcement Officer powers, including arrest authority, in the Commonwealth of Virginia.

**LYNCHBURG POLICE DEPARTMENT**
**Detective**, January 1999 to March 2019
Lynchburg, VA

Served as detective and digital forensic examiner in the department's criminal investigations division and forensics unit. Participated in local, state, and federal investigations into a wide array of traditional and cyber-based crimes involving data breaches, wire fraud, and organized crime. Duties included interviewing witnesses, interrogating suspects, completing written reports detailing response, forensic procedures, and evidentiary findings, as well as testifying in court. Provided law enforcement digital forensic imaging, mobile device data extractions, examination, and investigative services for a number of federal agencies including the United States Secret Service, Federal Bureau of Investigation, Bureau of Alcohol Tobacco and Firearms, Department of Health and Human Services, Social Security Administration and the U.S. Department of Homeland Security Investigations, as well as local police and sheriff's departments across the Commonwealth of Virginia.

## EDUCATION

**LIBERTY UNIVERSITY**
B.S., Criminal Justice, May 2010

## Testimony

I have provided investigative testimony in more than 200 court appearances over the past 22 years as a sworn law enforcement officer in both state and federal court. Most of the cases that I have testified in from 2011 to present were related to criminal investigations I conducted and/or subsequent digital forensic examinations that I performed on computers and mobile devices related to various criminal offenses. The cases listed below are cases in which I was qualified as an expert and provided testimony as an expert in the field of digital forensics.

**Circuit Court, Bedford County, Virginia**

*Commonwealth v. Kevin Soto-Bonilla – CR17000350 - Capital Murder – 2019.* Provided expert trial testimony leading to a conviction of my acquisition and examination of multiple mobile devices and WhatsApp communications tying defendant's involvement related to a MS-13 gang related homicide.

*Commonwealth v. Victor Rodas – CR17000180 - Capital Murder – 2018.* Provided expert testimony of my acquisition and examination of multiple mobile devices and WhatsApp communications tying defendant's involvement related to a MS-13 gang related homicide.

**Circuit Court, City of Lynchburg, Virginia**

*Commonwealth v. Gary Hicks – CR16000089 – Possession of Child Pornography – 2016.* Provided expert trial testimony leading to a conviction concerning child sexual exploitation material located on defendant's computer.



**Circuit Court, Amherst County, Virginia**

*Commonwealth v. Edward Leroy Marshall, JR. – CR15M15271-03  - 2nd Degree Murder- 2016*, Provided expert testimony leading to a conviction, related to cellphone data connecting the defendant to the homicide.

*Commonwealth v. Cordell Carter – CR14015034-01 – 1st Degree Murder – 2014*. Provided expert testimony leading to a conviction, related to cellphone data connecting the defendant to the homicide.

**Circuit Court, Campbell County, Virginia**

*Commonwealth v. Darrell Wayne Delp – CR14000085 – Agg Sexual Battery of multiple children <13 and Possession of Child Pornography – 2014.* Provided expert trial testimony leading to a conviction, concerning child sexual exploitation material created by defendant which was found on defendant's computer and additional digital media.

**Juvenile & Domestic Relations Court, Nelson County, Virginia**

*Commonwealth v. Kenneth Alan Spratt – CR14000065 - Object Sex Pen: Victim <13 and Possession of Child Pornography – 2014*. Provided expert testimony during a preliminary hearing leading to a guilty plea and conviction, concerning child sexual exploitation material created by defendant which was found on defendant's computer and additional digital media.

## CERTIFICATIONS

Certified Cyber Crime Examiner (3CE), National White-Collar Crime Center (NW3C), January 2019 to Present

Cellebrite Certified Physical Analyst (CPOSESSION OF CHILD PORNOGRAPHYA), June 2017 to Present

Cellebrite Certified Operator (CCO), September 2015 to Present

BlackBag Technologies Blacklight Certified Examiner (BCE), July 2015 to Present

Virginia Certified Law Enforcement Officer, Virginia Department of Criminal Justice Services, June 1999 to Present

DME Forensics, DVR Examiner User Certification, September 2017 to 2019

AccessData Certified Examiner (ACE), April 2012 to 2015

## PROFESSIONAL AND CIVIC AFFILIATIONS

Senior Vice President, Blue Ridge Chapter, Virginia Police Benevolent Association, June 2018 to Present

