```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3  IN RE:                         :    Civil Action
                                   :    No. PWG-19-MD-2879
 4  MARRIOTT INTERNATIONAL, INC.,  :
    CUSTOMER DATA SECURITY BREACH  :
 5  LITIGATION                     :    MOTIONS HEARING
    _____         _____
 6
                     TRANSCRIPT OF PROCEEDINGS
 7             BEFORE THE HONORABLE PAUL W. GRIMM
                  UNITED STATES DISTRICT JUDGE
 8            WEDNESDAY, APRIL 20, 2022; 9:30 A.M.
                      GREENBELT, MARYLAND
 9
                     A P P E A R A N C E S
10
    FOR THE CONSUMER PLAINTIFFS:
11
          COHEN MILSTEIN SELLERS & TOLL, PLLC
12             BY:  ANDREW FRIEDMAN, ESQUIRE

13        DiCELLO LEVITT GUTZLER, LLC
               BY:  AMY KELLER, ESQUIRE
14
          HAUSFELD, LLP
15             BY:  JAMES PIZZIRUSSO, ESQUIRE

16  FOR DEFENDANT MARRIOTT INTERNATIONAL, INC.:

17        BAKER and HOSTETLER, LLP
               BY:  DANIEL WARREN, ESQUIRE
18             BY:  GILBERT KETELTAS, ESQUIRE
               BY:  LISA GHANNOUM, ESQUIRE
19
    FOR DEFENDANT ACCENTURE, LLP:
20
               BY:  DEVIN ANDERSON, ESQUIRE
21        KIRKLAND & ELLIS, LLP

22  ***Proceedings Recorded by Mechanical Stenography***
          Transcript Produced By Computer-Aided Transcription
23  _____

24             MARLENE KERR, RPR, RMR, CRR, FCRR
                  FEDERAL OFFICIAL COURT REPORTER
25                 GREENBELT, MARYLAND 20770
                        (301)344-3499
```

1                   P R O C E E D I N G S

2        (Call to Order of the Court.)

3            THE COURTROOM DEPUTY:  May I have your attention,

4   please.  The United States District Court for the District of

5   Maryland is now in session, the Honorable Paul W. Grimm

6   presiding.

7            THE COURT:  Good morning, everybody.

8        (Counsel replied: Good morning, Your Honor.)

9            THE COURTROOM DEPUTY:  The matter now pending before

10   this Court is civil number PWG-19-2879, Marriott International,

11   Inc. versus -- oh, excuse me -- Customer Data Security Breach

12   Litigation.

13            THE COURT:  All right.  Let me remove my mask.  The

14   policy in the court now, which is always subject to change

15   depending upon what the pandemic data is, is that if you have

16   been vaccinated and if you are not feeling ill, you may remove

17   your mask when speaking; otherwise, you must keep your mask on.

18   And people in the audience, of course, who are not speaking do

19   have to keep their masks on.

20        If you're going to stand when you argue, which is

21   something that comes naturally after a while, we should

22   probably get a lavaliere on you because if you don't stay close

23   up on these microphone, you get six, eight inches away, you

24   can't hear.  The court reporter can't hear and I can't hear.

25   So otherwise, you're welcome to sit.  That doesn't come

1   naturally to most people.  So if you are going to stand, we'll

2   have you with a lavaliere mic.

3       I understand we have quite a few people here today.  I

4   will -- I don't want to take an hour and a half just to get

5   counsel's identification on the record.  Who is going to be

6   speaking on behalf of the parties here today?  Who will be

7   arguing on behalf of the plaintiffs?

8           MR. FRIEDMAN:  Your Honor, on behalf of the

9   plaintiffs, Andrew Friedman with Cohen Milstein, but I will be

10  ably assisted by Ms. Keller and, perhaps, Mr. Pizzirusso

11  depending upon Your Honor's questions.

12          THE COURT:  Okay, great.  Thank you.

13      And for the defendants, please.

14          MR. WARREN:  Your Honor, this is Dan Warren.  And,

15  first of all, thank you for accommodating me by video this

16  morning.  I appreciate that.

17          THE COURT:  Oh, no, no.  Absolutely.  I hope you're

18  feeling all right.  It's -- your case is a cautionary reminder

19  that although all of us are tired of the virus, the virus is

20  not yet tired of all of us.  So I hope you're feeling all

21  right, sir, and I'm happy that we could accommodate you this

22  way.

23          MR. WARREN:  I am well and thank you.

24      I will be speaking on behalf of Marriott, and this morning

25  we would like to share the argument on the Marriott team.

 1          THE COURT:  Sure.

 2          MR. WARREN:  Mr. Keteltas and Ms. Ghannoum will also

 3  be speaking.  And I can identify --

 4          THE COURT:  No, no, no.  I'll leave it to you to

 5  handle the portions of it as you see fit once the plaintiffs

 6  have finished their argument.

 7          MR. WARREN:  Okay, thank you.

 8          THE COURT:  And do keep your voice up, sir, so that

 9  we can all hear you as well.

10          MR. WARREN:  I will.  Thank you.

11          THE COURT:  All right.

12      And, Counsel, you can see on the screen so that when

13  counsel is speaking, Mr. Warren is speaking, that you can hear

14  him and see him as well.

15      So with that in mind, I'm happy to hear from the

16  plaintiffs.

17          MR. FRIEDMAN:  Thank you, Your Honor.  Again, Andrew

18  Friedman with Cohen Milstein Sellers & Toll on behalf of the

19  bellwether classes and the plaintiffs.

20      Your Honor, we've moved to certify three types of

21  bellwether classes; the negligence classes, the consumer

22  protection classes, and the breach of contract classes.  The

23  negligence classes are under Florida, Georgia, Maryland,

24  Connecticut; and for Connecticut and Georgia, there is also a

25  negligence, per se, class.  The definition of those are in the

1   briefs, but, simply put, they are all natural persons residing

2   in each of those states whose personal information was given to

3   Starwood in connection with the making of reservation at a

4   Starwood property, and that information was compromised in the

5   data breach that was announced by Marriott on November 30th of

6   2018.

7        The consumer protection classes include the California UCL

8   class, the Maryland CPA class, and the New York GBL class, and

9   those are for all natural persons residing in each of those

10  states who actually paid for a stay at a Starwood property and,

11  again, whose information was given to Starwood and lost in the

12  data breach.

13       The fourth Consumer Protection Act claim is actually under

14  the Michigan Identity Theft Protection Act, and that doesn't

15  require anyone to have actually paid for their purchase, just

16  that they gave their information; again, for people in

17  Michigan.

18       And, finally, you have the contract classes.  There are

19  contract -- breach of contract classes under both Maryland and

20  New York law, and there are subclasses for each for class

21  members that paid for their stays.

22       Before we get into the details of why these classes meet

23  the strict requirements of Rule 23, I would like to turn over

24  the podium to my colleague Amy Keller who is going to discuss

25  some of the factual issues that we've learned in discovery but

1    also will address the breach of contract claim, the contract at

2    issue.

3              THE COURT:  Okay.  Could I ask a question,

4    Mr. Friedman, that you or one of your colleagues can help me

5    with?  I understand that the liability theories are the

6    negligence and consumer breach of contract claims for the

7    various states that you have indicated.  There is also

8    classwide damages that you are seeking, and we spent much time

9    last month with the experts on that.

10        And can you clarify -- the classwide damages, of course,

11   the plaintiffs seek are two different theories that Dr. Prince

12   has set forth in his disclosures.  One was the overpayment

13   theory and the other one was the inherent value or market value

14   of personal identifying information.

15        Are you -- can you help me understand whether you are

16   seeking benefit of bargain damages only for consumer and breach

17   of contract claims or also for negligence claims?

18              MR. FRIEDMAN:  Your Honor, I will clear that up in a

19   second.  With regard to the negligence claims, we are not

20   seeking benefit of bargain damages.

21              THE COURT:  Okay.  All right, it was logical to me

22   but I didn't want to assume something.  I just wanted to make

23   it clear.

24              MR. FRIEDMAN:  Thank you.

25              THE COURT:  Thank you, sir.

1            MS. KELLER:  Good morning, Your Honor.

2            THE COURT:  Good morning.

3            MS. KELLER:  Amy Keller of DiCello Levitt Gutzler in

4    Chicago on behalf of plaintiffs and the punitive class members.

5            THE COURT:  So we need to lavalier if you could,

6    please.

7            MS. KELLER:  Okay.  Or I could just squat, Your

8    Honor.  Whatever works for the Court.

9            THE COURT:  No, I don't want you to --

10           MS. KELLER:  Fair enough, Your Honor.

11           THE COURT:  It's not high enough to make it

12   comfortable to argue.  Do try to get the microphone as close to

13   you as you can.  All right.

14           MS. KELLER:  I'm mindful of the feedback issue so if

15   everyone --

16           THE COURT:  We'll see if we can adjust it from up

17   here so that you don't have to --

18           MS. KELLER:  Sure.

19           THE COURT:  Go ahead.

20           MS. KELLER:  Okay.  So does this sound okay now?

21           THE COURT:  Yes.

22           MS. KELLER:  Wonderful.

23      Okay, so I wanted to briefly begin, Your Honor, by

24   explaining what we've learned in discovery, covering some very

25   high points of classwide proof before the Court.  Now,

1    Plaintiffs have filed a publicly available redacted version of

2    their memorandum in support of their motion for class

3    certification, which appears at ECF number 858-1.  And while

4    Judge Facciola has issued a report and recommendation

5    concerning evidence that -- an argument that he believed should

6    no longer be under seal, and that's at ECF 1003, the time for

7    objecting to that report and recommendation has not yet run.

8         So I'm very mindful about the issues that I'm going to

9    address in open court today, and I've already discussed with

10   Marriott that if I start to edge too closely to those issues

11   that are filed under seal, that we would let each other know.

12   Of course, whatever the Court would like to do in this regard,

13   we're happy to abide by.  The only thing is the protective

14   order in place just doesn't cover what to do in circumstances

15   such as this.

16        THE COURT:  Well, I understand.  You all have seen

17   the challenged information, and until the briefing is complete,

18   I haven't turned my attention to it.  But my view is this:  All

19   those confidentiality designations don't mean a thing once you

20   start on the record to determine things that are necessary to

21   rule.  So as far as I'm concerned, whatever the confidentiality

22   order said, it's superseded by the need for counsel to be able

23   to not be cryptic when their talking to me today.

24        And whether Judge Facciola's report, recommendations is

25   affirmed as issued, modified, or rejected, for purposes of

1    today, if people are going to argue information dealing with

2    the class certification, then I don't want them to be tap

3    dancing around information that could be more plainly set

4    forth.  All right?

5              MS. KELLER:  Understood, Your Honor.  We just want to

6    be, of course, very mindful that information concerning our

7    named plaintiffs not be put on the docket all in one place.

8              THE COURT:  Well, I mean, obviously, if there is a

9    telephone number or social security number, I don't need that.

10             MS. KELLER:  Sure.

11             THE COURT:  So it's not information that's likely to

12   put someone in harm's way in terms of having their identity

13   subject to being identified in a way that would be harmful.

14   But I do want to make sure I understand what people are arguing

15   today.

16             MS. KELLER:  Of course.  And we appreciate that, Your

17   Honor.

18        So that all being said, I will mostly discuss information

19   that's on the public record.  But, to use your words, Your

20   Honor, I won't tap dance around the facts, and I'll try to

21   present things in a way that's very easy to follow.

22        As we detail in our brief, there were four easily

23   preventable security failures that led to the catastrophic

24   four-year breach at Marriott that exposed information in the

25   NDS database -- and that stood for New Data Storage database --

1  from the year 2002 moving forward.  The first of which, Your

2  Honor -- and the reason why I'm going through all of this is

3  because this is common classwide proof, which Plaintiffs will

4  use at trial to prove their theory of the case and their theory

5  of liability.

6       The first one of those easily preventable security

7  failures is multifactor authentication.  Defendants in this

8  case failed to implement multifactor authentication to control

9  access to servers containing personal identifying information.

10 And we'll refer to that as PII throughout this morning.

11          THE COURT:  And this, I mean -- Counsel, does anybody

12 object -- if I'm going to interrupt with questions, I'm just

13 going to keep my mask off.  Does anybody have a problem with

14 that?  If I get to a point where I've fallen asleep, which I

15 hope not to do, or I think there is no area I want to ask

16 about, I'll put it back on, but it becomes a little bit

17 awkward.

18      Your position will be that if I agree with your motion on

19 class certification, that all of these four things you're about

20 to explain to me would fall under a duty of care that could be

21 shown by some -- either by expert testimony or by industry

22 standards or other sources that would show that there was a

23 duty and a breach of that duty.  Is that right?

24          MS. KELLER:  Correct, Your Honor.  And, actually,

25 it's supported by the expert report of Mary Frantz, which we

1   have attached to our class certification motion.  In that

2   report, she has about 132 pages or so of substantive

3   information as it relates to this breach where she goes through

4   industry standards, information that she reviewed in the

5   record, the PFI report that was prepared by Verizon that Your

6   Honor is very familiar with because he had to rule on that with

7   regard to the security plaintiffs, right.

8        So Mary Frantz goes through in explicit detail all of the

9   industry standards, as well as the discovery in this case to

10  support these four findings.  And importantly, Your Honor,

11  Marriott doesn't necessarily dispute Ms. Frantz's findings.

12  Instead, it has arguments with regard to how it passed certain

13  limited reviews or audits, but it offers no evidence in

14  rebuttal to Ms. Frantz's reports, no actual testimony, expert

15  testimony of their own to combat what Ms. Frantz is saying.

16       So we think her report is actually very powerful in

17  pointing out these four failures, the first of which, Your

18  Honor, is multifactor authentication, also known as MFA

19  sometimes.  And that's a powerful well-recognized tool that's

20  been around for a very long time, and essentially, Your Honor,

21  it prevents a hacker from getting into a system with just

22  simply a password.

23       You may be familiar with this where you try to log into

24  email accounts and you get a text message on your phone and you

25  have to enter a security code.  That is one example of

1  multifactor authentication.

2      In this case and in this breach, multifactor

3  authentication was not enabled, and Marriott was warned about

4  this several times throughout the course of the discovery that

5  we've been finding out for several years leading up to the

6  breach.  So the fact that it didn't have multifactor

7  authentication on the relevant accounts that had access to the

8  PII in this case is very important, and it could have easily

9  prevented or at least made it, the breach, less catastrophic.

10      The other large failure that Ms. Frantz points out is too

11  many accounts at Marriott had overdesignated privileges.  And

12  what does that mean?  Well, as we detailed in our brief, Your

13  Honor, one example of privileged is, for example, in this case.

14  We have access to documents filed under seal in this case, but

15  we don't have access to documents filed under seal in other

16  cases.  That's one really great example of privileged accounts

17  and how you should make the privileges only necessary to the

18  type of work that you are doing.

19      Marriott had many overprivileged accounts and was warned

20  about it back in 2014.  And as we found in discovery --

21          THE COURT:  So that's sort of a need-to-know concept,

22  that you should only have privileges consistent with

23  information you need to know to do your function but not have

24  access to information that is not necessary for you to have

25  access to?

1          MS. KELLER:  Exactly right, Your Honor.  And you're

2     catching onto this much quicker than I actually did.

3          So Marriott knew that it had -- it was warned back in 2014

4     that too many accounts had -- were overprivileged access, and

5     two years later, in 2016, we found out in discovery that it

6     still hadn't started to engage in the account cleanup.  If it

7     had been engaging in account cleanup and it had only allowed

8     certain accounts to have privileged access to certain

9     information, that also could have mitigated the severity of the

10    breach and the kind of access that the hacker had to personally

11    identifiable information in this case.

12         The third failure is Marriott's failure to monitor or log

13    alerts on accounts that had access to this sensitive

14    information.  So not only do you have people being able to log

15    into accounts with a simple password and not two factor

16    authentication; you have overprivileged accounts where you have

17    access to lots of information and then you don't have the login

18    available to let you know when people are accessing types of

19    information or when they are putting together large files for

20    exportation.

21         And this is important because if a hacker gets into one

22    part of your system, you can catch her before she moves

23    laterally into another part of the system.  Additionally, it

24    helps you piece together the information after a hacker gains

25    access to the system.

1       If you are keeping logs of the types of access to your

2  accounts, you'll be able to determine what a hacker had access

3  to.  The problem was Marriott didn't have these logs, these

4  alerts turned on.  So after the fact, it really didn't know

5  some of the problems that it had with the attack.  It wasn't

6  alerted when the attack occurred, and it only knew about the

7  attack four years after it occurred.  So this was also a major

8  problem, Your Honor.

9       And then finally, Defendant's encryption of sensitive

10  information was woefully deficient.  Based upon the information

11  currently in the publicly available record, we can assert that

12  because Marriott's encryption was woefully deficient, it cannot

13  tell consumers that the hacker was unsuccessful in unencrypting

14  their sensitive information.  If sensitive information is

15  unencrypted, that allows the hacker to have an easier path to

16  allow -- I'm sorry -- to commit identity fraud and to commit

17  identity theft.

18       And one thing, Your Honor, that we noted is that there was

19  a suspicious file located within the other files on the

20  Marriott system that Marriott could not explain, and that

21  suspicious file suggested that the hacker actually was able to

22  unencrypt at least one credit card number because the hacker

23  had access to the master key to unencrypt the information and

24  that master key actually had not been changed since 2012.

25       So not only did Marriott have the same key that basically

1  allowed everything to be unencrypted, but that key, we think,

2  based upon the evidence available to us, was used to unencrypt

3  certain information; and we think that's an important fact that

4  the Court should note.

5       So those four issues -- and they are easily remediated,

6  Your Honor, by sophisticated companies, and, in fact, the

7  technology existed before the breach occurred to remediate

8  those issues and to implement controls and to adapt measures

9  that would have eliminated those security issues.  But Marriott

10 did not do those things.

11      And as I said before, our expert, Mary Frantz, has a very

12 detailed report where she not only goes through these failures

13 but she also has a comprehensive timeline of how the breach

14 occurred and the dates leading up to exfiltration of sensitive

15 information, when Marriott found out about the breach, and then

16 Marriott's woefully deficient response to the breach as well.

17 She basis that on a number of pieces of information,

18 including --

19           THE COURT:  Can I just interrupt one moment with my

20 apologies.

21      Is this our gentleman from the press with the laptop?

22 Good.  Okay, great.  I wanted to make sure that you had what

23 you needed on that and that that's the only person using the

24 digital materials.  But you're good to go, sir.

25      Thank you, ma'am.  Forgive me for interrupting.

1          MS. KELLER:  So, Your Honor, Ms. Frantz's expert

2    report goes through many key pieces of information, including

3    the payment card information, data security standard, PCI DSS

4    as they call it shorthand, and an assessment prepared by

5    Verizon dated December 2018, as well as previous PCI audits and

6    vulnerability assessments, the National Institute for Standards

7    and Technology, that's NIST, security and privacy protocols,

8    the payment card industry, forensic investigative report, which

9    I referred to earlier, the PFI report.  That was prepared by

10   Verizon after the breach.  And also the UK information,

11   Commissioner's Office report prepared in October of 2020

12   detailing specific findings about this breach.

13        So, Your Honor, we don't think that these facts are -- can

14   actually be disputed based upon the information in evidence and

15   the information -- or the report prepared by our expert, Mary

16   Frantz.  And, again, the defendants do not offer any kind of

17   expert report refuting any of those findings.

18        Your Honor, what Marriott and what Starwood do refute

19   are -- or what they do argue is that, okay, so there was a

20   breach but no harm, no foul.  That's their chief argument.  But

21   as Mr. Friedman will explain in a moment, that analysis ignores

22   the legal obligations defendants had to consumers to protect

23   their information, as well as our theory of damages, which we

24   covered in our last hearing before you and which you alluded to

25   at the beginning of this hearing.

1          Now, each one of our plaintiffs spent money on stays at

2     Starwood properties and did not receive the benefit of their

3     bargain in connection with the security of their sensitive

4     information.  And each one of our plaintiffs had their personal

5     information exposed in the breach, and each one of our

6     plaintiffs testified that they spent time on mitigation efforts

7     related to the breach.

8          The other thing the defendants argue is that --

9          THE COURT:  The mitigation efforts would not be part

10    of your classwide damages claim, right?

11         MS. KELLER:  Exactly right, Your Honor.

12         THE COURT:  So I understand that you have a plan for

13    how that would all be pulled together at a trial phase, but I

14    just want to make sure I'm clear about what is class liability,

15    class damages, and what is individualized.

16         MS. KELLER:  You are exactly right, Your Honor, and

17    we'll be covering that later as part of the trial plan.

18    Mr. Friedman will cover that with Mr. Pizzirusso's assistance

19    if necessary.

20         THE COURT:  Okay.  All right.

21         MS. KELLER:  So the plaintiffs argue that the

22    defendants owed them a duty to keep their sensitive information

23    safe.  Now, that duty comes from common law, various statutory

24    obligations, and then also, as we argue, the representations

25    that Marriott made in its privacy statement.

1          Now, Marriott doesn't argue that there were different

2     iterations of the privacy statement.  What they do argue is

3     that the -- there are different contracts which actually

4     control what we're talking about in this litigation.  They

5     argue that the contracts that they refer to, which would be the

6     SPG Program terms and conditions and then the website

7     agreement, that those contracts had different iterations

8     throughout the years.

9          But as we assert, the relevant portions of those

10    contracts, even if they did apply, are consistent.  And what

11    does matter is the language in the privacy statement, and the

12    privacy statement said that Marriott wouldn't keep data for

13    longer than was necessary and then it had security measures in

14    place to help protect data against accidental loss, misuse,

15    unlawful or unauthorized access disclosure or alteration while

16    under our control.

17          Now, the other thing that Marriott argues is that the SPG

18    Program terms and conditions and the website terms and

19    conditions have a class waiver.  But, Your Honor, it's our

20    position that those contracts don't apply because we're not

21    suing over the SPG Program's terms.  We're not litigating

22    whether Plaintiffs didn't get the points to which they were

23    entitled to or the fact that Marriott put them in a different

24    category of status that they would have been entitled to based

25    upon their hotel stays.  Those would be -- that would be a

1    lawsuit properly asserted under the SPG terms and conditions.

2        We're not bringing a lawsuit based on that.  We're

3    bringing a lawsuit based upon Marriott's failure to safeguard

4    data.

5        And then, Your Honor, when it comes to the website terms

6    and conditions, the website terms and conditions have nothing

7    to do with Plaintiffs' claims concerning reservations at

8    Starwood property's premerger, and they don't have anything to

9    do with the use of Marriott's current website.  So it's

10   important to remember that, Your Honor, when we're looking at

11   the conditions that actually control the terms of Plaintiffs'

12   lawsuit before you today, and it's our assertion that the SPG

13   terms and conditions and the website terms and conditions don't

14   control.  The privacy statement does.

15       Now, Marriott points to a few issues here and there as to

16   why a class cannot be certified, and Mr. Friedman will get to

17   those points when going through the specific provisions of Rule

18   23; but it's our position, Your Honor, that using the common

19   evidence that we've outlined before you, that we can present

20   this to a jury as one trial as to liability and then also

21   damages, as we've outlined before you in our last hearing.

22           THE COURT:  Ms. Keller, help me understand.  When you

23   say "liability," the elements that are swept into liability are

24   you saying is duty, breach, causation and then, of course,

25   damages are a separate matter?  Or are you limiting that to

1  duty and breach such that causation -- do you view causation as

2  being capable of being classwide common damages, as opposed to

3  individualized damages -- or individualized damages?  Excuse

4  me.

5         MS. KELLER:  Of course, Your Honor.  And Mr. Friedman

6  will, of course, cover this more extensively.

7         THE COURT:  They're putting a lot on you,

8  Mr. Friedman.

9         MR. FRIEDMAN:  I guess so.

10        MS. KELLER:  No, no, but --

11        THE COURT:  I hope you've been taking notes.

12        MS. KELLER:  This is what Mr. Friedman has

13  represented to me, but I'd be happy to cover it, too.

14     Causation, Your Honor, when it comes to Plaintiffs' theory

15  of liability and their theory of damages presented to you as to

16  what we can cover in a classwide trial is common because we

17  talk about benefit of the bargain, because we talk about

18  inherent value of PII.

19     Now, I understand Marriott has talked a lot in their

20  opposition brief about identity, theft, and fraud, but as we

21  talked about, those are issues for a separate matter.  That is

22  the (c)(4) part of class certification that we can present in

23  separate trials to Your Honor.  The important piece and the

24  bulk of the litigation that will drive this case toward

25  resolution, which is what you look at when you're examining

1  Rule 23, is going to be our damages for benefit of the bargain

2  and then also our damages for the value of personal

3  information.  And I think that's important to remember as Your

4  Honor rules on this.

5      Now, I realize I left a lot for Mr. Friedman.  So I'm

6  going to turn it back to him unless Your Honor has additional

7  questions for me.

8          THE COURT:  No, ma'am.  I'm good.  Thank you.

9          MS. KELLER:  Okay.  Thank you.

10          THE COURT:  All right, Mr. Friedman.  Earn your keep.

11          MR. FRIEDMAN:  Well, they put a lot of pressure.

12      Your Honor, I'm going to speak, as Ms. Keller already

13  noted, I'll speak to the (b)(3) issues, the 23(b) issues.

14          THE COURT:  Yeah, yeah.

15          MR. FRIEDMAN:  To the extent there are questions

16  about the trial plan or the (c)(4) issues that you noted,

17  Mr. Pizzirusso stands --

18          THE COURT:  Mr. Friedman, when do you that, would you

19  do me the favor of -- I'm sure everyone is aware when you get

20  in the Fourth Circuit and you get to (b)(3), you know, we spend

21  a lot of time on predominance and superiority.  But as part of

22  superiority or as a separate tag-along, the Fourth Circuit

23  talks about ascertainability.  I would appreciate your thoughts

24  on actually how you would ascertain the classes if classes are

25  certified.  I mean, the actual nuts and bolts of how you would

1  do that.

2           MR. FRIEDMAN:  I'll do my best, Your Honor.

3       So under Rule 23, Your Honor, the Court has to perform a

4  rigorous analysis to ensure that all of the prerequisites for

5  Rule 23 and class certification have been met.  We believe they

6  have obviously been met here.  Indeed, some of the

7  prerequisites are not contested.  There is no argument about

8  numerosity.  There is not even an argument about commonality.

9  Those are self-evident.

10      Under (a)(3) --

11          THE COURT:  My apologies again.  I'm going to ask

12  these as they come up because I'll forget otherwise.  I believe

13  it's clear in some of the subsequent briefing, but with regard

14  to your theory at least as it deals with classwide damages for

15  overpayment, that we're limiting the scope to either United

16  States or United States, Canada bookings, not international

17  bookings, correct?

18          MR. FRIEDMAN:  That's correct.

19          THE COURT:  All right.  I just wanted to make sure

20  about that.

21          MR. FRIEDMAN:  Sure.

22          THE COURT:  Go ahead, sir.  Sorry for the

23  interruption.

24          MR. FRIEDMAN:  No problem.

25      Under (a)(3), Your Honor, Plaintiffs have to show adequate

1  representation -- oh, I'm sorry.  They have to show typicality

2  and that really has easily been done here.  Each of the

3  representative class plaintiffs have made the same legal

4  arguments as other class members.  Each plaintiff has alleged

5  negligence stemming from the same duty as all members of the

6  proposed class based on the exact same facts and the same

7  breach and the exact same harm.

8       As you heard from Ms. Keller, every plaintiff with regard

9  to the breach of contract claims is talking about the same

10  contract, the privacy statement.  And in terms of negligence,

11  each of the defendants owed each of the plaintiffs and each

12  member of the class better security.

13       The only typicality argument that we heard in the papers,

14  we read in the papers had to do with the proposed Connecticut

15  negligence class representative Ms. Amarena.

16            THE COURT:  Right.

17            MR. FRIEDMAN:  She stayed at a Starwood property

18  only, according to them, in 2007, which is prior to the class

19  period and prior to the time, according to Accenture, that

20  Accenture became a Starwood contractor.  And that, according to

21  Accenture, somehow subjects her to a unique offense.

22            THE COURT:  You're saying that the cat was out of the

23  bag after 2017 through the time period so therefore --

24            MR. FRIEDMAN:  Well, it's more than that, Your Honor.

25  It's simply that it doesn't matter when you stayed at the

1  hotel.  Once Accenture came in and became the contractor, their

2  duty was to protect the information.  So if a class member or a

3  plaintiff actually stayed prior to the time Accenture got

4  involved, it doesn't matter.  Accenture was duty bound to make

5  sure that information didn't get out thereafter.  So it really

6  doesn't matter when they stayed.

7       Ms. Amarena was a foreseeable victim of Accenture's

8  negligence in protecting that information whether the

9  information was given before or after Accenture was retained.

10      Under (a)(4), Your Honor -- and I tried to jump there

11  prematurely -- we have to show adequacy in terms of the

12  plaintiffs and their counsel.  Here the plaintiffs and their

13  counsel quite simply have met the adequacy prong.  The claims

14  of the class representatives are not antagonistic to the claims

15  of other class members.  The plaintiffs will recover damages

16  unless -- they won't recover damages unless other class members

17  also recover damages.

18      And the plaintiffs and, respectfully, their counsel, the

19  people sitting at this table and the plaintiffs' steering

20  committee that Your Honor selected to litigate the case have

21  pursued the claims of the class --

22          THE COURT:  I don't understand there to be any

23  challenge to the adequacy of counsel.

24          MR. FRIEDMAN:  Okay.

25          THE COURT:  Marriott and Accenture will let me know

1   if I am misapprehending that, but I think that they are not

2   challenging adequacy of counsel.

3           MR. FRIEDMAN:  Okay, very well, Your Honor.

4       We get to ascertainability.  It's not specifically

5   enumerated in Rule 23 --

6           THE COURT:  I know.

7           MR. FRIEDMAN:  -- but the courts obviously require

8   that in the Fourth Circuit, and that only means that it's

9   defined, the class or the classes are defined by objective

10   criteria that are administratively feasible to apply.  And here

11   that's easily met because each class member or each class is

12   defined as people who, because they gave their personal

13   information to Starwood, wound up in the NDS database.  And

14   Marriott literally has that NDS database that contains the

15   actual identity of the class members.  Indeed, Marriott already

16   used that information, that NDS database to send out its email

17   notification letters.

18           THE COURT:  So let me -- you all have seen some of

19   this NDS database, all right, not all.  And if I certify

20   classes, then everyone contemplates additional discovery after

21   that.  Help me get a more granular picture of that.  I'm

22   looking at the NDS database.  There was some mention in the

23   briefing about multiple similarly named individuals, people who

24   have multiple addresses.  How are we going to figure out --

25   when I get that database, what does it show me?  It shows me a

1    name.  Does it show me an email address?  A hard copy address?

2    Are there copies of credit card receipts?  What's in that NDS

3    database that will allow you to be able to -- if there are five

4    Bill Smiths, to be able to determine which Bill Smith we're

5    talking about as being, for example, a Georgia or a Maryland

6    resident who booked a Starwood property in Tucson, Arizona in

7    the breach period and stayed at a particular hotel and paid 175

8    bucks a night?  And according to your damage model, there is a

9    ten percent delta that was an overcharge.

10        How are you going to be able to figure out which Bill

11   Smith it is?

12            MR. FRIEDMAN:  Well, there are a number of factors.

13            THE COURT:  Within the NDS database.

14            MR. FRIEDMAN:  So the NDS database has names.  It has

15   addresses.  It also has payment information.

16            THE COURT:  Okay.

17            MR. FRIEDMAN:  So that's another way.  And, look, the

18   standard on ascertainability isn't perfection.  It's whether

19   there is an objective criteria, and this clearly is objective.

20   To the extent it needs to be cleaned up at all, there are

21   address finding services that can be used to make sure that we

22   have the same Bill -- the right Bill Smith.

23        But in terms of ascertainability, this is the classic

24   case.  The defendants have their list of class members.  They

25   are hard-pressed to come back and say, yeah, it was good enough

1 | for us then but now it's not good enough for class purposes.

2 |     So Defendants appear to also argue that at least for those

3 | classes that are defined by those who paid for their Marriott

4 | stays, that those classes aren't ascertainable for some reason

5 | because Marriott itself doesn't have a record of who might have

6 | been reimbursed for those stays.  With all due respect, that is

7 | not an ascertainability issue.  If it has any bearing, Your

8 | Honor, it's on the amount of damages or the allocation of

9 | damages that class members could receive.

10 |     Again, the standard is -- for ascertainability is that the

11 | class has to be identified with an objective criteria.  Here

12 | the records everyone gave, their information to Starwood, are

13 | reasonably identified in those records; and there is objective,

14 | additional objective criteria in the NDS database as I just

15 | mentioned.  You could use the payment card information.

16 |     And, again, it's the wrong standard.  It's not whether the

17 | identification of class members can be ascertained with perfect

18 | accuracy.  It's whether Defendants will receive a fair

19 | opportunity to rebut if somebody comes forward and says I'm a

20 | member of the class.  They will have an ability to do that.

21 |     Now, in terms of (b)(3), Your Honor, we need to show that

22 | common issues predominate over individual ones.  In terms of

23 | the three types of bellwether claims that we've demonstrated,

24 | the common issues do predominate over individual ones.

25 |     With regards to the breach of contract classes brought

1  under New York and Maryland law, we need to show the existence

2  of a contract, Plaintiffs' performance, Defendants' breach of

3  that contract, and the resulting damages.

4       You've heard Ms. Keller describe all SPG members agreed to

5  this privacy statement.  It was a privacy statement that was

6  standardized.  It asserted that Starwood was dedicated to

7  protecting class members' privacy and personal data.  This is

8  one of those classic cases where the fact finder simply has to

9  determine if Marriott is liable for its deficient performance

10 in protecting all class members' data.  Here that determination

11 is going to be the same for all class members because they are

12 all bound by the same standardized contract.

13      To the extent Marriott asserts that it hasn't breached

14 that contract, its defense will be common to the class.  In

15 terms of damages, Plaintiffs will proffer, as you know, the

16 application of damages that do not rise or fall on

17 individualized calculations.  For the contract claims, you have

18 the benefit of the bargain damages that you heard from

19 Professor Prince and based on Ms. Butler's analysis.

20      And you have Prince's measurement of the inherent value of

21 the information that Marriott permitted attackers to get.  That

22 would allow a jury to award damages in a formulaic manner based

23 upon the type of data that was taken.

24      But even without Professor Prince's testimony on the

25 inherent market value, the jury can come up with a value of its

1   own based on evidence that will be in the record.  For example,

2   we can use Marriott's own valuation.  As Your Honor knows,

3   Marriott revealed after the close of discovery how much it

4   valued class members' personal information under the CCPA.

5   Whether that valuation comes into the case either by an

6   admission by a party opponent or by judicial notice, a jury can

7   utilize that in forming its own calculation for the value of

8   the class members' personal information; or the jury could look

9   at, for example, the market price of personal information on

10  the dark web to come up with a valuation.  All of those would

11  allow formulaic, across-the-board, common damages.

12      But even, Your Honor, if we didn't have a valuable

13  formulaic benefit of the bargain or inherent value damage model

14  in these cases, in these classes, all class members would be

15  able to be entitled to claim nominal damages.  Maryland and New

16  York law are very clear that nominal damages are available in

17  breach of contract actions where the party has injury but can't

18  determine precise consequential damages.  That wouldn't require

19  the analysis of any individual questions or an expert opinion.

