SEALED

# EXHIBIT

# 2

*Exhibit to Defendants' Opposition to Plaintiffs' Motion for Class Certification*

*In re: Marriott International Customer Data Security Breach Litigation, MDL No. 19-md-2879*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| IN RE: MARRIOTT | * |
| INTERNATIONAL, INC. | |
| CUSTOMER DATA SECURITY | * |
| BREACH LITIGATION | |
| | * |
| | MDL No.: 19-md-2879 |
| THIS DOCUMENT RELATES TO | * |
| THE CONSUMER TRACK | JUDGE GRIMM |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*        \*   \*   \*   \*   \*   \*   \*   \*

**DECLARATION OF CATHERINE TUCKER, PH.D., VERIFYING AND ADOPTING
EXPERT REPORT**

I, Catherine Tucker, Ph.D., declare:

1.  I have been retained by counsel for Defendants as an expert in this matter.  A true and
correct copy of my expert report titled "Expert Report of Catherine Tucker, Ph.D." is
attached hereto as Exhibit 1.  I hereby adopt its contents and affirm that the statements
contained therein are true and correct to the best of my knowledge and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct and that this declaration was executed on the 7 of September, 2021 in
Cambridge, Massachusetts.

September 7, 2021

By: _____
      Catherine Tucker, Ph.D.

HIGHLY CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
<u>**FOR THE DISTRICT OF MARYLAND**</u>
***Southern Division***

| | |
|---|---|
| **IN RE: MARRIOTT INTERNATIONAL**<br>**CUSTOMER DATA BREACH LITIGATION** | **MDL No.: 19-md-2879** |

**Expert Report of Catherine Tucker, Ph.D.**

**September 7, 2021**

HIGHLY CONFIDENTIAL

## Table of Contents

I.   Introduction ........................................................................................... 1

    A.   Qualifications ................................................................................ 1

    B.   Assignment .................................................................................... 3

    C.   Summary of Plaintiffs' Allegations ............................................. 3

II.  Summary of Opinions ........................................................................... 5

III. The Prince Report's Loss of Value Model Is Fundamentally Flawed ....................... 11

    A.   The Prince Report's Loss of Value Model Does Not Measure Economic Harm . 11

    B.   The Prince Report's Failure to Justify Ignoring Zero-Price Data Brokers Render Its Conclusions Unreliable ........................... 12

        1.   The Prince Report Explicitly Acknowledges That The Data Involved in the Attack Is Often Available at a Zero-Price But Ignores This Fact ............ 13

        2.   The Data from The Four Tables is Often Inaccurate, Which Is Another Reason To Reject These Zero-Price Benchmarks ................ 16

        3.   The Prince Report Incorrectly Associates Data from the Four Tables with Mailing Lists ........................... 18

        4.   The Prince Report's Failure to Justify Ignoring Zero-Priced Data Brokers Render Its Conclusions Unreliable ................ 18

    C.   The Prince Report Ignores What Drives the Market Value Of Its Non-Zero Priced Benchmarks ........................... 19

        1.   The Prince Report Focuses on Benchmarks That Promise To Generate Marketing Prospects ........................... 20

        2.   Sellers of Data Provide Value to Clients by Offering Filters And Targetable Data, in Contrast to the Four Tables Data ................ 21

        3.   The Value of The Data Records is Driven by Their Combination with Other Data Fields ........................... 28

        4.   There is Large Value in Delivering Accurate Data That The Prince Report Ignores ........................... 29

        5.   The Legitimate Sellers of Data Spend Time Collecting and Vetting the Data, in Contrast to the Four Tables Data ................ 31

    D.   The Dark Web sources cited in the Prince Report provide unreliable estimates for the value of the Four Tables Data ........................... 32

    E.   The Prince Report's Methodology Does Not Reflect the Price an Individual Would Receive If They Tried To Sell Their Data ........................... 35

    F.   The Prince Report's Loss of Value Model Would Require Record-by-Record Analysis ........................... 37

HIGHLY CONFIDENTIAL

**IV.    The Prince Report's Benefit of the Bargain Model Relies on Flawed Demand-Side Inputs And Supply-Side Inputs** ................................................................................ **44**

A.    The Prince Report's Reliance on The Butler Report's Use of Conjoint Analysis for Its Demand-Side is Inappropriate ........................................................ 44

B.    The Supply-Side of the Prince Report's Benefit of the Bargain Model Requires Individualized Inquiry ................................................................................ 48

1.    Determining the Contemporaneous Competitor Set ................................. 49

2.    Determining the Outside Option ........................................................ 54

3.    Collection of Contemporaneous Competitive Prices ............................... 57

4.    Deriving the Relevant Market Prices for Just One of the Bellwether Plaintiffs Would Require Extensive Analysis ........................................... 58

5.    The Prince Report's Benefit of the Bargain Model Is Sensitive to Its Inputs ............................................................................................................... 59

C.    The Prince Report's Benefit of the Bargain Model Would Provide Windfall Gains to Certain Bellwether Plaintiffs Without Record-by-Record Analysis ................. 61

HIGHLY CONFIDENTIAL

# I.   Introduction

## A.  Qualifications

1.   I am the Sloan Distinguished Professor of Management Science and Professor of Marketing at MIT Sloan at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts. I received an undergraduate degree in Politics, Philosophy and Economics from Oxford University in the United Kingdom. I received a Ph.D. in Economics from Stanford University in 2005. I have been at MIT since completing my Ph.D.

2.   My academic specialty lies at the intersection between the economics of the new digital economy and the economics of digital data, privacy, and security. I have conducted multiple studies on how consumers act on privacy and information security concerns in digital environments.

3.   I am a Co-Editor at Quantitative Marketing and Economics, Associate Editor at Management Science, Journal of Marketing Research, and Marketing Science, and a Co-Editor of the National Bureau of Economic Research's volume on the Economics of Digitization. I have published multiple peer-reviewed academic papers on the topic of the economics of privacy and information security in leading management and economics journals, including Science, Journal of Political Economy, Information Systems Research, Journal of Policy Analysis and Management, Journal of Economics and Strategy, Management Science, and the RAND Journal of Economics. I have also been on the program committee for the Workshop on the Economics of Information Security since 2008. I received a National Science Foundation CAREER Award, which is the National Science Foundation's most prestigious award in support of junior faculty who "exemplify the role of teacher-scholars through outstanding research, excellent education and the integration of education and research within the context of the mission of their organizations," for my research on digital privacy and information security.

HIGHLY CONFIDENTIAL

4.   I have testified twice before Congress on factors influencing privacy and the use of digital data and have presented my research on privacy to the Federal Trade Commission, the Federal Communications Commission, the European Commission, the UK Competition and Markets Authority, and the OECD.

5.   Further details of my experience are in my curriculum vitae, which is attached as Appendix A to this report. It includes a list of my publications. I also include in Appendix A a list of other cases in which I have testified as an expert by trial or deposition in the last four years.

6.   I am being compensated for my services in this matter at my customary hourly rate of $1,250. In preparing this report, I have been assisted by certain employees of Analysis Group. Analysis Group is being compensated for its time in this matter at an hourly rate ranging between $350 and $645 an hour. As an expert affiliated with Analysis Group, I receive a proportion of their total billing. Neither my compensation nor the compensation of Analysis Group is dependent on any outcome or opinions expressed in this case.

7.   Since my work on this matter and this litigation are ongoing, I may review additional materials produced subsequently to the issuance of this report or conduct further analysis. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to plaintiffs' experts and any additional information I may receive.

8.   A list of the materials I have considered to date in developing my opinions contained in this report is attached as Appendix B.

HIGHLY CONFIDENTIAL

### B.  Assignment

9.  I have been asked by counsel for Marriott and Accenture to:

a.  Assess the expert report submitted by plaintiffs' expert Jeffrey Prince (the Prince Report)[1] and its reliance on a report submitted by Sarah Butler (the Butler Report).[2]

b.  Analyze whether the plaintiffs' proposed methods for assessing damages can be assessed formulaically for an entire class or whether an individualized inquiry would be necessary to determine whether and to what extent any class member suffered any such damages.

### C.  Summary of Plaintiffs' Allegations

10.  In November 2018, Marriott announced there had been unauthorized access to Starwood's guest reservation database.[3] The PCI Forensic Investigator determined that four data tables in the guest reservation database had been accessed.[4] I refer to these tables as the Four Tables and the data in them as the Four Tables Data. For this litigation, Marriott produced a subset of data from the Four Tables that attempted to identify records containing the bellwether plaintiffs' information from the Four Tables Data.[5] I refer to this information as the Four Tables Data Production. Plaintiffs have moved to certify thirteen classes under the laws of seven states, seeking to represent residents of those states "whose Personal Information, given to Starwood

---

[1]  Expert Class Certification Report of Jeffrey T. Prince, Ph.D., *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 12, 2021 (hereafter, "Prince Report").

[2]  Expert Report of Sarah Butler, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 12, 2021.

[3]  Marriott News Center, "Marriott Announces Starwood Guest Reservation Database Security Incident," November 30, 2018, available at https://news.marriott.com/news/2018/11/30/marriott-announces-starwood-guest-reservation-database-security-incident.

[4]  Verizon Report, MI_MDL_00000001–205 at 005–006.

[5]  Counsel informs me that the file labeled MI_MDL_02496938 and titled "HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - Results of Four Tables Queries (per ECF 729) - Copy.xlsx" was produced from the combined Four Tables from agreed-to searches in the data that Marriott produced in litigation pursuant to a stipulation between the parties. *See* Stipulations Regarding Marriott's Searching for Information in NDS Database & Consumer Plaintiffs' Responses to Discovery Questions, ECF No. 729, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, January 28, 2021, ¶¶ 19-23; and HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - Results of Four Tables Queries (per ECF 729█████████ (hereafter "Four Tables Data Production"), MI_MDL_02496938.

in connection with the making of a reservation at a Starwood Property, was compromised in a data breach announced by Marriott."[6]

11. The Prince Report proposes two models that purport to present classwide methods to calculate damages.[7] First, the Prince Report uses a model I refer to as the "Loss of Value" model to purport to measure market prices for a grouping of data fields that were in the Four Tables, including "name, address, age, email address, phone number, whether one has children, and credit card information,"[8] which model plaintiffs describe as capturing the "diminishment in the value of their PII."[9] Second, the Prince Report uses a model I refer to as the "Benefit of the Bargain" model to measure damages, which plaintiffs describe as "the overpayment related to staying at hotels that did not secure their data as promised."[10] Plaintiffs assert that fraud and mitigation damages would be individualized.[11]

---

[6]   Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 19, 2021 (hereafter, "Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification"), pp. 4–7.

[7]   Prince Report, Section X, and Section XI.

[8]   Prince Report, ¶ 137.

[9]   Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, p. 3.

[10]  Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, p. 3.

[11]  Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, p. 3.

HIGHLY CONFIDENTIAL

## II.  Summary of Opinions

12.  Based on my expertise and analysis, I have reached the following opinions:

13.  The Prince Report's two methods to assess classwide damages are flawed and incapable of producing reliable results for determining classwide damages.

   a.  **The Prince Report's Loss of Value model is flawed for the following reasons.**

   i.  First, individual data is non-rival and its theft does not reduce its economic value to the individual. See Section III.A.

   ii.  Second, the Loss of Value model's failure to consider that many data brokers offer data records at a zero price renders its conclusions unreliable. The Prince Report acknowledges that some online data brokers offer data records for free but ignores the data brokers when selecting benchmark market values of data records to apply to the Loss of Value model. While the Prince Report attempts to justify ignoring free data brokers by claiming that the Four Tables contain accurate data, the data on the bellwether plaintiffs alone demonstrates that the Four Tables contain inconsistent, inaccurate,  and outdated data. The Prince Report further attempts to justify ignoring free data brokers by claiming that such brokers tend to offer only individual records rather than bulk mailing lists. But the Prince Report's Loss of Value model is purporting to estimate an individual measure of damages. Moreover, the Loss of Value model itself relies on sources that offer individual records for its calculation of credit card value, which undercuts any attempt to justify excluding free data brokers on account of their offering individual records. The Prince Report's failure to convincingly argue that non-zero-priced data brokers should be ignored leaves open the question of whether the data has inherent value and calls into question the entire premise of the Loss of Value model. See Section III.B.

HIGHLY CONFIDENTIAL

iii. Third, the Loss of Value model fails to measure the market price of underlying data from the non-zero price data brokers it focuses on, or the factors absent from the Four Tables that contribute to the market values of the benchmark sources the Prince Report applies to the Loss of Value model. Those benchmark sources offer:

1. Customizable solutions for identifying marketing prospects geared toward the needs of the specific client. In contrast, the Four Tables represents an unwieldy collection of data with little to no unifying features;

2. The ability to refine the desired list and target a specific segment of the population. In contrast, the Four Tables have no such capability; and/or

3. A promise that the data is accurate. In contrast, the Four Tables are neither uniformly accurate nor up to date.

Because each factor generates value for a client of these benchmark companies, the price set by the data brokers reflects each of these factors. The Prince Report ignores these factors and fails to disclose any method for separating the value of these factors from the value of the underlying data. By assigning the full market value to the data in the Four Tables, the Prince Report attributes characteristics to the Four Tables that they do not have and therefore fails to estimate the value of the data records in the Four Tables. Furthermore, each data broker has a wide array of data. However, the Prince Report applies the entire market value of the data brokers' lists to a subset of their contents. As a matter of economics, the value of a bundled good is not a reliable measure of the value of components of the bundled good. The Loss of Value model therefore represents an unreliable method. See Section III.C.

HIGHLY CONFIDENTIAL

iv. Fourth, the payment card values the Prince Report identifies from the Dark Web cannot be reasonably applied to the payment card information in the Four Tables. The Dark Web sources identify a market value to a criminal purchase of usable payment card information, but the Prince Report offers no explanation for why such illicit market information should apply to encrypted or expired payment card values that are not usable, or to individual consumers who would not sell the information to criminal purchasers. See Section III.D.

v. Fifth, the theory of harm underlying the Loss of Value model is inconsistent with the data sources the model relies upon. Professor Prince testified during deposition that the theory of harm reflects the lost opportunity individuals have to sell their data. However, the data brokers the Prince Report uses for its benchmark market values do not derive information from individuals looking to sell their information. The Prince Report estimates harm using market values that have no relationship to the price individuals could receive for their data. The Loss of Value model therefore does not estimate the harm proposed class members suffered from a lost opportunity to sell their data. See Section III.E.

vi. Sixth, applying the Loss of Value model requires record-by-record inquiry to identify the set of data for each bellwether plaintiff that may have value. The Four Tables Data requires record-by-record inquiry to first identify to which proposed class member the data relates, and then to separate outdated and inaccurate data from active data that may still be relevant to a proposed class member. See Section III.F.

HIGHLY CONFIDENTIAL

b.  **The Prince Report's "Benefit of the Bargain" model is similarly flawed.**

    i.  The Prince Report's "Benefit of the Bargain" model attempts to estimate market-specific hotel prices by modeling supply and demand "in a 'but for' world where consumers had known about Defendants' alleged security deficiencies."[12] The Prince Report then compares the price estimates derived from the model with current prices for Starwood hotel rooms listed on Expedia to predict by how much Starwood allegedly overcharged its guests.

    ii.  The demand-side of Benefit of the Bargain model relies on a conjoint survey from the Butler Report to estimate customers' willingness to pay for data-security in the hotel market. But conjoint surveys fail in the data-security context because of the privacy paradox: consumers state they care more about privacy in surveys than their actual behavior suggests. The Benefit of the Bargain model's reliance on an unreliable input renders its conclusions unreliable. See Section IV.A.

    iii.  The Benefit of the Bargain model relies on supply-side inputs that may not be available and require a time-consuming, record-by-record analysis for every hotel stay for the entire class. Furthermore, the Prince Report fails to acknowledge that data limitations may preclude the implementation of the model for each class member and does not explain how it would address such data limitations. See Section IV.B. Specifically,

        1.  For each of the millions of hotel stays of the proposed class, the Benefit of the Bargain model requires defining a set of competitor hotels for each reservation, as well as contemporaneous prices of those competitor hotels while replicating the booking window for each reservation. The Prince Report fails to disclose how it would

---

[12]  Prince Report, ¶ 95, and Section X.

identify contemporaneous sets of competitor hotels for each of the 1,200-1,500 Starwood properties that operated during the class period. The Prince Report fails to identify any data source that would allow it to collect prices for each competitor hotel at the time of booking for each reservation of each proposed class member. The Prince Report fails to disclose how it would address instances where historical hotel prices could not be found. The Prince Report therefore fails to demonstrate that the Benefit of the Bargain model can be applied classwide.

2.  The Benefit of the Bargain model also includes an "outside option," which theoretically captures the broader set of available hotels in a given market. The Prince Report relies on a single analysis to develop the number of hotels within a market. The analysis, however, is specific to the Las Vegas leisure market, and the authors of the analysis caution against generalizing the study's conclusions beyond the Las Vegas area. According to the analysis relied upon by the Prince Report, therefore, implementing the Benefit of the Bargain model requires a further individual assessment of the 1,200-1,500 Starwood properties to define a reasonable estimate for the "outside option." Furthermore, because demand for hotel rooms varies from market to market depending upon a variety of factors such as seasonality, conventions, school schedules, and business versus personal travel, assessing the outside option for reservations made at the same hotel at different times will require separate analyses. Defining the outside option would therefore require a time-intensive, reservation-by-reservation inquiry.

HIGHLY CONFIDENTIAL

iv.  The application of the Benefit of the Bargain model would provide windfall gains to certain plaintiffs without reservation-by-reservation inquiry. Professor Prince testified during deposition that any applicable damages should be paid to the person or entity that paid for a hotel stay. However, bellwether plaintiffs reveal that the name on a reservation does not necessarily reflect the individual who paid for the reservation. For example, employers, relatives, and friends may have paid for the reservation. Therefore, each of the proposed class members' hotel stays would need to be individually reviewed to determine who is entitled to damages under the Prince Report's model. See Section IV.C.

## III.  The Prince Report's Loss of Value Model Is Fundamentally Flawed

14.   This section summarizes the flaws in the Prince Report's Loss of Value model. First, the model makes no attempt to demonstrate how the value of plaintiffs' data has diminished, meaning the model fails to capture economic harm. Second, while the Prince Report acknowledges that data is often available for free, the model ignores this fact when purporting to establish a market price for the Four Tables Data. Third, characteristics absent in the Four Tables Data such as accuracy and filtering capabilities drive the value of the positively priced market benchmarks that the model uses to establish a market price for the Four Tables Data. Fourth, the theory of harm, which reflects the price that individuals receive for their data, runs contrary to the data sources the model relies upon. And fifth, applying the Loss of Value model necessarily requires a record-by-record inquiry, not formulaic calculations.

### A.  The Prince Report's Loss of Value Model Does Not Measure Economic Harm

15.   The Prince Report estimates the Loss of Value model using purported market prices for related data.[13] However, from an economics perspective, the owner of a good only suffers economic harm if the market value of that good is diminished in some way. Professor Prince stated during his deposition, "I'm not offering an opinion that speaks to a change in market prices as a result of the data breach."[14]

16.   Economic goods and services can be classified as either rival or non-rival.[15] When I consume a rival good such as an apple pie, other people cannot eat it. In contrast, a non-rival good does

---

[13]   Prince Report, Section XI.

[14]   Deposition of Jeffrey T. Prince, Ph.D, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, August 13, 2021 (hereafter, "Prince Deposition"), pp. 217:3–12 ("Q: Okay. Again, we'll get into how you approached it. But I do want some answers on these questions as well. Is it your testimony, Professor Prince, that you are not going to offer any opinion as to any change in the value of the data at issue as a result of the cyber attack? A: I'm not offering an opinion that speaks to a change in market prices as a result of the data breach. I don't speak to that in the report.").

[15]   Mankiw, N. Gregory, *Principles of Economics: Sixth Edition*, South-Western Cengage Learning, 2012, at p. 219.

not diminish after an individual consumes it.[16] A lighthouse represents an example of a non-rival good. One boat can benefit from the light from a lighthouse without diminishing the ability of other boats from benefiting. Like a lighthouse, it is widely recognized that digital data, including records in the Four Tables Data, is non-rival in consumption.[17]

17. The fact that data is non-rival poses challenges for trying to measure how the loss of any data in the cyberattack diminished the underlying value of the data. If someone steals a slice of apple pie, the underlying value of the apple pie diminishes because there is less of it. However, when a good is non-rival the logic does not hold, because when someone consumes a non-rival good, even without permission to do so, there is not less of it. Though the Prince Report acknowledges that data is non-rival,[18] the analysis fails to grapple with what that means for an attempt to measure how data diminishes in value as a result of the cyberattack. Because data is non-rival, its value cannot diminish simply because it was accessed in a cyberattack.

## B. The Prince Report's Failure to Justify Ignoring Zero-Price Data Brokers Render Its Conclusions Unreliable

18. To apply the Loss of Value model, the Prince Report draws from only the positively priced bundles of data that it observes online. The Prince Report applies to its model the prices of bundled data from only five of the 14 non-Dark Web data brokers from which it collected data.[19] The nine disregarded data brokers generally have an explicitly zero or close-to-zero price per record.[20] But the Prince Report is wrong to suggest that it can discard the zero-priced

---

[16] Mankiw, N. Gregory, *Principles of Economics: Sixth Edition*, South-Western Cengage Learning, 2012, at p. 219 ("A good is *rival in consumption* if one person's use of the good diminishes other people's use of it.").

[17] Prince Report, ¶ 138.

[18] Prince Report, ¶ 138.

[19] Prince Report, Figure 7, and ¶ 126 ("The subset I utilize is in Figure 7 below, as these datasets are most reasonably close in quality to the data that would have been attainable from the Marriott Data Breach.").

[20] Whitepages.com and PeopleMap on Westlaw represent the two exceptions. *See* Prince Report, Figure 3 and Figure 7. PeopleMap is a sophisticated tool used to conduct background checks. The website indicates reports include contact information, ownership records, news results, criminal records, and social media content. Thomson Reuters, "PeopleMap on Westlaw: Overview," available at https://legal.thomsonreuters.com/en/products/people-map#features. I agree with the Prince Report that this should be excluded as a benchmark given that as a background check tool it is serving a different purpose.

data brokers because they are relatively more inaccurate than the positively priced bundles of data. In fact, the zero-priced data brokers may be better comparators because, like the zero-priced data brokers, the Four Tables also had expired and outdated information as shown in **Table 1**. The Prince Report is also wrong to suggest that it can discard the zero-priced data brokers on account of them offering individual records because what the Loss of Value model purports to be able to measure is the value of an individual record of data. The Prince Report further fails to engage with the obvious conclusion that the zero-priced data sources imply that the market value of much of the data involved in the attack may be zero. This central flaw renders the Loss of Value model unreliable.

   1.   *The Prince Report Explicitly Acknowledges That The Data Involved in the Attack Is Often Available at a Zero-Price But Ignores This Fact*

19.   A general theme that emerges in the study of the economics of digital data is that a drastic reduction in the costs of parsing and storing data has led data itself to being ubiquitous to the point of being freely available.[21] The Prince Report includes in its Figure 3 multiple examples of this kind of zero-priced data, but ultimately ignores them.

20.   Figure 3 of the Prince Report reports that four data brokers have an (approximately[22]) zero price for data: ThatsThem.com,[23] TruePeopleSearch,[24] USA People search,[25] and Us Business

---

[21]   Goldfarb, Avi, and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No.1, 2019, pp. 3–43; Acs, Zoltan J., et al., "The Evolution of the Global Digital Platform Economy: 1971-2021," *SSRN,* February 2021.

[22]   Though the Prince report records the price per record as zero for US Business Data, it actually ranges from 1.11 to 4.82 millionths of a dollar. *See* Prince Report, Figure 3.

[23]   ThatsThem compiles information on individuals from over a billion public U.S. records and can be queried by name, address, email address, IP address, phone number, or vehicle identification number (VIN). ThatsThem, "Free People Search Engine," available at https://thatsthem.com.

[24]   TruePeopleSearch is a search engine that compiles reports of individuals based on public records. TruePeopleSearch, "TruePeopleSearch," available at https://www.truepeoplesearch.com.

[25]   USA People Search aggregates information based on "billions of public records compiled from thousands of official sources" to create reports of individuals. USA People Search, "What Info Can You Find with a People Search?" available at https://www.usa-people-search.com.

HIGHLY CONFIDENTIAL

Data (spanning their US Business Database,[26] US Cell Phone Database,[27] and US Residential Database[28]). However, the Prince Report ignores them when selecting market values to apply to the Loss of Value model.[29] Each of these data brokers provides data of the kind that the Prince Report purports to assess. For example, a USA People Search report includes a complete set of contact information including full name, current address, previous addresses, phone numbers, email addresses, aliases, and/or possible relatives.[30] A TruePeopleSearch report includes a complete set of contact information including full name, current address, previous addresses, phone numbers (mobile or home), email addresses, "associated names," and/or possible relatives and associates.[31] The homepage of ThatsThem identifies 46 fields which can be included in a report, including basic contact information as well as household size, home value, vehicle model, and interest in travel.[32] And US Business Data's US Cell Phone Database includes seven variables,[33] its US Residential Database includes 36 variables,[34] and its US Business Database includes 16 variables.[35] It is not clear why the Prince Report ignores this highly relevant information.

21.   Similarly, three sources of data that the Prince Report lists in Figure 3 as having a "NA" price allow unlimited data records for a small monthly fee and therefore have close to a zero price

---

[26]   US Business Data, "US Business Database," available at https://usbizdata.com/us-business-database.php.

[27]   US Business Data, "US Consumer Cell Phone Database," available at https://usbizdata.com/us-cell-phone-database.php.

[28]   US Business Data, "US Residential Database," available at https://usbizdata.com/us-residential-database.php.

[29]   Prince Report, Figure 7.

[30]   USA People Search, "What Info Can You Find with a People Search?" available at https://www.usa-people-search.com.

[31]   TruePeopleSearch, "Paula Jean O'Brien," available at
https://www.truepeoplesearch.com/details?name=Paula%20O%27Brien&citystatezip=New%20York&rid=0xl.

[32]   ThatsThem, "Free People Search Engine," available at https://thatsthem.com.