Associate Member, Association of Certified Fraud Examiners (ACFE), December 2018 to Present

Member, High Tech Crime Investigator's Association (HTCIA), Mid-Atlantic Chapter, March 2017 to Present

Member, Virginia Commonwealth's Attorney's Services Council, Cybercrime Task Force, 2018 to 2019

Affiliate Member, Southern Virginia Internet Crimes Against Children Task Force, 2011 to 2019

Regional Director, Central Shenandoah Region, Virginia Gang Investigator's Association, 2006 to 2019

LPD Member, Lynchburg Sexual Assault Response Team, March 2011 to March 2019

President, Blue Ridge Chapter, Virginia Police Benevolent Association, June 2012 to June 2018

Treasurer/Board Member, Big Brothers & Big Sisters of Central Virginia, June 2011 to December 2017

Founding Member of Youth Education and Support (YES) Program, 2005 to 2006

LPD Member, Lynchburg Sexual Assault Response Team, 2011 to 2019

## DIGITAL FORENSIC TRAINING

**SANS Institute**

September 2019: FOR508: Advanced Incident Response, Threat Hunting, and Digital Forensics

**National Computer Forensic Institute**

February 2018: Network Intrusion Response Program (NITRO)

June 2016: Paraben Mobile Forensics

September 2015: Mobile Device Examiner Course (MDE)



**Teel Technologies**

November 2017: In-System Programming (ISP) for Mobile Devices

**National White Collar Crime Center (NW3C)**

September 2016: Basic Network Intrusion Investigations

August 2016: Intro to Computer Networks

November 2015: Macintosh Forensic Analysis

July 2013: iDevice Forensics

July 2013: Macintosh Triage and Imaging

June 2013: Windows Internet Trace Evidence

May 2013: Windows Artifacts

March 2012: Intermediate Data Recovery & Acquisition

August 2011: Basic Data Recovery & Acquisition (BDRA)

**Digital Intelligence**

April 2012: AccessData Bootcamp

September 2011: EnCase Versatile Preservation & Examination Responder (VPER)

September 2011: Digital Forensics w/ FRED

## AWARDS AND RECOGNITION

Lynchburg Commonwealth's Attorney's Office, Outstanding Police Service Award, Digital Forensics, May 2016

Lynchburg Police Department, Meritorious Service Award, Digital Forensics, May 2016

United States Secret Service, Certificate of Appreciation for Digital Forensic Work, May 2015

Federal Bureau of Investigation, Certificate of Appreciation for Digital Forensic Work, May 2015

U.S. Social Security Administration OIG, Letter of Commendation for Digital Forensic Work, July 2012

Over 100 Lynchburg Police Department Commendations, January 1999 to 2019

## TEACHING AND PRESENTATIONS

General Instructor, Virginia Department of Criminal Justice Services, June 2003 to December 2020

Investigations Instructor, Central Virginia Criminal Justice Academy Digital Forensic Investigations, 2012 to 2019

Gang/Organized Crime Investigations Instructor, Central Virginia Criminal Justice Academy Basic/In-Service Police Academy, 2006 to 2015

Criminal Justice Course Instructor, Liberty University, 2012

Gang Identification Instructor, Virginia Attorney General's Office, 2012

Background Investigations Instructor, Southwestern Virginia Criminal Justice Academy

Virginia Forensic Nurses Annual Conference, November 2009

Virginia Commonwealth Attorney's Service Council, January 2009

Strategic Therapy Associates Annual Conference, May 2008

Virginia Crime Stoppers Annual Conference, 2007

# EXHIBIT C TO LETTER

ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

*Co-Lead Plaintiffs' Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK (NC) |
| | **MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** |
| | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |

On October 31, 2016, Magistrate Judge Cousins issued a discovery order requiring thirty plaintiffs to produce their PCs, laptops, and tablets for mirror imaging.  (Friedman Decl., Ex. 1.)

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████  If upheld, this order would mark the first time data breach victims have been subjected to intrusive forensic inspections of their personal devices, and would likely chill future participation in this and other data breach litigation.