20      Now, what we've heard from defendants on nominal damages

21  is that we can't seek them for the classes because we didn't

22  seek them in the complaint, but that's, frankly, a form over

23  substance argument that's just plain wrong.

24      The Fourth Circuit in the *Liberty Mutual* case held that

25  nominal damages don't have to be specifically pled in the

1   complaint.

2          THE COURT:  I'm familiar with the case.

3          MR. FRIEDMAN:  Okay.

4      And Your Honor then is probably familiar with your own

5   case --

6          THE COURT:  Don't bet on it.

7          MR. FRIEDMAN:  -- the *Ross vs. Chopra* case.

8      Okay.  *Ross vs. Chopra;* it's Westlaw 6197418.  It was a

9   December 30th of 2021 decision, Your Honor, where Your Honor

10  said not only does Maryland law provide that nominal damages

11  can be awarded where an injury has been proven, yet it's

12  impossible to precisely calculate the damages from that injury,

13  but that plaintiffs aren't even required to include nominal

14  damages in their damage disclosures or Answers to

15  Interrogatories.

16     Here, by the way, we did put in our complaint general

17  damages, and the case we were just talking about, *Liberty*

18  *Mutual* said that's all you need to put them on notice of

19  nominal damages.  So we believe nominal damages are a viable

20  alternative if for some reason we cannot come up with a

21  formulaic application of damages across the board.

22     We've also seen a related argument to the ascertainability

23  argument I just mentioned from Defendants about Article III

24  standing.  With regard to the breach of contract classes,

25  Defendants now claim that they can't be certified because,

1  according to them, we haven't shown all class members were

2  injured and, therefore, we haven't shown that they all have

3  standing.

4      According to them, with regard to the contract claims, the

5  subclass, for benefit of the bargain damages, they claim that,

6  well, they can't tell who was reimbursed for their stays.  So

7  they can't get out of pocket -- they can't get benefit of the

8  bargain damages.

9      But, in fact, Your Honor, everyone in that subclass was

10 injured because they all paid for their stays and, therefore,

11 they all overpaid for their stays.  To the extent that some

12 small number, some identified small number of that subclass may

13 be subjected to a repayment demand from some third-party person

14 or some third-party entity that may have reimbursed them really

15 has nothing to do with injury or standing.

16     In terms of the negligence claims, Your Honor, the

17 negligence classes against both defendants also support

18 certification.  Under the negligence claims, as you heard

19 Ms. Keller, we need to show Defendants were under a duty to

20 protect the plaintiff from injury, the defendants breached the

21 duty, and that plaintiff suffered injury or loss, and that the

22 loss or injury was proximately caused by Defendants breach of

23 the duty.

24     The duty of care to Plaintiffs was the subject of several

25 motions to dismiss in this case, Your Honor, and the Court

1   found that both Marriott and Accenture owed a duty of care

2   under the applicable negligence laws.  At trial, we will

3   present common facts that relate to all class members, that

4   Defendants owed this duty to all class members, and there

5   simply aren't any individualized facts.

6        Accenture has argued that the nature of a duty is somehow

7   an individualized factual inquiry, but that ignores the facts

8   of this case.  Accenture acknowledges neither Plaintiffs nor

9   any of the absent class members had any interactions with

10  Accenture, and no representations were actually made by

11  Accenture to the class.  So there are no individual issues.

12  Therefore, whether Accenture had a duty to Plaintiffs and the

13  class is the ultimate common question that is capable of class

14  resolution.

15       And the same holds for that breach of a duty.  At trial we

16  will present evidence that Defendants failed to take reasonable

17  care in protecting Plaintiffs and class members' from -- data

18  from unauthorized access.  A defendant's failure to do that

19  isn't based on any individual analysis but, rather, the

20  inadequate data security predominates over any individual

21  determination.  The question of whether or not Marriott

22  breached the duty will be answered identically for every class

23  member.

24       And for the injury element, Your Honor, the analysis would

25  be similar as under the contract claim but, as Your Honor

1   pointed out, without benefit of the bargain damages.  We have

2   an inherent damage calculation that can be applied

3   formulaically to all members of the negligence classes.  We

4   have Marriott's own admission about the valuation of class

5   members' personal information under the CCPA, and to the extent

6   those formulas are not applied, we'll be able to get nominal

7   damages, which would avoid individual issues.

8        To the extent defendants contest causation or proximate

9   cause, also a common question for all class members, that

10  question is did defendants' inadequate security cause the

11  breach?  That will be answered the same way for every class

12  member.  And the formulaic damage analyses that we've proposed

13  will remove any individual analysis.

14       In terms of the consumer protection claims, these are

15  suitable for certification, and these types of claims, frankly,

16  are routinely certified in these cases.  The violation of these

17  claims will be subject to common proof.  Was the harm caused by

18  Marriott's inadequate security practices related to Defendants'

19  uniform omission regarding its data security?

20       The California, Maryland, and New York statutes all use an

21  objective standard; that is, the question isn't whether a

22  consumer actually relied on the omissions but whether the

23  members of the public are likely to be deceived or whether it's

24  substantially likely that the consumer would not have made the

25  choice in question had the information been disclosed.

1       And the courts in Maryland and California, I should say,

2   also find that simply the maintaining a deficient data security

3   for customer personal information itself, even without an

4   omission or a misrepresentation, by itself violates those

5   business practice statutes without the misrepresentations or

6   omissions simply because they are unfair and unlawful.

7       In regard to the Michigan Identity Theft Protection Act,

8   Your Honor, the sole question for the jury there is whether

9   Marriott provided a notice of its security breach without

10  unreasonable delay.  The answer to that question is going to be

11  the same for every class member.  And to the extent Defendants

12  assert that Plaintiffs weren't injured by the delay, as I think

13  we saw in their papers, that they can raise on summary

14  judgment.

15      Now, finally, as to the damages for the consumer

16  protection claims, we'll have similar damage theories, as we've

17  already heard, that will apply across the board, benefit of the

18  bargain damages, inherent value, except for the California UCL

19  claim.  We will not have nominal damages, though.

20      In addition, at least as to the New York GBL claim, there

21  are statutory damages, which is actual damages or a minimum of

22  $50, whichever is greater; and if there is willfulness, the

23  jury could award damages, treble damages, up to three times the

24  actual damages, which would be based on those formulaic

25  analyses, up to $1,000.

1      So the GBL also has recognized that there is an actual

2   injury where a plaintiff purchased the product and didn't

3   receive the full value of their purchase.  Sounds very much

4   like a benefit of the bargain analysis.

5      What we've heard in regard to the GBL claims by Defendants

6   is a kind of a weird statute of limitations argument.  In their

7   papers, they made an assertion that common issues won't

8   predominate with regard to the New York class claims because

9   the New York class claims or New York breach of contract has a

10  six year statute of limitations and the GBL has a three year

11  statute of limitations, and they say that makes many of the

12  class members' claims time barred.

13     According to the defendants, some of the reservations made

14  by the class members go back as far as 2002.  According to

15  them, the date when class members gave their personal

16  information to Starwood is the date that the causes of action

17  accrued.  Therefore, since this action, according to them,

18  wasn't brought until 2018, many class members' GBL and New York

19  contract claims would be extinguished.

20     Thankfully, Your Honor, we believe the defendants'

21  interpretation of the law is erroneous.  If their

22  interpretation were true, there would be virtually no

23  sustainable data breach cases under those laws, nor many GBL or

24  contract cases in the first place.

25     The law in New York is that limitations periods begin to

1   run when all of the factual circumstances necessary to

2   establish a cause of action occurred so that the plaintiff

3   would be entitled to relief.

4        Here the plaintiffs and all the class members, for that

5   matter, reasonably expected that their personal information

6   would be protected by Defendants.  Their claim didn't start to

7   run until those expectations weren't met, and that was when

8   they learned in 2018 that their personal information had been

9   exfiltrated.

10        And interestingly, Defendants didn't even raise the

11   statute of limitations defense in the GBL claims in that joint

12   submission Your Honor asked for in February with regard to

13   outlining their defenses most relevant to the bellwether

14   claims.

15        Superiority, Your Honor, is pretty straightforward in this

16   case.  (b)(3) requires that the class action be superior to

17   other available methods for fairly adjudicating a controversy.

18        Here the classes would definitively be superior.  Most

19   class members have a minimal interest in individually

20   controlling the prosecution of their claims for the simple

21   reason that what they might recover is dramatically outweighed

22   by the cost of litigating the individual cases.  And, of

23   course, if a (b)(3) is certified, they cannot doubt and that's

24   pretty much all there is to say on that.

25        Finally, Your Honor, on the (b)(2) injunctive declaratory

1  relief, we are seeking a (b)(2) class.  I call this at this

2  point sort of a place holder simply because we haven't received

3  the discovery into the data security measurements that Marriott

4  undertook post breach.  That's why we left the injunctive

5  relief request in very broad terms.  But the law is also very

6  clear on that, that Plaintiffs aren't required to specify the

7  precise injunctive relief at this stage.

8       At some point, perhaps, we'll be afforded the opportunity

9  to take discovery on this and then we'll be able to elaborate

10 and really specify the type of discovery, type of declaratory

11 injunctive relief that we seek to ensure that at that time and

12 at this time the class members' personal injury is adequately

13 secured; but at this point, the details of that can wait.

14           THE COURT:  So, Mr. Friedman, while we're on

15 superiority, one of the aspects of superiority, of course, that

16 the cases talk about is whether or not non-class claims brought

17 by individual or small groups of common plaintiffs can achieve

18 many of the same advantages of class litigation against a

19 defendant if those plaintiffs prevail on the basis of

20 collateral estoppel arguments.  And some of the cases talk

21 about the -- which is sort of an arm of superiority -- the

22 ability of the court to be able to manage an enormous

23 litigation like this.

24       We've got three different types of claims from multiple

25 different states.  We've got different damage theories that

1  will be classwide.  There will be damage theories that will be

2  individualized that somehow have to be accounted for if the

3  claims go forward; those people who actually did have identity

4  loss and paid money to have a monitoring service or to get

5  their identities put back together again.

6       And this ties in somewhat with your proposed trial plan,

7  which contemplates that this court would be the place where

8  bellwethers would actually be tried.  That assumes, of course,

9  that the non-Maryland claims -- this court has jurisdiction

10 over all the Maryland claims, of course.  You can try those

11 whether the defendants are willing to have other claims that

12 would stem from other jurisdictions tried at the same time or

13 not.  But they do not -- at least, if they did, I didn't see it

14 -- jump on board with that, yeah, we'll agree that any trials

15 will be done in the District of Maryland, which would require

16 their consent in order to be tried by this court.

17      So my question is:  In the event that they do not, how, if

18 anything, does this impact your views of the

19 manageability/superiority concept of this?  It's a big case.

20 The idea of the bellwethers is to get answers from some trials

21 that can then be used to resolve all the other claims that were

22 not bellwether claims.  And if there are not going to be trials

23 all done in one court, figuring out how you would approach that

24 dealing, for example, with the notion of apportionability of

25 any classwide damages once awarded.

1     You're familiar, of course, with the Supreme Court case

2     that tried to figure out how you would apportion it when the

3     plaintiffs had one theory of damages and the evidence on that

4     and the jury came back with 50 percent of that damages.  Now

5     what do you do with it?  How are you going to divide it up

6     among all the class members when you had a measure that -- I

7     think that was a wage and hour claim case -- that you had a

8     measure that was tied to each individual that was supposed to

9     be formulaically done.

10          Tell me why you don't see these as yet unresolved issues

11    as posing any real hurdle to classwide certification of the

12    classes you've asked to be certified?

13          MR. FRIEDMAN:  Well, a couple of things.  I don't see

14    any manageability issues from what you've described.  If these

15    cases go back to -- after Your Honor -- assuming Your Honor

16    certifies the class and the defendants do not agree to have

17    them tried here as bellwether trials, they would go back just

18    to a handful of courts for a trial.  And so I don't see that as

19    really impacting the manageability.

20          In terms of the (c)(4) issue, I think that sort of

21    dovetails with what you were saying.  I'm actually going to tag

22    out on that one.  Although a lot of this has fallen on me, I

23    did look to Mr. Pizzirusso to be the (c)(4) maven here.

24          THE COURT:  Okay.

25          MR. FRIEDMAN:  So if you don't mind, I would like to

1  pass the baton over.

2  THE COURT:  Great.  Thank you, sir.

3  MR. FRIEDMAN:  Thank you.

4  MR. PIZZIRUSSO:  Your Honor, may it please the Court,

5  James Pizzirusso from Hausfeld on behalf of the plaintiffs.

6  The Court was asking about manageability and how the

7  trials would be managed if, for example, Marriott didn't

8  consent.  And as Mr. Friedman noted, the cases would just go

9  back to their respective jurisdictions for trial.  The Court,

10  of course, Your Honor, could travel to those jurisdictions to

11  try the cases.

12  We, the plaintiffs, think it would be much more beneficial

13  to try them here in front of a court that's familiar with the

14  cases.  You know, hopefully Marriott would agree with that.  I

15  think the prospect of trying these cases all over the country

16  would be a huge burden on Marriott, as well as the plaintiffs,

17  and it would be most convenient for the parties just to

18  consent.  So certainly we could ask Marriott about that.

19  THE COURT:  Well, it would certainly make a lot of

20  sense from the perspective of if you had separate trials in

21  separate jurisdictions, you would be ending up with the same

22  witnesses and the same evidence on a lot of the matters and

23  that certainly doesn't seem like a recipe for efficient

24  management.

25  I have read that some -- the ways in which the -- if there

1    is not overt consent, there's some clever, clever designation

2    of a judge from one district to be especially designated as a

3    district judge from another district for purposes of doing

4    that.  Leaving that judge, no doubt, to wonder who he had so

5    offended in an earlier life that this cup did not pass his lips

6    or her lips.  Go ahead.

7             MR. PIZZIRUSSO:  Your Honor, also, I believe it was

8    Justice Sotomayor when she was still on the Second Circuit in

9    the *In re Visa Check* case said, "Failure to certify an action

10   under Rule 23(b)(3) on the sole ground that it would be

11   unmanageable is disfavored and should be the exception rather

12   than the rule."

13        What the Courts of Appeal, in particularly the Fourth

14   Circuit, has over 30 years now of precedent on these issues

15   that manageability is in the sound discretion of the district

16   court.  There are a whole slew of tools that the Court can use

17   to make a case manageable.  Here we've talked about 23(c)(4) as

18   certification of particular issues as being one way to do that.

19        If, for example, the Court finds that there are

20   manageability issues and we have *A.H. Robins* in 1989 and in

21   *Dalkon Shield IUD* case saying that in a mass tort where you

22   have a slew of individualized personal harm issues, you can

23   certify common issues.

24        We have the *Central Wesleyan* case, also in the Fourth

25   Circuit, where a school was suing over asbestos in the

1   buildings where the Fourth Circuit said, look, there are a slew

2   of asbestos manufacturers.  Who knows what who even

3   manufactured this asbestos.  We're going to conditionally

4   certify the case.

5          THE COURT:  Yeah, not an option that exists anymore,

6   as you're familiar with, or since the rule changed.

7          MR. PIZZIRUSSO:  Well, I think --

8          THE COURT:  Although, you could uncertify.

9          MR. PIZZIRUSSO:  Right.  The Court can always

10  uncertify the case, which I think is the exact same thing.  And

11  so what we should --

12         THE COURT:  So let me interrupt, because I want to

13  get a picture.  Okay?  I want to get a picture.

14      You know, it's interesting.  As I've read the briefing in

15  this case, all the briefing many, many times over many, many

16  weekends, as you all no doubt did as well, I have had many

17  cases where I have had class action settlements where the

18  parties come in with a very specific allocation plan.  In fact,

19  Mr. Friedman, I think one of your colleagues was here this week

20  or last week with a class certification in a securities case

21  where there was the same kind of notion where you had a very

22  elaborate allocation method.

23      And I was interested because I was looking for cases that

24  had gone to trial and a judgment had been awarded on common

25  issues and then tried to see how you allocated it.  And the

1   closest I got was a Supreme Court case I made reference to with

2   Mr. Friedman where the jury came back with a number less than

3   what the plaintiff's evidence was but a substantial number.

4   And the Court then, as appellate courts are wanting to do,

5   said, well, we shouldn't weigh in on this.  Let's give it to

6   the trial judge.  They'll figure out what to do.

7        The whole notion of these things, it sort of seems to me,

8   is that your contention that you really can't make these final

9   trial-type decisions until you've given the notice.  If classes

10  are certified, you've got to give notices, particularly for

11  23(b)(3), right?  And people are going to have the opportunity

12  to vote out.  You've got to identify who you're going to send

13  the notice to.

14       You will, at that point, have some idea about the size of

15  these classes, and we'll know whether we're dealing with three

16  and a half million people from New York or two and a half

17  million people from Maryland, or a hundred thousand, or fifty.

18  We won't know any of these things until some future time once

19  the notification process has occurred because while we've

20  talked about (c)(4) and while we've talked about injunctive and

21  declaratory, certainly the thrust of what the plaintiffs would

22  most want to see in a ruling would be a (b)(3).  It would allow

23  not only liability but also classwide damages to be tried at

24  the same time.

25       But I'm trying to get my mind around from a -- just from a

1   simply -- an executive function of how you would then know who

2   was going to be part of this class, is that not going to give

3   you a significantly greater amount of information to be able to

4   figure out how you would actually go about trying this thing if

5   it's -- classes are certified?

6                   MR. PIZZIRUSSO:  Well, certainly I think that would

7   give us more information to know who is in the class, what the

8   number is.  Obviously, we've got to put together -- if there's

9   only a few states certified, we've got to put together the

10  damages for that particular state to know how much it is, to

11  know what to ask for the jury to award.  And certainly a (b)(3)

12  classified damage amount would be presented if that class is

13  certified for inherent value, benefit of the bargain, nominal

14  damages, statutory damages if it's New York.

15      So, yes, that's going to certainly clarify when we put out

16  notice and we know how many people are in the class and then

17  we're going to have a specific request to the jury for that

18  particular state if it's certified.

19                  THE COURT:  Okay.

20                  MR. PIZZIRUSSO:  So I don't know if the Court has

21  anymore questions about the trial or (c)(4), but if you do, I'm

22  prepared to answer them.

23                  THE COURT:  No, I think I'm done.

24                  MR. PIZZIRUSSO:  Thank you.

25                  THE COURT:  All right.  Anyone else?  Whenever we

1  have these multiple counsel arguments, I'm always reminded of

2  the famous quip from a legislative session where each

3  representative has gotten up and spoken on an issue, and

4  finally, a long way into their cue, someone stands up and says,

5  well, everything that needs to be said has already been said

6  but not everybody who needs to say it has said it and then

7  begins to go over it again.  That's not the case here, but is

8  there anybody else who needs to have an opportunity to speak on

9  behalf -- at least at this phase on behalf of the plaintiffs

10  before I hear from the defendants?

11        MR. FRIEDMAN:  No, Your Honor.  Thank you.

12        THE COURT:  Okay, great.  Thank you very much.  I

13  appreciate your comments and your arguments.

14     Mr. Warren, you'll be the master of ceremony on this, sir.

15  Let me know how you want to start.

16        MR. WARREN:  Okay.  Is this coming through loudly

17  enough, Your Honor?

18        THE COURT:  Yeah, but you are a -- under ordinary

19  circumstances, I enjoy your dulcet tone of voice.  I need you

20  to -- I want you to give me that from the diaphragm parade

21  ground voice right now because it is a little soft coming

22  through.  Assuming, of course, that this would not cause you

23  any kind of discomfort.

24        MR. WARREN:  No.  I will do my best, Your Honor.

25     And let me begin by saying that Marriott does, in fact,

1  contest the claim of negligence that was addressed at the

2  beginning of counsel's remarks, and if this case and when -- if

3  and when this case gets to the merits, we will certainly apply

4  ourselves to that.

5           THE COURT:  I didn't think that you had conceded.

6  Well, maybe you have -- maybe you're not going to argue too

7  strongly on duty, but I did not think you had conceded breach

8  of duty.

9           MR. WARREN:  Okay, well, thanks, Your Honor.

10      And today, on the class certification motion, we are

11  addressing those issues that we believe defeat class

12  certification here.

13           THE COURT:  Right.

14           MR. WARREN:  In that regard, as I mentioned, we are

15  dividing the argument.  My colleague, Mr. Keteltas, will be

16  addressing the issue of class action waiver, superiority, and

17  Rule 23(b)(2) certification of injunctive relief.  And

18  Ms. Ghannoum will be discussing Plaintiffs' statutory claims.

19      In addition, I should mention that Mr. Anderson, for

20  Accenture, will address the 20 -- I believe will address the

21  Rule 23(c)(4) issue and other Accenture-related arguments.

22      Judge Grimm, that leaves me with the issue of Article III

23  standing and a discrete issue regarding negligence.  I would

24  like to begin with the standing issue, which precludes

25  certification here outright.

1      The Court should not certify the class here because

2   Plaintiffs' class definitions, which essentially include

3   everyone whose information was on Starwood's NDS database,

4   sweep in a host of individuals who did not suffer an injury in

5   fact and who, thus, lack standing under Article III.

6      Last year the Supreme Court in the *TransUnion vs. Ramirez*

7   case held, and I quote, Every class member, every class member

8   must have Article III standing in order to recover individual

9   damages.  Article III does not give federal courts the power to

10  order relief to any uninjured plaintiff, class action or not.

11     So, Your Honor, to have Article III standing and to meet

12  the predominance requirement of Rule 23, Plaintiffs have the

13  burden and it's their burden to prove through classwide

14  evidence that everyone or at least nearly everyone in their

15  proposed class was, in fact, injured.

16     Now, Plaintiffs in this case pled their case initially and

17  had proceeded to litigate the case on four basic claims of

18  injury in fact.  Those are actual misuse-type injuries,

19  including actual identity fraud, imminent risk of future harm,

20  loss of value of personal information, and loss of benefit of

21  the bargain.

22     Now, let's see where we are now that we are at the

23  important stage of class certification and now that we have had

24  substantial discovery on each of these four theories.  As we

25  know, the actual misuse-type damages, including damages for

1   alleged actual identity fraud cannot be established on a

2   classwide basis.  Plaintiffs have admitted that.  There is no

3   dispute about that.

4        The increased risk of future harm is also now off the

5   table based on the Supreme Court's decision in *TransUnion* where

6   the Court held, and I quote, The risk of future harm on its own

7   is not enough to support Article III standing for a damages

8   claim.

9        That leaves plaintiffs with their two so-called classwide

10  theories of injury; overpayment and inherent value.

11       Now, here's the problem with overpayment and it was

12  addressed -- it was addressed in the comments earlier.  Class

13  members who did not pay for their hotel stays, for example,

14  because they were reimbursed by their employers, did not

15  overpay.  They did not pay and so they could not have overpaid

16  and, thus, they could not have suffered an overpayment injury.

17       Now, we cited in our briefing several cases which address

18  this issue in various contexts and all of which concluded that

19  this issue of reimbursement, whether it came in the form of an

20  employer reimbursement for baggage fees, as was the case in the

21  *Weidenhamer* case, or whether it was a resale of a defective

22  automobile, as was the case in the *Beaty vs. Ford* case, or

23  whether, as in the *Winkler* case, it came in the form of a

24  refund from the defendants.  In all those cases, the Court

25  found that this was an issue that precluded injury and, in

1    certain instances, required denial of a class certification

2    motion.

3         I also would like to call the Court's attention to another

4    case.  This one is *Colapinto vs. Esquire Deposition Services*,

5    2011 WL 913251 out of the Central District of California.  And

6    that court -- that was a case that involved transcription fees

7    on depositions, and the Court held, and I quote -- and it's a

8    bit of a lengthy quote but I think it's very meaningful.

9    "Plaintiffs proposed class definition includes members who are

10   unharmed.  For example, Plaintiffs allege that a number of

11   purchasers of defendant services will be attorneys who were

12   ultimately reimbursed for the charges by their clients.

13   However," the Court went on to say, "if these class members

14   were reimbursed, there would be no harm.  This would mean that

15   Plaintiffs' class would include attorneys who had once merely

16   paid for defendant's services even if they would lack standing

17   due to a lack of injury.  This alone, this alone is sufficient

18   to warrant denial of Plaintiffs' motion for class

19   certification."  So that was the *Colapinto* case, Judge Grimm.

20        In response, in their briefing, Plaintiffs did not cite a

21   single case to suggest that a reimbursed plaintiff should be

22   considered to have an injury under Article III, and I didn't

23   hear any reference to any additional authority during counsel's

24   comments this morning.

25        Now, Plaintiffs cite *Tyson Foods* and also suggested in

1  their remarks today that this is merely a matter of damages

2  allocation and it can be sorted out after certification is

3  completed.  But let me be very clear here, Your Honor.  We are

4  not complaining about the details of Plaintiffs' plan to

5  allocate damages only to uninjured or, in other words,

6  unreimbursed individuals.

7       Instead, we are saying that Plaintiffs have no such plan

8  at all.  Plaintiffs do not even mention the issue in their

9  trial plan, and Dr. Prince's model does not account for this

10  either.  In fact, in his view, if a hotel guest was reimbursed

11  by their employer, then it is the employer who should receive

12  any overpayment damages.  But, of course, the employers are not

13  members of the class.  They did not provide personal

14  information to Starwood in exchange for a reservation.

15       And nor can Marriott determine whether a class member was

16  reimbursed or not from its own records.  For example, several

17  bellwether plaintiffs in this case initially submitted

18  interrogatory answers and stay spreadsheets in which they

19  denied that they had been reimbursed for various stays only to

20  produce documents later showing that, yeah, in fact, they had

21  been reimbursed for certain stays or only to admit at

22  deposition after substantial questioning that they had been

23  reimbursed.

24       The experience that we had with the bellwether plaintiffs

25  in this case illustrates, Your Honor, that separate inquiry or

1  a mini-trial would have to be conducted not just into every

2  class member, because the units of damages on this benefit of

3  the bargain or overpayment theory don't break down by

4  individual; they break down by stay of every individual, and we

5  would need to have and conduct an inquiry into every stay to

6  determine once and for all whether that was a stay that was

7  reimbursed or not.

8       This is not an insignificant problem.  It's not a

9  relatively small number of individuals or state, as

10 Mr. Friedman suggested.  In fact, in our review of Plaintiffs'

11 stay spreadsheets, which they provided to us and which are now

12 part of the certification record before this Court, our review

13 shows that over half, in fact, well over half of the stays at

14 issue in the bellwether group were reimbursed.  That's a very

15 substantial number and that makes sense because business

16 travelers travel more or tend to, and they generally are the

17 ones who are being reimbursed.

18      The problem, Your Honor, is that Plaintiffs have not tried

19 to deal with this.  It's their burden.  It's not in their trial

20 plan.  We didn't hear a plan today.  And it's a problem that,

21 as many courts have held, does preclude class certification.

22      Next, inherent value.  Now, here we come to what I think

23 is Plaintiffs' essential argument on classwide injury for

24 Article III, and you find it, Your Honor, at page 29 of their

25 reply brief.  What they said there is, and I quote, Every

1   individual who had their information stolen lost the value of

2   that information.  So in other words, Plaintiffs' theory of

3   Article III injury here is the theft of the personal

4   information without more regardless of what happened to that

5   information or what didn't happen to that information after it

6   was stolen.

7        That argument, Judge Grimm, runs headlong into *Beck vs.*

8   *McDonald* where the Fourth Circuit stated, and I quote, The mere

9   theft of these items without more cannot create Article III

10  standing.  That holding is still good law.

11       As I believe the Court knows, that involved two data

12  breaches at a medical center.  One, a stolen laptop and the

13  other a stolen document, both of which contained personal

14  information of the plaintiffs including, in those cases, social

15  security numbers; but in neither case did the plaintiffs have

16  standing even though in both instances their personal

17  information was stolen or alleged to have been stolen, just as

18  Plaintiffs claim happened here.

19       So Plaintiffs' essential argument that the mere theft of

20  the personal information by itself satisfies Article III is

21  simply wrong.  And in that same vein, Plaintiffs make a similar

22  argument that the mere breach of a contract creates injury in

23  fact also.  But that is incorrect, too.

24       Plaintiffs rely on a case called L-3 Communications, but

25  the plaintiff there had suffered an actual injury, or at least

1   alleged it had, to the tune of over $80 million in damages.

2   The Court was only concerned with whether the plaintiff had

3   standing to assert a tortious interference claim, and in that

4   regard, the Court pointed out that alleging the contract that

5   -- under which the plaintiff claims to have expectancy was

6   enough to get past the pleadings stage on Article III and then

7   it would be up to a 12(b)(6) motion or a summary judgment

8   motion to determine whether they had actually -- could sustain

9   their claim.  But the Court never held that the mere breach of

10  a contract by itself could create an injury in fact.

11       And later, in the *Foodbuy* case, which is cited in our

12  brief, the Court made clear that in the Fourth Circuit, the

13  breach of a contract is not enough and a plaintiff would have

14  to demonstrate, quote, personal harm both traceable to the

15  challenged provision and redressable by a federal court.

16       So in other words, Your Honor, whichever way you look at

17  it, Plaintiffs have to offer classwide evidence proving an

18  actual injury in fact.  The mere breach of a contract like the

19  mere theft of personal information by themselves are not

20  sufficient.  There has to be an actual concrete injury

21  resulting from that breach of contract or resulting from that

22  theft and that is what is missing here.

23       And there has been -- there were several references to

24  nominal damages, and I don't think there is any dispute here

25  that nominal damages cannot supply an injury in fact either.

1  The cases indicate that nominal damages may go to the

2  redressability prong of Article III, but, obviously, they don't

3  create an injury where none otherwise exists.

4       So if the court has no questions on standing, I would like

5  to just turn briefly to an issue relating to Plaintiffs'

6  negligence claim, and I really only have one point to make

7  there.

8       As counsel indicated in response to Your Honor's question

9  this morning, they are not seeking to recover benefit of the

10  bargain damages on their negligence claim, and that makes

11  perfect sense because, of course, a negligence claim does not

12  involve a bargain for them to get the benefit of.

13       The point I would like to make is because they are not

14  seeking benefit of the bargain damages and cannot on their

15  negligence claim, if this Court were to eliminate the inherent

16  value theory of damages from this case, either on the *Daubert*

17  motion, which is currently before you, or on some other ground,

18  Plaintiffs would be left with no damages model or theory for

19  negligence at all, and without one, their claim cannot be

20  certified.

21       The only argument that they would have is that they would

22  be entitled to seek nominal damages, but several cases have

23  held, and we did cite them in our brief, that nominal damages

24  alone do not warrant class certification.  It is hard to see,

25  Your Honor, how any benefit to a class or a class member would

1  arise from pursuing a claim solely based on nominal damages.

2      And, Your Honor, if you have no questions on those issues,

3  I would like to turn to Mr. Keteltas.

4          THE COURT:  Thank you.

5          MR. WARREN:  Thank you.

6          MR. KETELTAS:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. KETELTAS:  Gil Keteltas for Marriott.  I'm going

9  to begin by addressing the class waiver argument, Your Honor.

10      The class waiver provisions of the Uniform Agreement

11  invoked by Plaintiffs for the first time at class certification

12  preclude at least the Maryland and New York breach of contract

13  claims.

14      I want to first address the waiver argument that was made

15  by Plaintiffs in their reply brief.  They argue that Marriott

16  waived this issue by not raising it until class certification.

17  Of course, that's not true.  Marriott raised this in its

18  affirmative defenses.  Marriott also questioned Peter Maldini

19  and Roger Cullen, proposed representatives of the contract --

20  for contract classes, about their class waiver arguments.

21      Judge Bennett in *Spotswood vs. Hertz* said, It is no secret

22  that a party intends to raise a class waiver argument when they

23  include it in their answer.  And he denied a similar argument

24  in that case.

25      The related point, however, is the reason we did not make

1    the argument as we make it now is because the very first time

2    in this case that Plaintiffs made this about a single uniform

3    contract was in their motion for class certification.  Up until

4    the moment they filed their brief and, frankly, still because

5    their sworn discovery responses have not been amended, every

6    bellwether provided an identical 22-page cut and paste response

7    to omnibus Interrogatory 15, which asked them to identify the

8    contracts they intend to rely on in support of their breach

9    claims.

10        And, Your Honor, may we approach and just give you one

11   example of those identical interrogatory responses?

12             THE COURT:  That's fine.

13             MR. KETELTAS:  As you will see -- and Mr. Marinucci

14   is bringing you the response of Mr. Fishon -- from pages 17

15   through 39, Plaintiffs don't talk about a single uniform

16   agreement.  Instead, they identified no fewer than 31 documents

17   and reserve the right to supplement this response with more

18   precision at a more appropriate time.

19        And so it was at class certification that Plaintiffs for

20   the first time defined their bellwether contract classes to be

21   based on the same material contract terms, not what you heard

22   today, not the privacy statement, but the SPG Program, which

23   they say incorporated that statement by reference.  I'll talk

24   more about that in a second because that incorporation is very

25   important.

1          And they did this, of course, to avoid individualized

2     issues and tried to neatly fit this case law that says you've

3     got to have a uniform agreement; otherwise, if this is just

4     about the privacy statement, we go back to the 31 -- I mean,

5     the 22-page discussion of what contracts apply.  We look at how

6     you got to the privacy statement, whether you booked through

7     Marriott.com, whether you went to a third-party like

8     Travelocity or Price Line where you don't even know the name of

9     the hotel at the time you book it.

10         All of those individualized issues put them in a bind, and

11    so they told you what matters here is the SPG Program terms

12    incorporating by reference the privacy statement.

13         So I, again, refer you to the words of Judge Bennett; this

14    time in the *Titanium Dioxide* litigation where he says, class

15    certification is exactly the time to raise this issue, and it

16    is not waived if not raised before because that is where

17    Plaintiffs try to define their classes.  And that is what

18    happened here.

19         And so we're nothing like the two waiver cases they cite.

20    *American International Group,* that is a case where the party

21    did not raise form selection in his answer, relied on another

22    party's form selection clause and motions practice, and then

23    waited until an affidavit on summary judgment to discuss his

24    form selection clause.

25         And Marriott is nothing like the litigant in *Kortright*

1  (phonetic) who waived the contract provision barring certain

2  capital redemptions by telling the defendant in writing to make

3  it a capital redemption.

4      Plaintiffs make a second waiver argument that I want to

5  very quickly touch on, Your Honor.  They say that by admitting

6  venue was proper in the answer that's focused just on the

7  bellwether claims by agreement, that we somehow also waived the

8  class certification argument.  Not so.  Of course, their

9  allegation had nothing to do with class certification.  But,

10 more importantly, Marriott was well aware of the provisions of

11 28 U.S.C. 1407(a) and rulings from the joint panel on

12 multidistrict litigation that, quote, Contractual form

13 selection clauses do not limit the panel's authority with

14 respect to the selection of a transferee court.  1407(a), of

15 course, Actions may be transferred to any district court for

16 coordinated pretrial proceedings.

17     Now, let's talk about their arguments that this is now

18 just about the privacy statement.  That is not -- that is an

19 argument they tried to craft, unreplied, but that is not what

20 they have argued in their motion.  Here's what they say in

21 their opening brief at page 22:  "Every plaintiff alleging

22 breach of contract alleges the same material contract terms

23 that apply to every other class member.  The SPG agreement."

24     Page 27:  "All SPG members agreed to Starwood's

25 standardized contract terms, which provided that defendants

1   would abide by a corresponding privacy statement."