[33]   US Business Data, "US Consumer Cell Phone Database," available at https://usbizdata.com/us-cell-phone-database.php.

[34]   US Business Data, "US Residential Database," available at https://usbizdata.com/us-residential-database.php.

[35]   US Business Data, "US Business Database," available at https://usbizdata.com/us-business-database.php.

per record: PeopleFinders,[36] BeenVerified,[37] and US Search.[38] The Prince Report ignores them when selecting market values to apply to the Loss of Value model.[39] However, each of these data brokers provides data of the kind that the Prince Report purports to assess. Indeed, PeopleFinders' People Search includes name, address, previous addresses, phone numbers, and birth date in its report.[40] A "People Search report" on BeenVerified includes select fields, including basic name, age, address, and contact information as well as a photo if available. Additionally, the same report can include criminal records, bankruptcies, professional information related to the individual's employment or education, as well as social media websites.[41] And a US Search report includes "a person's date of birth, phone numbers, address history, related persons, social media profiles including email addresses, and nearby sex offenders."[42]

22.   The Prince Report includes in Figure 3, but not in Figure 7, three entries for limited subscription services from Whitepages, but ignores that Whitepages also provides free reports,

---

[36]   PeopleFinders is a search engine that reviews billions of public records from more than 6,000 data sources in the U.S to produce individual reports on a person, a phone number, or a property. PeopleFinders, available at https://www.peoplefinders.com.

[37]   BeenVerified offers a subscription service where customers can execute individual people lookups, reverse phone lookups, reverse email lookups, reverse address lookups, vehicle identification number (VIN) lookups, and username lookups. The site offers unlimited searches for $30/month. BeenVerified, "The Everyday Information Company," available at https://www.beenverified.com/; and BeenVerified, "Final Step - It Only Takes 2 Minutes to Sign Up," available at https://www.beenverified.com/lp/98101d/4/subscribe?hide-fcra=true#.

[38]   US Search is a search engine that reviews "billions of public records" to produce individual reports on a person, a phone number, or a property. US Search, "US Search," available at https://www.ussearch.com.

[39]   Prince Report, Figure 7.

[40]   PeopleFinders, "Get an Instant Report on Brent Randal Long in Newnan, GA," available at https://www.peoplefinders.com/products/name?firstName=brent&middleName=randal&lastName=long&ln=long&city=newnan&state=ga&id=G4142684304065417767.

[41]   BeenVerified, "People Search," available at https://www.beenverified.com/people/.

[42]   The list of potential information is only presented after searching for an individual. US Search, "Final Step: Activate Your Account and Unlock Your Report!" available at
https://www.ussearch.com/register/?firstName=Brent&lastName=Long&city=Newnan&state=GA&pid=4%3AeJyKVnIqSs0rUdJRUtJR8snPS1fSgYgoQDl-qeV5iXlKOkrujhBFEOQcEOGka2JpbKyko1RSlJhXXJqXmQ9SZpCYaJGSlmyka2JpaaJrYpaWpmuRamisa2xpnmSempZimmZopBQLCAAA__-WcCAn&transaction_id=8bd0ebe8-8b27-48e7-bddb-041e7b58533a.

including reports on landlines, current address, and family members.[43] It also offers a $3.99/month paid, but unlimited, subscription that allows searches on similar sets of records, such as landlines, current address, relatives.[44] Again, there is no reason to ignore the fact that Whitepages provides data similar to that found in the Four Tables at a zero, or near zero price.

    *2. The Data from The Four Tables is Often Inaccurate, Which Is Another Reason To Reject These Zero-Price Benchmarks*

23.    The Prince Report attempts to justify ignoring these zero-price benchmarks by claiming that these companies' disclaimers do not guarantee accuracy and may offer outdated data.[45] However, this ignores that the data in the Four Tables includes inaccurate and outdated information.

24.    Bellwether plaintiffs illustrate the inaccurate and outdated nature of the Four Tables Data. For example, Plaintiff Cullen recently moved to ▮▮▮▮▮▮▮▮▮▮▮▮[46] But none of the data from the Four Tables Data Production containing a last name "Cullen" includes a ▮▮▮▮▮▮ ▮▮▮▮▮▮ address.[47] Likewise, Plaintiff Maldini testified that his phone number is currently

---

[43]  The Prince Report included an option that offers 20 records for $19.99 but this option could not be identified on the Whitepages website. Prince Report, Figure 3; Whitepages also offers an unlimited plan named "Whitepages unlimited" for $3.99 a month. Whitepages, "Choose A Plan That's Right for You," available at https://www.whitepages.com/checkout/pricing.

[44]  Whitepages, "Choose A Plan That's Right for You," available at https://www.whitepages.com/checkout/pricing.

[45]  Prince Report, ¶ 126 ("Considering that the data in Marriott's systems for each customer would be updated each time a new booking was made, this is appropriate compared to some data sources with disclaimers that they make no guarantees of accuracy and do not update their data.").

[46]  Deposition of Roger Cullen, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, May 24, 2021 (hereafter, "Cullen Deposition"), pp. 13:12–14:17 ("Q: What's your current address? A: That is something I don't have off the top of my head. We just moved there about six months ago. Out here in ▮▮▮▮▮▮ state, they have these ridiculously long addresses. I can tell you I'm in ▮▮▮▮▮▮ [...] Q: Okay. Could you get out your license for me, please, and provide your address? A: Sure.

[47]  If one filters the Four Tables Data Production to include only records with a last name "Cullen," there are 364 records; only 2 of those records identify ▮▮▮ as the state; both identify the city as ▮▮▮▮▮▮; and both identify an address of ▮▮▮▮▮▮▮▮ Four Tables Data Production, MI_MDL_02496938.

███████ [48] but none of the data from the Four Tables Data Production containing a last name "Maldini" includes that phone number.[49] And two records from the Four Tables Data Production containing the name "Anne Marie Amarena" include the phone number ████ ████ which Plaintiff Amarena testified is a now-disconnected phone line.[50]

25. Furthermore, the Four Tables Data Production includes records that are inaccurate on their face: one record has a first name "TOURS,"[51] and four are "SUSAN OF2;"[52] some addresses include "N.A,"[53] "ADDRESS NOT AVAILABLE,"[54] "NONE,"[55] "XYZ 123,"[56] and ".";[57] some email addresses include "HAS NOT BEEN ASKED FOR EMAIL,"[58] "WILL NOT GIVE EMAIL ADDRESS,"[59] "DOES NOT HAVE EMAIL";[60] 73 records contain an email address "DO NOT ASK";[61] 1,438 of 4,271 records in the Four Tables Data Production do not

---

[48] Deposition of Peter Maldini, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 20, 2021 (hereafter, "Maldini Deposition"), p. 42:7–8 ("Q: What is your phone number, Mr. Maldini? A: ████████ ").

[49] In MI_MDL_02496938, if one filters to include only records with a last name "Maldini" or "Maldini(G-SPG)" there are 21 records, and none include the phone number ████████ Four Tables Data Production, MI_MDL_02496938.

[50] Deposition of Anne Marie Amarena, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 9, 2021 (hereafter, "Amarena Deposition"), p. 315:3–10 ("Q: Is the phone number ████████ familiar to you? A: Yes. Q: What -- what number is that? A: That was my landline. Q: And that landline you said is disconnected? A: Correct."); Four Tables Data Production, MI_MDL_02496938, unique row IDs 283669162 and 684719302.

[51] Four Tables Data Production, MI_MDL_02496938, unique row ID 53949078.

[52] Four Tables Data Production, MI_MDL_02496938, unique row IDs 658446590, 658446614, 658446611, and 658446617.

[53] Four Tables Data Production, MI_MDL_02496938, unique row ID 863976644.

[54] Four Tables Data Production, MI_MDL_02496938, unique row IDs 58494398 and 235764305.

[55] Four Tables Data Production, MI_MDL_02496938, unique row ID 568929321.

[56] Four Tables Data Production, MI_MDL_02496938, unique row IDs 843289972, 843289973, 843289974, 843289975, 843289976, 843289977, and 843289980.

[57] Four Tables Data Production, MI_MDL_02496938, unique row ID 658446599.

[58] Four Tables Data Production, MI_MDL_02496938, unique row IDs 622721442, 550613486, and 928197866.

[59] Four Tables Data Production, MI_MDL_02496938, unique row ID 774223460.

[60] Four Tables Data Production, MI_MDL_02496938, unique row ID 343098188.

[61] In MI_MDL_02496938, if one filters to include only records with "DO NOT ASK" in the email address field, there are 73 records. Four Tables Data Production, MI_MDL_02496938.

have an email address at all;[62] and 1,555 of 4,271 records in the Four Tables Data Production do not have a phone number.[63]

### 3. The Prince Report Incorrectly Associates Data from the Four Tables with Mailing Lists

26.  The Prince Report further attempts to justify ignoring zero-priced benchmarks by asserting that the business model of data brokers offering zero-priced data involves downloading an individual report or a subscription and individual downloads of the reports.[64] As an initial matter, it is not apparent why looking at prices for individual records would be inappropriate here, since the Prince Report is purporting to offer a methodology for calculating damages for individual sets of records. In general, if the Prince Report seeks to estimate a price for the value of an individual's data rather than a mailing list, then the individual download benchmarks would appear more appropriate.

27.  Moreover, the Prince Report fails to explain why it includes two data sources from the Dark Web that did involve individual reports as benchmarks.[65]

### 4. The Prince Report's Failure to Justify Ignoring Zero-Priced Data Brokers Render Its Conclusions Unreliable

28.  In short, the Prince Report offers no convincing justification for ignoring the zero-priced data brokers. The Prince Report further fails to engage with why some data brokers offer services for a fee, and some offer data for free. Data brokers offering similar data for free may imply that many records in the Four Tables Data have little to no inherent value, much less that any

---

[62]   In MI_MDL_02496938, if one filters to include only records with a blank in the email address field, there are 1,438 records. Four Tables Data Production, MI_MDL_02496938.

[63]   In MI_MDL_02496938, if one filters to include only records with a blank in the phone number field, there are 1,555 records. Four Tables Data Production, MI_MDL_02496938.

[64]   Prince Report, ¶ 126 ("Similarly, while I reviewed prices on individual reports from 'people search' websites such as WhitePages.com, these sources do not provide the additional value of a customer being able to simply download a full list of people and their personal information. The need to search for an individual person in order to download a single report makes this business model incomparable to the format in which the hackers accessed Marriott customers' personal information."). Four Tables Data Production, MI_MDL_02496938.

[65]   In Figure 3 of the Prince Report two of the three Dark Web sources are identified as "Individual Reports." Prince Report, Figure 3.

inherent value has diminished as a result of the Starwood cybersecurity incident, which is what plaintiffs' theory of harm is.[66] But the Loss of Value model assumes data has value and therefore ignores instances where the data is priced as zero. As such, the Loss of Value model rests on an unjustified premise and is unreliable.

### C. The Prince Report Ignores What Drives the Market Value Of Its Non-Zero Priced Benchmarks

29.  The Prince Report's methodology is further flawed because it equates the prices for data services offered by various data brokers with the value of the data itself. The Loss of Value model relies on market prices of data that is "legitimately offered and sold."[67] The Prince Report derives the price per record by dividing the cost of the market price of the selected list of data by the number of records in the selected list.[68] The Prince Report then uses the price per record to estimate the value of the Four Tables Data.

30.  As an initial matter, I could not recreate exactly what the Prince Report did to obtain per record prices because each data broker offers a large list of options and filters that its client may select to establish a price, and the Prince Report did not disclose—either in the report or in the backup data provided with the report—what options or filters it chose.[69] As discussed in this section, the market value of data provided by data brokers derives from characteristics beyond any inherent value derived solely from the data itself.

---

[66]   Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, p. 3.

[67]   Prince Report, ¶ 81 ("A metric with clear relevance for the value of data is the 'market prices at which personal data are legitimately offered and sold.'").

[68]   Prince Report, ¶ 131 ("I utilize price per record when determining the prices for any given data product. In most cases, this figure is directly recorded in Figure 7. Some products are priced as subscriptions, whether paid annually or monthly, with a limit on the number of records that can be viewed and collected. In such cases, I infer a per record price as though the consumer collected the maximum number of allowed records for the billing period. For example, if a monthly subscription allowed 500 records per month, I took the cost of the subscription for one month divided by 500.").

[69]   For example, while the Prince Report did not provide any data to explain how it derived its prices, it appears that for Rocket Reach the Prince Report includes 12 entries which reflect three annual subscriptions without phone numbers, three annual subscriptions with phone numbers, three monthly subscriptions without phone numbers, and three monthly subscriptions with phone numbers. To identify the relevant subscriptions used in the Prince Report, you need to toggle between "Billed Monthly" and "Billed Annually." Additionally, within these two options you need to toggle the "Need Phone Results?" option. *See* RocketReach, "Prospect Leads at the Speed of Light!" available at https://rocketreach.co/pricing.

    *1.   The Prince Report Focuses on Benchmarks That Promise To Generate Marketing Prospects*

31.   The business model of the data brokers that the Prince Report relies upon focuses on helping those brokers' clients establish the right target audience. The Prince Report draws benchmark market prices from DirectMail (seven entries), Exact Data (one entry), LeadsPlease.com (three entries), and BookYourData (five entries).[70] Each data broker targets clients looking to contact a specific audience or individual. BookYourData advertises itself as helping clients "Zero in on your target audience and email leads with these databases to make more deals and boost your sales." Directmail.com advertisers its products by saying "Our industry savvy enables us to recommend the right Data Products & Tech to target and reach precisely the audiences and segments you desire." Exact Data advertisers its Customer Database by saying "Our user-friendly platform allows you to target your ideal audience and curate a custom email list within minutes."[71] RocketReach's primary service allows customers to search for professionals and subsequently target these individuals for business needs like recruiting efforts, sales efforts, or general marketing efforts.[72] LeadsPlease describe their mission as "To provide our customers with a secure way to quickly target sales leads and search for potential new customers online, so that they can feel confident about launching a highly targeted marketing campaign backed by quality data."[73] All the non-Dark Web sources the Prince Report relies upon in applying the Loss of Value model aim to sell their data to businesses interested in advertising their products to potential customers.

32.   In stark contrast, the Four Tables Data offers no such targeting capabilities if individual class members are claiming an individual value in offering to sell their individual data. The Four Tables instead represents an unwieldy assortment of hundreds of millions of records that stretch back to 2002.[74]

---

[70]  Prince Report, Figure 3.

[71]  Exact Data, "About Exact Data," available at https://www.exactdata.com/corporate/about-us.html#.

[72]  RocketReach, "Rocket Fuel for Your Growth," available at https://rocketreach.co.

[73]  LeadsPlease, "About LeadsPlease.com," available at https://www.leadsplease.com/about_us.

[74]  *See* Verizon Report, MI_MDL_00000001-205 at 025 and 060; and Section III.B.2.

33. The Prince Report does not justify why it thinks that firms providing services for enabling clients to find potential prospects represent useful benchmarks for the Four Tables Data. The Prince Report conflates the value of the underlying data with the useful marketing services and customer support provided by the benchmarks it chooses. And the Prince Report provides no methodology for disentangling the value provided by these benchmarks in assisting their clients with finding prospects from the underlying data.

*2. Sellers of Data Provide Value to Clients by Offering Filters And Targetable Data, in Contrast to the Four Tables Data*

34. The problems inherent in choosing benchmark prices from companies oriented around enabling their clients to find prospects are particularly clear when it comes to the Prince Report—which ignores a variety of targeting and filtering services these benchmark firms provide and conflates the value of those *services* with the value of the underlying *data*. The ability to easily identify or target an audience with specific characteristics provides value to businesses. The data brokers that the Prince Report relies on in applying its Loss of Value model–DirectMail, Exact Data, LeadsPlease, BookYourData, and RocketReach–all offer the ability to filter or target customers. This is important to firms, as much of the inherent value of obtaining data from these sites comes from isolating the proper audience for a market message.[75]

35. This ability to target is reflected in the way that a potential buyer of a list would purchase data from a seller such as DirectMail. First the seller would provide a geographical filter, and after that they would have the option of using many advanced filters to identify their target audience. For example, if I was searching using these filters, initially I would be invited to hone my list by geography. As a small business I might choose to target people who live in the 02478 zip code. I would pay $390.90 for the 10,023 records.[76] However, the reason the list would be

---

[75] Tucker, Catherine E., "Competition in the Digital Advertising Market," *The Global Antitrust Institute Report on the Digital Economy*, No. 19, November 11, 2020, pp. 679–706, at pp. 681–682.

[76] These figures were found using the GeoSelector tool on DirectMail. I selected "Households" as my target and the "Postal Addresses" option as a filter, and entered 02478 as the zip code. No other filters were

HIGHLY CONFIDENTIAL

valuable would not be driven by the data contained in the fields alone. The list would be valuable because it represents a targeted *collection* of potential prospects who might be interested in my local business.

36. As well as geographical targeting, DirectMail and LeadsPlease allow potential buyers to filter by a wide array of other data as shown in **Figure 1** and **Figure 2**. Rocket Reach allows one to use multiple filters to identify the right prospect as shown in **Figure 3**. These include location, job title, skills, years of experience, company, employee count, revenue, industry, and education. The filtering capabilities of these websites offer large value to any salesperson trying to identify the right prospect within a company.

included. I then selected "One Time Usage." DirectMail.com, "GeoSelector," available at https://www.directmail.com/geoinsight.

## Figure 1: DirectMail's Available Filters[77]



---

HIGHLY CONFIDENTIAL

**Figure 2: LeadsPlease's Available Filters[78]**



---

HIGHLY CONFIDENTIAL

**Figure 3: Rocket Reach's Available Filters[79]**



---

[79]   RocketReach, "RocketReach Search," available at

https://rocketreach.co/person?start=1&pageSize=10&current_title%5B%5D=%22professor%22&skills%5
B%5D=%22economics%22&employer%5B%5D=%22MIT%20Sloan%20School%20of%20Management
%22.

HIGHLY CONFIDENTIAL

**Figure 4: BookYourData's Available Filters[80]**



---

[80]   BookYourData, "Business Contacts," available at https://www.bookyourdata.com/tool/main.

**Figure 5: Exact Data's Available Filters[81]**



37.   Because at least part of the market value of DirectMail, Exact Data, LeadsPlease, BookYourData, and RocketReach derives from the ability to easily identify certain individuals or groups of individuals by curating and filtering, it is inappropriate to apply these market values to a data source that lacks such curating and filtering capabilities. The Prince Report ignores that the ability to target through filtering and curation drives the market price of the records for the data brokers it evaluates, and instead wrongly attributes this value to the individual data records. Furthermore, the Prince Reports provides no indication of how to disentangle the part of the price of these services which is driven by their ability to filter from that of the value of data alone. By applying market values of data that do not reflect the

---

[81]   Exact Data, "Build Your Leads List," available at https://www.exactdata.com/.

structure of the Four Tables, the Prince Report fails to estimate the value of the data it seeks to value.

   3.  *The Value of The Data Records is Driven by Their Combination with Other Data Fields*

38.   The Prince Report methodology is further flawed because it uses prices that are based on more fields of data than the Prince Report is trying to set a value for. Figure 8 of the Prince Report uses BookYourData to develop the market value for a set of data that includes name, age, whether the individual has children, email address, phone number, and current mailing address.[82] However, BookYourData offers more than name, email address, phone number, and current address. Based on a sample list downloaded from BookYourData, the Pre-made C-level list selected by the Prince Report includes 28 variables: Direct Email Address, First Name, Last Name, Job Level, Job Title, Job Function, Job Department, Company Name, Major Division Description, SIC 2 Code, SIC 2 Description, SIC 4 Code, SIC 4 Description, BYD Industries, Postal Address, City, State, Zip Code, Employee, Revenue, Area Code, County, Country, Founded, Type, Phone Number, Fax Number, and Website.[83] Other data brokers also offer more than the seven variables the Prince Report assesses in Figure 8. The final contact list generated by DirectMail includes name, address, email, phone, and at least 22 additional demographic variables, many of which are not available in the Four Tables.[84] Therefore the Loss of Value model applies the value of a bundled set of data to only a subset of that set of data.

---

[82]   I exclude any mention of the dark web and credit card information since the majority of credit card information would be inherently without market value on account of it being encrypted. Individualized inquiry would be required to determine any proposed class members that may have been at risk from the release of the small percentage of unencrypted cards; and Prince Report, Figure 8.

[83]   These variables were identified by downloading a sample file for the lists identified in the Prince Report. Dummy sample Data, BYD_Dummy_ Sampledata_2021.09.02.xls, downloaded from BookYourData, "C-Level Email List," available at https://www.bookyourdata.com/email-list-database/c-level.

[84]   DirectMail.com, "Terms," available at https://www.directmail.com/terms/; and DirectMail.com, "GeoSelector™," available at https://www.directmail.com/geoinsight/.

HIGHLY CONFIDENTIAL

39. As a matter of basic economics, the value of a good that represents a bundle of individual goods and characteristics is not necessarily equal to the sum of the value of its parts. A bundle may be worth more or less than the parts on their own and in some cases one part of the bundle is not worth anything on its own. Therefore, the value of a bundled good does not provide a reliable basis to determine the value of a subset of individual components of the bundle.

40. By applying the value of a bundled set of data to a subset of data derived from that bundle, the Prince Report's Loss of Value model unreliably estimates the value of that subset of data. It follows that the Prince Report's Loss of Value model cannot reliably assess classwide damages, if indeed any exist.

*4. There is Large Value in Delivering Accurate Data That The Prince Report Ignores*

41. Moreover, businesses pay a premium to purchase accurate data—a fact that the Prince Report ignores. To illustrate the premium data brokers can command for accurate data, consider the emphasis placed on accuracy in the marketing materials of the data brokers that charge a non-zero price, who the Prince Report relies on for benchmarking prices in Figure 7, compared to those data brokers who charge close to zero, and who the Prince Report disregards.

42. These premium sources often advertise the accuracy of their data. For example, DirectMail makes numerous statements regarding the accuracy of its data including that it is "the most comprehensive and accurate source for consumer marketing data available today."[85] Exact Data claims an "approximate 95% deliverability rate" and offers a satisfaction guarantee, meaning Exact Data will replace/refund leads that have any issues with delivery.[86] LeadsPlease guarantees at least 95 percent accuracy for its consumer mailing lists and at least 90 percent accuracy for its business mailing lists.[87] BookYourData guarantees a 95 percent success rate

---

[85] DirectMail.com, "Consumer Mailing Lists," available at https://www.directmail.com/mailinglists/consumer-mailinglists.

[86] Exact Data, "The Exact Data Difference," available at
https://www.exactdata.com/objects/content/files/The_Exact_Data_Difference_Overview.pdf.

[87] LeadsPlease, "Consumer Mailing Lists [2021]," available at https://www.leadsplease.com/mailing-lists/consumer; and LeadsPlease, "Grow Your Business with a Targeted Direct Mailing List," available at https://www.leadsplease.com.

when delivering emails and issues credits when a list falls below this success rate.[88] RocketReach represents to its customers that the "plans have an average 85% or higher fill rate for emails and a 60% fill rate for direct phone numbers."[89]

43.  By contrast, the data brokers in Figure 3 of the Prince Report that are excluded from Figure 7—the ones who offer close to zero prices—do not offer guarantees of accuracy. For example, TruePeopleSearch acknowledges that its information is not "100% accurate and up-to-date."[90] USA People Search does "not represent or warrant that the results provided will be 100% accurate."[91] US Business Data does not verify its data, instead delivering the data in the format it is received in.[92] US Search compiles public records, but offers no guarantee or representation of accuracy.[93] These examples make clear that accurate data drives at least part of the market value of the benchmark prices that the Prince Report uses to estimate the value of the data.

44.  That is not the case for the Four Tables, which makes the Prince Report's sources a poor fit for estimating a market value for the Four Tables Data. As explained in paragraphs 24–25 (Section III.B.2) and paragraphs 61–66 (Section III.F), the Four Tables Data includes outdated and inaccurate information.

45.  Since a component of the market price for DirectMail, Exact Data, LeadsPlease, BookYourData, and RocketReach's services include accuracy, it is inappropriate for the Prince Report to apply their prices to the inaccurate records within the Four Tables. Furthermore, the Prince Reports provides no indication of how to disentangle the part of the price of these services which is driven by their accuracy from that of the value of data alone. By applying

---

[88]  BookYourData, "Our Guarantees," available at https://www.bookyourdata.com/our-guarantees.

[89]  RocketReach represents that it "only ever charges our users a lookup credit when we are able to provide a verified email for a searched contact." RocketReach, "How Accurate Is RocketReach's Data?" available at https://knowledgebase.rocketreach.co/hc/en-us/articles/235187087-How-accurate-is-RocketReach-s-data-.

[90]  TruePeopleSearch, "Terms of Use," February 6, 2021, available at https://www.truepeoplesearch.com/terms.

[91]  USA People Search, "Terms of Use," February 8, 2021, available at https://www.usa-people-search.com/terms.

[92]  US Business Data, "Frequently Asked Questions," available at https://usbizdata.com/faq.php.

[93]  A disclaimer on the site says that "US Search does not make any representation or warranty about the accuracy of the information available through our website." US Search, "US Search," available at https://www.ussearch.com.

market values of data not reflective of the (in)accuracy of the Four Tables, the Prince Report fails to estimate the value of the data.

5. *The Legitimate Sellers of Data Spend Time Collecting and Vetting the Data, in Contrast to the Four Tables Data*

46. Data brokers, especially those offering bulk data, spend time and effort collecting and verifying the data they offer. The data brokers that the Prince Report relies on in applying its Loss of Value model—DirectMail, Exact Data, LeadsPlease, BookYourData, and RocketReach—all offer bulk data sets collected from both publicly available sources and proprietary sources.[94] These websites do not originate the data, but instead sell the service that scrapes publicly available data sources, merges that data with privately sourced data, verifies its accuracy, and compiles the data in an understandable format.[95] As a result, market prices "reflect search and other costs incurred by the data broker."[96] This is something I have emphasized in my own research: that, in today's economy, verification drives much of the value of data.[97]

47. The Four Tables Data Production has not been vetted, consolidated, or deduplicated.[98] Instead, it includes multiple records per person with no method to consolidate the information; indeed, searching for a single person's name in the data can return hundreds of false positives.