Plaintiffs respectfully request that the Court set aside the order, as Judge Cousins applied the wrong legal standard.  The law requires a heightened showing of good cause before private individuals may be compelled to provide mirror images of their personal devices—in recognition of the vast compendia of private information that such mirror images inevitably contain.  Judge Cousins failed to apply this heightened standard, and as a result allowed Defendants to proceed with what he termed a "fishing expedition."  If Defendants were not requesting that Plaintiffs' digital devices be cloned, such a fishing expedition might be permissible.  There is a possibility, however slight, that one of the rare forms of PC crimeware capable of exfiltrating data was installed on a plaintiff's computer around the time of the Anthem data breach.  If that crimeware were still detectible two years later, its existence could be relevant under one of the three damages theories Plaintiffs are pursuing.  But when the form of discovery sought involves mirroring every bit of digital information on Plaintiffs' devices, a different standard is required—a higher standard of relevancy that should have been applied below.

The discovery order could also be set aside on two other grounds.  The first is that the underlying document request Defendants moved to enforce was legally impermissible.  It sought to require Plaintiffs to generate new data that would be provided to Defendants, even though Rule 34 only authorizes a party to request things already in existence.  The second is that, even if mirror images were not involved, Judge Cousins could not weigh the relevance and intrusiveness of the protocol Defendants are now requesting without first knowing what that analysis would entail.

Plaintiffs appreciate that Judge Cousins was trying to accommodate Defendants, who have scaled back what they are asking for, with the close of discovery in the offing.  But Defendants'

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
Case No:  15-md-02617-LHK (NC)

1   proposal still involves the highly-invasive and unsettling procedure of cloning Plaintiffs' digital

2   devices.  Judge Cousins's earlier observation still applies: "there is an Orwellian irony to the

3   proposition that in order to get relief for a theft of one's personal information, a person has to

4   disclose even more personal information, including an inspection of all his or her devices that

5   connect to the internet."  (4/8/16 Order [Dkt. No. 502] at 2.)  Mirror imaging of digital devices by

6   independent experts is reserved for "extreme situations" under the law, such as when a particular

7   computer is the subject of the lawsuit.  Data breach cases have never before been found to pose

8   such an "extreme situation," but it will undoubtedly become common for defendants to demand

9   mirror imaging of plaintiffs' devices in future data breach cases if this discovery order is permitted

10  to stand.  Plaintiffs accordingly urge the Court to exercise its authority under Rule 72(a) and set

11  aside the present discovery order as contrary to law.

12          **A.      Judge Cousins Applied The Wrong Legal Standard.**

13          Under Rule 72(a), the Court is empowered to modify or set aside Judge Cousins' discovery

14  order if it is "clearly erroneous or contrary to law."  The Court's review of the underlying factual

15  determinations should be deferential, but its review of the underlying law is *de novo* (as is its

16  review of mixed questions of law and fact), and the Court should reverse if it finds that Judge

17  Cousins applied the wrong legal standard or failed to apply relevant case law.  *See Silicon Storage*

18  *Tech. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* No. 13-CV-05658-LHK, 2015 WL 5168696,

19  at *4 (N.D. Cal. Sept. 3, 2015) ("a magistrate judge's legal conclusions are reviewed *de novo* to

20  determine whether they are contrary to law"); *Ingram v. PG&E,* No. 12-CV-02777-JST, 2013 WL

21  6174487, at *2 (N.D. Cal. Nov. 25, 2013) ("Mixed questions of fact and law are reviewed *de*

22  *novo*."); *J & J Sports Prods. v. Bracamontes*, No. 11-CV-03713 YGR, 2013 WL 1149742, at *2

23  (N.D. Cal. Mar. 19, 2013) ("A legal conclusion is 'contrary to law' if the magistrate judge applies

24  the wrong legal standard"); *U.S. v. Cathcart*, No. C 07-4762 PJH, 2009 WL 1764642, at *2 (N.D.

25  Cal. June 18, 2009) ("A decision may be contrary to law if it fails to apply or misapplies relevant

26  statutes, case law, or rules of procedure").