2        And even on reply, with full knowledge of Marriott's

3   waiver argument, they state, Plaintiffs assert breach of

4   contract claims solely on behalf of SPG members who are

5   governed by the privacy statement as incorporated in the

6   standardized terms and conditions.

7        Now, the law is clear that when you have a contract that

8   incorporates another contract, those contracts must be read

9   together.  What you heard in the argument earlier was this has

10  nothing to do, this case has nothing to do with the Starwood

11  terms and conditions.  Of course, that is the uniform contract

12  they use to make the privacy statement apply.  But more

13  importantly, that is contrary to everything that they have

14  argued both in their complaint and in their interrogatory

15  answers.

16       Here is what they say about why the Starwood program

17  matters in part of Interrogatory 15.  When Plaintiff first

18  provided personal information to Marriott and/or Starwood, for

19  instance, when signing up for an SPG account, Plaintiff

20  understood that Plaintiff entered into a contract with Marriott

21  and/or Starwood where Marriott and/or Starwood would protect

22  Plaintiff's personal information and provide Plaintiff with its

23  services.  They say further, Thus express contracts exist when

24  Plaintiff first signed up with Marriott and/or Starwood and

25  agreed to any privacy policy in terms of use.

1          Their allegation is a breach of the integrated agreement,

2     the SPG Program agreement and the terms of use, and that

3     argument means they are bound by the -- they are bound by the

4     class waiver provision.

5          In addition, the Starwood preferred guest provisions

6     incorporate by reference the website terms of use.  Ms. Keller

7     said that was just the Marriott website terms of use.  That's

8     not true.  Exhibit 7 to our papers are the Starwood terms of

9     use, and they also provide for a class waiver.  And these class

10    waivers, Your Honor, use the broadest possible terms.  They use

11    the relating to terms.  They talk about not just, you know, use

12    of the site but damages relating to the site.  And so

13    reservations made through the site, information provided

14    through the site, information provided when joining the

15    Starwood preferred guest program and committing to terms about

16    how that information would be managed.  These are central

17    issues and are plainly within the reach of the waiver terms,

18    and, Your Honor, they say as much.

19         Paragraph 99 of the Amended Complaint:  Guests can make

20    reservations at Marriott Hotel via multiple methods, including

21    through Marriott's website.

22         Paragraph 100:  Marriott collected personal data through

23    Marriott.com and other websites owned and controlled by

24    Marriott Group.

25         The Court should decide this issue now.  A plaintiff

1   seeking appointment as a class representative must first be

2   able to bring a class action.  That's *Career Week*.  That's also

3   what Judge Bennett did in *Spotswood*.  He said you can't be a

4   class representative if you've got an agreement to only proceed

5   individually.

6        Notably, Plaintiffs do not argue unconscionability or

7   unenforceability.  They don't say these provisions are

8   unconscionable or unenforceable and those arguments are waived.

9        Finally, Your Honor, I note that the class certification

10  waiver applies to Plaintiffs' statutory claims or prevents

11  overwhelming individualized issues.  Every bellwether plaintiff

12  is an SPG member.  That's their allegation.  So that means

13  every one of them is subject to this class waiver provision.

14       But to the extent they argue this is outside the terms of

15  the SPG membership, especially on the non-contract issues, we

16  have all kinds of individualized issues of how Plaintiffs got

17  to the Starwood terms of use.  If they got to them at all

18  matters in some cases.  How did they make a reservation?  When

19  did they first give their information to Marriott?  Did they

20  use a Marriott source to get to the reservation?  Did they use

21  a third-party?  Did they use a travel agent?

22       There are a host of issues that either go headlong into

23  the waiver provision or require looking back at all of these

24  other contract provisions and all of these other transactions

25  that may have occurred.

1          Your Honor, I want to turn to -- unless you have questions

2     about class waiver, I'm going to turn to injunctive relief now.

3          THE COURT:  All right.

4          MR. KETELTAS:  And I saw you nodding when they said

5     we're going to punt on this issue because, of course, we

6     haven't been allowed discovery on the issue, and I want to

7     challenge that notion because while Judge Facciola said at the

8     30(b)(6) we couldn't look at independent questions about the

9     Marriott segmented network, he did not and never prevented

10    Plaintiffs from exploring the breach, Marriott's response to

11    the breach, and actions taken in response to the breach.  And

12    I'll give you some examples.

13         The same document they cite, Exhibit E to their reply,

14    says, Plaintiffs may ask Marriott what it knew about Marriott's

15    capabilities to repel attacks compared with Starwood's

16    capabilities.  The 30(b)(6) notice allowed them to look at the

17    steps taken to remediate any vulnerabilities identified by the

18    audits that implicated the path taken by the hacker into the

19    NDS database.

20         More importantly, you heard Ms. Keller identify four

21    things that she says Ms. Frantz identified as the issues.

22    Every one of those four things was subject to discovery by

23    Plaintiffs; MFA, privileged accounts, failure to monitor, an

24    encryption.  And we pointed you to some of that testimony, the

25    testimony of Arno Van Der Walt, Marriott's Chief Information

1    Security Officer.  He was asked -- and this is at page 49 of

2    our brief.  He was asked about Project Artemis.  What is

3    Project Artemis?  You'll see, if you look at his testimony, it

4    is about the security enhancement initiative by Marriott, both

5    before it learned of the breach and updated based on lessons

6    learned from the incident.

7         He was asked for I believe eight pages about that

8    initiative.  An exhibit was used with Mr. Van Der Walt that

9    laid out all of the initiatives that were underway and the

10   timing of those initiatives, and he was asked about them.

11        Plaintiffs also posed an interrogatory that asked Marriott

12   to detail all of the actions Marriott has taken to remediate

13   the data breach and Marriott responded to that.

14        May I approach, Your Honor, and hand you that response?

15             THE COURT:  Okay.

16             MR. KETELTAS:  Now, this response details the steps

17   that Marriott took, but what I really want to focus you on is

18   the *Facebook* case, Your Honor, because that is a case involving

19   not just some of the same counsel, Plaintiffs' counsel before

20   you today but Ms. Frantz, the exact same expert.  And what is

21   different about the *Adkins Facebook* case than this case?  You

22   were told you got 132 pages from Ms. Frantz.  What you didn't

23   get in that 132 pages is what she thought Marriott should do,

24   what should be in the injunction.

25        You don't need to know what Marriott is already doing to

1    have this leading expert tell you what she believes they should

2    be doing, and she did that in *Facebook* and that's what got them

3    by on the injunction class.  She laid out six steps, and she

4    laid out many substeps.  They didn't do a thing here other than

5    say require Marriott to comply with the law, and that is

6    insufficient under the case law.

7         Also, Plaintiffs offer no evidentiary proof, required by

8    *Comcast*, that Defendants still have not adequately secured

9    their PII.

10        Your Honor, finally, I want to comment on this discovery

11   question, which I think, again, is a red herring because what

12   Marriott did or didn't do, they -- first of all, they had

13   discovery of the relevant parts, but it doesn't prevent

14   Ms. Frantz from doing what she did in *Facebook* and saying what

15   should be done.

16        But if this were truly an issue involving the need for an

17   injunction to address imminent, irreparable harm to Plaintiffs

18   and Plaintiffs needed more discovery on this point for class

19   certification, they would not have just accepted Special Master

20   Facciola's ruling.  They would have objected and raised it to

21   your attention, which they did not.

22        Finally, what belies the claims of imminent danger here is

23   the fact that every bellwether continued to make reservations

24   at Marriott properties following the breach and all but one

25   stayed at Marriott properties after the breach.  They do not

1   have the evidence to support an injunctive relief class.

2       Your Honor, I want to now turn to the ascertainability

3   question you asked, because this is a big issue.  You are told

4   a few things; first, that because Marriott had email addresses

5   and emailed everyone who was in the database, that this is

6   easy.  Well, it's a different task to simply email every email

7   address you have in a database and tie specific people to SPG

8   numbers, to stays, to credit card numbers, to addresses.  And

9   how do I know that?  I participated in some of these deposition

10  testimony that is cited to you.

11      And here what Plaintiffs have done is merely put a massive

12  data in your lap and said we can do it, Your Honor, but they

13  don't tell you what's been done with that data today and that

14  makes this more like *Spotswood* -- again -- *v. Hertz* where Judge

15  Bennett was troubled by simply identifying a massive data and

16  saying don't worry; we'll get to it.

17      Every one of these plaintiffs gave us interrogatory

18  responses that identified a mass of information after receiving

19  the information from the NDS database that they said might be

20  theirs, SPG numbers that might be theirs, credit card numbers

21  that could be theirs.  And then when questioned, oftentimes for

22  an extended part of the deposition, they didn't know whether

23  they were their numbers.  They didn't know how they would find

24  out.  They didn't know which credit card numbers were theirs,

25  or if they were theirs, they didn't know if they were Visas or

1    Master Cards.  They didn't know whether certain stays were

2    theirs.  They didn't know whether certain stays were

3    reimbursed.

4        So this is not a simple matter of simply giving them NDS

5    database and providing the information in a neat package.  It's

6    going to be a slog reservation by reservation, person by

7    person.  And it is not the kind of ascertainability -- it's not

8    easily ascertainable as they suggest.

9        Your Honor, briefly on New York statute of limitations.

10   The point I have to make here is that this is more like *Fero*

11   and less like the *Gaidon* case that they cite.  Every single

12   breach and every single deception they allege occurred, if it

13   occurred at all, at the time the information was given to

14   Marriott.  If you look at the paragraphs -- paragraph 935 where

15   they allege the GBL deception, deceptive acts, every one of

16   those was at the time that Marriott provided the information.

17   All of the inadequacies they identify in the system were

18   present, they allege, at that time.

19       And the same is true with the breach.  They allege the

20   breach occurred when Marriott and Starwood -- and this is

21   paragraph 327 -- failed to use reasonable organizational,

22   technical, procedural, and administrative measures to protect

23   their information.  Well, they say that was the case since

24   2002.

25       And so we, you know, as you've used the word "harsh

1   cheese" before, may view the New York statute of limitations as

2   hard cheese but that is the New York law, and the only court

3   that's applied that law in a case like this, in the *Excellus*

4   case, has applied it the way we urge the statute of limitations

5   to apply.

6        Your Honor, I'm going to briefly touch on superiority, and

7   I suspect that you're going to hear more on superiority when

8   we -- or superiority overlapping points when we talk about the

9   (c)(4) issues.  But I just want to tell you that there is a bit

10  of a strawman here.  Our manageability argument is that we will

11  need a trial for every person's damages under their trial plan.

12  Every single one of the bellwethers, every one of them alleges

13  losses beyond overpayment and inherent value.  Indeed, that's

14  how Plaintiffs sold this case to you originally at the motion

15  to dismiss stage.

16       And if you look at paragraph 270 of the Complaint, they

17  list 12 categories of harm that they say each of the plaintiffs

18  experienced.  Of those categories, only three they are

19  proposing for the class certification stage.

20       There are going to be individual trials, and their

21  suggestion that it's no big deal is just wrong because when we

22  have to go question these witnesses, the time isn't going to be

23  changed if there is a decision on liability.  We're not

24  questioning individual defendants -- individual plaintiffs on

25  how Marriott operated its systems or met its duties.  We're

1    talking to them about the claims they make on these individual

2    issues.  And you've seen, I think, in our brief why this is

3    significant.

4         Mr. Viggiano sought time and effort damages for renewing

5    his passport after learning of the beach.  It took deposing him

6    to find out he renewed his passport before learning of the

7    breach.

8         Ms. O'Brien blamed Marriott for fraudulent credit charges

9    at various locations in Florida, but the third-party discovery

10   from the bank, which was necessary and would be necessary for

11   millions and millions of potential class members, showed that

12   those charges were made on the physical credit card she lost on

13   vacation.

14        When I leave this issue, which I will do and sit down in a

15   moment, I want to leave you thinking about *Gunnells* because

16   *Gunnells* is a case that the plaintiffs hold up to you, and I

17   don't think it's really the poster child for superiority.

18   Think about that case.  *Gunnells* involved only a few thousand

19   possible claimants, a single health plan sold over an 11-month

20   period.  A court fiduciary had already calculated most of the

21   claims for unpaid medical bills in the case but still the Court

22   was concerned enough about manageability to only conditionally

23   certify the class stating, "Given the number of possible class

24   members in this action, manageability could quickly dissipate."

25        And in *Gunnells*, the Court did not have the proximate

1  cause issues here, the reliance issues here.  In *Gunnells*, the

2  only question was did the person who was accused of dealing in

3  the funds, did his actions cause the funds to close.  Here

4  that's like saying, well, did Marriott cause the breach?  It

5  doesn't address the separate and very large limiting issues of

6  did the breach cause any of the nine categories of harms that

7  Plaintiffs allege.

8      So, Your Honor, I'm going to now turn it over to my

9  colleague Ms. Ghannoum unless you have questions for me.

10         THE COURT:  All right.  Thank you.

11         MS. GHANNOUM:  Thank you, Your Honor.  Good morning.

12  Lisa Ghannoum on behalf of the Marriott defendants.

13      Plaintiffs ask the Court to certify classes of California,

14  Maryland, and New York residents based on consumer protection

15  claims; and for Michigan residents, for violations of

16  Michigan's Identity Theft Protection Act.  These claims are not

17  certifiable for myriad reasons.

18      As you heard from my colleague Mr. Keteltas, the

19  bellwether plaintiffs seek to represent -- seeking to represent

20  the classes of California, Maryland, Michigan, and New York

21  have waived their ability --

22         THE COURT:  So don't repeat arguments that have

23  already been made, ma'am.

24         MS. GHANNOUM:  Okay.  I just want to make sure you

25  understand --

1          THE COURT:  I understand.  I've been paying

2    attention.  Don't repeat arguments that have already been made.

3    Move on to the new stuff that you need me to hear, please.

4          MS. GHANNOUM:  So the class waivers applicable to the

5    statutory claims.

6          Individualized issues of causation also predominate.

7    Plaintiffs fail to satisfy Rule 23(b)(3)'s predominance

8    requirement for any of these statutory claims.  These

9    individualized issues of causation and injury overwhelm any

10   alleged common questions of law or fact.

11         After moving to certify deceptive practices claims under

12   New York, California, and Maryland law, based on alleged

13   misrepresentations about Marriott's data security, Plaintiffs

14   attempt to avoid the overwhelming individualized reliance

15   issues involved in proving a misrepresentation claim and,

16   instead, in their reply brief, pivoted to only seek class

17   certification under the consumer protection statutes based on

18   Marriott's alleged omissions.  But Plaintiffs can't escape

19   these individualized causation or injury issues.

20         While New York law does not require reliance, it does

21   require that the putative class members were exposed to

22   deceptive conduct, including any omission.  Discovery has shown

23   that there was no uniformity in how bellwether plaintiffs

24   provided their PII when booking reservations.  Bellwether

25   plaintiffs booked reservation and provided PII to third-party

1   booking sites and, thus, would not have interacted with

2   Marriott when providing any PII in making a reservation.

3        Some did not make a reservation in advance and, thus,

4   would not have been exposed to any statements that Plaintiff

5   allege were deceptive.  Some, like a New York bellwether

6   plaintiff, had their reservations booked through their

7   employers, some booked their hotels online, through travel

8   agencies because of deals offered through airlines.

9        There are individualized questions about which plaintiffs

10  looked at, skimmed, or read the privacy statements.  Plaintiff

11  Cullen could not recall whether he reviewed the privacy

12  statement prior -- excuse me -- to making specific

13  reservations, but he claims he generally recalls seeing a

14  statement.

15       Paula O'Brien, a consumer protection attorney for the

16  State of New York, admitted that she never read a Starwood or

17  Marriott privacy statement.  Thus, whether a particular

18  plaintiff was exposed to any of Marriott's statements or

19  omissions about data security is highly individualized and

20  cannot be shown by common proof.

21       Plaintiffs simply have not met their burden of showing

22  there was classwide exposure to any alleged omission.

23       The *Dupler* case cited in Plaintiffs' reply is

24  distinguishable because the plaintiffs in that case only dealt

25  with *Costco*.  They did not deal with any third-parties.  Thus,

1  the court's provision of a presumption of exposure based on

2  omission makes sense in that case.  It does not make sense

3  here.

4      New York's GBL also requires that a plaintiff must show

5  that he or she was injured as a result of a defendant's

6  deceptive acts or practices.  The *Fero* court found

7  individualized questions regarding whether putative class

8  members were aware of defendant's alleged misrepresentations

9  and/or omissions precluded certification.  The evidence in

10  *Fero,* as in this case, demonstrated that plaintiffs chose their

11  insurance policies for different reasons and, importantly, that

12  some had no choice in the selection at all.

13      The Court further noted that some plaintiffs in the

14  proposed class dealt with affiliates and not the defendant

15  directly.  Ultimately, the Court held that the GBL class was

16  not certifiable because the plaintiffs would need to

17  demonstrate that the plaintiffs -- or excuse me -- the

18  defendant's purportedly deceptive conduct played a role in

19  their PII being stored on the defendant's insecure network,

20  which is simply not amenable to classwide resolution.

21      The same is true here.  Plaintiffs in this case, likewise,

22  chose Marriott hotels for various reasons, sometimes not

23  dealing with Marriott at all when booking and providing their

24  PII.  A bellwether plaintiff who is a federal air marshal chose

25  Marriott hotels based on DHS's travel policies requiring that

1    the hotel be close to the airport, that it had a free shuttle

2    and a fitness center.  He also testified that certain of his

3    reservations were booked for him by someone at work.

4         Plaintiff O'Brien chose Marriott properties for their

5    location and amenities, including because they are close to

6    shopping, one looked like a castle and had an indoor pool.  She

7    also testified that her sole reason for choosing a Marriott to

8    stay at a particular stay was because it was the only hotel

9    offering enough points to get a companion pass on Southwest

10   Airline, and she booked that reservation directly through the

11   Southwest portal.

12        Just like in New York, California's UCL requires that the

13   putative class members were exposed to the deceptive conduct,

14   including any alleged omission.  Thus, for the same reasons as

15   explained for the New York claims, exposure to and causation

16   for the California UCL claim is not amenable to classwide

17   proof.

18        Plaintiffs attempt to oversimplify the proof required by

19   arguing that reliance can be inferred for their proposed UCL

20   class where an omission is material and that materiality can be

21   based on objective factors.

22        Their allegation that they would not have stayed at a

23   Marriott had they known of Marriott's deficient data security

24   is belied by their actions following the breach.  Here the

25   California bellwether plaintiffs continued to book stays with

1  Marriott after receiving notice of the breach and after filing

2  their complaint in this case seeking injunctive relief and

3  arguing they were at imminent risk of another breach by

4  Marriott.

5       As explained by Judge Koh in the *In re Adobe* case where a

6  plaintiff's behavior after discovering the omission was exactly

7  the same as their behavior before they knew of the omission,

8  logic forecloses any allegations of reliance.  She was citing

9  *Noll v. eBay* in that case.

10      The fact that Plaintiffs continued to book stays at

11 Marriott after learning of the data breach is also evident that

12 the alleged omissions are simply not material to Plaintiffs,

13 and, thus, they are not entitled to any classwide presumption

14 of reliance.

15      Just like the New York plaintiffs, the California

16 bellwether plaintiffs testified that they made decisions to

17 book stays at Marriott for all sorts of reasons unrelated to

18 data security.  California Plaintiff Maisto testified that she

19 selected a Marriott hotel because she needed a cat-friendly

20 room to stay at while visiting friends.  She testified that her

21 cats were the sole reason that she chose this hotel.

22      Plaintiffs claim that they can prove a California UCL

23 claim under the Unfair Practices prong of the UCL statute

24 solely by showing that defendants' data security was

25 insufficient and not based on any additional misrepresentations

1   or omissions.  But the case they cite, *In re Adobe*, does not

2   stand for that proposition, and, in fact, it specifically

3   reinforces that the statutory UCL standing requirement of proof

4   of both injury and fact and lost money or property as the

5   result of the alleged act or practice is required for an Unfair

6   Practices claim.  Thus, claims of unfair UCL practices

7   implicate the same individualized causation and injury

8   determinations that I've outlined.

9        Plaintiffs' motion to certify Maryland consumer protection

10  class fares no better.  Individualized issue reliance precludes

11  certification of Maryland's claims as well.  Plaintiffs assert

12  because their claim is based, at least in part, on an omission,

13  they don't need to show actual reliance, but they are entitled

14  to a presumption of reliance based on materiality.

15       As I've explained with regard to the California class

16  members, the same holds true for the Maryland class members.

17  They are not entitled to the presumption because they -- the

18  fact that there had been a data breach was not material to them

19  because they continued to book stays at Marriott following the

20  breach.

21       Importantly, the Fourth Circuit has also recognized that

22  even if reliance is permitted to be presumed, defendants are

23  able to introduce evidence to rebut the presumption with

24  respect to individual plaintiffs.  There is no need to do that

25  here because the testimony that's already been elicited during

1    discovery shows that there was no reliance and that the

2    plaintiffs did not view this fact as material.

3          While Mr. Friedman acknowledged that no nominal damages

4    are available under the California UCL, they are also not

5    available under the Maryland Consumer Protection Act statute.

6    That case is *Frazier v. Castle Ford,* 27 A.3d 583.  And that

7    case was overruled but on other grounds.

8          I would like to turn to the other major individualized

9    issue as to the consumer protection claims, which is actual

10   injury.  Plaintiffs' statutory claims are likewise not capable

11   of certification due to these individualized questions as to

12   plaintiffs' injuries.  Plaintiffs do concede that actual injury

13   as a result of the deceptive conduct is a requirement of the

14   New York, California, and Maryland statutory claims.  And as my

15   colleagues have explained and discovery has shown,

16   individualized stays as to who pays for a given hotel stay has

17   to be determined on a stay-by-stay basis.

18         For example, New York Plaintiffs Cullen and O'Brien were

19   reimbursed for 100 percent of their stays during the class

20   period.  Others plaintiffs were reimbursed for some but not all

21   of their stays.

22         Finally, Plaintiffs attempt to seek certification of a

23   Michigan Identity Theft Protect Act class also fails.  The

24   statute requires that damages were caused by the delay in

25   notification.  Plaintiffs do not have a class representative

1   who suffered damages within the window between Marriott's

2   discovery of the breach and when it provided notice.

3        Neither Plaintiff Wallace nor Gononian booked a stay or

4   stayed at a Marriott in that window, and the only allegation of

5   individualized fraud damages that plaintiffs have asserted

6   within that window involved a payment card that Wallace

7   admitted he never gave to Marriott.

8        Furthermore, Plaintiffs can't prove there's any classwide

9   damage theory for this claim.  As you heard from Plaintiffs,

10  they believe they could prove on a classwide basis that there

11  was harm due to this delay and that it could be resolved on

12  summary judgment.  They have not offered any evidence as to how

13  they would do that, nor could they, because you would have to

14  individually assess any allegation of harm and damages in that

15  window on a plaintiff-by-plaintiff basis.

16       For these reasons, the reasons set forth in Defendants'

17  briefing and the reasons to be presented by co-counsel,

18  Mr. Anderson, this Court should deny Plaintiffs' motion.

19       I'm happy to ask any -- answer any questions the Court may

20  have about the consumer protection issues.

21            THE COURT:  Thank you.

22            MR. ANDERSON:  Good morning, Your Honor.  Devin

23  Anderson on behalf of Defendant Accenture.

24            THE COURT:  Go ahead, sir.

25            MR. ANDERSON:  Plaintiff's class case as to Accenture

1    rises and ultimately falls with their inherent value theory,

2    which is the only classwide theory of harm as to Accenture; but

3    as last month's hearing confirmed, the inherent value theory in

4    Dr. Prince's related damages model rests on a series of

5    completely implausible claims about sales of data that class

6    members didn't want to make and couldn't actually make on

7    markets that don't even exist.   Imaginary sales on imaginary

8    markets do not come close to showing a common classwide injury,

9    and without a common classwide theory of harm, there can be no

10   class.

11        As to Accenture, the only causes of action in play are for

12   negligence.   There aren't contractual or consumer protection

13   claims, which makes sense.   Accenture is not a hotel.   We

14   didn't receive, house, or use Plaintiffs' data, and we never

15   even interacted with Marriott's customers.   In fact, you heard

16   counsel for Plaintiffs today talk about Ms. Mary Frantz's

17   report as the basis for how they're going to show through

18   common proof the existence of a duty and breach.   And yet,

19   Ms. Frantz has no opinions and expressed no opinions about

20   Accenture.

21        And I'll refer the Court to pages 54 through 55 of our

22   class opposition and Exhibit 24 to that opposition where

23   Ms. Frantz admitted she hasn't studied anything about

24   Accenture.

25        There cannot be a more substantial issue in litigation

1   than the fact of an injury and its causal connection to the

2   defendant since the existence of an actual felt harm is both an

3   essential element of any negligence liability case and what

4   gives this Court jurisdiction under Article III.

5        The only classwide theory of injury as to Accenture is

6   inherent value, and the only way that Plaintiffs have offered

7   to establish an injury, a classwide injury through common proof

8   as to inherent value is through Dr. Prince.  And what

9   Dr. Prince is claiming is the idea that class members lost out

10  on potential revenue from selling their data as a result of the

11  breach.

12       This Court came up with the equation R=PxQ as a succinct

13  algebraic summary of what Plaintiffs are doing, but R=PxQ

14  doesn't come close to establishing and measuring a classwide

15  injury.

16       Let's start with P.  The March hearing confirmed that

17  there is not an actual market where -- with actual prices where

18  individuals can go and sell their data.  Instead, what

19  Plaintiffs and Dr. Prince are doing are pulling prices from

20  data broker websites.  But the revenue data brokers can obtain

21  from sales to marketers is not informative of a common

22  classwide injury suffered by the classwide members here.

23       And even if there were a market, we still have to deal

24  with Q in order to establish a classwide injury.  Plaintiffs

25  would need to show that individuals actually lost out on an

1   opportunity to sell.  As you remember from the hearing, Your

2   Honor, Dr. Prince has never been able to articulate how he's

3   going to come up with Q and that's probably because Q makes no

4   sense.

5        There is no reason to believe that the plaintiffs here

6   have lost out on any actual sales of their data as a result of

7   the breach.  They still have the data today and presumably can

8   go sell it if they wanted to.  It's not like grandma's jewels

9   or grandpa's medals or even a rookie Juan Soto baseball card

10  where if I have it and you take it, I don't have it anymore and

11  I can't do anything with it.

12       Ultimately, nothing about R=PxQ has any grounding in

13  reality.  Plaintiffs can't claim they're entitled to lost

14  revenue without showing they actually lost revenue.

15       Because Dr. Prince's inherent value model doesn't

16  establish or measure an actual injury as to the members of the

17  class, it fails both *Daubert* and *Comcast*.  And with that model

18  gone, Plaintiffs' class request fails as to Accenture.  They

19  don't have a way to establish the essential elements of injury,

20  as well as causation and damages relating to the value of PII

21  through common proof.

22       I want to turn to Rule 23(c)(4), Your Honor.  We heard

23  some discussion on that today.  Plaintiffs have asked this

24  Court to certify liability only classes under Rule (c)(4) for

25  the plaintiffs seeking individualized damages relating to

1  mitigation and identity theft.  But because individual issues

2  predominate as to essential elements of liability, like injury

3  and causation, there is nothing for (c)(4) to do here.  That's

4  because there is no way to establish liability up or down as to

5  the entire class.

6      When the Fourth Circuit has countenance the use of (c)(4)

7  -- and I know we've heard a lot of discussion of *Gunnells*

8  today, and I think that's the key case on that -- it has been

9  in the context of a specific coherent theory of liability that

10 could be established on a common classwide basis.

11     Because Plaintiffs cannot establish liability on a common

12 classwide basis as to their negligence claims, we're in the

13 same position Judge Koh found herself in, in *Davidson v. Apple*,

14 where she rejected the use on an issue class as a fallback when

15 the plaintiffs couldn't establish predominance as to

16 reliability because the ultimate question of reliability in

17 addition to damages would still have to result on an

18 individualized basis.

19     Now, what it seems Plaintiffs may be trying to do here,

20 Your Honor, is to carve out individual elements of a single

21 theory of liability and say, well, we can have a (c)(4) class

22 on, let's say, the issue of duty or the issue of breach and

23 then leave the rest for further proceedings.  The Fourth

24 Circuit hasn't endorsed the use of (c)(4) in that manner.  The

25 Fourth Circuit has endorsed (c)(4) only in the context of a

1  specific coherent theory of liability.

2          THE COURT:  Has it rejected it?

3          MR. ANDERSON:  I don't think it specifically rejected

4  it.  I think it reserved that issue.  There was a back and

5  forth between Judge Motz and Judge Niemeyer in the *Gunnells*

6  case on whether you can sort of carve out individual elements

7  of liability.

8      But I think if we get down to nuts and bolts, as Your

9  Honor talked about, and sort of play it out, let's say the

10  Court were to certify a class here as to, say, duty and breach.

11  What happens next?  And let's say a jury finds that there was a

12  breach of a duty.  Well, there is still liability to resolve.

13  We haven't disposed of liability for the entire class of

14  people, and so you would have potentially millions, tens of

15  millions of individual trials on both liability and damages

16  where presumably the plaintiffs --

17          THE COURT:  Hold on.  Hold on.  Duty and breach are

18  part of liability.

19          MR. ANDERSON:  They are part of liability.

20          THE COURT:  The part that if a jury -- if it were

21  certified as to duty and breach and it was a finding in favor

22  of the plaintiffs, those two elements of liability would have

23  be established by the jury.  What's left for liability is

24  causation and then, of course, damages.  Correct?

25          MR. ANDERSON:  I would say injury, causation, and

1    then damages, which serve the quantum, the measurement of any

2    injury that's found by the plaintiffs.  So duty and breach

3    would be established but we would still -- we wouldn't -- it's

4    not a circumstance here, Your Honor, where we're using (c)(4)

5    to carve out liability from damages, which is traditionally how

6    it's been used and which is where the Fourth Circuit has used

7    it.

8        This is a circumstance where you would still have to have

9    potentially tens of millions of trials on liability before you

10   get to any damages calculations.  And proving injury causation

11   and damages --

12       THE COURT:  Let me just make sure that I know what

13   you mean when you say "liability."  If duty and breach are

14   established, what is left that must be established for

15   liability separate from damages?

16       MR. ANDERSON:  Injury and causation I think are the

17   two remaining issues.

18       THE COURT:  Injury and causation are related, are

19   they not?  Or injury was suffered and these people caused it.

20       MR. ANDERSON:  Right.  I think, you know, someone

21   could come forward and say, for example, that they had a

22   fraudulent charge on their credit card.  Defendants may come in

23   and say, well, actually, that's not a credit card you gave to

24   Starwood.  And so whether or not you actually had that

25   fraudulent charge is not caused by any negligent conduct.

1          THE COURT:  So you're saying that the remaining

2   elements of liability, namely injury and causation, would still

3   have to be tried?

4          MR. ANDERSON:  Those would still have to be tried

5   before we get to any measurement and calculation of damages.

6   And so we will not have achieved anything by doing that.  And,

7   in fact, those elements of injury and causation, Your Honor,

8   are likely going to be the subject of substantial expert

9   testimony.  And so -- and even if you go through all of that

10  and a plaintiff shows up with experts and we litigate injury,

11  causation, what are the damages?  Even if you look at what

12  Dr. Prince had done, it's cents on the dollar.  No rational

13  plaintiff is ever going to go down that road.  And so what will

14  have issue classes have accomplished anything -- what will

15  issue classes have accomplished?  They won't have accomplished

16  anything except tremendous expenditure of resources by the

17  parties and by the Court.

18         THE COURT:  So it's impossible to ever certify a data

19  security breach class under these arguments that you're making.

20         MR. ANDERSON:  I'm not -- I don't think it's

21  impossible to certify a data breach class.

22         THE COURT:  Show me a case where it's been done.

23         MR. ANDERSON:  I think there have been data breach

24  class certified.  There was a case called *Brinker* that dealt

25  with a Chili's data breach certification that was down in the

1   Southern District of Florida.  But I think what we have to do

2   is we have to take the theories of harm that are at issue here

3   at face value, and what we're dealing with -- and I'm here on

4   behalf of Accenture -- is a negligence theory premised on the

5   loss of inherent value.

6           THE COURT:  Understood.

7           MR. ANDERSON:  And so because Plaintiffs don't have a

8   way to establish that on a common classwide basis, there is no

9   work for (c)(4) to do here, and it won't have achieved any

10  efficiency gains if we start sort of slicing up individual

11  elements of the claim because ultimately we're still talking

12  about millions, ten of millions potentially of individual

13  trials just to get to liability even before we get to damages.

14      Your Honor, I want to briefly touch on nominal damages.

15          THE COURT:  Nominal?

16          MR. ANDERSON:  On nominal damages just briefly.

17      Again, Plaintiffs -- this is very similar to the (c)(4)

18  issue.  Plaintiffs' request for nominal damages doesn't solve

19  their predominance problems here for a couple of reasons.

20  First and foremost, a prerequisite to the award of nominal

21  damages is injury, and as I've discussed at length, Plaintiffs'

22  central problem is the lack of common evidence to support

23  classwide liability on issues such as injury and causation.  In

24  fact, Plaintiffs' reply brief acknowledges that nominal damages

25  cannot rescue a motion for class certification if Plaintiffs

1  can't prove liability on a classwide basis, which is the case

2  here.

3       And, again, I'll refer the Court to Judge Koh's decision

4  in *Brazil v. Dole* where she wrote that there is no authority to

5  suggest that a damages class should remain certified solely

6  because nominal damages may be available.

7       Finally, as to the 23(b)(2) class, it is not clear to me,

8  Your Honor, that there is even a specific injunction sought

9  against Accenture here and it wouldn't -- and that kind of

10 makes sense because I don't know what injunctive relief would

11 be available given Accenture's role.  And so we don't think

12 that there is any basis for a Rule 23(b)(2) class as to

13 Accenture.  Plaintiffs certainly haven't articulated one in

14 their briefs or here today.

15      And for that, we'll rest of our brief as to the remaining

16 arguments unless the Court has any further questions.

17           THE COURT:  All right, thanks.

18      All right.  Let's take a 20-minute break and then we'll

19 come back and I'll hear from the plaintiffs since it's their

20 motion and then we'll be done.  Thank you.

21           THE COURTROOM DEPUTY:  This Honorable Court now

22 stands in recess.

23      (Recess taken, 11:48 A.M. - 12:12 P.M.)

24           THE COURTROOM DEPUTY:  This Honorable Court now

25 resumes in session.

1          THE COURT:  Be seated, please.

2      All right.  I'll hear from the plaintiffs now.

3  Mr. Friedman, will you be leading off?  Do me a favor, if you

4  would.   Now, the defendants have raised an issue, which I think

5  is a legitimate issue.  I would like to hear your thoughts on

6  it.  And that is how you would undertake to show that class

7  members had actually paid for their stay without reimbursement

8  from another party.  If you had to do that, how would that be

9  done?  How would you go about doing that?

10          MR. FRIEDMAN:  If we had to do that, Your Honor, one

11  thing that can be done in the NDS database itself is you can

12  look at the payment information and that will tell you who

13  paid.  And if it wasn't a credit card, then that's -- that may

14  be a red flag, but it may not be the end of it.  But there is

15  other information like payment information already in the NDS

16  database.

17          THE COURT:  All right.  So you're talking about bank

18  and credit card records.  Is that right?