48. Because part of the market value of DirectMail, Exact Data, LeadsPlease, BookYourData, and RocketReach derives from the time spent collecting the data they sell, it is inappropriate to

---

[94]  *See, for example,* Exact Data, "About Exact Data," available at https://www.exactdata.com/corporate/about-us html; See FAQ "Where is your data from?". LeadsPlease, "Grow Your Business with a Targeted Direct Mailing List," available at https://www.leadsplease.com/; RocketReach, "How Did My Profile Get On RocketReach?" available at https://knowledgebase rocketreach.co/hc/en-us/articles/234810007-How-did-my-profile-get-on-RocketReach.

[95]  *See, for example,* Exact Data, "About Exact Data," available at https://www.exactdata.com/corporate/about-us html; LeadsPlease, "Data Quality," available at https://www.leadsplease.com/data_quality; and RocketReach, "How Accurate Is RocketReach's Data," available at

https://knowledgebase.rocketreach.co/hc/en-us/articles/235187087-How-accurate-is-RocketReach-s-data-.

[96]  OECD, "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value," *OECD Digital Economy Papers,* No. 220, April 2, 2013, p. 27.

[97]  Cui, Tony H., et al, "Informational Challenges in Omnichannel Marketing: Remedies and Future Research," *Journal of Marketing,* Vol. 85, No. 1, November 2020, pp. 103–120.

[98]  *See* Section III.B.2.

apply these market values to a data source that has not been systematically collected and verified in any way. By applying market values of data not reflective of the characteristics of the Four Tables, the Prince Report fails to estimate the value of that data.

### D. The Dark Web sources cited in the Prince Report provide unreliable estimates for the value of the Four Tables Data

49.   The Prince Report estimates the value of payment card information using prices observed on the Dark Web, but the sources included in the Prince Report provide estimates for payment card data that do not reflect the data in the Four Tables. The Prince Report identifies two sources that summarize the Dark Web marketplace and present high-level estimates for the value of payment card numbers, but the sources do not provide any basis for those estimates, or for the underlying data.[99]

50.   One source is a blog post from January 20, 2021, authored by Paul Bischof of Comparitech, a "pro-consumer website providing information … to help our readers … improve their cyber security and privacy online."[100]

51.   The second source is written testimony from Lillian Ablon on March 15, 2018, before the House Financial Services Committee, Subcommittee on Terrorism and Illicit Finance.[101] Ms. Ablon's testimony includes one table of payment card values on the Dark Web derived from a 2014 RAND National Security Research Division report.[102]

52.   The Prince Report does not explain how the data in these sources were or could be validated for accuracy. Citing to the Ablon testimony, the Prince Report only says that "a freshly-acquired credit card number might fetch $15, whereas that same number after a period of time

---

[99]   Prince Report, Figure 3, and ¶ 134.

[100]  Comparitech, "About Our Company," available at https://www.comparitech.com/about-us/; and Bischoff, Paul, "How Much Are You Worth on the Dark Web? (Credit card, PayPal, SSN)," *Comparitech,* available at https://www.comparitech.com/blog/vpn-privacy/dark-web-prices/.

[101]  Ablon, Lillian, "Data Thieves: The Motivations of Cyber Threat Actors and Their Use and Monetization of Stolen Data," Testimony of Lillian Ablon before the Committee on Financial Services, Subcommittee on Terrorism and Illicit Finance, United States House of Representatives, March 15, 2018.

[102]  Ablon, Lillian, Martin C. Libicki, and Andrea A. Golay, "Markets for Cybercrime Tools and Stolen Data: Hackers' Bazaar," *RAND National Security Research Division Report*, 2014.

becomes stale and goes on 'clearance' in "a 'grab bag' of 100 credit card numbers for $700."[103] And citing to the blog post, the Prince Report only says that "[a]nother study calculated the median price of a U.S. credit card number on the Dark Web to be $1.50."[104] The Prince Report provides no further explanation, does not assess the reliability of the underlying data sources, and provides nothing that would verify the accuracy of these numbers.

53. The prices the Prince Report extracts from these two sources are not a reliable economic proxy for the value of the payment card information within the Four Tables. Forensic analysis concluded that the Four Tables contained 9,079,650 unique encrypted payment card numbers.[105] The forensic analysis found "no evidence that the master encryption key and/or individual record encryption keys that would be necessary to decrypt payment card numbers were compromised."[106] The forensic analysis identified one un-encrypted card number in a credit card field that expired in November 2011, and an additional 7,243 unencrypted card numbers for which no expiration date was reported within other, non-payment card data fields in two of the Four Tables.[107] Therefore, less than one-tenth of one percent of the millions of payment card records accessed in the data breach potentially contained unencrypted account numbers.[108] The Four Tables did not contain any PIN codes for debit cards or CVC/CVV

---

[103] Prince Report, ¶ 134.

[104] Prince Report, ¶ 134.

[105] The forensic analysis identified 9,079,650 unique encrypted payment card numbers and one unencrypted payment card value for 9,079,651 unique card numbers within the payment card data field. Verizon Report, MI_MDL_00000001–205 at 060–061.

[106] Verizon Report, MI_MDL_00000001–205 at 006, 061.

[107] Verizon Report, MI_MDL_00000001–205 at 006, 060, 073 ("The reason this record was not encrypted could not be determined; however, there was no evidence to suggest that this unencrypted value was related to unauthorized activity. The expiration date associated with the one non-encrypted payment card value was November 2011.").

[108] The forensic analysis located 7,243 unencrypted card numbers in other, non-payment card fields. *See* Verizon Report, MI_MDL_00000001–205 at 060–061, 073. Therefore, 7,244 cards out of 9,086,894 (= 9,079,651 + 7,243) were encrypted. 7,244 divided by 9,086,894 equals 0.080 percent.

numbers for credit cards.[109] Many online transactions require CVC/CVV numbers to authorize a transaction.[110]

54. Therefore, more than 99.9 percent of the payment card numbers involved in the data breach were encrypted.[111] And neither source identified in the Prince Report indicates there exists any value in purchasing an encrypted credit card number and the Prince Report does not independently demonstrate any value for an encrypted payment card. The Prince Report's estimates for the market value of credit cards on the Dark Web therefore do not apply because encrypted payment card numbers are not congruous with the unencrypted payment card information sold on the Dark Web.

55. For the less than one-tenth of one percent of compromised unencrypted payment information, record-by-record inquiry would be necessary to identify whether and to what extent the account holders suffered any damages. This record-by-record inquiry would need to identify which account holders' cards are unencrypted, determine whether the associated expiration data, zip code, or CVV is included in the Four Tables, and finally identify whether the account is still active or was active at the time of the breach.

---

[109] *See* Verizon Report, MI_MDL_00000001–205 at 026–030. *See also* Deposition of Erick C. Lawing, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 26, 2021 (hereafter, "Lawing Deposition"), pp. 38:16–39:3 ████████████████████████████████

[110] In 2018, 57 percent of merchants selling digital goods through mobile devices with at least $10 million annual sales used CVV verification, and 65 percent of merchants with an e-Commerce channel and at least $50 million annual sales used CVV verification. *See* LexisNexis Risk Solutions, "2018 True Cost of Fraud Study," July 2018, available at https://risk.lexisnexis.com/-/media/files/financial%20services/research/2018-true-cost-of-fraud-overall-rep%20pdf.pdf, at pp. 3, 26–27; and ████████████████████████████████

[111] The forensic analysis identified 9,079,651 unique card numbers within the payment card data field. While one of these nine million plus card numbers was unencrypted, it had expired in late 2011 and was therefore unusable during the time the unauthorized individual(s) had access to the guest reservation database. The forensic analysis further located 7,243 unencrypted card numbers in other, non-payment card fields. Verizon Report, MI_MDL_00000001–205 at 060–061, 073. Finally, the forensic analysis noted that one encrypted card number may have been decrypted using a guest reservation database decryption process. Verizon Report, MI_MDL_00000001–205 at 060, 062. Therefore, 9,079,650 cards out of 9,086,894 (= 9,079,651 + 7,243) were encrypted. 9,079,650 divided by 9,086,894 equals 99.92 percent.

56. Even if the compromised payment card numbers were useful to thieves, the Prince Report does not disclose how to value a payment card number separate from other important components of payment card information. The blog post reporting the Dark Web market value that the Prince Report uses for payment card value claims that thieves use most stolen cards for card-not-purchased (CNP) transactions, which require the CVV or PIN numbers.[112] But the blog post does not explain how the Dark Web values various components of payment card information. It merely reports a value of $1.50 for a U.S. credit card sold on the Dark Web.[113] The Four Tables do not include PIN numbers and CVV numbers,[114] and the Prince Report has not made clear whether the $1.50 estimate represents the value of a card alone, or the value of a card with additional information. The Prince Report, therefore, has selected a payment card value that does not reliably reflect the actual payment card information contained in the Four Tables.

### E. The Prince Report's Methodology Does Not Reflect the Price an Individual Would Receive If They Tried To Sell Their Data

57. In deposition, Professor Prince suggested that plaintiffs have suffered harm from losing opportunities to sell personal data.[115] This suggests that benchmark prices must reflect the

---

[112] *See* Bischoff, Paul, "How Much Are You Worth on the Dark Web? (Credit card, PayPal, SSN)," *Comparitech,* January 20, 2021, available at https://www.comparitech.com/blog/vpn-privacy/dark-web-prices/.

[113] *See* Bischoff, Paul, "How Much Are You Worth on the Dark Web? (Credit card, PayPal, SSN)," *Comparitech,* January 20, 2021, available at https://www.comparitech.com/blog/vpn-privacy/dark-web-prices/.

[114] *See* Verizon Report, MI_MDL_00000001–205 at 026–030. *See also* Lawing Deposition, pp. 38:16–39:3 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

[115] Prince Deposition, pp. 235:16–236:14 ("Q: All right. So is it your analysis, then, Professor, that the reason you, as a potential plaintiff, might lose value as a result of the cyber attack is that the hackers might sell your information to Person A and, now, Person A won't be interested in buying the information from you? Is that the injury you're talking about? […] A: I think that -- that's a way to think about it, yes. Q: Okay. Other than that scenario, do you have any other opinion or basis for your opinion that there has been an economic injury, in terms of the inherent value, of this data as a result of the cyber attack? A: That's primarily my thinking on it. Q: Primarily is great, but I just want to know if there's a secondarily. Do you have any other opinion or basis for that opinion? A: I think that covers the way I'm thinking about it.").

prices at which individuals can sell their data. However, the Prince Report has not identified any such price.

58. The non-zero market values for data identified in the Prince Report do not reflect the price at which individuals can sell their data. Data brokers collect information from both publicly available sources and proprietary sources but do not offer individuals the opportunity to sell them their information.[116] Likewise, Dark Web sites do not collect illicit credit card data from individuals selling their own information.

59. The Prince Report therefore chooses to estimate harm using market values that have no relationship to the price individuals could receive for their data. The Prince Report's application of the Loss of Value model therefore does not estimate the harm proposed class members suffered from a lost opportunity to sell their data.

60. Overall, the Prince Report's theory that lost opportunity to sell data caused harm does not align with the reality of the marketplace as well as not acknowledging the non-rivalry of data. First, no legitimate marketplace exists for one to sell sensitive information like credit cards, a fact Professor Prince himself confirmed in his deposition.[117] Second, for other non-credit-card data, the Prince Report identifies only one potential marketplace where individuals can sell their data.[118] However, the Prince Report does not propose to use it. Furthermore, Professor Prince

---

[116] *See, for example,* Exact Data, "About Exact Data," available at https://www.exactdata.com/corporate/about-us html; See FAQ "Where is your data from?". LeadsPlease, "Grow Your Business with a Targeted Direct Mailing List," available at https://www.leadsplease.com/; RocketReach, "How Did My Profile Get On RocketReach?" available at https://knowledgebase rocketreach.co/hc/en-us/articles/234810007-How-did-my-profile-get-on-RocketReach; Whitepages, "Where Does Your Information Come from?" available at https://support.whitepages.com/hc/en-us/articles/115010106948-Where-does-your-information-come-from-; and BeenVerified, "Our Data," available at https://www.beenverified.com/about/our-data/.

[117] Prince Deposition, pp. 278:20–279:9 ("Q: So you don't have any legitimate data merchants which you present as selling credit card data? A: I don't present any, that's right. Q: And that's because they don't sell credit card data, do they? A: Not that I'm aware of. Q: There isn't a very legitimate, lawful reason to be selling someone's credit card information, agreed? A: I don't have one. I don't have a reason to put forth here.").

[118] Prince Report, ¶ 83. The report identifies four marketplaces: Datacoup, Digi.me, Meeco, and Tartle. Datacoup, Digi me, and Meeco were included as part of a quote from an external source but during Professor Prince's deposition it was identified that this source was not correctly quoted and that Digi me and Meeco are not actually marketplaces where individuals can sell data. Prince Deposition, p. 246:3–247:1 ("Q: And you see where you changed the word or you added a word in brackets, 'such'? Do you see that? A: Yes. Q: The actual word was 'some,' which actually changes the meaning of the sentence. Do you know why someone, perhaps on your team, went to the trouble of taking out the word 'some' and substituting the word

testified he is not aware of any attempts by plaintiffs to sell their individual data or situations where plaintiffs were precluded from selling their data.[119] The Prince Report's model therefore does not measure any economic harm resulting from a purported lost opportunity for proposed class members to sell their data—nor does the Prince Report explain how one could model classwide effects given thousands if not millions of putative class members and their risk-tolerance levels associated with hypothetically attempting to sell varying bundles of information. Even if, contrary to the record, individuals were attempting to sell their personal information, any inquiry into the value of that information, if any, would necessarily require individualized assessment.

### F.  The Prince Report's Loss of Value Model Would Require Record-by-Record Analysis

61.  The Prince Report proposes a method to estimate the lost value of data that requires individual review and identification of data compromised in the data breach for each proposed class member.[120] To successfully identify the set of data compromised for each proposed class member, the data must be consistently organized in a way that easily allows it. The Four Tables do not possess characteristics of well-organized data, and the Prince Report fails to acknowledge this and makes no effort to explain how to address the Four Tables' lack of organization. The only identifiable approach to consolidate each plaintiffs' set of records into a single set of active and accurate compromised data is through a record-by-record analysis.

---

'such'? A: I don't. But I can look into it. Q: Because the way it reads, as you quoted it, it sounds like it's saying that Datacoup, Digi.me, and Meeco all provide a venue for consumers to monetize their own data. That's what you intended to convey there, right? A: I'd want to go back and look at the full quote to, you know, think through what I intended to convey. It conveys what it conveys. If it seems inaccurate, I can go back and correct it."); Digi me, "What Is Digi.me?" available at https://digi me/what-is-digime/; and Meeco, "The Infrastructure for Trusted Personal Data Ecosystems," available at https://www.meeco.me/.

[119]  Prince Deposition, p. 321:6–22 ("Q: Are you aware of any potential class member in this case who has been unable to make a sale of his personal data because the hackers already sold it to that person? A: I don't know of anyone in particular. Q: Are you aware of any individual, potential class member, who has attempted to sell his personal data at all? A: Not that I know of. Q: And in your proposed model, do you have any way of determining that? A: "That" being whether any individual attempted to sell their data? Q: Yes. And if so, whether they tried to sell it to someone who bought it from the hackers? A: The model -- I don't have that incorporated in the model as of now.").

[120]  Prince Report, ¶ 128.

37

62.  The Four Tables also do not contain a uniform set of information for each Starwood guest
represented in the data. For example, the Four Tables Data Production contains ▮▮▮▮▮▮▮
with the name "Paula O'Brien" or "Paula Obrien" (which is Plaintiff O'Brien's name).[121]
However, the distinct records include different information. If I consider only that set of data
identified by Figure 8 of the Prince Report, the eight records for "Paula O'Brien" or "Paula
Obrien" represent five distinct sets of information[122] summarized in **Table 1**.

### Table 1: Variables without missing data for Paula O'Brien[123]

| **Option 1** | **Option 2** | **Option 3** | **Option 4** | **Option 5** |
|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮ | ▮▮▮▮ | ▮▮ | ▮▮ |

**Note:**
These permutations are determined by identifying whether a column is populated with data,
concatenating the column names with a valid entry for every record, and then removing any
duplicative variations to arrive at the unique set of options. The following set of values were
considered to be not valid and the value was removed from the column: "HAS NOT BEEN
ASKED FOR EMAIL", "DO NOT ASK", "X", "NA", "N.A", ".", "NONE", "ADDRESS NOT
AVAILABLE". A value of "0" was removed when found in any field except for Presence of

---

[121]  In MI_MDL_02496938, if one filters to first name "Paula" and last name "O'Brien" or "Obrien," there are
▮▮▮▮▮▮▮▮▮▮ Four Tables Data Production, MI_MDL_02496938.

[122]  The Prince Report identifies the following fields as having potential value: Name, Age, Address, Email,
Phone Number, Has Children, and Credit Card Information. However, the Four Tables does not have specific
columns associated with each field. To account for this mismatch, I assumed the following fields from the
Four Tables Data Production would produce the information identified in the Prince Report:



*See* Prince Report, ¶ 137; and Four Tables Data Production,
MI_MDL_02496938.

[123]  Four Tables Data Production, MI_MDL_02496938.

Children ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ as a value of 0 in the Four Tables Data Production indicates the lack of children in the room and is a valid entry for the column.

63. Further complicating the situation is the fact that the information in a given record needs to be verified to determine to whom it belongs and whether it is accurate. This is true because people have the same names, people move, they change phone numbers and email addresses, and they may also have more than one SPG account number.[124] As a result, if a customer makes reservations using different information and under different SPG accounts, it is nearly impossible to link the records without individualized inquiry.

64. For example, there are ▆▆▆▆▆▆▆ for an "Eric Fishon" that have completely different addresses, phone numbers, SPG numbers, and email addresses.[125] The only reason I know that these records both belong to Plaintiff Fishon and do not reflect ▆▆ separate people named Eric Fishon is because Plaintiff Fishon was asked about the information in these records at his deposition.[126] An identical situation occurs with the name "Maria Maisto."[127] However, in this situation the ▆▆▆▆▆▆ relate to ▆▆▆▆▆▆▆▆▆▆▆ Maria Maisto; this is again only knowable because Plaintiff Maisto was asked about these records in her deposition.[128]

---

[124] Video recording of a meeting between Parties, members of their clients' staffs, and potential witnesses, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 20, 2021, 1:11:50–1:12:45.

[125] Four Tables Data Production, MI_MDL_02496938, unique row IDs 72110346 and 385714087.

[126] Plaintiff Fishon identified the address associated with the record with Unique_Row_ID of 72110346 as his work address. Deposition of Eric Fishon, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 1, 2021 (hereafter, "Fishon Deposition"), p. 167:4–8 ("Q: Have you ever lived or worked at the following addresses: ▆▆▆▆▆▆▆▆▆▆▆▆? A: Yes. That is a work address for ▆▆▆▆▆▆▆▆▆ and Four Tables Data Production, MI_MDL_02496938, unique row ID 72110346. Plaintiff Fishon testified that the address, phone number, and email address of the record with Unique_Row_ID of 385714087 belonged to him. Fishon Deposition, p. 162:6–9 ("Q: [...] What are your e-mail addresses? A ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆."), p. 163:20–22 ("Q: Have you ever been used the phone number ▆▆▆▆▆▆▆ A: Yes."), and p. 168:7–13 ("Q: What other addresses have you lived at in the past decade, if any? A: We just went over both of them, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, were two of my permanent addresses in the past ten years."); and Four Tables Data Production, MI_MDL_02496938, unique row ID 385714087.

[127] Four Tables Data Production, MI_MDL_02496938 unique row IDs 543258550 and 374225148.

[128] The address for the record with Unique_Row_ID of 374225148 i ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The address for the record with Unique_Row_ID 543258550 is ▆▆▆▆▆▆▆▆▆▆▆▆ which Plaintiff Maisto confirmed is an address she has never lived at before. Deposition of Maria Maisto, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 2, 2021 (hereafter, "Maisto Deposition"), p. 36:9–

Likewise, there are ███████ in the Four Tables Data Production with the name "Michaela Bittner" and the email address ██████████████[129] During her deposition, Plaintiff Bittner testified that she never used this address.[130] And one record with the name "Michaela Bittner" includes the phone number ████████[131] which Plaintiff Bittner testified "does not sound familiar."[132]

65.  The bellwether plaintiffs' interrogatory responses also exemplify this verification problem. All bellwether plaintiffs provided, then supplemented—often multiple times—interrogatory responses about their information they believed they used during the relevant time period, including names, addresses, email addresses, passport numbers, Starwood Preferred Guest (SPG) numbers, and payment card numbers.[133] Plaintiff Gononian, for example, identified ██ SPG numbers and ███ Marriott Bonvoy number as hers, but then identified ████████ additional "numbers provided by Marriott . . . which may pertain to" her.[134] She also partially identified ████ payment card numbers she said were "provided to Marriott," but then identified ██████ additional partial card numbers as "provided by Marriott" which "may pertain" to her.[135] Yet

---

12 ("Q: Ms. Maisto, your address as of December 2018 was ██████████████ ███████████ A: That's correct."), and p. 240:4–6 ("Q: Have you ever lived at ██████████████ ██████████████ A: No."); and Four Tables Data Production, MI_MDL_02496938, unique row IDs 374225148 and 543258550.

129  Four Tables Data Production, MI_MDL_02496938, unique row IDs 550056385 and 641851989.

130  Deposition of Michaela Bittner, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 17, 2021 (hereafter, "Bittner Deposition"), p. 23:1–3 ("Q: Have you ever used the email address ████████████ A: No.").

131  Four Tables Data Production, MI_MDL_02496938, unique row ID567181516.

132  Bittner Deposition, p. 28:1–4 ("Q: How about ████████████ Have you ever used that phone number? [...] A: That does not sound familiar.").

133  *See, for example,* Deposition of Laura Gononian, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, April 8, 2021 (hereafter, "Gononian Deposition"), Exhibit 29 (Consumer Plaintiff Laura Gononian's Third Supplemental Responses to Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, March 22, 2021).

134  Gononian Deposition, Exhibit 29, pp. 8–9.

135  Gononian Deposition, Exhibit 29, pp. 9–10.

in her deposition, Plaintiff Gononian complicated the story further by testifying "I do not

recognize those numbers."[136] Other plaintiffs repeated this pattern.[137]

---

[136] Gononian Deposition, pp. 80:19–81:14 ("Q: So it's your understanding that Marriott indicated these were potentially card numbers that may pertain to you? A: Numbers provided by Marriott. It indicates that the numbers were provided by Marriott as potentially a payment card number, as you can read there. Q: These are your words, they're not -- they're not mine. So I'm trying to understand why you -- you put this in your response. [...] A: I mean, I rely on my attorneys to handle these technical issues regarding the case. Q: But sitting here today, you don't have -- it's your belief that none of these numbers pertain to you. Correct? A: I do not recognize those numbers.").

[137] Bittner Deposition, pp. 195:15–200:4 ("Q: Ma'am, do you see that Interrogatory No. 2 asked you to "Identify all of the following used by you at any point from January 1st, 2004 to the present," and then lists a number of things? A: … Yes...Q: And then the next paragraph, you identify the following personal information that you used from January 1st, 2004 to December 19th, correct? A: Yes… Q: Okay. Residential addresses, we talked about those two before. Any missing? A: I don't recall the stay that I -- the address that I told you at ████████████ It was a year. I may have overlooked that. I don't even remember the year I was there. Q: Okay. And I think you mentioned the ████ address as well, but you couldn't remember that precisely? A: Correct. It was just a temporary three months. I didn't -- I don't even know if I changed my address, but, yes… Q: All right. The second email address ████████████ when did you use that email address? A: I used it, I believe, it was prior to my ████ use, the ████ but I'm not a hundred percent certain. And then I transitioned to using ████ Q: Did you have a passport before the passport that's listed here? A: I believe I did. Q: Was it active between January 1st, 2004 and December 1st, 2019? A: 207 -- 17. I think it was a ten-year expiration. So 2017. What dates were you asking? I'm sorry. Q: Well, the interrogatory asked for information between January 1st, 2004 to December 1st, 2019. A: I know I had one before this, which was obviously expired, but I -- I don't recall…"), and Exhibit 205 (Consumer Plaintiff Michaela Bittner's Fourth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 14, 2021); Cullen Deposition, pp. 91:10–96:21 ("Q: And the paragraph below that says [as read]: Plaintiffs' counsel further believes that the following information identified in the records provided by Marriott pertains to plaintiff, but -- and I'm paraphrasing -- plaintiff is unable, at this time, to conclusively determine that the information pertains to plaintiff. And there's a list of five numbers. Do you see that? A: Yes[…] Q: Do you see the numbers listed in Part B? A: Yes. Q: Why do you believe that those numbers are likely to be yours? A: Well, likely, based on the search -- a -- a very comprehensive search of my email records and emailed receipts from Marriott[…] And I -- I can say with extreme accuracy that, based on my records, those are -- those are likely. But those are very common numbers…Q: Did you find any records that are in your possession that listed last of a payment card number ████████████ A:[…] I put my trust in the expert that was used to do a search of Marriott records[…] Q: So you didn't find any documents in your possession that indicated that a payment card ending in ████ had been issued to you. Correct? A: Correct. Q: And you didn't find any documents in your possession that indicated that a payment card ending in ████ had been issued to you. Correct? A: Correct. Q: And you didn't find any documents in your possession that indicated that a payment card ending in ████ had been issued to you. Correct? A: I would like to answer by stating exactly as it's stated here in the response. I believe, likely. So… Q: You didn't find any documents in your possession that indicated that a payment card ending in ████ had been issued to you. Correct? A: Correct. Q: You didn't find any documents in your possession that indicated that a payment card ending in ████ had been issued to you. Correct? A: Correct[…] Q: So, Mr. Cullen, why is ████ listed in Part B of your verified interrogatory response? A: I couldn't say."), and Exhibit 72 (Consumer Plaintiff Roger Cullen's Fourth Supplemental Responses to Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, May 20, 2021); Deposition of Bryan Wallace, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 22, 2021 (hereafter, "Wallace Deposition"), pp. 91:5–92:8 ("Q: Looking at the -- at the Letter C, SPG or Marriott Rewards number, the number ending ████ do you recognize that number as yours? A: Without some sort of documentation identifying that as mine, I do not recall that number at this time that that's -- I've used that number. Q: Okay. Is that the same for the four card numbers that are listed under Letter D? A: Those numbers

66.     Despite describing the model as applying "per plaintiff,"[138] the Prince Report does not disclose how the model can be applied when a plaintiff has numerous records with different information. Professor Prince testified during deposition that the Loss of Value model would be applied to any set of data that has some identifiable value in the market, though, he suggested that there could be "many, many combinations."[139] But as the example of Plaintiff

---

were provided by Marriott. […] After a reasonable and exhaustive search of my records, I have -- I have no documentation to show or to confirm that those are my numbers… Q: Okay. Sitting here, you have no reason to believe that these are numbers that you ever provided to Marriott or Starwood. Is that correct? A: I do not know if those are my numbers."), pp. 101:6–103:8 ("Q: And you believe this number ending in ███ is a payment card number associated with those stays? A: I have no documents that confirm in my possession, that I'm aware of, that that credit card was used. I'm simply going by the information Marriott provided to my attorneys. […] Q: Did you make any independent evaluation or determination about whether these payment cards, any of these payment cards listed in Letter D, actually were used by you? A: I was -- I made a reasonable search of all my documents, all my e-mails, all my credit card transactions, and I could not locate, to the best of my knowledge, anything that referenced those."), and Exhibit 327 (Consumer Plaintiff Bryan Wallace's Sixth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 21, 2021); Deposition of Brent Long, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 8, 2021 (hereafter, "Long Deposition"), pp. 41:20–44:4 ("Q: -- there is an indication that you believed two other SPG or Marriott Rewards numbers pertain to you? Do you see those two numbers in A? A: Yes. […] A: The ██████ is my Bonvoy number. The SPG number is not my number, that I'm aware of. […] Q: So you don't believe that number pertains to you? A: I don't. […] Q: So sitting here today, you have no idea how that ██ number pertains to you? Is that right? […] A: I don't know why it's there."), and Exhibit 120 (Consumer Plaintiff Brent Long's Seventh Supplemental Responses To Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 4, 2021); Deposition of Robert Guzikowski, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 24, 2021 (hereafter, "Guzikowski Deposition"), pp. 94:14–96:4 ("Q: So is it right that you have no idea how the numbers that we just talked about pertain to you? […] THE WITNESS: I don't -- I don't recall how those numbers pertain to me. […] Q: Did you find a single record or email containing any of these numbers? […] THE WITNESS: I don't recall the exact -- if I did or I didn't. But -- I may have, but I don't recall […] Q: Well, what's your best recollection as to whether you found a single document in your possession that contains one of these numbers? […] THE WITNESS: I may -- may have or may have not; I don't recall."), and Exhibit 345 (Consumer Plaintiff Robert Guzikowski's Fifth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 22, 2021).