27          Here, Plaintiffs contend that Judge Cousins applied the wrong legal standard and failed to

28  apply relevant case law governing requests to mirror image a party's personal computer.  Our

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
Case No:  15-md-02617-LHK (NC)

personal computers, laptops, and tablets contain a running digital diary of our activities: they catalog the webpages we visit, track our internet searches, log our emails with friends and family (and attorneys), and store photographs and videos of loved ones.  Accordingly, the law requires a "heightened showing of good cause" before parties may be compelled to produce mirror images of their digital devices.  *Cefalu v. Holder*, No. 12-0303 TEH (JSC), 2013 WL 4102160, at *1 (N.D. Cal. Aug. 12, 2013).  "[C]ourts have allowed independent experts to obtain and search a 'mirror image' of a party's computer equipment," only in the "extreme situation where data is likely to be destroyed or where computers have a special connection to the lawsuit." *Memry Corp. v. Kentucky Oil Tech., N.V.*, No. C04-03843 RMW (HRL), 2007 WL 832937, at *3 (N.D. Cal. Mar. 19, 2007).

Judge Cousins's order does not address this heightened standard, much less conclude that Defendants have satisfied it.  In fact, Judge Cousins evaluated the parties' respective expert testimony and concluded that Defendants are on "a fishing expedition."  (Friedman Decl., Ex. 2 at 30.)  Defendants claim that mirror images will be used to assess the existence of malware on Plaintiffs' devices, and those assessments might reveal that someone other than Anthem stole and monetized Plaintiffs' identities.  (*Id.* at 14.)  They submitted expert testimony showing that hackers could have used keystroke loggers to capture everything typed into a Plaintiff's computer.  That may be theoretically true, but the vast majority of malware detected by off-the-shelf software is "adware."  (*Id.*, Ex. 5 (Karabelnik Decl.), ¶ 7.)  And even when "crimeware" is detected, it is seldom a keystroke logger or other program capable of extracting personal data.  (*Id.*, ¶¶ 8, 10.)  It simply is not economically rational for hackers to infiltrate personal computers one-by-one and laboriously collect individual PII.  (*Id.*, ¶¶ 14-18.)  That is why hackers target the large compilations of PII maintained by corporations like Anthem.  (*Id.*, ¶ 15.)  Finally, even if this exceedingly rare (and economically inefficient) form of crimeware was on Plaintiffs' computers around the time of the Anthem data breach, it would be long gone and undetectable at this point.  (*Id.*, ¶¶ 12-13.)  There is, in other words, a very low chance that Defendants' requested discovery would lead to relevant information.  Defendants truly are engaged in a fishing expedition, and while fishing expeditions may be permitted from time to time under ordinary circumstances, they are not permitted under the heightened standard of good cause applicable here.

3

Instead of assessing whether Defendants had demonstrated heightened good cause for imaging Plaintiffs' digital devices, as required by case law like *Cefalu* and *Memry*, Judge Cousins permitted Defendants to proceed based on a finding that their current imaging request is less intrusive than their prior imaging request.  (*Id.*, Ex. 1 at 2.)  He cited three reasons: (1) the devices will be provided to a third-party examiner, not Anthem; (2) handheld devices are excluded; and (3) production will be limited to 30 plaintiffs.[1]  (*Id.*)  These caveats do not change the legal standard, however; Defendants are still seeking mirror images and so still must make a heightened showing of good cause.  As the *Memry* court found, mirror images should be ordered only in "extreme situation[s]"—even when the proposal is that the image be produced only to "a third party consultant pursuant to a protocol to be determined by the parties or the court."  *Memry*, 2007 WL 832937 at *3.  Turning over a forensic record of one's entire digital life is invasive regardless of who receives it.  Whether Defendants or one of the consultants suggested by Defendants takes custody, either way Plaintiffs are losing control over their most personal of details (and will be devoting several hours while their devices are imaged).  Similarly, the fact that Defendants would not be imaging each and every one of plaintiffs' devices does not diminish the invasiveness of those mirror images that would be created.  Judge Cousins was required to assess whether Defendants' had satisfied the heightened legal standard set forth in *Cefalu* and *Memry* before *any* mirror images could be compelled.  Because he failed to do so, his order compelling the creation of mirror images of thirty plaintiffs' digital devices is contrary to law and should be set aside.

## B. Judge Cousins's Order Is Contrary To Law In Other Respects As Well.

Plaintiffs believe that Judge Cousins's order is contrary to law and should be set aside for two additional reasons as well.  The first is that the subject of Defendants' motion to compel, Request for Production No. 33, does not comply with the federal rules.  It calls for Plaintiffs to create and produce data that is not yet in existence—namely, the results of an unidentified malware program that is to be run on their digital devices.  (Friedman Decl., Ex. 4.)  But "Rule 34 cannot be used to require the adverse party to prepare, or cause to be prepared, a writing to be

---

[1]   The 30 Plaintiffs covered by the Order are *not* limited, however, to those who have alleged damages as the result of identity theft related to the Anthem data breach.