19          MR. FRIEDMAN:  Correct.

20          THE COURT:  All right.  Are there any other ways that

21  you would do it?

22          MR. FRIEDMAN:  I'm not sure what else is in the

23  database, Your Honor.  But, again, I think we're putting the

24  cart before the horse.

25      If I may, a couple of items.  You know, Mr. Warren used

1    that usage or that analysis of who paid and who didn't pay as a

2    standing argument.  It's not a standing argument.  In fact, the

3    case that he cited to the Court, the *Colapinto* case, wasn't

4    standing; it was ascertainability and we've discussed that.

5         But he also raised the *TransUnion* case, and I'm glad he

6    did because it's important to look at what TransUnion said and

7    what TransUnion did not say.  *TransUnion* was a case about a

8    FCRA claim --

9              THE COURT:  A what?  I'm sorry?

10             MR. FRIEDMAN:  A FCRA claim, F-C-R-A.

11        -- and whether or not it was a violation to put notices

12   about class members, and those notices would say this person

13   may be a criminal or this person may be a terrorist.  And so

14   those notices went in TransUnion's files, and the Court said,

15   no, no, no; that's not concrete harm.  That's not really a risk

16   of harm because it's staying within TransUnion's files.

17        But what the Court did find, without any dispute

18   whatsoever, they said once that information goes out to

19   third-parties, that's a violation.  That's a concrete harm.

20   And that's exactly what we have here.

21        This was an intentional exfiltration of personal

22   information from Marriott.  It wasn't an accidental case.  It

23   wasn't a case where somebody left a laptop in a car and that

24   laptop was found.  This was an intentional intrusion into

25   Marriott where they were successful, and they took all of the

1   information out.  So the harm to the class members and the

2   plaintiffs is totally concrete.  It's totally different.

3        And we also heard from Mr. Keteltas about how difficult it

4   is to go through that NDS database.  And I'm sorry, Your Honor,

5   the cases are legion about that.  You can't cry me a river

6   about that.  It's your database.  If you say your database

7   isn't accurate now and you relied on it before, that's your

8   problem.  It doesn't decertify a class.  And, again, if need

9   be, there can be more information like the payment information

10  that could go through that to help find out who paid and who

11  didn't pay.

12       And we've heard from Mr. Warren on a related matter that

13  if we don't have an inherent market value calculation, if we

14  don't have that formulaic value and part of the class can't use

15  benefit of the bargain damages, then we have no injury and we

16  have no harm and we have no calculation of damages.  Well,

17  that's not so.  We've pointed that out numerous times, Your

18  Honor, but I guess it bears just telling that to the Court

19  again.

20       If we don't have an inherent damage model from Mr. Prince,

21  Dr. Prince, we'll still have Marriott's admissions about the

22  value of personal information to Marriott.  Also, the jury can

23  come up with other ways to come up with that.  The jury can

24  come up with a number of ways to do that.

25            THE COURT:  How would they do that without an expert

1  since the time for disclosure of experts?

2          MR. FRIEDMAN:  Well, part of the report, Your Honor,

3  whether or not that -- whether or not he --

4          THE COURT:  The report?

5          MR. FRIEDMAN:  The report of Dr. Prince.

6          THE COURT:  Oh, I'm sorry.  Go ahead.

7          MR. FRIEDMAN:  I'm sorry.

8      Even if his theory on inherent value was not approved by

9  the Court, there is still factual items within that report such

10  as what does the dark web prices -- what are the dark web

11  prices for value -- for certain personal information?  That can

12  still be utilized by the jury to come up with their own

13  inherent value.

14      But we'd also have nominal damages, and we're not using,

15  as Defendants seem to be accusing us of, we're not using

16  nominal damages as the injury itself.  The injury itself is

17  very clear.  Again, not a laptop case, as Your Honor made a

18  distinction between the Fourth Circuit cases.  This is a case

19  where there was a direct intentional withdrawal of information.

20  They targeted this information.  Thieves targeted this

21  information and they exfiltrated it.  That is the injury.  So

22  the injury already exists.

23      Nominal damages here would only be used, only be used if

24  the formulaic damage theories for calculating precise damages

25  are not utilized.  It's not a separate injury and nobody has

1   ever claimed that.

2          And then finally, Your Honor, I just wanted to say

3   something before I turn it over to Ms. Keller about an argument

4   we just heard about people who didn't pay or did pay and

5   somehow were reimbursed and how that destroys the class.  I

6   mean, that would be kind of crazy.  They are really saying we,

7   Marriott, are not on the hook for anybody if some people got

8   reimbursed.  That -- it just runs afoul of classic class action

9   law, but it also runs afoul of the collateral source rule.

10          Marriott is on the hook for all the damages it caused and

11  it caused these damages.  If, in fact, some people in the class

12  were reimbursed, if they were reimbursed, that would be,

13  perhaps, the subject of a follow-on collateral proceeding

14  against those individuals to turn it over.  It's like an

15  insurance case.  If you hit another car, you're responsible for

16  that.  And if, in fact -- you're responsible for 100 percent of

17  that.  If the insurance repays the victim some of it, that

18  doesn't negate the amount that the defendant owes the

19  plaintiff, and that's exactly what the issue is here.

20          With that, Your Honor, I'll turn it over to Ms. Keller who

21  will talk about the waiver issue.

22                 THE COURT:  Okay.

23                 MS. KELLER:  Thank you, Your Honor.  Would you like

24  me to put the lav back on?

25                 THE COURT:  Just keep talking loud.

1          MS. KELLER:  I will.  I will.

2          THE COURT:  Project and I think we'll be all right.

3          MS. KELLER:  Happy to do so, Your Honor.

4      So briefly the class waiver issue.  As we point out in our

5  reply brief, while Marriott included a one line affirmative

6  defense that miscellaneous contracts contain class waiver

7  without any further explanation or argument, Marriott did

8  participate in the bellwether process for over 30 months

9  without any objection where it selected bellwether claims,

10 presented defenses, participated in extensive discovery,

11 offensive discovery, defensive discovery, and third-party

12 discovery, and would have happily accepted a ruling in favor on

13 a classwide basis at summary judgment.

14      More to the point, while Marriott argues that Plaintiffs

15 cannot have their cake and eat it, too, Marriott argued to the

16 JPML that the litigation should proceed in this court, not in

17 the venue consistent with the venue selection clause that is

18 part of the class action waiver.

19      More to the point, Your Honor, I previously argued that

20 they don't apply, the class waivers, and we discuss that in our

21 reply brief further, and I don't want to repeat any arguments

22 before you; but if they do apply, of course they would be

23 unconscionable if those provisions mean what Marriott says they

24 mean.  Why?  Because individual consumers would have to proceed

25 against Marriott in what has been an incredibly grueling

1    discovery process, submitting to hours of deposition testimony,

2    producing hundreds of pages of documents per plaintiff and

3    having their personal financial accounts subpoenaed for minimal

4    recovery.

5         It would also mean that the hundreds of plaintiffs who

6    have already filed cases in various courts throughout the

7    country would then have to try those cases individually

8    because, as to your earlier question, it is doubtful that

9    Marriott would concede the ability of plaintiffs to use

10   offensive collateral estoppel under *Parklane Hosiery*.  Marriott

11   could gladly overwhelm the court system rather than face

12   liability in this court.

13        And, Your Honor, I think those two arguments especially

14   address the class waiver issue.

15             THE COURT:  Do you have a case that says that it's

16   unconscionable to assert boilerplate class waivers in the type

17   of documents that we're dealing with here?

18             MS. KELLER:  Your Honor, we would be happy to

19   supplement our briefing with that.  There are cases that deal

20   with situations where you have power dynamic where you're

21   presented with a contract on a take it or leave it basis where

22   you have no ability to negotiate the terms of that contract.

23   And that is -- we have both substantive unconscionability and

24   then procedural unconscionability, Your Honor.  If we're

25   preventing individuals from pursuing claims for minimal dollar

1  amounts because of the fact that there is a class waiver that

2  they cannot negotiate, then substantive unconscionability would

3  come into effect.  Both of those things are at issue here.

4      We're happy to provide the Court with those cases if the

5  Court would like them, but basically we would have to just show

6  both procedural and substantive unconscionability, both which

7  are at issue here because there is a problem with the power

8  dynamic.  None of the plaintiffs could have negotiated this

9  contract with Marriott.  None of them.

10     Let's set aside the fact that the contracts don't even

11  apply.  You can't go to a Marriott and say, I'm sorry, I'm not

12  going to give you my personal information because you might not

13  keep it safe and then I wouldn't be able to sue you in a court

14  of law.  That's just -- those aren't the facts before Your

15  Honor, and Marriott has not said that any plaintiff could have

16  negotiated these contracts with them.

17     So, Your Honor, for those reasons, we would also argue

18  that they are unconscionable.

19              THE COURT:  Okay.

20              MS. KELLER:  Thank you.

21     I believe my colleague Mr. Pizzirusso has some closing

22  remarks.

23              THE COURT:  Okay.  Wherever you're ready, sir.

24              MR. PIZZIRUSSO:  Thank you, Your Honor.

25     Just a couple of points to address some of the issues that

1   Mr. Anderson raised, in particular, and I believe Mr. Warren

2   raised as well and that is -- and Your Honor asked, you know,

3   can there ever be a data breach class action?  And there has

4   been a couple.  Mr. Anderson cited the *Brinker* case in

5   particular, and what the Court said there in conclusion -- and

6   this is at star 14 of the 2021 Westlaw 1405508.

7          THE COURT:  Is that the Florida case?

8          MR. PIZZIRUSSO:  Yes, the *In re Brinker Data Incident*

9   *Litigation*.  The Court said, Though this class action is not

10  perfectly composed, on balance, the Court finds it to be an

11  appropriate and, perhaps, the only vehicle for adjudication of

12  the claims of Chili's customers whose personal data was stolen.

13  The court acknowledges it may be the first to certify a Rule

14  23(b)(3) class involving individual consumers complaining of a

15  data breach involving payment cards but is also one of the

16  first to consider the issues, as many individual data breach

17  cases do not reach this point either due to settlement or other

18  disposition.

19      So and I think that goes to the point that was made, which

20  Mr. Anderson said, and when he said to the Court, No rational

21  plaintiff is going to bring a claim for a couple of dollars.

22  And that's why we have the class action device.  The very core

23  of its purpose, as the Supreme Court said in *Amchem Products v.*

24  *Windsor*, 521 U.S. 591 at page 617, the policy at the very core

25  of the class action mechanism is to overcome the problem that

1  small recoveries do not provide the incentive for any

2  individual to bring a solo action prosecuting his or her

3  rights.

4      Your Honor, this is why we need a class action in this

5  case.  This is why manageability concerns should not trump.

6  That's why individual damages concerns should not trump.  We

7  can have (c)(4) to resolve these issues.

8      And the defendants complained about having tens of

9  millions of people come in here and bring individual claims

10  that wouldn't be resolved through a (c)(4) class action.  But

11  at the very least, we could resolve some of the issues, some of

12  the issues.  And no one thinks there's going to be tens of

13  millions of individual cases.  That would never happen.

14        THE COURT:  Well, it would never happen and Marriott

15  doesn't really want it.

16        MR. PIZZIRUSSO:  Exactly.  But it's also why we need

17  and should have a 23(b)(3), a 23(b)(2), and a 23(c)(4) class

18  action in this case.

19        THE COURT:  They don't disagree that class action is

20  the only vehicle under which you can try to bring these.

21  They're complaint is that the class action requirements haven't

22  been met in this particular case for the reasons that we've all

23  been talking about here today.

24      But I do agree that -- I can tell you right now that

25  Mr. Anderson would be doing cartwheels if he had his (c)(4)

1    class and it found no breach.  He'd be more than happy to take

2    that result back to Accenture.

3         Not only that, but the alternative of having thousands and

4    thousands and thousands of these cases brought throughout the

5    United States where these issues have to be tried and the

6    expense and the possibility of inconsistencies where one time

7    that a plaintiff wins against Marriott, then they have to face

8    some collateral estoppel; but each time Marriott wins, it gets

9    them nothing shows that the arguments that are made, legitimate

10   arguments to be made mask the notion that when people are

11   talking about certainly manageability and superiority of class

12   claims, that the fact that class resolution, if successful to

13   the defendants, gives them peace against all the class members

14   is a significant benefit that can never be achieved by a

15   victory against thousands and thousands of individual claims.

16        And that's something that the cases say needs to be looked

17   at with regard to whether or not class action is superior and

18   whether the -- there are management problems.

19        But there are many, many other issues that have been

20   brought out here that are not related to the notion of

21   ascertainability or management that have to be reckoned with,

22   and I'm grateful for the briefing that you all have done and

23   the arguments that you have made.

24        Anything further from the plaintiffs?

25             MR. PIZZIRUSSO:  Nothing further, Your Honor.  Thank

1    you.

2              THE COURT:  All right.  So let's talk schedule.

3    You're doing some briefing on some reports and recommendation

4    for -- by Judge Facciola and we'll deal with those.

5        I have pretty much completed the *Daubert* ruling, and I

6    expect that we'll have finished the decision on the class cert

7    by some point in the week of May 2nd is my goal.  And so you

8    can expect that we'll be having some rulings fairly quickly

9    here.

10        I appreciate the -- both the work that was done for the

11   tutorial and the argument that we had last month on that.  It

12   may have even been March.  It was March.  We're still in April.

13   But hopefully we'll be able to have both decisions -- I intend

14   to issue -- there are separate decisions for each of the

15   motions, but we'll issue them at the same time.

16        So thank you very much.  We are now in recess.

17        Mr. Warren, I hope you feel better, sir.

18              MR. WARREN:  Thank you, Judge Grimm.

19              THE DEPUTY CLERK:  This Honorable Court now stands in

20   recess.

21        (Recess taken, 12:31 P.M.)

22

23

24

25

1          I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

2     foregoing is a correct transcript of the stenographic record of

3     proceedings in the above-entitled matter.

4

5                          Dated this 25th day of April, 2022.

6

7                          _____
                                            /s/
                                       Marlene Kerr
8                           Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 34:25
**$50** [1] - 34:22
**$80** [1] - 53:1

## /

**/s** [1] - 99:6

## 1

**100** [3] - 60:22, 76:19, 91:16
**1003** [1] - 8:6
**11-month** [1] - 68:19
**11:48** [1] - 86:23
**12** [1] - 67:17
**12(b)(6** [1] - 53:7
**12:12** [1] - 86:23
**12:31** [1] - 98:21
**132** [3] - 11:2, 63:22, 63:23
**14** [1] - 95:6
**1405508** [1] - 95:6
**1407(a** [2] - 58:11, 58:14
**15** [2] - 56:7, 59:17
**17** [1] - 56:14
**175** [1] - 26:7
**1989** [1] - 41:20

## 2

**20** [2] - 1:8, 46:20
**20-minute** [1] - 86:18
**2002** [3] - 10:1, 35:14, 66:24
**2007** [1] - 23:18
**2011** [1] - 49:5
**2012** [1] - 14:24
**2014** [2] - 12:20, 13:3
**2016** [1] - 13:5
**2017** [1] - 23:23
**2018** [4] - 5:6, 16:5, 35:18, 36:8
**2020** [1] - 16:11
**2021** [2] - 30:9, 95:6
**2022** [2] - 1:8, 99:5
**20770** [1] - 1:25
**22** [1] - 58:21
**22-page** [2] - 56:6, 57:5
**23** [7] - 5:23, 19:18, 21:1, 22:3, 22:5, 25:5, 47:12
**23(b** [1] - 21:13
**23(b)(2** [4] - 46:17, 86:7, 86:12, 96:17

**23(b)(3** [4] - 41:10, 43:11, 95:14, 96:17
**23(b)(3)'s** [1] - 70:7
**23(c)(4** [4] - 41:17, 46:21, 80:22, 96:17
**24** [1] - 78:22
**25th** [1] - 99:5
**27** [2] - 58:24, 76:6
**270** [1] - 67:16
**28** [1] - 58:11
**29** [1] - 51:24
**2nd** [1] - 98:7

## 3

**30** [2] - 41:14, 92:8
**30(b)(6** [2] - 62:8, 62:16
**301)344-3499** [1] - 1:25
**30th** [2] - 5:5, 30:9
**31** [2] - 56:16, 57:4
**327** [1] - 66:21
**39** [1] - 56:15

## 4

**49** [1] - 63:1

## 5

**50** [1] - 39:4
**521** [1] - 95:24
**54** [1] - 78:21
**55** [1] - 78:21
**583** [1] - 76:6
**591** [1] - 78:22

## 6

**617** [1] - 95:24
**6197418** [1] - 30:8

## 7

**7** [1] - 60:8

## 8

**858-1** [1] - 8:3

## 9

**913251** [1] - 49:5
**935** [1] - 66:14
**99** [1] - 60:19
**9:30** [1] - 1:8

## A

**a)(3** [2] - 22:10, 22:25
**a)(4** [1] - 24:10
**A.3d** [1] - 76:6
**A.H** [1] - 41:20
**A.M** [2] - 1:8, 86:23
**abide** [2] - 8:13, 59:1
**ability** [5] - 27:20, 37:22, 69:21, 93:9, 93:22
**able** [17] - 8:22, 13:14, 14:2, 14:21, 26:3, 26:4, 26:10, 29:15, 33:6, 37:9, 37:22, 44:3, 61:2, 75:23, 80:2, 94:13, 98:13
**ably** [1] - 3:10
**above-entitled** [1] - 99:3
**absent** [1] - 32:9
**absolutely** [1] - 3:17
**ACCENTURE** [1] - 1:19
**Accenture** [29] - 23:19, 23:20, 23:21, 24:1, 24:3, 24:4, 24:9, 24:25, 32:1, 32:6, 32:8, 32:10, 32:11, 32:12, 46:20, 46:21, 77:23, 77:25, 78:2, 78:11, 78:13, 78:20, 78:24, 79:5, 80:18, 85:4, 86:9, 86:13, 97:2
**Accenture's** [2] - 24:7, 86:11
**Accenture-related** [1] - 46:21
**accepted** [2] - 64:19, 92:12
**access** [17] - 10:9, 12:7, 12:14, 12:15, 12:24, 12:25, 13:4, 13:8, 13:10, 13:13, 13:17, 13:25, 14:1, 14:2, 14:23, 18:15, 32:18
**accessing** [1] - 13:18
**accidental** [2] - 18:14, 88:22
**accommodate** [1] - 3:21
**accommodating** [1] - 3:15
**accomplished** [3] - 84:14, 84:15
**according** [6] - 23:18, 23:19, 23:20, 26:8, 31:1, 31:4, 35:13,

35:14, 35:17
**account** [4] - 13:6, 13:7, 50:9, 59:19
**accounted** [1] - 38:2
**accounts** [13] - 11:24, 12:7, 12:11, 12:16, 12:19, 13:4, 13:8, 13:13, 13:15, 13:16, 14:2, 62:23, 93:3
**accrued** [1] - 35:17
**accuracy** [1] - 27:18
**accurate** [1] - 89:7
**accused** [1] - 69:2
**accusing** [1] - 90:15
**achieve** [1] - 37:17
**achieved** [3] - 84:6, 85:9, 97:14
**acknowledged** [1] - 76:3
**acknowledges** [3] - 32:8, 85:24, 95:13
**across-the-board** [1] - 29:11
**act** [1] - 75:5
**Act** [6] - 5:13, 5:14, 34:7, 69:16, 76:5, 76:23
**action** [24] - 35:16, 35:17, 36:2, 36:16, 41:9, 42:17, 46:16, 47:10, 61:2, 68:24, 78:11, 91:8, 92:18, 95:3, 95:9, 95:22, 95:25, 96:2, 96:4, 96:10, 96:18, 96:19, 96:21, 97:17
**Action** [1] - 1:3
**Actions** [1] - 58:15
**actions** [5] - 29:17, 62:11, 63:12, 69:3, 73:24
**acts** [2] - 66:15, 72:6
**actual** [21] - 11:14, 21:25, 25:15, 34:21, 34:24, 35:1, 47:18, 47:19, 47:25, 48:1, 52:25, 53:18, 53:20, 75:13, 76:9, 76:12, 79:2, 79:17, 80:6, 80:16
**adapt** [1] - 15:8
**addition** [4] - 34:20, 46:19, 60:5, 81:17
**additional** [5] - 21:6, 25:20, 27:14, 49:23, 74:25
**additionally** [1] - 13:23
**address** [14] - 6:1, 8:9, 26:1, 26:21, 46:20,

48:17, 55:14, 64:17, 65:7, 69:5, 93:14, 94:25
**addressed** [3] - 46:1, 48:12
**addresses** [4] - 25:24, 26:15, 65:4, 65:8
**addressing** [3] - 46:11, 46:16, 55:9
**adequacy** [4] - 24:11, 24:13, 24:23, 25:2
**adequate** [2] - 22:25
**adequately** [2] - 37:12, 64:8
**adjudicating** [1] - 36:17
**adjudication** [1] - 95:11
**adjust** [1] - 7:16
**Adkins** [1] - 63:21
**administrative** [1] - 66:22
**administratively** [1] - 25:10
**admission** [2] - 29:6, 33:4
**admissions** [1] - 89:21
**admit** [1] - 50:21
**admitted** [4] - 48:2, 71:16, 77:7, 78:23
**admitting** [1] - 58:5
**Adobe** [2] - 74:5, 75:1
**advance** [1] - 71:3
**advantages** [1] - 37:18
**affidavit** [1] - 57:23
**affiliates** [1] - 72:14
**affirmed** [1] - 8:25
**afforded** [1] - 37:8
**afoul** [2] - 91:8, 91:9
**agencies** [1] - 71:8
**agent** [1] - 61:21
**agree** [5] - 10:18, 38:14, 39:16, 40:14, 96:24
**agreed** [3] - 28:4, 58:24, 59:25
**Agreement** [1] - 55:10
**agreement** [8] - 18:7, 56:16, 57:3, 58:7, 58:23, 60:1, 60:2, 61:4
**ahead** [5] - 7:19, 22:22, 41:6, 77:24, 90:6
**Aided** [1] - 1:22
**air** [1] - 72:24
**Airline** [1] - 73:10
**airlines** [1] - 71:8

**airport** [1] - 73:1
**alerted** [1] - 14:6
**alerts** [2] - 13:13, 14:4
**algebraic** [1] - 79:13
**allegation** [6] - 58:9, 60:1, 61:12, 73:22, 77:4, 77:14
**allegations** [1] - 74:8
**allege** [7] - 49:10, 66:12, 66:15, 66:18, 66:19, 69:7, 71:5
**alleged** [12] - 23:4, 48:1, 52:17, 53:1, 70:10, 70:12, 70:18, 71:22, 72:8, 73:14, 74:12, 75:5
**alleges** [2] - 58:22, 67:12
**alleging** [2] - 53:4, 58:21
**allocate** [1] - 50:5
**allocated** [1] - 42:25
**allocation** [4] - 27:8, 42:18, 42:22, 50:2
**allow** [5] - 14:16, 26:3, 28:22, 29:11, 43:22
**allowed** [4] - 13:7, 15:1, 62:6, 62:16
**allows** [1] - 14:15
**alluded** [1] - 16:24
**alone** [3] - 49:17, 54:24
**alteration** [1] - 68:6
**alternative** [2] - 30:20, 97:3
**Amarena** [2] - 23:15, 24:7
**Amchem** [1] - 95:23
**amenable** [2] - 72:20, 73:16
**Amended** [1] - 60:19
**amended** [1] - 56:5
**amenities** [1] - 73:5
**American** [1] - 57:20
**amount** [4] - 27:8, 44:3, 44:12, 91:18
**amounts** [1] - 94:1
**Amy** [2] - 5:24, 7:3
**AMY** [1] - 1:13
**analyses** [2] - 33:12, 34:25
**analysis** [9] - 16:21, 22:4, 28:19, 29:19, 32:19, 32:24, 33:13, 35:4, 88:1
**Anderson** [7] - 46:19, 77:18, 77:23, 95:1, 95:4, 95:20, 96:25
**ANDERSON** [13] - 1:20, 77:22, 77:25,

82:3, 82:19, 82:25, 83:16, 83:20, 84:4, 84:20, 84:23, 85:7, 85:16
**ANDREW** [1] - 1:12
**Andrew** [2] - 3:9, 4:17
**announced** [1] - 5:5
**answer** [6] - 34:10, 44:22, 55:23, 57:21, 58:6, 77:19
**answered** [2] - 32:22, 33:11
**answers** [3] - 38:20, 50:18, 59:15
**Answers** [1] - 30:14
**antagonistic** [1] - 24:14
**apologies** [2] - 15:20, 22:11
**Appeal** [1] - 41:13
**appear** [1] - 27:2
**appellate** [1] - 43:4
**apple** [1] - 81:13
**applicable** [2] - 32:2, 70:4
**application** [2] - 28:16, 30:21
**applied** [4] - 33:2, 33:6, 67:3, 67:4
**applies** [1] - 61:10
**apply** [12] - 18:10, 18:20, 25:10, 34:17, 46:3, 57:5, 58:23, 59:12, 67:5, 92:20, 92:22, 94:11
**appointment** [1] - 61:1
**apportion** [1] - 39:2
**apportionability** [1] - 38:24
**appreciate** [5] - 3:16, 9:16, 21:23, 45:13, 98:10
**approach** [3] - 38:23, 56:10, 63:14
**appropriate** [2] - 56:18, 95:11
**approved** [1] - 90:8
**April** [2] - 98:12, 99:5
**APRIL** [1] - 1:8
**area** [1] - 10:15
**argue** [16] - 2:20, 7:12, 9:1, 16:19, 17:8, 17:21, 17:24, 18:1, 18:2, 18:5, 27:2, 46:6, 55:15, 61:6, 61:14, 94:17
**argued** [5] - 32:6, 58:20, 59:14, 92:15, 92:19

**argues** [2] - 18:17, 92:14
**arguing** [4] - 3:7, 9:14, 73:19, 74:3
**argument** [34] - 3:25, 4:6, 8:5, 16:20, 22:7, 22:8, 23:13, 29:23, 30:22, 30:23, 35:6, 46:15, 51:23, 52:7, 52:19, 52:22, 54:21, 55:9, 55:14, 55:22, 55:23, 56:1, 58:4, 58:8, 58:19, 59:3, 59:9, 60:3, 67:10, 88:2, 91:3, 92:7, 98:11
**arguments** [18] - 11:12, 23:4, 37:20, 45:1, 45:13, 46:21, 55:20, 58:17, 61:8, 69:22, 70:2, 84:19, 86:16, 92:21, 93:13, 97:9, 97:10, 97:23
**arise** [1] - 55:1
**Arizona** [1] - 26:6
**arm** [1] - 37:21
**Arno** [1] - 62:25
**Artemis** [2] - 63:2, 63:3
**Article** [15] - 30:23, 46:22, 47:5, 47:8, 47:9, 47:11, 48:7, 49:22, 51:24, 52:3, 52:9, 52:20, 53:6, 54:2, 79:4
**articulate** [1] - 80:2
**articulated** [1] - 86:13
**asbestos** [3] - 41:25, 42:2, 42:3
**ascertain** [1] - 21:24
**ascertainability** [11] - 21:23, 25:4, 26:18, 26:23, 27:7, 27:10, 30:22, 65:2, 66:7, 88:4, 97:21
**ascertainable** [2] - 27:4, 66:8
**ascertained** [1] - 27:17
**aside** [1] - 94:10
**asleep** [1] - 10:14
**aspects** [1] - 37:15
**assert** [7] - 14:11, 18:9, 34:12, 53:3, 59:3, 75:11, 93:16
**asserted** [3] - 19:1, 28:6, 77:5
**assertion** [2] - 19:12, 35:7
**asserts** [1] - 28:13

**assess** [1] - 77:14
**assessment** [1] - 16:4
**assessments** [1] - 16:6
**assistance** [1] - 17:18
**assisted** [1] - 3:10
**assume** [1] - 6:22
**assumes** [1] - 38:8
**assuming** [2] - 39:15, 45:22
**attached** [1] - 11:1
**attack** [3] - 14:5, 14:6, 14:7
**attackers** [1] - 28:21
**attacks** [1] - 62:15
**attempt** [3] - 70:14, 73:18, 76:22
**attention** [5] - 2:3, 8:18, 49:3, 64:21, 70:2
**attorney** [1] - 71:15
**attorneys** [2] - 49:11, 49:15
**audience** [1] - 2:18
**audits** [3] - 11:13, 16:5, 62:18
**authentication** [7] - 10:7, 10:8, 11:18, 12:1, 12:3, 12:7, 13:16
**authority** [3] - 49:23, 58:13, 86:4
**automobile** [1] - 48:22
**available** [10] - 8:1, 13:18, 14:11, 15:2, 29:16, 36:17, 76:4, 76:5, 86:6, 86:11
**avoid** [2] - 33:7, 57:1, 70:14
**award** [4] - 28:22, 34:23, 44:11, 85:20
**awarded** [2] - 30:11, 38:25, 42:24
**aware** [3] - 21:19, 58:10, 72:8
**awkward** [1] - 10:17

**B**

**b)(2** [2] - 36:25, 37:1
**b)(3** [6] - 21:13, 21:20, 27:21, 36:16, 36:23, 44:11
**b)(3** [1] - 43:22
**bag** [1] - 23:23
**baggage** [1] - 48:20
**BAKER** [1] - 1:17
**balance** [1] - 95:10
**bank** [2] - 68:10, 87:17
**bargain** [19] - 6:16,

6:20, 17:3, 20:17, 21:1, 28:18, 29:13, 31:5, 31:8, 33:1, 34:18, 35:4, 44:13, 47:21, 51:3, 54:10, 54:12, 54:14, 89:15
**barred** [1] - 35:12
**barring** [1] - 58:1
**baseball** [1] - 80:9
**based** [25] - 14:10, 15:2, 16:14, 18:24, 19:2, 19:3, 23:6, 28:19, 28:22, 29:1, 32:19, 34:24, 48:5, 55:1, 56:21, 63:5, 69:14, 70:12, 70:17, 72:1, 72:25, 73:21, 74:25, 75:12, 75:14
**basic** [1] - 47:17
**basis** [15] - 15:17, 37:19, 48:2, 76:17, 77:10, 77:15, 78:17, 81:10, 81:12, 81:18, 85:8, 86:1, 86:12, 92:13, 93:21
**baton** [1] - 40:1
**beach** [1] - 68:5
**bearing** [1] - 27:7
**bears** [1] - 89:18
**Beaty** [1] - 48:22
**became** [2] - 23:20, 24:1
**Beck** [1] - 52:7
**becomes** [1] - 10:16
**BEFORE** [1] - 1:7
**begin** [5] - 7:23, 35:25, 45:25, 46:24, 55:9
**beginning** [2] - 16:25, 46:2
**begins** [1] - 45:7
**behalf** [13] - 3:6, 3:7, 3:8, 3:24, 4:18, 7:4, 40:5, 45:9, 59:4, 69:12, 77:23, 85:4
**behavior** [2] - 74:6, 74:7
**belied** [1] - 73:24
**belies** [1] - 64:22
**believes** [1] - 64:1
**bellwether** [23] - 4:19, 4:21, 27:23, 36:13, 38:22, 39:17, 50:17, 50:24, 51:14, 56:6, 56:20, 58:7, 61:11, 64:23, 69:19, 70:23, 70:24, 71:5, 72:24, 73:25, 74:16, 92:8, 92:9
**bellwethers** [3] - 38:8,

38:20, 67:12
**beneficial** [1] - 40:12
**benefit** [21] - 6:16,
6:20, 17:2, 20:17,
21:1, 28:18, 29:13,
31:5, 31:7, 33:1,
34:17, 35:4, 44:13,
47:20, 51:2, 54:9,
54:12, 54:14, 54:25,
89:15, 97:14
**Bennett** [4] - 55:21,
57:13, 61:3, 65:15
**best** [2] - 22:2, 45:24
**bet** [1] - 30:6
**better** [3] - 23:12,
75:10, 98:17
**between** [3] - 77:1,
82:5, 90:18
**beyond** [1] - 67:13
**big** [3] - 38:19, 65:3,
67:21
**Bill** [5] - 26:4, 26:10,
26:22
**bills** [1] - 68:21
**bind** [1] - 57:10
**bit** [3] - 10:16, 49:8,
67:9
**blamed** [1] - 68:8
**board** [4] - 29:11,
30:21, 34:17, 38:14
**boilerplate** [1] - 93:16
**bolts** [2] - 21:25, 82:8
**book** [5] - 57:9, 73:25,
74:10, 74:17, 75:19
**booked** [8] - 26:6,
57:6, 70:25, 71:6,
71:7, 73:3, 73:10,
77:3
**booking** [3] - 70:24,
71:1, 72:23
**bookings** [2] - 22:16,
22:17
**bound** [4] - 24:4,
28:12, 60:3
**Brazil** [1] - 86:4
**Breach** [1] - 2:11
**BREACH** [1] - 1:4
**breach** [88] - 4:22, 5:5,
5:12, 5:19, 6:1, 6:6,
6:16, 9:24, 10:23,
11:3, 12:2, 12:6,
12:9, 13:10, 15:7,
15:13, 15:15, 15:16,
16:10, 16:12, 16:20,
17:5, 17:7, 19:24,
20:1, 23:7, 23:9,
26:7, 27:25, 28:2,
29:17, 30:24, 31:22,
32:15, 33:11, 34:9,
35:9, 35:23, 37:4,

46:7, 52:22, 53:9,
53:13, 53:18, 53:21,
55:12, 56:8, 58:22,
59:3, 60:1, 62:10,
62:11, 63:5, 63:13,
64:24, 64:25, 66:12,
66:19, 66:20, 68:7,
69:4, 69:6, 73:24,
74:1, 74:3, 74:11,
75:18, 75:20, 77:2,
78:18, 79:11, 80:7,
81:22, 82:10, 82:12,
82:17, 82:21, 83:2,
83:13, 84:19, 84:21,
84:23, 84:25, 95:3,
95:15, 95:16, 97:1
**breached** [3] - 28:13,
31:20, 32:22
**breaches** [1] - 52:12
**break** [3] - 51:3, 51:4,
86:18
**brief** [16] - 9:22, 12:12,
20:20, 51:25, 53:12,
54:23, 55:15, 56:4,
58:21, 63:2, 68:2,
70:16, 85:24, 86:15,
92:5, 92:21
**briefing** [1] - 8:17,
22:13, 25:23, 42:14,
42:15, 48:17, 49:20,
77:17, 93:19, 97:22,
98:3
**briefly** [7] - 7:23, 54:5,
66:9, 67:6, 85:14,
85:16, 92:4
**briefs** [2] - 5:1, 86:14
**bring** [5] - 61:2, 95:21,
96:2, 96:9, 96:20
**bringing** [3] - 19:2,
19:3, 56:14
**Brinker** [3] - 84:24,
95:4, 95:8
**broad** [1] - 37:5
**broadest** [1] - 60:10
**broker** [1] - 79:20
**brokers** [1] - 79:20
**brought** [5] - 27:25,
35:18, 37:16, 97:4,
97:20
**bucks** [1] - 26:8
**buildings** [1] - 42:1
**bulk** [1] - 20:24
**burden** [5] - 40:16,
47:13, 51:19, 71:21
**business** [2] - 34:5,
51:15
**butler's** [1] - 28:19
**BY** [7] - 1:12, 1:13,
1:15, 1:17, 1:18,
1:18, 1:20

C

**c)(4** [19] - 20:22,
21:16, 39:20, 39:23,
43:20, 44:21, 67:9,
80:24, 81:3, 81:6,
81:21, 81:24, 81:25,
83:4, 85:9, 85:17,
96:7, 96:10, 96:25
**cake** [1] - 92:15
**calculate** [1] - 30:12
**calculated** [1] - 68:20
**calculating** [1] - 90:24
**calculation** [5] - 29:7,
33:2, 84:5, 89:13,
89:16
**calculations** [2] -
28:17, 83:10
**California** [16] - 5:7,
33:20, 34:1, 34:18,
49:5, 69:13, 69:20,
70:12, 73:16, 73:25,
74:15, 74:18, 74:22,
75:15, 76:4, 76:14
**California's** [1] - 73:12
**Canada** [1] - 22:16
**cannot** [15] - 14:12,
19:16, 30:20, 36:23,
48:1, 52:9, 53:25,
54:14, 54:19, 71:20,
78:25, 81:11, 85:25,
92:15, 94:2
**capabilities** [2] -
62:15, 62:16
**capable** [3] - 20:2,
32:13, 76:10
**capital** [2] - 58:2, 58:3
**car** [2] - 88:23, 91:15
**card** [15] - 14:22, 16:3,
16:8, 26:2, 27:15,
65:8, 65:20, 65:24,
68:12, 77:6, 80:9,
83:22, 83:23, 87:13,
87:18
**cards** [1] - 95:15
**Cards** [1] - 66:1
**care** [4] - 10:20, 31:24,
32:1, 32:17
**Career** [1] - 61:2
**cart** [1] - 87:24
**cartwheels** [1] - 96:25
**carve** [3] - 81:20, 82:6,
83:5
**case** [106] - 3:18, 10:4,
10:8, 11:9, 12:2,
12:8, 12:13, 12:14,
13:11, 20:24, 24:20,
26:24, 29:5, 29:24,
30:2, 30:5, 30:7,
30:17, 31:25, 32:8,

36:16, 38:19, 39:1,
39:7, 41:9, 41:17,
41:21, 41:24, 42:4,
42:10, 42:15, 42:20,
43:1, 45:7, 46:2,
46:3, 47:7, 47:16,
47:17, 48:20, 48:21,
48:22, 48:23, 49:4,
49:6, 49:19, 49:21,
50:17, 50:25, 52:15,
52:24, 53:11, 54:16,
55:24, 56:2, 57:2,
57:20, 59:10, 63:18,
63:21, 64:6, 66:11,
66:23, 67:3, 67:4,
67:14, 68:16, 68:18,
68:21, 71:23, 71:24,
72:2, 72:10, 72:21,
74:2, 74:5, 74:9,
75:1, 76:6, 76:7,
77:25, 79:3, 81:8,
82:6, 84:22, 84:24,
86:1, 88:3, 88:5,
88:7, 88:22, 88:23,
90:17, 90:18, 91:15,
93:15, 95:4, 95:7,
96:5, 96:18, 96:22
**cases** [32] - 12:16,
28:8, 29:14, 33:16,
35:23, 35:24, 36:22,
37:16, 37:20, 39:15,
40:8, 40:11, 40:14,
40:15, 42:17, 42:23,
48:17, 48:24, 52:14,
54:1, 54:22, 57:19,
61:18, 89:5, 90:18,
93:6, 93:7, 93:19,
94:4, 95:17, 96:13,
97:4, 97:16
**castle** [2] - 73:6, 76:6
**cat** [2] - 23:22, 74:19
**cat-friendly** [1] - 74:19
**catastrophic** [2] -
9:23, 12:9
**catch** [1] - 13:22
**catching** [1] - 13:2
**categories** [3] - 67:17,
67:18, 69:6
**category** [1] - 18:24
**cats** [1] - 74:21
**causal** [1] - 79:1
**causation** [21] - 19:24,
20:1, 20:14, 33:8,
70:6, 70:9, 70:19,
73:15, 75:7, 80:20,
81:3, 82:24, 82:25,
83:10, 83:16, 83:18,
84:2, 84:7, 84:11,
85:23
**caused** [7] - 31:22,

33:17, 76:24, 83:19,
83:25, 91:10, 91:11
**causes** [2] - 35:16,
78:11
**cautionary** [1] - 3:18
**CCPA** [2] - 29:4, 33:5
**center** [2] - 52:12,
73:2
**Central** [2] - 41:24,
49:5
**central** [2] - 60:16,
85:22
**cents** [1] - 84:12
**ceremony** [1] - 45:14
**cert** [1] - 98:6
**certain** [11] - 11:12,
13:8, 15:3, 49:1,
50:21, 58:1, 66:1,
66:2, 73:2, 90:11
**certainly** [10] - 40:18,
40:19, 40:23, 43:21,
44:6, 44:11, 44:15,
46:3, 86:13, 97:11
**certifiable** [2] - 69:17,
72:16
**certification** [39] - 8:3,
9:2, 10:19, 11:1,
20:22, 22:5, 31:18,
33:15, 39:11, 41:18,
42:20, 46:10, 46:12,
46:17, 46:25, 47:23,
49:1, 49:19, 50:2,
51:12, 51:21, 54:24,
55:11, 55:16, 56:3,
56:19, 57:15, 58:8,
58:9, 61:9, 64:19,
67:19, 70:17, 72:9,
75:11, 76:11, 76:22,
84:25, 85:25
**certified** [15] - 19:16,
21:25, 30:25, 33:16,
36:23, 39:12, 43:10,
44:5, 44:9, 44:13,
44:18, 54:20, 82:21,
84:24, 86:5
**certifies** [1] - 39:16
**certify** [16] - 4:20,
25:19, 41:9, 41:23,
42:4, 47:1, 68:23,
69:13, 70:11, 75:9,
80:24, 82:10, 84:18,
84:21, 95:13, 99:1
**challenge** [2] - 24:23,
62:7
**challenged** [2] - 8:17,
53:15
**challenging** [1] - 25:2
**change** [1] - 2:14
**changed** [3] - 14:24,
42:6, 67:23

**charge** [2] - 83:22, 83:25
**charges** [3] - 49:12, 68:8, 68:12
**Check** [1] - 41:9
**cheese** [2] - 67:1, 67:2
**Chicago** [1] - 7:4
**Chief** [1] - 62:25
**chief** [1] - 16:20
**child** [1] - 68:17
**Chili's** [2] - 84:25, 95:12
**choice** [2] - 33:25, 72:12
**choosing** [1] - 73:7
**Chopra** [2] - 30:7, 30:8
**chose** [5] - 72:10, 72:22, 72:24, 73:4, 74:21
**Circuit** [16] - 21:20, 21:22, 25:8, 29:24, 41:8, 41:14, 41:25, 42:1, 52:8, 53:12, 75:21, 81:6, 81:24, 81:25, 83:6, 90:18
**circumstance** [2] - 83:4, 83:8
**circumstances** [3] - 8:14, 36:1, 45:19
**cite** [7] - 49:20, 49:25, 54:23, 57:19, 62:13, 66:11, 75:1
**cited** [6] - 48:17, 53:11, 65:10, 71:23, 88:3, 95:4
**citing** [1] - 74:8
**civil** [1] - 2:10
**Civil** [1] - 1:3
**claim** [34] - 5:13, 6:1, 17:10, 29:15, 30:25, 31:5, 32:25, 34:19, 34:20, 36:6, 39:7, 46:1, 48:8, 52:18, 53:3, 53:9, 54:6, 54:10, 54:11, 54:15, 54:19, 55:1, 70:15, 73:16, 74:22, 74:23, 75:6, 75:12, 77:9, 80:13, 85:11, 88:8, 88:10, 95:21
**claimants** [1] - 68:19
**claimed** [1] - 91:1
**claiming** [1] - 79:9
**claims** [66] - 6:6, 6:17, 6:19, 19:7, 23:9, 24:13, 24:14, 24:21, 27:23, 28:17, 31:4, 31:16, 31:18, 33:14, 33:15, 33:17, 34:16,

35:5, 35:8, 35:9, 35:12, 35:19, 36:11, 36:14, 36:20, 37:16, 37:24, 38:3, 38:9, 38:10, 38:11, 38:21, 38:22, 46:18, 47:17, 53:5, 55:13, 56:9, 58:7, 59:4, 61:10, 64:22, 68:1, 68:21, 69:15, 69:16, 70:5, 70:8, 70:11, 71:13, 73:15, 75:6, 75:11, 76:9, 76:10, 76:14, 78:5, 78:13, 81:12, 92:9, 93:25, 95:12, 96:9, 97:12, 97:15
**clarify** [2] - 6:10, 44:15
**class** [193] - 4:25, 5:8, 5:20, 7:4, 8:2, 9:2, 10:19, 11:1, 17:14, 17:15, 18:19, 19:16, 20:22, 22:5, 23:3, 23:4, 23:6, 23:12, 23:15, 23:18, 24:2, 24:14, 24:15, 24:16, 24:21, 25:9, 25:11, 25:15, 26:24, 27:1, 27:9, 27:11, 27:17, 27:20, 28:7, 28:10, 28:11, 28:14, 29:4, 29:8, 29:14, 31:1, 32:3, 32:4, 32:9, 32:11, 32:13, 32:17, 32:22, 33:4, 33:9, 33:11, 34:11, 35:8, 35:9, 35:12, 35:14, 35:15, 35:18, 36:4, 36:16, 36:19, 37:1, 37:12, 37:16, 37:18, 39:6, 39:16, 42:17, 42:20, 44:2, 44:7, 44:12, 44:16, 46:10, 46:11, 46:16, 47:1, 47:2, 47:7, 47:10, 47:15, 47:23, 48:12, 49:1, 49:9, 49:13, 49:15, 49:18, 50:13, 50:15, 51:2, 51:21, 54:24, 54:25, 55:9, 55:10, 55:11, 55:16, 55:20, 55:22, 56:3, 56:19, 57:14, 58:8, 58:9, 58:23, 60:4, 60:9, 61:1, 61:2, 61:4, 61:9, 61:13, 62:2, 64:3, 64:18, 66:1, 67:19, 68:11, 68:23, 70:4, 70:16, 70:21, 72:7, 72:14, 72:15, 73:13, 73:20, 75:10, 75:15, 75:16,

76:19, 76:23, 76:25, 77:25, 78:5, 78:10, 78:22, 79:9, 80:17, 80:18, 81:5, 81:14, 81:21, 82:10, 82:13, 84:19, 84:21, 84:24, 85:25, 86:5, 86:7, 86:12, 87:6, 88:12, 89:1, 89:8, 89:14, 91:5, 91:8, 91:11, 92:4, 92:6, 92:18, 92:20, 93:14, 93:16, 94:1, 95:3, 95:9, 95:14, 95:22, 95:25, 96:4, 96:10, 96:17, 96:19, 96:21, 97:1, 97:11, 97:12, 97:13, 97:17, 98:6
**classes** [35] - 4:19, 4:21, 4:22, 4:23, 5:7, 5:18, 5:19, 5:22, 21:24, 25:9, 25:20, 27:3, 27:4, 27:25, 29:14, 29:21, 30:24, 31:17, 33:3, 36:18, 39:12, 43:9, 43:15, 44:5, 55:20, 56:20, 57:17, 69:13, 69:20, 80:24, 84:14, 84:15
**classic** [3] - 26:23, 28:8, 91:8
**classified** [1] - 44:12
**classwide** [38] - 6:8, 6:10, 7:25, 10:3, 17:10, 20:2, 20:16, 22:14, 38:1, 38:25, 39:11, 43:23, 47:13, 48:2, 48:9, 51:23, 53:17, 71:22, 72:20, 73:16, 74:13, 77:8, 77:10, 78:2, 78:8, 78:9, 79:5, 79:7, 79:14, 79:22, 79:24, 81:10, 81:12, 85:8, 85:23, 86:1, 92:13
**clause** [3] - 57:22, 57:24, 92:17
**clauses** [1] - 58:13
**cleaned** [1] - 26:20
**cleanup** [2] - 13:6, 13:7
**clear** [11] - 6:18, 6:23, 17:14, 22:13, 29:16, 37:6, 50:3, 53:12, 59:7, 86:7, 90:17
**clearly** [1] - 26:19
**CLERK** [1] - 98:19
**clever** [2] - 41:1
**clients** [1] - 49:12
**close** [8] - 2:22, 7:12,

29:3, 69:3, 73:1, 73:5, 78:8, 79:14
**closely** [1] - 8:10
**closest** [1] - 43:1
**closing** [1] - 94:21
**co** [1] - 77:17
**co-counsel** [1] - 77:17
**code** [1] - 11:25
**COHEN** [1] - 1:11
**Cohen** [2] - 3:9, 4:18
**coherent** [2] - 81:9, 82:1
**Colapinto** [3] - 49:4, 49:19, 88:3
**collateral** [5] - 37:20, 91:9, 91:13, 93:10, 97:8
**colleague** [5] - 5:24, 46:15, 69:9, 69:18, 94:21
**colleagues** [3] - 6:4, 42:19, 76:15
**collected** [1] - 60:22
**combat** [1] - 11:15
**Comcast** [2] - 64:8, 80:17
**comfortable** [1] - 7:12
**coming** [2] - 45:16, 45:21
**comment** [1] - 64:10
**comments** [3] - 45:13, 48:12, 49:24
**Commissioner's** [1] - 16:11
**commit** [2] - 14:16
**committee** [1] - 24:20
**committing** [1] - 60:15
**common** [29] - 10:3, 17:23, 19:18, 20:2, 20:16, 27:22, 27:24, 28:14, 29:11, 32:3, 32:13, 33:9, 33:17, 35:7, 37:17, 41:23, 42:24, 70:10, 71:20, 78:8, 78:9, 78:18, 79:7, 79:21, 80:21, 81:10, 81:11, 85:8, 85:22
**commonality** [1] - 22:8
**Communications** [1] - 52:24
**companies** [1] - 15:6
**companion** [1] - 73:9
**compared** [1] - 62:15
**complained** [1] - 96:8
**complaining** [2] - 50:4, 95:14
**complaint** [6] - 29:22, 30:1, 30:16, 59:14,

74:2, 96:21
**Complaint** [2] - 60:19, 67:16
**complete** [1] - 8:17
**completed** [2] - 50:3, 98:5
**completely** [1] - 78:5
**comply** [1] - 64:5
**composed** [1] - 95:10
**comprehensive** [1] - 15:13
**compromised** [1] - 5:4
**Computer** [1] - 1:22
**Computer-Aided** [1] - 1:22
**concede** [2] - 76:12, 93:9
**conceded** [2] - 46:5, 46:7
**concept** [2] - 12:21, 38:19
**concerned** [3] - 8:21, 53:2, 68:22
**concerning** [3] - 8:5, 9:6, 19:7
**concerns** [2] - 96:5, 96:6
**concluded** [1] - 48:18
**conclusion** [1] - 95:5
**concrete** [4] - 53:20, 88:15, 88:19, 89:2
**conditionally** [2] - 42:3, 68:22
**conditions** [11] - 18:6, 18:18, 18:19, 19:1, 19:6, 19:11, 19:13, 59:6, 59:11
**conduct** [6] - 51:5, 70:22, 72:18, 73:13, 76:13, 83:25
**conducted** [1] - 51:1
**confidentiality** [2] - 8:19, 8:21
**confirmed** [2] - 78:3, 79:16
**Connecticut** [3] - 4:24, 23:14
**connection** [3] - 5:3, 17:3, 79:1
**consent** [4] - 38:16, 40:8, 40:18, 41:1
**consequential** [1] - 29:18
**consider** [1] - 95:16
**considered** [1] - 49:22
**consistent** [3] - 12:22, 18:10, 92:17
**Consumer** [2] - 5:13, 76:5

**CONSUMER** [1] - 1:10
**consumer** [15] - 4:21,
5:7, 6:6, 6:16, 33:14,
33:22, 33:24, 34:15,
69:14, 70:17, 71:15,
75:9, 76:9, 77:20,
78:12
**consumers** [4] -
14:13, 16:22, 92:24,
95:14
**contain** [1] - 92:6
**contained** [1] - 52:13
**containing** [1] - 10:9
**contains** [1] - 25:14
**contemplates** [2] -
25:20, 38:7
**contention** [1] - 43:8
**contest** [2] - 33:8,
46:1
**contested** [1] - 22:7
**context** [2] - 81:9,
81:25
**contexts** [1] - 48:18
**continued** [4] - 64:23,
73:25, 74:10, 75:19
**contract** [49] - 4:22,
5:18, 5:19, 6:1, 6:6,
6:17, 23:9, 23:10,
27:25, 28:2, 28:3,
28:12, 28:14, 28:17,
29:17, 30:24, 31:4,
32:25, 35:9, 35:19,
35:24, 52:22, 53:4,
53:10, 53:13, 53:18,
53:21, 55:12, 55:19,
55:20, 56:3, 56:20,
56:21, 58:1, 58:22,
58:25, 59:4, 59:7,
59:8, 59:11, 59:20,
61:15, 61:24, 93:21,
93:22, 94:9
**contractor** [2] - 23:20,
24:1
**contracts** [12] - 18:3,
18:5, 18:7, 18:10,
18:20, 56:8, 57:5,
59:8, 59:23, 92:6,
94:10, 94:16
**contractual** [1] - 78:12
**Contractual** [1] -
58:12
**contrary** [1] - 59:13
**control** [5] - 10:8,
18:4, 18:16, 19:11,
19:14
**controlled** [1] - 60:23
**controlling** [1] - 36:20
**controls** [1] - 15:8
**controversy** [1] -
36:17

**convenient** [1] - 40:17
**coordinated** [1] -
58:16
**copies** [1] - 26:2
**copy** [1] - 26:1
**core** [2] - 95:22, 95:24
**correct** [6] - 10:24,
22:17, 22:18, 82:24,
87:19, 99:2
**corresponding** [1] -
59:1
**cost** [1] - 36:22
**Costco** [1] - 71:25
**Counsel** [3] - 2:8,
4:12, 10:11
**counsel** [13] - 4:13,
8:22, 24:12, 24:13,
24:18, 24:23, 25:2,
45:1, 54:8, 63:19,
77:17, 78:16
**counsel's** [3] - 3:5,
46:2, 49:23
**countenance** [1] -
81:6
**country** [2] - 40:15,
93:7
**couple** [6] - 39:13,
85:19, 87:25, 94:25,
95:4, 95:21
**course** [26] - 2:18,
6:10, 8:12, 9:6, 9:16,
12:4, 19:24, 20:5,
20:6, 36:23, 37:15,
38:8, 38:10, 39:1,
40:10, 45:22, 50:12,
54:11, 55:17, 57:1,
58:8, 58:15, 59:11,
62:5, 82:24, 92:22
**Court** [64] - 2:2, 2:4,
2:10, 7:8, 7:25, 8:12,
15:4, 22:3, 31:25,
39:1, 40:4, 40:6,
40:9, 41:16, 41:19,
42:9, 43:1, 43:4,
44:20, 47:1, 47:6,
48:6, 48:24, 49:7,
49:13, 51:12, 52:11,
53:2, 53:4, 53:9,
53:12, 54:15, 60:25,
68:21, 68:25, 69:13,
72:13, 72:15, 77:18,
77:19, 78:21, 79:4,
79:12, 80:24, 82:10,
84:17, 86:3, 86:16,
86:21, 86:24, 88:3,
88:14, 88:17, 89:18,
90:9, 94:4, 94:5,
95:5, 95:9, 95:10,
95:20, 95:23, 98:19,
99:7

**court** [23] - 2:14, 2:24,
8:9, 37:22, 38:7,
38:9, 38:16, 38:23,
40:13, 41:16, 49:6,
53:15, 54:4, 58:14,
58:15, 67:2, 68:20,
72:6, 92:16, 93:11,
93:12, 94:13, 95:13
**COURT** [101] - 1:1,
1:24, 2:7, 2:13, 3:12,
3:17, 4:1, 4:4, 4:8,
4:11, 6:3, 6:21, 6:25,
7:2, 7:5, 7:9, 7:11,
7:16, 7:19, 7:21,
8:16, 9:8, 9:11,
10:11, 12:21, 15:19,
17:9, 17:12, 17:20,
19:22, 20:7, 20:11,
21:8, 21:10, 21:14,
21:18, 22:11, 22:19,
22:22, 23:16, 23:22,
24:22, 24:25, 25:6,
25:18, 26:13, 26:16,
30:2, 30:6, 37:14,
39:24, 40:2, 40:19,
42:5, 42:8, 42:12,
44:19, 44:23, 44:25,
45:12, 45:18, 46:5,
46:13, 55:4, 55:7,
56:12, 62:3, 63:15,
69:10, 69:22, 70:1,
77:21, 77:24, 82:2,
82:17, 82:20, 83:12,
83:18, 84:1, 84:18,
84:22, 85:6, 85:15,
86:17, 87:1, 87:17,
87:20, 88:9, 89:25,
90:4, 90:6, 91:22,
91:25, 92:2, 93:15,
94:19, 94:23, 95:7,
96:14, 96:19, 98:2
**court's** [1] - 72:1
**Court's** [2] - 48:5, 49:3
**COURTROOM** [4] -
2:3, 2:9, 86:21,
86:24
**courts** [7] - 25:7, 34:1,
39:18, 43:4, 47:9,
51:21, 93:6
**Courts** [1] - 41:13
**cover** [5] - 8:14, 17:18,
20:6, 20:13, 20:16
**covered** [1] - 16:24
**covering** [2] - 7:24,
17:17
**CPA** [1] - 5:8
**craft** [1] - 58:19
**crazy** [1] - 91:6
**create** [3] - 52:9,
53:10, 54:3

**creates** [1] - 52:22
**credit** [11] - 14:22,
26:2, 65:8, 65:20,
65:24, 68:8, 68:12,
83:22, 83:23, 87:13,
87:18
**criminal** [1] - 88:13
**criteria** [4] - 25:10,
26:19, 27:11, 27:14
**CRR** [2] - 1:24, 99:1
**cry** [1] - 89:5
**cryptic** [1] - 8:23
**cue** [1] - 45:4
**Cullen** [3] - 55:19,
71:11, 76:18
**cup** [1] - 41:5
**current** [1] - 19:9
**customer** [1] - 34:3
**CUSTOMER** [1] - 1:4
**Customer** [1] - 2:11
**customers** [2] - 78:15,
95:12
**cut** [1] - 56:6

# D

**Dalkon** [1] - 41:21
**damage** [12] - 26:8,
29:13, 30:14, 33:2,
33:12, 34:16, 37:25,
38:1, 44:12, 77:9,
89:20, 90:24
**damages** [115] - 6:8,
6:10, 6:16, 6:20,
16:23, 17:10, 17:15,
19:21, 19:25, 20:2,
20:3, 20:15, 21:1,
21:2, 22:14, 24:15,
24:16, 24:17, 27:8,
27:9, 28:3, 28:15,
28:16, 28:18, 28:22,
29:11, 29:15, 29:16,
29:18, 29:20, 29:25,
30:10, 30:12, 30:14,
30:17, 30:19, 30:21,
31:5, 31:8, 33:1,
33:7, 34:15, 34:18,
34:19, 34:21, 34:23,
34:24, 38:25, 39:3,
39:4, 43:23, 44:10,
44:14, 47:9, 47:25,
48:7, 50:1, 50:5,
50:12, 51:2, 53:1,
53:24, 53:25, 54:1,
54:10, 54:14, 54:16,
54:18, 54:22, 54:23,
55:1, 60:12, 67:11,
68:4, 76:3, 76:24,
77:1, 77:5, 77:14,
78:4, 80:20, 80:25,

81:17, 82:15, 82:24,
83:1, 83:5, 83:10,
83:11, 83:15, 84:5,
84:11, 85:13, 85:14,
85:16, 85:18, 85:21,
85:24, 86:5, 86:6,
89:15, 89:16, 90:14,
90:16, 90:23, 90:24,
91:10, 91:11, 96:6
**Dan** [1] - 3:14
**dance** [1] - 9:20
**dancing** [1] - 9:3
**danger** [1] - 64:22
**DANIEL** [1] - 1:17
**dark** [3] - 29:10, 90:10
**Data** [3] - 2:11, 9:25,
95:8
**data** [45] - 2:15, 5:5,
5:12, 16:3, 18:12,
18:14, 19:4, 28:7,
28:10, 28:23, 32:17,
32:20, 33:19, 34:2,
35:23, 37:3, 52:11,
60:22, 63:13, 65:12,
65:13, 65:15, 70:13,
71:19, 73:23, 74:11,
74:18, 74:24, 75:18,
78:5, 78:14, 79:10,
79:18, 79:20, 80:6,
80:7, 84:18, 84:21,
84:23, 84:25, 95:3,
95:12, 95:15, 95:16
**DATA** [1] - 1:4
**database** [24] - 9:25,
25:13, 25:14, 25:16,
25:19, 25:22, 25:25,
26:3, 26:13, 26:14,
27:14, 47:3, 62:19,
65:5, 65:7, 65:19,
66:5, 87:11, 87:16,
87:23, 89:4, 89:6
**date** [2] - 35:15, 35:16
**Dated** [1] - 99:5
**dated** [1] - 16:5
**dates** [1] - 15:14
**Daubert** [3] - 54:16,
80:17, 98:5
**Davidson** [1] - 81:13
**deal** [6] - 51:19, 67:21,
71:25, 79:23, 93:19,
98:4
**dealing** [7] - 9:1,
38:24, 43:15, 69:2,
72:23, 85:3, 93:17
**deals** [2] - 22:14, 71:8
**dealt** [3] - 71:24,
72:14, 84:24
**deceived** [1] - 33:23
**December** [2] - 16:5,
30:9

**deception** [2] - 66:12, 66:15
**deceptive** [8] - 66:15, 70:11, 70:22, 71:5, 72:6, 72:18, 73:13, 76:13
**decertify** [1] - 89:8
**decide** [1] - 60:25
**decision** [5] - 30:9, 48:5, 67:23, 86:3, 98:6
**decisions** [4] - 43:9, 74:16, 98:13, 98:14
**declaratory** [3] - 36:25, 37:10, 43:21
**dedicated** [1] - 28:6
**defeat** [1] - 46:11
**defective** [1] - 48:21
**Defendant** [1] - 77:23
**DEFENDANT** [2] - 1:16, 1:19
**defendant** [6] - 37:19, 49:11, 58:2, 72:14, 79:2, 91:18
**Defendant's** [1] - 14:9
**defendant's** [6] - 32:18, 49:16, 72:5, 72:8, 72:18, 72:19
**Defendants** [14] - 27:2, 27:18, 30:23, 30:25, 31:19, 31:22, 32:4, 32:16, 34:11, 35:5, 36:6, 36:10, 64:8, 90:15
**defendants** [25] - 3:13, 10:7, 16:16, 16:22, 17:8, 17:22, 23:11, 26:24, 29:20, 31:17, 31:20, 33:8, 35:13, 38:11, 39:16, 45:10, 48:24, 58:25, 67:24, 69:12, 75:22, 83:22, 87:4, 96:8, 97:13
**defendants'** [3] - 33:10, 35:20, 74:24
**Defendants'** [3] - 28:2, 33:18, 77:16
**defense** [3] - 28:14, 36:11, 92:6
**defenses** [3] - 36:13, 55:18, 92:10
**defensive** [1] - 92:11
**deficient** [6] - 14:10, 14:12, 15:16, 28:9, 34:2, 73:23
**define** [1] - 57:17
**defined** [5] - 25:9, 25:12, 27:3, 56:20
**definition** [2] - 4:25,

49:9
**definitions** [1] - 47:2
**definitively** [1] - 36:18
**delay** [4] - 34:10, 34:12, 76:24, 77:11
**delta** [1] - 26:9
**demand** [1] - 31:13
**demonstrate** [2] - 53:14, 72:17
**demonstrated** [2] - 27:23, 72:10
**denial** [2] - 49:1, 49:18
**denied** [2] - 50:19, 55:23
**deny** [1] - 77:18
**deposing** [1] - 68:5
**Deposition** [1] - 49:4
**deposition** [4] - 50:22, 65:9, 65:22, 93:1
**depositions** [1] - 49:7
**DEPUTY** [5] - 2:3, 2:9, 86:21, 86:24, 98:19
**Der** [2] - 62:25, 63:8
**describe** [1] - 28:4
**described** [1] - 39:14
**designated** [1] - 41:2
**designation** [1] - 41:1
**designations** [1] - 8:19
**destroys** [1] - 91:5
**detail** [3] - 9:22, 11:8, 63:12
**detailed** [2] - 12:12, 15:12
**detailing** [1] - 16:12
**details** [4] - 5:22, 37:13, 50:4, 63:16
**determination** [2] - 28:10, 32:21
**determinations** [1] - 75:8
**determine** [8] - 8:20, 14:2, 26:4, 28:9, 29:18, 50:15, 51:6, 53:8
**determined** [1] - 76:17
**device** [1] - 95:22
**Devin** [1] - 77:22
**DEVIN** [1] - 1:20
**DHS's** [1] - 72:25
**diaphragm** [1] - 45:20
**DiCello** [2] - 1:13, 7:3
**different** [12] - 6:11, 18:1, 18:3, 18:7, 18:23, 37:24, 37:25, 63:21, 65:6, 72:11, 89:2
**difficult** [1] - 89:3
**digital** [1] - 15:24
**Dioxide** [1] - 57:14

**direct** [1] - 90:19
**directly** [2] - 72:15, 73:10
**disagree** [1] - 96:19
**disclosed** [1] - 33:25
**disclosure** [2] - 18:15, 90:1
**disclosures** [2] - 6:12, 30:14
**discomfort** [1] - 45:23
**discovering** [1] - 74:6
**discovery** [28] - 5:25, 7:24, 11:9, 12:4, 12:20, 13:5, 25:20, 29:3, 37:3, 37:9, 37:10, 47:24, 56:5, 62:6, 62:22, 64:10, 64:13, 64:18, 68:9, 70:22, 76:1, 76:15, 77:2, 92:10, 92:11, 92:12, 93:1
**discrete** [1] - 46:23
**discretion** [1] - 41:15
**discuss** [4] - 5:24, 9:18, 57:23, 92:20
**discussed** [3] - 8:9, 85:21, 88:4
**discussing** [1] - 46:18
**discussion** [2] - 57:5, 80:23, 81:7
**disfavored** [1] - 41:11
**dismiss** [2] - 31:25, 67:15
**disposed** [1] - 82:13
**disposition** [1] - 95:18
**dispute** [4] - 11:11, 48:3, 53:24, 88:17
**disputed** [1] - 16:14
**dissipate** [1] - 68:24
**distinction** [1] - 90:18
**distinguishable** [1] - 71:24
**District** [5] - 2:4, 38:15, 49:5, 85:1
**DISTRICT** [3] - 1:1, 1:1, 1:7
**district** [5] - 41:2, 41:3, 41:15, 58:15
**divide** [1] - 39:5
**dividing** [1] - 46:15
**DIVISION** [1] - 1:2
**docket** [1] - 9:7
**document** [2] - 52:13, 62:13
**documents** [6] - 12:14, 12:15, 50:20, 56:16, 93:2, 93:17
**Dole** [1] - 86:4
**dollar** [2] - 84:12, 93:25

**dollars** [1] - 95:21
**done** [15] - 23:2, 38:15, 38:23, 39:9, 44:23, 64:15, 65:11, 65:13, 84:12, 84:22, 86:20, 87:9, 87:11, 97:22, 98:10
**doubt** [3] - 36:23, 41:4, 42:16
**doubtful** [1] - 93:8
**dovetails** [1] - 39:21
**down** [7] - 51:3, 51:4, 68:14, 81:4, 82:8, 84:13, 84:25
**Dr** [11] - 6:11, 50:9, 78:4, 79:8, 79:9, 79:19, 80:2, 80:15, 84:12, 89:21, 90:5
**dramatically** [1] - 36:21
**drive** [1] - 20:24
**DSS** [1] - 16:3
**due** [5] - 27:6, 49:17, 76:11, 77:11, 95:17
**dulcet** [1] - 45:19
**Dupler** [1] - 71:23
**during** [3] - 49:23, 75:25, 76:19
**duties** [1] - 67:25
**duty** [30] - 10:20, 10:23, 17:22, 17:23, 19:24, 20:1, 23:5, 24:2, 24:4, 31:19, 31:21, 31:23, 31:24, 32:1, 32:4, 32:6, 32:12, 32:15, 32:22, 46:7, 46:8, 78:18, 81:22, 82:10, 82:12, 82:17, 82:21, 83:2, 83:13
**dynamic** [2] - 93:20, 94:8

### E

**earn** [1] - 21:10
**easier** [1] - 14:15
**easily** [7] - 9:22, 10:6, 12:8, 15:5, 23:2, 25:11, 66:8
**easy** [2] - 9:21, 65:6
**eat** [1] - 92:15
**eBay** [1] - 74:9
**ECF** [2] - 8:3, 8:6
**edge** [1] - 8:10
**effect** [1] - 94:3
**efficiency** [1] - 85:10
**efficient** [1] - 40:23
**effort** [1] - 68:4
**efforts** [2] - 17:6, 17:9

**eight** [2] - 2:23, 63:7
**either** [8] - 10:21, 22:15, 29:5, 50:10, 53:25, 54:16, 61:22, 95:17
**elaborate** [2] - 37:9, 42:22
**element** [2] - 32:24, 79:3
**elements** [9] - 19:23, 80:19, 81:2, 81:20, 82:6, 82:22, 84:2, 84:7, 85:11
**elicited** [1] - 75:25
**eliminate** [1] - 54:15
**eliminated** [1] - 15:9
**ELLIS** [1] - 1:21
**email** [4] - 11:24, 25:16, 26:1, 65:4, 65:6
**emailed** [1] - 65:5
**employer** [3] - 48:20, 50:11
**employers** [3] - 48:14, 50:12, 71:7
**enabled** [1] - 12:3
**encryption** [3] - 14:9, 14:12, 62:24
**end** [1] - 87:14
**ending** [1] - 40:21
**endorsed** [2] - 81:24, 81:25
**engage** [1] - 13:6
**engaging** [1] - 13:7
**enhancement** [1] - 63:4
**enjoy** [1] - 45:19
**enormous** [1] - 37:22
**ensure** [2] - 22:4, 37:11
**enter** [1] - 11:25
**entered** [1] - 59:20
**entire** [2] - 81:5, 82:13
**entitled** [10] - 18:23, 18:24, 29:15, 36:3, 54:22, 74:13, 75:13, 75:17, 80:13, 99:3
**entity** [1] - 31:14
**enumerated** [1] - 25:5
**equation** [1] - 79:12
**erroneous** [1] - 35:21
**escape** [1] - 70:18
**especially** [3] - 41:2, 61:15, 93:13
**Esquire** [1] - 49:4
**ESQUIRE** [7] - 1:12, 1:13, 1:15, 1:17, 1:18, 1:18, 1:20
**essential** [5] - 51:23, 52:19, 79:3, 80:19,

81:2

**essentially** [2] - 11:20, 47:2
**establish** [9] - 36:2, 79:7, 79:24, 80:16, 80:19, 81:4, 81:11, 81:15, 85:8
**established** [6] - 48:1, 81:10, 82:23, 83:3, 83:14
**establishing** [1] - 79:14
**estoppel** [3] - 37:20, 93:10, 97:8
**event** [1] - 38:17
**evidence** [17] - 8:5, 11:13, 15:2, 16:14, 19:19, 29:1, 32:16, 39:3, 40:22, 43:3, 47:14, 53:17, 65:1, 72:9, 75:23, 77:12, 85:22
**evident** [2] - 22:9, 74:11
**evidentiary** [1] - 64:7
**exact** [4] - 23:6, 23:7, 42:10, 63:20
**exactly** [8] - 13:1, 17:11, 17:16, 57:15, 74:6, 88:20, 91:19, 96:16
**examining** [1] - 20:25
**example** [16] - 11:25, 12:13, 12:16, 26:5, 29:1, 29:9, 38:24, 40:7, 41:19, 48:13, 49:10, 50:16, 56:11, 76:18, 83:21
**examples** [1] - 62:12
**Excellus** [1] - 67:3
**except** [2] - 34:18, 84:16
**exception** [1] - 41:11
**exchange** [1] - 50:14
**excuse** [4] - 2:11, 20:3, 71:12, 72:17
**executive** [1] - 44:1
**exfiltrated** [2] - 36:9, 90:21
**exfiltration** [2] - 15:14, 88:21
**exhibit** [1] - 63:8
**Exhibit** [3] - 60:8, 62:13, 78:22
**exist** [2] - 59:23, 78:7
**existed** [1] - 15:7
**existence** [3] - 28:1, 78:18, 79:2
**exists** [3] - 42:5, 54:3, 90:22

**expect** [2] - 98:6, 98:8
**expectancy** [1] - 53:5
**expectations** [1] - 36:7
**expected** [1] - 36:5
**expenditure** [1] - 84:16
**expense** [1] - 97:6
**experience** [1] - 50:24
**experienced** [1] - 67:18
**expert** [12] - 10:21, 10:25, 11:14, 15:11, 16:1, 16:15, 16:17, 29:19, 63:20, 64:1, 84:8, 89:25
**experts** [3] - 6:9, 84:10, 90:1
**explain** [3] - 10:20, 14:20, 16:21
**explained** [4] - 73:15, 74:5, 75:15, 76:15
**explaining** [1] - 7:24
**explanation** [1] - 92:7
**explicit** [1] - 11:8
**exploring** [1] - 62:10
**exportation** [1] - 13:20
**exposed** [6] - 9:24, 17:5, 70:21, 71:4, 71:18, 78:13
**exposure** [3] - 71:22, 72:1, 73:15
**express** [1] - 59:23
**expressed** [1] - 78:19
**extended** [1] - 65:22
**extensive** [1] - 92:10
**extensively** [1] - 20:6
**extent** [8] - 21:15, 26:20, 28:13, 31:11, 33:5, 33:8, 34:11, 61:14
**extinguished** [1] - 35:19

## F

**F-C-R-A** [1] - 88:10
**Facciola** [3] - 8:4, 62:7, 98:4
**Facciola's** [2] - 8:24, 64:20
**face** [3] - 85:3, 93:11, 97:7
**Facebook** [4] - 63:18, 63:21, 64:2, 64:14
**fact** [37] - 12:6, 14:4, 15:3, 15:6, 18:23, 28:8, 31:9, 42:18, 45:25, 47:5, 47:15,

47:18, 50:10, 50:20, 51:10, 51:13, 52:23, 53:10, 53:18, 53:25, 64:23, 70:10, 74:10, 75:2, 75:4, 75:18, 76:2, 78:15, 79:1, 84:7, 85:24, 88:2, 91:11, 91:16, 94:1, 94:10, 97:12
**factor** [1] - 13:15
**factors** [2] - 26:12, 73:21
**facts** [7] - 9:20, 16:13, 23:6, 32:3, 32:5, 32:7, 94:14
**factual** [4] - 5:25, 32:7, 36:1, 90:9
**fail** [1] - 70:7
**failed** [3] - 10:8, 32:16, 66:21
**fails** [3] - 76:23, 80:17, 80:18
**Failure** [1] - 41:9
**failure** [6] - 12:10, 13:12, 19:3, 32:18, 62:23
**failures** [4] - 9:23, 10:7, 11:17, 15:12
**fair** [2] - 7:10, 27:18
**fairly** [2] - 36:17, 98:8
**fall** [2] - 10:20, 28:16
**fallback** [1] - 81:14
**fallen** [2] - 10:14, 39:22
**falls** [1] - 78:1
**familiar** [7] - 11:6, 11:23, 30:2, 30:4, 39:1, 40:13, 42:6
**famous** [1] - 45:2
**far** [2] - 8:21, 35:14
**fares** [1] - 75:10
**favor** [2] - 21:19, 82:21, 87:3, 92:12
**FCRA** [2] - 88:8, 88:10
**FCRR** [2] - 1:24, 99:1
**feasible** [1] - 25:10
**February** [1] - 36:12
**Federal** [1] - 99:7
**federal** [3] - 47:9, 53:15, 72:24
**FEDERAL** [1] - 1:24
**feedback** [1] - 7:14
**fees** [2] - 48:20, 49:6
**felt** [1] - 79:2
**Fero** [3] - 66:10, 72:6, 72:10
**few** [5] - 3:3, 19:15, 44:9, 65:4, 68:18
**fewer** [1] - 56:16
**fiduciary** [1] - 68:20

**fifty** [1] - 43:17
**figure** [5] - 25:24, 26:10, 39:2, 43:6, 44:4
**figuring** [1] - 38:23
**file** [2] - 14:19, 14:21
**filed** [6] - 8:1, 8:11, 12:14, 12:15, 56:4, 93:6
**files** [4] - 13:19, 14:19, 88:14, 88:16
**filing** [1] - 74:1
**final** [1] - 43:8
**finally** [11] - 5:18, 14:9, 34:15, 36:25, 45:4, 61:9, 64:10, 64:22, 76:22, 86:7, 91:2
**financial** [1] - 93:3
**finder** [1] - 28:8
**findings** [4] - 11:10, 11:11, 16:12, 16:17
**fine** [1] - 56:12
**finished** [2] - 4:6, 98:6
**first** [18] - 3:15, 10:1, 10:6, 11:17, 35:24, 55:11, 55:14, 56:1, 56:20, 59:17, 59:24, 61:1, 61:19, 64:12, 65:4, 85:20, 95:13, 95:16
**Fishon** [1] - 56:14
**fit** [2] - 4:5, 57:2
**fitness** [1] - 73:2
**five** [1] - 26:3
**flag** [1] - 87:14
**Florida** [4] - 4:23, 68:9, 85:1, 95:7
**focus** [1] - 63:17
**focused** [1] - 58:6
**follow** [2] - 9:21, 91:13
**follow-on** [1] - 91:13
**following** [4] - 64:24, 73:24, 75:19
**Foodbuy** [1] - 53:11
**Foods** [1] - 49:25
**FOR** [4] - 1:1, 1:10, 1:16, 1:19
**Ford** [2] - 48:22, 76:6
**forecloses** [1] - 74:8
**foregoing** [1] - 99:2
**foremost** [1] - 85:20
**forensic** [1] - 16:8
**foreseeable** [1] - 24:7
**forget** [1] - 22:12
**forgive** [1] - 15:25
**form** [7] - 29:22, 48:19, 48:23, 57:21, 57:22, 57:24, 58:12
**forming** [1] - 29:7

**formulaic** [8] - 28:22, 29:11, 29:13, 30:21, 33:12, 34:24, 89:14, 90:24
**formulaically** [2] - 33:3, 39:9
**formulas** [1] - 33:6
**forth** [4] - 6:12, 9:4, 77:16, 82:5
**forward** [4] - 10:1, 27:19, 38:3, 83:21
**foul** [1] - 16:20
**four** [9] - 9:22, 9:24, 10:19, 11:10, 11:17, 14:7, 15:5, 47:17, 47:24, 62:20, 62:22
**four-year** [1] - 9:24
**Fourth** [15] - 21:20, 21:22, 25:8, 29:24, 41:13, 41:24, 42:1, 52:8, 53:12, 75:21, 81:6, 81:23, 81:25, 83:6, 90:18
**fourth** [1] - 5:13
**frankly** [3] - 29:22, 33:15, 56:4
**Frantz** [12] - 10:25, 11:8, 11:15, 12:10, 15:11, 16:16, 62:21, 63:20, 63:22, 64:14, 78:19, 78:23
**Frantz's** [4] - 11:11, 11:14, 16:1, 78:16
**fraud** [5] - 14:16, 20:20, 47:19, 48:1, 77:5
**fraudulent** [3] - 68:8, 83:22, 83:25
**Frazier** [1] - 76:6
**free** [1] - 73:1
**Friedman** [19] - 3:9, 4:18, 6:4, 16:21, 17:18, 19:16, 20:5, 20:8, 20:12, 21:5, 21:10, 21:18, 37:14, 40:8, 42:19, 43:2, 51:10, 76:3, 87:3
**FRIEDMAN** [33] - 1:12, 3:8, 4:17, 6:18, 6:24, 20:9, 21:11, 21:15, 22:2, 22:18, 22:21, 22:24, 23:17, 23:24, 24:24, 25:3, 25:7, 26:12, 26:14, 26:17, 30:3, 30:7, 39:13, 39:25, 40:3, 45:11, 87:10, 87:19, 87:22, 88:10, 90:2, 90:5, 90:7
**friendly** [1] - 74:19

**friends** [1] - 74:20
**front** [1] - 40:13
**full** [2] - 35:3, 59:2
**function** [2] - 12:23, 44:1
**funds** [2] - 69:3
**furthermore** [1] - 77:8
**future** [4] - 43:18, 47:19, 48:4, 48:6

## G

**Gaidon** [1] - 66:11
**gains** [2] - 13:24, 85:10
**GBL** [11] - 5:8, 34:20, 35:1, 35:5, 35:10, 35:18, 35:23, 36:11, 66:15, 72:4, 72:15
**general** [1] - 30:16
**generally** [2] - 51:16, 71:13
**gentleman** [1] - 15:21
**Georgia** [3] - 4:23, 4:24, 26:5
**GHANNOUM** [4] - 1:18, 69:11, 69:24, 70:4
**Ghannoum** [4] - 4:2, 46:18, 69:9, 69:12
**Gil** [1] - 55:8
**GILBERT** [1] - 1:18
**Given** [1] - 68:23
**given** [7] - 5:2, 5:11, 24:9, 43:9, 66:13, 76:16, 86:11
**glad** [1] - 88:5
**gladly** [1] - 93:11
**goal** [1] - 98:7
**Gononian** [1] - 77:3
**governed** [1] - 59:5
**grandma's** [1] - 80:8
**grandpa's** [1] - 80:9
**granular** [1] - 25:21
**grateful** [1] - 97:22
**great** [5] - 3:12, 12:16, 15:22, 40:2, 45:12
**greater** [2] - 34:22, 44:3
**GREENBELT** [2] - 1:8, 1:25
**Grimm** [5] - 2:5, 46:22, 49:19, 52:7, 98:18
**GRIMM** [1] - 1:7
**ground** [3] - 41:10, 45:21, 54:17
**grounding** [1] - 80:12
**grounds** [1] - 76:7

**Group** [2] - 57:20, 60:24
**group** [1] - 51:14
**groups** [1] - 37:17
**grueling** [1] - 92:25
**guess** [2] - 20:9, 89:18
**guest** [3] - 50:10, 60:5, 60:15
**guests** [1] - 60:19
**Gunnells** [7] - 68:15, 68:16, 68:18, 68:25, 69:1, 81:7, 82:5
**GUTZLER** [1] - 1:13
**Gutzler** [1] - 7:3

## H

**hacker** [10] - 11:21, 13:10, 13:21, 13:24, 14:2, 14:13, 14:15, 14:21, 14:22, 62:18
**half** [5] - 3:4, 43:16, 51:13
**hand** [1] - 63:14
**handful** [1] - 39:18
**handle** [1] - 4:5
**happily** [1] - 92:12
**happy** [9] - 3:21, 4:15, 8:13, 20:13, 77:19, 92:3, 93:18, 94:4, 97:1
**hard** [4] - 26:1, 26:25, 54:24, 67:2
**hard-pressed** [1] - 26:25
**harm** [2] - 16:20, 23:7, 33:17, 41:22, 47:19, 48:4, 48:6, 49:14, 53:14, 64:17, 67:17, 77:11, 77:14, 78:2, 78:9, 79:2, 85:2, 88:15, 88:16, 88:19, 89:1, 89:16
**harm's** [1] - 9:12
**harmful** [1] - 9:13
**harms** [1] - 69:6
**harsh** [1] - 66:25
**Hausfeld** [1] - 40:5
**HAUSFELD** [1] - 1:14
**headlong** [2] - 52:7, 61:22
**health** [1] - 68:19
**hear** [14] - 2:24, 4:9, 4:13, 4:15, 45:10, 49:23, 51:20, 67:7, 70:3, 86:19, 87:2, 87:5
**heard** [19] - 23:8, 23:13, 28:4, 28:18, 29:20, 31:18, 34:17,

35:5, 56:21, 59:9, 62:20, 69:18, 77:9, 78:15, 80:22, 81:7, 89:3, 89:12, 91:4
**HEARING** [1] - 1:5
**hearing** [6] - 16:24, 16:25, 19:21, 78:3, 79:16, 80:1
**held** [8] - 29:24, 47:7, 48:6, 49:7, 51:21, 53:9, 54:23, 72:15
**help** [6] - 6:4, 6:15, 18:14, 19:22, 25:21, 89:10
**helps** [1] - 13:24
**herring** [1] - 64:11
**herself** [1] - 81:13
**Hertz** [2] - 55:21, 65:14
**high** [2] - 7:11, 7:25
**highly** [1] - 71:19
**hit** [1] - 91:15
**hold** [3] - 68:16, 82:17
**holder** [1] - 37:2
**holding** [1] - 52:10
**holds** [2] - 32:15, 75:16
**Honor** [126] - 2:8, 3:8, 3:14, 4:17, 4:20, 6:18, 7:1, 7:8, 7:10, 7:23, 9:5, 9:17, 9:20, 10:2, 10:24, 11:6, 11:10, 11:18, 11:20, 12:13, 13:1, 14:8, 14:18, 15:6, 16:1, 16:13, 16:18, 17:11, 17:16, 18:19, 19:5, 19:10, 19:18, 20:5, 20:14, 20:23, 21:4, 21:6, 21:12, 22:2, 22:3, 22:25, 23:24, 24:10, 24:20, 25:3, 27:8, 27:21, 29:2, 29:12, 30:4, 30:9, 31:9, 31:16, 31:25, 32:24, 32:25, 34:8, 35:20, 36:12, 36:15, 36:25, 39:15, 40:4, 40:10, 41:7, 45:11, 45:17, 45:24, 46:9, 47:11, 50:3, 50:25, 51:18, 51:24, 53:16, 54:25, 55:2, 55:6, 55:9, 56:10, 58:5, 60:10, 60:18, 61:9, 62:1, 63:14, 63:18, 64:10, 65:2, 65:12, 66:9, 67:6, 69:8, 69:11, 77:22, 80:2, 80:22, 81:20, 82:9,

83:4, 84:7, 85:14, 86:8, 87:10, 87:23, 89:4, 89:18, 90:2, 90:17, 91:2, 91:20, 91:23, 92:3, 92:19, 93:13, 93:18, 93:24, 94:15, 94:17, 94:24, 95:2, 96:4, 97:25
**Honor's** [2] - 3:11, 54:8
**Honorable** [4] - 2:5, 86:21, 86:24, 98:19
**HONORABLE** [1] - 1:7
**hook** [1] - 91:7, 91:10
**hope** [5] - 3:17, 3:20, 10:15, 20:11, 98:17
**hopefully** [2] - 40:14, 98:13
**horse** [1] - 87:24
**Hosiery** [1] - 93:10
**host** [2] - 47:4, 61:22
**HOSTETLER** [1] - 1:17
**Hotel** [1] - 60:20
**hotel** [12] - 18:25, 24:1, 26:7, 48:13, 50:10, 57:9, 73:1, 73:8, 74:19, 74:21, 76:16, 78:13
**hotels** [3] - 71:7, 72:22, 72:25
**hour** [2] - 3:4, 39:7
**hours** [1] - 93:1
**house** [1] - 78:14
**huge** [1] - 40:16
**hundred** [1] - 43:17
**hundreds** [2] - 93:2, 93:5
**hurdle** [1] - 39:11

## I

**idea** [3] - 38:20, 43:14, 79:9
**identical** [2] - 56:6, 56:11
**identically** [1] - 32:22
**identifiable** [1] - 13:11
**identification** [2] - 3:5, 27:17
**identified** [8] - 9:13, 27:11, 27:13, 31:12, 56:16, 62:17, 62:21, 65:18
**identify** [5] - 4:3, 43:12, 56:7, 62:20, 66:17
**identifying** [3] - 6:14, 10:9, 65:15
**identities** [1] - 38:5

**Identity** [4] - 5:14, 34:7, 69:16, 76:23
**identity** [9] - 9:12, 14:16, 14:17, 20:20, 25:15, 38:3, 47:19, 48:1, 81:1
**ignores** [1] - 16:21, 32:7
**Ill** [15] - 10:23, 46:22, 47:5, 47:8, 47:9, 47:11, 48:7, 49:22, 51:24, 52:3, 52:9, 52:20, 53:6, 54:2, 79:4
**ill** [1] - 2:16
**illustrates** [1] - 50:25
**imaginary** [2] - 78:7
**imminent** [4] - 47:19, 64:17, 64:22, 74:3
**impact** [1] - 38:18
**impacting** [1] - 39:19
**implausible** [1] - 78:5
**implement** [2] - 10:8, 15:8
**implicate** [1] - 75:7
**implicated** [1] - 62:18
**important** [9] - 12:8, 13:21, 15:3, 19:10, 20:23, 21:3, 47:23, 56:25, 88:6
**importantly** [6] - 11:10, 58:10, 59:13, 62:20, 72:11, 75:21
**impossible** [3] - 30:12, 84:18, 84:21
**IN** [2] - 1:1, 1:3
**inadequacies** [1] - 66:17
**inadequate** [3] - 32:20, 33:10, 33:18
**INC** [2] - 1:4, 1:16
**Inc** [1] - 2:11
**incentive** [1] - 96:1
**inches** [1] - 2:23
**Incident** [1] - 95:8
**incident** [1] - 63:6
**include** [5] - 5:7, 30:13, 47:2, 49:15, 55:23
**included** [1] - 92:5
**includes** [1] - 49:9
**including** [9] - 15:18, 16:2, 47:19, 47:25, 52:14, 60:20, 70:22, 73:5, 73:14
**inconsistencies** [1] - 97:6
**incorporate** [1] - 60:6
**incorporated** [2] - 56:23, 59:5

**incorporates** [1] - 59:8
**incorporating** [1] - 57:12
**incorporation** [1] - 56:24
**incorrect** [1] - 52:23
**increased** [1] - 48:4
**incredibly** [1] - 92:25
**indeed** [3] - 22:6, 25:15, 67:13
**independent** [1] - 62:8
**indicate** [1] - 54:1
**indicated** [2] - 6:7, 54:8
**individual** [34] - 27:22, 27:24, 29:19, 32:11, 32:19, 32:20, 33:7, 33:13, 36:22, 37:17, 39:8, 47:8, 51:4, 52:1, 67:20, 67:24, 68:1, 75:24, 81:1, 81:20, 82:6, 82:15, 85:10, 85:12, 92:24, 95:14, 95:16, 96:2, 96:6, 96:9, 96:13, 97:15
**individualized** [27] - 17:15, 20:3, 28:17, 32:5, 32:7, 38:2, 41:22, 57:1, 57:10, 61:11, 61:16, 70:6, 70:9, 70:14, 70:19, 71:9, 71:19, 72:7, 75:7, 75:10, 76:8, 76:11, 76:16, 77:5, 80:25, 81:18
**individually** [4] - 36:19, 61:5, 77:14, 93:7
**individuals** [8] - 25:23, 47:4, 50:6, 51:9, 79:18, 79:25, 91:14, 93:25
**indoor** [1] - 73:6
**industry** [4] - 10:21, 11:4, 11:9, 16:8
**inferred** [1] - 73:19
**information** [100] - 5:2, 5:4, 5:11, 5:16, 6:14, 8:17, 9:1, 9:3, 9:6, 9:11, 9:18, 9:24, 10:9, 11:3, 11:4, 12:23, 12:24, 13:9, 13:11, 13:14, 13:17, 13:19, 13:24, 14:10, 14:14, 14:23, 15:3, 15:15, 15:17, 16:2, 16:3, 16:10, 16:14, 16:15, 16:23, 17:4,

17:5, 17:22, 21:3, 24:2, 24:5, 24:8, 24:9, 25:13, 25:16, 26:15, 27:12, 27:15, 28:21, 29:4, 29:8, 29:9, 33:5, 33:25, 34:3, 35:16, 36:5, 36:8, 44:3, 44:7, 47:3, 47:20, 50:14, 52:1, 52:2, 52:4, 52:5, 52:14, 52:17, 52:20, 53:19, 59:18, 59:22, 60:13, 60:14, 60:16, 61:19, 65:18, 65:19, 66:5, 66:13, 66:16, 66:23, 87:12, 87:15, 88:18, 88:22, 89:1, 89:9, 89:22, 90:11, 90:19, 90:20, 90:21, 94:12
**Information** [1] - 62:25
**informative** [1] - 79:21
**inherent** [22] - 6:13, 20:18, 28:20, 28:25, 29:13, 33:2, 34:18, 44:13, 48:10, 51:22, 54:15, 67:13, 78:1, 78:3, 79:6, 79:8, 80:15, 85:5, 89:13, 89:20, 90:8, 90:13
**initiative** [2] - 63:4, 63:8
**initiatives** [2] - 63:9, 63:10
**injunction** [4] - 63:24, 64:3, 64:17, 86:8
**injunctive** [10] - 36:25, 37:4, 37:7, 37:11, 43:20, 46:17, 62:2, 65:1, 74:2, 86:10
**injured** [5] - 31:2, 31:10, 34:12, 47:15, 72:5
**injuries** [2] - 47:18, 76:12
**injury** [60] - 29:17, 30:11, 30:12, 31:15, 31:20, 31:21, 31:22, 32:24, 35:2, 37:12, 47:4, 47:18, 48:10, 48:16, 48:25, 49:17, 49:22, 51:23, 52:3, 52:22, 52:25, 53:10, 53:18, 53:20, 53:25, 54:3, 70:9, 70:19, 75:4, 75:7, 76:10, 76:12, 78:8, 79:1, 79:5, 79:7, 79:15, 79:22, 79:24, 80:16,

80:19, 81:2, 82:25, 83:2, 83:10, 83:16, 83:18, 83:19, 84:2, 84:7, 84:10, 85:21, 85:23, 89:15, 90:16, 90:21, 90:22, 90:25
**inquiry** [3] - 32:7, 50:25, 51:5
**insecure** [1] - 72:19
**insignificant** [1] - 51:8
**instance** [1] - 59:19
**instances** [2] - 49:1, 52:16
**instead** [5] - 11:12, 50:7, 56:16, 70:16, 79:18
**Institute** [1] - 16:6
**insufficient** [2] - 64:6, 74:25
**insurance** [3] - 72:11, 91:15, 91:17
**integrated** [1] - 60:1
**intend** [2] - 56:8, 98:13
**intends** [1] - 55:22
**intentional** [3] - 88:21, 88:24, 90:19
**interacted** [2] - 71:1, 78:15
**interactions** [1] - 32:9
**interest** [1] - 36:19
**interested** [1] - 42:23
**interesting** [1] - 42:14
**interestingly** [1] - 36:10
**interference** [1] - 53:3
**International** [2] - 2:10, 57:20
**international** [1] - 22:16
**INTERNATIONAL** [2] - 1:4, 1:16
**interpretation** [2] - 35:21, 35:22
**Interrogatories** [1] - 30:15
**Interrogatory** [2] - 56:7, 59:17
**interrogatory** [5] - 50:18, 56:11, 59:14, 63:11, 65:17
**interrupt** [3] - 10:12, 15:19, 42:12
**interrupting** [1] - 15:25
**interruption** [1] - 22:23
**introduce** [1] - 75:23
**intrusion** [1] - 88:24
**investigative** [1] -

16:8
**invoked** [1] - 55:11
**involve** [1] - 54:12
**involved** [6] - 24:4, 49:6, 52:11, 68:18, 70:15, 77:6
**involving** [4] - 63:18, 64:16, 95:14, 95:15
**irreparable** [1] - 64:17
**issue** [45] - 6:2, 7:14, 27:7, 39:20, 45:3, 46:16, 46:21, 46:22, 46:23, 46:24, 48:18, 48:19, 48:25, 50:8, 51:14, 54:5, 55:16, 57:15, 60:25, 62:5, 62:6, 64:16, 65:3, 68:14, 75:10, 76:9, 78:25, 81:14, 81:22, 82:4, 84:14, 84:15, 85:2, 85:18, 87:4, 87:5, 91:19, 91:21, 92:4, 93:14, 94:3, 94:7, 98:14, 98:15
**issued** [2] - 8:4, 8:25
**issues** [54] - 5:25, 8:8, 8:10, 15:5, 15:8, 15:9, 19:15, 20:21, 21:13, 21:16, 27:22, 27:24, 32:11, 33:7, 35:7, 39:10, 39:14, 41:14, 41:18, 41:20, 41:22, 41:23, 42:25, 46:11, 55:2, 57:2, 57:10, 60:17, 61:11, 61:15, 61:16, 61:22, 62:21, 67:9, 68:2, 69:1, 69:5, 70:6, 70:9, 70:15, 70:19, 77:20, 81:1, 83:17, 85:23, 94:25, 95:16, 96:7, 96:11, 96:12, 95:7, 97:19
**items** [3] - 52:9, 87:25, 90:9
**iterations** [2] - 18:2, 18:7
**itself** [8] - 27:5, 34:3, 34:4, 52:20, 53:10, 87:11, 90:16
**IUD** [1] - 41:21

## J

**James** [1] - 40:5
**JAMES** [1] - 1:15
**jewels** [1] - 80:8
**joining** [1] - 60:14
**joint** [2] - 36:11, 58:11
**JPML** [1] - 92:16

**Juan** [1] - 80:9
**judge** [5] - 41:2, 41:3, 41:4, 43:6, 55:21
**JUDGE** [1] - 1:7
**Judge** [16] - 8:4, 8:24, 46:22, 49:19, 52:7, 57:13, 61:3, 62:7, 65:14, 74:1, 81:13, 82:5, 86:3, 98:4, 98:18
**judgment** [6] - 34:14, 42:24, 53:7, 57:23, 77:12, 92:13
**judicial** [1] - 29:6
**jump** [2] - 24:10, 38:14
**jurisdiction** [2] - 38:9, 79:4
**jurisdictions** [4] - 38:12, 40:9, 40:10, 40:21
**jury** [17] - 19:20, 28:22, 28:25, 29:6, 29:8, 34:8, 34:23, 39:4, 43:2, 44:11, 44:17, 82:11, 82:20, 82:23, 89:22, 89:23, 90:12
**Justice** [1] - 41:8

## K

**keep** [9] - 2:17, 2:19, 4:8, 10:13, 17:22, 18:12, 21:10, 91:25, 94:13
**keeping** [1] - 14:1
**Keller** [12] - 3:10, 5:24, 7:3, 19:22, 21:12, 23:8, 28:4, 31:19, 60:6, 62:20, 91:3, 91:20
**KELLER** [27] - 1:13, 7:1, 7:3, 7:7, 7:10, 7:14, 7:18, 7:20, 7:22, 9:5, 9:10, 9:16, 10:24, 13:1, 16:1, 17:11, 17:16, 17:21, 20:5, 20:10, 20:12, 21:9, 91:23, 92:1, 92:3, 93:18, 94:20
**KERR** [1] - 1:24
**Kerr** [2] - 99:1, 99:7
**Keteltas** [6] - 4:2, 46:15, 55:3, 55:8, 69:18, 89:3
**KETELTAS** [6] - 1:18, 55:6, 55:8, 56:13, 62:4, 63:16
**key** [6] - 14:23, 14:24,

14:25, 15:1, 16:2, 81:8
**kind** [8] - 13:10, 16:16, 35:6, 42:21, 45:23, 66:7, 86:9, 91:6
**kinds** [1] - 61:16
**KIRKLAND** [1] - 1:21
**knowledge** [1] - 59:2
**known** [2] - 11:18, 73:23
**knows** [3] - 29:2, 42:2, 52:11
**Koh** [2] - 74:5, 81:13
**Koh's** [1] - 86:3
**Kortright** [1] - 57:25

**L**

**L-3** [1] - 52:24
**lack** [4] - 47:5, 49:16, 49:17, 85:22
**laid** [3] - 63:9, 64:3, 64:4
**language** [1] - 18:11
**lap** [1] - 65:12
**laptop** [5] - 15:21, 52:12, 88:23, 88:24, 90:17
**large** [3] - 12:10, 13:19, 69:5
**last** [7] - 6:9, 16:24, 19:21, 42:20, 47:6, 78:3, 98:11
**laterally** [1] - 13:23
**lav** [1] - 91:24
**lavalier** [1] - 7:5
**lavaliere** [2] - 2:22, 3:2
**law** [20] - 5:20, 17:23, 28:1, 29:16, 30:10, 35:21, 35:25, 37:5, 52:10, 57:2, 59:7, 64:5, 64:6, 67:2, 67:3, 70:10, 70:12, 70:20, 91:9, 94:14
**laws** [2] - 32:2, 35:23
**lawsuit** [4] - 19:1, 19:2, 19:3, 19:12
**leading** [4] - 12:5, 15:14, 64:1, 87:3
**learned** [5] - 5:25, 7:24, 36:8, 63:5, 63:6
**learning** [3] - 68:5, 68:6, 74:11
**least** [12] - 12:9, 14:22, 22:14, 27:2, 34:20, 38:13, 45:9, 47:14, 52:25, 55:12, 75:12, 96:11
**leave** [5] - 4:4, 68:14,

68:15, 81:23, 93:21
**leaves** [2] - 46:22, 48:9
**leaving** [1] - 41:4
**led** [1] - 9:23
**left** [6] - 21:5, 37:4, 54:18, 82:23, 83:14, 88:23
**legal** [2] - 16:22, 23:3
**legion** [1] - 89:5
**legislative** [1] - 45:2
**legitimate** [2] - 87:5, 97:9
**length** [1] - 85:21
**lengthy** [1] - 49:8
**less** [3] - 12:9, 43:2, 66:11
**lessons** [1] - 63:5
**letters** [1] - 25:17
**LEVITT** [1] - 1:13
**Levitt** [1] - 7:3
**liability** [34] - 6:5, 10:5, 17:14, 19:20, 19:23, 20:15, 43:23, 67:23, 79:3, 80:24, 81:2, 81:4, 81:9, 81:11, 81:21, 82:1, 82:7, 82:12, 82:13, 82:15, 82:18, 82:19, 82:22, 82:23, 83:5, 83:9, 83:13, 83:15, 84:2, 85:13, 85:23, 86:1, 93:12
**liable** [1] - 28:9
**Liberty** [2] - 29:24, 30:17
**life** [1] - 41:5
**likely** [4] - 9:11, 33:23, 33:24, 84:8
**likewise** [2] - 72:21, 76:10
**limit** [1] - 58:13
**limitations** [8] - 35:6, 35:10, 35:11, 35:25, 36:11, 66:9, 67:1, 67:4
**limited** [1] - 11:13
**limiting** [3] - 19:25, 22:15, 69:5
**line** [1] - 92:5
**Line** [1] - 57:8
**lips** [2] - 41:5, 41:6
**Lisa** [1] - 69:12
**LISA** [1] - 1:18
**list** [2] - 26:24, 67:17
**literally** [1] - 25:14
**litigant** [1] - 57:25
**litigate** [3] - 24:20, 47:17, 84:10
**litigating** [2] - 18:21,

36:22
**litigation** [8] - 18:4, 20:24, 37:18, 37:23, 57:14, 58:12, 78:25, 92:16
**LITIGATION** [1] - 1:5
**Litigation** [2] - 2:12, 95:9
**LLC** [1] - 1:13
**LLP** [4] - 1:14, 1:17, 1:19, 1:21
**located** [1] - 14:19
**location** [1] - 73:5
**locations** [1] - 68:9
**log** [3] - 11:23, 13:12, 13:14
**logic** [1] - 74:8
**logical** [1] - 6:21
**login** [1] - 13:17
**logs** [2] - 14:1, 14:3
**look** [15] - 20:25, 26:17, 29:8, 39:23, 42:1, 53:16, 57:5, 62:8, 62:16, 63:3, 66:14, 67:16, 84:11, 87:12, 88:6
**looked** [1] - 71:10, 73:6, 97:16
**looking** [4] - 19:10, 25:22, 42:23, 61:23
**loss** [7] - 18:14, 31:21, 31:22, 38:4, 47:20, 85:5
**losses** [1] - 67:13
**lost** [9] - 5:11, 52:1, 68:12, 75:4, 79:9, 79:25, 80:6, 80:13, 80:14
**loud** [1] - 91:25
**loudly** [1] - 45:16

**M**

**ma'am** [3] - 15:25, 21:8, 69:23
**maintaining** [1] - 34:2
**Maisto** [1] - 74:18
**major** [2] - 14:7, 76:8
**Maldini** [1] - 55:18
**manage** [1] - 37:22
**manageability** [10] - 39:14, 39:19, 40:6, 41:15, 41:20, 67:10, 68:22, 68:24, 96:5, 97:11
**manageability/ superiority** [1] - 38:19
**manageable** [1] - 41:17

**managed** [2] - 40:7, 60:16
**management** [3] - 40:24, 97:18, 97:21
**manner** [2] - 28:22, 81:24
**manufactured** [1] - 42:3
**manufacturers** [1] - 42:2
**March** [3] - 79:16, 98:12
**Marinucci** [1] - 56:13
**market** [6] - 6:13, 28:25, 29:9, 79:17, 79:23, 89:13
**marketers** [1] - 79:21
**markets** [2] - 78:7, 78:8
**MARLENE** [1] - 1:24
**Marlene** [2] - 99:1, 99:7
**MARRIOTT** [2] - 1:4, 1:16
**Marriott** [116] - 2:10, 3:24, 3:25, 5:5, 8:10, 9:24, 11:11, 12:3, 12:11, 12:19, 13:3, 14:3, 14:20, 14:25, 15:9, 15:15, 16:18, 17:25, 18:1, 18:12, 18:17, 18:23, 19:15, 20:19, 24:25, 25:14, 25:15, 27:3, 27:5, 28:9, 28:13, 28:21, 29:3, 32:1, 32:21, 34:9, 37:3, 40:7, 40:14, 40:16, 40:18, 45:25, 50:15, 55:8, 55:15, 55:17, 55:18, 57:25, 58:10, 59:18, 59:20, 59:21, 59:24, 60:7, 60:20, 60:22, 60:24, 61:19, 61:20, 62:9, 62:14, 63:4, 63:11, 63:12, 63:13, 63:17, 63:23, 63:25, 64:5, 64:12, 64:24, 64:25, 65:4, 66:14, 66:16, 66:20, 67:25, 68:8, 69:4, 69:12, 71:2, 71:17, 72:22, 72:23, 72:25, 73:4, 73:7, 73:23, 74:1, 74:4, 74:11, 74:17, 74:19, 75:19, 77:4, 77:7, 88:22, 88:25, 89:22, 91:7, 91:10, 92:5, 92:7, 92:14, 92:15, 92:23, 92:25,

93:9, 93:10, 94:9, 94:11, 94:15, 96:14, 97:7, 97:8
**Marriott's** [20] - 13:12, 14:12, 15:16, 19:3, 19:9, 29:2, 33:4, 33:18, 59:2, 60:21, 62:10, 62:14, 62:25, 70:13, 70:18, 71:18, 73:23, 77:1, 78:15, 89:21
**Marriott.com** [2] - 57:7, 60:23
**marshal** [1] - 72:24
**Mary** [5] - 10:25, 11:8, 15:11, 16:15, 78:16
**MARYLAND** [3] - 1:1, 1:8, 1:25
**Maryland** [22] - 2:5, 4:23, 5:8, 5:19, 26:5, 28:1, 29:15, 30:10, 33:20, 34:1, 38:9, 38:10, 38:15, 43:17, 55:12, 69:14, 69:20, 70:12, 75:9, 75:16, 76:5, 76:14
**Maryland's** [1] - 75:11
**mask** [5] - 2:13, 2:17, 10:13, 97:10
**masks** [1] - 2:19
**mass** [2] - 41:21, 65:18
**massive** [2] - 65:11, 65:15
**master** [3] - 14:23, 14:24, 45:14
**Master** [2] - 64:19, 66:1
**material** [6] - 56:21, 58:22, 73:20, 74:12, 75:18, 76:2
**materiality** [2] - 73:20, 75:14
**materials** [1] - 15:24
**matter** [12] - 2:9, 18:11, 19:25, 20:21, 23:25, 24:4, 24:6, 36:5, 50:1, 66:4, 89:12, 99:3
**matters** [4] - 40:22, 57:11, 59:17, 61:18
**maven** [1] - 39:23
**McDonald** [1] - 52:8
**mean** [12] - 8:19, 9:8, 10:11, 12:12, 21:25, 49:14, 57:4, 83:13, 91:6, 92:23, 92:24, 93:5
**meaningful** [1] - 49:8
**means** [3] - 25:8, 60:3,

61:12
**measure** [3] - 39:6, 39:8, 80:16
**measurement** [3] - 28:20, 83:1, 84:5
**measurements** [1] - 37:3
**measures** [3] - 15:8, 18:13, 66:22
**measuring** [1] - 79:14
**Mechanical** [1] - 1:22
**mechanism** [1] - 95:25
**medals** [1] - 80:9
**medical** [2] - 52:12, 68:21
**meet** [2] - 5:22, 47:11
**member** [14] - 23:12, 24:2, 25:11, 27:20, 32:23, 33:12, 34:11, 47:7, 50:15, 51:2, 54:25, 58:23, 61:12
**members** [46] - 5:21, 7:4, 23:4, 23:5, 24:15, 24:16, 25:15, 26:24, 27:9, 27:17, 28:4, 28:11, 29:14, 31:1, 32:3, 32:4, 32:9, 33:3, 33:9, 33:23, 35:14, 35:15, 36:4, 36:19, 39:6, 48:13, 49:9, 49:13, 50:13, 58:24, 59:4, 68:11, 68:24, 70:21, 72:8, 73:13, 75:16, 78:6, 79:9, 79:22, 80:16, 87:7, 88:12, 89:1, 97:13
**members'** [9] - 28:7, 28:10, 29:4, 29:8, 32:17, 33:5, 35:12, 35:18, 37:12
**membership** [1] - 61:15
**memorandum** [1] - 8:2
**mention** [3] - 25:22, 46:19, 50:8
**mentioned** [3] - 27:15, 30:23, 46:14
**mere** [6] - 52:8, 52:19, 52:22, 53:9, 53:18, 53:19
**merely** [3] - 49:15, 50:1, 65:11
**merits** [1] - 46:3
**message** [1] - 11:24
**met** [8] - 22:5, 22:6, 24:13, 25:11, 36:7, 67:25, 71:21, 96:22

**method** [1] - 42:22
**methods** [2] - 36:17, 60:20
**MFA** [2] - 11:18, 62:23
**mic** [1] - 3:2
**Michigan** [6] - 5:14, 5:17, 34:7, 69:15, 69:20, 76:23
**Michigan's** [1] - 69:16
**microphone** [2] - 2:23, 7:12
**might** [5] - 27:5, 36:21, 65:19, 65:20, 94:12
**million** [3] - 43:16, 43:17, 53:1
**millions** [9] - 68:11, 82:14, 82:15, 83:9, 85:12, 96:9, 96:13
**Milstein** [2] - 3:9, 4:18
**MILSTEIN** [1] - 1:11
**mind** [3] - 4:15, 39:25, 43:25
**mindful** [3] - 7:14, 8:8, 9:6
**mini** [1] - 51:1
**mini-trial** [1] - 51:1
**minimal** [3] - 36:19, 93:3, 93:25
**minimum** [1] - 34:21
**misapprehending** [1] - 25:1
**miscellaneous** [1] - 92:6
**misrepresentation** [2] - 34:4, 70:15
**misrepresentations** [4] - 34:5, 70:13, 72:8, 74:25
**missing** [1] - 53:22
**misuse** [3] - 18:14, 47:18, 47:25
**misuse-type** [2] - 47:18, 47:25
**mitigated** [1] - 13:9
**mitigation** [3] - 17:6, 17:9, 81:1
**model** [8] - 26:8, 29:13, 50:9, 54:18, 78:4, 80:15, 80:17, 89:20
**modified** [1] - 8:25
**moment** [4] - 15:19, 16:21, 56:4, 68:15
**money** [3] - 17:1, 38:4, 75:4
**monitor** [2] - 13:12, 62:23
**monitoring** [1] - 38:4
**month** [2] - 6:9, 98:11

**month's** [1] - 78:3
**months** [1] - 92:8
**morning** [13] - 2:7, 2:8, 3:16, 3:24, 7:1, 7:2, 10:10, 49:24, 54:9, 55:6, 55:7, 69:11, 77:22
**most** [6] - 3:1, 36:13, 36:18, 40:17, 43:22, 68:20
**mostly** [1] - 9:18
**motion** [16] - 8:2, 10:18, 11:1, 46:10, 49:2, 49:18, 53:7, 53:8, 54:17, 56:3, 58:20, 67:14, 75:9, 77:18, 85:25, 86:20
**motions** [3] - 31:25, 57:22, 98:15
**MOTIONS** [1] - 1:5
**Motz** [1] - 82:5
**move** [1] - 70:3
**moved** [1] - 4:20
**moves** [1] - 13:22
**moving** [2] - 10:1, 70:11
**MR** [71] - 3:8, 3:14, 3:23, 4:2, 4:7, 4:10, 4:17, 6:18, 6:24, 20:9, 21:11, 21:15, 22:2, 22:18, 22:21, 22:24, 23:17, 23:24, 24:24, 25:3, 25:7, 26:12, 26:14, 26:17, 30:3, 30:7, 39:13, 39:25, 40:3, 40:4, 41:7, 42:7, 42:9, 44:6, 44:20, 44:24, 45:11, 45:16, 45:24, 46:9, 46:14, 55:5, 55:6, 55:8, 56:13, 62:4, 63:16, 77:22, 77:25, 82:3, 82:19, 82:25, 83:16, 83:20, 84:4, 84:20, 84:23, 85:7, 85:16, 87:10, 87:19, 87:22, 88:10, 90:2, 90:5, 90:7, 94:24, 95:8, 96:16, 97:25, 98:18
**MS** [29] - 7:1, 7:3, 7:7, 7:10, 7:14, 7:18, 7:20, 7:22, 9:5, 9:10, 9:16, 10:24, 13:1, 16:1, 17:11, 17:16, 17:21, 20:5, 20:10, 20:12, 21:9, 69:11, 69:24, 70:4, 91:23, 92:1, 92:3, 93:18, 94:20

**multidistrict** [1] - 58:12
**multifactor** [6] - 10:7, 10:8, 11:18, 12:1, 12:2, 12:6
**multiple** [5] - 25:23, 25:24, 37:24, 45:1, 60:20
**must** [6] - 2:17, 47:8, 59:8, 61:1, 72:4, 83:14
**Mutual** [2] - 29:24, 30:18
**myriad** [1] - 69:17

**N**

**name** [2] - 26:1, 57:8
**named** [2] - 9:7, 25:23
**namely** [1] - 84:2
**names** [1] - 26:14
**National** [1] - 16:6
**natural** [2] - 5:1, 5:9
**naturally** [2] - 2:21, 3:1
**nature** [1] - 32:6
**NDS** [17] - 9:25, 25:13, 25:14, 25:16, 25:19, 25:22, 26:2, 26:13, 26:14, 27:14, 47:3, 62:19, 65:19, 66:4, 87:11, 87:15, 89:4
**nearly** [1] - 47:14
**neat** [1] - 66:5
**neatly** [1] - 57:2
**necessarily** [1] - 11:11
**necessary** [8] - 8:20, 12:17, 12:24, 17:19, 18:13, 36:1, 68:10
**need** [22] - 7:5, 8:22, 9:9, 12:21, 12:23, 27:21, 28:1, 30:18, 31:19, 45:19, 51:5, 63:25, 64:16, 67:11, 70:3, 72:16, 75:13, 75:24, 79:25, 89:8, 96:4, 96:16
**need-to-know** [1] - 12:21
**needed** [3] - 15:23, 64:18, 74:19
**needs** [5] - 26:20, 45:5, 45:6, 45:8, 97:16
**negate** [1] - 91:18
**negligence** [26] - 4:21, 4:23, 4:25, 6:6, 6:17, 6:19, 23:5, 23:10, 23:15, 24:8, 31:16, 31:17, 31:18, 32:2,

33:3, 46:1, 46:23, 54:6, 54:10, 54:11, 54:15, 54:19, 78:12, 79:3, 81:12, 85:4
**negligent** [1] - 83:25
**negotiate** [2] - 93:22, 94:2
**negotiated** [2] - 94:8, 94:16
**network** [2] - 62:9, 72:19
**never** [9] - 53:9, 62:9, 71:16, 77:7, 78:14, 80:2, 96:13, 96:14, 97:14
**New** [30] - 5:8, 5:20, 9:25, 28:1, 29:15, 33:20, 34:20, 35:8, 35:9, 35:18, 35:25, 43:16, 44:14, 55:12, 66:9, 67:1, 67:2, 69:14, 69:20, 70:12, 70:20, 71:5, 71:16, 72:4, 73:12, 73:15, 74:15, 76:14, 76:18
**new** [1] - 70:3
**next** [2] - 51:22, 82:11
**Niemeyer** [1] - 82:5
**night** [1] - 26:8
**nine** [1] - 69:6
**NIST** [1] - 16:7
**nobody** [1] - 90:25
**Noll** [1] - 74:9
**nominal** [28] - 29:15, 29:16, 29:20, 29:25, 30:10, 30:13, 30:19, 33:6, 34:19, 44:13, 53:24, 53:25, 54:1, 54:22, 54:23, 55:1, 76:3, 85:14, 85:15, 85:16, 85:18, 85:20, 85:24, 86:6, 90:14, 90:16, 90:23
**non** [3] - 37:16, 38:9, 61:15
**non-class** [1] - 37:16
**non-contract** [1] - 61:15
**non-Maryland** [1] - 38:9
**none** [3] - 54:3, 94:8, 94:9
**notably** [1] - 61:6
**note** [2] - 15:4, 61:9
**noted** [5] - 14:18, 21:13, 21:16, 40:8, 72:13
**notes** [1] - 20:11
**nothing** [11] - 19:6, 31:15, 57:19, 57:25,

58:9, 59:10, 80:12, 81:3, 97:9, 97:25
**notice** [9] - 29:6, 30:18, 34:9, 43:9, 43:13, 44:16, 62:16, 74:1, 77:2
**notices** [4] - 43:10, 88:11, 88:12, 88:14
**notification** [3] - 25:17, 43:19, 76:25
**notion** [6] - 38:24, 42:21, 43:7, 62:7, 97:10, 97:20
**November** [1] - 5:5
**number** [17] - 2:10, 8:3, 9:9, 14:22, 15:17, 26:12, 31:12, 43:2, 43:3, 44:8, 49:10, 51:9, 51:15, 68:23, 89:24
**numbers** [7] - 52:15, 65:8, 65:20, 65:23, 65:24
**numerosity** - 22:8
**numerous** [1] - 89:17
**nuts** [2] - 21:25, 82:8

## 0

**O'Brien** [4] - 68:8, 71:15, 73:4, 76:18
**object** [1] - 10:12
**objected** [1] - 64:20
**objecting** [1] - 8:7
**objection** [1] - 92:9
**objective** [8] - 25:9, 26:19, 27:11, 27:13, 27:14, 33:21, 73:21
**obligations** [2] - 16:22, 17:24
**obtain** [1] - 79:20
**obviously** [5] - 9:8, 22:6, 25:7, 44:8, 54:2
**occurred** [10] - 14:6, 14:7, 15:7, 15:14, 36:2, 43:19, 61:25, 66:12, 66:13, 66:20
**October** [1] - 16:11
**OF** [2] - 1:1, 1:6
**offended** [1] - 41:5
**offense** [1] - 23:21
**offensive** [2] - 92:11, 93:10
**offer** [3] - 16:16, 53:17, 64:7
**offered** [3] - 71:8, 77:12, 79:6
**offering** [1] - 73:9
**offers** [1] - 11:13

**Office** [1] - 16:11
**Officer** [1] - 63:1
**OFFICIAL** [1] - 1:24
**Official** [1] - 99:7
**oftentimes** [1] - 65:21
**omission** [10] - 33:19, 34:4, 70:22, 71:22, 72:2, 73:14, 73:20, 74:6, 74:7, 75:12
**omissions** [7] - 33:22, 34:6, 70:18, 71:19, 72:9, 74:12, 75:1
**omnibus** [1] - 56:7
**once** [8] - 4:5, 8:19, 24:1, 38:25, 43:18, 49:15, 51:6, 88:18
**one** [43] - 6:4, 6:12, 6:13, 9:7, 10:6, 11:25, 12:13, 12:16, 13:21, 14:18, 14:22, 15:19, 17:1, 17:4, 17:5, 19:20, 28:8, 37:15, 38:23, 39:3, 39:22, 41:2, 41:18, 42:19, 49:4, 52:12, 54:6, 54:19, 56:10, 61:13, 62:22, 64:24, 65:17, 66:15, 67:12, 73:6, 86:13, 87:10, 92:5, 95:15, 96:12, 97:6
**ones** [3] - 27:22, 27:24, 51:17
**online** [1] - 71:7
**open** [1] - 8:9
**opening** [1] - 58:21
**operated** [1] - 67:25
**opinion** [1] - 29:19
**opinions** [2] - 78:19
**opponent** [1] - 29:6
**opportunity** [5] - 27:19, 37:8, 43:11, 45:8, 80:1
**opposed** [1] - 20:2
**opposition** [3] - 20:20, 78:22
**option** [1] - 42:5
**Order** [1] - 2:2
**order** [6] - 8:14, 8:22, 38:16, 47:8, 47:10, 79:24
**ordinary** [1] - 45:18
**organizational** [1] - 66:21
**originally** [1] - 67:14
**otherwise** [5] - 2:17, 2:25, 22:12, 54:3, 57:3
**ourselves** [1] - 46:4
**outlined** [3] - 19:19,

19:21, 75:8
**outlining** [1] - 36:13
**outright** [1] - 46:25
**outside** [1] - 61:14
**outweighed** [1] - 36:21
**overcharge** [1] - 26:9
**overcome** [1] - 95:25
**overdesignated** [1] - 12:11
**overlapping** [1] - 67:8
**overpaid** [2] - 31:11, 48:15
**overpay** [1] - 48:15
**overpayment** [8] - 6:12, 22:15, 48:10, 48:11, 48:16, 50:12, 51:3, 67:13
**overprivileged** [3] - 12:19, 13:4, 13:16
**overruled** [1] - 76:7
**oversimplify** [1] - 73:18
**overt** [1] - 41:1
**overwhelm** [2] - 70:9, 93:11
**overwhelming** [2] - 61:11, 70:14
**owed** [4] - 17:22, 23:11, 32:1, 32:4
**owes** [1] - 91:18
**own** [9] - 11:15, 29:1, 29:2, 29:7, 30:4, 33:4, 48:6, 50:16, 90:12
**owned** [1] - 60:23

## P

**P.M** [2] - 86:23, 98:21
**package** [1] - 66:5
**page** [5] - 51:24, 58:21, 58:24, 63:1, 95:24
**pages** [7] - 11:2, 56:14, 63:7, 63:22, 63:23, 78:21, 93:2
**paid** [12] - 5:10, 5:15, 5:21, 26:7, 27:3, 31:10, 38:4, 49:16, 87:7, 87:13, 88:1, 89:10
**pandemic** [2] - 2:15
**panel** [1] - 58:11
**panel's** [1] - 58:13
**papers** [5] - 23:13, 23:14, 34:13, 35:7, 60:8
**parade** [1] - 45:20
**paragraph** [5] - 60:19,

60:22, 66:14, 66:21, 67:16
**paragraphs** [1] - 66:14
**Parklane** [1] - 93:10
**part** [17] - 13:22, 13:23, 17:9, 17:17, 20:22, 21:21, 44:2, 51:12, 59:17, 65:22, 75:12, 82:18, 82:19, 82:20, 89:14, 90:2, 92:18
**participate** [1] - 92:8
**participated** [2] - 65:9, 92:10
**particular** [9] - 26:7, 41:18, 44:10, 44:18, 71:17, 73:8, 95:1, 95:5, 96:22
**particularly** [2] - 41:13, 43:10
**parties** [6] - 3:6, 40:17, 42:18, 71:25, 84:17, 88:19
**parts** [1] - 64:13
**party** [12] - 29:6, 29:17, 31:13, 31:14, 55:22, 57:7, 57:20, 61:21, 68:9, 70:25, 87:8, 92:11
**party's** [1] - 57:22
**pass** [2] - 40:1, 41:5, 73:9
**passed** [1] - 11:12
**passport** [2] - 68:5, 68:6
**password** [2] - 11:22, 13:15
**past** [1] - 53:6
**paste** [1] - 56:6
**path** [2] - 14:15, 62:18
**PAUL** [1] - 1:7
**Paul** [1] - 2:5
**Paula** [1] - 71:15
**pay** [6] - 48:13, 48:15, 88:1, 89:11, 91:4
**paying** [1] - 70:1
**payment** [9] - 16:3, 16:8, 26:15, 27:15, 77:6, 87:12, 87:15, 89:9, 95:15
**pays** [1] - 76:16
**PCI** [2] - 16:3, 16:5
**peace** [1] - 97:13
**pending** [1] - 2:9
**people** [24] - 2:18, 3:1, 3:3, 5:16, 9:1, 9:14, 13:14, 13:18, 24:19, 25:12, 25:23, 38:3, 43:11, 43:16, 43:17, 44:16, 65:7, 82:14,

83:19, 91:4, 91:7, 91:11, 96:9, 97:10
**per** [2] - 4:25, 93:2
**percent** [4] - 26:9, 39:4, 76:19, 91:16
**perfect** [2] - 27:17, 54:11
**perfection** [1] - 26:18
**perfectly** [1] - 95:10
**perform** [1] - 22:3
**performance** [2] - 28:2, 28:9
**perhaps** [4] - 3:10, 37:8, 91:13, 95:11
**period** [5] - 23:19, 23:23, 26:7, 68:20, 76:20
**periods** [1] - 35:25
**permitted** [2] - 28:21, 75:22
**person** [7] - 15:23, 31:13, 66:6, 66:7, 69:2, 88:12, 88:13
**person's** [1] - 67:11
**personal** [34] - 5:2, 6:14, 10:9, 17:4, 21:2, 25:12, 28:7, 29:4, 29:8, 29:9, 33:5, 34:3, 35:15, 36:5, 36:8, 37:12, 41:22, 47:20, 50:13, 52:3, 52:13, 52:16, 52:20, 53:14, 53:19, 59:18, 59:22, 60:22, 88:21, 89:22, 90:11, 93:3, 94:12, 95:12
**personally** [1] - 13:10
**persons** [2] - 5:1, 5:9
**perspective** [1] - 40:20
**Peter** [1] - 55:18
**PFI** [2] - 11:5, 16:9
**phase** [2] - 17:13, 45:9
**phone** [1] - 11:24
**phonetic** [1] - 58:1
**physical** [1] - 68:12
**picture** [3] - 25:21, 42:13
**piece** [2] - 13:24, 20:23
**pieces** [2] - 15:17, 16:2
**PII** [10] - 10:10, 12:8, 20:18, 64:9, 70:24, 70:25, 71:2, 72:19, 72:24, 80:20
**pivoted** [1] - 70:16
**Pizzirusso** [5] - 3:10, 21:17, 39:23, 40:5, 94:21

**PIZZIRUSSO** [12] - 1:15, 40:4, 41:7, 42:7, 42:9, 44:6, 44:20, 44:24, 94:24, 95:8, 96:16, 97:25

**Pizzirusso's** [1] - 17:18

**place** [6] - 8:14, 9:7, 18:14, 35:24, 37:2, 38:7

**plain** [1] - 29:23

**plainly** [2] - 9:3, 60:17

**plaintiff** [31] - 23:4, 23:8, 24:3, 31:20, 31:21, 35:2, 36:2, 47:10, 49:21, 52:25, 53:2, 53:5, 53:13, 58:21, 60:25, 61:11, 71:6, 71:10, 71:18, 72:4, 72:24, 73:4, 77:15, 84:10, 84:13, 91:19, 93:2, 94:15, 95:21, 97:7

**Plaintiff** [8] - 59:17, 59:19, 59:20, 59:22, 59:24, 71:4, 74:18, 77:3

**plaintiff's** [3] - 43:3, 74:6, 77:25

**Plaintiff's** [1] - 59:22

**plaintiff-by-plaintiff** [1] - 77:15

**PLAINTIFFS** [1] - 1:10

**Plaintiffs** [59] - 8:1, 10:3, 18:22, 22:25, 28:15, 31:24, 32:8, 32:12, 32:17, 34:12, 37:6, 47:12, 47:16, 49:10, 49:20, 49:25, 50:7, 51:18, 52:18, 52:21, 53:17, 54:18, 55:11, 55:15, 56:2, 56:15, 56:19, 57:17, 59:3, 61:6, 61:16, 62:10, 62:14, 62:23, 64:7, 64:17, 64:18, 65:11, 67:14, 69:7, 70:13, 70:18, 74:10, 74:12, 76:18, 76:22, 77:8, 77:9, 78:16, 79:6, 79:13, 79:19, 81:11, 81:19, 85:7, 85:17, 85:25, 86:13, 92:14

**plaintiffs** [85] - 3:7, 3:9, 4:5, 4:16, 4:19, 6:11, 7:4, 9:7, 11:7, 17:1, 17:4, 17:6, 17:21, 23:3, 23:11, 24:12, 24:15, 24:18,

30:13, 36:4, 37:17, 37:19, 39:3, 40:5, 40:12, 40:16, 43:21, 45:9, 48:2, 48:9, 49:9, 50:8, 50:17, 50:24, 52:14, 52:15, 52:24, 58:4, 63:11, 65:17, 67:17, 67:24, 68:16, 69:13, 69:19, 70:7, 70:23, 70:25, 71:9, 71:21, 71:24, 72:10, 72:13, 72:16, 72:17, 72:21, 73:18, 73:25, 74:15, 74:16, 74:22, 75:11, 75:24, 76:2, 76:12, 76:20, 76:25, 77:5, 79:24, 80:5, 80:13, 80:23, 80:25, 81:15, 82:16, 82:22, 83:2, 86:19, 87:2, 89:2, 93:5, 93:9, 94:8, 97:24

**plaintiffs'** [5] - 24:19, 75:9, 76:10, 76:12, 85:18

**Plaintiffs'** [22] - 19:7, 19:11, 20:14, 28:2, 46:18, 47:2, 49:15, 49:18, 50:4, 51:10, 51:23, 52:2, 52:19, 54:5, 61:10, 63:19, 71:23, 77:18, 78:14, 80:18, 85:21, 85:24

**plan** [12] - 17:12, 17:17, 21:16, 38:6, 42:18, 50:4, 50:7, 50:9, 51:20, 67:11, 68:19

**play** [2] - 78:11, 82:9

**played** [1] - 72:18

**pleadings** [1] - 53:6

**pled** [2] - 29:25, 47:16

**PLLC** [1] - 1:11

**pocket** [1] - 31:7

**podium** [1] - 5:24

**point** [16] - 10:14, 37:2, 37:8, 37:13, 43:14, 54:6, 54:13, 55:25, 64:18, 66:10, 92:4, 92:14, 92:19, 95:17, 95:19, 98:7

**pointed** [4] - 33:1, 53:4, 62:24, 89:17

**pointing** [1] - 11:17

**points** [8] - 7:25, 12:10, 18:22, 19:15, 19:17, 67:8, 73:9, 94:25

**policies** [2] - 72:11, 72:25

**policy** [3] - 2:14, 59:25, 95:24

**pool** [1] - 73:6

**portal** [1] - 73:11

**portions** [2] - 4:5, 18:9

**posed** [1] - 63:11

**posing** [1] - 39:11

**position** [4] - 10:18, 18:20, 19:18, 81:13

**possibility** [1] - 97:6

**possible** [5] - 60:10, 68:19, 68:23

**post** [1] - 37:4

**poster** [1] - 68:17

**potential** [2] - 68:11, 79:10

**potentially** [3] - 82:14, 83:9, 85:12

**power** [3] - 47:9, 93:20, 94:7

**powerful** [2] - 11:16, 11:19

**practice** [3] - 34:5, 57:22, 75:5

**practices** [4] - 33:18, 70:11, 72:6, 75:6

**Practices** [1] - 74:23, 75:6

**precedent** [1] - 41:14

**precise** [3] - 29:18, 37:7, 90:24

**precisely** [1] - 30:12

**precision** [1] - 56:18

**preclude** [2] - 51:21, 55:12

**precluded** [2] - 48:25, 72:9

**precludes** [2] - 46:24, 75:10

**predominance** [5] - 21:21, 47:12, 70:7, 81:15, 85:19

**predominate** [5] - 27:22, 27:24, 35:8, 70:6, 81:2

**predominates** [1] - 32:20

**preferred** [2] - 60:5, 60:15

**prematurely** [1] - 24:11

**premerger** [1] - 19:8

**premised** [1] - 85:4

**prepared** [6] - 11:5, 16:4, 16:9, 16:11, 16:15, 44:22

**prerequisite** [1] - 85:20

**prerequisites** [2] - 22:4, 22:7

**present** [6] - 9:21, 19:19, 20:22, 32:3, 32:16, 66:18

**presented** [5] - 20:15, 44:12, 77:17, 92:10, 93:21

**presiding** [1] - 2:6

**press** [1] - 15:21

**pressed** [1] - 26:25

**pressure** [1] - 21:11

**presumably** [2] - 80:7, 82:16

**presumed** [1] - 75:22

**presumption** [5] - 72:1, 74:13, 75:14, 75:17, 75:23

**pretrial** [1] - 58:16

**pretty** [3] - 36:15, 36:24, 98:5

**prevail** [1] - 37:19

**prevent** [1] - 64:13

**preventable** [2] - 9:23, 10:6

**prevented** [2] - 12:9, 62:9

**preventing** [1] - 93:25

**prevents** [2] - 11:21, 61:10

**previous** [1] - 16:5

**previously** [1] - 92:19

**Price** [1] - 57:8

**price** [1] - 29:9

**prices** [4] - 79:17, 79:19, 90:10, 90:11

**prince** [9] - 6:11, 79:8, 79:9, 79:19, 80:2, 84:12, 89:20, 89:21, 90:5

**Prince** [1] - 28:19

**prince's** [2] - 78:4, 80:15

**Prince's** [3] - 28:20, 28:24, 50:9

**privacy** [22] - 16:7, 17:25, 18:2, 18:11, 18:12, 19:14, 23:10, 28:5, 28:7, 56:22, 57:4, 57:6, 57:12, 58:18, 59:1, 59:5, 59:12, 59:25, 71:10, 71:11, 71:17

**privileged** [4] - 12:13, 12:16, 13:8, 62:23

**privileges** [3] - 12:11, 12:17, 12:22

**problem** [12] - 10:13, 14:3, 14:8, 22:24, 48:11, 51:8, 51:18, 51:20, 85:22, 89:8, 94:7, 95:25

**problems** [3] - 14:5, 85:19, 97:18

**procedural** [3] - 66:22, 93:24, 94:6

**proceed** [3] - 61:4, 92:16, 92:24

**proceeded** [1] - 47:17

**proceeding** [1] - 91:13

**PROCEEDINGS** [1] - 1:6

**Proceedings** [1] - 1:22

**proceedings** [3] - 58:16, 81:23, 99:3

**process** [3] - 43:19, 92:8, 93:1

**produce** [1] - 50:20

**Produced** [1] - 1:22

**producing** [1] - 93:2

**product** [1] - 35:2

**Products** [1] - 95:23

**Professor** [2] - 28:19, 28:24

**proffer** [1] - 28:15

**Program** [5] - 18:6, 18:18, 56:22, 57:11, 60:2

**program** [2] - 59:16, 60:15

**Program's** [1] - 18:21

**project** [1] - 92:2

**Project** [2] - 63:2, 63:3

**prong** [3] - 24:13, 54:2, 74:23

**proof** [11] - 7:25, 10:3, 33:17, 64:7, 71:20, 73:17, 73:18, 75:3, 78:18, 79:7, 80:21

**proper** [1] - 58:6

**properly** [1] - 19:1

**properties** [4] - 17:2, 64:24, 64:25, 73:4

**property** [5] - 5:4, 5:10, 23:17, 26:6, 75:4

**property's** [1] - 19:8

**proposed** [9] - 23:6, 23:14, 33:12, 38:6, 47:15, 49:9, 55:19, 72:14, 73:19

**proposing** [1] - 67:19

**proposition** [1] - 75:2

**prosecuting** [1] - 96:2

**prosecution** [1] - 36:20

**prospect** [1] - 40:15

**Protect** [1] - 76:23

**protect** [6] - 16:22, 18:14, 24:2, 31:20, 59:21, 66:22

**protected** [1] - 36:6
**protecting** [4] - 24:8, 28:7, 28:10, 32:17
**Protection** [5] - 5:13, 5:14, 34:7, 69:16, 76:5
**protection** [11] - 4:22, 5:7, 33:14, 34:16, 69:14, 70:17, 71:15, 75:9, 76:9, 77:20, 78:12
**protective** [1] - 8:13
**protocols** [1] - 16:7
**prove** [6] - 10:4, 47:13, 74:22, 77:8, 77:10, 86:1
**proven** [1] - 30:11
**provide** [6] - 30:10, 50:13, 59:22, 60:9, 94:4, 96:1
**provided** [11] - 34:9, 51:11, 56:6, 58:25, 59:18, 60:13, 60:14, 66:16, 70:24, 70:25, 77:2
**providing** [3] - 66:5, 71:2, 72:23
**proving** [3] - 51:17, 70:15, 83:10
**provision** [6] - 53:15, 58:1, 60:4, 61:13, 61:23, 72:1
**provisions** [7] - 19:17, 55:10, 58:10, 60:5, 61:7, 61:24, 92:23
**proximate** [2] - 33:8, 68:25
**proximately** [1] - 31:22
**public** [2] - 9:19, 33:23
**publicly** [2] - 8:1, 14:11
**pulled** [1] - 17:13
**pulling** [1] - 79:19
**punitive** [1] - 7:4
**punt** [1] - 62:5
**purchase** [2] - 5:15, 35:3
**purchased** [1] - 35:2
**purchasers** [1] - 49:11
**purportedly** [1] - 72:18
**purpose** [1] - 95:23
**purposes** [3] - 8:25, 27:1, 41:3
**pursued** [1] - 24:21
**pursuing** [2] - 55:1, 93:25
**put** [16] - 5:1, 9:7,

9:12, 10:16, 18:23, 21:11, 30:16, 30:18, 38:5, 44:8, 44:9, 44:15, 57:10, 65:11, 88:11, 91:24
**putative** [3] - 70:21, 72:7, 73:13
**putting** [3] - 13:19, 20:7, 87:23
**PWG-19-2879** [1] - 2:10
**PWG-19-MD-2879** [1] - 1:3

---

## Q

**quantum** [1] - 83:1
**questioned** [2] - 55:18, 65:21
**questioning** [2] - 50:22, 67:24
**questions** [17] - 3:11, 10:12, 21:7, 21:15, 29:19, 44:21, 54:4, 55:2, 62:1, 62:8, 69:9, 70:10, 71:9, 72:7, 76:11, 77:19, 86:16
**quicker** [1] - 13:2
**quickly** [3] - 58:5, 68:24, 98:8
**quip** [1] - 45:2
**quite** [2] - 3:3, 24:13
**quote** [8] - 47:7, 48:6, 49:7, 49:8, 51:25, 52:8, 53:14, 58:12

---

## R

**R=PxQ** [3] - 79:12, 79:13, 80:12
**raise** [5] - 34:13, 36:10, 55:22, 57:15, 57:21
**raised** [7] - 55:17, 57:16, 64:20, 87:4, 88:5, 95:1, 95:2
**raising** [1] - 55:16
**Ramirez** [1] - 47:6
**rather** [3] - 32:19, 41:11, 93:11
**rational** [2] - 84:12, 95:20
**RE** [1] - 1:3
**re** [4] - 41:9, 74:5, 75:1, 95:8
**reach** [2] - 60:17, 95:17
**read** [6] - 23:14, 40:25, 42:14, 59:8,

71:10, 71:16
**ready** [1] - 94:23
**real** [1] - 39:11
**reality** [1] - 80:13
**realize** [1] - 21:5
**really** [14] - 12:16, 14:4, 23:2, 24:5, 31:14, 37:10, 39:19, 43:8, 54:6, 63:17, 68:17, 88:15, 91:6, 96:15
**reason** [8] - 10:2, 27:4, 30:20, 36:21, 55:25, 73:7, 74:21, 80:5
**reasonable** [2] - 32:16, 66:21
**reasonably** [2] - 27:13, 36:5
**reasons** [11] - 69:17, 72:11, 72:22, 73:14, 74:17, 77:16, 77:17, 85:19, 94:17, 96:22
**rebut** [2] - 27:19, 75:23
**rebuttal** [1] - 11:14
**receipts** [1] - 26:2
**receive** [6] - 17:2, 27:9, 27:18, 35:3, 50:11, 78:14
**received** [1] - 37:2
**receiving** [2] - 65:18, 74:1
**recess** [3] - 86:22, 98:16, 98:20
**Recess** [2] - 86:23, 98:21
**recipe** [1] - 40:23
**reckoned** [1] - 97:21
**recognized** [3] - 11:19, 31:5, 75:21
**recommendation** [3] - 8:4, 8:7, 98:3
**recommendations** [1] - 8:24
**record** [9] - 3:5, 8:20, 9:19, 11:5, 14:11, 27:5, 29:1, 51:12, 99:2
**Recorded** [1] - 1:22
**records** [4] - 27:12, 27:13, 50:16, 87:18
**recover** [6] - 24:15, 24:16, 24:17, 36:21, 47:8, 54:9
**recoveries** [1] - 96:1
**recovery** [1] - 93:4
**red** [2] - 64:11, 87:14
**redacted** [1] - 8:1
**redemption** [1] - 58:3

**redemptions** [1] - 58:2
**redressability** [1] - 54:2
**redressable** [1] - 53:15
**refer** [5] - 10:10, 18:5, 57:13, 78:21, 86:3
**reference** [5] - 43:1, 49:23, 56:23, 57:12, 60:6
**references** [1] - 53:23
**referred** [1] - 72:7
**refund** [1] - 48:24
**refute** [1] - 16:18
**refuting** [1] - 16:17
**regard** [16] - 6:19, 8:12, 11:7, 11:12, 22:13, 23:8, 30:24, 31:4, 34:7, 35:5, 35:8, 36:12, 46:14, 53:4, 75:15, 97:17
**regarding** [3] - 33:19, 46:23, 72:7
**regardless** [1] - 52:4
**regards** [1] - 27:25
**reimbursed** [22] - 27:6, 31:6, 31:14, 48:14, 49:12, 49:14, 49:21, 50:10, 50:16, 50:19, 50:21, 50:23, 51:7, 51:14, 51:17, 66:3, 76:19, 76:20, 91:5, 91:8, 91:12
**reimbursement** [3] - 48:19, 48:20, 87:7
**reinforces** [1] - 75:3
**rejected** [4] - 8:25, 81:14, 82:2, 82:3
**relate** [1] - 32:3
**related** [9] - 17:7, 30:22, 33:18, 46:21, 55:25, 78:4, 83:18, 89:12, 97:20
**relates** [1] - 11:3
**relating** [5] - 54:5, 60:11, 60:12, 80:20, 80:25
**relatively** [1] - 51:9
**relevant** [4] - 12:7, 18:9, 36:13, 64:13
**reliability** [2] - 81:16
**reliance** [11] - 69:1, 70:14, 70:20, 73:19, 74:8, 74:14, 75:10, 75:13, 75:14, 75:22, 76:1
**relied** [3] - 33:22, 57:21, 89:7
**relief** [11] - 36:3, 37:1,

37:5, 37:7, 37:11, 46:17, 47:10, 62:2, 65:1, 74:2, 86:10
**rely** [2] - 52:24, 56:8
**remain** [1] - 86:5
**remaining** [3] - 83:17, 84:1, 86:15
**remarks** [2] - 46:2, 50:1, 94:22
**remediate** [3] - 15:7, 62:17, 63:12
**remediated** [1] - 15:5
**remember** [3] - 19:10, 21:3, 80:1
**reminded** [1] - 45:1
**reminder** [1] - 3:18
**remove** [2] - 2:13, 2:16, 33:13
**renewed** [1] - 68:6
**renewing** [1] - 68:4
**repayment** [1] - 31:13
**repays** [1] - 91:17
**repeat** [3] - 69:22, 70:2, 92:21
**repel** [1] - 62:15
**replied** [1] - 2:8
**reply** [9] - 51:25, 55:15, 59:2, 62:13, 70:16, 71:23, 85:24, 92:5, 92:21
**report** [19] - 8:4, 8:7, 8:24, 10:25, 11:2, 11:5, 11:16, 15:12, 16:2, 16:8, 16:9, 16:11, 16:15, 16:17, 78:17, 90:2, 90:4, 90:5, 90:9
**Reporter** [1] - 99:7
**REPORTER** [1] - 1:24
**reporter** [1] - 2:24
**reports** [2] - 11:14, 98:3
**represent** [2] - 69:19
**representation** [1] - 23:1
**representations** [2] - 17:24, 32:10
**representative** [6] - 23:3, 23:15, 45:3, 61:1, 61:4, 76:25
**representatives** [2] - 24:14, 55:19
**represented** [1] - 20:13
**request** [4] - 37:5, 44:17, 80:18, 85:18
**require** [8] - 5:15, 25:7, 29:18, 38:15, 61:23, 64:5, 70:20, 70:21

**required** [6] - 30:13, 37:6, 49:1, 64:7, 73:18, 75:5
**requirement** [4] - 47:12, 70:8, 75:3, 76:13
**requirements** [2] - 5:23, 96:21
**requires** [4] - 36:16, 72:4, 73:12, 76:24
**requiring** [1] - 72:25
**resale** [1] - 48:21
**rescue** [1] - 85:25
**reservation** [10] - 5:3, 50:14, 61:18, 61:20, 66:6, 70:25, 71:2, 71:3, 73:10
**reservations** [9] - 19:7, 35:13, 60:13, 60:20, 64:23, 70:24, 71:6, 71:13, 73:3
**reserve** [1] - 56:17
**reserved** [1] - 82:4
**resident** [1] - 26:6
**residents** [2] - 69:14, 69:15
**residing** [2] - 5:1, 5:9
**resolution** [4] - 20:25, 32:14, 72:20, 97:12
**resolve** [4] - 38:21, 82:12, 96:7, 96:11
**resolved** [2] - 77:11, 96:10
**resources** [1] - 84:16
**respect** [3] - 27:6, 58:14, 75:24
**respectfully** [1] - 24:18
**respective** [1] - 40:9
**responded** [1] - 63:13
**response** [10] - 15:16, 49:20, 54:8, 56:6, 56:14, 56:17, 62:10, 62:11, 63:14, 63:16
**responses** [3] - 56:5, 56:11, 65:18
**responsible** [2] - 91:15, 91:16
**rest** [2] - 81:23, 86:15
**rests** [1] - 78:4
**result** [7] - 72:5, 75:5, 76:13, 79:10, 80:6, 81:17, 97:2
**resulting** [3] - 28:3, 53:21
**resumes** [1] - 86:25
**retained** [1] - 24:9
**revealed** [1] - 29:3
**revenue** [4] - 79:10, 79:20, 80:14

**review** [2] - 51:10, 51:12
**reviewed** [2] - 11:4, 71:11
**reviews** [1] - 11:13
**rights** [1] - 96:3
**rigorous** [1] - 22:4
**rise** [1] - 28:16
**rises** [1] - 78:1
**risk** [5] - 47:19, 48:4, 48:6, 74:3, 88:15
**river** [1] - 89:5
**RMR** [2] - 1:24, 99:1
**road** [1] - 84:13
**Robins** [1] - 41:20
**Roger** [1] - 55:19
**role** [2] - 72:18, 86:11
**rookie** [1] - 80:9
**room** [1] - 74:20
**Ross** [2] - 30:7, 30:8
**routinely** [1] - 33:16
**RPR** [2] - 1:24, 99:1
**Rule** [15] - 5:23, 19:17, 21:1, 22:3, 22:5, 25:5, 41:10, 46:17, 46:21, 47:12, 70:7, 80:22, 80:24, 86:12, 95:13
**rule** [5] - 8:21, 11:6, 41:12, 42:6, 91:9
**rules** [1] - 21:4
**ruling** [4] - 43:22, 64:20, 92:12, 98:5
**rulings** [2] - 58:11, 98:8
**run** [3] - 8:7, 36:1, 36:7
**runs** [3] - 52:7, 91:8, 91:9

## S

**safe** [2] - 17:23, 94:13
**safeguard** [1] - 19:3
**sales** [4] - 78:5, 78:7, 79:21, 80:6
**satisfies** [1] - 52:20
**satisfy** [1] - 70:7
**saw** [2] - 34:13, 62:4
**schedule** [1] - 98:2
**school** [1] - 41:25
**scope** [1] - 22:15
**screen** [1] - 4:12
**se** [1] - 4:25
**seal** [4] - 8:6, 8:11, 12:14, 12:15
**seated** [1] - 87:1
**Second** [1] - 41:8
**second** [3] - 6:19,

56:24, 58:4
**secret** [1] - 55:21
**secured** [2] - 37:13, 64:8
**securities** [1] - 42:20
**security** [26] - 9:9, 9:23, 10:6, 11:7, 11:25, 15:9, 16:3, 16:7, 17:3, 18:13, 23:12, 32:20, 33:10, 33:18, 33:19, 34:2, 34:9, 37:3, 52:15, 63:4, 70:13, 71:19, 73:23, 74:18, 74:24, 84:19
**Security** [2] - 2:11, 63:1
**SECURITY** [1] - 1:4
**see** [14] - 4:5, 4:12, 4:14, 7:16, 38:13, 39:10, 39:13, 39:18, 42:25, 43:22, 47:22, 54:24, 56:13, 63:3
**seeing** [1] - 71:13
**seek** [8] - 6:11, 29:21, 29:22, 37:11, 54:22, 69:19, 70:16, 76:22
**seeking** [10] - 6:8, 6:16, 6:20, 37:1, 54:9, 54:14, 61:1, 69:19, 74:2, 80:25
**seem** [2] - 40:23, 90:15
**segmented** [1] - 62:9
**selected** [3] - 24:20, 74:19, 92:9
**selection** [7] - 57:21, 57:22, 57:24, 58:13, 58:14, 72:12, 92:17
**self** [1] - 22:9
**self-evident** [1] - 22:9
**sell** [3] - 79:18, 80:1, 80:8
**SELLERS** [1] - 1:11
**Sellers** [1] - 4:18
**selling** [1] - 79:10
**send** [2] - 25:16, 43:12
**sense** [8] - 40:20, 51:15, 54:11, 72:2, 78:13, 80:4, 86:10
**sensitive** [7] - 13:13, 14:9, 14:14, 15:14, 17:3, 17:22
**separate** [19] - 19:25, 20:21, 20:23, 21:22, 40:20, 40:21, 50:25, 69:5, 83:15, 90:25, 98:14
**series** [1] - 78:4
**serve** [1] - 83:1

**servers** [1] - 10:9
**service** [1] - 38:4
**services** [4] - 26:21, 49:11, 49:16, 59:23
**Services** [1] - 49:4
**session** [3] - 2:5, 45:2, 86:25
**set** [4] - 6:12, 9:3, 77:16, 94:10
**settlement** [1] - 95:17
**settlements** [1] - 42:17
**several** [7] - 12:4, 12:5, 31:24, 48:17, 50:16, 53:23, 54:22
**severity** [1] - 13:9
**share** [1] - 3:25
**Shield** [1] - 41:21
**shopping** [1] - 73:6
**shorthand** [1] - 16:4
**show** [16] - 10:22, 22:25, 23:1, 24:11, 25:25, 26:1, 27:21, 28:1, 31:19, 72:4, 75:13, 78:17, 79:25, 84:22, 87:6, 94:5
**showed** [1] - 68:11
**showing** [5] - 50:20, 71:21, 74:24, 78:8, 80:14
**shown** [6] - 10:21, 31:1, 31:2, 70:22, 71:20, 76:15
**shows** [5] - 25:25, 51:13, 76:1, 84:10, 97:9
**shuttle** [1] - 73:1
**signed** [1] - 59:24
**significant** [2] - 68:3, 97:14
**significantly** [1] - 44:3
**signing** [1] - 59:19
**similar** [5] - 32:25, 34:16, 52:21, 55:23, 85:17
**similarly** [1] - 25:23
**simple** [3] - 13:15, 36:20, 66:4
**simply** [17] - 5:1, 11:22, 23:25, 24:13, 28:8, 32:5, 34:2, 34:6, 37:2, 44:1, 52:21, 65:6, 65:15, 66:4, 71:21, 72:20, 74:12
**single** [8] - 49:21, 56:2, 56:15, 66:11, 66:12, 67:12, 68:19, 81:20
**sit** [2] - 2:25, 68:14

**site** [4] - 60:12, 60:13, 60:14
**sites** [1] - 71:1
**sitting** [1] - 24:19
**situations** [1] - 93:20
**six** [3] - 2:23, 35:10, 64:3
**size** [1] - 43:14
**skimmed** [1] - 71:10
**slew** [3] - 41:16, 41:22, 42:1
**slicing** [1] - 85:10
**slog** [1] - 66:6
**small** [5] - 31:12, 37:17, 51:9, 96:1
**Smith** [3] - 26:4, 26:11, 26:22
**Smiths** [1] - 26:4
**so-called** [1] - 48:9
**social** [2] - 9:9, 52:14
**soft** [1] - 45:21
**sold** [2] - 67:14, 68:19
**sole** [4] - 34:8, 41:10, 73:7, 74:21
**solely** [4] - 55:1, 59:4, 74:24, 86:5
**solo** [1] - 96:2
**solve** [1] - 85:18
**someone** [4] - 9:12, 45:4, 73:3, 83:20
**sometimes** [2] - 11:19, 72:22
**somewhat** [1] - 38:6
**sophisticated** [1] - 15:6
**sorry** [8] - 14:16, 22:22, 23:1, 88:9, 89:4, 90:6, 90:7, 94:11
**sort** [8] - 12:21, 37:2, 37:21, 39:20, 43:7, 82:6, 82:9, 85:10
**sorted** [1] - 50:2
**sorts** [1] - 74:17
**Soto** [1] - 80:9
**Sotomayor** [1] - 41:8
**sought** [2] - 68:4, 86:8
**sound** [2] - 7:20, 41:15
**sounds** [1] - 35:3
**source** [2] - 61:20, 91:9
**sources** [1] - 10:22
**Southern** [1] - 85:1
**SOUTHERN** [1] - 1:2
**Southwest** [2] - 73:9, 73:11
**speaking** [7] - 2:17, 2:18, 3:6, 3:24, 4:3, 4:13

**Special** [1] - 64:19
**specific** [9] - 16:12, 19:17, 42:18, 44:17, 65:7, 71:12, 81:9, 82:1, 86:8
**specifically** [4] - 25:4, 29:25, 75:2, 82:3
**specify** [2] - 37:6, 37:10
**spend** [1] - 21:20
**spent** [3] - 6:8, 17:1, 17:6
**SPG** [17] - 18:6, 18:17, 18:21, 19:1, 19:12, 28:4, 56:22, 57:11, 58:23, 58:24, 59:4, 59:19, 60:2, 61:12, 61:15, 65:7, 65:20
**spoken** [1] - 45:3
**Spotswood** [3] - 55:21, 61:3, 65:14
**spreadsheets** [2] - 50:18, 51:11
**squat** [1] - 7:7
**stage** [5] - 37:7, 47:23, 53:6, 67:15, 67:19
**stand** [3] - 2:20, 3:1, 75:2
**standard** [5] - 16:3, 26:18, 27:10, 27:16, 33:21
**standardized** [4] - 28:6, 28:12, 58:25, 59:6
**standards** [3] - 10:22, 11:4, 11:9
**Standards** [1] - 16:6
**standing** [18] - 30:24, 31:3, 31:15, 46:23, 46:24, 47:5, 47:8, 47:11, 48:7, 49:16, 52:10, 52:16, 53:3, 54:4, 75:3, 88:2, 88:4
**stands** [4] - 21:17, 45:4, 86:22, 98:19
**star** [1] - 95:6
**start** [6] - 8:10, 8:20, 36:6, 45:15, 79:16, 85:10
**started** [1] - 13:6
**Starwood** [28] - 5:3, 5:4, 5:10, 5:11, 16:18, 17:2, 19:8, 23:17, 23:20, 25:13, 26:6, 27:12, 28:6, 35:16, 50:14, 59:10, 59:16, 59:18, 59:21, 59:24, 60:5, 60:8, 60:15, 61:17, 66:20,

71:16, 83:24
**Starwood's** [3] - 47:3, 58:24, 62:15
**State** [1] - 71:16
**state** [4] - 44:10, 44:18, 51:9, 59:3
**statement** [20] - 17:25, 18:2, 18:11, 18:12, 19:14, 23:10, 28:5, 56:22, 56:23, 57:4, 57:6, 57:12, 58:18, 59:1, 59:5, 59:12, 71:12, 71:14, 71:17
**statements** [3] - 71:4, 71:10, 71:18
**states** [5] - 5:2, 5:10, 6:7, 37:25, 44:9
**States** [4] - 2:4, 22:16, 97:5
**STATES** [2] - 1:1, 1:7
**stating** [1] - 68:23
**status** [1] - 18:24
**statute** [10] - 35:6, 35:10, 35:11, 36:11, 66:9, 67:1, 67:4, 74:23, 76:5, 76:24
**statutes** [3] - 33:20, 34:5, 70:17
**statutory** [10] - 17:23, 34:21, 44:14, 46:18, 61:10, 70:5, 70:8, 75:3, 76:10, 76:14
**stay** [15] - 2:22, 5:10, 50:18, 51:4, 51:5, 51:6, 51:11, 73:8, 74:20, 76:16, 76:17, 77:3, 87:7
**stay-by-stay** [1] - 76:17
**stayed** [8] - 23:17, 23:25, 24:3, 24:6, 26:7, 64:25, 73:22, 77:4
**staying** [1] - 88:16
**stays** [22] - 5:21, 17:1, 18:25, 27:4, 27:6, 31:6, 31:10, 31:11, 48:13, 50:19, 50:21, 51:13, 65:8, 66:1, 66:2, 73:25, 74:10, 74:17, 75:19, 76:16, 76:19, 76:21
**steering** [1] - 24:19
**stem** [1] - 38:12
**stemming** [1] - 23:5
**stenographic** [1] - 99:2
**Stenography** [1] - 1:22
**steps** [3] - 62:17,

63:16, 64:3
**still** [19] - 13:6, 41:8, 52:10, 56:4, 64:8, 68:21, 79:23, 80:7, 81:17, 82:12, 83:3, 83:8, 84:2, 84:4, 85:11, 89:21, 90:9, 90:12, 98:12
**stolen** [7] - 52:1, 52:6, 52:12, 52:13, 52:17, 95:12
**stood** [1] - 9:25
**Storage** [1] - 9:25
**stored** [1] - 72:19
**straightforward** [1] - 36:15
**strawman** [1] - 67:10
**strict** [1] - 5:23
**strongly** [1] - 46:7
**studied** [1] - 78:23
**stuff** [1] - 70:3
**subclass** [3] - 31:5, 31:9, 31:12
**subclasses** [1] - 5:20
**subject** [8] - 2:14, 9:13, 31:24, 33:17, 61:13, 62:22, 84:8, 91:13
**subjected** [1] - 31:13
**subjects** [1] - 23:21
**submission** [1] - 36:12
**submitted** [1] - 50:17
**submitting** [1] - 93:1
**subpoenaed** [1] - 93:3
**subsequent** [1] - 22:13
**substance** [1] - 29:23
**substantial** [6] - 43:3, 47:24, 50:22, 51:15, 78:25, 84:8
**substantially** [1] - 33:24
**substantive** [4] - 11:2, 93:23, 94:2, 94:6
**substeps** [1] - 64:4
**successful** [2] - 88:25, 97:12
**succinct** [1] - 79:12
**sue** [1] - 94:13
**suffer** [1] - 47:4
**suffered** [6] - 31:21, 48:16, 52:25, 77:1, 79:22, 83:19
**sufficient** [2] - 49:17, 53:20
**suggest** [3] - 49:21, 66:8, 86:5
**suggested** [3] - 14:21, 49:25, 51:10

**suggestion** [1] - 67:21
**suing** [2] - 18:21, 41:25
**suitable** [1] - 33:15
**summary** [6] - 34:13, 53:7, 57:23, 77:12, 79:13, 92:13
**superior** [2] - 36:16, 36:18, 97:17
**superiority** [12] - 21:21, 21:22, 36:15, 37:15, 37:21, 46:16, 67:6, 67:7, 67:8, 68:17, 97:11
**superseded** [1] - 8:22
**supplement** [2] - 56:17, 93:19
**supply** [1] - 53:25
**support** [9] - 8:2, 11:10, 31:17, 48:7, 56:8, 65:1, 85:22
**supported** [1] - 10:25
**supposed** [1] - 39:8
**Supreme** [5] - 39:1, 43:1, 47:6, 48:5, 95:23
**suspect** [1] - 67:7
**suspicious** [2] - 14:19, 14:21
**sustain** [1] - 53:8
**sustainable** [1] - 35:23
**sweep** [1] - 47:4
**swept** [1] - 19:23
**sworn** [1] - 56:5
**system** [7] - 11:21, 13:22, 13:23, 13:25, 14:20, 66:17, 93:11
**systems** [1] - 67:25

---

**T**

**table** [2] - 24:19, 48:5
**tag** [2] - 21:22, 39:21
**tag-along** [1] - 21:22
**talks** [1] - 21:23
**tap** [2] - 9:2, 9:20
**targeted** [2] - 90:20
**task** [1] - 65:6
**team** [1] - 3:25
**technical** [1] - 66:22
**technology** [1] - 15:7
**Technology** [1] - 16:7
**telephone** [1] - 9:9
**ten** [2] - 26:9, 85:12
**tend** [1] - 51:16
**tens** [4] - 82:14, 83:9, 96:8, 96:12
**terms** [39] - 9:12, 18:6,

18:18, 18:21, 19:1, 19:5, 19:6, 19:11, 19:13, 23:10, 24:11, 26:23, 27:21, 27:22, 28:15, 31:16, 33:14, 37:5, 39:20, 56:21, 57:11, 58:22, 58:25, 59:6, 59:11, 59:25, 60:2, 60:6, 60:7, 60:8, 60:10, 60:11, 60:15, 60:17, 61:14, 61:17, 93:22
**terrorist** [1] - 88:13
**testified** [6] - 17:6, 73:2, 73:7, 74:16, 74:18, 74:20
**testimony** [11] - 10:21, 11:14, 11:15, 28:24, 62:24, 62:25, 63:3, 65:10, 75:25, 84:9, 93:1
**text** [1] - 11:24
**thankfully** [1] - 35:20
**THE** [108] - 1:1, 1:1, 1:7, 1:10, 2:3, 2:7, 2:9, 2:13, 3:12, 3:17, 4:1, 4:4, 4:8, 4:11, 6:3, 6:21, 6:25, 7:2, 7:5, 7:9, 7:11, 7:16, 7:19, 7:21, 8:16, 9:8, 9:11, 10:11, 12:21, 15:19, 17:9, 17:12, 17:20, 19:22, 20:7, 20:11, 21:8, 21:10, 21:14, 21:18, 22:11, 22:19, 22:22, 23:16, 23:22, 24:22, 24:25, 25:6, 25:18, 26:13, 26:16, 30:2, 30:6, 37:14, 39:24, 40:2, 40:19, 42:5, 42:8, 42:12, 44:19, 44:23, 44:25, 45:12, 45:18, 46:5, 46:13, 55:4, 55:7, 56:12, 62:3, 63:15, 69:10, 69:22, 70:1, 77:21, 77:24, 82:2, 82:17, 82:20, 83:12, 83:18, 84:1, 84:18, 84:22, 85:6, 85:15, 86:17, 86:21, 86:24, 87:1, 87:17, 87:20, 88:9, 89:25, 90:4, 90:6, 91:22, 91:25, 92:2, 93:15, 94:19, 94:23, 95:7, 96:14, 96:19, 98:2, 98:19
**Theft** [4] - 5:14, 34:7, 69:16, 76:23

**theft** [8] - 14:17, 20:20, 52:3, 52:9, 52:19, 53:19, 53:22, 81:1

**theirs** [6] - 65:20, 65:21, 65:24, 65:25, 66:2

**themselves** [1] - 53:19

**theories** [9] - 6:5, 6:11, 34:16, 37:25, 38:1, 47:24, 48:10, 85:2, 90:24

**theory** [23] - 6:13, 10:4, 16:23, 20:14, 20:15, 22:14, 39:3, 51:3, 52:2, 54:16, 54:18, 77:9, 78:1, 78:2, 78:3, 78:9, 79:5, 81:9, 81:21, 82:1, 85:4, 90:8

**thereafter** [1] - 24:5

**therefore** [5] - 23:23, 31:2, 31:10, 32:12, 35:17

**thieves** [1] - 90:20

**thinking** [1] - 68:15

**thinks** [1] - 96:12

**third** [10] - 13:12, 31:13, 31:14, 57:7, 61:21, 68:9, 70:25, 71:25, 88:19, 92:11

**third-parties** [2] - 71:25, 88:19

**third-party** [7] - 31:13, 31:14, 57:7, 61:21, 68:9, 70:25, 92:11

**thoughts** [2] - 21:23, 87:5

**thousand** [2] - 43:17, 68:18

**thousands** [5] - 97:3, 97:4, 97:15

**three** [7] - 4:20, 27:23, 34:23, 35:10, 37:24, 43:15, 67:18

**throughout** [5] - 10:10, 12:4, 18:8, 93:6, 97:4

**thrust** [1] - 43:21

**tie** [1] - 65:7

**tied** [1] - 39:8

**ties** [1] - 38:6

**timeline** [1] - 15:13

**timing** [1] - 63:10

**tired** [2] - 3:19, 3:20

**Titanium** [1] - 57:14

**today** [19] - 3:3, 3:6, 8:9, 8:23, 9:1, 9:15, 19:12, 46:10, 50:1, 51:20, 56:22, 63:20,

65:13, 78:16, 80:7, 80:23, 81:8, 86:14, 96:23

**together** [7] - 13:19, 13:24, 17:13, 38:5, 44:8, 44:9, 59:9

**TOLL** [1] - 1:11

**Toll** [1] - 4:18

**tone** [1] - 45:19

**took** [3] - 63:17, 68:5, 88:25

**tool** [1] - 11:19

**tools** [1] - 41:16

**tort** [1] - 41:21

**tortious** [1] - 53:3

**totally** [2] - 89:2

**touch** [2] - 58:5, 67:6, 85:14

**toward** [1] - 20:24

**traceable** [1] - 53:14

**traditionally** [1] - 83:5

**transactions** [1] - 61:24

**Transcript** [1] - 1:22

**transcript** [1] - 99:2

**TRANSCRIPT** [1] - 1:6

**transcription** [1] - 49:6

**Transcription** [1] - 1:22

**transferee** [1] - 58:14

**transferred** [1] - 58:15

**TransUnion** [6] - 47:6, 48:5, 88:5, 88:6, 88:7

**TransUnion's** [2] - 88:14, 88:16

**travel** [5] - 40:10, 51:16, 61:21, 71:7, 72:25

**travelers** [1] - 51:16

**Travelocity** [1] - 57:8

**treble** [1] - 34:23

**tremendous** [1] - 84:16

**trial** [20] - 10:4, 17:13, 17:17, 19:20, 20:16, 21:16, 32:2, 32:15, 38:6, 39:18, 40:9, 42:24, 43:6, 43:9, 44:21, 50:9, 51:1, 51:19, 67:11

**trial-type** [1] - 43:9

**trials** [11] - 20:23, 38:14, 38:20, 38:22, 39:17, 40:7, 40:20, 67:20, 82:15, 83:9, 85:13

**tried** [14] - 24:10, 38:8, 38:12, 38:16, 39:2,

39:17, 42:25, 43:23, 51:18, 57:2, 58:19, 84:3, 84:4, 97:5

**troubled** [1] - 65:15

**true** [12] - 35:22, 55:17, 60:8, 66:19, 72:21, 75:16

**truly** [1] - 64:16

**trump** [2] - 96:5, 96:6

**try** [9] - 7:12, 9:20, 11:23, 38:10, 40:11, 40:13, 57:17, 93:7, 96:20

**trying** [4] - 40:15, 43:25, 44:4, 81:19

**Tucson** [1] - 26:6

**tune** [1] - 53:1

**turn** [13] - 5:23, 21:6, 54:5, 55:3, 62:1, 62:2, 65:2, 69:8, 76:8, 80:22, 91:3, 91:14, 91:20

**turned** [2] - 8:18, 14:4

**tutorial** [1] - 98:11

**two** [10] - 6:11, 13:5, 13:15, 43:16, 48:9, 52:11, 57:19, 82:22, 83:17, 93:13

**type** [8] - 12:18, 28:23, 37:10, 43:9, 47:18, 47:25, 93:16

**types** [6] - 4:20, 13:18, 14:1, 27:23, 33:15, 37:24

**typicality** [2] - 23:1, 23:13

**Tyson** [1] - 49:25

## U

**U.S** [1] - 95:24

**U.S.C** [1] - 58:11

**UCL** [10] - 5:7, 34:18, 73:12, 73:16, 73:19, 74:22, 74:23, 75:3, 75:6, 76:4

**UK** [1] - 16:10

**ultimate** [2] - 32:13, 81:16

**ultimately** [5] - 49:12, 72:15, 78:1, 80:12, 85:11

**unauthorized** [2] - 18:15, 32:18

**uncertify** [2] - 42:8, 42:10

**unconscionability** [5] - 61:6, 93:23, 93:24, 94:2, 94:6

**unconscionable** [4] -

61:8, 92:23, 93:16, 94:18

**under** [39] - 4:23, 5:13, 5:19, 8:6, 8:11, 10:20, 12:14, 12:15, 18:16, 19:1, 22:3, 22:10, 22:25, 24:10, 28:1, 29:4, 31:18, 31:19, 32:2, 32:25, 33:5, 35:23, 41:10, 45:18, 47:5, 49:22, 53:5, 64:6, 67:11, 70:11, 70:17, 74:23, 76:4, 76:5, 79:4, 80:24, 84:19, 93:10, 96:20

**understood** [3] - 9:5, 59:20, 85:6

**undertake** [1] - 87:6

**undertook** [1] - 37:4

**underway** [1] - 63:9

**unencrypt** [3] - 14:22, 14:23, 15:2

**unencrypted** [2] - 14:15, 15:1

**unencrypting** [1] - 14:13

**unenforceability** [1] - 61:7

**unenforceable** [1] - 61:8

**Unfair** [2] - 74:23, 75:5

**unfair** [2] - 34:6, 75:6

**unharmed** [1] - 49:10

**Uniform** [1] - 55:10

**uniform** [5] - 33:19, 56:2, 56:15, 57:3, 59:11

**uniformity** [1] - 70:23

**uninjured** [2] - 47:10, 50:5

**unique** [1] - 23:21

**UNITED** [2] - 1:1, 1:7

**United** [4] - 2:4, 22:15, 22:16, 97:5

**units** [1] - 51:2

**unlawful** [2] - 18:15, 34:6

**unless** [6] - 21:6, 24:16, 62:1, 69:9, 86:16

**unmanageable** [1] - 41:11

**unpaid** [1] - 68:21

**unreasonable** [1] - 34:10

**unreimbursed** [1] - 50:6

**unrelated** [1] - 74:17

**unreplied** [1] - 58:19

**unresolved** [1] - 39:10

**unsuccessful** [1] - 14:13

**up** [32] - 2:23, 4:8, 6:18, 7:16, 12:5, 15:14, 22:12, 25:13, 26:20, 28:25, 29:10, 30:20, 34:23, 34:25, 39:5, 40:21, 45:3, 45:4, 53:7, 56:3, 59:19, 59:24, 68:16, 79:12, 80:3, 81:4, 84:10, 85:10, 89:23, 89:24, 90:12

**updated** [1] - 63:5

**urge** [1] - 67:4

**usage** [1] - 88:1

**utilize** [1] - 29:7

**utilized** [2] - 90:12, 90:25

## V

**vacation** [1] - 68:13

**vaccinated** [1] - 2:16

**valuable** [1] - 29:12

**valuation** [4] - 29:2, 29:5, 29:10, 33:4

**value** [32] - 6:13, 20:18, 21:2, 28:20, 28:25, 29:7, 29:13, 34:18, 35:3, 44:13, 47:20, 48:10, 51:22, 52:1, 54:16, 67:13, 78:1, 78:3, 79:6, 79:8, 80:15, 80:20, 85:3, 85:5, 89:13, 89:14, 89:22, 90:8, 90:11, 90:13

**valued** [1] - 29:4

**Van** [2] - 62:25, 63:8

**various** [7] - 6:7, 17:23, 48:18, 50:19, 68:9, 72:22, 93:6

**vehicle** [2] - 95:11, 96:20

**vein** [1] - 52:21

**venue** [3] - 58:6, 92:17

**Verizon** [3] - 11:5, 16:5, 16:10

**version** [1] - 8:1

**versus** [1] - 2:11

**via** [1] - 60:20

**viable** [1] - 30:19

**victim** [2] - 24:7, 91:17

**victory** [1] - 97:15

**video** [1] - 3:15

**view** [5] - 8:18, 20:1, 50:10, 67:1, 76:2

**views** [1] - 38:18

**Viggiano** [1] - 68:4
**violates** [1] - 34:4
**violation** [3] - 33:16, 88:11, 88:19
**violations** [1] - 69:15
**virtually** [1] - 35:22
**virus** [2] - 3:19
**Visa** [1] - 41:9
**Visas** [1] - 65:25
**visiting** [1] - 74:20
**voice** [3] - 4:8, 45:19, 45:21
**vote** [1] - 43:12
**vs** [7] - 30:7, 30:8, 47:6, 48:22, 49:4, 52:7, 55:21
**vulnerabilities** [1] - 62:17
**vulnerability** [1] - 16:6

**W**

**wage** [1] - 39:7
**wait** [1] - 37:13
**waited** [1] - 57:23
**waived** [6] - 55:16, 57:16, 58:1, 58:7, 61:8, 69:21
**waiver** [23] - 18:19, 46:16, 55:9, 55:10, 55:14, 55:20, 55:22, 57:19, 58:4, 59:3, 60:4, 60:9, 60:17, 61:10, 61:13, 61:23, 62:2, 91:21, 92:4, 92:6, 92:18, 93:14, 94:1
**waivers** [4] - 60:10, 70:4, 92:20, 93:16
**Wallace** [2] - 77:3, 77:6
**Walt** [2] - 62:25, 63:8
**warned** [3] - 12:3, 12:19, 13:3
**warrant** [2] - 49:18, 54:24
**WARREN** [12] - 1:17, 3:14, 3:23, 4:2, 4:7, 4:10, 45:16, 45:24, 46:9, 46:14, 55:5, 98:18
**Warren** [7] - 3:14, 4:13, 45:14, 87:25, 89:12, 95:1, 98:17
**ways** [4] - 40:25, 87:20, 89:23, 89:24
**web** [3] - 29:10, 90:10
**website** [9] - 18:6, 18:18, 19:5, 19:6, 19:9, 19:13, 60:6,

60:7, 60:21
**websites** [2] - 60:23, 79:20
**WEDNESDAY** [1] - 1:8
**week** [3] - 42:19, 42:20, 98:7
**Week** [1] - 61:2
**weekends** [1] - 42:16
**Weidenhamer** [1] - 48:21
**weigh** [1] - 43:5
**weird** [1] - 35:6
**welcome** [1] - 2:25
**well-recognized** [1] - 11:19
**Wesleyan** [1] - 41:24
**Westlaw** [2] - 30:8, 95:6
**whatsoever** [1] - 88:18
**whichever** [2] - 34:22, 53:16
**whole** [2] - 41:16, 43:7
**willfulness** [1] - 34:22
**willing** [1] - 38:11
**window** [4] - 77:1, 77:4, 77:6, 77:15
**Windsor** [1] - 95:24
**Winkler** [1] - 48:23
**wins** [2] - 97:7, 97:8
**withdrawal** [1] - 90:19
**witnesses** [2] - 40:22, 67:22
**WL** [1] - 49:5
**woefully** [3] - 14:10, 14:12, 15:16
**wonder** [1] - 41:4
**Wonderful** [1] - 7:22
**word** [1] - 66:25
**words** [5] - 9:19, 50:5, 52:2, 53:16, 57:13
**works** [1] - 7:8
**worry** [1] - 65:16
**wound** [1] - 25:13
**writing** [1] - 58:2
**wrote** [1] - 86:4

**Y**

**year** [5] - 9:24, 10:1, 35:10, 47:6
**years** [5] - 12:5, 13:5, 14:7, 18:8, 41:14
**York** [28] - 5:8, 5:20, 28:1, 29:16, 33:20, 34:20, 35:8, 35:9, 35:18, 35:25, 43:16, 44:14, 55:12, 66:9, 67:1, 67:2, 69:14,

69:20, 70:12, 70:20, 71:5, 71:16, 73:12, 73:15, 74:15, 76:14, 76:18
**York's** [1] - 72:4