[138]   Prince Report, ¶ 137 ("I estimate a market price to acquire a basic grouping of personal data fields that were part of the Data Breach (name, address, age, email address, phone number, whether one has children, and credit card information) of $1.58 per Plaintiff per sale of data including credit card information and a market value of $0.09 per Plaintiff per sale of data excluding credit card information (see Figure 8 below).").

[139]   Prince Deposition, pp. 222:8–223:16 ("Q: That parenthetical that we're talking about, with the various types of data described, is that intended to mean that the $1.58 price tag applies to combinations of data that includes all of those components? A. So let me be very clear. So the two figures you see there, the one with the parenthetical, that's one example of a combination of data that may have been taken… Q: Okay. A: By no means is that the universe of all combinations. Q: There could be many, many combinations? A: Correct. […] Q: And so you could have combos of almost infinite variety? A: Well, so, I limit myself to ones with -- where I identify market prices or some price metric.").

HIGHLY CONFIDENTIAL

O'Brien attests, proposed class members may have multiple sets of information to choose from. The examples of Plaintiffs Fishon, Maisto, and Bittner demonstrate the challenge in associating a record with any given individual without conducting a record-by-record analysis.

## IV. The Prince Report's Benefit of the Bargain Model Relies on Flawed Demand-Side Inputs And Supply-Side Inputs

67. The Prince Report uses its Benefit of the Bargain model to simulate the change in market prices that would occur if consumers were willing to pay less for Marriott hotels due to the data-security disclosure modeled in the Butler Survey.[140] The Benefit of the Bargain model simulates an oligopolistic market to measure equilibrium prices in a but-for world.[141] To produce reliable results, the model requires reliable inputs to estimate supply and demand in the market simulation.[142] However, the Prince Report relies on fundamentally flawed inputs for supply and demand, which render the results of the Benefit of the Bargain model unreliable. Finally, the application of the model to the proposed class members may provide windfall gains to some plaintiffs because Professor Prince testified in deposition that damages should be awarded to the person or entity who paid for the reservation but proposes no mechanism for doing so without individualized inquiry.[143]

### A. The Prince Report's Reliance on The Butler Report's Use of Conjoint Analysis for Its Demand-Side is Inappropriate

68. The Prince Report says there exists no "market data that adequately captures data-security across hotels," which is why it is forced to rely on the Butler Report's estimates that come from the Butler Report's Conjoint Analysis.[144] In this section, I discuss the ways in which a Conjoint Analysis ("conjoint") in general, and the specific conjoint used in the Butler Report, is inappropriate to approximate the demand-side of the Prince Report's Benefit of the Bargain

---

[140] Prince Report, ¶ 95.

[141] Prince Report, ¶ 105.

[142] Prince Report, Section X.C.3.

[143] Prince Deposition, p. 198:8–20 ("Q: And was it your thinking, when you thought about it, that I'm still going to charge the overcharge percentage but I'm going to award it to the entity that actually reimbursed the hotel guest? Is that your thinking? A: That's the way I would think about it. Q: Okay. And would the same apply if I treat a family member, if I allow my daughter to go on a trip with one of her friends and I pay for it, I'd be the one to get the reimbursement, or I'd be the one to get the damages that you're calculating? A: That's the way I would think about it.").

[144] Prince Report, ¶ 112.

model. I then conclude that the Benefit of the Bargain model's reliance on this unreliable input makes it unreliable as well.

69.    Conjoint is a tool used by market researchers to assess the potential consumer response to incremental features for a given product or service. An example of an appropriate conjoint includes the ███████████████████ Study by Marriott.[145] Using a conjoint study, ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.[146] ███████████████████████████████████████████████████████████████████████ ███████████████████████.[147] ███████████████ ███████████████████████████████.[148] When I teach students how to use conjoint, I always emphasize that although this specific tool can be a useful tool for ex ante product design decisions, like the Marriott example, it can be a dangerous tool if misused. It will always produce numbers even for contexts where the choice scenario is inappropriate for a conjoint study, and consequently it can yield nonsensical numbers. There are also some specific concerns I have regarding the reliability of this conjoint, given my work on privacy and information security.

70.    The **privacy paradox** describes the contradiction that "[w]hereas people say they care about privacy, they are willing to relinquish private data quite easily when incentivized to do so."[149] In my own research I have found that when "expressing a preference for privacy is essentially costless, as it is in surveys, consumers are eager to express such a preference, but when faced with small costs this taste for privacy quickly dissipates."[150] Considerations of privacy and

---

[145]   Marriott, ███████████████ Study - Executive Summary," ██████ (hereafter, "Marriott Study"), MI_MDL_02482952.

[146]   Marriott Study, MI_MDL_02482952, Slide 4.

[147]   Marriott Study, MI_MDL_02482952, Slide 3.

[148]   Marriott Study, MI_MDL_02482952, Slide 7.

[149]   Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper,* No. 23488, June 2017, p. 2.

[150]   Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper,* No. 23488, June 2017, p. 4.

data-security often play a small part in consumer decisionmaking. For example, studies have found that MIT undergraduates have been found willing to trade off quite a lot of personal data in exchange for cheese pizza,[151] and that small changes in webpage layout and additional (but extraneous) data-security offerings influenced whether a student chose a technology that offered data-security or not.[152]

71. This downplaying of data-security considerations can be seen in other choices internet users make. For example, though there are privacy-protective internet browsers such as Tor, the vast majority of users use other browsers.[153] Similarly, people use Bing or Google Search rather than DuckDuckGo, even though DuckDuckGo does not retain their data.[154] Such contradictory behavior has also been studied in the context of social networking sites such as Facebook. For example, Barnes (2006), Tufekci (2008), and Reynolds et al. (2011) find little correlation between individuals' attitudes towards privacy and their actual disclosure of information on social networking sites.[155] Therefore, the literature highlighting the disconnect between survey

---

[151] Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper,* No. 23488, June 2017, pp. 8–9.

[152] Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper,* No. 23488, June 2017, p. 12.

[153] StatCounter Global Stats, "Browser Market Share Worldwide," available at https://gs.statcounter.com/browser-market-share. According to the official website, "Tor Browser isolates each website you visit so third-party trackers and ads can't follow you. Any cookies automatically clear when you're done browsing. So will your browsing history … All anyone monitoring your browsing habits can see is that you're using Tor … Your traffic is relayed and encrypted three times as it passes over the Tor network." Tor Project, "Anonymity Online," available at https://www.torproject.org. According to Tor Project, its network uses a bandwidth of about (299 Gbit/s), while the internet as a whole used a bandwidth of about 1,360,000 Gbit/s (= 170 Tbit/s * 8,000 Gbit/Tb)it. *See* Data from January 1, 2020 through December 31, 2020 on the advertised and consumed bandwidth of Tor in Gigabits per second, Tor Traffic - Bandwidth 2020-01-01 - 2020-12-31.csv, downloaded from Tor Project, "Metrics – Traffic – Total Relay Bandwidth, " available at https://metrics.torproject.org/bandwidth.html; and Mingas, Melanie, "Global Internet Capacity Up 35% in 2020," *Capacity Media,* February 17, 2021, available at https://www.capacitymedia.com/articles/3827731/global-internet-capacity-up-35-in-2020.

[154] Burgess, Matt, and Victoria Woollaston-Webber, "DuckDuckGo: What Is It and How Does It Work?" *Wired UK*, February 1, 2017, available at https://www.wired.co.uk/article/duckduckgo-anonymous-privacy. DuckDuckGo currently has 0.6% of the global search engine market. *See* StatCounter Global Stats, "Search Engine Market Share Worldwide," August 2021, available at https://gs.statcounter.com/search-engine-market-share#monthly-201701-202108.

[155] Barnes, Susan B., "A Privacy Paradox: Social Networking in the United States," *First Monday*, Vol. 11, No. 9, September 4, 2006; Tufekci, Zeynep, "Can You See Me Now? Audience and Disclosure Regulation in Online Social Network Sites," *Bulletin of Science, Technology & Society*, Vol. 28, No. 1, February 2008, pp. 20–36; and Reynolds, Bernardo, et al., "Sharing Ephemeral Information in Online Social Networks: Privacy

evidence and actual marketplace preferences towards the privacy of data undermines the Butler Report's method of using a survey-based estimate to calculate the value of security features towards an individual's data.

72.   In fact, all fifteen bellwether plaintiffs in this matter exemplify the privacy paradox. Plaintiffs allege that "had consumers known the truth about Defendants' data-security practices—that they did not adequately protect and store their data—they would not have stayed at a Marriott Property, purchased products or services at a Marriott Property, and/or would have paid less."[156] They also allege that the risk of "another data breach at Marriott" is "real, immediate, and substantial."[157] However, every bellwether plaintiff apparently made a reservation or stayed at a Marriott hotel after Marriott announced the Starwood cyberattack.[158]

---

Perceptions and Behaviours," *Proceedings of the 13th IFIP TC13 Conference on Human-Computer Interaction* (Lisbon, Portugal, September 5–9, 2011). In fact, one researcher working with Ms. Butler in this matter highlighted the importance of the privacy paradox, indicating that surveys "may be subject to response biases that could exaggerate the apparent value of personal information." Glasgow, Garrett, and Chris Stomberg, "Consumer Welfare and Privacy in Antitrust Cases–An Economic Perspective," *Antitrust*, Vol. 35, No. 1, pp. 46–50, at p. 47; and Deposition of Sarah Butler, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, August 19, 2021, p. 14:16–21 ("Q: Who, at NERA, assisted you in your work? A: Sure. I have a team of research staff. So that would include […] Garrett Glasgow.").

[156]   Second Amended Consolidated Consumer Class Action Complaint, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, February 13, 2020 (hereafter, "Complaint"), ¶ 275.

[157]   Complaint, ¶ 352.

[158]   Gononian Deposition, Exhibit 34; Maldini Deposition, Exhibit 51; Cullen Deposition, Exhibit 73; Fishon Deposition, Exhibit 099; Long Deposition, Exhibit 134; Maisto Deposition, Exhibit 00015; Deposition of Irma Lawrence, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 28, 2021, Exhibit 93; Deposition of Paula O'Brien, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 11, 2021, Exhibit 173; Amarena Deposition, pp. 250:11–251:13 ("Q: And ▮▮▮▮ was a -- was a Marriott? A: Yes. Q: And it looks like you did -- you stayed there for a week in April of 2019? A: Was it '19 or '18? Yes. Q: I think it's '19. A: Okay. Q: Do you see that? A: Okay. Yeah. Yeah. Yeah […] Q: So the stay occurred in April of 2019? A: Correct. Q: And this would have been after you learned of the data breach? A: Yes. Q: Why did you continue to stay at a Marriott property? A: Well, the breach had already happened. I had changed my credit cards. What's done was done. And I already booked it."), and p. 256:11–21 ("Q: Well, sitting here today, do you now remember that you stayed at a Marriott Courtyard ▮▮▮▮▮▮ A: Yes."); Deposition of David Viggiano, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* June 30, 2021, p. 71:19-21 (Q: This stay was from ▮▮▮▮ is that correct? A: Correct."); Deposition of Kathleen Hevener, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 15, 2021, p. 339:18-22 ("Q: And you also testified, I believe, that you stayed at at least one Starwood property after the data security incident; is that right? A: Yes. Former -- former Starwood property […]"); Wallace Deposition, pp. 352:19–353:11 ("Q: Mr. Wallace, I don't believe we specifically talked about the stay at ▮▮▮▮ Do you see that? This would be in Row 2. A: Row 2. Yes. Q: Okay. This hotel you arrived at ▮▮▮▮ and departed ▮▮▮▮ Is that correct? A:

73. The available literature and research on the privacy paradox and the real-life examples from the bellwether plaintiffs indicate that the willingness to pay outputs from the Butler Report's model are unreliable. This in turn has a direct impact on the Prince Report's Benefit of the Bargain model results. The Prince Report does not provide an alternative approach and Professor Prince in deposition indicated that while such an alternative was "possible," he had not considered one in his report.[159] Therefore, if the Butler Report's estimate for willingness to pay is deemed inaccurate, which I believe it should be, the Prince Report's Benefit of the Bargain model no longer has the necessary demand inputs to accurately calculate but-for prices.

### B. The Supply-Side of the Prince Report's Benefit of the Bargain Model Requires Individualized Inquiry

74. For the supply-side inputs, the Benefit of the Bargain model requires inputs to simulate the competitive landscape. This includes identification of competing hotels and their associated attributes, including price. Each Marriott hotel exists in a unique competitive landscape, so the supply-side inputs are required for each hotel associated with a class member reservation over a four-year period. As a result, for every market, the Benefit of the Bargain model must develop: a set of competing hotels; consideration sets; and contemporaneous prices for the

---

That's what it states. Q: Okay. What was the purpose of this visit? A This would have been a business stay."); Guzikowski Deposition, pp. 315:10–316:20 ("Q: Does this refresh your recollection that, in ▮▮▮▮▮ after you had notice of the data breach involving Marriott and Starwood, you reserved the honeymoon suite with hot tub at the ▮▮▮▮▮ […] A: I likely reserved the ▮▮▮▮▮ but I was just having some fun with her. Q: Okay. So the part that's not accurate is "The 'honeymoon suite' with hot tub," but the part that's accurate is you reserved a ▮▮▮▮▮ room, correct? A: I believe so, but -- I believe I reserved the Marriott, but I can't -- if it would have been convenient to the concert venue."); Bittner Deposition, p. 192:11-15 ("Q: And despite that belief, you made a reservation on ▮▮▮▮▮ to stay at a ▮▮▮▮▮ correct? […] A: Yes."); and Deposition of Denitrice Marks, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 17, 2021, pp. 235:15–236:1 ("Q: Right. And you said you found out in December of 2018. Correct? A: Exactly. Q: Then who stayed at the ▮▮▮▮▮ in ▮▮▮▮▮ A: Me and my husband. Q: Okay. So you -- you didn't stop staying at Marriott after -- A: I didn't know it was part of the property. I didn't know they were part of Marriott.").

[159] Prince Deposition, p. 32:5–13 ("Q: Could you have calculated your overcharge percentages without Ms. Butler's distribution that you utilized? A: I don't want to say that's not possible. I'd have to think more about that as to what other alternatives might be appropriate here. I believe using her numbers was appropriate, but I don't want to say there's no other way to think about this.").

focal hotel and competing hotels. This analysis would require detailed, individualized market-by-market and reservation-by-reservation analyses and so does not provide a formulaic methodology for calculating class members' damages. Furthermore, the Prince Report neither identifies the data necessary to these analyses nor demonstrates that it is feasible to obtain such information. Finally, individualized analyses would be necessary to direct damages to the appropriate paying party, given the prevalence of reimbursement for many stays.

75. The supply-side of the Prince Report's Benefit of the Bargain model relies on two key inputs. The first is a determination of a set of competitor hotels and a realistic outside option. The second is competitive prices for the competitor hotels. Competitor hotels may change as hotels open, close, or renovate, and hotel prices change daily. Therefore, each of these inputs needs to be contemporaneous with the booking and the prices need to consider the booking period. The Prince Report proposes to gather the relevant market and competitive prices "for each stay by a class member."[160] However, because of the idiosyncratic nature of relevant markets and prices across time, geography, and booking platform, applying them to "each stay by a class member" requires a time-intensive, individualized analysis for every single reservation of each proposed class member. Furthermore, some of the necessary input data may not even be available, which would destroy the reliability of the Prince Report's Benefit of the Bargain model even if individualized inquiry were undertaken. I discuss each of these inputs in the following sections.

   *1. Determining the Contemporaneous Competitor Set*

76. For each hotel that a class member stayed at (the "focal" hotel), the Prince Report proposes to identify the set of competitor hotels.[161] The identification of these competitor hotels is important because plaintiffs will feed the competitor hotels' prices into the model, and they

---

[160]  Prince Report, ¶ 99 ("For each stay by a class member, I collect relevant information for the market in which that stay occurred.").

[161]  Prince Report, ¶ 99 ("For each stay by a class member, I collect relevant information for the market in which that stay occurred. The data include information on the set of competing hotels, and the market shares and features (including prices) of those competing hotels."); and Prince Report Back Up Materials, Figure 6 Hotel Data.xlsx.

will help determine how the simulated market responds to the change in demand (or willingness to pay) modeled by the Butler survey. Identifying the set of competitor hotels for each stay by each class member requires a detailed and individualized analysis.

77.  As acknowledged by Professor Prince in his deposition,[162] determining the set of competitor hotels requires looking at the marketplace that existed at the time of the relevant booking date,[163] meaning the hotels had to be a competitor of the focal hotel on the date a class member booked a given reservation.[164] This is because using an out-of-date competitor set may result in an inaccurate overcharge. This also means that the competitor hotels must have been operating in the same geographic area of each focal hotel at the time a class member booked a given reservation; it must have been an actual competitor of the focal hotel; and be targeting the same set of customers depending on the local market, availability, location, personal preferences, length of stay, and other factors.

---

[162]  Prince Deposition, p. 65:6–19 ("Q: Okay. To do that, sir, did you have to, first, define each of those markets? A: […] But what I'm essentially doing is looking at a set of firms that one could reasonably say are competing with each other. Q: Okay. And in effect, then, you are defining what the market is for each of the subject Marriott/Starwood Hotels, correct? A: Well, again, I'm -- for each hotel, I'm telling you what I believe is a reasonable set of competitors that that hotel is facing. "), pp. 91:4–92:3 ("Q: So you used geography and tier to identify those competing hotels for each of the four markets, right? A: Each of the four cities. So I chose four cities. Q: Okay. A: Picked a focal hotel in each city and then used geography and tier to identify the competing hotels for each of those focal hotels. Q: Okay. And is there a difference between, as you're using the terminology, a city and the market? A: In the way that I'm discussing it in the report, yes. Q: And what's the difference? A: Well, so, as we've discussed, when I -- well, the market, for my analysis in the report, I'm talking about the focal hotel and the set of competing hotels. And the city can be larger than that. So, obviously, the city can encompass a larger number of hotels, it may or may not, but it may"), and pp. 102:18–103:9 ("Q: Well, what I'm asking, Professor, is you would need to look at it in both -- let me get at it. Assuming that you had stays in each of the four or five years of your damage period in Hyderabad, you would need to look at each of those time periods to see if the competitive market was the same or different as in other vendors, right? A: I would look at what the competitive landscape looks at those different points in time. Q: And you would have to do that for all 1,200 to 1,400 Starwood locations that potentially are at issue here, right? A: Whatever the number that are at issue, I would do that.").

[163]  Prince Report, ¶ 111 ("The same dates of stay were examined for each hotel within a given geography and were sampled at the same point in time to avoid capturing price fluctuations resulting from different booking windows or different dates of stay.").

[164]  Prince Report, ¶ 111 ("The same dates of stay were examined for each hotel within a given geography and were sampled at the same point in time to avoid capturing price fluctuations resulting from different booking windows or different dates of stay.").

78. Defining a set of contemporaneous competitor hotels requires market analyses across geography and time for every single reservation made by each proposed class member. The following steps must be followed to ensure a contemporaneous, valid set of competitor hotels:

    a. Identify the booking dates and booking window for each reservation of each class member.

    b. Identify the geographic area of the focal hotel for each reservation of each class member.

    c. Determine the set of contemporaneous hotels operating within the general geographic area of the focal hotel at the time of each reservation for each class member.

    d.  From this set of hotels, select those hotels that were a direct competitor to the focal hotel at the time of reservation for each class member.

79. By proposing to define a set of competitor hotels for each hotel in which a proposed class member stayed, the Prince Report acknowledges the need to conduct an individualized market analysis for every hotel stay by the alleged class members. Professor Prince acknowledged this fact by saying it was "correct" that he would need to analyze the individual markets, and that he would "potentially" need to do this for different time periods.[165] Furthermore, the Prince Report indicates that among the selected competitor hotels for the four focal hotels listed in Figure 6 of the Prince Report, it collected information on price, number of rooms, and existence of a restaurant, fitness center, and free in-room wireless internet.[166] The Prince Report uses these characteristics because they are the features that the Butler Report collected data on in its survey. However, a more complete model would incorporate all hotel features that influence hotel choice.

80. Setting aside the question of whether a restaurant, fitness center, and in-room wireless internet represent the set of hotel features that drive consumer decision-making—which the Prince

---

[165] Prince Deposition, pp. 97:21–98:16 ("Q: So, in other words, 1,200 to 1,400 competitive segments that you would have to analyze; is that true? A: Taking that number as given, yes, that would be correct. Q. And you would have to do it, potentially, for different time periods within your four-year damage period; would you not? A: Potentially. Q: And all of those analyses, those market analyses would have to be done individually by you in order to complete your damages calculation for the potential class, correct? […] A: I mean, as I understand it, right now, we're assessing class, so if I were to, ultimately, provide a damages opinion, I and my team would -- would calculate that.").

[166] Prince Report Back Up Materials, Figure 6 Hotel Data.xlsx.

Report does not purport to claim or analyze—collecting such information requires analysis of each competitor hotel at each point in time of every reservation made by the class. The Prince Report's Benefit of the Bargain model uses the willingness to pay estimates from these features to determine their relative attractiveness to the hypothetical consumers in its simulation, therefore, it needs reliable data on whether these features existed at each hotel at the time of stay to determine the potential overcharge. As I demonstrate in Section IV.B.5, the Prince Report's model is sensitive to these inputs and small data collection errors can lead to large changes in its estimated overcharge.

81.  In his deposition, Professor Prince said that "I'm demonstrating it on current data, but it's very clear that one could go and run it for 2018, 2017, 2016. I simply demonstrated it on a 2021."[167] However, the Prince Report has provided no indication of how to undertake this data collection exercise. The Prince Report merely mentions that it "will collect relevant information for the market in which that stay occurred. The data include information on the set of competing hotels…"[168] But as explained by Marriott representative Russell Vereb, even when doing contemporaneous research, selecting competitor hotels requires "a lot of work" and that "█████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ "[169] Mr. Vereb explains:

---

[167]  Prince Deposition, p. 165:8–19 ("Q. So you see no issue or no problem with analyzing the competition that would have existed between 2014 and '18 by considering a hotel that wasn't open until more than a year after the close of that period? A. Well, as we discussed before, you had talked about my model would require that I have to run it over and over again for different time periods. This speaks exactly to that point. I'm demonstrating it on current data, but it's very clear that one could go and run it for 2018, 2017, 2016. I simply demonstrated it on a 2021").

[168]  Prince Report, ¶ 99.

[169]  Deposition of Russell S. Vereb, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, May 26, 2021 (hereafter, "Vereb Deposition"), pp. 43:25–45:5 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



70

82.  The Prince Report provides no indication that it plans to replicate the competitive analysis that the hotel industry and Marriott itself performs, let alone demonstrating how this would or could be done.

83.  In addition, in the deposition, Professor Prince acknowledged that "a person traveling for business or pleasure [could] have an impact on which hotel he or she will consider staying at."[171] However, when asked if he is planning to account for any of these differences in tastes and choices, Professor Prince in deposition responded: "I don't incorporate those aspects. As I said, I look at geography and tier. I don't have reason to believe that's going to affect my results



---

[170]  Vereb Deposition, pp. 69:17–71:1.

[171]  Prince Deposition, pp. 106:15–107:20 ("Q. Does a person traveling for business or pleasure have an impact on which hotel he or she will consider staying at? A. It could. Q. So a business traveler may be looking at a different set of competing hotels than a vacation traveler, even within the same city; is that true? A. I believe that's possible. Q. People traveling with their kids may have different target hotels than those who are vacationing without kids, right? A. That's possible. Q. So they would be looking at distinct sets of competing hotels? A. They could be. Q. And, in fact, vacation travelers may, actually, be considering hotels in different cities across the country? A. Yes, they could. Q. Does your model account for any of those differences in competitive markets within each of the cities you were looking at? A I don't incorporate those aspects. As I said, I look at geography and tier. I don't have reason to believe that's going to affect my results but if there was information that suggested otherwise, I could incorporate it").

but if there was information that suggested otherwise, I could incorporate it."[172] But he does not explain how he would do so. These differences in tastes and choices between business travelers and vacation travelers would have to be taken into account and would add to the already individualized analysis necessary to apply the Prince Report's model.

84.   In its supporting materials, the Prince Report indicates it selected between eight and ten competitor hotels for the four focal hotels listed in Figure 6 of the Prince Report.[173] But the Prince Report does not disclose how it selected these competitor hotels. Given the lack of information, I was unable to replicate the Prince Report's analysis. By offering no guidance for how to define a set of competitor hotels, the Prince Report has not demonstrated how its selection of competitor hotels aligns with the hotel industry's general practice. By failing to demonstrate that competitor hotels will be selected in accordance with industry practice, the Prince Report fails to demonstrate it can select a set of competitor hotels that reliably reflects the competitive marketplace for any focal hotel. But the set of competitor hotels represents a critical input to the Prince Report's Benefit of the Bargain model. Therefore, the Benefit of the Bargain model's reliance on an unreliable input makes it unreliable as well.

### 2.   Determining the Outside Option

85.   For each market, the Prince Report also proposes to define an outside option represented by all theoretically remaining hotels in the relevant market.[174] These theoretically remaining hotels

---

[172]   Prince Deposition, pp. 106:15–107:20 ("Q. Does a person traveling for business or pleasure have an impact on which hotel he or she will consider staying at? A. It could. Q. So a business traveler may be looking at a different set of competing hotels than a vacation traveler, even within the same city; is that true? A. I believe that's possible. Q. People traveling with their kids may have different target hotels than those who are vacationing without kids, right? A. That's possible. Q. So they would be looking at distinct sets of competing hotels? A. They could be. Q. And, in fact, vacation travelers may, actually, be considering hotels in different cities across the country? A. Yes, they could. Q. Does your model account for any of those differences in competitive markets within each of the cities you were looking at? A I don't incorporate those aspects. As I said, I look at geography and tier. I don't have reason to believe that's going to affect my results but if there was information that suggested otherwise, I could incorporate it").

[173]   Prince Report Back Up Materials, Figure 6 Hotel Data.xlsx.

[174]   The Prince Report does not identify specific hotels when defining the outside option. Instead, the outside option is meant to represent the market share for any remaining hotels not specifically identified in the Benefit of the Bargain model. Prince Report, Footnote 209 ("For this demonstration of the market simulation model, I estimate the outside option share according to studies of consumer consideration sets for booking hotels.

would include any hotel that may be a competitor to the focal hotel but is not explicitly included in the Prince Report's Benefit of the Bargain model. Utilizing outside options is a common tool in modeling that allows the simulated model to choose an alternative other than those explicitly identified in the Prince Report's model. The Prince Report defines this outside option by assuming that each relevant market can be represented by a consideration set of 34 hotels,[175] and that "[o]utside option calculations can be calibrated further with market data, and would not require individualized inquiry to do so."[176] In practice, this means that for each Starwood hotel, the Prince Report proposes to select a competitor set of seven to nine hotels for the focal hotel[177] and then assumes that an anonymous set of 24-26 hotels make up the outside option, meaning the outside option constitutes the majority of each of the relevant markets.

86. The Prince Report does not explain how it proposes to calibrate the outside option to the various relevant markets. Each hotel market will be unique not only to the hotel's geographic location, but also to the time of booking. Even if the Prince Report contemplates further research, it fails to disclose how individualized market data can be applied to the calibration without first undertaking a threshold individualized inquiry to collect the hotel- and time-specific market data.

---

One such study indicates a consideration set of 33.9 […] Thus I apply an outside option share that assumes 34 additional properties in the consideration set where properties not included in the list of nearest competitors (i.e., those utilized by the businesspeople for setting prices) have shares that are on average equal to average share of the firms expressly modeled. Outside option calculations can be calibrated further with market data, and would not require individualized inquiry to do so."); and Prince Deposition, p. 147:13–21 ("Q: And the reason you're going through the trouble of -- that you describe in footnote 209 is because you need this information about the outside option to calculate your market share, correct? A: It rounds out the model, so it allows for, you know, the standard modeling of what we call "inside choices" which are the hotels I specified and the outside option, something else.").

[175]   Prince Deposition, pp. 151:22–152:8 ("Q: But you used it for that purpose, you used it for very disparate markets; did you not? A: I used it as what I thought was a reasonable estimate for the size of the consideration set. Q: Even though Iowa City and Orlando, for example, are greatly different hotel markets right? A: They're different hotel markets, yes.").

[176]   Prince Report, Footnote 209.

[177]   As seen in the backup to Prince Report Figure 6, seven competing hotels were identified for each of the ██████ ████████ and ██████ markets, while nine competing hotels were identified in the ████████ market. Prince Report Back Up Materials, Figure 6 Hotel Data.xlsx.

87. The Prince Report fails to disclose whether it intends to select alternative outside option values for each market, and if it does, how it plans to do so. The Prince Report simply states, "[f]or this demonstration of the market simulation model, I estimate the outside option share according to studies of consumer consideration sets for booking hotels. One such study indicates a consideration set of 33.9."[178]

88. The Prince Report does not justify why an outside option of 34 hotels is an appropriate consideration set that defines the total number of hotels that are in the market for the hotel for each of these disparate markets and heterogeneous traveler types. The study that the Prince Report cites concludes that "the size of these [consideration] sets may be influenced by the size of the hotel market from which the selection is being made."[179] The study determines its 34-hotel consideration set based on an analysis of the Las Vegas area, which I would expect to look different from many local markets. Indeed, the article says, "The results [from the study] almost certainly are not generalisable to all hotels or all hotel markets, nor to market segments other than that represented in this study."[180] The article focuses only on leisure travelers, and therefore provides no basis for developing a consideration set for business travelers.[181]

89. The Prince Report's assumption that a 34-hotel consideration set is applicable to each relevant market is a flawed assumption and would produce unreliable results. Further, identifying a proper consideration set for each relevant market and customer segment would require individualized inquiry for each market.

---

[178]  Prince Report, Footnote 209.

[179]  Jones, Peter and Meng-Mei Chen, "Factors Determining Hotel Selection: Online Behaviour by Leisure Travellers," *Tourism and Hospitality Research*, Vol. 11, No. 1, January 1, 2011, pp. 83–95, at p. 90.

[180]  Jones, Peter and Meng-Mei Chen, "Factors Determining Hotel Selection: Online Behaviour by Leisure Travellers," *Tourism and Hospitality Research*, Vol. 11, No. 1, January 1, 2011, pp. 83–95, at pp. 90–91.

[181]  Jones, Peter and Meng-Mei Chen, "Factors Determining Hotel Selection: Online Behaviour by Leisure Travellers," *Tourism and Hospitality Research*, Vol. 11, No. 1, January 1, 2011, pp. 83–95, at p. 83 ("It reveals the decision-making process and factors affecting choice for a specific market segment, namely leisure travellers").

3. *Collection of Contemporaneous Competitive Prices*

90. The Prince Report's Benefit of the Bargain model relies on the market shares,[182] marginal costs, and contemporaneous competitor prices (across time, geography, and booking platform) to simulate the competitive response to the change in willingness to pay for Marriott hotels, post-data breach. This simulation results in the plaintiffs' claimed overcharge.

91. The Prince Report uses an online travel agency, Expedia, to identify the prices for the weeknight stay at each property.[183] The prices were collected from April 14 through April 19, 2021, rather than during the class period that the Prince Report identifies as 2014-2018.[184]

92. In his deposition, Professor Prince stated that contemporaneous Expedia prices are merely illustrative, and that he would obtain alternative data.[185] Professor Prince stated in his deposition that he has "not engaged in that, but I'm confident that that information could be gathered."[186] However, it is not clear to me that it is possible to collect such data. These contemporaneous prices would need to be collected for each of Marriott's competitors for the 1,200 to 1,500 Starwood hotels[187] at which class members made a reservation during the class

---

[182]  These market shares are determined by the competitor set described in IV.B.1.and the counts of hotels informed by the outside option described in IV.B.1.b.

[183]  Prince Report, ¶ 111.

[184]  Prince Deposition, pp. 174:20–175:3 ("Q: Professor, I looked at a number of your Expedia citations in your materials considered, and it appeared to me that the price checks were run in approximately April 14th or so of 2021. Does that sound right? A: That does sound right.").

[185]  Prince Deposition, pp. 178:17–179:18 ("Q: Okay. And if you were ever asked to do an actual damages calculation, would you, then, have to go get the observed, real-world price from the actual time of this stay that you're looking at? A: That's what I would expect to do. […] Q: And how would you go about determining by using the example I gave you before of a stay on January 1st, 2015, how would you go about determining what the Iowa House Hotel was charging on that date? A: I would -- I would consult relevant data sources. So I could go and look at historical pricing, use Internet archive. I could purchase data that would have pricing information over time. So, obviously, have not engaged in that, but I'm confident that that information could be gathered.").

[186]  Prince Deposition, pp. 179:17–18 ("Q: And how would you go about determining by using the example I gave you before of a stay on January 1st, 2015, how would you go about determining what the Iowa House Hotel was charging on that date? A: I would -- I would consult relevant data sources. So I could go and look at historical pricing, use Internet archive. I could purchase data that would have pricing information over time. So, obviously, have not engaged in that, but I'm confident that that information could be gathered.").

[187]  After the merger, Starwood properties can be identified by looking for the following brands in the tables listing the number of properties: W Hotels, The Luxury Collection, St. Regis, Sheraton, Westin, Le Méridien, Tribute Portfolio, Four Points, Aloft Hotels, and Element Hotels. Starwood Hotels & Resorts Worldwide, Inc., "Form 10-K," December 31, 2014, available at

period. A reservation for a given day may have different prices depending on when the reservation is made. Collecting contemporaneous prices during various booking windows, however, further complicates the process of correctly identifying historical prices. This is something which the Prince Report methodology has not yet grappled with.[188]

93. By failing to identify a precise data source for contemporaneous prices, the Prince Report fails to explain how the Benefit of the Bargain model could be applied classwide.

### 4. Deriving the Relevant Market Prices for Just One of the Bellwether Plaintiffs Would Require Extensive Analysis

94. As an example of the individualized analysis required by the supply-side of the Prince Report's Benefit of the Bargain model, consider three reservations made by Plaintiff Cullen. Plaintiff Cullen booked a ▮▮▮▮ stay at ▮▮▮▮▮▮▮▮▮▮▮▮ hotel on ▮▮▮▮▮ ▮▮▮▮ a ▮▮▮▮ stay at the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on ▮▮▮▮▮▮ and a ▮▮▮▮ stay at the ▮▮▮▮▮▮▮▮▮▮▮▮ hotel on ▮▮▮▮▮▮.[189] Plaintiff Cullen's visits to the two airport hotels appear to be work-related trips since Plaintiff Cullen received reimbursement from his employer for these two reservations.[190]

---

https://www.sec.gov/Archives/edgar/data/316206/000119312515062758/d838837d10k.htm, p. 2; Starwood Hotels & Resorts Worldwide, Inc., "Form 10-K," December 31, 2015, available at https://www.sec.gov/Archives/edgar/data/316206/000156459016013371/hot-10k_20151231 htm, p. 2; Marriott International, Inc., "Form 10-K," December 31, 2016, available at https://marriott.gcs-web.com/static-files/eb3efa90-4311-454f-a430-0e03f2344ee0, pp. 7–8; Marriott International, Inc., "Form 10-K," December 31, 2017, available at https://marriott.gcs-web.com/static-files/ea577917-fe7f-4696-9eb7-dcf0fd356737, pp. 7–8; and Marriott International, Inc., "Form 10-K," December 31, 2018, available at https://marriott.gcs-web.com/static-files/a9e39469-3202-4593-bbaa-cc3b71a67a9d, pp. 6–7.

[188] Prince Report, ¶ 111 ("The same dates of stay were examined for each hotel within a given geography and were sampled at the same point in time to avoid capturing price fluctuations resulting from different booking windows or different dates of stay.").

[189] These examples were identified by reviewing the reservations for Plaintiff Cullen using Exhibit 73 from his deposition. Cullen Deposition, Exhibit 73.

[190] To determine if a trip is work related, I used the column in Exhibit 73 from Plaintiff Cullen's deposition, which indicates whether reimbursement was received for the reservation. Plaintiff Cullen testified that he is reimbursed for work related travel so I assume the reservations where a reimbursement is indicated reflect work travel. Cullen Deposition, p. 104:6–9 ("Q: You have access to a web system where you can see your reimbursements for work travel. Correct? A: There's -- there's a -- yeah, there's -- I -- I can see transaction lists for work expenses.").

95. To apply the Benefit of the Bargain model to these reservations, the Prince Report must undertake multiple, separate inquires for each reservation. First, the Prince Report must identify: hotels competing ███████████ hotel in and around 2014; hotels competing with the ███████████████████ in and around 2016; and hotels competing with the ███████████████ in and around 2016. To determine the actual competitors, it would need to consider whether and how the market would be influenced by the purpose of the travel (that is, business or leisure). Second, the Prince Report must determine an estimate for the outside option for each hotel, which requires a selection of the consideration set for the ██████████ market, the ██████ resort market, and the ██████ airport market. Third, the Prince Report must locate contemporaneous prices for ████████ ████████████ hotels, along with contemporaneous prices for each of the three hotel's set of competitor hotels during the booking windows for each reservation (which the Prince Report has not demonstrated can be located).

96. Accurately analyzing the overpayment for just three reservations of one plaintiff through the Prince Report's Benefit of the Bargain model requires many individualized analyses. And the Prince Report suggests performing each of these analyses for every stay of every potential class member.

### 5.  The Prince Report's Benefit of the Bargain Model Is Sensitive to Its Inputs

97. In his deposition, Professor Prince emphasizes that the Benefit of the Bargain model is intended to demonstrate the method he would use with to-be-determined-later inputs.[191] However, these inputs are critical. Indeed, seemingly small changes in the inputs can have a large impact on the alleged overcharge the Prince Report's model estimates.

---

[191]  Prince Deposition, p. 165:8–19 ("Q. So you see no issue or no problem with analyzing the competition that would have existed between 2014 and '18 by considering a hotel that wasn't open until more than a year after the close of that period? A. Well, as we discussed before, you had talked about my model would require that I have to run it over and over again for different time periods. This speaks exactly to that point. I'm demonstrating it on current data, but it's very clear that one could go and run it for 2018, 2017, 2016. I simply demonstrated it on a 2021").

98. To illustrate this sensitivity, I reran the Prince Report's model with corrections for two small data errors that Professor Prince acknowledged in his deposition.

    a. Each of the hotels in ███████ have a fitness center.[192]

    b. The Hyatt Place hotel in ███████ may have wi-fi Internet.[193]

99. Making just these two modifications to the Prince Report model reduces the estimated overcharge in the ███████ example from $5.44 to $3.23, a decline of 41 percent.[194] The Benefit of the Bargain model requires historical data.[195] However, as this example demonstrates, the reliability of this historical data is essential as small errors in the data can have a large effect on the alleged overcharge. The Prince Report's failure to identify a reliable

---

[192] Prince Deposition, pp. 160:17–162:18 ("Q In your Exhibit 480, you indicate that the ███████ does not have a fitness center. Do you see that? A Yes, I see that. Q You list it as the only hotel among your competitor set in ███████ that you say does not have a fitness center? A Yes, I see that. […] Q And this is a printout of the website for the ███████ Do you see that on the top left? A Yes, I do. […] Q Do you see, under the heading fitness and recreation, where it says, "fitness center on site"? A Let's see; I think I need to scroll down. Yes, I see that. […] Q Well, why would they make a mistake like that? I mean, everyone has a fitness center in ███████ except for the ███████ but the ███████ has one. I mean, how did your team miss that? A I can't speak to exactly what happened. It might be that they just didn't catch the second page here. But I can speak with them about it and make a correction.").

[193] Prince Deposition, pp. 169:21–171:11 ("Q: Speaking of the ███████ downtown, you list it as the only hotel in your set that doesn't have free Wi-Fi in the room. A: Yes, that's how it's listed there. […] Q: Do you see, halfway down on the right, where it says among the amenities are free Internet access? A: I do see that. Q: So, again, your team made a mistake, I take it? A: I'd want to investigate this one further. As you saw in the spreadsheet, it says "free in-room Wi-Fi." I'd want to clarify what they're specifying here is equivalent. Q: I see. So this might be free Internet access but not in the room? A: Correct. Q: Okay. Would you find that to be a bit embarrassing, if that were the case? A: Not necessarily. I'd want to investigate this document further. I'm just explaining the possible, just, difference here."). The Hyatt website indicates there is free internet access but does not clarify if this is in the rooms or only in designated locations. For the purposes of this example I assumed the hotel offered free in-room Wi-Fi. *See* Hyatt, ███████ Downtown," available at https://www.hyatt.com/en-US/hotel/iowa/hyatt-place-iowa-city-downtown/iowzi.

[194] To arrive at this figure, I made two modifications to the R code that the Prince Report uses to run the market simulation. By comparing the table in Figure 6 Hotel Data.xlsx to the matrix of zeros and ones in the R code, I identified the 0/1 in the code corresponding to Wi-Fi for the Hyatt Place hotel and fitness center for the ███████ and changed the zero to a one in both instances. Prince Report Back Up Materials, Figure 6 Hotel Data.xlsx; and Prince Report, Figure 6.

[195] Prince Deposition, pp. 164:15–165:19 ("Q: Yet, you selected it to be one of your comparators in your market competition analysis for ███████ Why would you include a hotel that wasn't even open during the damage period you're supposedly looking at? A: Well, because I conducted this as a demonstration of the method and since I was using information from a current period, then current information is relevant. […] Q: So you see no issue or no problem with analyzing the competition that would have existed between 2014 and '18 by considering a hotel that wasn't open until more than a year after the close of that period? A: Well, as we discussed before, you had talked about my model would require that I have to run it over and over again for different time periods. This speaks exactly to that point. I'm demonstrating it on current data, but it's very clear that one could go and run it for 2018, 2017, 2016. I simply demonstrated it on a 2021.").

source for historical data confirms that the Benefit of the Bargain model cannot be applied classwide in a reliable manner.

### C. The Prince Report's Benefit of the Bargain Model Would Provide Windfall Gains to Certain Bellwether Plaintiffs Without Record-by-Record Analysis

100. The Prince Report's Benefit of the Bargain model proposes to apply "overcharges to data on Plaintiffs' booking to calculate class-wide damages."[196] However, according to Professor Prince, it may be inappropriate to assign all the damages associated with plaintiffs' reservations to the plaintiffs. In his deposition, Professor Prince testified that he believed the person or entity that actually paid for a hotel stay would receive any applicable damages.[197] But bellwether plaintiffs' data and documents reveal that the party on a reservation may not be the actual paying party. For example, data from stay spreadsheets provided by the bellwether Plaintiffs identify ███████████████████████████[198] Plaintiff Eric Fishon provided further data as part of this litigation that indicates that of his ████████ his employer reimbursed him ███████████████████[199] According to the Prince Report's methodology, therefore, Plaintiff Fishon's employer should be reimbursed for ███████████████ But the understanding that Plaintiff Fishon's employer paid ██████ ██████ came from an individualized discovery response from Plaintiff Fishon -- not formulaic data in the Four Tables. And without that individualized discovery response, the Prince Report's Benefit of the Bargain model would have calculated an overpayment applicable to Plaintiff Fishon for ████████████████████, which would provide Plaintiff Fishon

---

[196]  Prince Report, ¶ 120.

[197]  Prince Deposition, p. 198:8–20 ("Q: And was it your thinking, when you thought about it, that I'm still going to charge the overcharge percentage but I'm going to award it to the entity that actually reimbursed the hotel guest? Is that your thinking? A: That's the way I would think about it. Q: Okay. And would the same apply if I treat a family member, if I allow my daughter to go on a trip with one of her friends and I pay for it, I'd be the one to get the reimbursement, or I'd be the one to get the damages that you're calculating? A: That's the way I would think about it.").

[198]  Fishon Deposition, Exhibit 099.

[199]  Fishon Deposition, Exhibit 099.

with a windfall gain. Other bellwether plaintiffs indicated that they paid for a reservation for a family member or reimbursed friends for a reservation they held.[200]

101. The Prince Report identifies no process or methodology for identifying on a classwide basis, putative class members that were reimbursed, and therefore may have suffered no harm or significantly less harm than alleged. The Prince Report offers no process or methodology for identifying entities that provided the reimbursement to putative class members. In my opinion, properly allocating any alleged damages to the appropriate entity can only be done on an individualized, transaction-by-transaction basis.

Dated: September 7, 2021

Cambridge, MA

Catherine Tucker, Ph.D.

---

[200]  Cullen Deposition, pp. 273:10–274:7 ("Q: Did you stay at -- at the ███████████████ A: I booked the reservation. Q: ███████████ My question was, did you stay at the hotel -- at the ███████████ A: I did not sleep at that hotel. Q: Okay. Who did sleep at that hotel? A: ███████ Q: And who paid for that room? A ███████████████ Q: Okay. And why is this reflected on a spreadsheet of your stays with your information? A: Because the room was booked in my name. I made the reservation."); and Deposition of Maria Maisto, Volume 2, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 7, 2021, pp. 451:2–453:2 ("Q: Okay. And this is a stay that you had at ███████████ correct? A: Correct. [...] Q: You have an arrival date ███████████ and a departure date ███████████ correct? A: Well, that was all on your end. I did not give those dates because I didn't even remember this stay. So those dates are from you. Q: Okay. That's what the chart reflects, though, correct? A: That is what the chart reflects, yes. [...] Q: ███████ do you understand that? A: Yes. Q: ███████████ Correct? A: Correct. We went over all this in the last deposition. Q: Okay. Well, forgive me if that's the case, but -- and I'm not going to belabor it, but can you remind me who the friend and the friend's employer was? A: An ex-boyfriend of mine had an architecture firm conference, meeting, whatever, for the weekend. He invited me to go along. And then at one point he -- he said -- he was in meetings the whole day, and that was the whole two days, and at one point he was like, oh, you should go to the front desk if you have a Starwood or Westin or whatever number, Marriott number, and see if they'll give you the points for this because my office paid for it. So at one point I went to the front desk and told them what was going on, and they said, yes, we'd be happy to take your number. So the room was paid for by I believe his architecture firm.").

# Appendix A

# CATHERINE TUCKER

MIT Sloan School of Management

100 Main St, E62-536

Cambridge MA 02142

Tel: (617) 252-1499

cetucker@mit.edu

http://mitmgmtfaculty.mit.edu/cetucker/

---

## EDUCATION

Stanford University, Ph.D. in Economics (Advisor: Tim Bresnahan), 2005

Oxford University, BA in Politics, Philosophy and Economics, 1999

---

## APPOINTMENTS

MIT Sloan, Sloan Distinguished Professor of Management Science, September 2015 –

MIT Sloan, Chair MIT Sloan PhD Program, July 2015 –

MIT Sloan, Professor of Management Science, July 2015 –

MIT, Co-Founder of the MIT CryptoEconomics Lab, 2018 -

National Bureau of Economic Research (NBER), Research Associate, September 2012 –

MIT Sloan, Mark Hyman Jr. Career Development Professor (with tenure), July 2012 – September 2015

MIT Sloan, Associate Professor of Management Science, July 2011 – July 2015

National Bureau of Economic Research (NBER), Faculty Research Fellow, May 2011 – September 2012

MIT Sloan, Douglas Drane Career Development Chair in IT and Management, July 2006 –

MIT Sloan, Assistant Professor of Marketing, July 2005 – June 2011

---

## Honors and Awards

| | |
|---|---|
| 2020 | CITI Fellowship (Columbia University Institute of TeleInformation) |
| 2020 | O'Dell Award |
| 2020 | TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019 |
| 2018 | ISMS Long Term Impact Award |
| 2018 | O'Dell Award |
| 2018 | MSI Scholar |
| 2017 | Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers' |
| 2017 | Nominated for Teacher of the Year award (Also in 2012, 2010 and 2009) |
| 2015 | Erin Anderson Award |
| 2014 | Paul E. Green Award |
| 2013 | Teacher of the Year Award, MIT Sloan |
| 2013 | Jamieson Prize for Excellence in Teaching |
| 2012 | Garfield Economic Impact Award for Best Paper in Health Economics |
| 2011 | WHITE Award for best paper in the Economics of Healthcare IT |
| 2011 | Public Utility Research Prize for the best paper in regulatory economics |
| 2011 | NSF CAREER Award |
| 2011 | MSI Young Scholar |
| 2010 | Management Science Distinguished Service Award |
| 2004 | Koret Foundation Scholar, Stanford Institute for Economic Policy Research Fellowship |
| 2004 | Fourth Annual Claire and Ralph Landau Student Working Paper prize |

---

## Published/Accepted Papers

1. 'Identifying Formal and Informal Influence in Technology Adoption with Network Externalities', *Management Science*, Vol. 55 No. 12, December 2008, pp. 2024-2039

2. 'Privacy Protection and Technology Diffusion: The Case of Electronic Medical Records' with Amalia Miller, *Management Science (Lead Article)*, Vol. 55 No. 7, July 2009, pp.

A-2

1077-1093

- Republished as part of INFORMS 'Healthcare in the Age of Analytics' series

3. 'How Sales Taxes Affect Customer and Firm Behavior: The Role of Search on the Internet' with Eric Anderson, Nathan Fong and Duncan Simester, *Journal of Marketing Research*, Vol. 47 No. 2, April 2010, pp. 229-239

4. 'Growing Two-sided Networks by Advertising the User Base: A Field Experiment', with Juanjuan Zhang, *Marketing Science*, Vol. 29 No. 5, September-October 2010, pp. 805-814

5. 'Privacy Regulation and Online Advertising' with Avi Goldfarb, *Management Science*, Vol. 57 No. 1, January 2011, pp. 57-71

- Nominated for Long Term Impact Award 2020

6. 'Search Engine Advertising: Channel Substitution when Pricing Ads to Context', with Avi Goldfarb, *Management Science*, Vol. 57 No 3, March 2011, pp. 458-470

7. 'Stuck in the Adoption Funnel: The Effect of Interruptions in the Adoption Process on Usage' with Anja Lambrecht and Katja Seim, *Marketing Science*, Vol. 30 No. 2, March-April 2011, pp. 355-36

8. 'Advertising Bans and the Substitutability of Online and Offline Advertising', with Avi Goldfarb, *Journal of Marketing Research (Lead Article)*, Vol. 48 No. 2, April 2011, pp. 207-227

9. 'Can Healthcare Information Technology Save Babies?' with Amalia Miller, *Journal of Political Economy*, Vol. 119 No. 2, April 2011, pp. 289-324

10. 'How Does Popularity Information Affect Choices? A Field Experiment' with Juanjuan Zhang, *Management Science*, Vol. 57 No. 5, May 2011, pp. 828-842

11. 'Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science (Lead Article and Discussion Paper)*, Vol. 30 No. 3, May-June 2011, pp. 389-404

- 'Rejoinder - Implications of "Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science*, Vol. 30 No. 3, May-June 2011, pp. 413-415
- Nominated for John D. C. Little Award
- Nominated for Long Term Impact Award 2017

A-3

- Long Term Impact Award 2018

12. 'Encryption and Data Security' with Amalia Miller, *Journal of Policy Analysis and Management*, Vol. 30 No. 3, Summer 2011, pp. 534-556

13. 'Paying With Money or With Effort: Pricing When Customers Anticipate Hassle' with Anja Lambrecht, *Journal of Marketing Research*, Vol. 49 No. 1, February 2012, pp. 66-82.

14. 'Heterogeneity and the Dynamics of Technology Adoption' with Stephen Ryan, *Quantitative Marketing and Economics*, Vol 10 No. 1, March 2012, pp 63-109

15. 'Shifts in Privacy Concerns', *American Economic Review: Papers and Proceedings* with Avi Goldfarb, Vol. 102 No. 3, May 2012, pp. 349-53

16. 'How does the Use of Trademarks by Intermediaries Affect Online Search?' with Lesley Chiou. *Marketing Science*, Vol 31 No. 5, September 2012, pp 819-837

17. 'Active Social Media Management: The Case of Health Care' with Amalia Miller. *Information Systems Research*, Vol. 24 No. 1, March 2013, pp. 52-70

   - Republished as part of Informs 'Healthcare in the Age of Analytics' series

18. 'Paywalls and the Demand for News' with Lesley Chiou. *Information Economics and Policy*, Vol. 25 No. 2, June 2013, pp. 61-69

19. 'Days on Market and Home Sales' with Juanjuan Zhang and Ting Zhu. *RAND Journal of Economics*, Vol. 44 No. 2, Summer 2013, pp. 337-360,

20. 'When Does Retargeting Work? Timing Information Specificity' with Anja Lambrecht. *Journal of Marketing Research (Lead Article)* Vol. 50 No. 5, October 2013, pp. 561-576

   - Paul E. Green Award for the 'Best article in the Journal of Marketing Research that demonstrates the greatest potential to contribute significantly to the practice of marketing research.'
   - William O'Dell Award. This award award honors the JMR article published in 2013 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

21. 'Health Information Exchange, System Size and Information Silos' with Amalia Miller. *Journal of Health Economics*, Vol. 33 No. 2, January 2014: pp. 28-42

22. 'Electronic Discovery and the Adoption of Information Technology' with Amalia Miller. *Journal of Law, Economics, & Organization (Lead Article)*, Vol. 30. No. 2, May 2014, pp. 217-243

23. 'Social Networks, Personalized Advertising, and Privacy Controls.', *Journal of Marketing Research*, Vol. 51 No. 5, October 2014, pp. 546-562.

    - Citation of Excellence Award Emerald Publishing
    - Nominated for William O'Dell Award (2019)

24. 'Trademarks, Triggers, and Online Search' with Stefan Bechtold. *Journal of Empirical Legal Studies*, Vol. 11 No. 4, December 2014

25. 'The Reach and Persuasiveness of Viral Video Ads' *Marketing Science*, Vol. 34 No. 2, 2015, pp. 281-296

26. 'Privacy Regulation and Market Structure' with James Campbell and Avi Goldfarb. *Journal of Economics & Management Strategy*, Vol 24, No. 1, Spring 2015, pp. 47-73

27. 'Standardization and the Effectiveness of Online Advertising' with Avi Goldfarb. *Management Science*, Vol. 61 No. 11, 2015, pp. 2707-2719

28. 'Harbingers of Failure' with Eric Anderson, Song Lin and Duncan Simester. *Journal of Marketing Research (Lead Article)*, Vol. 52 No. 5, Oct 2015, pp. 580-592

    - William O'Dell Award. This award award honors the JMR article published in 2015 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

29. 'The Effect of Patent Litigation and Patent Assertion Entities on Entrepreneurial Activity' with Stephen Kiebzaka. and Greg Rafert. *Research Policy*, Vol. 45 No. 1, February 2016, pp. 218-231

30. 'When early adopters don't adopt' with Christian Catalini. *Science*, Vol. 357, Issue 6347, 2017 pp. 135-136

31. 'Network Stability, Network Externalities, and Technology Adoption' in *Advances in Strategic Management*, Vol. 37, 2017, pp.151 - 175

32. 'Digital Content Aggregation Platforms: The Case of the News Media.' with Lesley Chiou - *Journal of Economics & Management Strategy*, Vol. 26 No. 4, 2017, pp. 782-805

33. 'Should You Target Early Trend Propagators? Evidence from Twitter' with Anja Lambrecht and Caroline Wiertz (Lead Article). *Marketing Science*, Vol. 37 No. 2, 2018, pp. 177-199

34. 'Privacy Protection, Personalized Medicine and Genetic Testing' with Amalia Miller. *Management Science*, Vol. 64 No. 10, 2018, pp. 4648-4668.

35. 'Digital Economics' with Avi Goldfarb, *Journal of Economic Literature*, Vol. 57 No. 1, 2019, pp. 3-43

36. Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers? with Jeanine Miklós-Thal *Management Science*, Vol. 65 No. 4, 2019, pp. 1552-1561

37. 'Algorithmic Bias? An Empirical Study into Apparent Gender-Based Discrimination in the Display of STEM Career Ads ' with Anja Lambrecht. *Management Science* 2019, Vol 65, No 7, pp. 2966-2981

    - TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019

38. 'How Effective Is Black-Box Digital Consumer Profiling And Audience Delivery?: Evidence from Field Studies' with Nico Neumann and Tim Whitfield. *Marketing Science*, Dec, 2019, Vol 38, No 6, pp. 918-926 (Lead Article)

39. The Surprising Breadth of 'Harbingers of Failure' with Duncan Simester and Clair Yang. *Journal of Marketing Research* 2019, Vol 56, No. 6, pp 1034-1049

40. 'Consumer privacy and the future of data-based innovation and marketing.' with Alexander Bleier and Avi Goldfarb. Forthcoming at *International Journal of Research in Marketing*

41. 'Information Shocks and Internet Silos: Evidence from Creationist Friendly Curriculum' with Ananya Sen. Forthcoming at *Journal of Marketing Research*

42. 'Informational Challenges in Omnichannel Marketing: Remedies and Future Research' with Tony Cui, Anindya Ghose, Hanna Halaburda, Raghuram Iyengar, Koen Powels, S. Siriam, and Sriraman Vankatarman. Forthcoming at *Journal of Marketing*

43. 'How Do Restrictions on Advertising Affect Consumer Search?' with Lesley Chiou. Forthcoming *Management Science*

CHAPTERS IN EDITED VOLUMES AND SUMMARY PIECES

44. 'Modeling Social Interactions: Identification, Empirical Methods and Policy Implications' with Wes Hartmann, Puneet Manchanda, Harikesh Nair, Matt Bothner, Peter Dodds, David Godes and Karthik Hosanagar, *Marketing Letters*, Vol. 19 No. 3, December 2008, pp. 287-304

45. 'Search Engine Advertising - Examining a profitable side of the long tail of advertising that is not possible under the traditional broadcast advertising model' with Avi Goldfarb, *Communications of the ACM*, Vol. 51 No. 11, November 2008, pp. 22-24

46. 'Online Advertising', with Avi Goldfarb, *Advances in Computers*, Vol. 81, March 2011, Marvin Zelkowitz (Ed), Elsevier

47. 'Substitution between Online and Offline Advertising Markets', with Avi Goldfarb, *Journal of Competition Law and Economics*, Vol. 7 No. 1, March 2011, pp. 37-44

48. 'Online Advertising, Behavioral Targeting, and Privacy', with Avi Goldfarb, *Communications of the ACM*, Vol. 54 No. 5, May 2011, 25-27

49. 'Privacy and Innovation', *Innovation Policy and the Economy*, Vol. 11, 2012, Josh Lerner and Scott Stern (Eds), NBER

50. 'The Economics of Advertising and Privacy', *International Journal of Industrial Organization*, Vol. 30 No. 3, May 2012, pp. 326-329

51. 'Empirical Research on the Economic Effects of Privacy Regulation'. *Journal on Telecommunications and High Technology Law*, Vol. 10 No. 2, Summer 2012, pp. 265-272

52. 'Social Networks, Advertising and Antitrust', with Alex Marthews, *George Mason Law Review*, 2012, Vol 19 No 5., pp. 1211-1227.

53. 'Why Managing Customer Privacy Can Be an Opportunity' with Avi Goldfarb, *Spring 2013, Sloan Management Review*

54. 'The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets', *George Mason Law Review*, Vol. 2 No. 2, pp. 1025-1054 (2013).

55. 'Patent Trolls and Technology Diffusion' Chapter in NBER book 'Standards, Patents and Innovations' (2014), Timothy Simcoe, Ajay K. Agrawal, and Stuart Graham

56. 'Privacy and the Internet' Chapter 11, *Handbook of Media Economics*, 2016, Edited by Simon Anderson and Joel Waldfogel

57. Frontiers of Health Policy: Digital Data and Personalized Medicine, *Innovation Policy and the Economy*, Vol. 15, 2016, Josh Lerner and Scott Stern (Eds), NBER

58. 'Impacts of Surveillance on Behavior' with Alex Marthews, in Gray, David C. and Henderson, Stephen (Editors), *The Cambridge Handbook of Surveillance Law* (2017).

59. 'On Storks and Babies: Correlation. Causality and Field Experiments, ' with Anja Lambrecht,  *GfK Marketing Intelligence Review*, Vol 8. No 2. 2016

60. 'Field Experiments in Marketing,' with Anja Lambrecht, *Handbook of Marketing Analytics*, Edited by Natalie Mizik and Dominique Hanssens, Edward Elgar Publishing, (2018)

61. 'Can Big Data Protect a Firm from Competition?', *CPI Chronicle*, January, 2017 with Anja Lambrecht

62. Network Effects and Market Power: What Have We Learned in the Last Decade? *Antitrust* Vol. 32 No 2., Spring 2018

63. 'Inequality, Privacy and Digital Market Design', with Avi Goldfarb, Chapter in *Fair by Design* edited by Scott Kominers and Alex Teytelboym, 2017, Oxford University Press

64. 'Digital Data, Platforms and the Usual [Antitrust] Suspects: Network Effects, Switching Costs, Essential Facility' *Review of Industrial Organization* Volume 54, pp 683–694 (2019)

65. 'Antitrust and Costless Verification: An optimistic and a pessimistic view of the implications of blockchain technology' with Christian Catalini, *Antitrust Law Journal* - Volume 82 Issue 3, 2019

66. Online Advertising and Antitrust: Network Effects, Switching Costs and Data as an Essential Facility. April 2019, *'Competition Policy International'*

67. Blockchain and Identity Persistence, with Alex Marthews, Chapter in *Cryptoassets: Legal, Regulatory, and Monetary Perspective*, edited by Chris Brummer, Oxford University Press, 2019.

68. 'Digital Marketing,' with Avi Goldfarb, in the *Handbook of the Economics of Marketing*, Volume 1, edited by JP-Dube and Peter Rossi, pp. 259-290, Elsevier

69. 'Privacy Policy and Competition', with Alex Marthews. *Brookings Papers*

70. Digital Infrastructure: Does the 'Coring'of Digital Platforms make them part of Digital Infrastructure?." (2020) in 'Economic Analysis and Infrastructure Investment' edited by Edward L. Glaeser and James M. Poterba, University of Chicago Press

71. Competition in the Digital Advertising Market, The Global Antitrust Report on the Digital Economy

## Books Edited

72. The Evolution of Antitrust in the Digital Era: Essays on Competition Policy, with David Evans and Alan Fels Ao. November 9, 2020

73. Blockchain: The Insights You Need from Harvard Business Review (HBR Insights Series), 2019

74. Economic Analysis of the Digital Economy, University of Chicago Press, 2015, with Avi Goldfarb and Shane Greenstein

75. The Economics of Digitization, Edward Elgar Publishing, 2013., with Avi Goldfarb and Shane Greenstein

## Policy Writing

76. OECD Roundtable on Privacy, Report on the 'Economic Value of Online Information', December 2010

77. Written Congressional Testimony on 'Internet Privacy: The Impact and Burden of European Regulation,' U.S. House Energy and Commerce Committee, September 2011

78. Written Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers,' U.S. House Energy and Commerce Committee, November 2017

## Papers under Review

79. 'Social Advertising: How Advertising that Explicitly Promotes Social Influence Can Backfire'. Revise and resubmit at *Management Science*

80. 'Patent Trolls and Technology Diffusion: The Case of Medical Imaging' Revise and resubmit at *RAND Journal of Economics*

81. 'Third-Party Certification: The Case of Medical Devices' with Cristina Nistor Revise and resubmit at *Management Science*

82. 'Guns, Privacy and Crime' with Alessandro Acquisti Revise and resubmit at *Information Systems Research*

83. 'Does IT Lead to More Equal or More Unequal Treatment? An Empirical Study of the Effect of Smartphone Use on Social Inequality in Employee-Customer interactions' with Shuyi Yu. Revise and resubmit at *Journal of Marketing Research*

84. 'The Digital Privacy Paradox: Small Money, Small Costs, Small Talk' with Susan Athey and Christian Catalini, Revise and resubmit at *Journal of Marketing Research*

85. 'Tensile Promotions in Displays Advertising' with Anja Lambrecht Revise and resubmit at *Quantitative Marketing and Economics*

86. 'A New Method of Measuring Online Media Advertising Effectiveness: Prospective Meta-Analysis in Marketing' with Gui Liberali, Glen L. Urban, Benedict G. Dellaert, Yakov C. Bart, and S. Stremersch.

87. 'Apparent Algorithmic Discrimination and Real-Time Algorithmic Learning with Anja Lambrecht

88. 'Personalizing mental fit for online shopping applications - How the success of recommendations depends on mental categorization and mental budgeting' with Oliver Emrich and Thomas Rudolph.

89. 'Government Surveillance and Internet Search Behavior' with Alex Marthews

90. 'TV Advertising and Online Sales: The Role of Inter-Temporal Substitution' with Anja Lambrecht and Xu Zhang

91. 'Social Distancing and School Closures: Documenting Disparity in Internet Access among School Children' with Ananya Sen

92. 'Asymmetric Consequences of Cyber-Vulnerability on Health Services' with Yiting Deng and Anja Lambrecht

93. 'Tradeoffs in Automated Political Advertising Regulation: Evidence from the COVID-19 Pandemic' with Grazia Cecere, Clara Jean, and Vincent Lefrere

94. 'Social Distancing, Internet Access and Inequality' with Leslie Chiou

95. 'Conducting Research with Quasi-Experiments: A Guide for Marketers' with Avi Goldfarb and Yanwen Wang,

96. Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling with Nico Neumann

---

WORK IN PROGRESS

*Manuscripts*

97. Health IT and Ambulatory Care Quality with Carole R. Gresenz, Scott Laughery, and Amalia R. Miller

98. 'Testimonial Advertising on Social Networks to Existing Customers and New Customers' with Shuyi Yu *Data Analysis*

99. 'Data Privacy and Children: An Empirical Study of Mobile Applications' with Grazia Cecere, Fabrice Le Guel, Vincent Lefrere, and Pai-Ling Yin

100. 'Big Bad Data: The Case of For-Profit College Advertising' with Avinash Gannamaneni and Avi Goldfarb

101. 'Selection and Inequality in Big Data' with Amalia Miller

102. 'Spillovers from Product Failure' with Amalia Miller

103. 'Rules For a Nascent Domain: Technological Innovation and Regulatory Uncertainty' with Christian Catalini

104. 'The Shifters and Virality of Hate Speech Online' with Uttara Ananthakrishnan

105. 'Privacy, Surveillance and Antitrust' with Alex Marthews

*Data Collection*

106. 'Mergers and Big Data: Evidence from Healthcare' with Amalia Miller

107. 'Privacy Regulation and Education IT' with Amalia Miller and Avi Goldfarb

108. 'The Lack of Appeal of Cross-Partisan Appeals: Evidence from an Experiment on Facebook' with Christina Tucker

A-11

109. 'The Resillience of Franchise Business Models: Evidence from the Pandemic' with Avi Goldfarb, Verina Que and Shuyi Yu

---

INVITED SEMINARS

*Universities*
1. item April 2021, Marketing Science Institute
2. April 2021, George Mason University, Law and Economics Seminar
3. March 2021, Marketing Group, University of Michigan
4. March 2021, BIDT, Bavarian Academy of Sciences and Humanities
5. February 2021, University of Virginia, Law and Economics Seminar
6. January 2021, Marketing Group, Carnegie Mellon University
7. December 2020, Boston University, Boston Digital Leadership Forum
8. December 2020, Toulouse University, France
9. November 2020, Luohan Academy, Platform Economy and Market Dynamics, Virtual Seminar
10. November 2020, John Hopkins University
11. October 2020, Wharton, Marketing Group
12. October 2020, ITAM, Mexico City
13. September 2020, Econ, Stats and ML Team, Etsy
14. June 2020, CMU Seminar
15. April 2020, Virtual Digital Economy Seminar
16. March 2020, IS group, University of Minnesota
17. February 2020, Georgia Institute of Technology, GA
18. December 2019, HBS Field Experiments Seminar, Cambridge, MA
19. November 2019, Bank of Canada, Ottawa
20. May 2019, Joint-Economics Seminar, Autonomous University of Barcelona) and the IAE (Institute for Economic Analysis)
21. March 2019, LMU Center for Advanced Management Studies in Munich
22. February 2019, Berlin Applied Micro Seminar
23. January 2019, Marketing Group, University of Bologna
24. January 2019, Marketing Group, University College, London
25. January 2019, Marketing Group, London Business School
26. November 2018, Marketing Group, HEC Paris, France
27. November 2018, Management Group, Cass Business School, City University of London, UK
28. November 2018, Marketing Group, SOAS University of London
29. November 2018, All Souls College, Oxford
30. November 2018, Economics Group, Paris Telecom
31. October 2018, Marketing Group, University of Amsterdam, Netherlands
32. October 2018, Marketing Group, King's Business School, King's College, London
33. September 2018, Marketing Group, University of Frankfurt, Germany
34. June 2018, Harbin Institute of Technology, China

35. February 2018, IS/OM Group, New York University, NY
36. November 2017, Marketing Group, Rochester University, NY
37. October 2017, Marketing Group, Maryland University, MD
38. May 2017, Marketing Group, Old Dominion University
39. April 2017, Marketing Group, University of Southern California
40. March 2017, Marketing Group, Arison School of Business, IDC, Israel
41. January 2017, Distinguished Speakers Series, McGill University, Canada
42. September 2016, Technology Group, Harvard Business School, MA
43. August 2016, Southern Jiatong University, Sichuan, China
44. May 2016, Chapman University, Marketing Group
45. April 2016, Carnegie Mellon University, Public Policy Group
46. April 2016, Harvard Business School, Entrepreneurial Management Group
47. March 2016, INSEAD, Marketing Group
48. March 2016, University of Paris-Sud, Privacy Research Group
49. March 2016, Vienna University of Economics and Business, Marketing Group
50. September 2015 University of Maryland, IS Group
51. June 2015, Marketing Group, University of Cambridge, UK
52. May 2015, Marketing Group, University of Texas at Dallas, TX
53. March 2015, Health Policy Group, Georgia State University, GA
54. March 2015, Marketing Group, University of Colorado, CO
55. February 2015, Strategy Group, University of North Carolina, NC
56. January 2015, Marketing Group, Emory University, GA
57. December 2014, OPIM, Wharton School of Management, PA
58. October 2014, Economics Department, Yale University, CT
59. September 2014, Marketing Group, Boston University, MA
60. March 2014, Technology Group, University of California at Berkeley, CA
61. January 2014, Marketing Department at Texas A&M
62. November 2013, Marketing Group, University of California at Berkeley, CA
63. October 2013, Marketing Group, Tulane University, LA
64. October 2013, Marketing Group, University of Houston, TX
65. May 2013, Tuck School of Management, Dartmouth University, NH
66. March 2013, Economics Department, University of Toulouse
67. March 2013, Marketing Group, Rotterdam University
68. March 2013, Economics Department, University of Zurich
69. March 2013, Marketing group, Georgia Tech
70. January 2013, Anderson School, UCLA
71. January 2013, Marketing Group, CMU
72. October 2012, Marketing Group, Stanford University
73. October 2012, Marketing Group, Columbia University
74. October 2012, Marketing Group, University of Texas at Austin
75. September 2012, Marketing Group, Harvard Business School
76. June 2012, Strategy Group, London Business School
77. March 2012, Marketing Group, Cornell
78. February 2012, IS Group, Indian School of Business
79. February 2012, Marketing Group, Wharton

80. January 2012, Marketing Group, UCLA
81. November 2011, Marketing Group, University of Rochester
82. October 2011, Marketing Group, University of Zurich
83. October 2011, Department of Law and Economics, Swiss Federal Institute of Technology, Zurich
84. May 2011, Marketing Group, National University of Singapore
85. May 2011, IS Group, National University of Singapore
86. May 2011, Strategy Group, LMU Munich
87. May 2011, Marketing Group, New York University
88. March 2011, Marketing Group, Florida University
89. February 2011, IS Group, New York University
90. November 2010, European School of Management and Technology
91. October 2010, Marketing Group, Yale University
92. October 2010, Networked Business Group, Harvard Business School
93. September 2010, TIES Group, MIT Sloan
94. July 2010, Department of Economics, University of Mannheim
95. March 2010, Marketing Group, Wharton School, University of Pennsylvania
96. January 2010, Marketing Group, University of Michigan
97. November 2009, Marketing Group, University of California at Berkeley
98. October 2009, Digital Business Seminar, MIT Sloan
99. December 2008, Marketing Group, MIT Sloan
100. November 2008, Marketing Group, Rady School of Business, UCSD
101. September 2008, Strategy Group, MIT Sloan
102. May 2008, Digital Strategy Group, Tuck School of Business, Dartmouth University
103. April 2008, Kellogg Management and Strategy Group, Northwestern University
104. March 2008, Marketing Group, Duke University
105. March 2008, Strategy Group, Chicago GSB
106. July 2007, Marketing Group, London Business School, London, UK
107. April 2007, Marketing Group, Chicago GSB
108. March 2007, Marketing Group, Rotman School, University of Toronto
109. November 2005, Economics Department, Harvard University
110. October 2004-February 2005 (Job Market): NYU Stern, University of Michigan, University of Arizona, University of British Columbia, Federal Reserve Board, Federal Reserve Bank of New York, Harvard Business School, Kellogg, MIT Sloan, Federal Reserve Bank of Chicago, Stanford Economics Department

*Other*

111. April 2021, American Enterprise Institute
112. June 2020, EE Times- Privacy and Security during Covid-19
113. May 2020, The Digital Economy & The Coronavirus, Bertelsmann Foundation Seminar
114. April 2020, Technology Policy Institute
115. October 2018, Digital Competition Expert Panel, HM Treasury, UK
116. October 2018, Competition and Markets Authority, UK
117. January 2018, IMF
118. December 2017, Technology Policy Institute

119. October 2016, Federal Communications Commission
120. April 2015, Federal Communications Commission
121. November 2014, Office of Research at the Consumer Financial Protection Bureau
122. April 2014, Big Data Working Group, The White House.
123. February 2014, Main Street Patent Coalition, Panel hosted at the Senate by Senator Orrin Hatch
124. July 2013, Federal Communications Commission
125. August 2012, DG Competition, European Commission, Brussels
126. August 2012, Technology Policy Institute Conference, Aspen
127. December 2011, Havas Digital, New York
128. June 2011, Eneca
129. September 2010, Federal Trade Commission
130. September 2010, Google European Public Policy Unit, Paris
131. July 2009, Information Technology and Innovation Foundation, Washington DC

---

## PRESENTATIONS OF RESEARCH AT CONFERENCES

1. March 2021, Digital Economics Seminar, Digital Tutorial
2. December 2020, Digital Economics Research Network Conference
3. December 2020, Conference on Artificial Intelligence, Machine Learning, and Business Analytics
4. December 2020, Health Systems Innovation Advisory Board Meeting
5. November 2020, 2nd Luohan Academy Frontier Dialogue - Platform Economy and Market Dynamics
6. October 2020, Policy Toolkit for a Better Europe, European Commission
7. September 2020, ICN Annual conference
8. June 2020, Marketing Science
9. June 2020, International Competition Network, ' Competition law enforcement at the intersection of Competition, Consumer Protection, and Privacy'
10. November 2019, ABA Fall Forum: The Tech Summit, Washington DC.
11. November 2019, Annual Challenges to Antitrust in a Changing Economy, Harvard Law School
12. October 2019, World Bank Platforms Summit, Washington DC.
13. September 2019, Economics of AI Doctoral Consortium, Toronto
14. July 2019, Quantitative Marketing and Structural Econometrics Workshop, Northwestern University
15. June 2019, Marketing Science, Rome
16. June 2019, Keynote Speaker, ZEW Conference on the Economics of Information and Communication Technologies, Mannheim
17. June 2019 Keynote Speaker, Munich Summer Institute, Munich
18. May 2019, Keynote Speaker, 3rd Doctoral Workshop on the Economics of Digitization, Brussels
19. November 2019, FTC Hearings on Big Data, Privacy, and Competition

A-15

20. October 2019, FTC Hearings on Platform Economics, George Mason University
21. June 2018, Antitrust and Big Data, Penn Wharton China Center Conference, Beijing
22. June 2018, Marketing Science
23. May 2018, Boston College Digital Innovation Workshop
24. December 2017, Mobile Marketing and Big Data Conference, NYU
25. September 2017, NBER Economics of AI Conference
26. July 2017, BU Platforms Conference
27. July 2017, NBER Digitization Meetings
28. June 2017, Marketing Science
29. June 2017, Regulation of Algorithms, Berlin
30. May 2017, Boston College Digital Innovation Workshop
31. November 2016, ICANN Public Meetings
32. October 2016, Conference on Digital Experimentation, Cambridge, MA
33. September 2016, FTC Consumer Protection Conference, Washington, DC
34. September 2016, George Washington roundtable on Platforms, Washington DC
35. May 2016, Competing with Big Data, Brugel, Brussels, Belgium
36. April 2016, NBER Innovation and Policy, Washington DC
37. April 2016, Financial Services Roundtable, NYC
38. March 2016, Digitization Tutorial, NBER
39. January 2016, PrivacyCon, FTC Conference, Washington, DC
40. July 2015, NBER Law and Economics (co-author presented), Cambridge, MA
41. July 2015, NBER Economics of Digitization, Cambridge, MA
42. June 2015, 'The Future of Research in the Digital Society', French Ministry of Culture and Communication - Toulouse School of Economics, Paris, France
43. June 2015, Marketing Science, Baltimore, MD
44. June 2015, Doctoral Consortium, Baltimore, MD
45. March 2015, IP Leadership Conference, Washington, DC
46. February 2015, Patents in Theory and Practice, Washington, DC
47. June 2014, Marketing Science, Atlanta, GA
48. May 2014, Boston College Social Media Workshop, Boston, MA
49. January 2014, American Economic Association Meetings
50. July 2013, Marketing Science, Istanbul, Turkey
51. June 2013, Searle Center Conference on Internet Search and Innovation, Chicago, IL
52. April 2013, Brown University Mini-Networks Conference
53. February 2013, WSDM 2013 Conference (Keynote Speaker), Rome, Italy
54. January 2013, American Economic Association Meetings, San Diego, CA (Co-author presented)
55. December 2012, New York Computer Science and Economics Day
56. November 2012, Search and Competition Conference, Melbourne Australia
57. October 2012, Economics of Personal Data, (Keynote Speaker), Amsterdam
58. August 2012, Amsterdam Symposium on Behavioral and Experimental Economics
59. July 2012, Fudan University Marketing Research Symposium, China
60. June 2012, Searle Center Conference on Internet Search and Innovation, Chicago, IL
61. June 2012, Innovation, Intellectual Property and Competition Policy Conference, Tilburg, Netherlands

62. June 2012, Marketing Science, Boston, MA
63. June 2012, Social Media and Business Transformation, Baltimore, MD
64. May 2012, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
65. February 2012, NBER Economics of Digitization (co-author presented), Cambridge, MA
66. January 2012, Symposium on Antitrust and High-Tech Industries, George Mason University, VA
67. January 2012, Patents, Standards and Innovation, Tucson, AZ
68. January 2012, Econometric Society Meetings, Chicago, IL
69. January 2012, AEA Meetings (2 papers), Chicago, IL
70. December 2011, Economics of Privacy Workshop, Boulder, CO
71. November 2011, Economics and Computation Day, Cambridge, MA
72. November 2011, HBS Strategy Research Conference, Boston, MA
73. November 2011, The Law and Economics of Internet Search and Online Advertising Roundtable, George Mason University, Arlington, VA
74. November 2011, Patents Statistics for Decision Makers, Alexandria, VA
75. October 2011, Workshop on Health IT and Economics, Washington, DC
76. October 2011, Innovation, Organizations and Society, University of Chicago, IL
77. October 2011, Direct Marketing Research Summit, Boston, MA
78. September 2011, Invited Session 'Economics and Marketing', EARIE, Stockholm, Sweden.
79. July 2011, NBER Economics of Digitization, Cambridge, MA
80. July 2011, SICS, Berkeley, CA
81. June 2011, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
82. June 2011, Workshop on the Economics on Information Security, Washington, DC
83. June 2011, Marketing Science (3 papers), Houston, TX
84. June 2011, Searle Center Conference on Internet Search and Innovation, Chicago, IL
85. May 2011, Boston College Social Media Workshop, Boston, MA
86. May 2011, Technology Pricing Forum, Boston, MA
87. April 2011, NBER Innovation Policy and the Economy, Washington, DC
88. April 2011, International Industrial Organization Conference (3 papers), Boston, MA
89. March 2011, Technology Policy Institute, Washington, DC
90. February 2011, NBER Economics of Digitization (co-author presented), Palo Alto, CA
91. January 2011, Sixth bi-annual Conference on The Economics of Intellectual Property, Software and the Internet (2 papers, plenary speaker), Toulouse, France
92. January 2011, MSI Young Scholars Conference, Park City, UT
93. December 2010, Workshop on Information Systems and Economics, Washington University of St. Louis (co-author presented), St. Louis, MO
94. December 2010, OECD Economics of Privacy Roundtable, Paris, France
95. November 2010, Net Institute Conference, New York, NY
96. October 2010, Workshop on Media Economics and Public Policy (co-author presented), New York, NY
97. October 2010, Workshop on Health IT and Economics, Washington, DC
98. September 2010, ITIF and CAGW Privacy Working Group Meetings, Washington, DC
99. September 2010, Medical Malpractice Conference, Mohegan, CT

100. September 2010, Search and Web Advertising Strategies and Their Impacts on Consumer Workshop, Paris, France
101. July 2010, NBER Meetings (IT), Cambridge, MA
102. July 2010, NBER Meetings (Healthcare and IT), Cambridge, MA
103. July 2010, SICS, Berkeley, CA
104. July 2010, Keynote Speaker, 8th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
105. June 2010, American Society of Health Economists Conference, Cornell, NY
106. June 2010, Marketing Science (2 papers), Koeln, Germany
107. June 2010, Workshop on the Economics of Information Security (2 papers), Harvard, MA
108. January 2010, AEA Meetings, Atlanta, GA
109. December 2009, Workshop on Information Systems and Economics, Scottsdale, AZ
110. November 2009, WPP/Google Marketing Awards, Cambridge, MA
111. July 2009, NBER meetings (IT), Cambridge, MA
112. June 2009, IHIF Debate on Privacy, Washington, DC
113. June 2009, Marketing Science, Ann Arbor, MI
114. April 2009, International Industrial Organization Conference, Boston, MA
115. January 2009, Information Security Best Practices Conference, Philadelphia, PA
116. January 2009, Modeling Social Network Data Conference, Philadelphia, PA
117. July 2008, NBER Meetings (Productivity), Cambridge, MA
118. July 2008, SICS, Berkeley, CA
119. July 2008, Fourth Workshop on Ad Auctions, Chicago, MA
120. June 2008, Marketing Science, Vancouver, BC
121. May 2008, International Industrial Organization Conference, Richmond, VA
122. April 2008, Net Institute Conference, New York, NY
123. November 2007, NBER Health Meetings (Co-author presented), Boston, MA
124. July 2007, SICS, Berkeley, CA
125. June 2007, Workshop on the Economics of Information Security, Pittsburgh
126. June 2007, Choice Symposium, Philadelphia, PA
127. May 2007, eCommerce Research Symposium, Stamford, CT
128. April 2007, Net Institute Conference, New York, NY
129. April 2007, International Industrial Organization Conference, Savannah, GA
130. March 2007, Health Economics Conference, Tucson, AZ
131. February 2007, NBER Winter Meetings, Palo Alto, CA
132. January 2007, Economics of the Software and Internet Industries (2 Papers), Toulouse, France
133. October 2006, QME Conference, Stanford University, CA
134. June 2006, Marketing Science, Pittsburgh, PA
135. April 2006, International Industrial Organization Conference, Boston, MA
136. October 2005, NEMC Conference, Boston, MA
137. October 2005, TPRC Conference, Washington, DC
138. June 2005, CRES Industrial Organization Conference, Washington University in St. Louis, MO
139. July 2002, Payment Systems Conference, IDEI, Toulouse, France

PROFESSIONAL SERVICE

- Director of the program on the Economics of Digitization at The National Bureau of Economic Research.
- Co-Director of the program on the Artificial Intelligence at The National Bureau of Economic Research.
- **Vice President (Education)**, ISMS 2019-2021
- **Associate Editor:** Management Science, Marketing Science, Journal of Marketing Research, International Journal of Research in Marketing
- **Associate Editor:** Information Systems Research, Special Issue on Social Media and Business Transformation
- **Departmental Editor:** Quantitative Marketing and Economics
- **Editor:** The Economics of the Internet, Palgrave Dictionary of Economics
- **Co-Editor:** NBER: The Economics of Digitization - An Agenda
- **Co-Editor:** Information Economics and Policy, Special Issue on Economics of Digital Media Markets
- **Editorial Review Board:** Journal of Marketing, ISR Special Issue on Managing Digital Vulnerabilities, Journal of Economic Literature

- **Conference Program Committees**
  - 2020 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2020 Organizer, ISMS Doctoral Consortium
  - 2019 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2019 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2019 Program Committee: Workshop on the Economics of Information Security
  - 2019 Scientific Committee: IP Statistics for Decision Makers
  - 2018 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2017 Scientific Committee: IP Statistics for Decision Makers
  - 2017 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2017 Program Committee: Workshop on the Economics of Information Security
  - 2016 Program Committee: Workshop on the Economics of Information Security
  - 2016 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2015 Scientific Committee: Competition, Standardization and Innovation
  - 2015 Scientific Committee: Intellectual Property Statistics for Decision Makers
  - 2015 Associate Editor: ICIS 2015, Healthcare track
  - 2015 Scientific Committee: European Association for Research in Industrial Economics
  - 2015 Program Committee: ACM Conference on Economics and Computation
  - 2015 Program Committee: Workshop on the Economics of Information Security
  - 2015 Chief-Organizer: Quantitative Marketing and Economics Conference
  - 2015 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2014 Scientific Committee: European Association for Research in Industrial Economics
  - 2014 Scientific Committee: Conference on the Economics of Information and

A-19

Communication Technologies
- 2014 Program Committee: International Conference on Big Data and Analytics in Healthcare
- 2013 Program Committee: Quantitative Marketing and Economics
- 2013 Scientific Committee: European Association for Research in Industrial Economics Conference
- 2013 Scientific Committee: Conference on the Economics of Information and Communication Technologies
- 2013 Program Committee: Workshop on the Economics of Information Security
- 2013 Associate Editor of Personal Data Markets Track: ECIS 2013
- 2012 Program Committee: European Association for Research in Industrial Economics Conference
- 2012 Program Committee (Conference Organizer) NBER: The Economics of Digitization Pre-Conference, June 2012
- 2012 Scientific Committee: Conference on the Economics of Information and Communication Technologies
- 2012 Senior Program Committee: 13th ACM Conference on Electronic Commerce
- 2012 Program Committee: Workshop on the Economics of Information Security
- 2011 Scientific Committee: European Association for Research in Industrial Economics Conference
- 2011 Scientific Committee: Conference on the Economics of Information and Communication Technologies
- 2011 Program Committee: Ad Auctions Workshop
- 2011 Program Committee: Workshop on the Economics of Information Security
- 2010 Program Committee: Workshop on IT and Economic Growth
- 2010 Program Committee: Conference on Health IT and Economics
- 2010 Program Committee: Workshop on the Economics of Information Security
- 2009 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Ad Auctions Workshop

**External Affiliations**
- **Affiliate:** CESifo Research Network
- **Advisory Board:** Future of Privacy Forum

---

MIT SERVICE

- 2015- Faculty Chair, PhD program
- 2015- EMBA Committee
- 2015- ASB Committee
- 2014- MIT Sloan Gender Equity Committee
- 2013-2014 Group Head, Marketing Group
- 2013-2014 Chair, Marketing Faculty Search Committee
- 2013-2014 MIT Committee on Undergraduate Admissions and Financial Aid

- 2011 North East Marketing Conference Coordinator
- 2011 MIT Sloan Marketing Conference, Panel Moderator
- 2011 Sloan Women in Management Conference, Panel Moderator
- 2005, 2008, 2012 Marketing Faculty Search Committee

---

## ADVISING

- 2019: Shuyi Yu, PhD Thesis supervisor
- 2016: Abhishek Nagaraj, PhD Thesis advisor
- 2012: Cristina Nistor, PhD Thesis advisor
- 2010: Katherine Molina, Masters Thesis
- 2008: Dinesh Shenoy, Masters Thesis
- 2007: James Kelm, Masters Thesis

---

## GRANTS AND SUPPORT

*Academic Grants*

| | | |
|---|---|---|
| 2018 | Sloan Foundation Grant (2018-2021), 'NBER Project on the Economics of Artificial Intelligence' - Grant supporting series of NBER Economics of AI Conferences. (Joint with Ajay Agrawal, Joshua Gans and Avi Goldfarb) | $914,250 |
| 2017 | Net Institute Grant (Joint with Anuj Kapoor) | $3,000 |
| 2016 | Net Institute Grant (Joint with Christian Catalini) | $6,000 |
| 2013 | MSI research Grant 4-1840 (Joint with Anja Lambrecht) | $10,200 |
| 2011 | Tilburg Law and Economics Center (TILEC) IIPC grant | $21,000 |
| 2011 | Google Grant | $50,000 |
| 2011 | Junior Faculty Research Assistance Program | $30,000 |
| 2011 | Net Institute Grant | $6,000 |
| 2011 | NBER Digitization Grant | $20,000 |
| 2011 | NSF CAREER Award | $502,000 |
| 2010 | Time-Warner Research Program on Digital Communications | $20,000 |
| 2010 | Net Institute Grant | $6,000 |
| 2009 | Net Institute Grant | $6,000 |
| 2009 | The James H. Ferry, Jr. Fund for Innovation in Research Education | $50,000 |
| 2009 | Google/WPP Grant (Joint with Avi Goldfarb) | $55,000 |
| 2008 | Net Institute Grant | $15,000 |
| 2007 | Net Institute Grant | $8,000 |
| 2006 | Net Institute Grant (Joint with Stephen Ryan) | $8,000 |

*Industry Research Grants*

| 2015 | CCIA Research: Research into Sustainable Competitive Advantage and Big Data (Joint with Anja Lambrecht) | $60,000 |
| 2015 | E-Logic: Research into Vertical Mergers and Patent Litigation | $60,000 |
| 2014 | CCIA Research: Research into Patent Litigation and Entrepreneurship | $100,000 |
| 2012 | Google Australia: Research into Measurement and Attribution | $50,000 |

## Expert Testimony

- I have provided expert testimony for ADT, Bausch Health, Context Logic, Facebook, Lyft, Microsoft, Plaintiffs in Blue Cross Blue Shield Antitrust Litigation , Revizer, RDIC, Samsung, Sound Exchange, Verizon (Yahoo and AOL), US Debtors (Nortel Bankrupcy Proceedings) and Walworth Investments.

## Teaching

- 15.818, Pricing (MBA Elective) 2006-
- 15.732, Marketing Management for Senior Executives 2012-
- 15.726, Pricing (EMBA Elective) 2012-
- 15.838, Doctoral Seminar, Spring 2006, Fall 2007, Fall 2013
- Marketing Management, Asian School of Business, 2016
- Guest Lecturer: HST.936: Health information systems to improve quality of care in resource-poor settings, 2014
- Executive Education: Blockchain Technologies: Business Innovation and Application, 2018-
- Executive Education: Marketing Innovation, 2016-
- Executive Education: Pricing 4dX, 2016-
- Executive Education: Strategic Marketing for the Technical Executive, 2012-2015
- Executive Education: Systematic Innovation of Products, Processes, and Services, 2013-
- Executive Education: Platform Strategy: Building and Thriving in a Vibrant Ecosystem, 2014-
- Executive Education: Global Executive Academy (multi-language), 2013, 2014
- Executive Education: Entrepreneurship Development Program, 2012-
- Faculty Coach, Takeda Leadership Academy, 2016-18

**Catherine Tucker Expert Testimony and Reports**

1. Broadcast Music, Inc. v. North American Concert Promoters Association., 18 Civ. 8749, Related to United States v. Broadcast Music, Inc., 64 Civ. 3787, United States District Court Southern District of New York
   - Expert Report (2021)

2. dotStrategy, Co., Individually and On Behalf of All Other Similarly Situated, v. Facebook, Inc., Case No. 20-cv-00170-WHA, United States District Court for the Northern District of California
   - Expert Report and Deposition (2021)

3. Deborah Louise Douez, v. Facebook, Inc., Case No. VLC-S-S-122316, Supreme Court of British Columbia, Vancouver Registry
   - Expert Report and Cross-Examination (2021)

4. SEAN RAD, Plaintiff/Counterclaim-Defendant, PAUL CAFARDO, GARETH JOHNSON, ALEXA MATEEN, JUSTIN MATEEN, and RYAN OGLE, Plaintiffs, v. IAC/INTERACTIVECORP, MATCH GROUP, INC., and MATCH GROUP, LLC, Defendants/Counterclaim-Plaintiffs. Index No. 654038/2018, Supreme Court of the State of New York, County of New York
   - Expert Report and Deposition (2021)

5. TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC, v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotel Group, LLC., Case No. 5:18-cv-152-RWS-CMC, United States District Court, Eastern District of Texas, Texarkana Division
   - Expert Report and Deposition (2021)

6. DZ Reserve, and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc., Case No. 3:18-cv-04978, United States District Court, Northern District of California
   - Expert Report and Deposition (2021)

7. Integritymessageboard.com. LLC, v. Facebook, Inc., Case No. 4:18-cv-05286-PJH, United States District Court, Northern District of California
   - Expert Report and Deposition (2021)

8. In re: Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406), Master File No. 2:13-CV-20000-RDP, United States District Court, Northern District of Alabama, Southern Division
   - Expert Report and Deposition (2021)

9. In Re: Glumetza Antitrust Litigation, Case No. 3:19-cv-05822-WHA, United States District Court for the Northern District of California
   - Expert Report and Deposition (2020)

10. In re Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V), CaseNo. 19-CRB-0005-WR (2021-2025), United States Copyright Royalty Judges, Washington, D.C.
    - Expert Reports and Deposition Testimony (2018, 2020), Expert Reports (2019, 2020), Deposition testimony (2020) and Hearing testimony (2020)

11. Stephen Adkins, et al., v. Facebook, Inc., Case No. 18-CV-05982-WHA, United States District Court, Northern District of California
    - Expert Report and Deposition (2019)

12. Walworth Investments - LG, LLC vs Mu Sigma, Inc. and Dhiraj C. Rajaram, Defendant, Case No. 2016-L-002470, Circuit Court of Cook County, Illinois County Department - Law Division
    - Expert Report (2019)

13. DealDash OYJ and DealDash Inc, Plaintiffs vs, Contextlogic Inc. d/b/a Wish, Defendant, Case No. 18-cv-02353-MMC, District Court of Northern California
    - Expert Report and Deposition (2019)

14. Tri-City, LLC; and Endor Car and Driver, LLC, Petitioners v. New York City Taxi and Limousine Commission, Supreme Court of the State of New York and County of New York
    - Expert Report (2019)

15. In Re: Yahoo! Inc. Customer Data Security Breach Litigation, Case No. 16-md-02752-LHK United States District Court, Northern District of California, San Jose Division
    - Expert Report (2018)

16. In Re Disposable Contact Lens Antitrust Litigation. No. 3:15-md-2626-J-20JRK United States District Court, Middle District of Florida, Jacksonville Division
    - Expert Report and Deposition Testimony (2018)

17. In Re Appraisal of AOL Inc: Consolidated C.A. No. 11204-VCG. Chancery Court of Delaware
    - Expert Report, Deposition and Trial Testimony (2017)

18. Michael Edenborough v. ADT, LLC, d/b/a ADT Security Services, Inc. Case No: 3:16-cv-02233-JST United States District Court, Northern District of California, San Francisco Division
    - Declaration (2017)

19. YETI Coolers, LLC, v. RTIC Coolers, LLC, et al. Civil Action No. 1:15-cv-00597-RP United States District Court Western District of Texas Austin Division
    - Expert Report and Deposition Testimony (2016)

20. Red Online Marketing Group LP, d/b/a 50onRED v. Revizer Ltd., d/b/a Ad Force Technologies, Ltd., and Revizer Technologies, Ltd. United States District Court, Eastern District of Pennsylvania Civil Action No. 14-1353
    - Expert Report and Deposition Testimony (2016)

21. Matthew Campbell and Michael Hurley et al. v. Facebook, Inc. Case No. C 13-05996 PJH. United States District Court Northern District of California
    - Expert Report and Deposition Testimony (2016)

22. GO Computer, Inc. et al. v. Microsoft Corporation Case No. CGC-05-442684 Superior Court of the State Of California for the City and County of San Francisco
    - Expert Report and Deposition Testimony (2015)

23. Queen's University at Kingston and PARTEQ Research and Development Innovations, v. Samsung Electronics Co., Ltd., et al. Civil Action No. 2:14-cv-53-JRG-RSP
    - Expert Report and Deposition Testimony (2015)

24. Yahchaaroah Lightbourne, on behalf of himself and all other similarly situated, Plaintiff, v.

Printroom.com, Inc., Professional Photo Storefronts, Inc., Brand Affinity Technologies, Inc. and CBS Interactive Inc. E-2 Case No. SACV13-00876 JLS (RNBx) United States District Court, Central District of California
   - Expert Report (2015)

25. In re: Chapter 11, Nortel Networks, Inc., et al., Debtors, U.S. Bankruptcy Court, District of Delaware, Case No. 09-10138(KG) (Jointly Administered), Re Dkt No. 13208
   - Expert Report, Deposition and Trial Testimony (2014)

26. Angel Fraley, et al., Plaintiffs, v. Facebook, Inc., a corporation; and DOES 1-100, Defendants, U.S. District Court, Northern District of California, Case No. 5:11-cv- 01726-LHK
   - Expert Report and Deposition Testimony (2012)

HIGHLY CONFIDENTIAL

## Appendix B
## Materials Considered

**Court Documents**

Second Amended Consolidated Consumer Class Action Complaint, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, February 13, 2020.

Stipulations Regarding Marriott's Searching for Information in NDS Database & Consumer Plaintiffs' Responses to Discovery Questions, ECF No. 729, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, January 28, 2021.

Consumer Plaintiff Laura Gononian's Third Supplemental Responses to Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, March 22, 2021.

Video recording of a meeting between Parties, members of their clients' staffs, and potential witnesses, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 20, 2021.

Marriott Defendants' Amended Response to Consumer Plaintiffs' First Set of Interrogatories, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 19, 2021.

Consumer Plaintiff Roger Cullen's Fourth Supplemental Responses to Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 20, 2021.

Marriott Defendants' Supplemental Responses to Consumer, Financial Institution, and Government Track's Omnibus Interrogatories, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 25, 2021.

Consumer Plaintiff Brent Long's Seventh Supplemental Responses to Marriott Defendants' First Set of Interrogatories to Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 4, 2021.

Consumer Plaintiff Michaela Bittner's Fourth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 14, 2021

Consumer Plaintiff Bryan Wallace's Sixth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 21, 2021

Consumer Plaintiff Robert Guzikowski's Fifth Supplemental Responses To Marriott Defendants' First Set Of Interrogatories To Consumer Plaintiffs, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 22, 2021

Plaintiff and Defendant Interrogatories, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879.

Plaintiff and Defendant Requests for Production, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879.

Corrected Memorandum in Support of Bellwether Plaintiffs' Motion for Class Certification, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 19, 2021.


## Expert Reports

Expert Class Certification Report and Supporting Materials of Jeffrey T. Prince, Ph.D., *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 12, 2021.

Expert Report and Supporting Materials of Sarah Butler, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 12, 2021.


## Depositions

Deposition and Exhibits of James Perry, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, March 31, 2021.

Deposition and Exhibits of Maria Maisto, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 2, 2021.

Deposition and Exhibits of Joshua M. Costa, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 8, 2021.

Deposition and Exhibits of Laura Gononian, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, April 8, 2021.

Deposition and Exhibits of Peter Maldini, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 20, 2021.

Deposition and Exhibits of Roger Cullen, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 24, 2021.

Deposition and Exhibits of Erick C. Lawing, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 26, 2021.

Deposition and Exhibits of Russell S. Vereb, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 26, 2021.

Deposition and Exhibits of Irma Lawrence, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, May 28, 2021.

Deposition and Exhibits of Eric Fishon, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 1, 2021.

Deposition and Exhibits of Brent Long, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 8, 2021.

Deposition and Exhibits of Anne Marie Amarena, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 9, 2021.

Deposition and Exhibits of Paula O'Brien, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 11, 2021.

Deposition and Exhibits of Kathleen Hevener, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 15, 2021.

HIGHLY CONFIDENTIAL

Deposition and Exhibits of Denitrice Marks, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 17, 2021.

Deposition and Exhibits of Michaela Bittner, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 17, 2021.

Deposition and Exhibits of Bryan Wallace, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, MDL No. 19-md-2879, June 22, 2021.

Deposition and Exhibits of Robert Guzikowski, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, June 24, 2021.

Deposition and Exhibits of David Viggiano, *In Re: Marriott International Inc., Customer Data Security Breach Litigation*, June 30, 2021.

Deposition and Exhibits of Maria Maisto, Volume 2, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, July 7, 2021.

Deposition and Exhibits of Jeffrey T. Prince, Ph.D., *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, August 13, 2021.

Deposition and Exhibits of Sarah Butler, *In Re: Marriott International Inc., Customer Data Security Breach Litigation,* MDL No. 19-md-2879, August 19, 2021.

**Bates-Stamped Documents**

MI_MDL_00000001 – MI_MDL_00000205
MI_MDL_02482952
MI_MDL_02490157 – MI_MDL_02490160
MI_MDL_02490165 – MI_MDL_02490167
MI_MDL_02490177 – MI_MDL_02490182
MI_MDL_02490381 – MI_MDL_02490382
MI_MDL_02490397 – MI_MDL_02490408
MI_MDL_02490480 – MI_MDL_02490484
MI_MDL_02490509 – MI_MDL_02490511
MI_MDL_02490539 – MI_MDL_02490540
MI_MDL_02490565 – MI_MDL_02490566
MI_MDL_02490589 – MI_MDL_02490598
MI_MDL_02490619 – MI_MDL_02490624
MI_MDL_02490661 – MI_MDL_02490667
MI_MDL_02490675 – MI_MDL_02490677
MI_MDL_02490689 – MI_MDL_02490691
MI_MDL_02490703
MI_MDL_02490711 – MI_MDL_02490712
MI_MDL_02490721 – MI_MDL_02490723
MI_MDL_02490744 – MI_MDL_02490745
MI_MDL_02490764 – MI_MDL_02490766
MI_MDL_02490792 – MI_MDL_02490794
MI_MDL_02490815 – MI_MDL_02490816

MI_MDL_02490828
MI_MDL_02490836 – MI_MDL_02490837
MI_MDL_02490854 – MI_MDL_02490856
MI_MDL_02490866 – MI_MDL_02490868
MI_MDL_02490876 – MI_MDL_02490878
MI_MDL_02496938
MI_MDL_02497119 – MI_MDL_02497136
MI_MDL_02497343 – MI_MDL_02497538
MI_MDL_02497788 – MI_MDL_02497860
MI_MDL_02524706 – MI_MDL_02524707
MI_MDL_02536999 – MI_MDL_02537421
MI_MDL_02568692 – MI_MDL_02568703
MI_MDL_02568742 – MI_MDL_02568752
MI_MDL_038 (MI_MDL_02497119 – MI_MDL_02497136)
MI_MDL_040 (MI_MDL_02497343 – MI_MDL_02497538)
MI_MDL_042 (MI_MDL_02497788 – MI_MDL_02497857)
MI_MDL_043 (MI_MDL_02497858 – MI_MDL_02497860)
MI_MDL_061 (MI_MDL_02552985 – MI_MDL_02552991)


**Other Documents**

2.5.21 Marriott BW Pls Exhibit A.xlsx


**Academic Articles**

Ablon, Lillian, Martin C. Libicki, and Andrea A. Golay, "Markets for Cybercrime Tools and Stolen Data: Hackers' Bazaar," *RAND National Security Research Division Report*, 2014.

Acs, Zoltan, J., Abraham Song, Laszlo Szerb, David B. Audretsch, and Eva Komlosi, "The Evolution of the Global Digital Platform Economy: 1971-2021," *SSRN*, February 2021.

Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper*, No. 23488, June 2017.

Barnes, Susan B., "A Privacy Paradox: Social Networking in the United States," *First Monday*, Vol. 11, No. 9, September 4, 2006.

Copes, Heith, and Lynne Vieraitis, "Identity Theft: Assessing Offenders' Strategies and Perceptions of Risk," *National Institute of Justice,* No. 219122, June 30, 2007.

Cui, Tony H., et al, "Informational Challenges in Omnichannel Marketing: Remedies and Future Research," *Journal of Marketing,* Vol. 85, No. 1, November 2020, pp. 103-120.

Dhamija, Rachna, J. D. Tygar, and Marti Hearst, "Why Phishing Works," *Proceedings of the CHI-2006 Conference on Human Factors in Computing Systems* (Montreal, 2006).

HIGHLY CONFIDENTIAL

Florencio, Dinei, and Cormac Herley, "A Large-Scale Study of Web Password Habits," *Proceedings of the 16th International Conference on World Wide Web* (Banff, Alberta, Canada, 2007).

Glasgow, Garrett, and Chris Stomberg, "Consumer Welfare and Privacy in Antitrust Cases–An Economic Perspective," *Antitrust*, Volume 35, No. 1, Fall 2020.

Goldfarb, Avi, and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No. 1, 2019, pp. 3–43.

Herley, Cormac, "The Plight of the Targeted Attacker in a World of Scale" in 9th Annual Workshop on the Economics of Information Security, (Cambridge, MA, 2010).

Herley, Cormac, "Why Do Nigerian Scammers Say They Are from Nigeria?" *WEIS 2012: 11th Annual Workshop on the Economics of Information Security* (Berlin, June 25-26, 2012).

Humphreys, Lee, Phillipa Gill, and Balachander Krishnamurthy, "How Much Is Too Much? Privacy Issues on Twitter," *ResearchGate,* March 2012.

Holt, Thomas J., Olga Smirnova, and Yi Ting Chua, "Exploring and Estimating the Revenues and Profits of Participants in Stolen Data Markets," *Deviant Behavior,* Vol. 37, No. 4, 2016, pp. 353–367.

Jones, Peter and Meng-Mei Chen, "Factors Determining Hotel Selection: Online Behaviour by Leisure Travellers," *Tourism and Hospitality Research*, Vol. 11, No. 1, January 1, 2011, pp. 83–95.

Lambrecht, Anja, and Catherine E. Tucker, "Can Big Data Protect a Firm From Competition?" *Competition Policy International Antitrust Chronicle,* January 2017.

Mankiw, N. Gregory, *Principles of Economics: Sixth Edition*, South-Western Cengage Learning, 2012.

OECD, "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value," *OECD Digital Economy Papers*, No. 220, April 2, 2013.

Olmstead, Kenneth, and Aaron Smith, "Americans and Cybersecurity," *Pew Research Center,* January 26, 2017.

Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Research Publishers, 2006.

Reynolds, Bernardo, et al., "Sharing Ephemeral Information in Online Social Networks: Privacy Perceptions and Behaviours," *Proceedings of the 13th IFIP TC13 Conference on Human-Computer Interaction* (Lisbon, Portugal, September 5–9, 2011).

Schechter, Stuart, A. J. Bernheim Brush, and Serge Egelman, "It's No Secret: Measuring the Security and Reliability of Authentication via 'Secret' Questions," *2009 30th IEEE Symposium on Security and Privacy* (Berkeley, CA, 2009).

Schechter, Stuart E., et al., "The Emperor's New Security Indicators," *Proceedings of the 2007 IEEE Symposium on Security and Privacy* (Oakland, CA, 2007).

Steel, Chad M.S., "Stolen Identity Valuation and Market Evolution on the Dark Web," *International Journal of Cyber Criminology,* Vol. 13, No. 1, January – June 2019, pp.70–83.

Sunshine, Joshua, et al., "Crying Wolf: An Empirical Study of SSL Warning Effectiveness," *Proceedings of the 18th Conference on USENIX Security Symposium* (Montreal, 2009).

HIGHLY CONFIDENTIAL

Tucker, Catherine E., "Competition in the Digital Advertising Market," *The Global Antitrust Institute Report on the Digital Economy,* No. 19, November 11, 2020, pp. 679–706.

Tufekci, Zeynep, "Can You See Me Now? Audience and Disclosure Regulation in Online Social Network Sites," *Bulletin of Science, Technology & Society*, Vol. 28, No. 1, February 2008, pp. 20–36.


**Public Documents**

Ablon, Lillian, "Data Thieves: The Motivations of Cyber Threat Actors and Their Use and Monetization of Stolen Data," Testimony of Lillian Ablon before the Committee on Financial Services, Subcommittee on Terrorism and Illicit Finance, United States House of Representatives, March 15, 2018.

Acxiom, "Acxiom Audience Data and Distribution," available at https://www.acxiom.com/customer-data/audience-data-distribution/, accessed August 30, 2021.

Acxiom, "Acxiom Data: Understand and Engage Consumers Everywhere by Leveraging the World's Best Data," 2018, available at https://www.acxiom.com/wp-content/uploads/2019/02/Acxiom_Data_Overview_2019_02.pdf, accessed May 25, 2018.

Arns, Christopher, "This Database Shows Salary for Every California Public Employee," *Sacramento Business Journal*, February 8, 2016, available at https://www.bizjournals.com/sacramento/datacenter/this-database-shows-salary-for-every-state-worker.html/, accessed August 10, 2021.

BeenVerified, "Final Step - It Only Takes 2 Minutes to Sign Up," available at https://www.beenverified.com/lp/98101d/4/subscribe?hide-fcra=true#/, accessed September 3, 2021.

BeenVerified, "Our Data", available at https://www.beenverified.com/about/our-data/, accessed September 4, 2021.

BeenVerified, "People Search," available at https://www.beenverified.com/people/, accessed August 10, 2021.

BeenVerified, "The Everyday Information Company," available at https://www.beenverified.com/, accessed September 3, 2021.

Bischoff, Paul, "How Much Are You Worth on the Dark Web? (Credit card, PayPal, SSN)," *Comparitech,* January 20, 2021, available at https://www.comparitech.com/blog/vpn-privacy/dark-web-prices/, accessed August 10, 2021.

BookYourData, "Build Targeted Email Lists in Seconds," available at https://www.bookyourdata.com/, accessed September 3, 2021.

BookYourData, "Business Contacts," available at https://www.bookyourdata.com/tool/main, accessed August 10, 2021.

BookYourData, "C-Level Email List," available at https://www.bookyourdata.com/email-list-database/c-level, accessed September 1, 2021.

BookYourData, "Our Guarantees," available at bookyourdata.com/our-guarantees, accessed August 10, 2021.

HIGHLY CONFIDENTIAL

BookYourData, "Ready-Made Lists," available at https://www.bookyourdata.com/ready-made-lists, accessed August 10, 2021.

Brookline Massachusetts, "Assessors FY 2020 Preliminary Property Database," available at http://apps.brooklinema.gov/assessors/propertylookup.asp, accessed August 4, 2021.

Burgess, Matt, and Victoria Woollaston-Webber, "DuckDuckGo: What Is It and How Does It Work?" *Wired UK*, February 1, 2017, available at https://www.wired.co.uk/article/duckduckgo-anonymous-privacy, accessed August 27, 2021.

Capital One Financial Corporation, "Press Release: Capital One Announces Data Security Incident," July 29, 2019, available at https://www.capitalone.com/about/newsroom/capital-one-announces-data-security-incident/, accessed August 5, 2021.

Comparitech, "About Our Company," available at https://www.comparitech.com/about-us/, accessed September 1, 2021.

Crail, Chauncey and Dia Adams, "Credit Card Expiration Dates: What You Need To Know," *Forbes*, April 5, 2021, available at https://www.forbes.com/advisor/credit-cards/credit-card-expiration-dates-what-you-need-to-know, accessed August 4, 2021.

Data from January 1, 2020 through December 31, 2020 on the advertised and consumed bandwidth of Tor in Gigabits per second, Tor Traffic - Bandwidth 2020-01-01 - 2020-12-31.csv, downloaded from Tor Project, "Metrics – Traffic – Total Relay Bandwidth, " available at https://metrics.torproject.org/bandwidth.html, accessed August 30, 2021.

Digi.me, "What Is Digi.me?" available at https://digi.me/what-is-digime/, accessed September 6, 2021.

DirectMail.com, "All Data Cards," available at https://www.directmail.com/mailinglists/datacards/getcategory.aspx?catid=7, accessed August 28, 2021.

DirectMail.com, "Consumer Mailing Lists," available at https://www.directmail.com/mailinglists/consumer-mailinglists/, accessed August 10, 2021.

DirectMail.com, "Data Cards," available at https://www.directmail.com/mailinglists/datacards/, accessed August 28, 2021.

DirectMail.com, "Direct Mail Marketing Solutions," available at https://www.directmail.com/, accessed September 3, 2021.

DirectMail.com, "GeoSelector™," available at https://www.directmail.com/geoinsight/, accessed August 10, 2021.

DirectMail.com, "GeoSelector™ FAQ," available at https://www.directmail.com/faq.aspx, accessed August 10, 2021.

DirectMail.com, "Terms," available at https://www.directmail.com/terms/, accessed September 1, 2021.

DirectMail.com, "The Perfect Mailing and Email List Solution from DirectMail.com," available at https://www.directmail.com/mailinglists, accessed August 10, 2021.

HIGHLY CONFIDENTIAL

Dummy sample Data, BYD_Dummy_Sampledata_2021.09.02.xls, downloaded from
BookYourData, "C-Level Email List," available at
https://www.bookyourdata.com/email-list-database/c-level, accessed September 2, 2021.

Equifax Consumer Notice, "2017 Cybersecurity Incident & Important Consumer Information,"
available at https://www.equifaxsecurity2017.com/consumer-notice/, accessed August
26, 2021.

Exact Data, "About Exact Data," available at https://www.exactdata.com/corporate/about-
us.html#, accessed September 3, 2021.

Exact Data, "Build Your Leads List," available at https://www.exactdata.com, accessed
September 3, 2021.

Exact Data, "Ready-Made Lists," available at https://www.exactdata.com/ready-made-lists.html,
accessed August 10, 2021.

Exact Data, "The Exact Data Difference," available at
https://www.exactdata.com/objects/content/files/The_Exact_Data_Difference_Overview.
pdf, accessed August 31, 2021.

Florida Department of State, "Voter Information as a Public Record," *Division of Elections*,
available at https://dos.myflorida.com/elections/for-voters/voter-registration/voter-
information-as-a-public-record, accessed August 27, 2021.

Hyatt, "Hyatt Place Iowa City Downtown," available https://www.hyatt.com/en-
US/hotel/iowa/hyatt-place-iowa-city-downtown/iowzi, accessed September 1, 2021.

LeadsPlease, "About LeadsPlease.com," available at https://www.leadsplease.com/about_us,
accessed September 3, 2021.

LeadsPlease, "Buy Mailing Lists," available at https://www.leadsplease.com/buy-mailing-lists,
accessed August 10, 2021.

LeadsPlease, "Consumer Mailing Lists [2021]," available at
https://www.leadsplease.com/mailing-lists/consumer, accessed September 2, 2021.

LeadsPlease, "Data Quality," available at https://www.leadsplease.com/data_quality/, accessed
September 4, 2021.

LeadsPlease, "Demography Selection," available at
https://www.leadsplease.com/dm_proc_demography#toggle, accessed September 2,
2021.

LeadsPlease, "Geography Selection," available at
https://www.leadsplease.com/dm_proc_geography?listtype=consumer, accessed August
10, 2021.

LeadsPlease, "Grow Your Business with a Targeted Direct Mailing List," available at
https://www.leadsplease.com/, accessed September 2, 2021.

LeadsPlease, "In Escrow Mailing Lists [2021]," available at
https://www.leadsplease.com/mailing-lists/in-escrow, accessed September 2, 2021.

LeadsPlease, "Just Listed Mailing Lists [2021]," available at
https://www.leadsplease.com/mailing-lists/just-listed, accessed September 2, 2021.

HIGHLY CONFIDENTIAL

LexisNexis Risk Solutions, "2018 True Cost of Fraud Study," August 2018, available at
https://risk.lexisnexis.com/-/media/files/financial%20services/research/2018-true-cost-of-fraud-overall-rep%20pdf.pdf, accessed September 6, 2021.

LinkedIn, "Eric Fishon," available at https://www.linkedin.com/in/eric-fishon-424b515/, accessed August 6, 2021.

Marriott International, Inc., "Form 10-K," December 31, 2016, available at https://marriott.gcs-web.com/static-files/eb3efa90-4311-454f-a430-0e03f2344ee0/, accessed September 5, 2021.

Marriott International, Inc., "Form 10-K," December 31, 2017, available at https://marriott.gcs-web.com/static-files/ea577917-fe7f-4696-9eb7-dcf0fd356737/, accessed September 5, 2021.

Marriott International, Inc., "Form 10-K," December 31, 2018, available at https://marriott.gcs-web.com/static-files/a9e39469-3202-4593-bbaa-cc3b71a67a9d/, accessed September 5, 2021.

Marriott News Center, "Marriott Announces Starwood Guest Reservation Database Security Incident," November 30, 2018, available at https://news.marriott.com/news/2018/11/30/marriott-announces-starwood-guest-reservation-database-security-incident, accessed August 30, 2021.

Marriott News Center, "Marriott Provides Update on Starwood Database Security Incident," January 4, 2019, available at https://news.marriott.com/news/2019/01/04/marriott-provides-update-on-starwood-database-security-incident/, accessed August 4, 2021.

Meeco, "The Infrastructure for Trusted Personal Data Ecosystems," available at https://www.meeco.me/, accessed September 6, 2021.

Mingas, Melanie, "Global Internet Capacity Up 35% in 2020," *Capacity Media*, February 17, 2021, available at https://www.capacitymedia.com/articles/3827731/global-internet-capacity-up-35-in-2020/, accessed September 6, 2021.

PeopleFinders, "Find Anyone. Anywhere," available at https://www.peoplefinders.com, accessed August 10, 2021.

PeopleFinders, "Get an Instant Report on Brent Randal Long in Newnan, GA," available at https://www.peoplefinders.com/products/name?firstName=brent&middleName=randal&lastName=long&ln=long&city=newnan&state=ga&id=G4142684304065417767, accessed August 30, 2021.

PeopleFinders, "Instant Access to Private & Background Information on Anyone," available at https://www.peoplefinders.com/join, accessed September 2, 2021.

PeopleFinders, "PeopleFinders Terms of Use," available at https://www.peoplefinders.com/about/terms, last updated April 20, 2021, accessed August 10, 2021.

RocketReach, "How Accurate Is RocketReach's Data?" available at https://knowledgebase.rocketreach.co/hc/en-us/articles/235187087-How-accurate-is-RocketReach-s-data-, accessed August 10, 2021.

HIGHLY CONFIDENTIAL

RocketReach, "How Did My Profile Get On RocketReach?" available at
    https://knowledgebase.rocketreach.co/hc/en-us/articles/234810007-How-did-my-profile-
    get-on-RocketReach, accessed September 4, 2021.

RocketReach, "I Only Want Personal Emails", available at
    https://knowledgebase.rocketreach.co/hc/en-us/articles/360045299133-I-Only-Want-
    Personal-Emails, accessed August 10, 2021.

RocketReach, "People," available at https://rocketreach.co/person, accessed September 2, 2021.

RocketReach, "Prospect Leads at the Speed of Light!", available at
    https://rocketreach.co/pricing, accessed August 10, 2021.

RocketReach, "Rocket Fuel for Your Growth," available at https://rocketreach.co, accessed
    August 10, 2021.

RocketReach, "RocketReach Search," available at
    https://rocketreach.co/person?start=1&pageSize=10&current_title%5B%5D=%22profess
    or%22&skills%5B%5D=%22economics%22&employer%5B%5D=%22MIT%20Sloan%
    20School%20of%20Management%22, accessed September 4, 2021.

Starwood Hotels & Resorts Worldwide, Inc., "Form 10-K," December 31, 2014, available at
    https://www.sec.gov/Archives/edgar/data/316206/000119312515062758/d838837d10k.ht
    m/, accessed September 5, 2021.

Starwood Hotels & Resorts Worldwide, Inc., "Form 10-K," December 31, 2015, available at
    https://www.sec.gov/Archives/edgar/data/316206/000156459016013371/hot-
    10k_20151231.htm/, accessed September 5, 2021.

Starwood Hotels & Resorts, "Join Starwood Preferred Guest," archived by Wayback Machine,
    March 28, 2016, available at
    https://web.archive.org/web/20160328215309/http://www.starwoodhotels.com/preferredg
    uest/account/enroll/index.html, accessed August 27, 2021.

Starwood Hotels & Resorts, "Join Starwood Preferred Guest," archived by Wayback Machine,
    June 6, 2017, available at
    https://web.archive.org/web/20170606045222/http://www.starwoodhotels.com/preferredg
    uest/account/enroll/index.html, accessed August 27, 2021.

Starwood Hotels & Resorts, "Join Starwood Preferred Guest," archived by Wayback Machine,
    May 31, 2018, available at
    https://web.archive.org/web/20180531012845/https://www.starwoodhotels.com/preferred
    guest/account/enroll/index.html, accessed August 27, 2021.

StatCounter Global Stats, "Search Engine Market Share Worldwide," August 2021, available at
    https://gs.statcounter.com/search-engine-market-share#monthly-201701-202108,
    accessed August 26, 2021.

StatCounter Global Stats, "Browser Market Share Worldwide," August 2021, available at
    https://gs.statcounter.com/browser-market-share, accessed September 6, 2021.

TARTLE, "Background packet 4," available at https://athena.tartle.co/buyers/packets/11,
    accessed September 2, 2021.

TARTLE, "Share Data. Earn Money. Change Your World." available at https://tartle.co/,
    accessed August 31, 2021.

HIGHLY CONFIDENTIAL

ThatsThem, "About Us" available at https://thatsthem.com/about, accessed August 30, 2021.

ThatsThem, "Pricing," available at https://thatsthem.com/pricing, accessed August 31, 2021.

ThatsThem, "Subscriptions," available at https://thatsthem.com/about/subscriptions, accessed August 30, 2021.

ThatsThem, "Terms of Service," April 18, 2021, available at https://thatsthem.com/terms-of-service, accessed August 27, 2021.

ThatsThem, "Free People Search Engine" available at https://thatsthem.com, accessed August 30, 2021.

Thomson Reuters, "PeopleMap Quick Reference Guide", available at https://legal.thomsonreuters.com/content/dam/ewp-m/documents/legal/en/pdf/quick-reference-guides/westlaw-peoplemap-quick-reference-guide-narrow-search.pdf, accessed August 10, 2021.

Thomson Reuters, "PeopleMap on Westlaw: Overview," available at https://legal.thomsonreuters.com/en/products/people-map#features, accessed August 10, 2021.

Thomson Reuters, "Westlaw plans and pricing," available at https://legal.thomsonreuters.com/en/products/westlaw/westlaw-plans-pricing#small, accessed August 10, 2021.

Tor Project, "Anonymity Online," available at https://www.torproject.org, accessed August 30, 2021.

Tor Project, "Metrics – Traffic – Total Relay Bandwidth, " available at https://metrics.torproject.org/bandwidth.html, accessed August 30, 2021.

TruePeopleSearch, "About Us," available at https://www.truepeoplesearch.com/about, accessed August 10, 2021.

TruePeopleSearch, "Paula Jean O'Brien," available at https://www.truepeoplesearch.com/details?name=Paula%20O%27Brien&citystatezip=New%20York&rid=0xl, accessed September 2, 2021.

TruePeopleSearch, "Removals," available at https://www.truepeoplesearch.com/removal, accessed August 10, 2021.

TruePeopleSearch, "Terms of Use," February 6, 2021, available at https://www.truepeoplesearch.com/terms, accessed August 10, 2021.

TruePeopleSearch, "TruePeopleSearch," available at https://www.truepeoplesearch.com/, accessed August 10, 2021.

US Business Data, "Frequently Asked Questions," available at https://usbizdata.com/faq.php, accessed September 2, 2021.

US Business Data, "International Business Databases," available at https://usbizdata.com/international-business-databases.php, accessed September 2, 2021.

US Business Data, "SIC Code Databases," available at https://usbizdata.com/sic-code-databases.php, accessed September 2, 2021.

US Business Data, "Specialty Databases," available at https://usbizdata.com/us-business-specialty-databases.php, accessed September 2, 2021

HIGHLY CONFIDENTIAL

US Business Data, "US Accountant Database," available at https://usbizdata.com/us-accountant-database.php, accessed September 2, 2021.

US Business Data, "US Business Database," available at https://usbizdata.com/us-business-database.php, accessed September 2, 2021.

US Business Data, "US Consumer Cell Phone Database," available at https://usbizdata.com/us-cell-phone-databases.php, accessed September 2, 2021.

US Business Data, "US Consumer Opt-In Email Database," available at https://usbizdata.com/us-optin-email-database.php, accessed September 2, 2021.

US Business Data, "US Residential Database," available at https://usbizdata.com/us-residential-database.php, accessed September 2, 2021.

US Business Data, "Welcome to US Business Data," available at https://usbizdata.com/, accessed August 31, 2021.

US Search, "Final Step: Activate Your Account and Unlock Your Report!" available at https://www.ussearch.com/register/?firstName=Brent&lastName=Long&city=Newnan&state=GA&pid=4%3AeJyKVnIqSs0rUdJRUtJR8snPS1fSgYgoQDl-qeV5iXlKOkrujhBFEOQcEOGka2JpbKyko1RSlJhXXJqXmQ9SZpCYaJGSlmyka2Jpaa JrYpaWpmuRamisa2xpnmSempZimmZopBQLCAAA__-WcCAn&transaction_id=8bd0ebe8-8b27-48e7-bddb-041e7b58533a, accessed August 10, 2021.

US Search, "Notice," available at https://www.ussearch.com, accessed September 6, 2021.

US Search, "US Search," available at https://www.ussearch.com, accessed August 10, 2021.

USA People Search, "Opt Out," available at https://www.usa-people-search.com/manage, accessed August 10, 2021.

USA People Search, "Terms of Use," February 8, 2021, available at https://www.usa-people-search.com/terms, accessed August 10, 2021.

USA People Search, "What Info Can You Find with a People Search?" available at usa-people-search.com, accessed August 10, 2021.

Whitepages, "Choose A Plan That's Right for You," available at https://www.whitepages.com/checkout/pricing/, accessed September 2, 2021.

Whitepages, "Find People & Contact Info with People Search," available at https://www.whitepages.com, accessed August 10, 2021.

Whitepages, "Get these details and more with Premium," available at https://www.whitepages.com/checkout/summary?wpId=Pj9QjmW47My&wp_medium=PersonContactInfoUpsell&wp_source=PersonResults&wp_term=serp_sb1&funnel_type=person_onepages_1&wp_content=cta, accessed August 10, 2021.

Whitepages, "Where Does Your Information Come From?" available at https://support.whitepages.com/hc/en-us/articles/115010106948-Where-does-your-information-come-from-, accessed September 4, 2021.

Whitepages, "Whitepages Terms of Service," February 1, 2021, available at https://www.whitepages.com/terms-of-service, accessed August 10, 2021.

Wikipedia, "Catherine Tucker," available at https://en.wikipedia.org/wiki/Catherine_Tucker, accessed August 4, 2021.