4

1   produced for inspection … it can only be used to require the production of things in existence."

2   *Lamon v. Adams*, No. 1:09-CV-00205-LJO, 2015 WL 1879606, at *3 (E.D. Cal. Apr. 22, 2015).

3          The second reason is that Request No. 33 included no information about the forensic scans

4   to be used, it simply asked for "a program to be agreed upon by Plaintiffs and the Anthem

5   Defendants."  (Friedman Decl., Ex. 4.)  This is important because the results of the scans will be

6   conveyed to Defendants, and so even if mirror images were not involved, the Court could not

7   accurately evaluate either the relevance or the intrusiveness of this information under Rule

8   26(b)(1) without knowing what it would contain.  After briefing was complete, Defendants

9   submitted a proposed protocol (adopted in pertinent part by Judge Cousins) that included examples

10  of scanning software that will detect far more than the specific type of crimeware Defendants say

11  they are looking for.  (*Id.*, Ex. 6.)  One problem with using overly-broad scans is that they detect

12  files—like website tracking cookies and adware—whose names alone reveal information about

13  Plaintiffs' internet browsing history.  (See *id.*, Ex. 5, ¶¶ 4-5, 7.)  Another is that finding any

14  "malware"—including these relatively benign tracking cookies or adware—authorizes the forensic

15  examiner to "confer" with Defendants, to potentially run a "root cause analysis" that could probe

16  deep into Plaintiffs' internet, email, and download histories, and to convey the results of that

17  analysis to Defendants in a summary report.  (*Id.*, Ex. 1 at 3-4.)  ████████████████

18  ██████████████████████████████████████████████

19  ████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ██████████████████████████████████████████

22          While Plaintiffs are asking the Court to set aside the present discovery order, they do not

23  rule out the possibility that Defendants could propose a protocol that (i) would not require mirror

24  imaging, (ii) would involve remotely scanning devices for crimeware capable of exfiltrating PII

25  only, and (iii) would exclude private information from the results conveyed to Defendants.

26  Request No. 33 and Defendants' later proposed protocol do none of this, however, and in the many

27  conversations the parties have had in an effort to reach a compromise, Defendants have never

28  moved off their intrusive demand that Plaintiffs' devices be mirror imaged.

5

Respectfully Submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**
ANDREW N. FRIEDMAN
GEOFFREY GRABER
SALLY M. HANDMAKER
ERIC KAFKA

Dated:  November 4, 2016          By: /s/ Andrew N. Friedman

**ALTSHULER BERZON LLP**
EVE H. CERVANTEZ
JONATHAN WEISSGLASS
DANIELLE E. LEONARD
MEREDITH A. JOHNSON

Dated:  November 4, 2016          By: /s/ Eve H. Cervantez

*Co-Lead Plaintiffs' Counsel*

**GIRARD GIBBS LLP**
ERIC GIBBS
DAVID M. BERGER
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:  (510) 981-4800
Facsimile:   (415) 981-4846

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
MICHAEL W. SOBOL
NICOLE D. SUGNET
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Plaintiffs' Steering Committee*

6

1

**SIGNATURE ATTESTATION**

2

     Pursuant to Civil L.R. 5(i)(3), I hereby attest that concurrence in the filing of this

3

document has been obtained from the signatories shown above.

4

                                    */s/ David Berger*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LORALEE GIOTTA, et al., | Case No. 15-MD-02617-LHK |
| Plaintiffs, | **ORDER RE: MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** |
| v. | |
| ANTHEM, INC., et al., | Re: Dkt. No. 630 |
| Defendants. | |

On November 4, 2016, Plaintiff filed a motion for Relief from Nondispositive Pretrial Order of Magistrate Judge. The Court finds that a response to the motion is unnecessary, and the Court will not order a briefing schedule. Instead, the Court will allow the 14-day period under Civil Local Rule 72-2 to lapse, after which the motion will be deemed denied.

**IT IS SO ORDERED.**

Dated: November 17, 2016

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No. 15-MD-02617-LHK
ORDER RE: MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE